UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-80072-CR-MARRA/VITUNAC (s)(s)

UNITED STATES OF AMERICA

vs.

ROSE MARKS, et al.

           Defendants.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION FOR PRODUCTION OF GRAND JURY TESTIMONY

      The United States of America, by and through undersigned counsel, files this response to Defendant ROSE MARKS' Motion for Production of Transcript of Grand Jury Testimony and Proceedings, and Of Victim Witness Statements and Reports Referencing Such Statements. Defendant's motion is merely a discovery request seeking grand jury testimony, and investigative reports.

      Defendant seeks to review grand jury transcripts, investigative reports and wishes to be provided the names and contact information for witnesses so defense counsel can interview the victims. Defendant seeks theses remedies claiming that misconduct has occurred in the grand jury process. Defendant is not entitled to grand jury testimony, investigative reports, or names and contact information of the victims at this time.[1]

---

[1] If this Court deems it necessary, the United States will provide copies of grand jury transcripts and investigative reports to review *in camera*. However, trial judges are not required to personally examine government files. See United States vs. Valera, 845 F.2d 923, 927 (11th Cir. 1988).

A court should not inquire into the sufficiency of the evidence before the indicting grand jury because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protection will be afforded during trial. See United States vs. Maceo, 873 F.2d 1,3 (1st Cir. 1989).

> If indictments were held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. United States vs. Costello, 350 U.S. 359, 362-63 (1956).

The grand jury serves the "dual function of determining if there is probable cause to believe a crime has been committed and of protecting citizens against unfounded criminal prosecutions". See United States vs. Sells Engineering, 463 U.S.418, 103 S.Ct. 3133, 3137 (1983). The grand jury's role "has been to serve as a protective bulwark standing between the ordinary citizen and the overzealous prosecutor." United States vs. Pabian, 704 F.2d 1533, 1535 (11th Cir. 1983), quoting United States vs. Dionsio, 410 U.S. 1 (1973). "The grand jury's sources of information are widely drawn and the validity of an indictment is not affected by the character of evidence considered." United States vs. Calandra, 414 U.S. 338, 344 (1974).

An indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. Calandra, 414 U.S. at 344-45. In this particular case, Defendant seeks grand jury transcripts and/or investigative reports claiming that the agents' conduct has been improper. This claim is based on the fact that one of the alleged "victims" in this case (hereafter referred to as J.C.) never spoke to the agents before the superseding

2

indictment was returned.[2]  An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.  See Costello vs. United States, 350 U.S. at 363.  Defendant should not be permitted to inquire into the evidence that was presented to the grand jury, as it is merely a fishing expedition.

Agents did not speak to this particular witness (J.C.) before the Superseding Indictment was returned.  In retrospect, such rationale may have been ill-advised.  However, the reasoning for such a decision was the concern that J.C. would alert Victoria Eli, or one of her co-defendants, that an investigation was ongoing.  Instead, of meeting with J.C. and alerting him to the ongoing investigation, agents utilized circumstantial evidence, analyzing reports, complaints and records, to determine that J.C. was a victim of fraud.  Agents were aware of various complaints against Victoria Eli and her family members relating to their psychic business.  Agents also were aware of significant amounts of money moving in and out of Victoria Eli's bank accounts. Agents were able to trace significant amounts of money from J.C. to Victoria Eli and her bank accounts.

The concerns about alerting J.C. proved to be warranted. Victoria Eli was not arrested on August 16, 2011, with her co-defendants.  Instead, she turned herself in to U.S. Marshals on October 7, 2011.  For almost two months (from August 16, 2011 until October 7, 2011),  VICTORIA ELI was aware that there were pending charges against her, and never turned herself in. During the time she was out, Victoria Eli was in contact with J.C.

On September 13, 2011, J.C. was interviewed by law enforcement officials.  Various facts

---

[2] A second superseding indictment was returned on January 12, 2012.  There are no allegations pertaining to J.C. in the Second Superseding Indictment.

3

came out during the interview with J.C., who was interviewed in the presence of his attorney. J.C. stated that he met Victoria Eli approximately 13 years ago. J.C. stated he had health issues and sought advice at her astrology business. J.C. further indicated that he currently was in contact with Victoria Eli and spoke with her approximately twice a day. In fact, J.C. indicated that Victoria Eli called him the morning of the telephone interview with agents and told him that he was being contacted by the government due to some tax issues Eli had. Further, J.C. indicated that the attorney who was representing him at that interview was recommended by Victoria Eli.

