**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  11-80072-CR-MARRA/VITUNAC**


UNITED STATES OF AMERICA,                West Palm Beach, Florida

        Plaintiff,                   February 16, 2012

v.

ROSE MARKS,
    a/k/a Joyce Michael
NANCY MARKS,
    a/k/a Nancy Michael,
    a/k/a Kate Michael,
    a/k/a Vivian,
CYNTHIA MILLER,
    a/k/a Cynthia Angel Marks,
ROSIE MARKS,
    a/k/a Rosie Eli,
VICTORIA ELI,
VIVIAN MARKS,
RICKY MARKS,
MICHAEL MARKS,
DONNIE ELI,
and PETER WOLOFSKY,

        Defendants.                   Pages 1 - 67
-------------------------------------------------------------

HEARING ON DEFENDANT'S MOTION FOR PRODUCTION OF TRANSCRIPT OF
GRAND JURY TESTIMONY AND PROCEEDINGS,
AND VICTIM STATEMENTS AND REPORTS REFERENCING SUCH STATEMENTS
AND DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH STANDING
DISCOVERY ORDER
BEFORE THE HONORABLE ANN E. VITUNAC
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE GOVERNMENT:          LAURENCE BARDFELD, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEY
                             and MARK DISPOTO, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEY
                             99 Northeast 4th Street,
                             West Palm Beach, Florida 33132

```
FOR THE DEFENDANTS            FRED A. SCHWARTZ, ESQUIRE
ROSE MARKS and NANCY MARKS:   700 South Federal Highway
                              Suite 200,
                              Boca Raton, Florida 33432

FOR THE DEFENDANT             RICHARD G. LUBIN, ESQUIRE
CYNTHIA MILLER                Second Floor, Flagler Plaza
                              1217 South Flagler Drive
                              West Palm Beach, Florida 33401

FOR THE DEFENDANT             RICHARD F. DELLA FERA, ESQUIRE
ROSIE MARKS                   110 Southeast 6th Street, #1970,
                              Fort Lauderdale, Florida 33301

FOR THE DEFENDANT             GEORGE T. YOSS, ESQUIRE
VICTORIA ELI                  800 S. Douglas Road, Suite 530,
                              Coral Gables, Florida 33134

FOR THE DEFENDANT             EDWARD D. REAGAN, ESQUIRE
VIVIAN MARKS                  2161 Palm Beach Lakes Blvd.,
                              Suite 401,
                              West Palm Beach, Florida 33409

FOR THE DEFENDANT             RONALD S. CHAPMAN, ESQUIRE
RICKY MARKS                   400 Clematis Street
                              West Palm Beach, Florida 33401

REPORTED BY:                  BONNIE JOY LEWIS, R.P.R.
                              7001 Southwest 13 Street
                              Pembroke Pines, Florida 33023
                              (954) 985-8875
                              caselawrptg@gmail.com
```

```
 1              (Thereupon, the following proceedings were held:)
 2                    THE COURT:  Be seated, please.  Good morning.
 3                    In the case of United States of America versus
 4    Rose Marks, et al., Case 11-Cr-Marra, second superseding,
 5    correct?
 6                    MR. BARDFELD:  That is correct, Your Honor.
 7                    THE COURT:  May I have counsels' representation.
 8                    MR. BARDFELD:  Good morning, Your Honor.
 9                    Larry Bardfeld on behalf of the United States.
10    With me at counsel table is Assistant United States Attorney
11    Mark Dispoto.
12                    THE COURT:  Good morning.
13                    MR. SCHWARTZ:  Good morning, Your Honor.  Fred
14    Schwartz for defendant Rose Marks.  Also Mr. Gottlieb, who
15    joined the motion, had to be in New York today.  So his client
16    is here and he has asked me to stand in for him to the extent
17    that it may be necessary.
18                    THE COURT:  And who is his client?
19                    MR. SCHWARTZ:  That's a good question, Judge.  He
20    represents Nancy Marks.
21                    THE COURT:  Thank you.
22                    MR. YOSS:  George Yoss on behalf of Victoria Eli.
23                    THE COURT:  Good morning, sir.
24                    MR. YOSS:  Good morning, Judge.
25                    MR. LUBIN:  Good morning, Your Honor.
```

```
 1                    Richard Lubin and I represent Cynthia Miller.

 2                    Also there was a question we had as with the

 3       others that had filed a motion to adopt.  I don't think I saw

 4       an order coming through granting that or addressing it.  So I'm

 5       asking that we can just adopt the motion like --

 6                    THE COURT:  We did an order.

 7                    Okay.  I have to do yours ore tenus because the

 8       clerk's office didn't docket them correctly.  So until they

 9       docket them we can't get an order in on the entry.

10                    MR. LUBIN:  So I would ore tenus move to adopt

11       Rose Marks' motion and there is --

12                    THE COURT:  Right.  If the government is not

13       objecting to standing, it's granted.

14                    Do they all have standing to join?

15                    MR. BARDFELD:  Your Honor, that's a good question.

16       I don't know.

17                    The issue that I have with Mr. Lubin is Mr. Lubin

18       originally came into this case representing Victoria Eli.  At

19       some point, he stopped representing Miss Eli and started

20       representing Cynthia Miller.  We will have to have a Garcia

21       hearing at some point.  We recognize that.

22                    I have talked to Mr. Lubin and we will set it up,

23       but what I am saying is, I didn't want to agree to it at this

24       point with the idea that there might be some problem with it.

25                    But having said that, if the Court is going to
```

```
 1    grant it, then --
 2              THE COURT:  Well, you need to tell me if there is
 3    some reason why they do not have standing to grant it.
 4              MR. BARDFELD:  No.
 5              THE COURT:  And the Garcia issue, this is the
 6    first time that has been brought to the Court's attention as
 7    far as I know.  I think Judge Hopkins had been ruling on most
 8    of these.
 9              MR. BARDFELD:  Yes, he has, Your Honor.
10              THE COURT:  All right.
11              MR. BARDFELD:  But we will have to have a Garcia
12    hearing at some point so.
13              THE COURT:  Ken, set a Garcia hearing.
14              THE CLERK:  Yes.
15              THE COURT:  Can we go forward today without a
16    Garcia hearing?
17              MR. BARDFELD:  Yes, Your Honor.
18              THE COURT:  Thank you.
19              Thank you, Mr. Lubin.
20              MR. LUBIN:  So do I take that to mean granted?
21              THE COURT:  Yes.
22              MR. LUBIN:  Thank you.
23              THE COURT:  You're welcome.
24              MR. CHAPMAN:  Good morning, Your Honor.
25              Ron Chapman for Ricky Marks, who is present.  Your
```

```
 1   Honor, I also filed a motion to adopt Mr. Schwartz' motion and
 2   I have not received an order.  So I would make an ore tenus
 3   motion to join in this.
 4           THE COURT:  Your motion is granted.
 5           MR. DELLA FERA:  Good morning, Your Honor.
 6           I have your Richard Della Fera on behalf of Rosie
 7   Marks.  She is present and Your Honor signed an order as to my
 8   motion to adopt.
 9           THE COURT:  Thank you.
10           MR. REAGAN:  Good morning, Your Honor.  Edward
11   Reagan on behalf of Vivian Marks who is present at the back of
12   the courtroom.
13           THE COURT:  Good morning.  How are you?
14           MR. REAGAN:  Fine, Your Honor.
15           THE COURT:  Okay.
16           MR. RABIN, JR.:  Judge, good morning.
17           Sam Rabin on behalf of Peter Wolofsky.  He is not
18   present and I have adopted the motion and I believe you have
19   signed an order.
20           THE COURT:  Thank you, sir.
21           All right.  Mr. Schwartz, since it is your motion
22   I am going to let you argue.  I am not going to let everyone
23   else argue.  If there is something that Mr. Schwartz leaves
24   out, if that would happen, let me know.
25           Good morning.
```

```
 1              MR. SCHWARTZ:  Good morning, Your Honor.  And of
 2    course, with such bright and prominent lawyers here, I'm sure
 3    there is something that I am going to leave out that one or
 4    more of them are going to want to add to.  I know that
 5    Mr. Young had a few things that he wanted to say and I know
 6    Mr. Lubin had a few things that he wanted to say.
 7              Just so that I understand the parameters of our
 8    hearing today, as I read Your Honor's order ordering this
 9    hearing, it was not an evidentiary hearing.
10              THE COURT:  That's right.  It is argument.
11              MR. SCHWARTZ:  And therefore, I did not bring in
12    any witnesses or I will not attempt to present any evidence.
13    Since there is an evidentiary hearing I believe we are limited
14    to the record that is before Your Honor.
15              THE COURT:  Since it is not an evidentiary
16    hearing?
17              MR. SCHWARTZ:  I'm sorry.  Since it's not an
18    evidentiary hearing.  That's why I need their help, Judge.
19              THE COURT:  You don't need their help.
20              MR. SCHWARTZ:  Since it's not an evidentiary
21    hearing, I believe we are limited to my motion and the exhibits
22    thereof, the government's response, and my reply of those
23    exhibits.
24              THE COURT:  That's what is before me?
25              MR. SCHWARTZ:  That's right.  So I'll go forward
```

1    on that.

2              THE COURT:  Thank you, sir.

3              MR. SCHWARTZ:  And I think you allocated an hour

4    to the hearing.  I don't know.

5              THE COURT:  I don't think we can finish this in an

6    hour, but we'll see.  I have the day.

7              MR. SCHWARTZ:  Okay.  Judge, here is what we are

8    asking for and if Your Honor wants to shortcut me because I

9    know you have read the motions, and read the responses and the

10   reply, feel free to stop me at any time.

11             THE COURT:  You asked for three things, right?

12             MR. SCHWARTZ:  Right.

13             THE COURT:  Page -- what is it -- 8, 9?

14             MR. SCHWARTZ:  Well, I can summarize instead of

15   reading them, Judge.

16             THE COURT:  Okay.

17             MR. SCHWARTZ:  There were Grand Jury proceedings

18   here, obviously.  We have asked Your Honor to give to us, or

19   alternatively review yourself, all of the transcripts of the

20   Grand Jury proceedings in the original and first superseding

21   indictment.  There is a second superseding indictment that Your

22   Honor is aware of.

23             Second, we ask for all of the investigative

24   reports.

