UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-80072-CR-MARRA/HOPKINS

**UNITED STATES OF AMERICA**,

v.

**ROSE MARKS, NANCY MARKS,
CYNTHIA MILLER, ROSIE MARKS,
VICTORIA ELI, VIVIAN MARKS,
RICKY MARKS, MICHAEL MARKS,
ONNIE ELI, and PETER WOLOFSKY,**

Defendants.

_____/

## MOTION BY ROSE MARKS TO DISMISS THE THIRD SUPERSEDING INDICTMENT AND THE PREVIOUS THREE INDICTMENTS WITH PREJUDICE

The Defendant Rose Marks by and through her undersigned attorney files this Motion to Dismiss With Prejudice The Third Superseding Indictment, and the previous three indictments which are the product of this flawed investigation and states as follows:

1.      Sometime in the middle of the last decade an investigation into a family of United States citizens of Romany descent was commenced by a then Fort Lauderdale Detective named Charles Stack. There are at least two scenarios as to how this investigation started. Mr. Stack has testified that he received a complaint from some officers in New York about deposits being made into a bank account in Fort Lauderdale, Florida and that he investigated that bank account and was led to a web of fraud. Unfortunately, after fifteen months of alleged discovery, the defense has received no evidence of those communications to Mr. Stack. The other scenario is that Rose Marks' brother-in-law, Sammy "The Snake" Marks, a long time informant for Mr. Stack, against whom Ms. Marks' family has had a number of restraining orders, provided false information to Mr. Stack to commence an investigation. Other than statements from "The

Snake" about his involvement, there is no proof that the investigation started in that manner either.

2.     The above dichotomy is representative of a flawed investigation, conducted without any significant prosecutorial supervision, by an out of control Fort Lauderdale Detective who was seconded to the Secret Service after a few years of the investigation.  The Detective, referred to by the prosecutor as the case agent in the case, was assisted by two less than experienced young and enthusiastic agents, one from the Secret Service and one from the Internal Revenue Service.

3.     Due to the cavalier disregard of the niceties of the United States Constitution by Mr. Stack and his co-investigators, the investigation of these defendants has so tainted their rights to a fair trial, that this Court has no option but to dismiss the four Indictments that have been returned in relation to this investigation with prejudice.  The case agent controlled the entire investigation, and the Government responsible for ensuring compliance with the constitutional rules abdicated its responsibility to do so and in a number of instances was complicit in violating them.  There is no way to recreate the reports that should have been generated or to be aware with any degree of surety all the wrongs that were committed.

4.     The chronicle of misconduct is so exhaustive that it is difficult to organize in a coherent fashion.  However, counsel will start with the location where many investigations start, the Grand Jury.  Although the Grand Jury misconduct in this case is significant, and has clearly tainted one Grand Jury, the flawed investigation has spilled over to so many different facets, that the defense is going to ask the Court to look not only at the Grand Jury misconduct, but also numerous acts   in violation of *Brady*, *Giglio* and other cases designed to protect defendants' rights, violated here by the intimidation of potential witnesses, the providing of deceptive

{R6118033_1}

information to United States Magistrates, the improper relationship between investigator and witness, the improper editing or false preparation of investigative reports, and numerous other acts of investigative and therefore prosecutorial misconduct.

5.     On November 29, 2012, more than fifteen months after the arrests in this case, six weeks before the scheduled trial, and one day before the Defendant was to file this Motion to Dismiss for Misconduct, the Government caused a new Grand Jury to return a Third Superseding Indictment . This new indictment presents no significant new facts or criminal acts. It attempts to "clean-up" the Government's misconduct by eliminating some of the blatant misstatements and misconduct utilized to obtain previous indictments.  Apparently the Government is hoping the Court will allow them four strikes before pronouncing them "out."  However, the defense believes that, from the extensive chronicle of misconduct presented below, the Court will conclude this investigation is so tainted by the Government's wrongdoing that no amount of *mea culpas* will cause the Defendants, the court, or the public to believe the investigation, the investigators, or the Government have acted or **in the future will act** in accord with the United States constitution.

## I.     THE GRAND JURY AND INVESTIGATIVE MISCONDUCT

6.     In order to present evidence to the Federal Grand Jury the prosecutor has two basic options.  First, he can present sworn testimony by live witnesses with firsthand knowledge of the events testified about to the Grand Jury.  Second, he can have an agent interview and gather evidence from these live witnesses and present it to the Grand Jury as hearsay.  The facts testified about either by direct or hearsay evidence should then find their way into an indictment which is returned by a Grand Jury after serious consideration and a majority vote.

7.      In the instant case, the Government developed a new method of presenting evidence and producing the resulting indictment.  At least as to some of the alleged witnesses in the case, the Government chose not to interview them or individuals related to them direct knowledge of the facts.  The Government chose to have the case agent provide some minimal amount of information about the alleged victims to the Grand Jury, and then engage in the type of creative writing (perhaps influenced by the famous novelist who is an alleged victim) in the Indictment which culminated into making up from whole cloth facts that were never presented to the Grand Jury and placing those facts in an Indictment which the Government caused the Grand Jury to vote on and return.  In addition to creating a fictional story to place in the Indictment as to some witnesses, rather than relying on the facts provided to it by the witnesses the Government interviewed, it again created fictional facts (if that is not an oxymoron) in keeping with their theory of the case which they included in the Indictment[1].

8.      Much of this misconduct was hidden by the Government's failure to provide defendants with material pursuant to *Brady* and presentation of false testimony contrary to *Giglio* and was only through the orders of two United States Magistrate Judges that the defendants were made aware of much of this misconduct.  Although former United States Magistrate Judge Ann Vitunac referred to this investigation as slip-shod, the actions recounted above and set forth further herein were not merely slip-shod, they were venal acts of an out of control law enforcement officer left unguided and uncorrected by Government prosecutors.

---

[1]      This "creative writing" carried through from the Indictment into search warrants and testimony before United States Magistrates.  Further, the third superseding indictment modifies the theory of fraud.

## MAKING UP VICTIMS

### The Paragraphs In The Indictments Regarding J.C.

9.      Paragraph 48 of the original Indictment in this case (DE 3), which is identical to

Paragraph 44 of the Superseding Indictment (DE 14) states as follows:

> 48.  It was further part of the conspiracy that Defendant VICTORIA ELI
> would tell J.C. that in order to rid him and his family of all evil spirits, bad
> luck and curses, J.C. would have to make sacrifices, which would involve
> money because money was the root of all evil.  J.C. would provide
> Defendant VICTORIA ELI with large sums of money, after Defendant
> VICTORIA ELI assured him that it was a sacrifice, not a payment, and
> promised that the money would be returned.  The sacrifice entailed the
> money being set aside and prayed upon.  Defendant VICTORIA ELI
> promised that while she prayed on the money, it would start relieving J.C.
> and his friends and family of all evil spirits, the end of bad luck, and the
> end of curses.  Defendant VICTORIA ELI reassured J.C. that he would
> get the money back.  The money was never returned.