J.C. further indicated in that interview that he believed that Eli had a gift or psychic ability to communicate with God. During the interview, J.C. indicated that Victoria Eli told him that she could resolve his problems as long as he followed her instructions and guidance. Eli further told J.C. that in order to do the work for J.C., he would have to make sacrifices which involved money, but the money could not be personally used by Eli. Eli would cleanse the money and the money would eventually be donated. Although J.C. was unsure where the donation would be made, he assumed it would go to a church. Eli told J.C. that if he did not make sacrifices then something bad could happen to his family. Eli further told J.C. that it was not necessary to discuss the work with others. J.C. indicated that he never discussed the work with his wife or anyone else.

In an affidavit signed on September 27, 2011, J.C. indicated that he was satisfied with the services that he received from Victoria Eli and looked forward to working with her again in the future.[3] Although he stated he was not a victim, the facts he provided in the interview were very

---

[3] In the affidavit, J.C. indicated that he considered Victoria Eli his psychic life coach, and that he found her services to be helpful. He did not indicate that he felt threatened by the agents. He did not state that he thought he was going to be subject to an IRS audit. He did not state that he was concerned that agents were going to talk to his wife about Victoria Eli's work with him. Those are only conclusions suggested by Defense counsel.

similar to statements made by numerous other witnesses/victims in this case.

The claim that J.C. was threatened by law enforcement is groundless. J.C. agreed to be interviewed. If he did not want to be interviewed, he could have informed the agents that he was not interested in providing a statement. His lawyer could have said J.C. did not wish to be interviewed. Agents did not ask J.C. if his wife knew about the money that he provided to Victoria Eli as a means of threatening him. Instead, agents wanted to know if J.C. was isolated from friends and family, as many of the other victims were. Therefore, agents were inquiring to determine if the person he was closest to, was aware of the financial commitment he made to Victoria Eli. Any alleged threat of an audit was in the imagination of counsel or J.C. At no time during the telephone interview did any of the agents, including the Special Agent from the Internal Revenue Service, suggest or imply that an audit would be forthcoming. The only comment made by the agent was that she worked for the Internal Revenue Service.

Similarly, Defendant's claim that threats were made to other witnesses is without merit. The Government was unaware of witnesses N.F and D.V.B. during the presentation of evidence to the grand jury. No mention of either of these witnesses was made to the grand jury. However, after defendants were arrested, agents located other potential witnesses in this case, including D.V.B. and N.F. Agents called D.V.B. on the telephone. D.V.B. told agents that she resided out of state, and that she knew Rose Marks and her former husband Nick Marks from church. She further stated that she had not given Rose Marks any money for Marks' fortune telling services. No threats were made.

As to witness N.F., agents inquired as to his relationship with Victoria Eli. During a telephone interview, N.F. stated that in 2003 or 2004, he went to Victoria Eli for her fortune telling services. He paid her approximately $2,000 to $4,000, and was satisfied with the money he paid for

those services.  He further stated that in 2005, he gave Victoria Eli approximately $155,000 to be donated to various charities as Eli told N.F. that she had a special way to donate money anonymously.  He said the money he gave to Eli to donate was a lot of money to him, and he would be very upset if the money he gave to Victoria Eli had not been given to charity.  To learn that N.F. was "so troubled by the conversation that he flew from Pennsylvania to Florida to discuss the conversation with an investigator and two of the defense counsel in this case", (Defense motion, page 7) is surprising, as he told the agents that he would be willing to meet with them to further discuss the investigation.  However, before that happened, he met with defense counsel and investigators.  No threats were made by law enforcement officials to any potential witnesses or victims in this case.

Any claim that there were *Brady* violations is without merit. The purpose of *Brady* is to assure that the accused will not be denied access to exculpatory evidence known to the government but unknown to him.   See United States vs. Valera, 845 F.2d 923, 927 (11th Cir. 1988). Numerous cases have ruled that the government is not obliged under *Brady* to furnish a defendant with information he already has or with any diligence, he can obtain himself.  Valera, 845 F.2d at 928; United States vs. Prior, 546 F.2d 406, 420 (5th Cir. 1976).  In this case, after speaking with witnesses N.F., D.V.B., and J.C. , the government and its agents were unaware that those witnesses may have possessed exculpatory evidence.  The statements they made to government agents were not exculpatory.  Defendants and their counsel have more information on these witnesses and their statements than the government.