25             THE COURT:  You want me to look at every Grand

1    Jury proceeding?

2              MR. SCHWARTZ:  Yes.  And I will tell you why.  We

3    believe that a number of things happened here.

4              First, we believe that the agents took to

5    themselves the determination as to whether there was enough

6    evidence to establish probable cause that a crime was committed

7    by one or more of these defendants.  Rather than presenting

8    evidence to the Grand Jury as to each of the counts in the

9    original and first superseding indictment to establish that a

10   crime was committed and there was probable cause that these

11   defendants committed the crime.

12             THE COURT:  Are you saying that an indictment was

13   returned where there were no facts presented to the Grand Jury

14   establishing probable cause?

15             MR. SCHWARTZ:  As to some of the counts.

16             THE COURT:  Tell my which counts.

17             MR. SCHWARTZ:  Okay.

18             THE COURT:  And your basis for that belief.

19             MR. SCHWARTZ:  Okay.

20             THE COURT:  Don't worry, Mr. Bardfeld, you will

21   get to respond.  He's having trouble staying in his chair.

22             MR. SCHWARTZ:  I would let him go first, Judge.

23             First, as to the counts involving a defendant by

24   the name of J.C.

25             THE COURT:  A victim?

```
 1              MR. SCHWARTZ:  A victim, yes.

 2              THE COURT:  Alleged victim.

 3              MR. SCHWARTZ:  You say it so much better than I

 4    did, Judge.

 5              THE COURT:  It's better than defendant.

 6              MR. SCHWARTZ:  An alleged victim by the name of

 7    John Cleary.  Mr. Cleary was allegedly a victim of a young lady

 8    by the name of Victoria Eli, who is one of the defendants in

 9    the case.

10              If Your Honor were to look at Paragraph 44 of the

11    first superseding indictment, there are certain statements made

12    regarding Mr. Cleary or J.C.  It says on Paragraph 44, Page 19

13    of the first superseding indictment:

14              "That it was further part of the conspiracy that

15    defendant, Victoria Eli, would tell J.C. that in order to rid

16    him and his family of evil spirits, bad luck and curses J.C.

17    would have to make sacrifices which would involve money because

18    money was the root of all evil."

19              It's a very specific allegation.

20              "J.C. would provide defendant, Victoria Eli, with

21    large sums of money..."

22              That probably could be established independently.

23              "...after defendant, Victoria Eli, assured him

24    that it was a sacrifice and not a payment and promised that the

25    money would be returned."
```

```
 1              Again, a specific allegation that would have to

 2     come from J.C.

 3              THE COURT:  Or someone J.C. told him.

 4              MR. SCHWARTZ:  Or someone to whom J.C. provided

 5     information who could then testify via hearsay at the Grand

 6     Jury.

 7              THE COURT:  Right.

 8              MR. SCHWARTZ:  "The sacrifice entailed money being

 9     set aside and prayed upon.  Defendant, Victoria Eli, promised

10     that while she prayed on the money it would start relieving

11     J.C. and his friends and family of all evil spirits, the end of

12     bad luck and the end of curses.  Defendant, Victoria Eli,

13     assured J.C. that he would get the money back and the money was

14     never returned."

15              Now, other than the fact that money was

16     transferred from J.C. to Victoria Eli, all of that needs either

17     direct or hearsay testimony from J.C. to establish those facts

18     before the Grand Jury.

19              THE COURT:  What evidence do you have that the

20     government had none of that --

21              MR. SCHWARTZ:  Well, first of all --

22              THE COURT:  -- before the Grand Jury?

23              MR. SCHWARTZ:  -- we have J.C.'s statements to us

24     and then, we have a concession by Mr. Bardfeld.  Mr. Bardfeld,

25     in his response says that they determined that they did not --
```

1              THE COURT:  They?

2              MR. SCHWARTZ:  The government determined that they

3    did not want to alert the defendant about a possible

4    indictment.  And therefore, they did not interview or meet with

5    J.C. before --

6              THE COURT:  Okay.  We've established that.

7              Now, do you have any evidence that government

8    agents never talked to anyone else to whom J.C. had confided?

9              MR. SCHWARTZ:  Only the fact that Mr. Bardfeld, in

10   his reply, says they established this through circumstantial

11   evidence.  They don't say hearsay evidence or direct evidence,

12   but they say circumstantial evidence.

13             And Judge, we think that is enough to at least

14   create enough evidence to allow you to review the transcripts,

15   or to provide the transcripts to us to review to see if there

16   was any other evidence to establish these particular facts.

17             Now --

18             THE COURT:  Let me ask you a question.

19             Years ago Mr. Lubin and I, many, many, many years

20   ago tried a case.  A murder case where a husband murdered his

21   wife.  During the course of the trial -- I was the prosecutor

22   at that time -- presented evidence of the defendant having

23   attempted on three occasions to murder his first wife by

24   poisoning until she cancelled her life insurance policy and

25   then he divorced her.

```
 1              I called her as a witness at the trial.

 2              MR. SCHWARTZ:  Uh-huh.

 3              THE COURT:  She testified that he never tried to

 4   kill her, that she still loved him and she never did believe

 5   that he tried to kill her.  However, a medical doctor said he

 6   tried to poison her three times.  She went to the hospital

 7   three times near death.  And circumstantially, there is poison.

 8   There is a doctor saying this is the cause of her going to the

 9   hospital was the poison.  She never believed it.  She loved him

10   at the murder trial.

11              Now, is that not similar to what we have here?

12   J.C. does not think he's a victim.

13              MR. SCHWARTZ:  It may be, Judge, in the ultimate

14   question as to whether J.C. were a victim or not.

15              THE COURT:  Right.

16              MR. SCHWARTZ:  But it is not as to whether there

17   was misconduct in the Grand Jury, or whether an indictment was

18   returned lacking any evidence to support the allegations

19   included by the prosecutor in that indictment.

20              THE COURT:  But you have to show me in pulling out

21   the specific misconduct that there was no PC, no probable

22   cause, presented to the Grand Jury to return this or that it

23   was infused with -- I think you're calling it some kind of

24   racial slurs or ethnic slurs, something.

25              Don't you have to do that before you're entitled
```

```
 1     to look at what the Grand Jury did?  Otherwise, we would have

 2     to open up the Grand Jury in every single case.

 3               MR. SCHWARTZ:  I suggest not, Judge.

 4               THE COURT:  Tell me why.

 5               MR. SCHWARTZ:  I suggest not, Judge, for this

 6     reason.  Were this a motion dismiss, which may be coming down

 7     the line.

 8               THE COURT:  Right.

 9               MR. SCHWARTZ:  Assuming that the evidence in the

10     Grand Jury establishes what I'm suggesting, then I would

11     certainly have to do that.  And I'll give you a case that we

12     don't cite in our brief, United States v. Dibernardo.  I'll

13     give you the citation before we finish.

14               THE COURT:  Okay.

15               MR. SCHWARTZ:  Where a young, handsome, debonair

16     prosecutor in 1980 or '79 --

17               THE COURT:  Was that you, Mr. Schwartz?

18               MR. SCHWARTZ:  It was, Judge.  I am no longer

19     young, I am no longer handsome, and I'm certainly not debonair.

20               MR. BARDFELD:  Your Honor, I object to that

21     conclusion.

22               MR. SCHWARTZ:  Where a prosecutor in the Southern

23     District of Florida indicted a gentleman by the name of

24     Dibernardo and Judge Spellman dismissed the indictment.  Judge

25     Spellman dismissed the indictment for two reasons; one, because
```

1   there was an uncover agent who was subsequently charged with

2   shoplifting and lied to the police, gave his undercover name

3   instead of his real name.  And in a hearing before Judge

4   Spellman, Judge Spellman doubted the credibility of this FBI

5   agent.  And he said that if he lied when he was arrested for

6   shoplifting and if he lied now in some matters before me, he

7   could have lied in the Grand Jury.

8          They also said that because this was presented as

9   an organized crime that an investigation and evidence of

10  organized crime was presented to the Grand Jury, Judge Spellman

11  found that that would have prejudiced the Grand Jury.

12         The Eleventh Circuit reversed Judge Spellman

13  upholding the young and handsome debonair attorney.

14         But the Eleventh Circuit said there wasn't enough

15  evidence presented that there were lies in the Grand Jury.  Had

16  there been proof of lies on misleading the Grand Jury, that may

17  have been enough to dismiss.  And that although there was

18  evidence of organized crime, it wasn't organized crime

19  investigation, the fact that the superseding indictments that

20  were subsequently returned by the same Grand Jury did not have

21  organized crime and it wasn't enough for a dismissal.