> 44.  It was further part of the conspiracy that Defendant VICTORIA ELI
> would tell J.C. that in order to rid him and his family of all evil spirits, bad
> luck and curses, J.C. would have to make sacrifices, which would involve
> money because money was the root of all evil.  J.C. would provide
> Defendant VICTORIA ELI with large sums of money, after Defendant
> VICTORIA ELI assured him that it was a sacrifice, not a payment, and
> promised that the money would be returned.  The sacrifice entailed the
> money being set aside and prayed upon.  Defendant VICTORIA ELI
> promised that while she prayed on the money, it would start relieving J.C.
> and his friends and family of all evil spirits, the end of bad luck, and the
> end of curses.  Defendant VICTORIA ELI reassured J.C. that he would
> get the money back.  The money was never returned.

10.      Pursuant to the Order of United States District Judge Hopkins, the Government

turned over certain Grand Jury transcripts to the defense.  The transcript of May 5, 2011 states at

page 34 the following:

> at line 10:

> Q: One of the victims that Victoria Eli received a lot of money from was
> John Cleary; is that correct?

A:      Yes.  Our records indicate there was quite a large number of checks sent from John Cleary to Victoria Eli.

Q:      And we are talking about hundreds of thousands of dollars that Mr. Cleary would have sent to Victoria Eli, is that correct?

A:      That is correct.

That paragraph is also quoted in Judge Vitunac's Order of March 8, 2012 at page 5. When undersigned counsel received the Grand Jury transcript he expected that there would be some other information regarding John Cleary and Victoria Eli; something where Victoria Eli promised to return the money, something where Victoria Eli talked about removing evil spirits, and the end of curses, but none of that appears in the Grand Jury transcripts.  Unless the prosecutors have not turned over all of the Grand Jury transcripts that Judge Hopkins ordered, those two questions and answers are the entire testimony regarding John Cleary and his relationship with Victoria Eli.  It is clear the prosecutors created the facts contained in the Paragraphs in the Original and Superseding Indictment.

Subsequent to the Indictment in this case, the defendants learned the Government was for the first time trying to interview John Cleary.  There were a number of telephone calls culminating with a telephonic meeting between the prosecutor and case agents and Mr. Cleary and his attorney.  Mr. Cleary made clear at that meeting he was not a victim of Ms. Eli and that she never promised to return the money, the crux of the Government's fraud claim.  No transcript or notes of that meeting were turned over by the Government until almost seven months after the Indictment herein, when they were ordered to be turned over by Judge Vitunac.  The nature of the interaction with Mr. Cleary and the agents will be addressed in another section.

11.     When questioned about the failure to interview Mr. Cleary and another witness prior to the numerous Grand jury presentations the Government asserted it did not want to

{R6118033_1}

question these people since it did not want the defendants to learn about the investigation. This assertion is clearly at odds with the actions by the Government taken in 2008. In 2008 Assistant United States Attorney Bardfeld and two Fort Lauderdale detectives met with the attorney for J.M. and confirmed to her the existence of an investigation of Rose Marks and her family, and the fact that it was to be presented to a Grand Jury. This information was provided to enable J.M.'s attorney to defend a contempt motion in New Mexico in which her ex-husband, Claude White, was attempting to collect in excess of a quarter of a million dollars in back property settlements from her. The attorney for J.M. quoted the statements by the detectives and the U.S. Attorney in a motion to defend against contempt for J.M. What makes this inconsistent with the Government's position as to why it did not interview J.C. and other Grand Jury witnesses prior to the Grand Jury hearing, is that at the time of this 2008 meeting, and up until the time of the Indictment, the Government felt that in some way J.M.'s ex-husband Claude White was a co-conspirator of Rose Marks, a position the Government has since abandoned. Why notify a confederate of Rose Marks of the Grand Jury investigation and neglect to interview witnesses until two or three years later?

**The Grand Jury Testimony Regarding C.C.**

12.     In the Original Indictment (DE 3) at paragraph 35, and in the First Superseding Indictment (DE 14) at paragraph 30 identical statements appear.

> 35. It was further part of the conspiracy that Defendant ROSE MARKS and ROSIE MARKS would tell C.C. that in order to rid her and her family of all evil spirits, bad luck and curses, C.C., would have to make sacrifices, which would involve money because money was the root of all evil. C.C. would provide Defendants ROSE and ROSIE MARKS with large sums of money, after Defendants ROSE MARKS and ROSIE MARKS assured her that it was a sacrifice, not a payment, and promised that the money would be returned. They money was never returned.

7

30.  It was further part of the conspiracy that Defendant ROSE MARKS and ROSIE MARKS would tell C.C. that in order to rid her and her family of all evil spirits, bad luck and curses, C.C., would have to make sacrifices, which would involve money because money was the root of all evil.  C.C. would provide Defendants ROSE and ROSIE MARKS with large sums of money, after Defendants ROSE MARKS and ROSIE MARKS assured her that it was a sacrifice, not a payment, and promised that the money would be returned.  They money was never returned.

13.     This was a wholly concocted story.  Pursuant to the March 8, 2012 Order (DE 412) of Magistrate Judge Vitunac the Government was required to turn over a memorandum of conversation between C.C., Special Agent Beth Watts of the Internal Revenue Service and Retired Fort Lauderdale Police Department Detective Charlie Stack.  This memorandum of conversation is dated August 18, 2011 which is six days after the return of the Superseding Indictment in this case.  Thus the Government never spoke to C.C. before returning two indictments in this matter though it relates facts it had no information to support.  Further, the memorandum of conversation shows that C.C. only dealt with Rosie Marks and does not provide any information about a relationship with Rose Marks, though she is included in the above quoted paragraphs.

14.     Pursuant to the Order of Judge Hopkins the Government on October 29, 2012 turned over certain Grand Jury transcripts to the defense.  The only reference found to C.C., is found on May 5, 2011 at page 34, at line 20:

Q:  Is there a victim by the name of (C.C.)

A.  Yes, I think is how you say it.

Q:  (Spelling the name)

A:  Yes.

Q:  What can you tell us about her?  What kind of dealings, who dealt with her?     There were telephone conversations, numerous telephone conversations?

A:  Yes, from the phone records Rosie Marks would receive I believe it was within a year period from '08 to '09, 4,000 probably about 4,200 calls were made to Rosie Marks and Rosie Marks made approximately 300 to 400 calls to C.  Now C. would then send wired money to Rose Marks to conceal the true source of the money but in Wachovia records of C. the wires would spell out Rosie Marks.

15.     It was upon this limited testimony that the Government again created from whole cloth the allegations regarding evil spirits, bad luck and curses, sacrifices, money being the root of all evil and defendants Rose Marks and Rosie Marks assuring C. that it was a sacrifice not a payment and promising the money would be returned and the fact that the money was never returned.

### DISTORTING AND MISREPRESENTING FACTS TO THE GRAND JURY, COURT AND IN AFFIDAVITS SUPPORTING WARRANTS

### Testimony Relating to T.L. –

16.     The Original Indictment (DE 3) at paragraph 40 and the Superseding Indictment (DE 14) at paragraph 36 state as follows:

40.  It was further part of the conspiracy that Defendant NANCY MARKS would tell T.L. that in order to rid her and her family of all evil spirits, bad luck and curses, T.L. would have to make sacrifices, which would involve money because money was the root of all evil.  T.L. would provide Defendant NANCY MARKS and DONNIE ELI with large sums of money, after Defendant NANCY MARKS assured her that it was a sacrifice, not a payment, and promised that the money would be returned. The sacrifice entailed the money being set aside and prayed upon. Defendant NANCY MARKS promised that while she prayed on the money, it would start relieving T.L. and her friends and family of all evil spirits, the end of bad luck, and the end of curses.  Defendant NANCY MARKS reassured T.L. that she would get the money back 'three times over.'  The money was never returned.