Counsel contends that the term "gypsy" is an "ethnic slur, and since it conjures up negative stereotypes and generalizations that have no place in a court of law, including Grand Jury

6

proceedings" (Defense motion, page 3).  It is interesting to note that during the approximately five hour pretrial detention hearing that proceeded before Judge Hopkins, no attorneys for the defense ever objected to the use of the term "gypsy".  Obviously, it was not such a slur as to warrant an immediate objection to its use.  In fact, during that hearing, the first time the term "gypsy" was used was by one of the defense attorneys who stated,

> I have not consulted with Rose Marks about the contents or the indictment in this case. I was simply advising the Court that I was there as a family lawyer who's represented different members at different times on civil zoning matters to say that because the gypsy families have their own court systems, their own method of justice, if you will, they did not understand the judicial process of the United States of America. See pages 12-13 of pretrial detention hearing on August 19, 2011.

This is simply another way that defense counsel is trying to "muddy up the waters" in an attempt to discredit the government, and allege wrongdoing.  No objection was ever made by any of the defense attorneys at the hearing when the term "gypsy" was used.  The prosecutor, defense counsel and even the judge used the term "gypsy".

The Oxford English Dictionary defines "gypsy" as: "A member of a wandering race (by themselves called Romany), of Hindu origin, which first appeared in England beginning of the 16th c and was then believed to have come from Egypt."   The Merriam Webster Dictionary defines "gypsy" as:  "a member of a traditionally itinerant people who originated in Northern India and now live chiefly in south and southwest Asia, Europe, and North America".  No mention from either of these dictionaries refer to it as an ethnic slur.

Additionally, co-defendant Ricky Marks refers to himself as a "gypsy". Ricky Marks, who is the son of Defendant Rose Marks, has uploaded various video presentations onto You Tube:

7

"Gypsy Super Bowl Trip to Key Largo, FL (Some Pictures of My Toys)", "Gypsy New Year's Video of Karaoke in Back Yard", "Gypsy Christmas and New Year's Party in Florida", "Gypsy Road Trip". Obviously, Ricky Marks does not consider the term an ethnic slur as he uses it in titles on his You Tube videos.

Finally, defense alleges some type of inappropriate relationship between one of the victims in this case and the lead detective. Again these are simply spurious allegations in an attempt to discredit the agents and witnesses in this case. The detective did his job as an officer with the Fort Lauderdale Police Department. He learned that a crime had been committed. He contacted the victim and learned of the victim's long history with Defendant Rose Marks. After it was determined that Rose Marks had been defrauding this victim, Rose Marks continued to try to contact the victim. The detective simply did his job and protected the victim from the defendant. The fact that the victim appreciated his efforts to protect her should not be questioned.

Defendant's allegations are a means to try to obtain discovery. Defense counsel is accusing the government and its agents of misconduct. The allegations are meritless. Defense counsel should not be permitted to review the grand jury transcripts, the investigative reports or be provided with the name and contact information for the witnesses.[4] If this Court wishes to review the grand jury transcripts or investigative reports to determine if any misconduct occurred, the United States will produce those documents for *in camera* review. However, the United States does not believe that is necessary as no misconduct has occurred.

---

[4] Many of the victims in this case have already been contacted by defense counsel or defense investigators, so defense counsel know the identity of many of the government witnesses.

8

WHEREFORE the United States respectfully requests that this Court deny Defendant Rose Marks' Motion for Production of Grand Jury Transcripts and Proceedings, and Of Victim Witness Statements and Reports Referencing Such Statements.

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

By:  */s/ Laurence M. Bardfeld*
     Laurence M. Bardfeld
     Assistant United States Attorney
     Florida Bar No. 712450
     500 East Broward Boulevard, Suite 700
     Fort Lauderdale Florida 33394
     Tel: (954) 356-7255, ext 3611
     Fax: (954) 356-7336
     E-Mail: Laurence.Bardfeld@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed by electronic filing this 19th day of January, 2012 and sent to: Fred Schwartz, Esquire, Michael Gottlieb, Esquire, Richard Lubin, Esquire, George Yoss, Esquire, Ned Reagan, Esquire, Richard Della Ferra, Esquire, Ronald Chapman, Esquire, Alvin Entin, Esquire, Norman Kent, Esquire, and Sam Rabin, Esquire.

/s/ *Laurence M. Bardfeld*
Laurence M. Bardfeld
Assistant United States Attorney