22         But they did establish in that case that

23  misleading the Grand Jury was enough for a dismissal.  There

24  just wasn't the misleading of the Grand Jury there, but that's

25  at the dismissal stage.  And we cited you some other dismissal

```
 1    cases in our reply brief because we agree with the government

 2    that we have a heavy burden to get the indictment dismissed.

 3              THE COURT:  Well, what is your burden to get

 4    discovery?

 5              MR. SCHWARTZ:  Just to show that there is a

 6    reasonable basis to believe that there may have been misconduct

 7    in the Grand Jury because we certainly can't prove that there

 8    was misconduct in the Grand Jury absent some review of those

 9    Grand Jury transcripts.  I can't tell you what happened there.

10              I can only tell you, based on circumstantial

11    evidence, that there are specific statements in the indictment

12    in this count and three other paragraphs -- and I cite those

13    paragraphs to you in my reply brief -- that at least one

14    person, J.C., John Cleary, has stated that he never said that,

15    that didn't happen, at least before the presentment to the

16    Grand Jury.

17              Now, John Cleary may be a victim.  He thinks he's

18    not.  He may be delusional.  He may not.  That's not for me to

19    comment on at this point and Mr. Yoss is a little aggravated

20    that I did comment on it.

21              But the question is not whether J.C. was a victim.

22    It's what evidence was presented to the Grand Jury to justify

23    the statements in Paragraph 44 of the indictment or as to the

24    other three victims, which I even have less basis.  I haven't

25    been able to speak to them.  I haven't been able to get them to
```

```
 1    tell me if they were interviewed before the Grand Jury.
 2              That's why the second prong of our request is that
 3    you review the investigative reports to make a determination is
 4    this a Cleary like situation or is it something different?
 5              But the fact that, first of all as to Cleary, they
 6    used specific statements that he had to have made to somebody.
 7    And we suggest that there is not evidence before you, and
 8    certainly not evidence in Mr. Bardfeld's responsive pleading,
 9    that Mr. Cleary made these statements to anybody.  Then, we
10    wonder, how did they get into the indictment?
11              THE COURT:  Let me stop you one second.
12              Mr. Bardfeld, in each of these paragraphs, it says
13    it was further part of the conspiracy that defendant blah, blah
14    would tell or would state.  Are you interpreting would to mean
15    did?
16              MR. BARDFELD:  Yes.
17              THE COURT:  Okay.
18              MR. BARDFELD:  And the second superseding
19    indictment changes that language.
20              THE COURT:  Okay.  That it would tell?
21              MR. BARDFELD:  That's right.
22              THE COURT:  Okay.  That's a colloquialism from
23    some part of the country.
24              MR. BARDFELD:  And the old supervisor wanted to do
25    it that way and the new supervisor wants to do it this way.
```

```
 1              THE COURT:  So you are stating that this means
 2    that Victoria Eli did tell J.C. that in order to -- whatever --
 3    that's what that indictment says.
 4              MR. BARDFELD:  Well, the second superseding
 5    indictment does not even mention J.C.
 6              THE COURT:  I'm just talking about the superseding
 7    indictment, Paragraph 44.
 8              MR. BARDFELD:  Yes.
 9              THE COURT:  And that means that she did tell and
10    not that it was the conspiracy that she would do it maybe in
11    the future that this did happen.
12              MR. BARDFELD:  Well, the language would tell that
13    it did happen.  I mean, I'm not trying to be difficult here.
14    So I would rely on would tell, at that point, for the
15    superseding indictment.
16              That doesn't answer your question.
17              THE COURT:  Well, it's pushing me to have to read
18    this, the Grand Jury transcripts, which really I don't want to
19    do, but I may have to do it.
20              MR. BARDFELD:  I will address that at the
21    appropriate time if that's all right.
22              THE COURT:  All right.
23              MR. SCHWARTZ:  And Your Honor, we're not pushing
24    you to read the Grand Jury transcripts.  We understand that
25    this part of the district is understaffed right now as to
```

1    magistrates.  And that you and Judge Hopkins have assumed some

2    significant loads from a retiring magistrate.

3              THE COURT:  Hopefully by tomorrow I think Judge

4    Brennen might be with us.  I'll keep my fingers crossed.

5              MR. SCHWARTZ:  We would much rather that you shift

6    that burden to us and allow us to do the review and we will

7    tell you what it says.

8              THE COURT:  Okay.  Paragraph 44 --

9              MR. SCHWARTZ:  Right.

10             THE COURT:  -- as I read it, has clear statements

11   that purport to say what was told to J.C. by Victoria Eli.

12             MR. SCHWARTZ:  Right.

13             THE COURT:  And I'll expect something from the

14   government when the government gets up to tell me how they made

15   those statements and then we will see where we go.

16             What else have you got?

17             MR. SCHWARTZ:  Let me just backtrack.

18             THE COURT:  Okay.

19             MR. SCHWARTZ:  Something that Mr. Bardfeld just

20   said also corroborates it and that is there is no mention of

21   J.C. in the superseding indictment.

22             MR. YOSS:  Second.

23             MR. SCHWARTZ:  Second superseding indictment.

24             THE COURT:  But am I to assume that is because

25   this never happened?

```
 1                    MR. SCHWARTZ:  Yes.

 2                    THE COURT:  Okay.

 3                    MR. SCHWARTZ:  Or at least check and see if it

 4      never happened.

 5                    THE COURT:  Okay.  Tell me, what else have you

 6      got.  Give me your best stuff.

 7                    MR. SCHWARTZ:  Give you my best shot?

 8                    THE COURT:  Yes.

 9                    MR. SCHWARTZ:  Okay.  In addition to J.C., I

10      direct Your Honor's attention to -- and I'm going to find the

11      pages now for a second -- the paragraph regarding C.C.

12                    THE COURT:  Where are you looking?

13                    MR. SCHWARTZ:  In the first superseding

14      indictment.

15                    THE COURT:  Okay.  Page and paragraph, please?

16                    MR. SCHWARTZ:  Yes.  Paragraph 20 in the second

17      superseding indictment, but Paragraph 30 in the first

18      superseding indictment.

19                    THE COURT:  Are they the same?

20                    MR. SCHWARTZ:  No.

21                    THE COURT:  Okay.

22                    MR. SCHWARTZ:  If you look at Paragraph 30 in the

23      first superseding indictment, Judge --

24                    THE COURT:  Okay.

25                    MR. SCHWARTZ:  And that's on Page 12.
```

```
 1                THE COURT:  All right.

 2                MR. SCHWARTZ:  The language is somewhat familiar.

 3                "It was further part of the conspiracy that the

 4      defendant..."

 5                And this is a little different.

 6                "...Rose Marks and Rosie Marks..."

 7                Not Victoria Eli this time.

 8                "Would tell J.C. --

 9                THE COURT:  C.C.

10                MR. SCHWARTZ:  "C.C. that in order to rid her and

11      her family of evil spirits, bad luck and curses, C.C. would

12      have to make sacrifices which would involve money because money

13      was the root of all evil.  C.C. would provide the defendants,

14      Rose and Rosie Marks, with large sums of money after the

15      defendants, Rose and Rosie Marks, assured her that it was a

16      sacrifice and not a payment and promised that the money would

17      be returned.  The money was never returned."

18                I suggest to the Court that that's very similar

19      to, if not identical to -- with some name changes -- to the

20      paragraph about J.C.

21                Now, we haven't been able to yet contact C.C. or

22      get any statements from C.C. as to whether she was interviewed

23      by the government or not.

24                But we do, in our motion, attempt to contrast the

25      language in the first superseding indictment with the language
```

```
 1    in the second superseding indictment, which was also regarding

 2    J.C. --

 3               THE COURT:  C.C.

 4               MR. SCHWARTZ:  C.C.  When I get older I forget

 5    things.

 6               MR. YOSS:  Paragraph 20.

 7               MR. SCHWARTZ:  Yes, it's in Paragraph 20 of the

 8    second superseding indictment.

 9               And there, instead of this boilerplate language,

10    they go on to add that:

11               "C.C. inherited the money from C.C.'s mother.  It

12    was cursed and filled with negativity and that the reason C.C.

13    could not find love was because of the curse of negativity."

14               That has supplemented the boilerplate.  That now

15    appears that at least after the first superseding indictment

16    was returned, the agents went out and talked to C.C., which is

17    fine, but they should have done it before they presented

18    specific fact evidence to the first Grand Jury about what C.C.

19    would testify to were she called as a witness in the Grand

20    Jury.

21               THE COURT:  But you have told me nothing about

22    whether or not the government had information as to what it

23    alleged in Paragraph 30 in the first indictment at the time

24    that indictment was returned.

25               Do you have any evidence that they didn't have the
```

```
 1    facts that they set out?
 2              MR. SCHWARTZ:  I do not have the evidence as I had
 3    as to J.C.  I do not have that evidence for a number of
 4    reasons.
 5              One, the Grand Jury transcripts are secret and we
 6    know secrecy is required for that;
 7              Second, Mr. Bardfeld didn't make a concession in
 8    his response regarding C.C.  Perhaps because we -- although we
 9    alluded to these other paragraphs in our original motion -- we
10    didn't specify them in the first motion.
11              But I suggest to the Court, that Your Honor should
12    read the Grand Jury transcripts to see what was stated also
13    about C.C. for the following reasons.
14              The exact same paragraph appears for J.C. where
15    the government made the concession and C.C.  And without going
16    into -- well, I can go into specifics.  The same as to the
17    paragraph as to N.D., which appears in the second superseding
18    indictment, again, supplemented at Paragraph 30 and in the
19    first superseding indictment --
20              MR. DELLA FERA:  Paragraph 38.
21              MR. SCHWARTZ:  -- as in Paragraph 38.
22              And I can quote that same language from Paragraph
23    38, if Your Honor wishes, as to the defendant -- alleged victim
24    N.D.  In Paragraph 38, it states:
25              "It was further part of the conspiracy that
```

```
 1   defendant..."
 2              Nancy Marks this time.
 3              "...would tell N.D. that in order to rid her and
 4   her family of evil spirits, bad luck and curses, N.D. would
 5   have to make sacrifices which would involve money because money
 6   was the root of all evil.  N.D. would provide Nancy Marks with
 7   lots of the money after the defendant, Nancy Marks, assured her
 8   that it was a sacrifice and not a payment and promised the
 9   money would be returned."
10              That language is virtually exactly the same as the
11   language as to J.C.
12              And we have a similar situation as to the victim
13   T.L., which Mr. Lubin is going to tell me what paragraph T.L.
14   is in.
15              MR. LUBIN:  Yes.  T.L. is Paragraph 36 of the
16   superseding.  And then, Paragraph 28 of the second superseding.
17              MR. SCHWARTZ:  Paragraph 36:
18              "It was further part of the conspiracy that
19   defendant, Nancy Marks, would tell T.L. in order to rid her and
20   her family of all evil spirits, bad luck and curses, that T.L.
21   would have to make sacrifices, which would involve money
22   because money was the root of all evil.  T.L. would provide
23   defendants, Nancy Marks and Donna Eli, with large sums of money
24   after the defendant, Nancy Marks, assured her that it was a
25   sacrifice and not a payment and promised that the money would
```

1    be returned.  The sacrifice entailed the money would be set

2    aside and prayed upon, et cetera."

3            THE COURT:  So what is the point with respect to

4    your argument here?

5            MR. SCHWARTZ:  The point with respect to my

6    argument, Judge, is I believe we establish an extremely

7    reasonable basis for Your Honor to go forward and review the

8    Grand Jury testimony as to J.C. based on concessions by the

9    government, based on J.C.'s affidavit and the interview with

10   J.C. by defense counsel.

11           If, in fact, there is a basis for Your Honor to

12   review as to J.C., then, I suggest to the Court that there is

13   also a basis for you to review as to C.C., T.L., and N.D.

14   because of the very similar language.  And the fact, as we cite

15   in our reply brief, that language is then changed to specific

16   non-boilerplate language after our motion was filed and before

17   the second superseding indictment was returned.