36.  It was further part of the conspiracy that Defendant NANCY MARKS would tell T.L. that in order to rid her and her family of all evil spirits, bad luck and curses, T.L. would have to make sacrifices, which would involve money because money was the root of all evil.  T.L. would provide Defendant NANCY MARKS and DONNIE ELI with large sums of

{R6118033_1}

money, after Defendant NANCY MARKS assured her that it was a sacrifice, not a payment, and promised that the money would be returned. The sacrifice entailed the money being set aside and prayed upon. Defendant NANCY MARKS promised that while she prayed on the money, it would start relieving T.L. and her friends and family of all evil spirits, the end of bad luck, and the end of curses.  Defendant NANCY MARKS reassured T.L. that she would get the money back 'three times over.'  The money was never returned.

17.    T.L. was interviewed prior to the indictments being returned.  Pursuant to an Order by Judge Vitunac the defense received an Affidavit from T.L. dated March 5, 2011. Nowhere in that Affidavit does it state Nancy Marks promised or represented to T.L. that the money she gave Nancy Marks would be returned to her.  The money is referred to as a sacrifice. Rather T.L. was informed that, due to the work performed by Nancy Marks, T.L.'s music career would be advanced and she would earn three times or more the amount of money she gave Nancy Marks from her music career.  The Indictments the Government caused the Grand Jury to return clearly misrepresent the facts set forth in the investigative affidavit.  The Government even more blatantly misled the Grand Jury when it superseded the Superseding Indictment with a Second Superseding Indictment on January 12, 2012 (DE 306).  In that Second Superseding Indictment the Government totally left out any reference to getting money back three times over (which could have provided a clue that T.L. was to earn the money rather than getting the original money returned, and completely distorts the facts evidenced by T.L.'s affidavit).  The Government causes the Grand Jury to allege in paragraph 28 of the Second Superseding Indictment that

> T.L. provided Defendants Nancy Marks and Rosie Marks with large sums of money after the Defendants Nancy Marks and Rosie Marks assured T.L. that it was a sacrifice not a payment and promised the money would be returned.  The money was never returned.

{R6118033_1}

Neither the Original Indictment at paragraph 40 nor the Superseding Indictment at paragraph 36 make reference to Rosie Marks with regard to T.L. Allegations regarding Rosie Marks first appear in the Second Superseding Indictment. However, the Affidavit of T.L. contains no allegation T.L. provided Rosie Marks with large sums of money after Rosie Marks assured T.L. it was a sacrifice, not a payment and promised that the money would be returned. In the Grand Jury transcripts regarding the Second Superseding Indictment on January 12, 2012 at page 19 there is a blanket statement regarding Count 51 at line 21 saying the "changes in this Count is originally we had Nancy and Donnie Eli as individuals who are defendants in these Counts, Rosie Marks was added because of her relationship with T." and it stops there. There is nothing in the Grand Jury transcript to justify the inclusion of Rosie Marks. This fact is consistent with all three of these alleged victims and other matters presented to the Grand Jury. The Government has an obligation as the advisor of the Grand Jury to truthfully provide it with the law and the facts and allow them to vote an honest indictment. The defense is not complaining about the lack of probable cause as to many of the alleged facts in the Grand Jury Indictment, although there is a lack of probable cause; rather, what is set forth herein is part of a larger pattern of misconduct by the agents in the case, misleading both the prosecutors and the Grand Jury, and intentional actions by the prosecutors in allowing the agents to run the investigation and not confirming the evidence collected by the agents and presented to the Grand Jury supports the facts and allegations it then asked the Grand Jury to affirm. For instance, nowhere in the Grand Jury transcripts provided to the defense is there <u>any</u> mention of what is now the theme of the Government's case; *i.e.,* that the Defendants took this money, promised to return it and did not return it. Instead, throughout the Grand Jury transcripts that the defense has been provided, the Government's theme is that offering to take curses off money and offering to help make

11

people's lives better through the defendants' actions was a fraud.  Unfortunately, if this was true, many of our major religions would have preachers who are participating in fraud.  The Government has conceded in its Answer to Nancy Marks' Motions to Dismiss for First Amendment purposes that such acts are not fraud.  The only fraud the Government is claiming in the instant indictments is a failure to fulfill a promise to return the money.  Nowhere is that theory seen in the Grand Jury transcripts the defense has received; and yet, the Government, through its made up facts cited in this motion misled the Grand Jury into taking improper actions.  However, it is not only the taint of the Grand Jury that is the crux of our argument, but also the improper acts of the Government in misleading the Grand Jury into voting an indictment containing pure fiction and continuing to foist that upon the Court in this case.  The Government argued these falsehoods and others in the Magistrate's Court causing the Defendants to be incarcerated for a month or months before a pretrial detention order was reversed and bond was set, and it further misled Magistrates with misrepresentations in search warrant affidavits and violated the Defendants' constitutional rights in other ways as set forth below.

18.   The Government told the Grand Jury its fraud theory in this case on May 19, 2011 mere days before the returning of the Superseding Indictment at page 10, starting at line 8:

> Q.  And the object of this conspiracy was that the defendants would and did unjustly enrich themselves and others, by falsely claiming to tell the future, to cure people of diseases, to chase away evil spirits from homes and bodies and to remove curses, and cleanse the souls of clients and their families and exchange for money, jewelry and other things of value.  Is that correct?
>
> A.  That is correct.

The things  the Government said were the objects of the conspiracy, were conceded by the Government in the Government's Response to the Motion to Dismiss on First Amendment Grounds (DE 501) in which the Government admits such activities were legal acts, *i.e;* to tell the

future, cure diseases, chase away evil spirits, etc.  There is no evidence before the Grand Jury that the Defendants did so fraudulently.  What the Government has alleged is that the fraudulent acts here were to promise to return this money and never return it.  In fact, the paragraph quoted above reflects the Defendants offered to engage in services  in exchange for money, jewelry and things of value.  The reality is the witnesses never expected to get the money back and were paying for these services but the Government believes these services were fraudulent.  That theory is totally inapposite to what appears in the Indictment as to each of the witnesses cited above.  The Government fraudulently and improperly caused the Grand Jury to return an indictment.  Its misconduct not only taints this Grand Jury, but taints the entire investigation.

## GRAND JURY PRESENTATION REGARDING N.D.

19.     As to the paragraph regarding ND, as with T.L., Nancy Marks is alleged in an investigative report (labeled a Complaint Affidavit of N.D) with telling N.D. the money was a sacrifice for personal use but that the money would "come back to N.D."  (See Bates No. 607 of the complaint affidavit of Ms N.D. given to Ms. Beth Watts and Detective Charles J. Stack Exhibit "1").  At no place else in this affidavit is there any allegation regarding the money being kept and physically returned.  As with the previous investigative affidavit of T.L., N.D. is merely saying ~~that~~ Nancy Marks stated that while the money would be sacrificed, and the value of the money would come back to N.D.  However, in paragraph 42 of the original indictment (DE 3), and paragraph 38 of the Superseding Indictment (DE 14) the Grand Jury finds, based on an indictment provided to them by the Government, that Defendant Nancy Marks reassured N.D. that "she would get the money back" and "The money was never returned."  This was made more misleading in the Second Superseding Indictment returned January 12, 2012 (DE 306).  Paragraph 30 states that Nancy Marks promised that "the money would be returned." and "[t]he

{R6118033_1}

money was never returned."   This misrepresents what N.D. swore to the Government in her Affidavit.