18           THE COURT:  Do you have any information whatsoever

19   that the government did not possess that information at the

20   time of the first indictment and just chose not to put it in

21   the indictment?

22           MR. SCHWARTZ:  As to C.C.?

23           THE COURT:  As to any of them.

24           MR. SCHWARTZ:  No.  We do as to J.C. because

25   there's nothing in the second superseding indictment as to

1    J.C., but as to the other three, we don't.

2              There is one way to specifically determine whether

3    there was misconduct in the Grand Jury or not based on these

4    other three individuals and that is to review the Grand Jury

5    transcripts.  That's their -- I assume set in stone.  No one is

6    going to change it.  I wouldn't suggest that the prosecutors or

7    anybody else is going to change what occurred before these

8    Grand Juries or this Grand Jury.  One Grand Jury because the

9    same Grand Jury was utilized for all three indictments.

10             So I suggest, if Your Honor has to review the

11   transcripts, at least as to J.C., then Your Honor has a

12   reasonable basis based on the boilerplate language and the

13   changes, again, in the second superseding indictment to review

14   as to these other three.

15             Can I prove it at this point beyond a reasonable

16   doubt?  No.  Can I prove it by a preponderance of the evidence

17   at this point or by substantial evidence?  No.

18             Would Your Honor grant a search warrant based on

19   probable cause?

20             And I understand that Your Honor is strict on

21   granting search warrants, but would there be enough for

22   probable cause for Your Honor to grant a search warrant based

23   on this?  I suggest there would.  And if there would, then, I

24   suggest Your Honor should also review the Grand Jury

25   transcripts to see whether there was misconduct because the

1    prosecutor has full control of that Grand Jury.  I've seen

2    maybe one Grand Jury, a runaway Grand Jury in my life, and

3    fortunately it wasn't mine.

4            But the prosecutor decides what evidence is

5    presented to the Grand Jury.  Presents an indictment to the

6    Grand Jury.  Instructs the Grand Jury as to the law on

7    returning that indictment.  We have no input into that process.

8            And I agree with Your Honor and I agree with a

9    number of the Supreme Court and circuit court cases, which say,

10   we can't just shortcut the process and create all of this extra

11   work by having every Grand Jury transcript and every Grand Jury

12   presentation be reviewed without some significant basis.  But

13   here, we do have such a basis.

14           That basis being at least as to one person, a

15   concession that no one ever talked to him first.  Now, maybe

16   they interviewed his first ex-wife and she said something to

17   them, but there is no allegation of that.  There is no basis of

18   that.  There is no establishment of any hearsay basis for that

19   evidence.  And then, we have the same exact statement as to

20   three other people.  Virtually the same statements as to three

21   other people.

22           I suggest that that is enough of a factual basis

23   for Your Honor to review at least those portions of the Grand

24   Jury transcripts.  But let me get to why I think Your Honor

25   should not only review those portions, but more of the Grand

1    Jury and why Your Honor should turn over certain investigative

2    reports.

3              As to the rest of the Grand Jury, there is an

4    argument made in our motion and in our reply motion that it is

5    improper to categorize defendants based upon their cultural,

6    racial, or ethnic background.  And there is a lot of case law

7    that we cite to Your Honor.  I'm not going to burden the record

8    now with the case law, but there's cases to establish that in a

9    legal proceeding, the defendant's racial, religious, ethnic, or

10   cultural background is irrelevant.

11             There are cases about Chinese people and certain

12   Chinese groups beat their wives.  And therefore, we should tell

13   the jury that this Chinese person is from that Chinese group

14   and therefore, he has a propensity for beating his wife.  That

15   kind of thing.

16             We suggest to the Court that the term gypsy to

17   describe the Romani culture is a pejorative term.  It creates

18   images in the mind of those who hear it of people traveling

19   around the country in caravans stopping and stealing.  I don't

20   suggest that those images are true, but because of movies,

21   because of statements in culture whether we sing about gypsies

22   and thieves or not, those images exist.

23             The government brought up the term gypsy in

24   hearings before magistrates of this Court.

25             THE COURT:  They're claiming you did it first if

1    that matters.

2              MR. SCHWARTZ:  Well, they're not saying I did.

3    They're saying -- but I have to thank, I guess, Mr. Kent as

4    part of our defense team for this purpose.

5              They talked about it.  It was in the press.  It

6    was in the papers.  The question was, was it in the Grand Jury?

7    I don't have any proof it was in the Grand Jury, but as long as

8    you're going to be there anyway, Judge.

9              If the government did, in fact, present to the

10   Grand Jury statements about these people being gypsies, we

11   suggest that that would improperly hinder the Grand Jury from

12   carrying out the function that the barons at Runnymede had in

13   mind when they forced the evil King John -- who had been evil

14   Prince John to Robin Hood before that -- to sign the Magna

15   Carta and create the Grand Jury.

16             The Grand Jury, as the prosecutor properly said

17   and as the case law cites, is supposed to be a buffer to

18   prevent the government from taking advantage of citizens.

19   Whether or not it is true that the Grand Jury would indict the

20   Pope for being Catholic, the grand jury's purpose is to be a

21   buffer.  And if that buffer was somehow tampered with by

22   prejudicing them based on cultural, racial, or any type of

23   ethnic background, then this Grand Jury is tainted.

24             THE COURT:  Is there any case that you -- did you

25   cite me any cases where they're using with the word gypsy as

```
1    some kind of a slur?

2               MR. SCHWARTZ:  I believe we did, Judge.  We cited

3    a case --

4               THE COURT:  What is it?

5               MR. SCHWARTZ:  -- from the Third DCA which is a

6    state case.  It's going to take me a second to find it.

7               THE COURT:  That's okay.  I'll find it.  It's a

8    Florida case.

9               MR. SCHWARTZ:  That talks about --

10              THE COURT:  It's a federal case.

11              MR. SCHWARTZ:  No, it's a state case.

12              For some reason gypsies haven't made it to federal

13   court very often and we fight to have to leave them.

14              And that case does say using the term gypsy is

15   improper as a slur.

16              MR. LUBIN:  That's Stanton v. State.

17              MR. SCHWARTZ:  That's Stanton v. State.  It's a

18   Third DCA?

19              MR. LUBIN:  Yes.  It's 349 So.2d 761.

20              THE COURT:  Thank you.

21              MR. SCHWARTZ:  And Mr. Bardfeld suggests that

22   since Ricky Marks went on-line and posted videos on YouTube

23   saying gypsy wedding, gypsy -- this type of party or that type

24   of party, then, it's certainly proper to use the term gypsy

25   because Mr. Ricky Marks doesn't think of it as a slur.  And I
```

```
1    suggested that an African-American rapper comment might use a
2    word that's not thought of as a racial slur, but if I used it
3    in Harlem I would have a problem.  Actually, I talk about
4    Kramer from Seinfeld using it in his act.
5            It's no less of a racial slur to use the word in
6    Court because rappers or entertainers use it.
7            THE COURT:  I guess it just depends on who is
8    using it.
9            MR. SCHWARTZ:  It depends on how it is used.
10           THE COURT:  This Court has heard defendants
11   themselves use that word, but if one of you used it there would
12   be serious trouble.
13           MR. SCHWARTZ:  That's true.  It would be
14   considered a racial slur, but it's more important than that,
15   Judge.
16           THE COURT:  But that word there isn't any question
17   that that's a racial slur, but gypsy we all say it here in open
18   court.  You just used it, but you wouldn't come out with the N
19   word.  So maybe there's a difference in how one perceives this.
20           MR. SCHWARTZ:  Maybe I should say the G word,
21   Judge.
22           THE COURT:  The G word.
23           MR. SCHWARTZ:  So in order to avoid any problems
24   in the future I will refer to it as the G word.
25           THE COURT:  How silly we're getting, right?
```

1              MR. SCHWARTZ:  Yes.

2              THE COURT:  Ouch.

3              MR. SCHWARTZ:  And this is not for political

4    correctness.  I suggest to, Your Honor, that the G word or

5    gypsy, creates an image and it is an image that has been

6    created by Hollywood.  It has been culturally created.  It was

7    created by Adolf Hitler.  You know, we talk about six million

8    Jews being killed in the Holocaust, but Hitler and the Nazis

9    killed over a million and-a-half gypsies.  And compared to the

10   size of the G word population in Europe at the time, that was a

11   much more devastating murder rate for their culture than six

12   million was to the Jewish culture.

13             Gypsies have been despised, shunned, and

14   slaughtered throughout the last millennium.  And to use that

15   word in a legal proceeding only connotes a prejudice or

16   projects a prejudice onto the people who have to judge that

17   proceeding whether they be --

18             THE COURT:  I don't know about that.  That's like

19   saying Jews were slaughtered so you can't use the term Jews.

20   That doesn't make sense to me.

21             MR. SCHWARTZ:  You can refer to Jews.  Certainly

22   you can't say Kikes.

23             THE COURT:  Right.  But we don't know if gypsy is

24   in the same category as those words.

25             MR. SCHWARTZ:  Well, let me use an example.  An

```
1    example of a very learned erudite Magistrate Judge in this
2    court.  Somebody who I have great respect for.  Who at a
3    pretrial detention hearing stated on the record when he
4    pretrial detained the defendant in this very instant case, that
5    he could use the fact that they were gypsies to in part help
6    his determination as to whether they were risks of flight.  I
7    suggested to Judge Marra, I suggested to that Magistrate, that
8    that was improper, but they were pretrial detained because as
9    Mr. Bardfeld says in his response, gypsies are viewed as a
10   wandering race.  I suggest that view as a wandering race of
11   thieves, but as a wandering race.
12            My defendant, Rose Marks, is anything but a
13   wanderer.  She has been at the same two addresses, subsequent
14   to each other for the last 33 years, in Virginia and then in
15   Florida.
16            So even somebody as astute as a magistrate judge
17   in this court gives that connotation to the word gypsy, what
18   does a Grand Jury say?  What would a trial jury say?
19            Let me go to one other area, Judge.
20            THE COURT:  Okay.  And then, I'm going to hear
21   from Mr. Yoss.
22            MR. SCHWARTZ:  And I was going to say I don't want
23   to beat a dead horse, but that's in reference to gypsy
24   caravans.
25            We suggest to the Court that it's also important
```

1    that the Court get and review the reports of the investigation.