20.     The only Grand Jury transcripts the defense has received regarding N.D. are from May 5, 2011, shortly before the return of the Second Superseding Indictment, pages 34 and 38, and on May 19, 2011.   On May 5th the Government asked questions and received answers regarding information on N.D.'s family and their large wealth, her marital situation, the fact that she was having problems with someone she was dating at the time, that she gave checks to Nancy Marks made out to Joyce Michael, Inc., a legal corporation with a legal bank account, and about an incident that occurred in the Tampa Airport.   On May 19, 2011 on pages 20 and 21  the transcript also refers to mailing some checks by N.D. to Joyce Michaels also known at that time as Nancy Marks.

21.     Although the Government induced the Grand Jury to return an indictment alleging promises to give the money back and that the money was never returned, no such testimony appears in the Grand Jury transcripts the defense was given.   On this issue as well the Government intentionally misled the Grand Jury into returning an indictment which was a complete misrepresentation of facts and misconduct on behalf of the Government.

### THE FORFEITURE COUNTS OF THE INDICTMENT

22.     During the course of Defendants' investigation and the discovery in the instant case, the Defendant Rose Marks asserted in her Motion to Return a white Rolls Royce (DE 299) that the alleged Rolls Royce could not have been the fruit of this conspiracy or purchased with the fruit of the conspiracy, as it was purchased by Rose Marks and her husband in 1977 approximately fourteen years before the alleged conspiracy started.   That motion led to a review of the Grand Jury transcripts regarding the Rolls Royce by Judge Vitunac and upon review of the

{R6118033_1}

other Grand Jury transcripts regarding other forfeitures.  The various motions, responses and orders by Judge Vitunac are attached as Composite Exhibit "2".  The Government ultimately returned to the Defendants all of the property that was seized pursuant to warrants issued predicated on the Government misconduct which resulted in what Judge Vitunac determined were fallacious forfeitures.  The Grand Jury transcripts provided pursuant to Judge Vitunac's Order confirms that all that was presented to the Grand Jury regarding the forfeiture was information that the Defendants owned certain property, houses, vehicles and gold coins at the time that the Indictment was being returned. There was absolutely no evidence presented to the Grand Jury as to how these items (other than some gold coins) were acquired, whether any of these items were the fruits of the criminal enterprise or were purchased with the fruits of the criminal enterprise.  In fact,  the Government knew from documents filed with the IRS over a number of years that Rose Marks won substantial sums gambling at legal gambling venues while falsely alleging in search warrant affidavits that she had no legitimate source of income.  The Government has now acknowledged a significant part of her business was legal.

23.    The Grand Jury was misled by the Government into believing there was a valid basis for forfeiting millions of dollars worth of properties when there plainly was not.  Although the Defendants eventually got these properties returned, they were deprived of the use of their vehicles, use of their equity in their homes, and had to go to significant expense to utilize other vehicles and to get friends and family to post collateral for their bond (in excess of the small amount of collateral the Magistrate Court allowed Mrs. Marks to use in her home for bond).  All of this occurred because of clear misconduct on behalf of the Government which taints not only the Grand Jury but contributes to the pattern of wrongdoing tainting the entire investigation. Whether through negligence by the Government in failing to supervise the case agent and/or

{R6118033_1}

intentional misconduct by the case agent and his assistants, the Defendants were harmed, the Grand Jury and Court misled, and the investigation was not slip-shod but fallacious, malicious, biased and improperly designed to manufacture false testimony.

24.     As stated in Defendant Rosie Marks' Supplementary Motion for Production of Grand Jury Testimony [DE 418], an application for a search warrant dated 8/12/11 directed to 1003 SE 17th Street, Second Floor contained an allegation by Agent Kelly Cook that an undercover agent "provided Rosie Marks sums of money in exchange for claiming to cleanse the money of an evil curse, thereby eliminating the curse from the agent."  At the time Defendant Rosie Marks filed that motion, she was in possession of only two transcripts of conversations between her and the undercover detective.  In those two conversations, there were no claims by Rosie Marks that the detective's money should be provided so that the evil curse could be removed.  Quite the contrary, Defendant Rosie Marks only spoke of a prior payment of $230 made for her time and then expressed to the undercover agent that "her services had been paid for."  Rosie Marks spoke of obtaining a sum of money in the future to "get some crystals." Rosie Marks speaks of the power of positive thinking and that "there are no magic wands being waived."  As to future funds, Rosie Marks says that she would require "probably around a few thousand dollars" and "that'll be my fee for my time."  Rosie Marks reiterated "you're paying me for my time."  Rosie Marks says she had a gift which she has turned into a career and says "so this is why I have to charge for my time."

25.     Based upon the fact that nothing said to the undercover detective by Rosie Marks comes remotely close to the allegation made by Agent Cook in the application for the search warrant, Defendant Rosie Marks filed the supplemental motion to produce any Grand Jury testimony that relates Rosie Marks' contact with the undercover detective who is indentified in

{R6118033_1}

Count 12 of the Second Superseding Indictment as A.T.  In response to that motion, on March 15, 2012, the Government produced *for the very first time* recordings and transcripts of eleven (11) additional conversations between Rosie Marks and the undercover detective.  In those conversations topics include burning of candles, questions of pregnancy, marital infidelity and the obtaining of healing crystals. There is no conversation concerning the undercover agent providing sums of money to Rosie Marks to lift a curse.  A brief synopsis of pertinent areas of the newly-produced conversations between the undercover agent and Defendant Rosie Marks follows.

26.     On November 11, 2009, Rosie Marks directs the undercover detective to gather up some personal items, such as photos and her husband's business card, and mail them to her. On the subject of money, mid-way through the conversation, the undercover agent asks "how much money do I need to send you?"  Rosie Marks responds "You don't need to send me anything right now." *Transcript of November 11, 2009 conversation* at p. 21, ll. 576-79.

27.     In a conversation on November 13, 2009, Rosie Marks recommends the undercover detective obtain three different crystals; an Amethyst crystal which promotes positive energy and peace, a Quartz crystal which  promotes healing, and a Carnelian crystal which promotes happiness and sexual energy. *Transcript of November 14, 2009 conversation,* pp. 9-10; ll. 246-264.  Rosie Marks offers to get the stones for the undercover detective and says "it's gonna be a total of twenty eight hundred but the thing is I'm gonna need a credit card and I'm gonna have to send them to you." *Id.* at p. 10, ll. 270-276.  When the undercover detective suggests her husband would not approve of her (U/C) consulting with Rosie Marks, Rosie Marks says "you can be honest with him in the sense of telling him that you're taking a holistic, ah, route and these, you know, telling the truth about the stones and that they're to, to cleanse some

17

energy and, produce positive energy and protection." *Id.* at p. 13, ll. 344-348.  Rosie Marks goes

on to say "that'll be the fee for the stone . . . and you're gonna be getting the stones and you'll be

getting your receipt . . . so that's your purchase." *Id*. at 17; ll. 458-462.