2              Now, just as background, the investigation was

3    initially primarily conducted by the State of Florida, the

4    locals in the Fort Lauderdale Police Department.  And then,

5    they were joined by two -- and I guess everybody looks younger

6    than me -- but younger agents from the Secret Service and the

7    IRS.

8              We suggest that through the way the government has

9    been interviewing our clients' clients that they have engaged

10   in misconduct.  We also suggest -- and I don't mention it, but

11   in reviewing the standard of discovery -- we also believe that

12   they violated Section D of the standard of discovery orders by

13   not turning over those report to us ab initio.

14             But the government concedes that -- and if I'm

15   going beyond that concession I'm sure Mr. Bardfeld will correct

16   me -- that in approaching the clients of our clients -- and I'm

17   just going to call them the clients in order to avoid that

18   supposed redundancy.  They believe that our clients were under

19   a spell, that they needed to hit them over the head to make

20   them see what actually was going on, that they didn't believe

21   they were victims.  They had to be shown they were victims.

22             In the very first hearing that we held -- I guess

23   the pretrial detention hearing -- the prosecutor said, well, we

24   had to go back to a number of these victims two or three times

25   because they were too embarrassed to admit that they were

```
 1    victims.  They direct them to a website called Gypsy Psychic
 2    Scam, which talks about a lot of different, quote, gypsy scams.
 3              Again, I'm not using the word G word and maybe I
 4    should, but at least we know as to J.C. and others that they
 5    tell them that they are victims of a fraud.  They tell them --
 6    they ask them, does your wife, or your husband, or your
 7    significant other know about all this money you gave to -- and
 8    they cite the defendant's name.
 9              We are told by J.C., Mr. Cleary, that they said to
10    him:  Can you justify where you got the money that you gave
11    them?  This coming from an IRS agent.  Those things we suggest,
12    at least the second and third thing I'm going to tell your wife
13    on you, or your husband.
14              And they did that recently in New Hampshire.  They
15    went to the husband of the alleged victim and told him that he
16    and his wife were victims in the scam even though the wife was
17    happy with the services from the defendant.
18              But questioned by an IRS agent, can you justify
19    where you got the money, I suggest is a schtick.  It's a
20    threat, but then they would have the carrot and this is where I
21    suggest they violent the idea of the standard discovery order
22    by not giving us these reports.
23              Because in today's economy, if over the last ten
24    years, or eight years, or seven years, or five years you have
25    given somebody over three or four hundred thousand or more and
```

1    gotten services and not complained and been happy with the

2    services, and the government tells you that if you become a

3    complainant and you become a victim I can get you your money

4    back, or I can get some of your money back, or we're going to

5    seize the property and the property is going to be sold and

6    there are provisions for victims to be repaid money that they

7    have lost.  That's a reward.  That's under Giglio.  That's an

8    inducement made to somebody to become a government witness.

9            If that was said -- and I suggest it was said --

10   and I have some other specific instances where the government

11   attempted to help people regarding the money that they paid to

12   our clients and I talk about the defendants there.  They should

13   have turned those reports over to us within 14 days of the

14   issuance of the standing discovery orders initially in

15   September of this year showing that they made commitments.

16   They made inducements for people to become witnesses in the

17   case.

18            THE COURT:  Who says they did that?

19            MR. SCHWARTZ:  Well, first of all, J.C. says they

20   did that, but second of all, in 2009 --

21            THE COURT:  That's in J.C.'s affidavit?

22            MR. SCHWARTZ:  I believe so.  I'll take a look at

23   the affidavit.  It's an exhibit to our original motion.

24            THE COURT:  Right.

25            MR. SCHWARTZ:  But I also had conversations with

1    J.C.  And I don't want to swear it's in the original affidavit.

2    So let me look at it to be sure.

3              No, he didn't say that in his affidavit.

4              As recently as 2008, the U.S. Attorney's Office

5    and detectives from the Fort Lauderdale Police Department went

6    to the lawyers for Jude Deveraux -- under one of her names --

7    and provided information to those lawyers in order to relieve

8    -- help Jude Deveraux get relief from her obligation to pay her

9    ex-husband money.  Miss Deveraux was required by her divorce

10   attorney --

11             THE COURT:  Say that again.

12             MR. SCHWARTZ:  Jude Deveraux --

13             THE COURT:  Yes.

14             MR. SCHWARTZ:  -- also known as Jude White, Jude

15   Gilliam and Jude Montassir, I believe, is one of the victims in

16   this case.  She is the victim who alleges that the most money,

17   I believe, was taken from her by my client Rose Marks and by a

18   number of the other -- well, and using bank accounts of a

19   number of the other defendants as well as my client's own bank

20   account.

21             Miss Deveraux, just parenthetically, in the

22   discovery we learned that although Miss Deveraux claims that

23   she lost 20 million dollars to my client, a large portion of

24   that was because my client as her life coach advised her to

25   sign a divorce/property settlement agreement with her now

1    ex-husband Claude White.  That was in the early '90s.  And

2    pursuant to that telling her that Claude won't live very long

3    anyway.  He's going to die soon.

4              Pursuant to that property settlement/divorce

5    decree, she has paid many, many millions of dollars to Claude

6    White.  And she believes that part of the fraud -- part of the

7    money she was defrauded out of was the millions of dollars she

8    paid to her ex-husband.  That might be psychic malpractice, but

9    I suggest it's not fraud.  But she has had a continuing

10   obligation to pay money to Claude.

11             In 2008, Claude was trying to collect that money

12   from her and the First Judicial District Court of the County of

13   Santa Fe in the State of New Mexico in the case of Claude White

14   versus Jude White, a/k/a Jude Deveraux and Jude Gilliam

15   SF-921223.

16             As one of the pleadings, filed by Miss

17   Deveraux-White-Gilliam attorney, said:

18             "Upon information and belief, counsel may

19   represent to this court Montassir..."

20             That's another name of hers and that's referring

21   to Jude Deveraux.

22             "...was a victim of a tenacious and long-term

23   criminal conspiracy perpetrated by a woman acting as

24   Montassir's assistant.  The conspiracy included robbing

25   Montassir of literally millions of dollars over more than a

1    ten-year period.

2              Counsel has been in contact with two Florida State

3    police officers as well as a lawyer at the United States

4    Attorney's Office in Florida.  All have represented to counsel

5    that an investigation into this fraud/RICO conspiracy is

6    undergoing..."

7              I guess they meant ongoing.

8              "...that a Grand Jury has been convened to

9    evaluate the evidence and that evidence shows that Montassir

10   was a repeated victim at the hands of this woman and other

11   parties."

12             THE COURT:  I've lost track of where we are going

13   with this.

14             MR. SCHWARTZ:  Okay.  What I'm suggesting is, that

15   this was another benefit conferred by the government on one of

16   the alleged victims to induce her to testify.

17             THE COURT:  Where in there does it say the

18   government is going to get her money back for her?

19             MR. SCHWARTZ:  Well, the government is trying to

20   prevent her from having to pay money to her ex-husband.  That's

21   certainly a benefit.  This is a motion to prevent her from

22   having her to pay because --

23             THE COURT:  Filed by?

24             MR. SCHWARTZ:  Filed by Jude Deveraux Montassir

25   White Gilliam.

```
1                    THE COURT:  What lawyers?

2                    MR. SCHWARTZ:  The lawyers who filed it on her

3      behalf --

4                    THE COURT:  No.  Her lawyers.

5                    MR. SCHWARTZ:  Her lawyers?

6                    THE COURT:  Right.  Not the government.

7                    MR. SCHWARTZ:  No.  They're representing that the

8      government has told her about this secret Grand Jury

9      investigation that found its way because of the government's

10     information in the public papers in a hearing in Santa Fe when

11     they couldn't reveal to the alleged victims that the

12     investigation was ongoing because the victims might tell our

13     clients.

14                    That's a rationale, by the way, for not going to

15     the various victims and saying are you a victim?  We don't want

16     them to go to the clients, but they can have the existence of

17     the Grand Jury investigation set forth in public court.

18                    We suggest to the Court that the Court review the

19     investigative reports to see if the government, in fact,

20     attempted to induce people to become victims, people who were

21     happy with the defendant's services by, one, threatening them

22     with possible IRS investigation or I'm going to tell your wife

23     or husband; and two, offering to reward them by helping them

24     get their money back.

25                    Now, we know that victims can get money back from
```

1    the Court because there is nothing wrong with that if somebody

2    is legitimately a victim.  But again, if you have spent

3    hundreds of thousands of dollars for services that you're not

4    unhappy with, and somebody comes to you and says, if you say

5    you're unhappy with these services we can get you all or part

6    of the hundred thousand dollars back or hundreds of thousands

7    of dollars back as a victim.  That's an inducement.

8              And I suggest, combined with the other things is

9    prior inducement to become a victim, but more importantly, I

10   suggest it's Giglio material.  And if it existed, they should

11   have turned it over to us months ago.

12             I'll sit down and let my colleagues, who probably

13   are chopping at the bit, to clean up the mess that I have made.

14             THE COURT:  Thank you, Mr. Schwartz.

15             Mr. Yoss, are you going to be very long?

16             MR. YOSS:  I'll be very brief.

17             THE COURT:  All right.

18             MR. YOSS:  Obviously, George Yoss.  I represent

19   Victoria Eli.

20             THE COURT:  Good morning, sir.

21             MR. SCHWARTZ:  Good morning, again, Judge.

22             I'll adopt the arguments that Mr. Schwartz made

23   and the only thing that I wanted to add is how we found out

24   about J.C.  It is not that we went out looking for him and

25   contacted him, or even that our clients went out and looked for

1    him and contacted him.

2              After the government indicted the defendants in

3    this case, J.C. was contacted numerous times by government

4    agents who requested to interview him on the phone.  He refused

5    their efforts and said he didn't want to talk to them.  But

6    after a number of calls that were made to him, he went and

7    obtained the services of a lawyer.

8              He, then, met with the lawyer.  And then,

9    eventually after contacting Mr. Lubin, the lawyer supplied an

10   affidavit to Mr. Lubin.