28.     On November 17, 2009, the undercover agent calls Rosie Marks and a discussion

of the purchase of the stones continues.  Rosie Marks tells the  undercover agent "if you wanna

fax me a copy of your I.D. and your address . . . if you wanna do that in the morning and let me

see what I can do about ordering the crystals and we'll try to do it with the money orders . . . *if*

*not, then it's just not meant to be*."  *Transcript of November 17, 2009 conversation*, p. 25, ll.

688-693 (emphasis ours).

29.     On May 19, 2011, in the Grand Jury in the Southern District of Florida at page 13

commencing at line 13, the following colloquy takes place:

> Q.  In addition to victims there were also some undercover mailings that were
> completed by you and members of the Secret Service with whom you were
> working.  Is that correct?
>
> A.  That's correct.
>
> Q.  What was the purpose of these mailings?  These undercover mailings by you
> and the Secret Service to the Defendants.
>
> A.  To show that it was consistent to what the victims were telling us.
>
> Q.  So basically, you were saying the victims told us what happened.  We wanted
> to see if that's exactly what happened and that is apparently what happened?
>
> A.  That's correct.

There  are  discussions  about  mailings  by  Stephanie  Kirby  to  Cynthia  Miller,  and  other

discussions in the Grand Jury transcripts of that date at pages 24 through 25.  This is either an out

and out lie by the case agent, former Detective Charles Stack, or an inconvenient truth for the

Government.  As seen in the transcript cited to above, the conversations with Rosie Marks  are

{R6118033_1}

not consistent with the allegations the Government caused the Grand Jury to include in the Indictment, Superseding Indictment and Second and Third Superseding Indictments alleging the money was turned over to be held and returned, and the money never being returned.   The recorded conversations are instead consistent with Rosie Marks saying she needed to be paid for her work, the hours she puts into the matter and for crystals and other things she would sell to the undercover agent.  If Mr. Stack was telling the truth when he swore to the truth of the Grand Jury testimony stated above, that is, that the events with the undercover officer were consistent with what the victims had told him, then that testimony totally undermines the Government's theory of the case that the money was to be paid, curses were to be taken off, and the money was to be returned, because that is not what was told to the undercover agent.   If the victims had told Mr. Stack something else (which is not reflected in the Police Reports or the affidavits) then Mr. Stack is not telling the truth when he says what happened with the agents was consistent with what happened with the victims.  Either way, this is Government misconduct and it taints the entire investigation.

### THE MATTERS BETWEEN NANCY MARKS AND MP

30.    Defendant incorporates Exhibit "3" Defendant Nancy Marks' Motion In Support of Motion For Production of Transcripts of Grand Jury Testimony and Proceedings and Victims' Statements and the Reports Reflecting Such Statements.   The defense further alleges that the facts as to Nancy Marks set forth in those Motions are totally consistent with the facts set forth above and represent Government misconduct.  The Grand Jury transcripts are consistent with the Grand Jury testimony cited above as to Rosie Marks.

31.    Count 8 of the Indictment (DE 3) and the Superseding Indictment (DE 14) are identical.  They allege Mail Fraud against Cynthia Miller and Michael Marks, on May 14, 2009

{R6118033_1}

regarding "Seven Western Union money orders #09-078610374 through 09-078610380, each in the amount of $500, totaling $3500, sent via Fed Ex from R.K. to Cynthia Miller and deposited in Cynthia Miller and Michael Marks' Bank of America account ending in #3612."  Count 8 in the Second Superseding Indictment (DE 306) is almost the same, but leaves out any reference to the bank account and Michael Marks (although the Count still charges Michael Marks).

32.     Counsel for Cynthia Miller has reviewed the seven recorded conversations between R.K., who is an undercover police officer, and Cynthia Miller.  In each of these conversations, Ms. Miller makes no reference to returning the money or to it being a sacrifice. Instead, she clearly states that the money is to pay for her services and for material, those materials being minerals (crystals).  These were the only contacts between Ms. Miller and R.K. (the undercover officer).

33.     The only reference in the Grand Jury transcripts provided by the Government is on page 21 on  May 19, 2011 in which it is stated that Western Union transfers were made to Cynthia Miller and Michael Marks' bank account from the undercover agents.  There is nothing in the Grand Jury transcripts or undercover recordings showing any fraud or any act supporting the Government's allegation as to any of the victims identified as having been defrauded by Cynthia Miller.

**Falsehoods in the Search and Or Seizure Warrants**

34.     Defendants reiterate the misrepresentations detailed above about the misstatements in the Application for Search Warrant sworn to by Agent Kelly Cook for the search of 1003 SE 17th Street.  As stated the conversations about cleansing money of evil curses etc, just never took place and exist on none of the recordings turned over, but the agents swore to

these false statements for reliance by Judge Snow.  A copy of this warrant application and all applications referenced below are annexed as Composite Exhibit "4".

35.     In virtually all of the affidavits supporting the search and seizure warrants the Government agent swears that several consensually recorded conversations occurred between victims, Victoria Eli, Vivian Marks, and other defendants.  Examples of this sworn statement appear on page 5 of the affidavit supporting the search of safe deposit box #193 (bates stamp 547), on page 5 of the affidavit supporting the search of safe deposit box #2052 (bates stamp 536), on page 5 of the affidavit supporting the search of Psychic Life Coach, a business and residence (bates stamp 561) and on page 5 of the affidavit supporting the search of Rose Marks' residence at 1319 Seminole Drive (bates stamp 576).  After demands from the Defendants for copies of these recorded conversations, the Government has conceded that such recorded conversations do not exist.  The agent's sworn statement was a complete and utter falsehood.

36.     The IRS Special Agent swore in an Application for a Warrant to Seize Property Subject to Forfeiture she had reason to believe that a 1977 White Rolls Royce VIN # SRF 31885 was located in the Southern District of Florida (bates # 491).  In the affidavit in support of that application she swore "this vehicle is believed to be located at 1319 Seminole Drive, Ft. Lauderdale, FL, residence of Rose Marks" (bates #497).  Although Judge Lurana Snow was deceived by knowingly false statements into issuing a Seizure Warrant, believing that the White Rolls Royce was in Fort Lauderdale in the Southern District of Florida, the next day, the Government seized the Rolls Royce at an address in Los Angeles, CA, where they always knew the vehicle to be.

37.     Although there is no White Lexus SUV mentioned in pages 48-54 of the Grand Jury Transcript provided by the Government as justifying all of the forfeitures, a White Lexus

{R6118033_1}

SUV VIN # 2wT2GK31U28C044431 somehow appears as letter Q in the list of property to be forfeited in the Superseding Indictment (DE 14). In a seizure Warrant affidavit for the White Lexus SUV, the IRS Special Agent swears that White Lexus was registered to Rose Marks on July 7, 2011, at page 5 (bates #409). The IRS Special Agent further swears that two and one half months earlier, on May 19, 2011 the Grand Jury found probable cause to believe that the White Lexus SUV was forfeitable. The IRS Special Agent further swears the White Lexus SUV was last seen at the 1319 Seminole Drive, Fort Lauderdale, FL, residence of Rose Marks, at page 6, (bates #410). These sworn statements of the IRS Agent are false and suspicious for a number of reasons. There is no transcript that any evidence regarding the White Lexus SUV was ever considered by the Grand Jury, and certainly no probable cause that it should be forfeited. Although Rose Marks considered buying the White Lexus SUV, she never took delivery of it and it never was at 1319 Seminole Drive, Fort Lauderdale FL.