11             And the only thing that I wanted to add onto what

12   Mr. Schwartz said, was that I've never spoken into J.C., but

13   I've spoken to his lawyer.  Everything that Mr. Schwartz has

14   indicated that J.C. has said has been corroborated by his

15   lawyer who sat through the interview that they gave to the

16   government agents on the phone, where during the interview, the

17   lawyer took copious notes.

18             THE COURT:  Who is that lawyer?

19             MR. SCHWARTZ:  Joe Malley.

20             MR. YOSS:  Joe Malley.  He's in Pennsylvania.

21             And I have spoken to him.  I believe Mr. Lubin has

22   spoken to him.  I don't know if Mr. Schwartz has, but I have

23   gone over with him before we made the affidavit -- before I was

24   involved in making the affidavit public because I was the one

25   who filed my own motion to produce.

1          I made sure in speaking to the lawyer that

2    everything that I had either been told by Mr. Lubin,

3    Mr. Schwartz, or that I had gleaned from the affidavit was

4    accurate.  And as I indicated, everything that Mr. Schwartz

5    said was corroborated by Mr. Malley and he took copious notes.

6          And what they told the government was that he was

7    not a victim.  He has never told anybody that he's a victim.

8    All the money that he ever gave to my client was given to her

9    for services that she rendered to him as really a life coach

10   and everything that he gave her was justified and never wanted

11   anything back.

12         And that's relevant when Mr. Schwartz also talks

13   about this pattern of coercion that the government agents have

14   used with other witnesses out there to get them to testify as

15   to things that they never thought was improper.

16         And other than that, I don't think I need to add

17   anything that Mr. Schwartz said, unless Mr. Bardfeld would like

18   to inform me why I'm here because I still haven't figured out

19   after going through three indictments and reading every stitch

20   of discovery why my client is charged.

21         But I guess what Mr. Schwartz would say, that's a

22   subject of another motion.

23         THE COURT:  Thank you, Mr. Yoss.

24         MR. LUBIN:  Sixty seconds --

25         THE COURT:  Sixty seconds.

1            MR. LUBIN:  -- is really all I need.

2            First of all, thank you for bringing back a very

3    bad unfortunate memory for me from years ago.

4            I want to just pick up on one thing you asked

5    Mr. Schwartz.  And you said, do you have any evidence at all

6    that the government did not have this information.

7            THE COURT:  Right.

8            MR. LUBIN:  And I say to you, that's not the point

9    because it does not matter whether they did or they didn't and

10   we have no evidence whether they had or didn't.  What matters

11   is what did they tell the Grand Jury had occurred.  And if they

12   told the Grand Jury that J.C. and others said something that

13   they didn't say, that is discoverable for all of the reasons we

14   have.  It is discoverable under Brady.  It's discoverable under

15   Rule 16 and Giglio and it's a reason to break the Grand Jury

16   secrecy.

17           THE COURT:  Why isn't that the same question?  Do

18   you have any information that the government didn't have any of

19   those facts?

20           MR. LUBIN:  I don't have any information, but as I

21   say, that isn't the issue.  The issue is what did they tell the

22   Grand Jury had they had it?

23           In other words, let's say they had some

24   independent -- they have a videocamera of J.C. telling somebody

25   that he was a victim, but if they told the Grand Jury -- if

1    they didn't tell that to the Grand Jury and they told to the

2    Grand Jury that they had spoken to J.C. and that this is his

3    story, that is improper conduct in front of the Grand Jury.

4                 THE COURT:  Do you have any information that

5    anything untoward happened like that in the Grand Jury, any

6    facts?

7                 MR. LUBIN:  The only possible way a defendant

8    could ever have that would be circumstantially.

9                 THE COURT:  Okay.  What is your circumstantial

10   evidence that that happened?

11                MR. LUBIN:  The circumstantial evidence is that we

12   spoke to J.C.'s lawyer, Mr. Malley.  He gave me an affidavit.

13   The affidavit is opposite to what the indictment said.

14                And then, when they went back in after we had the

15   affidavit and I used it at the detention hearing for Victoria

16   Eli and they went back into the Grand Jury, that allegation was

17   eliminated from the Grand Jury.  All reference in the second

18   superseding indictment to J.C. was eliminated and that came

19   after the affidavit period.

20                And so the government -- the argument would be,

21   the strong probable cause that Mr. Schwartz said would be,

22   well, yeah, they kind of got caught on that one.  And they also

23   changed the almost identical affidavits as to three other

24   alleged victims.  So what is the logical conclusion?

25                They went back in on a second superseding and

1    wherever that same language appeared, they changed it for the

2    second superseding.  And we have one clear instance where we

3    know that the alleged victim said he wasn't, but the same thing

4    happened.

5              THE COURT:  Because he what?  Say that again.

6              MR. LUBIN:  We have one instance where the alleged

7    victim said he never spoke to them and that he wasn't a victim.

8    So they eliminated that.

9              Then, we know that they changed the three almost

10   identical paragraphs relating to other victims from that same

11   kind of boilerplate language to different language.  And it

12   appears that maybe after the first superseding indictment the

13   government did speak to some of the victims afterwards, but

14   that begs the question.

15             It really matters what was told to that Grand Jury

16   because whether a new Grand Jury would cure the problem -- and

17   by the way, it's the same Grand Jury -- whether a new Grand

18   Jury would cure the problem or not isn't the issue.

19             The issue here is discovery for us whether there

20   was misconduct at the Grand Jury that issued the first

21   superseding and what was told to that Grand Jury.  Not whether

22   the government may have had some information from some other

23   source, but didn't tell the Grand Jury that that was where it

24   came from.

25             THE COURT:  It is what was told to the Grand Jury

1    in light of what the facts are, correct?

2              MR. LUBIN:  Yes.  But if they tell the Grand Jury

3    J.C. was defrauded and he told us he was defrauded.

4              THE COURT:  That's a conclusion.  Oh, and he told

5    us --

6              MR. LUBIN:  And he told us, right.

7              THE COURT:  -- that it was a fact that he was

8    defrauded as a conclusion.

9              MR. LUBIN:  Right.  But we don't know because the

10   defense can never know.  Only the government knows right now

11   and of course, you're in a position to know and you're in a

12   position to say, you know what --

13             THE COURT:  Not yet.

14             MR. LUBIN:  Not yet.  You're in a position to make

15   the order.

16             THE COURT:  Okay.

17             MR. LUBIN:  The PC analysis is excellent.  You

18   look at the PC and you say, well, wait a minute.  All four of

19   these paragraphs got changed in the next indictment.  We have

20   one clear instance where it was completely eliminated.

21             I need to find out what went on in that Grand

22   Jury.  Was this just a rubber stamp?  Did they just say, here's

23   the indictment and not tell them where the evidence came from?