38. The Government and Detective Stack repeatedly told the Court at the detention hearing, and Detective Stack told numerous media outlets, that "the Defendants defrauded their clients of $40 million." The Government knew that number was greatly exaggerated, but used it to detain the defendants for weeks and months. In the recorded conversations with Jude Devereaux, Jude asserts that about $10 million of the alleged money was paid to her ex-husband as part of a divorce settlement on Rose Marks' advice. The Government further knew that Rose acted as Ms. Devereaux's assistant in the writing of 6 books with psychic, spiritual themes, that Jude earned many millions of dollars from those books and paid Rose Marks for her assistance.

### SOME "MINOR" CHANGES IN THE THIRD SUPERSEDING INDICTMENT

39. In the Third Superseding Indictment, the Government has admitted much of the abovementioned wrongdoing. It does so by totally omitted any mention of J.C., C.C., T.L. or

{R6118033_1}

N.D.   It also omits any reference to alleged crimes the Undercover agents falsely alleged occurred.  It further omits any specific items to be forfeited.  It also omits any references to ER, about whom no complaint was made.   Were there misrepresentations as to ER that the Government is trying to cover-up by omitting her, so as to never have to provide Jencks material?

40.   Since before the arrests in this case the Government has "shouted" there was a forty million ($40,000,000) dollar fraud.  It swore that to the Grand Jury, proffered it to US Magistrate Judges in Warrant Affidavits and in hearings, and announced it in press releases.  The new indictment now says the fraud was twenty-five million ($25,000,000) dollars.  What was the basis of the fifteen million ($15,000,000) dollar misrepresentation?

**Slurring and Stereotyping Defendants with Negative and Inaccurate Generalizations about "Gypsies"**

41.   In a number of pretrial motions the defense has alleged the Government acted improperly in the Grand Jury and committed misconduct by engaging in ethnic slurs.   The Government attempted to cause Magistrate Judge Hopkins at the Pretrial Detention Hearing to detain the Defendants in part because of their Romany culture, after the Government unlawfully referred to them as "gypsies".  There is a misconception of the Romany people as gypsies who wander around the country in caravans (although now not horse drawn) stealing from people and having no conscience and no belief in right or wrong.   The Government unconstitutionally invoked those unfair and improper ethnic stereotypes repeatedly before the Grand Jury in scandalous references to the Defendants' ethnicity, urging the Grand Jurors to rely upon those stereotypes as a basis for charging them with criminal conduct.  This misconduct is a part of the growing pattern of Government misconduct in this case, which has not only harmed the Defendants to date, but totally tainted the entire investigation.  The relevant pages of the Grand

Jury transcript are attached to this motion as Composite Exhibit "5" but quotes from some illustrate the profoundly prejudiced attitude of the Government to these Defendants, explicitly expressed to Grand Jurors, both creating and reinforcing unlawful prejudice.

42.     In the Grand Jury testimony of April 7, 2011 on page 46 the witness Charles Stack is speaking at line 20:

> I will give you something real quick.  I was talking to a gypsy out of New York
> The other day, and I said, "Can you tell me, please, do any of the Marks' family
> have psychic ability?"
> She said, "Charlie, are you kidding me?  No gypsy has psychic ability, none
> whatsoever."
> More or less, they think they've got a gullible victim and they take a lot of pride
> because they think it's a God given right to steal from the gajo or gaja, which
> means the American male or female.

On April 14, 2011 the witness, Charles Stack repeats the above statement at line 10 and goes on to say at line 14:

> They do not abide, for the most part, with American law.  They believe in gypsy
> law.

Question by the Grand Juror:

> "They believe in their mind that they have a right to do this?

> A.   Yes.

Grand Juror:

> No consciousness of guilt?

The Witness:

> All I can say is this: I'm speaking to a particular gypsy right now and she's a
> psychic.  So I said to her and I have it recorded.  I said "you have to tell me.  I need to
> know if any of these people in the Marks' family – they don't know I'm investigating this
> particular thing."

Grand Juror:

She must, she's a psychic.

The Witness:

She actually looks at me and goes, "Charlie, there isn't one gypsy psychic that has any psychic ability whatsoever.

On May 5, 2011 a Grand Juror asks at line 5:

I just have one question, I have asked before what their background was, they are American citizens, we believe.

The Witness, Charles Stack:

Well, the thing is, yes.  You know honestly I do believe they are citizens but gypsies have a unique thing that they believe that they believe they are Romany gypsies and not American citizens.  There is no indication that I can directly say that they are foreign born and came here.  I don't want to give the impression that every gypsy we come into contact with is a bad person, the Romany gypsies, there are a lot of them that live in Texas and they are not all criminals but this is what I would particularly say is the gypsy mafia.  Their one purpose is to take your money.

On May 19, 2011 at page 67 Mr. Stack responds to a question by Mr. Bardfeld, the representative of the United States Government:

In reference to – it's something I was thinking and I wanted to make a point of to make sure I disseminated this to you.

In reference to the gajo and the goja and the gypsies, we're dealing specifically with gypsy organized crime and gypsy criminals.  I don't want you to think I believe that every gypsy out there is a criminal.

The ones we are dealing with and their right to steal deals directly with gypsies that partake and participate in criminal activity.

**Refusal of the Government to Disclose *Brady and Giglio* evidence.**

43.    The Government knew shortly after the arrests of the Defendants in August of 2011 that J.C. was not a victim in the case and was happy with the services of Victoria Eli.  The Government failed to provide the Defendants with any of this information.  Fortunately, the Defendant Victoria Eli had not yet surrendered on the Indictment but tried to do some

investigative work on her own with the help of her then counsel because she believed the Original Indictment and Superseding Indictment was false as to J.C.  It was only through her work in contacting J.C. and eventually his counsel that the defense was able to ferret out the falsity of the Government's position as to J.C.  The Government never provided the defense with any of that information nor did it provide the investigative report as to J.C.'s conversations with the Government until eventually ordered to do so by Judge Vitunac, at least 7 months after the event and after their *Brady/Giglio* obligations had matured.

44.     The Government further knew that C.C. was not interviewed before the Indictments but did not inform the Defendants.  The defense only learned that when Judge Vitunac ordered the investigative reports as to C.C. turned over, almost 7 months later than required by the Standing discovery Order.

45.     The Government knew T.L.'s interview report differed significantly from the language in the Indictment, but never turned that exculpatory interview report over to the Defendants until ordered to by Judge Vitunac 7 months after the Constitution and Court Order required turnover.  The Government had a *Brady* obligation under the Standing Discovery Order with which it failed to comply.

46.     The Government knew, and knows, A.W. loaned funds to Rose Marks and the Government had a copy of a Promissory Note between Rose Marks and A.W.  Although this contradicted the Government's theory as to the relationship between Rose Marks and A.W., the Government has never provided the Defendants with a copy of that Promissory Note.

47.     The Government has in its possession numerous forms regarding earnings Rose Marks received from Seminole Bingo and the Seminole Hard Rock Casino.  Those forms were seized from Rose Marks.  The IRS was further a participant in this investigation and the forms

{R6118033_1}

above mentioned are required to be filed with the IRS by the Casino at the time of the winnings. The Government has never turned over those forms filed with the IRS to the Defendant Rose Marks.  The forms are for millions of dollars and totally disprove the Government's theory that the only source of funds by Rose Marks are illegally received funds, and yet the Government has not met its *Brady/Giglio* obligations.