24   We don't know.

25             And I'll sit down.  I said I would be a minute,

```
 1   but I had a recollection from the aconitine trial.  They had
 2   the heart scans.  What do they had call that?
 3              THE COURT:  Echocardiogram or EKG.
 4              MR. LUBIN:  They had the heart scans from the
 5   first woman.
 6              THE COURT:  Right.
 7              MR. LUBIN:  And the peaks matched exactly the
 8   echocardiograms from the victim in the murder case.
 9              And so the doctor was able to say it was the same
10   cause because the peaks and valleys were exactly the same and
11   that was troubling.  That was troubling.
12              THE COURT:  So we have the identical language and
13   that could mean that the scheme was identical with respect to
14   each.
15              MR. LUBIN:  Or that the government -- it could
16   likely mean -- because we have the one instance where we know
17   it wasn't accurate -- it likely means that the same rubber
18   stamp was applied as to the other three victims and if that's
19   true, we should know.
20              And there's probable cause kind of that sets a
21   good analogy for you to find that we need to look at this.
22              THE COURT:  Thank you.
23              MR. LUBIN:  Thank you.
24              THE COURT:  Okay.  Let's take a ten-minute recess
25   and then come back and hear from the government.
```

```
 1                      And I cut out the rest of you.  Is there any one
 2          of you who has something specifically that he would like to say
 3          from the defense side that hasn't already been said?
 4                      Okay.  We'll take a ten-minute recess and we'll be
 5          back.
 6                      (Thereupon, a ten-minute recess was taken and then
 7          the following proceedings resumed:)
 8                      THE COURT:  Be seated, please.
 9                      Okay.  Is the Government ready?
10                      MR. BARDFELD:  Yes, Your Honor.
11                      MR. DELLA FERA:  Your Honor, may I?  I apologize,
12          but before Mr. Bardfeld starts --
13                      THE COURT:  Mr. Della Fera.
14                      MR. DELLA FERA:  Thank you, Judge.
15                      Judge, on behalf of Rosie Marks, Richard
16          Della Fera.
17                      I wanted to let the Court know that I have to be
18          in front of Judge Moore at 2:00 --
19                      THE COURT:  Okay.
20                      MR. DELLA FERA:  -- in Miami.  So with the Court's
21          permission, I may have to leave at 12:30.
22                      THE COURT:  That's fine.
23                      MR. DELLA FERA:  I don't know how long
24          Mr. Bardfeld is going to be, but I spoke to Mr. Schwartz and
25          Mr. Schwartz can aptly and ably cover my position.
```

```
1              As a matter of fact, the victims, the alleged
2    victims C.C. and T.L. that he referred to are alleged victims
3    as to my client, Rosie Marks, as well.  So I rely on the
4    comments that he made before and anything that he may say if I
5    have to absent myself.
6              THE COURT:  Thank you, Mr. Della Fera.
7              MR. DELLA FERA:  Thank you.
8              THE COURT:  Mr. Bardfeld.
9              MR. BARDFELD:  Good morning, again, Your Honor.  I
10   will try to be brief.
11             But basically, what the defense has done is they
12   have accused us of misconduct in so many different ways.  It's
13   almost as if they're throwing things against the wall and
14   hoping that something sticks.
15             I think the real reason we are here is because of
16   the individual by the name of J.C., who we have referred to as
17   John Cleary, but I'll just refer to him by initials if I can
18   remember that as we're doing it.
19             THE COURT:  All right.
20             MR. BARDFELD:  There is no question -- and I will
21   concede and I did in my papers -- that we did not speak to J.C.
22   before we returned the superseding indictment, but what we did
23   instead is we relied on circumstantial evidence to determine
24   that this is what was happening.
25             His interview -- and we did interview him after
```

```
 1    the fact.  The interview that he gave is consistent with what
 2    was placed in the superseding indictment.  The only difference
 3    is he said that he was not a victim.
 4              And I would say, Your Honor, that he's not a
 5    victim the same way that in 1980, or whatever year you tried
 6    the case, that the woman who was a witness of an attempted
 7    murder, originally was not a victim.
 8              In this particular case, if you look at the
 9    circumstantial evidence that was available to us when we
10    presented to the Grand Jury, it was not an illogical conclusion
11    to conclude that he was a victim.
12              And what we have, Your Honor, and if you look at
13    it, just looking at Mr. Cleary's affidavit and he does not talk
14    about being threatened by the IRS.  He does not talk in there
15    about the threat to his wife.
16              So his affidavit basically says:
17              "I was billed for professional services rendered.
18    However, I believe I got fair value for any payments that were
19    made..."
20              THE COURT:  Please slow down.  Don't kill the
21    court reporter.
22              MR. BARDFELD:  I apologize.
23              "I was billed for professional services rendered.
24    However, I believe I got fair value for any payments that were
25    made to Miss Eli."
```

```
 1              Now, Judge, as we go back and look at some of the
 2      payments that were made and we used some of the bank records.
 3      We have significant amounts of money going from J.C. to
 4      Victoria Eli.
 5              For example, in September of 2006, we have a
 6      transfer of $18,900.
 7              THE COURT:  Are you referring to the indictment?
 8              MR. BARDFELD:  No, no.  We did not -- and as far
 9      as J.C. goes, J.C. is mentioned in the general allegations in
10      the manner and means section of the conspiracy.  He is not
11      subject to any of the specific mail fraud counts or wire fraud
12      counts.  It is just the allegation that is in the conspiracy
13      part of the indictment.
14              THE COURT:  The pending indictment.
15              MR. BARDFELD:  The pending indictment and the
16      superseding indictment, yes, that is correct.
17              But if you look at the evidence that the agents
18      had before them when we went to the Grand Jury, there was a
19      wire transfer -- or a transfer of $18,900 on September 18,
20      2006.  Ten days later a transfer of $21,000.  Two months later
21      a transfer of $3,000.
22              Then, you have in January of 2007, Eli receiving
23      $63,000 from J.C.  That same year, two months later, a check or
24      a wire transfer -- I don't remember which it was -- for $83,800
25      and in between those two, which is $146,000, you have a $12,000
```

```
 1    transfer, again, from J.C. to Victoria Eli.

 2                Well, I think any competent law enforcement

 3    officer who looks at those numbers is going to make the

 4    conclusion, okay, even if it is for services rendered, I'm not

 5    quite sure what services could be rendered that are worth

 6    $150,000 over a two-month period.  Mr. J.C. has given close to

 7    $500,000 to Miss Eli over the course of their relationship.

 8                Okay.  So what the agents had, was they had

 9    information that there were other complaints lodged with the

10    Secaucus New Jersey Police Department that Victoria Eli was

11    doing that.  There were other victims that we spoke to that had

12    indicated that Victoria Eli was acting as a fortune teller, a

13    psychic, whatever it is, and that there were curses and the way

14    you get rid of the curses is with money.

15                So what it comes down to is, we did not speak to

16    J.C. before the indictment was returned.  And as I wrote and

17    conceded it was ill-advised.  But Judge, the reason we didn't

18    do it is we knew that he was in continuous contact with

19    Victoria Eli.  We were concerned if we had talked to him that

20    he was going to mention that there was an ongoing

21    investigation.

22                THE COURT:  Let me stop you, Mr. Bardfeld.

23                At issue is Paragraph 44 on Page 19 of the first

24    superseding indictment.

25                MR. BARDFELD:  Okay.
```

```
 1                    THE COURT:  And it's called superseding
 2      indictment.
 3                    MR. BARDFELD:  Yes.
 4                    THE COURT:  It says:
 5                    "It was further part of the conspiracy that the
 6      defendant, Victoria Eli, would tell J.C. that in order to rid
 7      him and his family of all evil spirits, bad luck and curses,
 8      J.C. would have to make a sacrifice which would involve money
 9      because money was the root of all evil."
10                    Who said that to whom?  Who said that Victoria Eli
11      told J.C. that?
12                    MR. BARDFELD:  Well, we found out after-the-fact
13      that Victoria said it to J.C.
14                    THE COURT:  You found that out.  What do you mean
15      after-the-fact?
16
17                    MR. BARDFELD:  Well, we interviewed him after the
18      superseding indictment was returned.
19                    THE COURT:  But at the time of the return of this
20      indictment, was anyone possessed of that knowledge who
21      testified before the Grand Jury?
22                    MR. BARDFELD:  No, Your Honor.  It was based on
23      circumstantial evidence that the pattern of activity was
24      similar to other victims in this case.
25                    THE COURT:  And it specifically says:
```

1          "That Victoria Eli assured him that it was a

2    sacrifice and not a payment and promised that the money would

3    be returned."

4          Are you saying that no one said that to any agent,

5    that Victoria Eli said that to this defendant?

6          MR. BARDFELD:  No.  Not until after the return of

7    the indictment.  And as I said, Your Honor, it was ill-advised

8    to go to the Grand Jury with that.  I recognize that now, but

9    when you look at the circumstantial evidence that had been

10   presented that this is what Victoria Eli was doing with others

11   that's why we made that conclusion.

12          THE COURT:  Okay.  Go ahead.

13          MR. BARDFELD:  Okay.  As far as some of the other

14   arguments that have been made, the whole idea as it relates to

15   -- well, one of the things that Mr. Schwartz was complaining

16   about is the threats that were made to potential witnesses.

17          And Judge, I have a notebook full of witness

18   statements.  I know you don't want to go through it.  I know

19   you don't want to go through the Grand Jury transcripts.  I

20   recognize that, but they are available.

21          Our concern is that the defense, at this point,

22   have contacted a number of the witnesses in this case through

23   their investigators and our witnesses are now getting concerned

24   about what is going on along those lines.  They are concerned

25   when they say we don't want to talk to the investigator and the

```
 1    investigator calls back and they want to know what's going on.
 2                   For example, I received an e-mail from one of the
 3    witnesses in the case before she was ever added to the second
 4    superseding indictment.  After the defendants were arrested and
 5    the case made the newspaper, she contacted law enforcement
 6    officials.  And then, she sent an e-mail and it says something
 7    along the lines of:
 8                   "I received a phone call Sunday night on my mobile
 9    phone.  I don't know why they called me on my mobile phone.
10    Was my name leaked to her?"
11                   And the name was not.
12                   "Why would she call my mobile phone?  Did Kate
13    provide my name and number to her?  I will call you to discuss
14    tomorrow.  I am concerned there is something going on and I
15    feel uneasy."
16                   So to provide names, contact information to the
17    witnesses, which the defense already has most of them, is
18    something of concern to the witness in this case.  That's one
19    of the concerns they have.
20                   Another witness that I will go through is someone
21    with the initials A.W.  And she happened to be in town recently
22    and she gave me an e-mail that she had received from, I believe
23    it was one of Mr. Schwartz' investigators.  And it says:
24                   "On August 16, 2011, Joyce Michael was arrested by
25    federal agents.  She along with several members of her family
```

1   were charged in a federal indictment.  Joyce and Kate spent 30

2   days in jail.  Are you aware you are named as one of the

3   victims on the indictment?  This may oblige you to go to court

4   and testify about your private matters."

5           Again, she told us that she was concerned that

6   they were going to dig up some laundry.  She's a witness in

7   this case and she was concerned as to what that meant.  It also

8   says further on in there:

9           "Joyce has the sincerest intentions of satisfying

10  on her debt."

11          One of the things in this case, Your Honor, is

12  that the victims were always told that they were going to get

13  their money back and they never received their money back.

14          This victim happened to come to the United States

15  to talk to a lawyer to potentially obtain close to a million

16  dollars.  I think she gave $900,000 to Joyce Michael and her

17  family members over the course of this conspiracy.

18          But when she came to the United States she

19  contacted a lawyer and the lawyer said what are you trying to

20  do?  And she said I'm trying to get money back from Joyce

21  Michael.  She found out Joyce Michael' address at 1319 Seminole

22  Drive or Seminole Way -- I don't remember which one -- in Fort

23  Lauderdale.  It's a 1.5 million dollar house or a 1.2 million

24  dollar house, depending on what it is.

25          But the lawyer said, well, that house is in the

1    name of Rose Marks.  You can't get anything from them.  You

2    can't file a lawsuit against Joyce Michael because there is no

3    connection between Joyce Michael and Rose Marks, as we know.

4              We now come to find out, during our investigation,

5    we learned that Rose Marks is Joyce Michael.  So those are the

6    kind of games that the defendants are playing.

7              Finally, there was one other witness that the

8    government is using at trial.  And this is a witness who has

9    known Rose Marks over 30 years since their days back in

10   Virginia.  And this witness spent around or paid around a

11   million dollars to the defendants over the course of it -- over

12   the course of the conspiracy.

13             And she received an information and this would

14   have been done, I think it was about an hour after the second

15   superseding indictment was returned.  I remember she was not in

16   the superseding indictment, but this victim we learned about in

17   the second superseding indictment.  And after that second

18   superseding indictment was returned, it says:

19             "Dear victim, the recent superseding indictment

20   received in the Rose Marks case appears to list you as a

21   victim.  The government provides the following information in

22   the indictment."

23             And then, they write the paragraph that relates to

24   her.  Then it continues on:

25             "Did you speak with the government or an

1    investigator for the government?  If so, when did you speak

2    with them and was this the information you gave them?  Finally,

3    did you agree to appear before the government as a victim and

4    testify if necessary?"

5                Now, that on its face is innocuous.  It's not a

6    big deal.  They're doing their investigation.  They're doing

7    what they're supposed to do.  So the next part of the e-mail,

8    then, is somewhat concerting.

9                "Rose Marks and this individual have a credit card

10   at Neiman Marcus in both of their names.  Rose Marks uses the

11   credit card.  She pays this victim back and the victim pays the

12   bill."

13               THE COURT:  Wait a minute.  Say that again.

14               MR. BARDFELD:  Rose Marks has a credit card at

15   Neiman Marcus with this particular victim, D.W.; okay?

16               THE COURT:  Okay.

17               MR. BARDFELD:  Rose Marks then uses the credit

18   card.