48.     The Government also has similar forms with the IRS by Seminole Hollywood Bingo and Seminole Hard Rock Casino filed during the time frame of the alleged conspiracy for the Defendant Rose Marks' now deceased husband, Nicholas Marks.  Those forms have never been turned over although those forms, and the forms of Rose Marks, show millions of dollars worth of winnings and contradict the Government's theory of the case and are thus *Brady* material.

49.     The Government has numerous forms from Seminole Hollywood Bingo and Seminole Hard Rock Casino regarding Ricky Marks, a Defendant in the case.  Although these forms show hundreds of thousands of dollars of winnings, and contradict the theory that Ricky Marks and Nancy Marks only had illegally acquired money, these forms have still not been turned over to the Defendants.

50.     The Government has in its possession a Will of Ricky Marks' grandmother leaving him money, jewelry and other valuables.  It was only after numerous demands by Ricky Marks' attorney that the Government exhibited to him a copy of this Will.  The Government paid no attention to its *Brady* obligations and the Standing Discovery Order.

51.     The Government has admitted and Judge Hopkins has found the Government had numerous interviews with potential victims who did not believe they were defrauded.  The Government visited these potential victims a number of times and "hit them on the head" to

{R6118033_1}

"break the spell they were under."  Yet the defense still has not been provided with reports from all of these alleged victims and potential victims stating that they were not victims of the Marks family and they were happy with their services. This is a *Brady/Giglio* violation.  Although Judge Hopkins in his most recent hearing regarding the Grand Jury transcripts has warned the Government of its obligations to comply with *Brady v. Maryland*, none of these reports or transcripts have yet been seen.

52.     During the course of the initial discovery the Government turned over some recorded conversations between the Defendants and some alleged victims of the Defendants and with undercover officers.  A number of the Defendants were aware they had more conversations with the undercover officers and these conversations were demanded.  It was only after these demands by the defense attorneys that the case agent in the case, former Detective Charles Stack, "suddenly remembered" he had left close to a hundred recorded telephone conversations between the Defendants and alleged victims and undercover officers at the Fort Lauderdale Police Department.   These recordings were not produced until many, many months after the Government's *Brady v. Maryland* obligations had matured.  Many of these conversations were exculpatory conversations between the Defendants and alleged victims and the Defendants and undercover officers.

53.     The Defendants have received no transcripts or police reports regarding Defendants' clients who have asserted to the Government they are not victims of the conspiracy. These reports, if they exist, would be consistent with the Defendants' claim of innocence and allow the defense  to not only call the Defendants' clients as witnesses, but to show that their statements, if challenged as recent fabrications, were made to Government agents many years ago or at least close to a year and half before trial.   These exculpatory statements by the

Defendants' clients would be *Brady/Giglio* material and none have been turned over.  If the Government failed to make reports of these interviews, it would be committing yet another act of misconduct.

### INCOMPLETE OR DOCTORED INTERVIEW REPORTS, INTERFERENCE WITH DEFENSE WITNESSES AND FINANCIAL ENTANGLEMENT OF THE LEAD AGENT AND LEAD VICTIM

54.     At present, the only incomplete or doctored interview report the defense has been provided is one that was received by Order of Judge Vitunac.  The report of the interview of J.C., which has been turned over pursuant to Judge Vitunac's Order, makes no mention of J.C.'s statements that he was not a victim or of being happy with the Defendant's services.  Further, the Government has conceded that the IRS asked J.C. if he could justify where he got the money to give Victoria Eli or if his spouse knew that he gave Victoria Eli money.  None of these questions or answers appear in the report of interview provided by the Government; and, although the Government has conceded it told J.C. he could recover some of his money as a victim if there is a forfeiture or restitution requirement after conviction of money to alleged victims that also does not appear in the report of the interview.  Under *Brady* and *Giglio*, the Government is required to immediately turn over any promises or threats made to witnesses to induce them to testify.  Both these threats and promises were made to J.C. to induce him to testify.  The Government has admittedly "hit victims over the head" to get them out from under the "spell they were under", yet it has provided no reports reflecting this improper persuasive conduct and the only report provided is doctored.  The Government's failure to turn over any reports containing these alleged promises to J.C. or to any other victim who was "hit over the head" is a *Brady/Giglio* violation.  The doctoring of reports to leave out such promises constitutes complete and utter misconduct by the Government agents.  If the promises or threats that were made to J.C. appear in the reports of other witnesses who were interviewed, that would be *Brady or Giglio* material.  If the reports of

29

these witnesses are void of these promises or threats and they were in fact made, that is also misconduct for doctoring or intentionally leaving out exculpatory material in reports.

55.     The defense has more concerns relating to misrepresentations in search warrant affidavits, in affidavits of seizure warrants and in misrepresentations to the Court.  At this point any fruits of this investigation must be precluded from going forward with prejudice.  Since the case the United States brought against former Senator Ted Stevens, there has been an enhanced effort in the Justice Department for prosecutors and investigators to err on the side of turning over material rather than excluding that material or somehow preventing the defendants from having it.  That effort completely missed these Government agents.  As with all the examples cited above, it is clear the Defendants were not given materials that they should have been given, and not informed of things about which they should have been informed.  Based on the Government's conduct so far in this case, going forward there is no reason to believe this same absence of effort to comply with the Constitution will not continue, preventing the Defendants from getting those items which by statute and case law they are entitled to in order to defend themselves.  There is no way of knowing, for instance, whether there are reports of clients who were interviewed and did not become victims.  There is no way for knowing for sure or proving whether items have been left out of reports.  As a recent example, through diligent investigative work, an investigator for the Defendants learned that on August 11, 2011, days before the arrests in this case, the main complaining witness, a woman referred to as J.M., who has been revealed to be the New York Times bestselling author Jude Deveraux, loaned money to a business owned by former Detective Charles Stack, the case agent in the investigation.  That type of relationship between the case agent and a victim is and of itself something that should have been immediately revealed to the Defendants, as it creates impeachment material and it could be grounds in and of

{R6118033_1}

itself for a motion to dismiss for misconduct.  However, the defense was not informed of it, and instead had to discover it through diligent and expensive investigation.