19               THE COURT:  Okay.

20               MR. BARDFELD:  D.W. is responsible for paying the

21   bill.  In some instances, Rose Marks has paid D.W. that money

22   so that she can pay the bill.  It might just be for credit

23   reasons.  I'm not sure, but this particular victim has a credit

24   card that she is responsible for; okay.

25               Then the e-mail written to her again:

1           "While you were merely a client of Rose's, defense

2    counsel had no problem with Rose continuing to pay back the

3    money she committed to you pursuant to her money-back

4    guarantee.  However, after we received the second superseding

5    indictment yesterday indicating that you were now a complaining

6    witness against Rose, there is significant concern that

7    continued payments on your behalf may be deemed to create the

8    appearance of in some way attempting to influence your

9    testimony.

10          Therefore, Rose has been instructed to suspend any

11   further payments until the case is over.  If we are incorrect

12   in assuming that you have sworn to the facts from the

13   superseding indictment as we sent you yesterday, please notify

14   us immediately."

15          Again, a cynic might say that that is someone

16   trying to silence a witness.  I'm not doing that, but defense

17   counsel, all of these people are accusing us of so much

18   wrongdoing.  I would never bring this to the Court's attention,

19   but they have accused us of so much wrongdoing that something

20   that may be innocuous, that may have a perfectly logical

21   explanation, is we're not going to pay.  Therefore, now that

22   you're talking, we're no longer paying what we owe.  Plain and

23   simple.

24          Finally, as it relates to Jude Montassir, who is

25   one of the victims in this case -- and we can mention her by

1    name because I know that defense counsel did and I think it's

2    already made the papers -- she is one of the victims against

3    Rose Marks.  Over a twenty-year period she has paid close to 20

4    million dollars to Rose Marks for her fortune telling and

5    psychic abilities and things along those lines.  She was

6    involved in a divorce and counsel is trying to obtain copies of

7    those deposition transcripts in that divorce.

8              And from the court reporter out there, it says:

9              "I just received a request for the depositions of

10   the victim and her husband taken in December of 2008 on behalf

11   of a Florida attorney..."

12             And that would be Mr. Schwartz.

13             "...who allegedly represents some detectives who

14   are involved in litigation.  I believe he mentioned the name

15   Detective Stack."

16             Again, Your Honor, I think this is something that

17   we need to be concerned about so that if -- and I don't know if

18   there was a misrepresentation there.  It could have been a

19   simple misunderstanding, but it seems to me with a number of

20   these things is concerting.  So if we give what defense wants,

21   which is names and addresses of the witnesses in this case,

22   that there is going to be a chance that they will -- I don't

23   want to say abuse the process, but they will certainly -- there

24   is concern if we give them names.

25             THE COURT:  Do you concede that there has been

1    enough raised by the defense that the Court should review Grand

2    Jury testimony?

3              MR. BARDFELD:  No, I do not because I think, Your

4    Honor, if you look at the case law for a -- because ultimately,

5    it is a motion to dismiss.  It's not styled as a motion to

6    dismiss at this point.  It's only styled as a motion for

7    discovery, but the standard is so high on the motion to

8    dismiss --

9              THE COURT:  Don't look at the motion to dismiss.

10   Look at discovery.  Has the defense alleged enough to have the

11   Court review the testimony that was before the Grand Jury?

12             MR. BARDFELD:  I don't think so.  I really don't

13   because, again, ultimately what they want is they want

14   discovery so that they can file a motion to dismiss.

15             While the case law is pretty clear on the motion

16   to dismiss that an indictment --

17             THE COURT:  Wait a second.

18             If they are correct on what they believe the Court

19   will find in the Grand Jury, then they will be filing a motion

20   to dismiss.

21             But the issue is, is there enough to require the

22   Court to look to see what happened in the Grand Jury.

23             MR. BARDFELD:  I don't think there is.

24             THE COURT:  What's the standard?

25             MR. BARDFELD:  I don't know what the standard is.

```
 1    I tried reviewing it, Your Honor.  I don't think it's probable
 2    cause that they said.  I could not find cases that stand for
 3    the proposition of what the standard would be in a situation
 4    like this, but I don't think it has risen to that level.
 5              I think what you have is, you have an affidavit
 6    from J.C. that says -- basically that says, I am satisfied with
 7    the services I received from Victoria Eli and as a result of
 8    that, I am not a victim in the case.
 9              THE COURT:  I really don't care anything about
10    what J.C. said in his affidavit.  It's not up to J.C. or anyone
11    else to determine whether or not he is or is not a victim.
12              I am concerned about Paragraph 44 where someone,
13    in my opinion, had to have told the Grand Jury that J.C. said
14    X,Y and Z, or someone else to whom J.C. confided said X,Y and
15    Z, and you have now told me that none of that ever occurred.
16    That's very disturbing.
17              That, in and of itself, I believe requires the
18    Court to look at the Grand Jury testimony.  So I am going to be
19    looking at the Grand Jury testimony.  At this point, I see no
20    reason to turn over witness statements, names, addresses.  And
21    of course, your concern will be taken into account if I think
22    that that becomes necessary later on.  I can't remember what
23    number two was, the police reports, or whatever you call them.
24              MR. BARDFELD:  Agent reports.
25              THE COURT:  What are they?
```

```
 1              MR. BARDFELD:  Agent reports.

 2              THE COURT:  Agent reports.  I don't know, 302s,

 3    whatever they are.  The Secret Service calls them something

 4    else.

 5              MR. BARDFELD:  Memorandum of interviews.

 6              THE COURT:  Okay.  So at this point, I do want to

 7    see the Grand Jury testimony.  And then, I'll have to decide

 8    with whether or not I need to look at agent reports.

 9              MR. BARDFELD:  Okay.

10              THE COURT:  I did not let you finish.  Did you

11    have anything else you wanted to say?

12              MR. BARDFELD:  As it relates to the whole term

13    gypsy, I don't know that I need to get into that argument.

14              THE COURT:  Which one?

15              MR. BARDFELD:  Gypsy.  The argument gypsy.

16              THE COURT:  We'll do our own research on gypsy.

17              I mean, just the fact that we all use that term

18    here in the courtroom and no one shutters when we say the word

19    gypsy, but I'll look at the -- Mr. Schwartz is shuttering.  Let

20    the record reflect that there was a Kramer reaction.

21              All right.  So we'll see what is in the Grand

22    Jury.  And give me all three, if there were three sessions of

23    the Grand Jury, or whatever there were.

24              MR. BARDFELD:  I have them all.

25              THE COURT:  Anything else, Mr. Schwartz?
```

```
 1              MR. SCHWARTZ:  I just wanted to reply to a couple
 2    of minor statements.
 3              THE COURT:  Very brief reply.
 4              MR. SCHWARTZ:  I was going to say I'll be short,
 5    but Judge Spellman already told me I was short, be brief.
 6              THE COURT:  Judge Spellman is tough.
 7              MR. SCHWARTZ:  Judge, first of all, on the e-mail
 8    that we sent to D.W, I believe that it was totally improper
 9    once she became a victim for Rose Marks to be continuing to pay
10    her money.  And we told her that Rose wasn't going to continue
11    paying her money.
12              THE COURT:  I believe that in every bond that is
13    set you're allowed to have no contact whatsoever with witnesses
14    or co-defendants.
15              MR. SCHWARTZ:  Right.  And we stopped that
16    immediately upon her becoming a victim and being clear she was
17    a victim.
18              Just so it is clear what was going on here,
19    there's really one --
20              THE COURT:  It's not clear what is going on here,
21    but I'm going to take the first step and look at the Grand
22    Jury.  And the government hasn't filed any motions against
23    anybody on the defense side on any activities.
24              So I am concerned right now with what is in the
25    Grand Jury and I will look at that.  We'll issue a written
```

1   order as a result of what has happened here today and we'll go

2   from there.

3             Do you have a trial date?

4             MR. SCHWARTZ:  The trial date is at the end of

5   May, but we've had conversations with the government and

6   defense counsel and we're waiting for the defendant asking for

7   a continuance of a trial date.

8             THE COURT:  Okay.

9             MR. SCHWARTZ:  I believe it has to be filed by the

10  middle of March and I just don't see that realistically

11  happening.

12            THE COURT:  Okay.  Well, we'll get to work.  When

13  can I have those things?

14            MR. BARDFELD:  Today do you know want them?

15            THE COURT:  Well, yes.

16            MR. SCHWARTZ:  Can we make Mr. Rabin a neutral

17  person?

18            One last point and I guess I'm defending myself

19  here.  We never said we were representing Mr. Stack, or anyone

20  from Fort Lauderdale.  As part of the case in New Mexico, the

21  attorneys for Jude Deveraux's ex-husband noticed Mr. Stack and

22  his partners for depositions.

23            We asked the court reporter for the depositions

24  that were taken of Mr. White and Miss Deveraux.  And then,

25  asked her, did you take any depositions of Detective Stack or

1   the other detectives from Fort Lauderdale.  As a matter of

2   fact, I never spoke to her.  An investigator for us did.  So I

3   want that to be clear on the record.

4           THE COURT:  Thank you.

5           Mr. Lubin.

6           MR. LUBIN:  The last thing I wanted to say is, I

7   know that the government generally does type of the testimony

8   of the Grand Jury witnesses so that they will have it later for

9   Jenks or whatever.  But I think what you're asking for in this

10  case is also the argument of the government and what the

11  government told the grand jurors.

12          THE COURT:  The whole ball of wax.

13          MR. LUBIN:  The whole ball of wax.

14          THE COURT:  Anything else from either side?

15          Thank you very much.  We're in recess.

16          MR. SCHWARTZ:  I'm sorry.  I promised you the

17  citation on the Dibernardo case.

18          THE COURT:  Give it to my law clerk, Marcus

19  Massey.

20          (Thereupon, the hearing was concluded at 12:15 p.m.)

21

22

23

24

25

CERTIFICATE


                    I hereby certify that the foregoing is an

accurate transcript of the proceedings in the above-entitled

matter.


02/23/12                              Bonnie Joy Lewis,
                              Registered Professional Reporter
                                CASE LAW REPORTING, INC.
                                7001 Southwest 13 Street,
                              Pembroke Pines, Florida 33023
                                     954-985-8875