56.     At the Pretrial Detention Hearing in the instant case before Judge Hopkins Mr. Stack was asked about the nature of his business now that he had retired from the Fort Lauderdale Police Department.  He merely said that he was an investigator for the Public Defender Office, and neglected to tell anybody that he was a one-third partner in a kickboxing gym.  It is to that gym that J.M. put $35,000 into.  When the Defendant learned of this and made a demand of the Government for information pursuant to *Brady v. Maryland*, the Government came up with an explanation, the gist of which was that Ms. Deveraux "invested" $35,000 in this business through one of Mr. Stack's partners without Mr. Stack's knowledge, and that Mr. Stack only learned of the "investment" after the Pretrial Detention Hearing in the case.  When Mr. Stack learned of the "investment" he caused the "investment" to be returned to Ms. Deveraux.  There are a number of problems with that scenario.  First, it is not normal to take in a new investor in a small, closely held business without consulting with the other one or two or three investors.  For this reason alone it is unlikely Mr. Stack's version of this financial transaction is true.  Second, an investor in a small closely held company would surely question who infused a substantial amount of capital in that business.  When the defense demanded copies of the checks from the Government, and they were turned over, they showed the money that was paid back to Ms. Deveraux after the bond hearings in this case was paid back by check with a memo on it saying "Repayment of loan" –not return of investment, which is different from the alleged facts presented on behalf of Mr. Stack. (A copy of the checks is Composite Exhibit "6").  Because of the prior actions by Mr. Stack on behalf of the Government, it is unlikely the events occurred the way Mr. Stack describes.  It is more likely that after Mr. Stack was questioned by former

{R6118033_1}

attorney in this case, Norman Kent, as to his relationship with Ms. Deveraux he thought he should return this money and caused Ms. Deveraux's "loan" to be repaid to her.  But more troubling is the fact that at least as of September 2, 2011 when the repayment of the JM "loan" was made, Mr. Stack knew of this transaction, and apparently, since he caused the money to be given back, also knew it was improper.  The correct thing for Mr. Stack, as case agent of the Government, to do would have been to reveal this improper financial entanglement to the Government and for the Government to reveal these secret dealings to the defense attorneys. Whatever could be done with this information for impeachment or other purposes would then have been available.  But this evidence was not turned over to defense counsel until approximately September of 2012, more than a year after the arrests in this case, and more than a year after the "loan" was returned to Jude Deveraux.  The Government has not provided proper disclosure of exculpatory material and this conduct is another basis to dismiss the case with prejudice.  To paraphrase Yogi Berra, "We will never know what we don't know."

57.     Yet another example of the Government's misconduct in this case is the following:  For many months Victoria Eli's attorney had been trying to get copies of checks and wire transfers that supposedly went through Victoria Eli's bank account and came from Jude Deveraux, at the direction of Rose Marks.  Finally, when the alleged wire transfers and checks were turned over to the Defendant Eli by the Government, the wire transfer forms appeared to have been doctored.   A copy of five wire transfer forms are Composite Exhibit "7".   In examining these wire transfer forms the untrained eye can immediately perceive from the "broken lines" that in the Beneficiary's Information Section  the lines for the ABA Number, Bank Name, Bank Address, Name of Person Receiving Funds, and Credit Account Number show evidence that some other information had been "whited out" and the Eli information

{R6118033_1}

inserted. It is apparent all of these utilized the same form with the same fax, date and time on top, even though these transfers supposedly covered a period of almost two years.

58.     Undersigned counsel received four of the alleged wire transfers from counsel for Victoria Eli.  They consisted of wire transfers which allegedly occurred in from October 1, 2001 through November 28, 2001.  Undersigned counsel could not confirm from Bank of America that the referenced Victoria Eli had an account in 2001.  Undersigned Counsel informed assistant United States Attorney Roger Stefin that he was "suspicious" of the wire transfer forms.  Mr. Stefin checked with security at Bank of America ("BOA") and reported to counsel in an email, a copy of which is attached hereto as Exhibit "8", Counsel's suspicions were unwarranted. Mr. Stefin spoke with a Corporate Security Officer at BOA and was informed that that the bank only retains account records for 7 years, but that they had found a signature card for the questioned account signed by Victoria Eli dated December 8, 2000.  That date was approximately 10 or 11 months prior to the four wire transfers that undersign counsel then possessed so the matter appeared to be somewhat settled.  However, subsequently undersigned counsel learned there was a fifth wire transfer form allegedly representing a wire transfer sent by J.M. to the same account of Victoria Eli.  That form, a copy of which is annexed as Exhibit "9", bears the same physical characteristics, but is dated **JANUARY 20, 2000,** approximately 328 days prior to the signature card allegedly opening the account.  There are a number of explanations for this apparent inconsistency.  The innocent explanations are that either Mr. Stefin or an agent spoke to Bank of America security and either Mr Stefin, or the agent, or the security officer were mistaken as the date of the signature card referenced in Mr. Stefan's email.  The other possibility is that, believing there were only four wire transfers in 2001, an agent lied to Mr. Stefin.  Mr. Stack admittedly started investigating the Defendants bank accounts in 2007 or 2008.  At that time he

{R6118033_1}

could have obtained the bank records.   Does the Government agent have them?   Further, presumably Mr. Stack learned of BOA's 7 year destruction policy.   Did Mr. Stack or J.M. manufacture this evidence knowing it could not be refuted by documents?   Normally an attorney suggesting such conduct occurred would be accused of taking lessons from Oliver Stone. However, in the context of the wrongdoing in this investigation, a court could reasonably doubt the authenticity of these documents based on the Government's prior noncompliance with the Constitutional safeguards in this case.

### JM's Civil Case In New Mexico

59.     The Government intervened to help J.M. in the civil case brought against her in New Mexico by her former Husband C.W.  C.W. was demanding that J.M. be held in contempt for not paying $250,000 required by a property settlement.   The defense made a number of demands of the Government for information as to any actions it took which would have assisted J.M. in that case. The AUSA informed the defense he had no knowledge of anything done by the government in that case.  The defense finally, independently obtained copies of a motion filed by J.M.'s attorney in 2008 claiming that J.M. could not pay as she was a victim of fraud by her longtime assistant, Rose Marks, who was to be the target of a Grand jury investigation.  The motion went on to say this was confirmed to J.M.'s counsel, Sarah Bennett, by two detectives and an assistant United States Attorney from South Florida.  We again demanded this evidence of a benefit to the Government's major witness. Again we were rebuffed.   Finally, the Government conceded the defense was correct.  Ms. Bennett found the card of the AUSA with whom she met, and confirmed she met with AUSA Larry Bardfeld.  Mr. Bardfeld stated he forgot about the meeting.

{R6118033_1}

60. The defense also learned then Detective Stack and his partner were subpoenaed by C.W.'s attorney for depositions, but before they were to be deposed, J.M. settled by paying money to CW and promising him a portion of any funds she obtained as restitution in this case.

**Request for A Hearing**

61. The defendant believes that a hearing is necessary as to many of the facts set forth above. All of the clients of the defendant who were interviewed should be called as witnesses to determine how they were "hit on the head" to break the "spell." Former Detective Stack, Jude Deveraux, and perhaps Mr. Stack's partners in the kick boxing gym should be called to discuss the improper "loan." Former Detective Stack and the agents in the case, and AUSA Bardfeld should be called to discuss their actions regarding witnesses, the Grand jury improprieties, the false search warrant affidavits and the other misconduct detailed above.

WHEREFORE, it is respectfully requested that all outstanding indictments resulting from the tainted investigation be dismissed with prejudice based upon this Motion; or, alternatively, that a hearing be held.

Dated: December 27, 2012                Respectfully submitted,

                                        By:    s/ Fred A. Schwartz

                                               Fred A. Schwartz, Esq.
                                               Fla. Bar No. 360538
                                               *Attorney for Defendant Rose Marks*
                                               Kopelowitz Ostrow, et al.
                                               700 South Federal Highway
                                               Suite 200
                                               Boca Raton, Florida  33432
                                               schwartz@kolawyers.com
                                               Telephone:  (561) 910-3070
                                               Facsimile:  (561) 910-3080

{R6118033_1}

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically

filed via CM/ECF on this 27th day of December, 2012.

s/ *Fred A. Schwartz*
Fred A. Schwartz, Esq.

{R6118033_1}