```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                    Case No. 11-80072-CR-MARRA
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
          GOVERNMENT,              )
 5                                 )
          -v-                      )
 6                                 )
    ROSE MARKS,                    )
 7                                 )
          DEFENDANT.               )    West Palm Beach, Florida
 8                                 )    September 18, 2013
    _____)
 9

10                   Volume 14, Pages 1 - 223

11             TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12          BEFORE THE HONORABLE KENNETH A. MARRA

13                 UNITED STATES DISTRICT JUDGE

14

15  Appearances:

16  FOR THE GOVERNMENT          Laurence M. Bardfeld, AUSA, and
                                Roger H. Stefin, AUSA
17                              United States Attorney's Office
                                500 East Broward Boulevard
18                              7th Floor
                                Fort Lauderdale, FL 33301
19
    FOR THE DEFENDANT           Fred A. Schwartz, ESQ.
20                              Kopelowitz, Ostrow, Ferguson
                                Weiselberg, Keechl
21                              700 South Federal Highway,
                                Suite 200
22                              Boca Raton, FL 33432

23  Reporter                    Stephen W. Franklin, RMR, CRR, CPE
    (561)514-3768               Official Court Reporter
24                              701 Clematis Street
                                West Palm Beach, Florida  33401
25                              E-mail:  SFranklinUSDC@aol.com
```

1      (Call to the order of the Court.)

2           THE COURT:  Good morning, everyone.  Please be

3   seated.

4           All right.  We're back on the record.  Ms. Marks is

5   present with counsel.

6           We ready to proceed?

7           MR. SCHWARTZ:  Ready to proceed.

8           THE COURT:  We ready?

9           MR. STEFIN:  Yes.  I need to get the witness,

10  though.

11          THE COURT:  Let's bring the jurors in.

12          Were we finished with the direct, or is there still

13  more?

14          MR. STEFIN:  Yes, I finished direct.

15          THE COURT:  Good morning, sir.  Have a seat.

16          You're still under oath.

17          THE WITNESS:  Okay.

18          THE COURT:  Thank you for being back.

19     (The jury enters the courtroom, after which the following

20  proceedings were had:)

21          THE COURT:  Welcome back, everyone.  Please be

22  seated.  Good morning.  Sorry that you -- some of you may

23  have gotten stuck in the bad weather.  I hope it wasn't too

24  inconvenient for you.  I guess if we got started at our

25  normal time we may have missed all that bad weather.  So I

```
 1   apologize for putting you through that, but we're ready to
 2   continue.
 3              Before we begin, has anyone read or heard anything
 4   about the case since yesterday?  Okay.  Thank you.
 5              Mr. Schwartz, you may cross-examine.
 6              MR. SCHWARTZ:  Thank you, Your Honor.
 7      John Van Vorst, Government's witness, resumed the stand.
 8                          Cross-examination
 9   BY MR. SCHWARTZ:
10   Q    Mr. Van Vorst, you're the only one in the courtroom who
11   looks dry.
12   A    I'm wet, also.
13   Q    We've never met or spoken, have we?
14   A    I don't recall.  We may have spoken once.
15   Q    I did speak to an attorney who represented you, though,
16   right?
17   A    Yes.
18   Q    Let me direct your attention to what's been marked in
19   evidence as Government exhibit 20 composite.  And if you
20   don't mind, I will project it on the screen, and if you can't
21   hear me, I'm told often that I mumble a lot, so just tell me
22   and I'll speak louder.
23   A    Thank you.
24   Q    Now, the first page of Government's exhibit 20 I believe
25   is a letter dated March 28th, 2003, from you and your firm to
```

1    Rose and Nicholas Marks sort of summarizing what you said to

2    them and what they said to you in the preparation of their

3    2001 tax returns.  Is that -- was it your practice in those

4    years to do such a summary letter?

5    A    As a normal?  No, not as a normal, no.

6    Q    But because Mrs.~Marks and her husband were in the

7    fortune-telling business and had a lot of gambling wins and

8    losses, you chose to summarize your contact with them by

9    letter, is that fair to say?

10   A    Yes, we wanted to document the information.

11   Q    And thank you for doing that.

12        Let me direct your attention to the second

13   paragraph of that letter.  Could you read that to us?

14   A    Yes.

15        "I included all deposits as other income and then

16   allocated $877,687 as gambling income from the 1099s

17   Mrs.~Marks provided us.  All wire-transfers from Jude

18   Montassir totaling $483,980 were included as

19   fortune-telling-income except for $300,000 Mrs. Marks stated

20   was a loan."

21   Q    So that I understand what we're saying in this

22   paragraph, in March of 2003 for Rose and Nicholas' 2001 tax

23   return, you found that there were wire-transfers from this

24   lady named Jude Montassir -- and I'll just call her Jude,

25   because I've pronounced her name about seven times already in

1    this case -- totaling almost $500,000, is that fair?

2    A    Yes.

3    Q    And of that, Rose told you 200,000 of it was income that

4    was paid to her for -- 183,000 of it was income that was paid

5    to her for services, and 300,000 was a loan from Jude?

6    A    Yes.

7    Q    Okay.  So she acknowledged that she was doing work for

8    Jude and got paid for that work, and also, that Jude had

9    loaned her money; is that correct?

10   A    Yes.

11   Q    And you included the 183, almost $184,000 in income in

12   that return, I assume, since she told you it was income?

13   A    I assume so.

14   Q    Yes.

15         And let me ask you about loans.  If I loan you

16   money, is that income to you?

17   A    No.

18   Q    Because eventually you'll have an obligation to pay it

19   back, right?

20   A    Yes.

21   Q    So you didn't include the 300,000 in income, did you?

22   A    No.

23   Q    Okay.  And while we're on that, and I have a little bit

24   of an accounting background, but I don't understand at all

25   gift tax or gift law.  Over the years, has that law changed

1    in the last 10 or 15 years almost every year or two?

2    A    Almost every year or two.

3    Q    At some years could an individual give a gift of any

4    amount if they wanted to?

5    A    I can't recall, but it could have been one year that was

6    unlimited gift exclusion, yeah.

7    Q    Some years you could give up to a million dollars

8    lifetime; is that right?

9    A    Yes.

10   Q    Sometimes you could give $13,000 to a hundred

11   individuals, if you want, with no gift tax consequences?

12   A    Yes.

13   Q    If you got a tax-free gift, did you have an obligation

14   to pay taxes on it?  That might sound like a crazy question,

15   but explain it to me, because I don't really understand it.

16   A    The recipient of a gift is not taxable on a gift.

17   Q    So if, in addition to loans and payment for services, in

18   some years Jude gave Rose gifts that qualified as under the

19   gift tax, she wouldn't have to pay -- Rose wouldn't have to

20   pay taxes on it, would she?

21   A    No.

22   Q    And can you just sort of -- this year, for instance,

23   what are the rules as to gift taxes?

24   A    Individuals for 2013 --

25              MR. STEFIN:  Objection as to relevance.

```
1    BY MR. SCHWARTZ:

2    Q    Okay.  Let's say 2007.

3    A    I can't recall exactly.  I can give you an

4    approximation.

5    Q    But can somebody give another person a million dollars

6    as a gift?

7    A    Yes.

8    Q    Tax free?

9    A    Yes.

10   Q    Let me go further as to -- let me ask you another

11   question.  If I have -- if somebody gives me a gift or a loan

12   but doesn't give it to me directly, instead pays one of my

13   bills with money that's a gift or a loan, and it's a

14   qualified gift, do I owe taxes on that?

15   A    If -- on a gift, if you receive a gift, it's not

16   taxable.

17   Q    Okay.

18   A    And it doesn't matter what you do with it.

19   Q    Let's say it's a gift, but they don't give it to me.

20   Let's say I owe a mortgage payment, and instead of giving

21   that gift directly to me, they pay it to my bank to pay my

22   mortgage.  Do I owe tax on that?

23   A    Well, I don't -- I don't think so, without looking at

24   the details of it.  But a gift is not taxable.  It doesn't

25   matter what you do with it.
```

```
 1    Q     And if somebody loans me the money to pay my mortgage
 2    but doesn't give it to me and I give it to my bank, they give
 3    it directly to the bank and that's a loan, do I owe taxes on
 4    that?
 5    A     Well, if you receive a loan, whatever you do, it's not
 6    taxable, and whatever you do with it is up to you.
 7    Q     Even if it doesn't come through my bank account, if it
 8    goes directly to my bank, if it's a loan to me, I don't owe
 9    tax on it?
10    A     My inclination would be to say it's not taxable.
11    Q     Okay.  And you might have some question.  You might want
12    to go back and look at the statutes to be sure.
13    A     I'd probably want to look it up.  I wouldn't think so.
14    Q     You wouldn't think that it would be taxable.
15          Now, you went to college?
16    A     Yes.
17    Q     You majored in accounting in college?
18    A     Yes.
19    Q     Probably, you did it back when the controlling documents
20    were ARB 43, which was back when I went to college.  And now
21    I think your accounting decisions and what you do are
22    controlled by GAAP, generally accepted accounting principles,
23    is that right?
24    A     Yes.
25    Q     In addition to your college education in accounting, you
```

```
 1   had to study to take a CPA exam; is that right?
 2   A    Yes.
 3   Q    And just in Florida, or were you qualified in other
 4   states also?
 5   A    The exam is given nationally.
 6   Q    Okay.
 7   A    But you have to qualify.  Each state has certain
 8   particularities.
 9   Q    And over the years, have you gone back to take
10   continuing education courses?
11   A    Yes, we're required to have continuing education.
12   Q    So you generally understand, because of your college,
13   your study for the CPA exam, and your continuing education,
14   because the accounting rules change over the years, these
15   accounting principles we're talking about, right?
16   A    Yes.
17   Q    Are they easy for somebody with a third grade education
18   to understand?
19   A    It's difficult for anyone with a college education to
20   understand.
21   Q    I'm law school.
22        And they're constantly changing?
23   A    Constantly changing.
24   Q    Now, I believe I understood in a conversation I had
25   through your attorney that you never discussed with
```

```
 1    Mrs. Marks, with Rose, whether or not she had an obligation
 2    to pay taxes on money paid on her behalf to third parties,
 3    did you?  This never came up.
 4    A    Never came up.
 5    Q    Okay.  So is that something someone with a third grade
 6    education would understand in your opinion?
 7            MR. STEFIN:  Objection.
 8            THE COURT:  Sustained.
 9            MR. SCHWARTZ:  Okay.  That's fair.
10   BY MR. SCHWARTZ:
11    Q    Let's look at the third page of Government's exhibit 20
12    composite.  And I would direct your attention to -- first of
13    all, can you tell me the date that that letter was written?
14    A    October 17th, 2005.
15    Q    And was that regarding the 2004 tax return?
16    A    Yes.
17    Q    Okay.  And for 2004, how much did Mrs. Marks tell you
18    she had gotten in loans that year as opposed to working in
19    her astrology or fortune-telling business?
20    A    $1,122,553.62.
21    Q    Okay.  And, again, although I've asked it before, if she
22    got the money in loans either directly to her or to pay her
23    bills, she wouldn't have a tax consequence on that.  She
24    wouldn't have to pay a tax on that; is that right?
25    A    Loans are not taxable, right.
```

1   Q     Okay.  And did she also have income that year from her

2   astrology business?

3   A     Yes.

4   Q     And what would that amount be?

5   A     $209,671.48.

6   Q     And based upon the information you gave her -- she gave

7   you, rather, you filed tax returns on her behalf, right?

8   A     Yes, I did.

9   Q     You didn't ask her, were there any payments made to

10  anybody else on your behalf?

11  A     I'm sorry?

12  Q     You didn't ask her, did somebody make payments to

13  somebody else on your behalf?  You never had that discussion

14  with her?

15  A     I don't remember.  I couldn't say.  This is 2005.

16  Q     We just talked about earlier, about she never asked you

17  and you never told her that you have an obligation to pay

18  taxes on payments made by third parties on your behalf.  We

19  talked about that earlier.

20        But let's go to the next year.  And what's the date

21  on this letter, the one on the screen now?  What's the date

22  on the letter on the screen?

23  A     September 12th, 2006.

24  Q     And is that discussing the 2005 tax returns?

25  A     If you could move that just a touch.  I can't see the

```
 1   year.

 2           Yes, 2005.

 3   Q    Now, for this year, Mrs. Marks was starting to have very

 4   large medical bills because of her husband's illness, wasn't

 5   she?

 6   A    I believe she was.

 7   Q    And medical bills are deductible to some extent, aren't

 8   they?

 9   A    Yes.

10   Q    And when you asked her to put together documents

11   regarding the cost of the office in New York that she was

12   paying for, the rent, the telephone, the electric, what did

13   she tell you?  Take a look at the paragraph that starts "due

14   to."

15   A    I'm sorry, what?

16   Q    The paragraph that starts "due to," could you read that

17   to us?

18   A    Yes.

19           "Due to Mr. Marks' illness, Mrs.~Marks stated that

20   we should use her 2004 1040 Schedule C fortune-telling

21   expenses, electric, telephone and rent, for her 2005 Joyce

22   Michael, Inc. tax return.  We saw no documentation for these

23   amounts.  She also assured us that the rent expense for the

24   New York office was $3850 a month."

25   Q    And did she also seem distracted -- if you remember, I
```

1   know it's a long time ago, eight years ago or seven years

2   ago, did she seem like she was paying attention to business

3   that year, or was she -- did she seem concerned with her

4   husband's health?

5   A    I can't recall exactly.

6   Q    That's fair.

7            Let's go to the last page of this document.  And I

8   apologize to the Government for wrinkling the document.  When

9   you say that, in this August 2007 letter, that Mr. and

10  Mrs. Nicholas Marks engaged us to prepare their return, was

11  that because the return technically was for Mr. and

12  Mrs. Marks, even though Mr. Marks became deceased in the

13  middle of the year 2006?  You didn't meet with -- well, maybe

14  since Rose is a psychic, you did, but if you look at the

15  first line, it says, Mr. and Mrs. Marks engaged us to prepare

16  this return.  Mr. Marks was no longer alive; is that right?

17  A    I think he was deceased at that time, yeah.

18  Q    As a matter of fact, the return you filed showed he was

19  deceased in or around the middle of 2006.

20  A    I believe so.

21  Q    Right.

22           But saying this was because you were preparing a

23  return for both of them, because under the law, as long as he

24  was alive for a portion of the year, they could still file

25  the joint return; is that right?

```
 1    A    Oh, yes.  I was thinking of 2009.  We're back in the

 2    2009 letter.  This is the 2007 letter.

 3    Q    Right.

 4    A    Yes, he died in, I believe, '06.

 5    Q    Correct.

 6    A    So they would file a joint return in '06.

 7    Q    Uh-huh.  But the only one you met with that year, even

 8    though previous years you met with both of them, this year,

 9    2007, you only met with Mrs. Marks, correct?

10    A    I met with Mrs. Marks.

11    Q    And in this year, she also talks to you, I believe, let

12    me just -- oh, yes.  In the first paragraph, the third

13    sentence, can you read that, "Mrs. Marks and Susan?"

14    A    I'm sorry, what sentence?

15    Q    I believe it's the third sentence that starts,

16    "Mrs. Marks and Susan."

17    A    "Mrs. Marks and Susan went over the items that had

18    cleared the bank but were unidentified, and Mrs. Marks

19    assured us that most were loans and gambling expenses by the

20    large round amounts."

21          Shall I continue?

22    Q    No, that's fine.

23          No, read the next sentence.

24    A    "Most of the monies dispensed from these accounts were

25    to pay for the large number of medical bills incurred by
```

1    Nicholas in 2006.  All other checks that cleared the bank but

2    were unidentified were included as personal expenses."

3    Q    And that's the proper procedure to follow, correct?

4    A    Yes.

5    Q    Now, again, Mrs. Marks stated that there were a lot of

6    loans in that year; is that correct?

7    A    Yes.

8    Q    And in -- were you aware that in 2005, 2006, because of

9    Nicholas' illness and passing away and her grief, she didn't

10   do a lot of work in her fortune-telling business?

11   A    I don't know.

12   Q    You never had that discussion with her?

13   A    No.

14   Q    But you saw that the fortune-telling-income for '05 --

15   part of '05, all of '06, and most of '07 was decreased

16   dramatically, correct?

17   A    I can't recall.  Whatever the numbers show.

18   Q    Well, you testified on direct that she didn't even file

19   a corporate return for 2007.

20   A    Yes, she did not file for 2007 or '8, yes.

21   Q    And then later when she --

22   A    She had no activity.

23   Q    Later when she stopped getting significant loans from

24   Jude Montassir and started working again, in 2009 she again

25   started filing her corporate returns; is that right?

```
 1    A    Yes.

 2    Q    Did you also -- did you have an attorney working with

 3    your firm at one time?

 4    A    No.

 5    Q    Well, let me mention the name -- did Mrs. Marks for one

 6    year have an appeal to the IRS regarding some of her taxes?

 7    Do you remember that?

 8    A    I remember something about that, yes.

 9    Q    And she was working with one of the people in your

10    office, a gentleman by the name of Dick Goold, G-o-o-l-d?

11    A    Dick is an employee of mine, he's not an attorney.

12    Q    No, I understand that.

13    A    Uh-huh.

14    Q    And I'm not suggesting he is.

15         But did Mr. Goold -- is it pronounced Goold?

16    A    Goold, yes.

17    Q    Work with Rose on her appeal with the IRS, and did he

18    work with a tax attorney by the name of Ed Phillips on that

19    appeal?

20    A    Yes, he did.

21    Q    And is that an attorney who Mrs. Marks hired who

22    retained your firm to work with her on the tax appeal

23    matters?

24    A    Yes.

25    Q    And did you and Mr. Goold have conversations with
```

1    Mr. Phillips and Mr. Marks -- Mrs. Marks about their personal

2    tax matters for that legal case?

3    A    I can't recall exactly, but I would assume so.

4    Q    Now, did there come a time when you decided to scale

5    back your practice?

6    A    Yes.

7    Q    About when was that?

8    A    Last year sometime.

9    Q    Well, let me ask you if in or about August 9th, 2011 --

10   A    Yes.

11   Q    -- you sent Ms. Marks a letter saying:  "Having turned

12   70, I am in the process of scaling down my practice.

13   Unfortunately, I will not be able to complete your tax

14   returns for this year," and you then enclosed extensions for

15   her to file both for her individual and her corporate return?

16   A    Yes.

17   Q    And you recommended an attorney by the name of Mike

18   Sullivan to continue with her work?

19   A    Yes.

20   Q    So your involvement with Ms. Marks and her taxes ended,

21   really, for the tax year 2009.  For the tax year 2010, you

22   filed an extension for her but told her that because at your

23   young age you wanted to play more golf, you were scaling back

24   your practice.

25   A    Yes, that's right.

```
 1              MR. SCHWARTZ:  I have no other questions, Judge.

 2              Oh, just wait.  I might.

 3              THE COURT:  All right.

 4  BY MR. SCHWARTZ:

 5  Q    Just one other question.

 6              In the years 2006, 2007, and 2008, did Ms. Marks

 7  tell you that because she wasn't working as much because of

 8  the illness and getting over her husband's death, that she

 9  got significant loans from both Jude Montassir and a fellow

10  by the name of Peter Wolofsky?

11  A    I don't remember the Jude, but I do remember the Peter

12  Wolofsky loan.  Yes, she did tell me that.

13  Q    And earlier, we saw the letter of 2003 for the 2001 year

14  where she talked about loans from Jude Montassir?

15  A    Yes.

16  Q    And you remembered that Peter Wolofsky -- I think you

17  remember -- had a mortgage on her house?

18  A    Yes.

19  Q    And that mortgage, although it went up and down, the

20  general process was it was going up, and she was borrowing

21  more and more money from him?

22  A    I don't recall the amounts of the mortgage, but I know

23  he had the mortgage.  He loaned her the money.

24  Q    And she was paying significant interest to him and

25  borrowing additional principal, is that fair to say?
```

```
 1   A     I don't know what the -- I can't remember the details.

 2   Q     It would be reflected on the returns?

 3   A     It would be reflected on the returns, yes.

 4         MR. SCHWARTZ:  I guess I have no other questions,

 5   Judge.

 6         THE COURT:  Thank you.

 7         Any redirect?

 8         MR. STEFIN:  Yes, a few questions.

 9                   Redirect Examination

10   BY MR. STEFIN:

11   Q    Mr. Van Vorst, with respect to those letters that

12   defense counsel showed you, I want to again direct you to the

13   letter on composite 20, document number Vorst-000753.

14         And in that second paragraph, it's indicated that

15   the Defendant disclosed or that there was a determination

16   there were wire-transfers from a Jude Montassir totaling

17   $483,980, but that 300,000 of that was a loan, correct?  Is

18   that what that paragraph states?

19   A     Yes.

20   Q     Do you know whether or not that $483,980 was all the

21   money that the Defendant received from a Jude Montassir in

22   that tax year, 2001?

23   A     I don't -- I don't understand the questioning.

24   Please --

25   Q     Do you know whether that is all the money that the
```

```
 1    Defendant received from Jude Montassir?

 2    A    That was what was reported to us.

 3    Q    That was reported to you by whom?

 4    A    By Mrs. Marks.

 5    Q    And if the Defendant had received additional money from

 6    Jude Montassir and didn't report it to you, would you have

 7    had any way to know that?

 8    A    Unless it was reported to me, I wouldn't know it.

 9    Q    And you'd take a client's word for it, simply what they

10    tell you that a certain amount of money is a loan?

11    A    Absolutely.  That's what we're required to do.  If they

12    tell us that's what it is, then we believe them, that's what

13    it is.  We're not required to audit.

14    Q    All right.  And you weren't required to ask for any

15    verification?

16    A    I'm sorry?

17    Q    I said, you weren't required to ask for any verification

18    of the loan?

19    A    We're not required to ask for any verification.  If a

20    client tells us that's what it is, then that's what we put

21    down, because we're preparing the return for the client.

22    Q    And if a client is later audited by the Internal Revenue

23    Service, the client may have to come up with documentation to

24    justify or explain that loan, correct?

25    A    Yes, that's correct.
```

```
 1    Q     And what type of documentation would one usually have in

 2    order to verify that a loan was made between parties?

 3    A     Oh, I don't -- it would vary by client.

 4    Q     Well, what is typically the types of documents that

 5    verify a loan?

 6    A     That normally verify a loan?

 7    Q     Right.

 8    A     Usually you would have some kind of a note, I would

 9    assume.

10    Q     Like a promissory note?

11    A     Promissory note or a mortgage if it's a mortgage, you'd

12    have a mortgage note.  But it could be a verbal loan, too.

13    Q     And did the Defendant disclose for the tax year 2001

14    whether or not there were third-party payments made to pay

15    off her other mortgages or to pay for cars that she leased?

16    A     I wouldn't know about that.

17    Q     Now, you indicated that you were aware of the fact that

18    she had taken out loans with someone by the name of Peter

19    Wolofsky.

20    A     Yes.

21    Q     Did she ever disclose that those loans were being paid

22    by -- partially by third-party payments from clients of hers?

23    A     No.

24    Q     Would that have troubled you in terms of determining her

25    income if you had been aware of that?
```

1    A    I would have asked her more details to determine if it

2    should be troubling or not.

3    Q    Now, in document number 759, this is the letter dated

4    August 9th of 2007, on the second sentence it says:

5    "Mrs. Marks has two bank accounts and uses them for her

6    personal, as well as for her gambling and fortune-telling

7    activity," and that she gave Bank of America bank statements

8    for January through December 2006 for an account, looks like

9    5908.

10            Again, you have to rely upon the representations

11   made by your clients in doing the tax returns, correct?

12   A    That's our obligation, yes.

13   Q    And would you have any way of knowing whether or not she

14   actually had additional bank accounts in that year with

15   additional income?

16   A    I would have no way of knowing.

17            MR. STEFIN:  That's all I have on redirect.

18            MR. SCHWARTZ:  Briefly, Judge?

19            THE COURT:  Okay.

20            MR. SCHWARTZ:  Just two topics.

21                      Recross-examination

22   BY MR. SCHWARTZ:

23   Q    Mr. Stefin -- I'm sorry.  Let me take the podium.

24            Mr. Stefin showed you the exhibit again, page 1,

25   and talked about Rose Marks telling you what her income was,

```
 1   for instance, the wire-transfers from Jude Montassir, but
 2   didn't she give you her bank account records, and you looked
 3   at them and saw what the wire-transfers were?  Isn't that
 4   what your letter says in the first paragraph?  Yes or no.
 5   A    May I read it?
 6   Q    Surely.
 7        And particularly the second sentence~-- the first
 8   and second sentence.
 9   A    Okay.  Should I read it out loud?
10   Q    Whichever's more comfortable to you.
11   A    Yes, we looked at the bank accounts.
12   Q    Okay.  So it wasn't she just came in and said, oh, I got
13   $483,000, and 300,000 of it was loans.  You looked at the
14   bank accounts and saw what the wire-transfers were, and you
15   asked her about them?
16   A    Yes, we added them up and asked her questions about
17   them.
18   Q    Okay.  Now, Mr. Stefin also asked you two other areas of
19   questions.  One, he said in 2007, when you were doing her
20   2006 returns, you -- she identified two bank accounts from
21   you for her personal -- on her personal accounts; is that
22   right?
23        Let me get the letter.
24        Do you see on the letter in front of you that
25   Mr. Stefin asked you about:  "Mr. and Mrs. Nicholas Marks
```

1    engaged us for the return.  Mrs. Marks has two bank accounts

2    and uses them for her personal, as well as gambling and

3    fortune-telling activity?"

4           You see those first two lines?

5    A    "Engaged us to prepare their 1040 for 2006.  Mrs. Marks

6    has two bank accounts and uses them for her personal, as well

7    as her gambling and fortune-telling activity," yes.

8    Q    And for that year, you weren't doing her corporate

9    return, right?

10   A    I don't remember.

11   Q    You did her corporate returns for '06.

12   A    '6.

13   Q    Right.

14          So this is on her personal returns.  You also did

15   her corporate return for that year.

16   A    I believe we did for '6.

17   Q    Okay.  And if she got loans into her corporate account,

18   or even her personal account, again, that wouldn't have a tax

19   consequence?

20   A    Loans are not taxable.

21   Q    And I believe you said that certain clients have notes.

22   Let's say if someone was a solicitor in England they might

23   draft a note for a loan, but other clients, the loans can be

24   based on verbal agreements?

25   A    Could be.

```
 1    Q     Yes.
 2          And they might be -- there might be evidence of
 3    them by either wire-transfers or checks or something like
 4    that?
 5    A     It's possible.
 6    Q     Okay.  Last question.  You, again with Mr. Stefin, said
 7    you didn't discuss third party payments.
 8    A     No.
 9    Q     And you never told and Mrs. Marks didn't know to ask if
10    she had a tax obligation on third-party payments, is that
11    fair?
12          MR. STEFIN:  Objection.
13          THE COURT:  Sustained.
14 BY MR. SCHWARTZ:
15    Q     Okay.  You never told Mrs. Marks and Mrs. Marks didn't
16    ask you whether there was a tax obligation for third-party
17    payments?
18    A     I don't recall.
19          MR. SCHWARTZ:  No other questions.
20          THE COURT:  Thank you, sir.  Have a good day.
21          MR. SCHWARTZ:  Thank you for coming, sir.
22          MR. BARDFELD:  The United States would call Susan
23    Utstein.
24          THE COURT:  Ma'am, would you please raise your
25    right hand.
```

```
 1              Susan Utstein, Government's witness, sworn.

 2                 THE COURT:  Please be seated.

 3                 THE WITNESS:  Thank you.

 4                 THE COURT:  If you can try and speak into that

 5     microphone for us, please.  It moves, so you can adjust it,

 6     whatever's comfortable, but so long as we can hear you.

 7                 Could you tell us your name and spell your last

 8     name for us, please.

 9                 THE WITNESS:  My name's Susan Utstein,

10     U-t-s-t-e-i-n.

11                 THE COURT:  Thank you, ma'am.

12                        Direct Examination

13     BY MR. BARDFELD:

14     Q    Good morning, Ms. Utstein.

15     A    Good morning.

16     Q    How are you currently employed?

17     A    I'm an office manager for a company called Variety

18     Foods.

19     Q    And before working for Variety Foods, what did you do?

20     A    I was an administrative assistant for John Van Vorst,

21     CPA.

22     Q    And what kind of things did you do as an administrative

23     assistant for John Van Vorst, CPA?

24     A    I would partly help gather information so that he could

25     prepare tax returns.
```

1    Q     And what kind of information would you gather?

2    A     A client would come in, would hopefully from their pro

3    forma, give me their income, give me expenses, I would write

4    it down, try and make it as neat and as organized as possible

5    so that the accountants could do the tax return.

6    Q     Were you the first person a client would normally see

7    when they were trying to have a tax return prepared?

8    A     Well, they would see the receptionist first, and, yes,

9    then they would come in and see me.

10   Q     And then you would take raw data and --

11   A     I would take raw data, I would, to the best that I can,

12   try and figure out is this income, is this dividends, do you

13   have W-2s, do you have -- what are your expenses that offset

14   your income, and get it as neat and as concise as possible.

15   If there's stuff missing, ask for it, and then give it on to

16   the accountants.

17   Q     While working for Mr. Van Vorst, did you have occasion

18   to work with a taxpayer by the name of Rose Marks?

19   A     Yes, I did.

20   Q     And what did you do for Rose Marks?

21   A     She would bring me information not put together neatly

22   or anything, and I would -- like puzzles.  So I would take

23   the information and try and make it so that it was

24   understandable.

25   Q     And what was your purpose in doing that?

```
 1   A     Well, the accountants need to know what your income is,

 2   what your expenses are, what -- where you derive your income

 3   from so that they can do a tax return.

 4   Q     Okay.  Let's talk about your first meeting with

 5   Ms. Marks.  Do you recall that meeting?

 6   A     Not -- can't tell you what the first meeting was, no.

 7   Q     Okay.  Do you recall meeting with her and going through

 8   documents with her?

 9   A     Yes.

10   Q     And what kind of documents did she provide to you?

11   A     She would give me some bank statements, she would give

12   me receipts from gambling losses, which would be -- what do

13   you call those, wrappers from -- currency wrappers and ATM

14   receipts that she would state to me were gambling losses, and

15   she would give me W-2Gs, I believe they're called, which are

16   gambling winnings, which are issued by wherever she won the

17   money from.

18             And then I would look through the stuff.  If there

19   were any questions on the bank statements, if there were bank

20   statements missing, I would go back and ask her.  If I'm

21   missing a certain month or something like that, and if there

22   were anything on the bank statement that I had to question, I

23   would call her and ask her about it.

24   Q     Do you recall what years you were preparing tax returns

25   for her?
```

```
 1    A     I was --

 2               MR. SCHWARTZ:  Objection.

 3               THE WITNESS:  I would have to guess.

 4               MR. SCHWARTZ:  I don't believe the witness said she

 5    prepared the tax returns.

 6               THE COURT:  Rephrase the question.

 7    BY MR. BARDFELD:

 8    Q     Do you recall what years tax returns were prepared for

 9    Ms. Marks and you were assisting?

10    A     I can't tell you exactly what years.  I would think it

11    would be maybe --

12               MR. SCHWARTZ:  Objection.

13               THE WITNESS:  -- '4, '5, and '6, but I don't

14    recall.

15               THE COURT:  What's the objection?

16               MR. SCHWARTZ:  She doesn't know what years.  She's

17    guessing.

18               THE WITNESS:  I don't remember the exact years.  It

19    was a couple of years, but I can't tell you exactly what year

20    it was.

21    BY MR. BARDFELD:

22    Q     Do you remember approximately what years?

23    A     Approximately, I would say '5 and '6.

24    Q     2005 and 2006?

25    A     2005 and 2006.
```

```
 1                    MR. BARDFELD:  May I approach, Your Honor?

 2   BY MR. BARDFELD:

 3   Q    I show you what's already been introduced into evidence

 4   as composite exhibit 413.  Can you take a look at these?

 5   A    Okay.  I've seen these before.

 6   Q    Let's do it one at a time.

 7             Government's exhibit 413.  You said you've seen

 8   those before?

 9   A    Yes.

10   Q    Where have you seen those?

11   A    These were given to me by Rose Marks.

12   Q    And what did you do -- well, were they given to you in

13   that form?

14   A    No, they -- I believe they came to me either in some

15   sort of envelopes or in a shopping bag, or I don't remember

16   exactly how they came to me, but they were not neat.

17   Q    Okay.  And what did you do with those documents?

18   A    I separated them into different piles of what they were,

19   and I would add them up and put tapes next to them as to

20   what -- how much they equaled.

21   Q    Okay.  And what -- why would you do something like that?

22   A    Because if this, first off, is a W-2G, that mean this is

23   winnings from gambling.  So that would have to go on a tax

24   return as far as how much money you won at the casinos.

25   Q     Okay.  And what is -- there's an envelope that's at the
```

```
 1   back of Government's exhibit 413.  What is that envelope?

 2   A    That's my handwriting.

 3   Q    Okay.  And what's on the envelope?

 4   A    And on the envelope I believe it's -- what it says on

 5   here would be the total of what her W-2Gs, what her earnings

 6   were from gambling for the year 2005, and then it lists

 7   wrappers and Seminole and Cash Systems and Global, which

 8   would have been ATM withdrawals, which would have been

 9   gambling losses, which are also listed on there.  And then

10   there's a tape that I took.

11   Q    When you say tape, you're talking about --

12   A    An adding machine tape to show that I added up the

13   winnings, I added up the losses and told the accountant that.

14   Q    And you said that this is your handwriting on the --

15   A    That's definitely my handwriting.

16        THE COURT:  Ma'am, you need to wait for him to

17   finish before you start answering, because this gentleman is

18   trying to take everything down.  When we speak at the same

19   time it's very difficult.

20        THE WITNESS:  I'm sorry.

21        THE COURT:  Thank you.

22   BY MR. BARDFELD:

23   Q    This is your handwriting, right?

24   A    Yes.

25   Q    Okay.  It says gambling 2005.  Is that your handwriting?
```

1    A    Yes, it is.

2    Q    Up in the top left corner of Government's exhibit 413,

3    what does that say?

4    A    It's a total of the W-2Gs, and that is my handwriting.

5    It says $220,340.78.

6    Q    And that would have come from tape -- well --

7    A    That would have come from the W-2Gs and from the tape.

8    Q    Okay.  And then up in the corner, what does it say?

9    A    That's a listing of wrappers, Seminole receipts, Visa,

10   Cash Systems and Global, and I was told those are gambling

11   losses, and there should be actual pieces there.

12   Q    When you say actual pieces, are you referring to

13   wrappers?

14   A    Wrappers, yes.

15   Q    If you look at the tape, which is part of the

16   exhibit 41301555, what are the losses -- those are all

17   gamblings, right?

18   A    Yes.

19   Q    What do you have the total -- what's the total gambling

20   winnings, and what's the total gambling losses?

21   A    The winnings are $220,340.78.  The losses read $432,450

22   (sic).

23   Q    And is it in red for a reason?

24   A    Because it's -- I deducted it off of the winnings to

25   show that she actually lost more money than she won.

```
 1    Q    And then the final number is $212,509?

 2    A    And 22 cents.

 3    Q    And that's a loss, a total gambling loss --

 4    A    For that year, yes.

 5              THE COURT:  Ma'am, you need to wait until he's

 6    finished before you start answering, please, because this

 7    gentleman can't keep taking both people at the same time.  We

 8    lose some of the testimony.  All right?  Thank you.

 9    BY MR. BARDFELD:

10    Q    I apologize for that.  It's my fault.  I'm speaking over

11    you at times.  So the answer was?

12    A    Yes, she would have shown a loss for the year 2005.  Her

13    losses would have exceeded her winnings.

14    Q    Did you assist in preparing her tax return for other

15    years?

16    A    I remember it, but I can't tell you what years.

17    Q    Well, do you remember -- I don't need to know the years,

18    but do you remember, were her gambling losses greater than

19    her gambling winnings?

20    A    To the best of my recollection.

21              MR. BARDFELD:  May I approach again, Your Honor?

22              THE COURT:  Yes.

23    BY MR. BARDFELD:

24    Q    I show you what's already been introduced into evidence

25    as Government's exhibit 413-2.  Can you identify those?
```

```
 1   A     Those are wrappers that would have been handed in to us,

 2   to me, stating that these are gambling losses in various

 3   denominations.

 4   Q     Is it unusual for a client to bring in gambling wrappers

 5   to document their winnings and -- their winnings and losses

 6   in gambling?

 7              MR. SCHWARTZ:  Objection, relevancy.

 8              THE COURT:  Overruled.

 9   BY MR. BARDFELD:

10   Q     You can answer that.

11   A     I've never seen it before except in her.

12   Q     Okay.  Now, we've got an idea of what her gambling

13   winnings and losses were.  How did you determine what her

14   income was?

15   A     Whatever information she would give me, whether it be

16   her gambling winnings were income, and if she had any 1099s

17   or any of that kind of information, that would have been

18   income.

19   Q     What else did you use to determine what her income was?

20   A     I would look at her bank statements, see the deposits on

21   the bank statements and ask her where did this money come

22   from, is this income or what is it.

23   Q     And what do you recall she said about that?

24   A     For the most part, I recall that she would say to me

25   that these are loans or it's transfers from one account to
```

1    the other account, and that it was gambling winnings that

2    were deposited.

3    Q    Did you ever ask the taxpayer -- well, would you ask

4    taxpayers if they provided all the information or

5    documentation they had regarding income and expenses?

6    A    Yes.

7    Q    And did you ask Rose Marks if she provided you with all

8    the information and documentation she had regarding income

9    and expenses?

10   A    Yes.

11   Q    And if you had a question about certain deposits that

12   were made on her bank slip, how would you get the answer to

13   what the source of that deposit was?

14   A    I would phone her, ask her the questions.

15   Q    Okay.  But when you looked at a bank statement, could

16   you tell from a bank statement the basis of the deposit?

17   A    Not from just looking at the statement.  It would just

18   show a deposit.

19   Q    Okay.

20   A    I would have to ask a question about the deposit, where

21   did the money come from.

22   Q    Right.

23          And who would you ask that information from?

24   A    I would ask Rose Marks.

25   Q    And did you do anything to verify her answers?

1   A     Well, sometimes you could see a withdrawal from one

2   account that would -- you could see it on the other account,

3   on one statement from the other.  You could kind of put them

4   together.  And then if she said it was a loan, I would ask

5   her, can you tell me about it, and sometimes she would just

6   say it's a loan.

7   Q     Did she ever provide documentation to show a particular

8   deposit was a loan?

9   A     There would be a deposit slip or two that would have her

10  signature -- would write across it that would say loan.

11  Q     Did you and Mr. Van Vorst ever provide organizers to

12  your clients to help them prepare their information and

13  documentation for ease and preparation of tax returns?

14  A     Every January, I believe an organizer goes to every

15  client.

16  Q     And do you recall did you prepare an organizer for

17  Ms. Marks?

18  A     An organizer was mailed to her.

19  Q     And do you know if she ever completed that organizer?

20  A     I don't remember ever seeing an organizer completed.

21  Q     Do you know if Rose Marks provided you with all the

22  documentation and information necessary to complete her tax

23  returns?

24  A     She gave me whatever information she gave me.  That's

25  all that she gave me.

```
1   Q     But if you didn't have anything -- everything you
2   needed, what would you do?
3   A     I would call her, I would write to her, and then I would
4   give it to Mr. Van Vorst and say, you've got to get the rest
5   of the information.
6   Q     Did you ever prepare letters to Rose Marks?
7   A     Yes, I did.
8   Q     And what was the purpose of those letters?
9   A     The letters were either stating I was missing
10  information or that we're preparing your tax return based on
11  this information that you gave us.
12  Q     And did you typically prepare those letters for other
13  taxpayers?
14  A     Some, but mostly no.
15  Q     Why did you prepare letters for Rose Marks but typically
16  not others?
17  A     There was a lot of money involved, and I just felt
18  comfortable to state in the letters, you know, exactly what
19  was there.  Other clients, it was small, it wasn't large
20  money.
21  Q     Okay.  I show you what's already been introduced as
22  Government's exhibit number 20, and this would be documents
23  Vorst-00757 and -758.
24              THE COURT:  You can -- if you want to lift that up
25  a little bit so it would be easier to see.
```

```
 1   BY MR. BARDFELD:

 2   Q    Is this a document that you would have prepared and sent

 3   out, either you or Mr. Van Vorst, to Rose Marks?

 4   A    Yes.

 5   Q    And you did it because of why you said, you wanted to

 6   document what was going on?

 7   A    Yes.

 8   Q    If you read the first paragraph:  "Mr. and Mrs. Nicholas

 9   Marks engaged us to prepare their Form 1040 for 2005.

10   Mrs. Marks has two bank accounts and uses them for her

11   personal, as well as her gambling and fortune-telling

12   activity."

13            Hold on one second.

14            Okay.  I'm sorry.  Later down in that paragraph:

15   "Mrs. Marks and Susan" -- is Susan you?

16   A    Yes.

17   Q    "Mrs. Marks and Susan went over the items that had

18   cleared the bank but were unidentified, and Mrs. Marks

19   assured us that most were loans and gambling expenses by the

20   large round amounts."

21            Does that -- do the round amounts mean anything to

22   you?

23   A    Well, it was just round amounts.  It would be -- like

24   there weren't pennies and dollars, you know, single dollars

25   or something.  It would have like struck me that it was a
```

1    round amount, like 10,000, or you know what I'm saying,

2    15,000.  It would have just been a round amount.

3    Q    Okay.  Who would have confirmed the nature of the

4    deposit based on those round amounts deposits?

5    A    Mrs. Marks.

6    Q    Okay.  And that information came solely from Mrs. Marks?

7    A    Yes.

8    Q    With no other documentation except for what she told

9    you?

10   A    No.  Once in a while, like I said, there was a deposit

11   slip that had the word "lone," l-o-n-e (sic), written across

12   it.  I remember that, but I can't tell you exactly where it

13   was.

14   Q    The second paragraph we talk about losses totaling

15   220,000, and then it just says net gambling loss of $432,000.

16   That would have been in reference to Government's exhibit 413

17   that you've already talked about in the cash register tape;

18   is that right?

19            MR. SCHWARTZ:  Your Honor, if that's a question, I

20   object.

21            THE COURT:  Sustained.

22            MR. SCHWARTZ:  Because he started out by saying

23   losses of.

24            THE COURT:  Sustained.

25            Rephrase your question.

```
1    BY MR. BARDFELD:

2    Q    Let's go through the second paragraph.  "Mrs. Marks gave

3    us forms W-2G that totaled $220,340.78."

4    A    Yes.

5    Q    You see that?

6    A    Yes.

7    Q    And that would have been information that was obtained

8    on the envelope that we had already seen before, right?

9    A    Yes.

10   Q    And those losses reconcile with the --

11           MR. SCHWARTZ:  Objection to categorizing that as

12   losses.

13   BY MR. BARDFELD:

14   Q    Do those numbers reconcile with the numbers that you had

15   on your cash register tape on exhibit 413?

16   A    Yes.

17   Q    Okay.  The paragraph starting:  "Mrs. Marks states that

18   when she wins at the casino, most times she receives the

19   prize in cash and replays the money.  Thus, she has no proof

20   of this additional gambling expense except for the $10,000,

21   $5000, $2000, $500, and $100 wrappers she provided to us.

22   The wrappers total $89,000, and she assured us that none of

23   these wrappers were for cash and she has purchased through --

24   she has purchased through a check or ATM withdrawal.

25           "Additional (sic), the Pink Mini-Tournament buy-in
```

1    receipts she stated were acquired with cash, not from checks

2    cashed or ATM withdrawals."

3         From whom did you receive that information that was

4    written in the letter?

5    A    Mrs. Marks.

6    Q    And, finally, one of the things that you have on there:

7    "By signing below, Mrs. Marks has read and agreed the above

8    to be true and information she has supplied to us to complete

9    their 2005 tax return."

10        So would it be fair to say that the 2005 tax return

11   that you assisted Mr. Van Vorst in preparing came from

12   documentation and information provided by Rose Marks?

13   A    Yes.

14   Q    Okay.  This is also part of Government's composite

15   exhibit number 20.  This is document 00759, dated August 9th,

16   2007.

17        The third sentence of the first paragraph reads:

18   "Mrs. Marks gave us Bank of America bank statements, in

19   parenthesis 5908, for January through December 2006.

20   Mrs. Marks and Susan went over the items that had cleared the

21   bank but were unidentified, and Mrs. Marks assured us that

22   most were loans and gambling expenses by the large round

23   amounts."

24        Again, where did you obtain that information from?

25   A    Mrs. Marks.

1    Q    Did you obtain information from anyone else?

2    A    I didn't meet with anybody else.

3    Q    Does that letter indicate that Rose Marks -- that that

4    was the only bank account or those were the only two bank

5    accounts that Rose Marks provided to you relating to a 2006

6    return?

7    A    Yes.

8    Q    Does the document indicate anything about statements for

9    Rose Marks' Washington Mutual account ending in 2373?

10   A    No.

11   Q    If she had an account at Washington Mutual, would you,

12   as assisting in her tax preparation, want to know about that

13   account?

14   A    Yes.

15   Q    And why would you want to know about that account?

16   A    Because it has activity, if it's got income and/or if

17   you wrote checks against it.

18   Q    If you would have been aware of that account, would you

19   have asked Rose Marks to provide bank statements relating to

20   that account?

21   A    Yes.

22   Q    Is it ultimately the client's responsibility or you and

23   Mr. Van Vorst's responsibility to provide the necessary

24   information and documentation for preparation of an accurate

25   tax return?

```
 1    A    It's the client's responsibility to provide the

 2    information.

 3    Q    If Rose Marks did not provide you with all the

 4    information and documentation she had regarding income and

 5    expenses, would you and Mr. Van Vorst have completed her tax

 6    return?

 7    A    No.

 8    Q    If Rose Marks had failed to inform both you and Mr. Van

 9    Vorst that she had other bank accounts, would you have

10    completed her return?

11    A    If we didn't know about them?  I don't understand.

12    Q    Well, if you had asked her about them.

13    A    If we had asked her, are there other --

14    Q    Right, and she had --

15            THE COURT:  You know, you keep talking over each

16    other.  Can you let her finish the answer before you ask the

17    next question?  Can you let him finish the question before

18    you answer, please?

19    BY MR. BARDFELD:

20    Q    If Rose Marks had failed to inform you that she had

21    other bank accounts, and you knew that there were other bank

22    accounts, would you have prepared her tax return?

23    A    No.

24    Q    If you had known that Rose Marks was not reporting all

25    of her income, would you and Mr. Van Vorst have prepared her
```

```
 1    tax return?

 2    A     No.

 3              MR. SCHWARTZ:  Objection, assumes facts not in

 4    evidence.

 5              THE COURT:  Sustained.  Rephrase the question.

 6    BY MR. BARDFELD:

 7    Q    Well, I guess if you didn't have all the documentation

 8    and information, would a tax return have been prepared?

 9    A     If the information was incomplete, no.

10              MR. BARDFELD:  I have no further questions.

11              THE COURT:  Thank you.

12              Cross-examination.

13                        Cross-examination

14    BY MR. SCHWARTZ:

15    Q    Ma'am, if she didn't give you information about the fact

16    that she got loans from somebody and put it in a bank

17    account, would that have any effect on her income?

18    A     Well, yeah, I mean if you -- if you put funds in your

19    checking account, you need to -- the accountants need to know

20    where did the funds come from.  Is the funds income?  Then

21    you pay taxes on it.  If the fund is a loan, then you don't

22    pay taxes on it.

23    Q    Correct.

24              So if I have a bank account and it's a home equity

25    line -- and I'm not saying that she did.  But if I have a
```

```
 1    home equity line and I take money from that bank account and
 2    pay bills, borrowing money from the bank --
 3    A    Uh-huh.
 4    Q    -- does that implicate anything to do with income taxes?
 5    A    I don't believe so, but I don't know what the --
 6    Q    Because you're not an accountant, so you don't know.
 7    A    I'm not an accountant.
 8             THE COURT:  Could you let her finish?
 9             MR. SCHWARTZ:  I'm sorry.  That's my fault.
10    BY MR. SCHWARTZ:
11    Q    So if Rose had a bank account and she got loans from,
12    let's say, Jude Montassir into that account, and she spent
13    that money on personal items, that would have no tax
14    consequence, would it?  Or don't you know?
15    A    I don't know.  I'm not an accountant.
16    Q    And, by the way, that form that Mr. -- that letter that
17    Mr. Bardfeld read to you that you sent to her, you never got
18    a signed copy of those forms back, did you?
19    A    It wouldn't have come to me.  When she would have picked
20    up her tax returns, she would have had to have signed it and
21    given to -- I believe to the receptionist when she picked up
22    her tax returns.
23    Q    And if you mailed the tax returns to her?
24    A    I don't recall ever mailing tax returns to her.
25    Q    Do you have any -- to the best of your knowledge, are
```

```
 1    there any signed copies of that form in the files of the

 2    former John Van Vorst office?

 3    A     I don't know.

 4    Q     Okay.  By the way, gambling's not a crime in -- forgive

 5    me.  Gambling in a licensed casino or bingo parlor is not a

 6    crime in Florida, is it?

 7    A     Not that I know of.

 8    Q     And you can't get indicted or charged with a crime

 9    because you go and gamble your money?

10    A     Not that I know of.

11    Q     How about losing?  Is losing your money gambling a

12    crime?

13    A     Not that I know of.

14    Q     I'm glad of that.

15          The -- and how many people who were large gamblers

16    did Mr. Van Vorst represent?

17    A     I don't know that.

18    Q     How many tax returns did you help organize for people

19    who were large gamblers?

20    A     Other than Ms. Marks, I don't remember many more.

21    Q     Okay.  So you don't know if it's regular or irregular in

22    the mid 2000s for a gambler to use the cash bands or the

23    receipts of cash bands that they get when they put their

24    credit card in an ATM machine at a casino as proof of their

25    losses, do you?
```

1    A    No.

2    Q    So when you said to Mr. Bardfeld that it was unusual,

3    that wasn't -- was not based on any empirical data, it was

4    just your opinion?

5    A    Yes, sir.

6    Q    Because you've never -- you haven't done anything with

7    other gamblers, have you?

8    A    No, sir.

9    Q    Okay.  Now, Mr. Bardfeld asked you, did you do anything

10   to verify that these were loans.  Let me ask you this

11   hypothetical.  If you had called Jude Montassir, and she

12   said, I gave Rose the money but she has to return it to me,

13   it wasn't for working, would you consider that a loan?

14            MR. BARDFELD:  Objection.

15            THE COURT:  Overruled.

16            THE WITNESS:  I never called her, so I don't know.

17   BY MR. SCHWARTZ:

18   Q    But if you had gotten that type of statement, would you

19   consider that a loan?

20   A    I can't answer that question.

21   Q    If the person who gave her money said it wasn't for

22   work, would you consider it income?

23   A    If the person who gave her money said it was a loan,

24   then it would have been a loan.

25   Q    Okay.  And if they said I gave it to her but she

1    promised to return it to me, would that be a loan?

2    A    If she said it's -- yes, then that would be a loan.

3    Q    Okay.  And if she said, or if somebody said, part of the

4    money I gave her was to pay her for things that she did, and

5    part of it she has to return to me, would the part that was

6    for work she did be income and the part she had to return be

7    a loan?

8    A    Yes, sir.

9                MR. SCHWARTZ:  No other questions.

10               THE COURT:  Any redirect?

11               MR. BARDFELD:  No, Your Honor.

12               THE COURT:  All right.  Thank you, ma'am.

13               THE WITNESS:  Thank you.

14               THE COURT:  Can we try and make it to lunch before

15   we break, or do you need a break?  Keep going?  Okay.  I see

16   the keep going signs.

17               Let's call our next witness.

18               MR. STEFIN:  I have a very exciting part of the

19   trial to present at this point.

20               Your Honor, we have a series of documents on the

21   exhibit list that, by stipulation, the Defense has kindly

22   agreed that we do not need records custodians to come in and

23   authenticate bank records and bank documents.

24               So at this time, the United States is going to be

25   moving into evidence Government's exhibits 201 through 234

```
 1    and 301 through 318.
 2              THE COURT:  Any objection?
 3              MR. SCHWARTZ:  No objection, Your Honor.
 4              THE COURT:  All right.  They will all be admitted
 5    without objection.
 6         (Government's Exhibit Nos. 201 through 234 and 301
 7    through 318 entered into evidence.)
 8              MR. STEFIN:  Judge, may I basically just go through
 9    the exhibits one by one to explain to the jury what has been
10    brought into evidence?
11              THE COURT:  Sure.
12              MR. STEFIN:  201 are Bank of America bank records
13    for Joyce Michael, Inc., account number ending in 8337.  I'll
14    go through quite a few of these.
15              202 is Bank of America documents for Joyce Michael,
16    Inc., account number ending in 8986.
17              Government's exhibit 203 composite is Bank of
18    America documents for Rose Marks, account number ending in
19    5908.
20              Government's composite exhibit 204, Bank of America
21    documents for Rose Marks, account number ending in 5002.
22              Government's exhibit 205 is Bank of America
23    documents for Rose Marks, account number ending in 2571.
24              206 composite is Bank of America documents for Rose
25    Marks, account number ending in 9658.
```

```
 1                   Government's composite 207 is Bank of America

 2   account for Rose Marks, ending in 1231.

 3                   208 is Bank of America documents for Rose Marks,

 4   account ending in 1184.

 5                   209, Bank of America documents for Rose Marks,

 6   account number 5523.

 7                   Government's exhibit 210 is Bank of America

 8   documents for Rose Marks, account number ending in 7709.

 9                   Government's composite 211, Bank of America

10   documents for an account in the name of Rose Marks, account

11   number ending in 7658.

12                   Composite exhibit 212, Bank Atlantic records of

13   Joyce Michael, Inc., account number ending in 4417.

14                   213, Bank United records, account in the name of

15   Rose Marks, account ending in 3777.

16                   Composite 214 is Chase Bank, account in the name of

17   Joyce Michael Consultant, Inc., account ending in 4017.

18                   Government's composite 215 is an account with Chase

19   Bank in the name of Rose Marks, account ending in 6658.

20                   Composite exhibit 216 is a Suntrust account in the

21   name of Joyce Michael, Inc., account number -- account ending

22   in 7994.

23                   Composite 217 is Suntrust Bank, an account in the

24   name of Rose Marks, account ending in 9662.

25                   Government's exhibit 218 composite is a TD Bank
```

```
 1    account in the name of Rose Marks, account ending in 8028.

 2            Government's composite 219 is another TD Bank

 3    account in the name Joyce Michaels Consultant, Inc., account

 4    ending in 2379.

 5            Composite 220 is an account -- actually, debit card

 6    accounts for TD Bank in the names of Rose Marks, account

 7    ending in 8028; Joyce Michaels, ending in 2379; Nancy Marks,

 8    ending in 6000; and Ricky Marks, ending in that same number,

 9    6000.

10            Government's composite 221 is Wachovia Bank records

11    in the name of Rose Marks, account ending in 0985.

12            222 composite is a Washington Mutual Bank account

13    in the name of Joyce Michael, Inc., account number -- account

14    ending in number 2498.

15            223 composite is a Washington Mutual Bank account

16    in the name of Rose Marks, account ending in 2373.

17            Composite 224 is another Washington Mutual account

18    in the name of Rose Marks, account ending in 3452.

19            225 composite is a BB&T Bank account in the name of

20    Joyce Michaels Consultant, Inc., account ending in 8509.

21            226 composite is a Bank of America account in the

22    name of Nancy Marks, account ending in 5522.

23            227 composite is a Bank of America account in the

24    name of Ricky Marks, account ending in 1636.

25            Exhibit 228 composite is a TB Bank account in the
```

```
 1    name of Ricky Marks and Nancy Marks, account ending in 6000.

 2            229 composite is a Bank of America account in the

 3    name of Victoria Eli, account ending in 9882.

 4            Exhibit 230 composite is a Chase Bank account in

 5    the name of Vivian Marks, account ending in 8565.

 6            Exhibit 231 composite is a Bank of America account.

 7    Actually, it's a safe deposit box in the name of Michael

 8    Marks, the safety deposit box with the account number ending

 9    in 0528.

10            232 composite is a Bank of New York account in the

11    name of Michael Marks and Cynthia Miller, account ending in

12    1373.

13            233 composite is a Bank of America account in the

14    names of Michael Marks and Cynthia Miller, account number --

15    account ending in 3612.

16            234 composite is a Bank of America account in the

17    name of Michael Marks, account ending in 6026.

18            In the 300 series, Government's exhibit 301 is an

19    American Savings Bank account in the name of Jennifer Hill,

20    account ending in 6766.

21            302, Government's exhibit 302, is a BB&T -- is

22    records from a BB&T Bank account in the name of Jude

23    Montassir.  That's already in evidence.

24            And 303, a BB&T account in the name of Jude

25    Montassir, account number 1951, is already in evidence.
```

```
1              There's Government's exhibit 304, is a bank called

2    Mountain Bank, the records of Jude Montassir, account ending

3    in 8936.

4              Exhibit 305 is an account with Mountain Bank for

5    Jude Montassir, account ending in 8607.

6              Exhibit 306 is a Fairfield Bank account in the name

7    of Deveraux, Inc., account ending in 4104.

8              307 is an American Savings Bank account in the name

9    of Jennifer Hill.  Actually, this looks like a repeat.

10             MR. SCHWARTZ:  We need more records.

11             MR. STEFIN:  Additional records -- actually, it's a

12   different timeframe, account ending in 6766.

13             Government's exhibit 308 is a Capital One account

14   in the name of Jennifer Hill, account ending in 8456.

15             309 is a CitiGroup account excerpts, Jennifer Hill.

16   8476 are the last four digits.

17             Government's exhibit 310 is a Hawaiian Bank account

18   of Jennifer Hill, account 1456.

19             311 is an account in a bank called Sandy Springs

20   Bank.  That's an account of Debra Bower, account ending in

21   4706.

22             There's an additional account at Sandy Springs

23   Bank, Government's exhibit 312, for Debra Bower, excerpts,

24   account ending in 4718.

25             Government's exhibit 313 is a Suntrust Bank account
```

```
 1    in the name of Deanna Wolfe and Will Rose, account

 2    number 8694.

 3              Government's exhibit 314 is a Suntrust Bank account

 4    for Deanna Wolfe and Will Rose, account number 3531.

 5              If I could just have one second.

 6              Government's exhibit 315 is a Suntrust Bank account

 7    of Peter Wolofsky.  These are excerpts, account ending in

 8    5782.

 9              Government's exhibit 316 is excerpts of a Suntrust

10    account of Atlas Leasing, account number 1677.

11              Government's exhibit 317 is excerpts of a Suntrust

12    Bank account in the name of Atlas Leasing, account ending in

13    9396.

14              And 318 is a Suntrust Bank account in the name of

15    Peter Wolofsky, account ending in 7862.

16              Your Honor, at this time we would call Joanne

17    Leavitt.

18              Joanne Leavitt, Government's witness, sworn.

19              THE COURT:  Please tell us your name and spell your

20    last name for us.

21              THE WITNESS:  Joanne Levitt, L-e-a-v-i-t-t.

22                         Direct Examination

23    BY MR. STEFIN:

24    Q    Ms. Levitt, what is your occupation?

25    A    I'm a revenue agent with Internal Revenue Service.
```

```
1    Q     And how long have you been with the IRS?

2    A     Twenty-five years.

3    Q     And how long have you worked as a revenue agent?

4    A     I have been a revenue agent for 19 years.

5    Q     And before that?

6    A     I was a tax auditor.

7    Q     Would you explain what a revenue agent does and how it

8    compares with a tax auditor?

9    A     A revenue agent examines tax returns and taxpayers for

10   Form 1040s, individuals, corporations, partnerships, trusts,

11   and employment taxes.  Whereas a tax auditor works in an

12   office.  It's office audit, and only audits individuals.

13   Q     All right.  So as a revenue agent, in addition to

14   working in an office, you sometimes go out and do on-site

15   examinations?

16   A     Yeah, we call ourselves field agents.  We often go out

17   to business sites or sometimes to offices of attorneys or

18   accountants when they're acting as representatives for the

19   taxpayers.

20   Q     Now, the Internal Revenue Service has actually two

21   branches, two sides, so to speak?

22   A     Yes.

23   Q     And they would be what?

24   A     Civil and criminal.

25   Q     And generally, you are assigned to which branch?
```

```
 1    A     I am a civil agent.
 2    Q     From time to time, are you assigned to assist the
 3    criminal side in an investigation?
 4    A     Yes, I currently work in a group that we provide
 5    assistance to the Criminal Investigation Division.  We help
 6    with review of records, we help them as far as advising on
 7    tax law, interviews, whatever they might need, we assist them
 8    with cases when they ask.
 9    Q     Over the course of your career, have you performed any
10    audits?
11    A     Lots.
12    Q     When you say lots, give us a round number.
13    A     I estimated that it was around 6000 audits.
14    Q     Did you recover any money?
15    A     Yes, but I work in examinations, so when we complete an
16    exam we do try to collect, if it's an aggrieved case and
17    there's money owed, we do try to get the taxpayer to make
18    payment.  But if the taxpayer's unable to pay, then the case
19    is closed, and eventually it would be assigned to the
20    collection division.
21    Q     Okay.  With respect to this particular case, were you
22    assigned to assist the United States Attorney's Office and
23    the criminal investigator in reviewing tax returns and other
24    financial information in this case?
25    A     Yes.
```

1    Q    And with respect to your review of tax-related

2    information regarding the Defendant, Rose Marks, what were

3    you asked to perform?

4    A    I was asked to review the records that were provided by

5    witnesses regarding funds given to Mrs. Marks.  I was also

6    asked to review bank statements over which Mrs. Marks had

7    control, to trace the deposit of those funds.  I also

8    reviewed tax information or tax bank deposit information of

9    third parties in order to trace the payment of funds to third

10   parties and to other individuals, as well.

11   Q    A few moments ago I just read a long list of bank

12   accounts and bank records that has been moved into evidence.

13   Did you utilize those records in reaching determinations as

14   to the financial aspects of this matter?

15   A    Yes.

16   Q    Now, with respect to tax returns of the Defendant, Rose

17   Marks, were you furnished with a series of tax returns that

18   had been filed by Rose Marks for a certain period of time?

19   A    Yes.

20   Q    And do you recall what tax years you were furnished

21   tax-related information for Rose Marks which came from the

22   Internal Revenue Service itself, not from an outside source,

23   such as a warehouse or anything of that nature?

24   A    I was furnished with filed tax returns from the years

25   2003 through 2009 for Rose Marks.  And for the years 2003

1    through 2006, those were joint tax returns, and then from

2    2007 through 2009, they were single tax returns.

3    Q     And in addition to the actual tax returns that were on

4    file with the Internal Revenue Service, in one of those tax

5    years was the -- is there also a file related to a tax audit

6    that was performed on Ms. Marks?

7    A     Yes, there was an office audit performed for the 2003

8    tax year.  There was also a collection hearing appeal that

9    was done for the 2004 tax year.

10   Q     Let's start one at a time.

11         THE COURT:  Mr. Stefin, would it be a good time to

12   take an early lunch and then we can start with all the

13   documents, rather than going for a few more minutes and then

14   breaking?

15         MR. STEFIN:  That would be fine.

16         THE COURT:  Okay.  Why don't we start -- why don't

17   we take our lunch break now, ladies and gentlemen, and come

18   back at 1:00 o'clock.

19         So don't discuss the case or form any opinions,

20   leave your notes, and we'll see you at 1:00 o'clock.  Thank

21   you.

22      (The jury exits the courtroom.)

23         THE COURT:  Don't discuss your testimony during the

24   recess, please.

25         MR. STEFIN:  Judge, am I permitted to talk to her?

```
 1    She's my summary witness.  She has been here.

 2              THE COURT:  What do you need to talk to her about?

 3    I would assume you've already prepared her for her testimony.

 4              MR. STEFIN:  Just -- well, I mean, in terms of

 5    getting the documents organized and things of that nature.  I

 6    don't think there's any substance.

 7              THE COURT:  Just don't discuss the substance.

 8              MR. STEFIN:  Okay.

 9              THE COURT:  I mean, I don't know what -- I would

10    assume you have already prepared her for testimony.  I don't

11    know what more you need to talk to her about.

12              MR. STEFIN:  I could always think of something.

13              MR. SCHWARTZ:  That's what worries me, Judge.

14              THE COURT:  Well, let's try and avoid any need to

15    talk to her.  Okay?

16       (A recess was taken from 11:51 a.m. to 1:01 p.m., after

17    which the following proceedings were had:)

18              THE COURT:  Good afternoon, please be seated.

19              We're back on the record.  Ms. Marks is present

20    with counsel.

21              We ready?

22              MR. SCHWARTZ:  I want to ask Your Honor one

23    question, if I could, or raise one issue.

24              Two of our witnesses are going to be attorneys who

25    represented various members of the Marks family in attempting
```

1    to or settling matters, giving money back to their clients.

2    I'm going to call them to testify about those particular

3    matters and limit their testimony to those matters, or one of

4    them brought a lawsuit to get a license in Fort Lauderdale

5    for the Defendants to have a fortune-telling business.

6              I'm not going to go into conversations with their

7    clients.  Therefore, I don't believe it's necessary for their

8    clients to waive attorney/client privilege with them.

9    Mr. Stefin has raised the question of whether the Defendants

10   are waiving attorney/client privileges when I put the

11   attorneys on the stand.  I could probably get a waiver of

12   attorney/client privilege, but I don't want to do that unless

13   the Court makes a finding that that's required.

14             THE COURT:  I don't think the mere fact that you

15   call a lawyer for a witness waives the privilege for the

16   client unless you ask questions that get into communications

17   between the client and the attorney, I would think, or unless

18   you touch on a subject that would -- or have the person

19   testify on something that necessarily requires them to get

20   into the communications.

21             MR. SCHWARTZ:  That was my analysis, Judge, but I

22   didn't want to call a witness and then hold us up because I

23   hadn't gotten a waiver.

24             THE COURT:  What's your --

25             MR. STEFIN:  Well, I think the issue really is

```
 1    Mr. Schwartz may be able to dance around not asking them what

 2    they asked -- you know, what their clients said to them, but

 3    I don't think, depending on what the testimony is, I think I

 4    have a right to ask questions which may -- their answers may

 5    only be -- you know, come from information they receive from

 6    their clients.  Like how many lawsuits were you hired to try

 7    to forestall, or how many victims above and beyond the

 8    witnesses in this case did you attempt to settle with, and

 9    who are they, and what representations were made to you with

10    respect to your efforts to try to resolve these matters.

11           So I think there's a -- it's rife with peril that

12    if this lawyer is on the stand, and, you know, if I'm allowed

13    to have any meaningful cross-examination, for the lawyer to

14    then say, well, I can't answer that, that's attorney/client

15    privilege, I think that that might --

16           THE COURT:  I don't know what he's intending to

17    offer.  I mean, if he's saying -- you know, if he's just

18    going to say, did you settle a case with so-and-so, and is

19    this the settlement papers that you drafted or signed or you

20    had prepared --

21           MR. SCHWARTZ:  Or did you attempt to settle a case

22    with so-and-so and they rebuffed you.  But I'm not going to

23    go into instructions given to him by his client or

24    conversations with his client.

25           THE COURT:  My initial reaction is it depends on
```

```
 1    what is asked and what he's -- but I don't know it -- I don't
 2    know 'til I hear the questions.
 3               But let's assume -- do we need to talk about this
 4    now?  Because we've got a jury waiting.
 5               MR. SCHWARTZ:  We can do it tomorrow morning before
 6    we start.  I'm anticipating that they will be amongst my
 7    first day or two of witnesses.
 8               THE COURT:  Okay.  Well, but we don't need to
 9    discuss it right now.
10               MR. SCHWARTZ:  No, Your Honor.
11               THE COURT:  So let's talk about it maybe after we
12    excuse the jury at the end of the day.  All right?
13               MR. SCHWARTZ:  Thank you, sir.
14               THE COURT:  Okay.  Let's bring the jury in.
15               You're still under oath.
16        (The jury enters the courtroom, after which the following
17    proceedings were had:)
18               THE COURT:  Welcome back, everyone.  Please be
19    seated, ladies and gentlemen.
20               All right.  We are ready to continue, Mr. Stefin.
21               MR. STEFIN:  Thank you, Your Honor.
22    BY MR. STEFIN:
23    Q    Ms. Leavitt, where we left off, we were talking about
24    whether the Internal Revenue Service has furnished tax
25    returns and tax return information pertaining to Rose Marks
```

```
 1   for particular tax years in this matter.

 2   A    Yes.

 3   Q    And you've had an opportunity to see the records that

 4   were produced by the Internal Revenue Service?

 5   A    Yes.

 6   Q    And these are records that have been certified by the

 7   Internal Revenue Service?

 8   A    Yes.

 9   Q    And let me just show you these exhibits.

10        MR. STEFIN:  May I approach?

11        THE COURT:  Yes.

12        MR. SCHWARTZ:  Your Honor, just for the record, I

13   have a 404(b) objection as to any years other than '05 and

14   '06.  We've discussed this already.

15        THE COURT:  So you're just preserving it.  You're

16   just preserving the objection you've already made?

17        MR. SCHWARTZ:  Correct, Your Honor.

18        THE COURT:  So I'll continue to overrule it based

19   on what we said earlier.

20        Did you want me to deal with the issue that we

21   talked about at sidebar?

22        MR. SCHWARTZ:  If you would at this time, Judge,

23   yes.

24        MR. STEFIN:  Judge, should I move them in first?

25        THE COURT:  Okay.  Yeah.
```

```
 1    BY MR. STEFIN:

 2    Q    Are those records furnished by the Internal Revenue

 3    Service for the tax years 2003 through 2000, I believe, is it

 4    '9 or '10?

 5    A    It would be '9.

 6    Q    And those pertain to Rose Marks and also a corporation

 7    called Joyce Michael, Inc.?  Just want to make sure that

 8    they're all there.

 9    A    Yes.

10    Q    For the tax years 2003 through 2009?

11    A    Yes.

12    Q    And did IRS have on file tax returns that went back

13    prior to 2003?

14    A    They're on file on our computer, but for actual hard

15    copy record retention, they were already destroyed.

16    Q    When you say they're on file on computer, are you saying

17    hard copies are on file or it's something else?

18    A    It's like a transcript of what happened in the account

19    so you can -- I can go onto the IRS computer and I can access

20    as far back as the early 1990s, and it will show the tax

21    return filed, the date filed, the amount of tax per the

22    return, certain basic information, but it's not a copy of the

23    return, and it doesn't contain all of every line item from

24    the return.

25         MR. STEFIN:  At this time, the United States would
```

1    offer into evidence Government's exhibits 601 composite

2    through 610.

3              MR. SCHWARTZ:  Same objection.

4              THE COURT:  I'm going to admit them over objection.

5              Ladies and gentlemen, let me review this

6    instruction I'm going to ask you to follow with regard to

7    some of the documents that are being offered.

8              As you know, the Defendant is charged with failing

9    to file, or filing false tax returns for the years 2006 and

10   '7?

11             MR. STEFIN:  Yes, Your Honor.

12             THE COURT:  2006 and 2007.

13             Some of the exhibits that are being admitted into

14   evidence now are for tax years other than 2006 and 2007.  So

15   with respect to those tax years other than 2006 and 2007, you

16   can consider the evidence of acts done by the Defendant on

17   other occasions that may be similar to the acts the Defendant

18   is currently charged with for 2006 and 2007, but you must

19   consider that evidence -- you must not consider that evidence

20   of the other tax years as evidence to decide whether the

21   Defendant committed the acts charged for 2006 and 2007, but

22   you may consider it for very limited other purposes.

23             If other evidence leads you to decide beyond a

24   reasonable doubt that the Defendant committed the charged

25   acts for 2006 and 2007, you may consider evidence of similar

1    acts done on other occasions to decide whether the Defendant

2    had the state of mind or intent necessary for the crimes

3    charged, acted according to a plan, or to prepare to commit a

4    crime, or committed the charged acts by accident or mistake.

5              So I ask you to consider that in conjunction with

6    the evidence that's being admitted for tax years other than

7    2006 and 2007.

8              All right.  You may proceed.

9    BY MR. STEFIN:

10   Q    Ms. Leavitt, because the charges in the indictment, as

11   the Court said, involved the tax years 2006 and 2007, I want

12   to focus initially on those two tax years to begin with.

13             I want to direct you, and you have the records in

14   front of you, to exhibit 604A.  If you could pull that out

15   and explain to the jury what that is.  Go ahead.

16   A    604A is the form 1120S filed by Joyce Michael, Inc. for

17   the 2006 tax year.

18   Q    All right.  And we've heard some testimony, and

19   Ms. Leavitt, you've actually been present during the taking

20   of testimony during the trial, correct?

21   A    Yes.

22   Q    And you've been in the courtroom because you're being

23   called as a summary witness to summarize certain financial

24   transactions that took place, as well as the tax information?

25   A    That's right.

1    Q    Now, there was testimony about this, but I just want to

2    ask you to reiterate some of it because some of us are not

3    that familiar with tax returns.

4    A    And it's so interesting.

5    Q    And it's a very exciting topic, I agree.

6         1120S.  It's been explained, but tell us the

7    difference between a 1120S and a 1040.

8    A    Well, the 1040 is filed by an individual.  An 1120S is a

9    corporate return for a small corporation that has a hundred

10   or fewer shareholders, they have to be U.S. citizens or

11   residents, and they can't be corporations or partnerships.

12   The income or loss reported on the 1120S then flows to the

13   tax return of each of those shareholders or owners.

14        In this case, there's only one shareholder, so

15   whatever the income or loss reported by the entity would flow

16   to Rose Marks' tax return.

17   Q    Okay.  So Joyce Michael, Inc. 2006 return showed a

18   gross -- and my vision is declining as the trial goes on.

19   Looks like $93,803 gross receipts on line 1?

20   A    Yes.

21   Q    Now -- and, again, we went through it earlier.  With

22   respect to the business, then there were deductions that were

23   taken from that gross amount, $93,803; is that correct?

24   A    Yes.

25   Q    And what are the amount of the deductions that were

1    taken on this return?

2    A    There's a deduction for rent in the amount of $46,200,

3    there's a deduction for interest expense for one dollar, and

4    there are other deductions of $8127.

5    Q    And would that then take us to line 21, ordinary

6    business income or loss?

7    A    Yes.

8    Q    And so taking those deductions, what was the claimed

9    business income for the tax year 2006 for Joyce Michael,

10   Inc.?

11   A    $39,475.

12   Q    Now, was that the amount of money that would then be

13   transferred on to the individual's personal return?

14   A    Correct.

15   Q    And that would be reflected in Government's exhibit, I

16   believe it's 604?

17   A    Yes.

18   Q    All right.  And would you pull 604 out.

19   A    I have it here.

20   Q    And, again, on 604, this is the personal return.  It

21   looks like an extension was granted, but personal return of

22   Nicholas G. and Rose Marks.

23   A    That's right.

24   Q    Listing of -- any listing of income, salary-wise or

25   wages?

```
 1    A     No, there are no salary or wages reported.

 2    Q     Line item 17, would that be where the transfer of the

 3    money for the 1120S comes into play?

 4    A     Yes.

 5    Q     And that's the $39,475 that was listed as the net income

 6    on the ordinary income on the 1120S?

 7    A     Correct.

 8    Q     And on top of that, we see gambling winnings of

 9    $292,211?

10    A     Yes.

11    Q     And are you aware that in a latter part of the return,

12    she offsets that amount by losses in the amount of $292,211?

13    A     Yes, that's reported on Schedule A, line 27.

14    Q     Line 27 shows gambling losses of $292,211?

15    A     Right.

16    Q     And then she also had the right to take other deductions

17    or show other deductions, as well, on her return?

18    A     Yes.  On, Schedule A that's for itemized deductions, and

19    there are others listed, as well.

20    Q     And again, we saw this, she listed medical expenses, she

21    listed real estate taxes and state taxes, she listed 25,000

22    on line 10, home mortgage interest, $25,195.

23    A     Yes.

24    Q     And based upon all these deductions she took, what was

25    the reported income for that tax year?
```

1    A    The taxable income?

2    Q    The taxable income.

3    A    Well, the taxable income is showing a zero, because if

4    it's less than zero, the tax return tells you just to put

5    zero.  But it's actually a negative taxable income of

6    approximately $13,000.

7    Q    And that's reflected on the second page of the return?

8    A    Yes, it is, on line 43.

9    Q    So she reported taxable income of zero, and therefore

10   her tax liability was?

11   A    Zero.

12   Q    Looks like she paid $40, though?

13   A    No, that was mentioned earlier in the trial.  That was

14   the telephone excise tax credit.  Everybody might remember

15   that one year we got to take a credit for supposedly the

16   phone companies charged too much tax, and this was a one-year

17   credit that we could take on our return.  So she got that

18   credit and a $40 refund based on the tax return.

19   Q    Now, you did an analysis of the bank records that have

20   been introduced in this case?

21   A    I did an analysis -- excuse me.  I did an analysis --

22   sorry.  I did an analysis of the witness payments to accounts

23   controlled by Rose Marks and to third parties on her behalf,

24   as well as to the other individuals that the witnesses

25   mentioned, Nancy Marks and Cynthia Miller.  I analyzed the

1    accounts for those transactions.

2    Q    And in reviewing bank records, did you see that there

3    were other transactions, as well, other deposits into bank

4    accounts owned or controlled by Rose Marks, other than the

5    deposits that were related to witness testimony in this

6    matter?

7    A    Yes.

8    Q    And for purposes of your analysis, are you including or

9    excluding all other deposits that may have been entered

10   during the timeframe in question?

11   A    I've excluded those.  I've only included amounts that

12   were testified to during this trial.

13   Q    And testified to and based on bank records, as well?

14   A    Yes.

15   Q    And for the tax year 2006, did you see that there were

16   either direct or indirect deposits into the Defendant's bank

17   accounts, entries from Jude Montassir and Deanna Wolfe?

18   A    Yes.

19   Q    And what was the total amount of receipts the Defendant

20   received from those two -- just those two individuals for the

21   tax year 2006?

22   A    Can I see the schedule?  I didn't memorize it, I'm

23   sorry.

24   Q    You didn't memorize this?

25   A    I could have.

```
 1    Q    If I had given you more time.
 2              Did you prepare a schedule of the unreported income
 3    for each of the tax years 2003 to 2006?
 4    A    Yes.
 5    Q    Is that --
 6              MR. SCHWARTZ:  Objection to the characterization,
 7    Judge.
 8              THE COURT:  Rephrase the question, please.
 9    BY MR. STEFIN:
10    Q    Did you create a schedule of receipts from witnesses in
11    this case for the tax years 2003 to 2006?
12    A    Yes, I did.
13    Q    Showing you Government's exhibit 722.  Is that a
14    schedule that you prepared?
15    A    Yes, it is.
16              MR. STEFIN:  We would offer 722 into evidence at
17    this time.
18              MR. SCHWARTZ:  May I have a moment, Judge?
19              Your Honor, I'm going to again object to any years
20    on this schedule other than '06 and '07.
21              THE COURT:  All right.  I'll admit it over your
22    objection.
23         (Government's Exhibit No. 722 entered into evidence.)
24              THE COURT:  Which witness was this for?
25              MR. STEFIN:  I'm sorry?
```

```
 1                THE COURT:  Which witness is this summary for?
 2   Which witness?
 3                MR. STEFIN:  It's a summary of -- well, for the tax
 4   year -- well, Jude Montassir and Deanna Wolfe on this
 5   particular.
 6                THE COURT:  Thank you.
 7                MR. STEFIN:  For the tax year 2006.  But then for
 8   the other tax years, Your Honor, it includes Andrea Walker,
 9   Sylvia Roma, Gary Tschetter.
10                THE COURT:  I'm sorry.  722 is the exhibit, right?
11                MR. STEFIN:  Yes, Your Honor.
12                THE COURT:  Because you have a whole -- you have
13   summary exhibits listed on your exhibit list that have no
14   numbers next to them.  So I was trying to match it up with
15   your exhibit list.
16                MR. STEFIN:  I'm sorry.
17                THE COURT:  I guess this is a new exhibit.
18                Go ahead.  I'm sorry.
19   BY MR. STEFIN:
20   Q    With respect to the tax year 2006, then, assuming the
21   monies received by Jude Montassir and Deanna Wolfe was income
22   to the Defendant, what would have been the total amount of
23   reported income for that year?
24   A    The total amount --
25                MR. SCHWARTZ:  Your Honor, I object to the
```

```
 1    assumption.
 2              THE COURT:  Overruled.
 3              THE WITNESS:  The total amount paid by Jude
 4    Montassir and Deanna Wolfe was 1,316,858, and then from that
 5    I subtracted the gross receipts that were reported on the
 6    1120S of Joyce Michael, Inc. in the amount of 93,803, to
 7    arrive at the unreported amount of $1,223,055.
 8    BY MR. STEFIN:
 9    Q    And then the amount from Jude Montassir, is that based
10    on bank records or bank records and testimony?
11    A    It's based on bank records, and it's based on third
12    party bank records also, and it was also testimony that backs
13    up these amounts.
14    Q    And when you say third party bank records, meaning money
15    that was sent to third parties by Jude Montassir other than
16    the Defendant, Rose Marks?
17    A    Yes.
18    Q    And those include which entities?
19    A    Atlas Leasing, Peter Wolofsky.  I don't recall if it was
20    in this year, but there was also payments to Bruce Green
21    Trust Account.
22    Q    And based on your 19 years of -- 25 years of experience
23    with IRS, do you know what the definition of "income" is?
24    A    Yes.
25    Q    And what is that?
```

```
 1    A      Well, do you want me to give you the Internal Revenue

 2    Code section?

 3    Q      Just what the definition is, if you can -- I don't think

 4    the code section will help too much, but . . .

 5    A      Well, basically, the Internal Revenue Code says that

 6    income, gross income, is income from every source derived

 7    unless it is specifically excluded in another code section.

 8    So there's some things that are excluded in code.  Gifts are

 9    not taxable, workman's compensation are not taxable, certain

10    veterans disability benefits are not taxable.  And those are

11    all listed in the Internal Revenue Code as being nontaxable

12    income.

13    Q    And are you familiar with how income derived from either

14    theft or fraud would be treated by the IRS?

15    A      Yes.

16    Q    And what is that?

17    A      It's taxable income.

18    Q    Let me direct you, then, to tax year 2007.  And that

19    would be Government's exhibit 605.

20    A      Oh, the tax return?

21    Q    The tax return, I'm sorry.

22               THE COURT:  And I just want to give a clarification

23    to the jury, because I overruled Mr. Schwartz's objection to

24    the witness saying what the non-reported income would be,

25    assuming this -- there's taxable income.
```

```
 1              Ladies and gentlemen, you're going to decide
 2    whether the amounts that the Government is contesting or
 3    contending was received by Ms. Marks was income or not.  So
 4    these questions are the assumption that you conclude that it
 5    was taxable income, but that's for you to decide, and that's
 6    what you're going to ultimately decide.
 7              THE WITNESS:  Yes, the 2007 tax return is
 8    exhibit 605.
 9    BY MR. STEFIN:
10    Q    Now, the previous years she filed an 1120S for a
11    corporation; was there an 1120S filed for 2007?
12    A    No.
13    Q    And what was the reported income for 2007?
14    A    There was no business income reported.  There was
15    capital gain income reported on line 13 in the amount of
16    42,453, and with the previous witness we looked at the
17    Schedule D  and saw that it was from the sale of real
18    property.
19    Q    Okay.  Then she reported on line 21, it says:  See
20    Statement 1, $221,532, and according to Statement 1 attached
21    to the tax return, what was that?
22    A    Gambling winnings.
23    Q    And did you see later in the tax return an offset in the
24    same amount of $221,532 for gambling losses?
25    A    Yes, on Schedule A, line 28, there are gambling losses
```

1    reported in the amount of 221,532.

2    Q    And, again, that's on line 28, you said?

3    A    Yes.

4    Q    And therefore with that deduction, what was the total

5    taxable -- total taxable income reported by Ms. Marks for the

6    tax year 2007?

7    A    Taxable income reported on line 43 was 40,372.

8    Q    And based upon that reported taxable income, what was

9    the calculation of her actual tax owing?

10   A    The tax was $2871.

11   Q    Now, for 2007, based upon your analysis of the bank

12   records and the receipts from Jude Montassir and Deanna

13   Wolfe, what was the actual total amount of receipts received

14   by the Defendant or on behalf of the Defendant for the tax

15   year 2007?

16   A    From those two individuals, the amount was 2,269,615.

17   Q    And assuming that these receipts constitute income, what

18   would have been the total amount of unreported income for

19   that tax year?

20   A    The same amount, because there was no business income

21   reported in that tax year.  So it's $2,269,615.

22   Q    Now, did you perform a similar analysis with other tax

23   years other than the charged tax years in this case?

24   A    Yes.

25   Q    And with respect to the tax year 2003, for example --

1   would you just pull that out and tell us what you found

2   there.

3   A    You want just the tax return from that year?

4   Q    Yes, just -- we don't need to go through it in such

5   detail, but what did she report as taxable income for the tax

6   year 2003?

7   A    It's easier if I get my copy.

8        MR. SCHWARTZ:  May I have a continuing objection,

9   Your Honor?

10       THE COURT:  Yes.

11       THE WITNESS:  The taxable income, you said?

12  BY MR. STEFIN:

13  Q    Yes.

14  A    On line 40 it was reported as zero, but it was a

15  negative taxable income of 1042.

16  Q    And did she report gambling winnings or losses for that

17  year?

18  A    Yes, she reported gambling winnings of 473,287 and an

19  equivalent amount of gambling losses.

20  Q    473,287?

21  A    Yes.

22  Q    And I think it's been explained, but could you explain

23  how tax -- how gambling losses are treated by the IRS in

24  connection with gambling winnings?

25  A    According to the Internal Revenue Code, gambling losses

1    are only deductible to the extent of winnings.  So if your

2    losses exceed your winnings, you can only report up to the

3    amount of winnings, and any excess losses are not carried

4    forward, carried back.  They're just losses that you cannot

5    deduct.

6    Q    Did she report income from any source in 2003?

7    A    Yes, she included a Schedule C, which is the form we

8    used for a sole proprietor business.  That is attached to the

9    2003 tax return.

10   Q    And how much did she report as a sole proprietor

11   Schedule C?

12   A    There are gross receipts reported of $221,021.  After

13   expenses, the net profit was 111,682.

14   Q    Based on your analysis of the monies received either

15   directly or indirectly from Jude Montassir or Deanna Wolfe

16   for the tax year 2003, what was the actual amount of gross

17   receipts received by the Defendant in 2003?

18   A    1,472,500.

19   Q    And assuming that those receipts would constitute

20   income, what would have been the total amount of unreported

21   income for 2003?

22   A    $1,251,479.

23   Q    By the way, on the Schedule C, would you explain that

24   again, how the Schedule C works?

25   A    When a person is self-employed, has their own business

1    as a sole proprietor, that income is reported on the

2    individual's tax return, and the Schedule C is used to report

3    the gross receipts and to deduct any expenses incurred in

4    that business to arrive at net profit or loss that is then

5    carried to the front of the tax return.

6    Q    Okay.  And how did she reduce the amount of 111,682 to a

7    taxable income of zero?  Did she have other deductions on her

8    1040?

9    A    Did you say a taxable income of zero?

10   Q    For 2003?

11   A    No, the -- oh, the taxable income.  I'm sorry.  Well,

12   the --

13   Q    Because she reported net --

14   A    Right.

15   Q    -- profit of $111,000.

16   A    Correct.  But then there were expenses on the tax

17   return.  We already talked about the gambling losses.  And in

18   addition, there were real estate taxes deducted in the amount

19   of 22,772 and mortgage interest of 93,129.  So therefore

20   total itemized deductions were 576,121.

21   Q    And if you eliminate the gambling losses from that

22   number, since it offsets the gambling winnings, the itemized

23   deductions were over a hundred thousand dollars?

24   A    Yes; about 115,000 more or less.

25   Q    Which exceeded the amount of the alleged net profit for

1    that year?

2    A    Yes.

3    Q    And that's how we get to the taxable income of zero?

4    A    Correct.

5         And there were a couple of other deductions.  For

6    instance, there was a capital loss carryover of 3000.  That

7    also reduced taxable income.

8    Q    Let me direct you then to the tax year 2004.  And, by

9    the way, these are all tax returns, hard copy tax returns

10   that were signed by the Defendant, Joyce Michael -- Rose

11   Marks?

12   A    Yes.  And in the case of the years where it's joint

13   returns, they were also signed by Nicholas Marks.

14   Q    And were those returns -- does it show who those returns

15   were prepared by, 2003?

16   A    2003, John Van Vorst, CPA, PA.

17   Q    All right.  And directing you to 2004, there were

18   Government exhibits 602A and 602.  602A, I believe is the

19   corporate.

20   A    602 is the 1040, and 602A is the 1120S.

21   Q    So by 2004, there was a corporation called Joyce

22   Michael, Inc. that was filing returns?

23   A    Yes, that was an initial return.

24   Q    And without going into all the nitty gritty of those

25   returns, what did she report as her taxable income for 2004?

1    A    Taxable income reported was 118,716.

2    Q    And, again, based on your analysis of the receipts from

3    Jude Montassir and Deanna Wolfe in the tax year 2004, what

4    was the actual total receipts from those two individuals?

5    A    1,796,656, rounding.

6    Q    All right.  And then you have two subtractions, Schedule

7    C gross receipts and Joyce Michael, Inc. gross receipts.

8    Were those reflected elsewhere on the tax returns?

9    A    Yes.  On the 2004 1040, there was a Schedule C for

10   fortune teller, but it listed Nicholas G. Marks as the

11   proprietor, and then the form 1120S for Joyce Michael, Inc.

12   reported the gross receipts you see subtracted there of

13   170,734.

14   Q    And assuming the receipts from Jude Montassir and Deanna

15   Wolfe would constitute income in this matter, what was the

16   total amount of unreported income for the tax year 2004?

17   A    $1,416,251.

18   Q    Let me then direct you to the tax year 2005,

19   Government's exhibit 603.  And, by the way, and I'm so sorry,

20   but before we leave 2004, did she report gambling winnings

21   and losses in 2004?

22   A    Yes, there were gambling winnings reported of 393,652,

23   and an equivalent amount of gambling losses was deducted on

24   Schedule A.

25   Q    All right.  So, now, 2005, exhibit 603, Government's

1    exhibit.

2    A    Yes.

3    Q    And there was an equivalent 1120S corporate return filed

4    for that year, as well, 2005?

5    A    Yes, exhibit 603A.

6    Q    And how much did the Defendant report -- and 603A is,

7    again, Joyce Michael, Inc.?

8    A    Yes, it is.

9    Q    And what did she report as -- what did the Defendant

10   report as gross receipts or income for the corporation that

11   year?

12   A    393,719.

13   Q    And after taking deductions for business expenses, what

14   was the amount that would have been transferred over to the

15   1040?

16   A    331,747.

17   Q    Did she take gambling winnings -- did she report

18   gambling winnings and losses that year?

19   A    Yes, line 21 reported on the 1040 reported gambling

20   winnings of 220,341, and there was equivalent amount of

21   gambling losses deducted on Schedule A.

22   Q    And did she take deductions above and beyond the ones

23   you've just described?

24   A    There was Schedule A deductions for medical expense,

25   real estate taxes, home mortgage interest, and a casualty

1    loss.

2    Q    And how much was the mortgage interest that year?

3    A    $126,330.

4    Q    So in 2005, then, what did she report as her taxable

5    income?

6    A    Taxable income reported was 95,509.

7    Q    Based on your analysis, again, of the records for 2005

8    with respect to receipts from Jude Montassir, what was the

9    actual total amount of receipts the Defendant received that

10   year?

11   A    1,192,305.

12   Q    And assuming that those receipts constitute income, what

13   was the total amount of unreported income, subtracting out

14   the 393,000 that she had reported as gross receipts?

15   A    $798,586.

16   Q    2006 and 2007 we've already covered, so let's go to

17   2008.

18   A    All right.

19   Q    That's Government's exhibit 606.

20   A    Yes.

21   Q    Was there a 1120S filed for corporation in 2008?

22   A    No.

23   Q    And was there one filed in 2007?  I think you've already

24   answered that.

25   A    There was not.

```
 1    Q     So we're dealing with one return, a 1040, in 2008?
 2    A     That's right.
 3    Q     And what did the Defendant report as income in the tax
 4    year 2008?
 5    A     The only income reported on the tax return is gambling
 6    winnings in the amount of 161,756, and there was an
 7    equivalent amount of gambling losses deducted on Schedule A.
 8    Q     So what did she report as her taxable income?
 9    A     Well, it's shown as zero on the return, because you
10    can't put below zero, but it's actually like negative 4400.
11    Q     And what was the actual amount of receipts the Defendant
12    obtained from either Jude Montassir and/or Deanna Wolfe in
13    2008?
14    A     61,275.
15    Q     And would that be -- assuming that's income, would that
16    be the same amount for unreported income?
17    A     Yes, because there was no other income other than
18    gambling winnings reported on the 2008 tax return.
19    Q     Now, tax year 2008, that was the year that Jude
20    Montassir was discovered in the hotel room in January of
21    2008?
22    A     I believe it was -- was it January?  I thought it was
23    around March.  Maybe it was January, sorry.
24    Q     But it was early 2008, your recollection?
25    A     Yes.  Yes, she stated that she had made one wire.  That
```

1    3700 was the wire that she made prior to the detectives

2    coming to her.

3    Q    And you recall that -- you don't recall that occurring

4    on January 15th of 2008?

5    A    It will show on my other schedule, yes.

6    Q    We'll get to it.

7    A    Okay.

8    Q    Let's go to 2009 tax year.  Was there a tax return filed

9    by the Defendant in 2009?

10   A    Yes.

11   Q    And an 1120S or a 1040?

12   A    Both.

13   Q    That would constitute Government's exhibits 607 and

14   607A?

15   A    That's right.

16   Q    And what did the Defendant report as gross income on her

17   1120S?

18   A    313,969.

19   Q    And after she took deductions, how much of that did she

20   transfer over to the 1040?

21   A    160,395.

22   Q    And on the 1040, that's Government's exhibit 607, did

23   she show any other income besides the 160?

24   A    Gambling winnings in the amount of 457,566, and an

25   equivalent amount of losses deducted on Schedule A.

1    Q    So what did she report as her taxable income for that

2    particular year?

3    A    Taxable income reported was 38,932.

4    Q    I think you said she carried over 160,000 from the

5    1120S?

6    A    Yes, it flows from the 1120S, yes.

7    Q    Right.

8         So how was she able to get it down from 160,000 to

9    a taxable income of 38,000?

10   A    On Schedule A, there is a home mortgage interest

11   deduction of 121,560.

12   Q    That pretty much covers it?

13   A    Well, and there's a small amount of sales tax deduction,

14   $1900, roughly.

15   Q    And for 2009, based on your analysis of the receipts

16   from witnesses in this matter, what was the total amount of

17   gross receipts the Defendant received?

18   A    The total amount?

19   Q    Yes, based upon your analysis of the witnesses, Deanna

20   Wolfe, Andrea Walker, Sylvia Roma, Gary Tschetter.

21   A    $821,898.

22   Q    And deducting the amount that you reported as gross

23   income, what would be the total amount of unreported income

24   for that year, 2009?

25   A    $507,929.

```
1    Q    Did you also do an analysis of her receipts for the tax

2    year 2010?

3    A    Yes, I did.

4    Q    Is there any record of the Defendant actually filing a

5    tax return for 2010?

6    A    No, there is not.

7    Q    In fact, did you obtain a certification from the

8    Internal Revenue Service with respect to there being no tax

9    return on file?

10        MR. SCHWARTZ:  Your Honor, I'm going to object, and

11   I'd ask to approach.

12        THE COURT:  All right.

13     (The following proceedings were held at sidebar:)

14        MR. SCHWARTZ:  The Government's now suggesting

15   another bad act, failure to file tax returns in 2010.  I'd

16   ask the Government to at least concede on the record or

17   somehow stipulate -- first of all, I'd ask them to withdraw

18   it.  But if they don't, at least stipulate that in 2011,

19   prior to the expiration of time to file returns, the

20   Government seized all of her records.  She was in jail and

21   then on house arrest, and she didn't have the ability to file

22   a tax return because they had all of her records regarding

23   income, et cetera.

24        And I'd like to -- I guess I could do that on

25   cross-examination, but I think it's improper with the
```

1    Government knowing that to, suggest a bad act for failure to

2    file.

3            THE COURT:  Well, I guess part of the problem is I

4    think you agreed to admit into evidence the certificate of

5    non-filing, I think was one of the exhibits that was offered

6    and admitted.

7            MR. SCHWARTZ:  I guess it was.

8            THE COURT:  Isn't that correct?

9            MR. STEFIN:  Yes.  And I just wanted to double

10   check.  That certificate may have gone to the -- I'm looking

11   at my exhibit list, and the certificate may have gone to 2007

12   and 2008, the 1120S.  I would just need to look at it.

13           THE COURT:  Well, I guess --

14           MR. STEFIN:  And I can withdraw the question

15   because it's --

16           THE COURT:  I guess to me, I mean, if you're trying

17   to show a 404(b) pattern, I don't see how failure to file

18   fits in with your theory of false filing.  So to that extent,

19   I don't really see the relevance of a failure to file.  So I

20   tend to agree with the Defendant that it shouldn't even come

21   up.  I didn't -- I mean, I saw the certificate.  I saw at

22   least a listing of a certificate of non-filing here on the

23   exhibit list.

24           MR. STEFIN:  Well, I think actually there was -- I

25   think 609 is the record that she did check that there was a

```
 1    non-filing for 2010.
 2              THE COURT:  Okay.  And so, I mean, I'm going to
 3    sustain the objection.  I'm going to tell the jury to
 4    disregard it.  I'm going to strike it from the -- I'm going
 5    to remove it from the exhibits.  It's really not -- it's
 6    not -- it doesn't fit in with the 404(b) analysis that I did
 7    yesterday, and I don't want to muddy the waters with
 8    something that's really not relevant.  Okay?
 9              So I'm going to strike the question and don't --
10    we're going to remove that exhibit.
11              MR. STEFIN:  All right.  I'll take it off the
12    screen.
13         (Sidebar conference concluded.)
14              THE COURT:  Ladies and gentlemen, I'm going to ask
15    you to disregard the question and answer regarding the
16    failure to file in 2010.  I'm telling you that it's not
17    relevant to this case, and you shouldn't consider the failure
18    to file, that issue at all, in deciding this case.  Okay?
19    BY MR. STEFIN:
20    Q    I don't know if you had it in front of you, but did you
21    do a computation as to the total amount of what we would
22    allege as unreported income from 2003 to 2009?  I would ask
23    you to eliminate the 2010.  Are you able to --
24    A    I don't have that computation in front of me.  I can
25    look at it and I can subtract mentally 2010.  It's a long
```

```
 1    sheet.

 2    Q    Okay.  We'll come to it.

 3    A    I can give you an estimate based on this paper if you

 4    want, subtracting 2010.

 5    Q    If you could just take a moment to do that while I look

 6    for the next exhibit.

 7    A    Okay.

 8    Q    Time's up.

 9    A    It's roughly seven and a half million dollars.

10    Q    Now, part of Government's exhibit 601 includes what's

11    called an audit file.

12    A    Yes.

13    Q    And there was the 2003 tax return, but also an audit

14    file.

15              And would you explain to the members of the jury

16    what an audit file is?

17    A    Well, what occurred in this case is that the 2003 return

18    was pulled by the computer for audit.  When —— I should

19    explain that every tax return is scored by the computer.  So

20    the higher the score receives, the more likelihood that the

21    computer will kick it out for an audit.  And then of all the

22    ones that get pulled by the computer, we only have enough

23    personnel to audit, not all of them.  So they get sent out to

24    the field or to the office or for correspondence for audit.

25              This particular return was sent to office audit in
```

```
1    Plantation, Florida.

2    Q    And does the file reflect the reason why that particular

3    return was selected for an audit?

4    A    I don't see the classification sheet in there, but based

5    on the auditor's work paper, she decided to look at gambling

6    winnings and losses because they were very high in relation

7    to the other income, and she also wanted to look at the

8    Schedule C gross receipts, expenses, and the mortgage

9    interest and real estate taxes.

10   Q    So does the file reflect that the taxpayer or

11   representative of the taxpayer came to an office of the

12   auditor and presented information or records pertaining to

13   those items?

14   A    The file shows that an attorney by the name of Edward

15   Phillips came with a power of attorney formed signed --

16   Q    What does that mean?

17   A    A power of attorney is a form that we have.  It's a Form

18   2848.  And if you have an audit or a collection matter or an

19   appeal, you can hire a representative to go in your place by

20   signing this form that appoints that person to act as you,

21   act on your behalf.

22   Q    According to the file, then, what was submitted in

23   support of the claim that there were this large number of

24   gambling winning -- gambling losses, I should say, that equal

25   more than $473,000?
```

```
 1    A     For the gambling losses, the attorney brought ATM
 2    withdrawals shown on bank statements with an adding machine
 3    tape, he brought casino wrappers with an adding machine tape,
 4    he brought a Quicken report of checks that were cashed that
 5    were used for gambling.  He brought an adding machine tape of
 6    withdrawals made via CSI, which I think that was explained by
 7    the person from Seminole, that that was a third party vendor
 8    that could be used for credit card cash advances.
 9    Q     And did you do a compilation or basically put together a
10    summary book of the records pertaining to the gambling
11    winnings and losses for the tax year 2003?
12    A     Yes.
13    Q     Government's exhibit 611, do you recognize that exhibit?
14    A     Yes, I do.
15    Q     Was that an exhibit that was put together by yourself?
16    A     Yes.
17    Q     And what does it comprise of?
18    A     It's comprised of photocopies from the examiner's work
19    papers, from the auditor's work papers regarding gambling
20    income and gambling losses, and then I prepared two
21    spreadsheets to make it easier to follow how the gambling
22    income and losses were presented to the auditor.  It includes
23    the copy of that Quicken or Quickbooks spreadsheet that was
24    present to the examiner that shows checks that were cashed
25    that were used for gambling.
```

```
 1                    And then what I did was go to the bank records

 2      using that spreadsheet with the date and the amount, and I

 3      was able to pull all but three of the checks listed, and the

 4      copies of those checks are in the book, as well.

 5      Q    Checks that were listed as what?

 6      A    That were listed here as checks cashed and used for

 7      gambling.

 8                    MR. STEFIN:  All right.  At this time, the United

 9      States would offer 611 composite.

10                    MR. SCHWARTZ:  No objection.

11                    THE COURT:  Admitted without objection.

12           (Government's Exhibit No. 611 entered into evidence.)

13      BY MR. STEFIN:

14      Q    Now, just to go back on 2003, I believe the number that

15      was reported as gambling winnings was $473,287.

16      A    Correct.

17      Q    And that in that same tax return, it was reported for

18      gambling losses that very same number, $473,287?

19      A    Right.

20      Q    All right.  And do these records show, again, the

21      individual acting as the power of attorney was demonstrating

22      that the losses amounted to or exceeded $473,287?

23      A    Yes.

24      Q    And actually, what was the claim demonstrated with

25      respect to gambling losses for 2003?  Was it more than
```

```
1    $473,287?

2    A    Yes, based on the records presented to the examiner, the

3    total amount of gambling losses was $1,053,254.

4    Q    So would this be a good example of someone only being

5    able to take the gambling losses up to the gambling winnings?

6    A    Yes.

7    Q    And basically not being able to have a tax benefit for

8    any amount that exceeds the amount of the winnings?

9    A    That's correct.

10   Q    1,053,200, you said?

11   A    254.

12   Q    And you talked about the kind of documentation that was

13   utilized to demonstrate that.

14        You mentioned ATM tapes?

15   A    Yes.

16   Q    And you mentioned that there were checks written, as

17   well, that were cashed, and that was offered, as well?

18   A    Yes, it was a Quickbooks sheet that listed check.

19   Doesn't have check number, but it has check date, from Bank

20   of America and the amount.  And these were presented as

21   checks cashed and used in gambling.

22        MR. SCHWARTZ:  Your Honor, if I could, I want to be

23   clear.  I didn't object specifically to this book, but within

24   the scope of your 404(b) ruling.

25        THE COURT:  All right.  I'll overrule the
```

```
 1    objection.
 2    BY MR. STEFIN:
 3    Q     So just to be clear, were copies of the checks
 4    themselves furnished to the auditor in 2000 -- in the year
 5    that the audit was performed?
 6    A     No.
 7    Q     But you were able to, based on the records, go back and
 8    pull those checks yourself in the bank records?
 9    A     Yes, all but three.
10    Q     All but three.  How many did you look for?
11    A     I looked for every single one that's on this
12    spreadsheet.  I don't know the exact number, but there's a
13    lot.
14    Q     Okay.  And a lot, more than a hundred?
15    A     No.  I don't know, probably about 50 maybe.  I didn't
16    count them.
17    Q     Okay.  Could you go ahead -- no, no.
18          Well, all right.  So there's dozens and dozens,
19    several dozens.
20    A     Yes.
21    Q     And you said you found all but three.  And based on
22    that, who did you see these checks had been written to that
23    were cashed out?
24    A     The checks are payable to Mary Guardia, Rose Marks, and
25    there were a few to a company called Fast Funds, which is
```

1    a -- I looked that up, and it's a check casher.

2    Q    And based on these checks to Mary Guardia and Rose

3    Marks, what did that total up to, just the cash withdrawals

4    from checks?

5    A    According to this spreadsheet or this Quicken sheet, it

6    was $387,069, rounding.

7    Q    And it was represented these checks that were cashed

8    were utilized for gambling, as gambling expenses and losses?

9    A    Yes.

10   Q    Now, were you also asked to do -- basically, to do an

11   analysis of the bank records both from records of the

12   Defendant, multiple bank records that we've introduced, and

13   also from records and bank records from various victims that

14   testified in this matter, to come up with, from the records,

15   how much money these victims gave to the Defendant or to

16   entities on behalf of the Defendant in this case?

17   A    Yes, and to other parties, too, such as Nancy Marks and

18   Cynthia Miller.

19   Q    So that victim money -- showing where the victim money

20   went with respect to the Defendant, members of the

21   Defendant's family and third party entities like Peter

22   Wolofsky and Atlas Leasing and Mr. Green that have been

23   mentioned in the testimony in this case?

24   A    Yes.

25   Q    And did you, in fact, do a -- basically do spreadsheets

```
 1   for each of the -- well, at least for 10 or 11 of the victims
 2   in this matter?
 3   A    Yes, I did.
 4   Q    And did you also prepare basically summary books,
 5   pulling out those specific transactions from the records,
 6   from which you were able to do a -- basically a summary
 7   spreadsheet?
 8   A    Yes.
 9   Q    And you're familiar with these records that are in front
10   of you, Government's exhibits 712 through 721?
11   A    Yes, I am.
12   Q    And these are blue books that are on the floor.  Are
13   these basically the summary books that you prepared with
14   respect to the transactions that I've just described?
15   A    Yes.
16   Q    And with respect to Government's exhibits 712 through
17   721, did you then prepare spreadsheets that we've identified
18   with a subcategory dash one.  So, for example, the summary
19   spreadsheet for Susan Abraham, which was Government's
20   exhibit 712, the spreadsheet summarizing it would be 712-1?
21   A    Yes.
22   Q    So that you prepared exhibits 712-1 through 721-1 for
23   each of the individuals that you did this for?
24   A    That sounds right, yes.
25        MR. STEFIN:  Your Honor, at this time we would
```

```
1    offer into evidence Government's exhibits 712 through 721,

2    with the accompanying spreadsheets of 712-1 through 721-1.

3            MR. SCHWARTZ:  Your Honor, for the record, I object

4    to the admission of any of these documents regarding Sue

5    Abraham, Paul Hughes, Jacob Soendergaard, Nana Adae, Jennifer

6    Hill.

7            THE COURT:  Can I see counsel?

8        (The following proceedings were held at sidebar:)

9            MR. SCHWARTZ:  Your Honor, I said it for the record

10   because I assumed you would rule against me.

11           THE COURT:  But I'm trying to understand why isn't

12   the objection to the some and not all?

13           MR. SCHWARTZ:  Okay.  The ones I didn't object to

14   were clients of Rose Marks, or one was a shared client, Rose

15   and Andrea.  I've made the argument that there's no

16   conspiracy here.  Your Honor ruled against me.

17           THE COURT:  I just wanted to make sure I understood

18   what the basis of the objection was.

19           So I'm going to overrule the objection.

20           MR. SCHWARTZ:  Right.

21           MR. STEFIN:  Judge, I'm going to want to distribute

22   these spreadsheets to the jurors, to go through these now.

23           THE COURT:  Okay.

24           MR. STEFIN:  That's all.

25           THE COURT:  All right.  Once they're in evidence,
```

```
 1   you can distribute them.

 2        (Sidebar conference concluded.)

 3              THE COURT:  I'm going to admit the exhibits over

 4   objection.  They're admitted over objection.

 5        (Government's Exhibit No. 712 through 721 and 712-1

 6   through 721-1 entered into evidence.)

 7              MR. STEFIN:  Your Honor, at this time I would like

 8   to publish the summary spreadsheets 712-1 through 721-1.

 9              THE COURT:  You may.

10              MR. STEFIN:  I have these in -- I'm turning them

11   over all together in one package as opposed to one at a time,

12   and they're in a folder in the order that we'll go through

13   them.

14              Please don't rush ahead.

15   BY MR. STEFIN:

16   Q    Ms. Leavitt, I want to direct you and the jurors'

17   attention to the first spreadsheet, which looks like a

18   two-page document which has the Government exhibit sticker on

19   the bottom right-hand corner of 712-1.

20   A    I see it.

21   Q    This is entitled, Susan Abraham, Payment to Various

22   Individuals.

23   A    Yes.

24   Q    And, again, you put this spreadsheet together based upon

25   what types of documents that you have reviewed?
```

1    A    The documents from each of the witnesses and from the

2    respective bank records.

3    Q    I just want to go through a few of these, and then we'll

4    talk about totals.

5              Ms. Abraham, for example, the first line, we go

6    across, you have a date of 7/9/2010, you have a description,

7    ServiRed card, parenthesis, bank card.  The third column,

8    from, Susan Abraham.  I assume for the most part that's going

9    to be the same for each transaction.

10   A    Yes.

11   Q    There are some differences.

12             You have the origin bank, the account number,

13   meaning the account number of the bank from which the money

14   came from?

15   A    Correct.

16   Q    You have the recipient, which you have is payable to,

17   then you have a column for the amount, the receiving bank,

18   and then the account number, which, is that the account

19   number of the receiving bank?

20   A    Yes, it is.

21   Q    Then you have one called Bate number.  Meaning those are

22   the document numbers from which you extracted the

23   information?

24   A    Yes.

25   Q    Are those the documents that are actually contained in

1    Government exhibits 712 through 721?

2    A    Well, when the Bate number has the witness' initials,

3    that item would actually be in the witness' book.  Otherwise,

4    the other Bate numbers will be in the blue books, yes.

5    Q    So the blue books are just based on the bank records of

6    the Defendant?

7    A    Of the bank records that were --

8    Q    Or the members of the Defendant's family?

9    A    Yes, the bank records subpoenaed in this case.  And if

10   the Bate number has the witness' initials, then it's going to

11   be in the witness' book.

12   Q    Okay.  So I don't want to belabor this, but that first

13   transaction you found was payable to Joyce Michael, Inc., for

14   $857.79 on July 9th of 2010?

15   A    Yes.

16         And I would like to point out that sometimes there

17   could be a day or two lapse between the date a payment is

18   posted let's say in the witness' statement, as to when it's

19   received.  So you might see a day or two lapse in there.

20   Q    So these dates we should consider as on or about dates,

21   not necessary precisely that particular date?

22   A    Well, they're that precise date on one or the other of

23   the bank records, but I just want to point out that if you

24   look to one account you might see 7/9, and you may see 7/10

25   on the other account.  So they're not on or about, it's based

1   on a record.

2   Q    So some of these -- one or more of the transactions, for

3   example, cash on 7/9/10, you included $300 to Nancy Marks.

4   What did you base that on?

5   A    That was based on the testimony of Susan Abraham and

6   from her book, this Bate number SA-018.

7   Q    And, again, without getting into each document, do you

8   recall SA-018 being a document that reflects a cash

9   withdrawal on that particular date?

10  A    I don't specifically recall, but seeing that it's

11  Barclays Bank and an account, it is likely going to be a cash

12  withdrawal on that date.

13  Q    On 7/19, we're going down four lines, going across, this

14  is a wire from a bank account, Barclays Bank, Susan Abraham

15  and Michael Abraham?

16  A    Yes.

17  Q    And that wire went into a TD Bank account?

18  A    Correct.

19  Q    Of Nancy Marks?

20  A    Yes.

21  Q    In the amount of $2700?

22  A    Yes.

23  Q    And you have the account number for TD Bank ending in

24  6000, and then again you have Bates numbers demonstrating

25  that particular transaction?

1    A     Yes.

2    Q     You have another bank card below that, a bank card

3    transaction on 7/30/2010, going across, Susan Abrahams,

4    Barclays Bank account.  This one payable to Joyce Michael,

5    Inc., $681.17?

6    A     Correct.

7    Q     So then you take us down to the bottom of 2010, you

8    total up the amount of money in 2010 from Susan Abraham that

9    went to either Joyce Michael, Inc. or Nancy Marks, and you

10   came up with a total of what?

11   A     $12,049 rounding.

12   Q     You did the same thing for 2011, various wire-transfers?

13   A     Yes, it was all wire-transfers in 2011.

14   Q     And in each of these wire-transfers from April 20th,

15   2011, until July the 28th of 2011, at least, these all came

16   out of Susan Abraham's bank account at Standard Bank?  No,

17   I'm sorry, Standard Bank, and then you have some from

18   Barclays Bank, as well.

19   A     Right.

20   Q     But the recipient in all these instances was Chase Bank,

21   Joyce Michaels, Inc -- Joyce Michaels Consultant, Inc.

22   account?

23   A     Right.

24   Q     Then on the bottom, 7/29/11, there was a wire from Susan

25   Abraham slash Norma Greaves.  Do you recall who Norma Greaves

```
 1   was?

 2   A     Yes, Susan Abraham said that was her mom.

 3   Q     And that came out of a Halifax bank, it was a wire.

 4   And, again, that money went to Joyce Michaels Consultant,

 5   Inc.

 6   A     Right.

 7   Q     And the total for 2011 is $264,592?

 8   A     That's right.

 9   Q     So the total, again on, page 1, was $276,640 for the

10   years 2010 and 2011?

11   A     That's correct.

12   Q     And then did I ask you to prepare -- to break it down

13   into how much of the money went into accounts controlled by

14   the Defendant, Rose Marks?

15   A     Yes, you did.

16   Q     And of that $276,640, or 641 rounded off, how much of

17   it, according to page 2, went into bank accounts controlled

18   by Rose Marks?

19   A     Roughly $267,000.  Really almost 268,000.

20   Q     2010 it was $3038?

21   A     Yes.

22   Q     2011, 264,592?

23   A     Yes.

24   Q     So you said -- as you said, $267,000?

25   A     Yes.
```

1    Q     All right.  We kinda have the idea now.

2          Directing you to Government's exhibit 713-1, this

3    is the records showing transfers to who, from whom?

4    A     It's from Nana Adae.

5    Q     And we have -- and your records reflect payments made

6    beginning in August -- on August 18th of 2009?

7    A     That's right.

8    Q     And it looks like it was through December 6th of 2010,

9    but then there's one payment in August of 2011?

10   A     Yes.

11   Q     In 2009, the total -- what was the total amount that

12   Nana Adae either sent directly to the Defendant or expended

13   on behalf of the Defendant based on the records that you've

14   reviewed?

15   A     $6800.

16   Q     I'm looking at for 2009, the total amount in 2009.

17   A     You said for the Defendant.  So I went to the bottom of

18   the spreadsheet.  I misunderstood.

19   Q     And I apologize.  How much -- let me rephrase it then.

20          How much money went to either the Defendant or

21   members of the Defendant's family in 2009?

22   A     $29,467.

23   Q     And then you've just answered the later question, which

24   is how much went to the Defendant?

25   A     $6800.

```
1              MR. SCHWARTZ:  Objection, Your Honor.

2              THE COURT:  Overruled.

3     BY MR. STEFIN:

4      Q    And that's reflected on August the 21st of 2009?

5      A    Correct.

6      Q    Was a check 1653 from Nana Adae on her bank account --

7              MR. SCHWARTZ:  Your Honor, may I state the basis of

8     my objection?

9         (The following proceedings were held at sidebar:)

10             MR. SCHWARTZ:  He asked how much money went to the

11    Defendant.  The money went to a corporate account in the name

12    of Joyce Michael, Inc.  That doesn't mean it went to the

13    Defendant, and I'd ask that he be more specific.

14             MR. STEFIN:  I can rephrase it, but . . .

15             THE COURT:  All right.  Rephrase the question.

16             MR. STEFIN:  Okay.

17             MR. SCHWARTZ:  I'm sorry.  I didn't mean to --

18             THE COURT:  No.

19             Rephrase the question.

20             MR. STEFIN:  Sure.

21         (Sidebar conference concluded.)

22             THE COURT:  Mr. Stefin, can you rephrase it as to

23    the earlier question?

24             MR. STEFIN:  Yes, I will.  Thank you, Your Honor.

25
```

```
 1   BY MR. STEFIN:

 2   Q    With respect to that one transaction on 8/21/09, again,

 3   that was a check written by Nana Adae in the amount of $6800?

 4   A    Yes.

 5   Q    And do the records reflect where that money was

 6   deposited into?

 7   A    Yes, it was deposited into an account controlled by Rose

 8   Marks at Bank of America ending in 8337.

 9        MR. SCHWARTZ:  Your Honor, again, I object.

10        THE COURT:  Well, I guess, clarify how she knows it

11   was controlled by Rose Marks.

12   BY MR. STEFIN:

13   Q    And how do you know that bank account was controlled by

14   Rose Marks?

15   A    It's an account for Joyce Michael, Inc.  Rose Marks is

16   signing the checks.

17        MR. SCHWARTZ:  Now, I have no objection.

18   BY MR. STEFIN:

19   Q    Okay.  And what was the total amount of money that was

20   expended by Nana Adae to either the Defendant's bank account

21   or to other members of the Defendant's family?

22   A    The total for all years?

23   Q    Yes.

24   A    $51,897.

25   Q    And it also reflects -- your spreadsheet does reflect
```

```
 1   that there was a repayment of $1800 to Nana Adae.

 2   A    That's correct.  She testified that she was paid back

 3   for the Best Buy gift card.

 4   Q    And you don't have any record that supports that, but

 5   you're taking the testimony as it was given?

 6   A    Absolutely.

 7   Q    Directing us to Government's exhibit 714-1.  This is

 8   actually a four-page document reflecting payments by who?

 9   A    Jennifer Hill.

10   Q    And, again, these were payments made to various

11   individuals?

12   A    Yes.

13   Q    Either to the Defendant, Defendant's family or other

14   individuals designated by Nancy Marks, I believe?

15   A    Correct.

16   Q    And these transactions began on September 23 of 2005?

17   A    Yes.

18   Q    Shows an $1800, that first transaction, to someone by

19   the name of Debra Bower for $1800?

20   A    Yes.

21   Q    Below that a cash advance on 9/27/05?

22   A    Yes.

23   Q    For $4500?

24   A    Yes.

25   Q    Let me jump down.  10/12/05, a check, check number 2275
```

 1   by Jennifer Hill on her American Savings Bank account went to

 2   where?

 3   A    To Joyce Michael, Inc.

 4   Q    In the amount of $9000?

 5   A    Yes.

 6   Q    It was deposited into the Bank of America account ending

 7   in 8986?

 8   A    Right.

 9   Q    Payments made to Ricky Marks?

10   A    Yes.

11   Q    Small amounts, 223 and 663.

12   A    Yes, those were Western Union transfers.

13   Q    Then on November 29th of '05, it looks like a Bulgari

14   merchandise, Advantage Visa card, $2176?

15   A    Yes.

16   Q    A Western Union on 12/1/05 for $988 to a Nicholas Eli?

17   A    Correct.

18   Q    Another transaction to Debra Bower on 12/6/05, was a

19   wire to Debra Bower for $7000?

20   A    Right, and deposited at the Sandy Spring Bank.

21   Q    The list goes on to the top of page 2.  And what was the

22   total amount of money furnished by Jennifer Hill to Nancy

23   Marks or individuals that were associated with her dealings

24   with Nancy Marks?

25   A    $42,570.

1    Q     You did an analysis year by year?

2    A     Yes, I did.

3    Q     And, again, without going through all of them, but,

4    again, Nancy Marks, Debra Bower, Nancy Michaels, a Western

5    Union to Nancy Michaels on 1/18/06?

6    A     Yes.

7    Q     A cashier's check to a Vivian White?

8    A     Yes.

9    Q     1/25/06 in the amount of $9000.  And where did that

10   $9000 end up?

11   A     It was deposited into the Bank of America account ending

12   5/9/08 of Rose Marks.

13   Q     We're still on page 2.

14         Then there was a second cashier's check, looks like

15   the same date, for another $9000 made payable to Vivian

16   White?

17   A     Yes.

18   Q     And, again, that ended up where?

19   A     Deposited in that same Bank of America account of Rose

20   Marks.

21   Q     You have transactions for Cartier gift certificate and

22   watch, watch in the amount of $5800.

23   A     Yes.  And then underneath you'll see that I subtracted

24   that, because Ms. Hill testified that eventually the watch

25   was returned to her.

```
 1    Q     On page 3, again, we're still in 2006, throughout 2006,
 2    additional transactions, Western Unions, actually mostly
 3    Western Unions from 2/19/06 through 8/18/06, made payable to
 4    various individuals:  Vivian Marks, Ricky Eli, Vivian Eli,
 5    Nancy Marks, Ricky Marks, Dylan Marks, Debra Bower, Nancy
 6    Marks?
 7    A     Yes.
 8    Q     On September 14th of '06, an $8000 transaction.  This is
 9    the second transaction from the bottom of page 3, a wire by
10    Jennifer Hill to Ricky Marks?
11    A     Yes.
12    Q     Or wire transactions to a Bank of America account ending
13    in 1636?
14    A     Yes.
15    Q     And that was the bank account of who?
16    A     Of Nancy and Ricky Marks.
17    Q     Another wire transaction on that same date for $6000
18    went to who?
19    A     Debra Bower.
20    Q     So to the middle of page 4, then, ending in 2006, what
21    was the total amount of transactions by Jennifer Hill with
22    respect to members of the Defendant's family?
23    A     $54,782.
24    Q     We have several transactions in 2007.  Looks like a
25    credit card, Jet Blue airline tickets, Ricky and Nancy Marks,
```

```
 1   although a credit was then given.

 2   A    Yes.

 3   Q    And then another transaction for airline tickets

 4   totaling $445?

 5   A    That's right.

 6   Q    And so adding up all of those years, what was the total

 7   that you were able to determine Jennifer Hill paid to members

 8   of the Defendant's family?

 9   A    $97,798.

10   Q    And of that 97,000, how much of that is shown to have

11   gone into bank accounts controlled by the Defendant, Rose

12   Marks?

13   A    27,000.

14   Q    And that is a total 2005 of nine plus a total of 18 in

15   2006?

16   A    Correct.

17   Q    $27,000?

18        Which would be roughly what percentage of the money

19   that you were able to trace?

20   A    Approximately a third.

21   Q    27 percent, something like that?

22   A    Okay.

23   Q    26 percent.

24        MR. SCHWARTZ:  Can we swear Mr. Stefin?

25        MR. STEFIN:  Just using my math skills, Judge.
```

```
 1              THE COURT:  Don't lead the witness.
 2   BY MR. STEFIN:
 3   Q     715-1, again this is a 10-page document.  These reflect
 4   what?
 5   A     These reflect payments made by Jude Montassir or by her
 6   corporation, Deveraux, Inc., to or for the benefit of Rose
 7   Marks.
 8   Q     And the records started in 1997?
 9   A     Yes.
10   Q     That you were -- had access to?
11   A     Yes, she testified that she had thrown out the older
12   records, although her testimony was that she began seeing
13   Ms. Marks in 1991.
14   Q     The "payable to" column lists for the first page pretty
15   much either Marco Polo Gold, Rose Marks, some Joyce Michael,
16   Precious Metal Department, and Bruce Green Trust Account.
17   A     Yes.
18   Q     Have I pretty much summarized the first page?
19   A     Good job.
20   Q     And that takes us from 1997 through 1999.  1997, the
21   total was 254,000.  That's the fourth line on the top.  Mid
22   page, 1998 was 510,000?
23   A     Yes.
24   Q     And 1999, 643,000?
25   A     Correct.
```

```
 1              MR. SCHWARTZ:  Your Honor, I'm going to object to

 2     leading.

 3              THE COURT:  Sustained.

 4   BY MR. STEFIN:

 5   Q     In the year 2000, on page 2, what was the total amount

 6   of funds that you were able to verify that were transferred

 7   to Rose Marks?

 8   A     $515,114.

 9   Q     In 2001?

10   A     $1,173,750.

11   Q     And in 2001, were there wires that were made to

12   individuals other than Rose Marks?

13   A     There were wires to Victoria Eli, and there were

14   cashier's checks to Victoria Eli and Victoria Somer.  And a

15   wire to Joyce Michaels.

16   Q     For 2002, takes us through almost to the top of page 5.

17   A     Yes.

18   Q     What was the total amount for 2002 of payments made to

19   either the Defendant, bank accounts controlled by the

20   Defendant, or other third party individuals related to the

21   testimony in this case?

22   A     $1,000,035 (sic).

23   Q     2003, which takes us from the top of page 5 to the top

24   of page 6, what were the payments made by Ms. Montassir in

25   that year?
```

```
 1    A    $1,468,500.

 2    Q    2004, again, page 6.

 3    A    $1,776,656.

 4    Q    2005.

 5    A    $1,192,305.

 6    Q    And that's reflected on the middle of page 7?

 7    A    Correct.

 8    Q    2006?

 9    A    That would be on page 9, $1,310,858.

10    Q    I just want to ask you about on page 7, the first

11    transaction in 2006 says 1/3/06, 2006, a check from Simon &

12    Schuster.

13    A    Yes.  That is, if you recall from Jude Montassir's

14    testimony, that was her publisher.  It was a check from Simon

15    & Schuster payable to Jude Montassir, and on the back it was

16    endorsed by Ms. Montassir and Joyce Michael.

17    Q    So there's a signature that says Joyce Michael on that

18    check?

19    A    Yes.

20    Q    And that check was in the amount of $132,000?

21    A    Yes.

22    Q    And where did that check end up?

23    A    In Bank of America account ending 8986.

24    Q    And that's the bank account of who?

25    A    I'm fairly certain that's for Joyce Michael, Inc.
```

1    Q    And that account being controlled by who?

2    A    By Rose Marks.

3    Q    As you said, that takes us to the top of page 9.  For

4    2007, what was the total amount of money transfers by Jude

5    Montassir through Deveraux, Inc.?

6    A    That would be on page 10, and it's 2,239,615.

7    Q    And then for 2008, we're in the middle of page 10.

8    A    Yes.  And there's that date that you asked me about,

9    January 15th.

10   Q    And on that date, there was a wire-transfer --

11   transaction for how much money?

12   A    $3700.

13   Q    And what bank account did it end up in or go transfer

14   to?

15   A    In the Washington Mutual account of Rose Marks ending in

16   2373.

17   Q    So adding up the years, again, from beginning in 1997 to

18   that last transaction, 2008, what was the total of these

19   transactions that you were able to put together from the

20   records, the bank records?

21   A    12,123,612.

22   Q    And then as per the bottom of page 10, did I ask you to

23   break it down as to each of the payees mentioned throughout

24   this summary?

25   A    Yes, you did.

```
 1    Q     And could you just go through that with us?

 2    A     I listed them in order from least to most.  So the

 3    totals -- do you want me to just say the people?

 4    Q     Sure, go ahead.

 5    A     Bruce Green, Donnie Eli --

 6    Q     Give the amounts.

 7    A     Bruce Green, 100,000; Donnie Eli, 134,500; Victoria

 8    Somer, 186,000; Precious Metal department, 301,936; Victoria

 9    Eli, 445,250; Atlas Leasing, 1,171,928; Marco Polo Gold,

10    1,304,500; Peter Wolofsky, 1,379,536; Joyce Michael and Joyce

11    Michael, Inc., 2,383,355, and, finally, Rose Marks,

12    4,716,608.

13    Q     I want to direct you to Government's exhibit 716-1.

14    It's a five-page document, and this pertains to who?

15    A     Sylvia Roma.

16    Q     And now that we have the hang of it, how much money did

17    Ms. Roma furnish to the Defendant or accounts controlled by

18    the Defendant or third parties related to this matter in

19    1997?

20    A     In 1997, 157,300.

21    Q     And I just would note on 12/22/97, what transaction took

22    place on that date?

23    A     That was a purchase of coins from Houston Numismatic

24    Exchange.

25    Q     In the amount of?
```

```
 1    A      105,925.

 2    Q      In 1998, what was the total amount of either money sent

 3    to Rose Marks or purchases at the Houston Numismatic

 4    Exchange?

 5    A      $156,856.

 6    Q      In 1999, what was the total?

 7    A      24,200.

 8    Q      In 2000, on page 2, in the middle?

 9    A      $134,716.

10    Q      2001?

11    A      $18,550.

12    Q      And then it jumps from 2001 to 2009?

13    A      Correct.

14    Q      And how much money was forwarded to accounts controlled

15    by the Defendant in 2009?

16    A      $176,744.

17    Q      And these indicate, at least the later transactions,

18    that these were cash deposits?

19    A      Yes.  If you recall in her testimony, Sylvia Roma said

20    that she was instructed to go to a branch of the bank and

21    make a deposit in Texas.

22    Q      And these went into a Joyce Michael, Inc. Bank of

23    America account?

24    A      Correct.

25    Q      And then in 2010 it continued.  How much money was
```

```
 1   furnished to Joyce Michael, Inc.?

 2   A    $109,860.

 3   Q    And in that year there were a couple of checks that were

 4   written back to Ms. Roma?

 5   A    Yes.

 6   Q    And when were those?

 7   A    There was one on July 20th, 2010, check 1111, for $5000;

 8   and then on September 27th, 2010, check 133, also for $5000.

 9   Q    And the total for 2010 was what?

10   A    $109,860.

11   Q    And there were also transfers in 2011, as well?

12   A    Yes.

13   Q    And that's on page 5 of 5?

14   A    Correct.

15   Q    And it looks like money returned?

16   A    Yes, in Sylvia's book, she had this official check

17   from -- the remitter was shown as Joyce Michael, but I was

18   unable to read the date, so I just put it here at the bottom

19   as a repayment, but I don't know what the date was.

20   Q    And what was the -- then the total amount of money you

21   were able to calculate that went from Sylvia Roma to either

22   directly or to the benefit of Rose Marks?

23   A    $793,826.

24   Q    717-1.  It's a one-page.  This is related to who?

25   A    Jacob Soendergaard.
```

```
 1   Q     And when did the first transaction begin?  What was the

 2   date of the first transaction?

 3   A     July 17, 2008.

 4   Q     And from July 17th of 2008 through January of 2009, what

 5   was the sum total of funds furnished by Mr. Soendergaard?

 6   A     $189,682.

 7   Q     Of that $189,682, how much of that money went directly

 8   into an account controlled by the Defendant?

 9   A     $23,535.

10   Q     Is that based on a transaction on October 29th of 2008?

11   A     That's correct.

12   Q     With respect to Government's exhibit 718-1, this is in

13   reference to payments made by whom?

14   A     Gary Tschetter.

15   Q     And these transactions began when?

16   A     In January 2009.

17   Q     And the last transaction in which Mr. Tschetter paid

18   money out was when?

19   A     June 10th, 2010.

20   Q     And how much -- before talking about repayments, how

21   much money did Mr. Tschetter furnish to Rose Marks or Joyce

22   Michael, Inc.?  And there's one $200 transaction to Cynthia

23   Miller, but what was the total in 2009?

24   A     Subtracting that $200, it would be $240,300.

25   Q     And in 2010, additional payments of how much?
```

```
 1    A     $11,900.

 2    Q     Your spreadsheet then reflects that there were payments

 3    from Rose Marks back to Gary Tschetter?

 4    A     Correct.

 5    Q     On what dates and how much?

 6    A     On May 28th, 2010, it was a cashier's check issued by

 7    Joyce Michael, Inc. in the amount of $66,000, and on

 8    January 28th, 2011, there was a cashier's check from Joyce

 9    Michaels Consultant, Inc. in the amount of $14,000.

10    Q     With respect to the next spreadsheet, Government's

11    exhibit 719-1, this was regarding the payments made by whom?

12    A     Atsuko Ueda.

13    Q     Payments began on what date?

14    A     October 16th, 2000.

15    Q     And the last wire transaction that took place from

16    Ms. Ueda to other individuals?

17    A     The last transaction was on September 14th, 2009, but at

18    the bottom of page 2, towards the bottom.

19    Q     And the total amount paid by Ms. Ueda during that time

20    period?

21    A     $486,008.

22    Q     And of that $486,008, how much of that money went into

23    bank accounts controlled by the Defendant, Rose Marks?

24    A     $23,000.

25    Q     And most of these were what kind of transactions?
```

```
 1    A    Most of them are wire-transfers.

 2    Q    Directing you to Government's exhibit 720-1.  This is a

 3    spreadsheet with respect to which witness?

 4    A    Andrea Walker.

 5    Q    And her transactions began on what date?

 6    A    February 24th, 2009.

 7    Q    And just to go across.  Well, let's just -- and the last

 8    transaction took place when?

 9    A    October 1st, 2010.

10    Q    And what was the total amount paid by Andrea Walker in

11    that timeframe?

12    A    The total including repayments?

13    Q    Well, without -- would you be adding money on that total

14    if you -- in other words, there are two repayments in April

15    of 2011?

16    A    Yes.  That's on page 2.

17    Q    So the total, which includes the repayments, what would

18    that amount be?

19    A    $856,490.

20    Q    Now, before we move on, on Ms. Walker, for example, the

21    first payment on 2/24/09, the top of the first page.

22    A    Yes.

23    Q    That was for $2978, U.S. dollars?

24    A    Yes.  Because on her sheet on this -- that's marked

25    AW-006, she had 2050 British Pounds, and I just went to -- I
```

1   went to a website that we use at work to do the conversion

2   from that date, and it came up less than what she was

3   stating.  But since that was the correct conversion at the

4   time, that's the amount I use.  It was like $1.45, more or

5   less.  I know she stated a larger amount, but maybe she had

6   done the conversion at a different date when she made her

7   book.

8   Q    Now, she made payments to Nancy Marks, Bank of America

9   account controlled by Nancy Marks?

10  A    Yes.

11  Q    And what was the account number of Nancy Marks ending

12  in?

13  A    5522.

14  Q    And then she also made payments -- I should say

15  wire-transfers to an account, Bank of America account in the

16  name of Joyce Michael, Inc.?

17  A    Yes, that was Bank of America account ending 8337.

18  Q    So -- and, again, for example, 2009 -- and I had skipped

19  this over.  In 2009, the total amount of payments made by

20  Andrea Walker was what?

21  A    $305,616.

22  Q    And out of that $305,616, how much of that money went

23  into bank accounts controlled by the Defendant, Rose Marks?

24  A    $263,904.

25  Q    And in 2010, the total indicated was $555,862?

```
 1    A     Correct.

 2    Q     And all of that money went into the Joyce Michael, Inc.

 3    Bank of America account ending in 8337?

 4    A     The last one into Joyce Michael Consultant, Inc., BB&T

 5    account ending 8509.

 6    Q     And, again, that account was controlled by who?

 7    A     By Rose Marks.

 8    Q     Last, but not least is 721-1, and that's an accounting

 9    of payments made by who?

10    A     Deanna Wolfe.

11          MR. SCHWARTZ:  Are you skipping the last page of

12    Andrea Walker?

13    BY MR. STEFIN:

14    Q     Let me just go back to Ms. Walker.  You mentioned the

15    returns of funds on page 2?

16    A     Yes, we did.

17    Q     And with those deductions returned back, the total is

18    what amount of money?

19    A     The total return?

20    Q     No, the total amount of money that was paid by

21    Ms. Walker?

22    A     Oh, $856,490.

23    Q     721-1.  This began in 1984?

24    A     Yes.

25    Q     And you were able to total up numbers for each of '84,
```

```
1    '85?

2    A    Yes.  I'd like to give you some of my water.

3    Q    That's okay.

4         Rather than going through year by year, started in

5    '84, you had some transactions in '85, '88.  I think is there

6    a typo there just on page 2?  I didn't notice that before,

7    the fourth transaction, 8/23.  Was that supposed to be 1989?

8    A    Oh, yes, you're right.  Thank you.  It is supposed to be

9    1989.

10   Q    So, for example, from 1989 to '93, you have no record

11   transactions?

12   A    Well, yeah, the records are spotty in those early years

13   because Deanna Wolfe didn't keep all those records.

14   Q    You have one transaction in '93 and one in '94?

15   A    Right.

16   Q    Several in '96, and then you -- looks like more in '97?

17   A    Yes.

18   Q    And to whom are these payments being made?

19   A    They're being made to Rose Marks, Joyce Michael.  Let's

20   see what I see.  In the later years there were some credit

21   card payoffs that she made.  But in the early years it's Rose

22   Marks, Joyce Michael, Joyce Michael, Inc.  And by the time

23   you get to 2010, it's Joyce Michaels Consultants, Inc.

24   Q    Let's go to 2000 -- let's go to page 8 on the middle of

25   the page.  This is beginning 2009.  You have an out-of-state
```

```
 1    counter deposit?

 2    A    Yes.

 3    Q    And that cash was deposited into whose bank account?

 4    A    Deanna Wolfe went to a branch, Bank of America branch in

 5    Virginia and made a cash deposit into the Joyce Michael, Inc.

 6    account ending in 8337.

 7    Q    And on May 11th, 2009, what was the transaction?

 8    A    You said May 11th, 2009?

 9    Q    Yes.  It's right below the one we just . . .

10    A    Right.

11              This was in Deanna's book.  She showed a withdrawal

12    from her personal savings of $1500 and indicated that was

13    given to Rose Marks.

14    Q    And then the one below that on August 10th of 2009,

15    $13,000 transaction?

16    A    Correct.

17    Q    Go ahead.

18    A    Deanna Wolfe got the money from her friend, Joanne

19    Barnes, and then she cashed the check and made a deposit into

20    the Joyce Michael, Inc., Bank of America account.

21    Q    And then just noting on November 13th of '09 and

22    12/1/09, there were two wire transactions?

23    A    Yes.

24    Q    And those are wires for $59,975?

25    A    Right.
```

1    Q    Two of them went into what bank account?

2    A    Into the Joyce Michael, Inc., Bank of America account

3    ending in 8337.

4    Q    So let us get to the bottom or the end.  What was the

5    total amount paid by Deanna Wolfe directly to or for the

6    benefit of the Defendant, Rose Marks?

7    A    On page 11, $567,687.

8    Q    And in that figure, you're including balances on credit

9    cards?

10   A    I'm including credit card payoffs.  If you recall from

11   Deanna's testimony, she was left with these cards that she

12   had opened and allowed Rose Marks to have the card and use,

13   and then there were significant balances that she had to pay

14   off in the year 2012.

15   Q    Now, another witness that testified in this case was

16   Janice Florendine.

17   A    Yes.

18   Q    Did you have any records by which you could make any

19   verification of the payments that were made by Janice

20   Florendine?

21   A    I didn't have records, but she did have a judgment.  So

22   we could have put that on a spreadsheet, because I would

23   think that a judgment would be sufficient documentation, but

24   I did not prepare a spreadsheet.

25   Q    And by judgment you're referring to a court-ordered

```
 1    judgment in a lawsuit?

 2    A    Yes.

 3              MR. STEFIN:  Would this be a good time?

 4              THE COURT:  Yes.

 5              Ladies and gentlemen, let's take a recess.  Don't

 6    discuss the case or form any opinions.  See you in about 15

 7    minutes.  Thank you.

 8         (The jury exits the courtroom.)

 9              THE COURT:  All right.  Again, don't discuss your

10    testimony, please.

11              Anything we need to talk about?

12              MR. STEFIN:  No, not from the United States.

13              THE COURT:  Does the Government have a report, an

14    interview report for Sylvia Roma that was given to the

15    defense in this case?  The witness, Sylvia Roma?  Is there

16    one of those reports?

17              MR. STEFIN:  Interview reports?

18              THE COURT:  Interview reports.  Did you ever turn

19    one over for her?

20              MR. STEFIN:  Yes.

21              THE COURT:  Can I see it when you have a chance?

22    Thanks.

23              MR. SCHWARTZ:  And, Your Honor, I'd also hand up to

24    the Court, we had a discussion yesterday about who went to

25    the police on their own, et cetera.  And I apologize.  I was
```

1  finishing this at 1:00 o'clock last night, but it's based on

2  my notes, and to say something that Your Honor says,

3  obviously, your notes and your memory control.

4          THE COURT:  Okay.  Thank you.

5      (A recess was taken from 3:05 p.m. to 3:22 p.m., after

6  which the following proceedings were had:)

7          THE COURT:  All right.  We're back on the record.

8  Defendant's present with counsel.

9          Just to let you know, the jurors have been making

10  inquiries as to how much longer the trial's going to take, so

11  we need to give them some kind of an indication at some

12  point.

13         MR. STEFIN:  You can tell them the Government

14  expects to rest its case tomorrow.

15         THE COURT:  Well, I'm sure they'll be happy to hear

16  that, but they're going to want to know how long the rest of

17  the case is going to take.

18         MR. SCHWARTZ:  Your Honor, I'm anticipating four

19  days.

20         THE COURT:  So --

21         MR. SCHWARTZ:  It might be a little longer, might

22  be a little shorter, but I think four days is a fair

23  estimate.

24         THE COURT:  So approximately another week.

25         MR. SCHWARTZ:  I would think we should finish the

```
 1    middle or towards the end of next week.
 2              THE COURT:  With the evidence?
 3              MR. SCHWARTZ:  With the evidence, and then
 4    summation and charge.
 5              THE COURT:  All right.  So I'll have to tell them
 6    it's going to be about another six days.
 7              MR. SCHWARTZ:  Your Honor, may I approach?
 8              THE COURT:  Yes.
 9              MR. SCHWARTZ:  We had in our computer the three
10    reports for Sylvia Roma.
11              THE COURT:  Thank you very much.  Appreciate it.
12              MR. SCHWARTZ:  And I've given them to Mr. Stefin.
13    I think that's all there are, but if there are more, he'll
14    tell us.
15              THE COURT:  Thank you.
16              Can we bring the jury in?
17              MR. STEFIN:  Yes.
18              THE COURT:  Mr. Schwartz, are you ready?
19              MR. SCHWARTZ:  We're ready, Your Honor.
20              THE COURT:  Bring the jury in, please.
21         (The jury enters the courtroom, after which the following
22    proceedings were had:)
23              THE COURT:  Welcome back, everyone.  Please be
24    seated, ladies and gentlemen.
25              You may continue, Mr. Stefin.
```

```
 1              MR. STEFIN:  Thank you, Your Honor.
 2   BY MR. STEFIN:
 3   Q    Did you have an opportunity to see documents that had
 4   been seized pursuant to search warrants in this case,
 5   specifically as it relates to tax matters?
 6   A    Yes.
 7   Q    I want to show you what has already been received in
 8   evidence as Government's composite 404.  And have you seen
 9   those documents before?
10   A    Yes.
11   Q    And describe to the jury what 404 composite is?
12   A    It's a copy of the 2001 federal income tax return of
13   Nicholas and Rose Marks, and it's also a Virginia part-year
14   resident tax return.
15   Q    Okay.  Now, 2001 was not a tax year that you were able
16   to get the hard copy from the Internal Revenue Service?
17   A    That's correct.
18   Q    So this is a copy of a return that was in the
19   possession, actually seized at the warehouse location during
20   a search that was executed by Secret Service?
21   A    Yes.
22              MR. SCHWARTZ:  Your Honor, just for the record, I
23   have that same 404(b) objection, and also, I've read Your
24   Honor's ruling.  I still would object to that.
25              THE COURT:  Yes.  Okay.  I'll admit it over
```

1    objection.

2        (Government's Exhibit No. 404 entered into evidence.)

3    BY MR. STEFIN:

4    Q    Now, that's just a copy.  Were you able to verify

5    whether or not a tax return reflecting the numbers on that

6    return was actually filed with the Internal Revenue Service?

7    A    Yes, I was.

8    Q    And how were you able to make that determination?

9    A    I accessed our computer master file, we call it, and I

10   checked for the 2001 year.  The income reported here matches

11   what's on the transcript.  And in addition, I asked one of

12   the support staff to pull a literal transcript for that year

13   so that we could compare it to the tax return, and I provided

14   that to you, Mr. Stefin.

15   Q    Provided to who?

16   A    To you.

17   Q    That's what I thought.

18        Okay.  With respect to the 2001 return, maybe we

19   can put it up on the screen.  Refresh my memory, was there a

20   1120S along with the 1040, or was this a tax year before the

21   corporation was formed?

22   A    This was prior to the formation of Joyce Michael, Inc.

23   Q    All right.  I'm going to rely you on for the time being,

24   but if we need to put something up on the board, we will.

25        This 2001 return was filed.  Who are the taxpayers

1   for that 2001 return?

2   A    Nicholas G. Marks and Rose Marks.

3   Q    And was their business -- well, first of all, were there

4   any wages or income reported on that return?

5   A    There were wages of $3921.

6   Q    And what was that reflected as coming from?

7   A    According to Statement 1 attached to the return, that

8   was paid by Teacher Childcare Nursery School.

9   Q    Is that a W-2 form that was attached?

10  A    Well, the W-2 itself is not attached.  It would have

11  been attached to the return filed with IRS.  But included

12  with the tax return is a statement that tells us what was on

13  the W-2.

14  Q    All right.  So in addition to the $3900 in income -- I'm

15  sorry -- of wages, again, 2001, what other -- are there any

16  other entries for other income?

17  A    Yes.  And since this return is not in order the way it's

18  Bate numbered, I guess they numbered it the way it was

19  received, I'm looking for the Schedule C.  Here it is.  There

20  was a Schedule C included for Rose Marks fortune teller sole

21  proprietorship.

22  Q    And how much income was reported a gross income from

23  Rose Marks, fortune teller?

24  A    $183,980.

25  Q    And in addition to the $183,980, were there any other

1   reported line items of income?

2   A    Well, there were expense items on the Schedule C.

3   Q    Okay.  Well, what were the expense items on the Schedule

4   C?

5   A    Legal and professional services.

6   Q    Well, what does it add up to?

7   A    Okay.  I'll tell you the net income was $31,900.

8   Q    All right.  And what reduced it substantially from

9   $183,980 to $31,900?

10  A    The largest expense is rent of $115,040.

11  Q    So 31,000 out of 183,980?

12  A    Yes, correct.

13  Q    And that went on a line item on the first page of the

14  tax return?

15  A    Yes, that goes to line 12 on the front of the 1040.

16  Q    Were there any other expense -- excuse me, other line

17  items of income?

18  A    Yes, gambling winnings in the amount of $877,687 were

19  reported, and there were gambling losses on Schedule A in the

20  amount of $792,831.

21  Q    So there's actually a gambling gain that year?

22  A    Apparently so.

23  Q    And what was then the total reported income?  And then,

24  were there other deductions, as well?

25  A    On Schedule A there was mortgage interest of 61,800,

1    some state income tax of $202.  The taxable income, let's see

2    if that page is here.  The taxable income reported on line 39

3    was $79,792.

4    Q    And based on that, was there a tax due and owing?

5    A    Yes, there was income tax of $16,288, self-employment

6    tax which was due on that net income from fortune telling of

7    $4507, for a total tax of $20,795.

8    Q    Now, does that tax return, does it break out where the

9    $183,000 -- $183,980, where that came from?

10   A    For the Schedule C gross receipts?

11   Q    Yes.

12   A    No.

13   Q    And a taxpayer, when they fill out a return, are they

14   required to list the -- where the income derives from?

15   A    No.  For Schedule C, no.

16   Q    If they had -- if they were audited they would have to

17   show where the --

18   A    Yes.

19   Q    -- the money came from?

20   A    If they were audited, we would have to determine whether

21   or not the gross receipts were correctly reported.

22   Q    Accurately stated.

23   A    Yes.

24   Q    But I want to draw your attention, then.  Again, this is

25   the 2001 return, correct?

1    A    Yes.

2    Q    I want to draw your attention to one of the documents

3    already in evidence from Mr. Van Vorst, a document 20 --

4    Government's exhibit 20 composite.  And you're familiar with

5    that?

6    A    Yes.

7    Q    Do you need to see a copy of it?

8    A    That would be helpful.

9    Q    We'll get one for you.  I'll put it on the screen.

10          On document number 753, that's Vorst-000753, we've

11   seen this a few times.

12   A    I can see this from the screen.

13   Q    Okay.  And are you -- from looking at this letter, are

14   you able to determine where the figure $183,980 came from?

15   A    Yes.  In the second paragraph, second sentence:  "All

16   wire-transfers from Jude Montassir totaling $483,980 were

17   included as fortune-telling-income except for 300,000

18   Mrs. Marks stated was a loan."

19          So you subtract 300,000, and you arrive at the

20   183,980 reported on the tax return.

21   Q    So would that be consistent with the return claiming

22   that -- well, $483,980 was received in wire-transfers, but

23   300,000 of that was a loan?

24   A    That's what it states here, yes.

25   Q    And that would be consistent with the return which

1    appears to have been filed?

2    A    Yes.

3    Q    All right.  But when you go back on the spreadsheet for

4    Jude Montassir, actually how much money had she forwarded to

5    Rose Marks in the tax year 2001?  And that's on page 2 of

6    Government's exhibit 715-1.

7    A    $1,173,750.

8    Q    Now, there's a bunch of wires, most of them to Rose

9    Marks, but there's also a couple to Victoria Eli.

10   A    Right.  And then there are the --

11   Q    Go ahead.

12   A    Then there are the cashier's checks to Victoria Eli and

13   Victoria Somer, and I see one wire to Joyce Michael.

14   Q    If an individual performs services or believes they've

15   performed services for someone and they believe they're

16   receiving compensation for it, but they have the money

17   forwarded to a third party instead of themselves, would that

18   money be taxable?

19   A    Of course.

20   Q    Does it appear from this letter, the March 28th letter

21   that was disclosed, that there was substantial sums forwarded

22   to a third party?

23   A    There's nothing on that letter about payments made to

24   third parties.

25   Q    In a letter, document Vorst-000754, which is still part

```
 1   of Government's composite 20, this is a letter dated

 2   September 15th of 2003.  Again, this was in the records of

 3   Mr. Van Vorst.

 4           In that first paragraph, there's a reference to

 5   "Mr. and Mrs. Nicholas Marks engaged us to prepare their Form

 6   1040 for 2002.  She gave forms W-2G that totaled 982,692 and

 7   betting tickets from various gambling institutions totaling

 8   912,999.  She also gave us Bank of America bank statements."

 9   And it has an account number ending in 5523.  "From May 23,

10   2002, through December 31, 2002.  Mrs. Marks states that no

11   bank account was used from January 1, 2002, through May 22,

12   2002."

13           Do you have information from the records that you

14   reviewed with respect to money that she failed to disclose

15   for 2002?

16   A    Yes, I'm going to go back to the Jude Montassir

17   spreadsheet for year 2002, which is mostly on pages -- it

18   starts at the bottom of page 2, and then it goes through

19   pages 3, 4, and ends on page 5.

20           So as with regard to the bank records, I did not

21   see anything in our records for the year 2002 prior to that

22   Bank of America account listed.  However, you see there are

23   numerous checks from Jude Montassir in the year 2002 that

24   were cashed at a check cashing service.

25   Q    And where is that reflected?
```

```
 1    A    For instance, if you look on page 3, the first one

 2    starts on August 6, 2002, you'll see check 1099 from

 3    Ms. Montassir written from her Mountain Bank account to Joyce

 4    Michael for $7250, and on the back of the check it's

 5    endorsed, and then it's stamped Gemstone Financial Services.

 6    And I looked at that on the Internet and saw that it is a

 7    check cashing --

 8              MR. SCHWARTZ:  Your Honor, I'm going to object to

 9    this testimony.

10              THE COURT:  Sustained.

11   BY MR. STEFIN:

12    Q    And how many other checks were cashed at Gemstone --

13              MR. SCHWARTZ:  Objection, irrelevant.

14              THE COURT:  Sustained.

15              MR. SCHWARTZ:  It doesn't impeach the statement on

16    the letter.

17              THE COURT:  Sustained.

18   BY MR. STEFIN:

19    Q    What about payments to Marco Polo Gold?

20              MR. SCHWARTZ:  Objection, irrelevant.  It doesn't

21    impeach the statement on the letter.

22              THE COURT:  Overruled.

23              THE WITNESS:  At the bottom page 2, you see two

24    payments to Marco Polo Gold totaling $625,000.  And according

25    to her testimony, Ms. Montassir purchased gold coins and had
```

```
 1    them delivered to Ms. Marks or had her family pick them up

 2    with a hand truck.

 3              THE COURT:  I just want to correct one of my

 4    rulings or change one of my rulings.

 5              I sustained the objection to the witness saying

 6    what she learned on the Internet about a company.  So that --

 7    I sustained that as based on hearsay.  But to the extent that

 8    there's evidence of what -- where the check was cashed, I'll

 9    allow that question.  So what she learned about what that

10    entity was, that's what I'm sustaining the objection to.

11              So if you want to go back to the question.

12              MR. STEFIN:  I appreciate that.  Thanks.

13              No, I get it.  I covered it.  Thank you.

14    BY MR. STEFIN:

15    Q    In 2004 -- or strike that.

16              Again, one of the letters from Mr. Van Vorst,

17    000755, October 17th of 2005.  In that year, according to

18    this letter, the Defendant reflected or stated that she had

19    received loans of one point -- $1,122,553?

20    A    That's what the letter states, yes.

21    Q    Does -- and in that tax year for 2004, how much did Jude

22    Montassir furnish to the Defendant?  That's on page 6, I

23    believe.

24    A    Yes, on page 6, 1,776,656.

25    Q    On September 12th, 2006, a letter, Vorst-000757, where
```

```
1    it starts out:  "Mr. and Mrs. Nicholas Marks engaged us to
2    prepare their Form 1040 for 2005.  Mrs. Marks has two bank
3    accounts and uses them for her personal, as well as for her
4    gambling and fortune-telling activity.  Mrs. Marks gave us
5    Bank of America bank statement 5908 for January through
6    December 2005, and 7658, January through December 2005."
7              Based on your review of the records, is there any
8    some inaccuracy with respect to that?
9    A    This letter doesn't mention about the Joyce Michael,
10   Inc. bank accounts, which, there was one at Bank of America
11   and -- that's it, Bank of America.  And this doesn't take
12   into consideration any payments made to third parties, which,
13   of course, would not be reflected in Ms. Marks' bank records.
14   Q    I'm sorry.  You have to speak up.
15   A    Oh.  Payments made to third parties would not be
16   reflected in Ms. Marks' bank records.
17   Q    And in that 2005, the spreadsheet shows a number of
18   payments that were made to Atlas Leasing and Peter Wolofsky?
19   A    That's correct.
20   Q    Totaling in 2005 $1,192,305?
21   A    Yes.
22   Q    Finally, with respect to Government's exhibit 20
23   composite, the final letter, August 9th of 2007 identified
24   document Vorst-000759, and again, this is August 9th of 2007
25   letter starts out:  "Mr. and Mrs. Nicholas Marks engaged us
```

1    to prepare their Form 1040 for 2006.  Mrs. Marks has two bank

2    accounts and uses them for her personal, as well as for her

3    gambling and fortune-telling activity."

4         Then it goes on to mention "she gave us Bank of

5    America bank statements 5908 for January through

6    December 2006."  I can't see whether it mentions the second

7    account.  And were there additional bank accounts that were

8    not mentioned with respect to this letter?

9    A    There are the accounts for Joyce Michael, Inc., and in

10   addition, there was a Washington Mutual account in the name

11   of Rose Marks ending in 2373.

12   Q    And I believe as you previously testified, in 2006 she

13   had received from Jude Montassir a total of $1.3 million.

14   That's' on page 9 of this spreadsheet, $1,310,858?

15   A    Yes.

16   Q    And substantial part of that money went into the

17   Washington Mutual account ending in 2498?

18   A    Yes, that's the Joyce Michael, Inc., and then there were

19   also substantial amount into the 2373.  If you look at the

20   bottom of page 8, you'll see the last -- just those last

21   three went into that account, and that's $180,000.

22   Q    Now, are you also familiar with the fact that in 2000 --

23   that certain documents were found in the warehouse with

24   respect to tax year 2001?

25   A    Yes.

```
1    Q    And showing you what has already been received in

2    evidence as part of composite exhibit 403, document number

3    SW-4052, which is the search warrant executed at the

4    warehouse, 4052 Oakland Park Drive, document 00522, this

5    appears to be a letter from an attorney, law offices of Mark

6    Vogel?

7    A    Correct.

8    Q    Dated October 15th, 15 October, 2001?

9    A    Yes.

10   Q    And it starts off addressed to Mr. and Mrs.~Nicholas

11   Marks at 1319 --

12              MR. SCHWARTZ:  Your Honor, I'm going to object.

13              THE COURT:  Is this in evidence?

14              MR. STEFIN:  It's in evidence.

15              MR. SCHWARTZ:  Well, Your Honor, if it is, I would

16   ask that it be stricken.

17              THE COURT:  Can we talk about it up here?  Let me

18   see it.

19        (The following proceedings were held at sidebar:)

20              THE COURT:  So what is this supposed to be?

21              MR. STEFIN:  This was found within the documents at

22   the warehouse under -- in a folder entitled 2001 tax papers,

23   whereas in the letter it shows that according to the letter,

24   they reflected that money received from Jude Montassir was a

25   gift.  I can show you the paragraph.
```

```
1              THE COURT:  I see.

2              Okay.  So what's your objection?

3              MR. SCHWARTZ:  May I see it again, Judge?

4              THE COURT:  When did this come into evidence?

5              MR. BARDFELD:  Early in the week when Delpozzo --

6              MR. STEFIN:  We had the witness from the

7    warehouse -- the Secret Service agent.  It was like one of

8    the first days, because we had to get the Secret Service

9    agents in, and the search of the warehouse and the boxes of

10   documents.

11             THE COURT:  Was this one of the ones that was

12   subject to the motion to suppress that I just ruled on, or is

13   this something separate?

14             MR. SCHWARTZ:  Subject to the motion to suppress

15   you just ruled on.

16             THE COURT:  Okay.  All right.  So?

17             MR. SCHWARTZ:  I think that's an attorney/client

18   privileged document.

19             THE COURT:  All right.  Why would -- why would

20   attorney/client communications be admissible even if the

21   documents otherwise would be properly seized?  Does that --

22   does that eliminate attorney/client privilege?

23             MR. STEFIN:  I think -- and I'm going to have to do

24   some research on it, but I believe that communications made

25   for the purpose of preparing a tax return is not covered
```

```
 1      under the attorney/client privilege even if the tax preparer
 2      happens to be an attorney.  I need to get the Court some case
 3      law to that effect.
 4              THE COURT:  I think you might be right about that,
 5      but -- that's possible, that you may be right.
 6              MR. STEFIN:  And I probably have other reasons to
 7      admit it.
 8              MR. SCHWARTZ:  He's correct as to that, but I think
 9      this is not the attorney preparing the form.  I think this is
10      an attorney discussing with his client information, getting
11      information, and then he is talking to the preparer.  I think
12      he says, I told the preparer to do certain things.
13              Now, I read this four weeks ago, but --
14              MR. STEFIN:  I could answer that, because -- if I
15      talk to the agent.  I didn't talk to this individual.  I
16      think he was doing tax preparation, but I would want to
17      confirm that before I . . .
18              What I could do is, I could hold off on this.
19              MR. SCHWARTZ:  You know what, Judge, I'll withdraw
20      my objection.
21              MR. STEFIN:  Well, I was going to go with it,
22      but . . .
23              THE COURT:  Okay.  Thank you.
24          (Sidebar conference concluded.)
25              MR. STEFIN:  May I proceed?
```

```
1              THE COURT:  You may proceed, yes.
2    BY MR. STEFIN:
3    Q    All right.  This reads:  "This will confirm several of
4    the items discussed over the last several weeks and months.
5    First, Mr. Marks has asked us to close our file, which we
6    have done and placed in storage.  Should you require the
7    services of this firm in the future, please feel free to
8    contact us.  In the interim, however, we will not accept any
9    further liability or responsibility for any of your legal
10   issues, including but not limited to any federal tax issues."
11             The second paragraph goes on to discuss children's
12   tax returns.
13             Let me move it down.
14             It goes on to talk about returning files.  Now, I
15   want to direct your attention to the fifth -- it starts out
16   "fifth."
17             Could you read that?
18   A    "Fifth, you instructed us not to research the issue of
19   professional gambling nor to file your gambling activity as a
20   Schedule C business."
21             Continue?
22   Q    Yes.
23   A    "Sixth, you have assured us repeatedly that amounts
24   received from Ms. Deveraux and Ms. Montassir were gifts, not
25   income, and that the appropriate IRS Forms 709, U.S. Gift Tax
```

```
 1    Return, were filed."

 2    Q    Okay.   Then it goes on to discuss other matters?

 3    A    Yes.

 4    Q    And signed by Mark Vogel, PA, Mark Vogel, Esquire.

 5    A    Right, LLM, CPA.

 6    Q    Also in connection with documents found at the

 7    warehouse, do you recall there was a folder labeled 2000

 8    taxes, IRS correspondence combined tax statement?

 9    A    Yes.

10    Q    And contained within that binder, 406 composite,

11    document number SW-4052, 4052 is the warehouse, document

12    00551 appears to be -- I wouldn't call it a spreadsheet, a

13    sheet that was prepared listing various financial

14    information?

15    A    Yes.

16    Q    And it reads:  "Nick and Rose Marks' financial

17    information tax year 2000.  The following financial

18    information was accumulated in the process of preparing the

19    Marks' 2000 tax return."

20            Then it goes on to talk about checking account, New

21    York, Michael Marks, deposits, 147,813, other income and

22    wire-transfers, 230,178 with an asterisk.  And then it goes

23    on to list a series of what's headed as wire-transfer income?

24    A    Yes.

25    Q    One is Akemi, A-k-e-m-i, Fujita, F-u-j-i-t-a, for $5000;
```

```
1    the next is Atsuko Ueda for $12,000; then Deveraux, 27,000.

2    In parenthesis it says gift not reported as income.  Below

3    that, Jude Montassir, $447,677.  In parenthesis indicates

4    gift not reported as income.

5            And then it goes on.  Well, actually, further down

6    it says Sylvia Roma, $88,886, and that's listed as income?

7    A    Yes, it's under that wire-transfer income heading.

8    Q    Then it lists a few other names, including Michael

9    Marks, 19,970, transfer to business account, adjusted.  Below

10   that, Victoria Eli for $5000, and Precious Metals, $29,810,

11   where it says in parenthesis, investment return of capital.

12           So on this form, at least according to whoever

13   prepared it, Deveraux and Jude Montassir, the money is listed

14   as gifts?

15   A    Yes, they are.

16   Q    And, again, this is tax year 2000.  Which, actually the

17   number of wire-transfers in 2000 total what?

18   A    From Jude Montassir?

19   Q    Yes.

20   A    $515,114.

21           MR. STEFIN:  If I may just have one moment?

22           THE COURT:  Yes.

23           MR. STEFIN:  That's all I have on direct.

24           THE COURT:  Thank you.

25                       Cross-examination
```

```
1    BY MR. SCHWARTZ:

2    Q    I'm sorry, I don't know how to spell your last name.

3    A    Are you serious?

4    Q    Yes.

5    A    L-e-a-v-i-t-t.

6    Q    And is it pronounced Levit or Lavit?

7    A    It's pronounced love-it -- no, I'm kidding.  Leavitt.

8    Q    Are you related to any saint?  Never mind.

9              Levit?

10   A    Yes.

11   Q    Ms. Leavitt, my auditing teacher once told me never

12   argue with taxes with a revenue officer, but let's talk a

13   little bit about taxes.

14   A    Well, a revenue officer is a collection officer.  I'm a

15   revenue agent.

16   Q    Ah, that's even worse.

17             Ms. Leavitt, the tax form for gift tax that was

18   mentioned in Mr. Vogel's letter that came into evidence just

19   a few moments ago?

20   A    Yes.

21   Q    It's my recollection, and I want to confirm this with

22   you, that's to be filed by the giver of the gift; is that

23   right?

24   A    Yes, the 709 is filed by the donor.

25   Q    So if Jude Deveraux, for instance, cashed in a
```

1    retirement account or something like that and gave a gift to

2    Rose, she would have to file the gift tax return, not Rose;

3    is that right?

4    A    Hypothetically, if a gift were given, the giver must

5    file the 709, if it's over certain amounts.

6    Q    Right.

7         If it's for $13,000 or less the year before, or

8    back then $10,000, there doesn't have to be a gift tax return

9    filed, does there?

10   A    Correct.

11   Q    But for large amounts there does?

12   A    Correct.

13   Q    So that wouldn't have been Rose's responsibility?

14   A    A recipient of the gift does not have to file the 709.

15   If a gift is given, it's the giver who files it.

16   Q    Okay.  So if Rose believed and told her lawyer, who was

17   also doing her taxes, that she had gotten a gift from Jude in

18   the year 2000, and Jude said that my accountant will take

19   care of any gift tax, Rose would have no obligation regarding

20   the gift tax return?

21   A    That's a lot of hypotheticals, but --

22   Q    Well, you've been doing a lot of hypotheticals.  Let's

23   do that one.

24   A    If a gift were given, and the recipient doesn't have to

25   file a gift tax return.

```
1    Q    Okay.  Now, you talked a lot about various total amounts
2    that you saw from wire-transfers and bank deposits into
3    Rose's various accounts, either individually or her corporate
4    accounts, on your direct examination; is that correct?
5    A    Yes.
6    Q    You have the advantage over other witnesses in that you
7    were allowed to sit in the entire trial; is that correct?
8    A    Yes.
9    Q    And did you sit in most -- virtually all of the trial, I
10   believe?
11   A    Virtually, yes.
12   Q    And you heard Jude Montassir testify, didn't you?
13   A    Yes.
14   Q    Okay.
15   A    Mostly.  There were times I was not here, but for the
16   most part I heard her testimony.
17   Q    Well, did you ever hear Jude testify that any money --
18   I'm not saying that she testified truthfully, but that any
19   money she gave Rose was given to her as income?
20   A    She did not use the words "I gave this to her as
21   income."
22   Q    Didn't she say I gave the money to Rose and she promised
23   she would return it?
24   A    She stated that the money was given for cleansing, it
25   was to be kept in a safe place, and that in the end when the
```

```
 1    negativity was cleared, the money would come back to her.
 2    Q    While we may dispute some of that, there was no
 3    testimony by her that the money she gave to Rose was given to
 4    her as income?
 5    A    Yes, and she also testified that she's not an
 6    accountant, and she doesn't understand accounting.  She was
 7    here to explain the purpose of the money.
 8    Q    That's fine.
 9    A    But you're correct.
10    Q    I'm not an accountant, and I don't understand it either.
11    A    I think you studied accounting, you said.
12    Q    I did, but I did badly.
13            So as I understand it, if we accept her testimony
14    in all or part, then none of the money that she gave to Rose
15    in 2005, in 2006 or 2007 would be treated as income unless it
16    was stolen from her, is that fair?
17    A    Income, unless it's specifically excluded under code, is
18    taxable.  So in the situation as she described it, that would
19    be taxable income.
20    Q    And it would be taxable income not because it's earned
21    income, although Rose contends, and she told her accountant
22    in a number of years, and we saw that in various letters,
23    that at least part -- withdrawn.  I'm getting convoluted.
24            We saw in the 2003 letter written by Mr. Van
25    Vorst's office to Rose, that Rose treated part of the money
```

```
 1   she got from Jude as income and part of it as loans; is that
 2   correct?
 3   A    Are you -- you're talking about the letter for the 2001
 4   tax year?
 5   Q    Correct.
 6   A    She stated that $300,000 was a loan.  That's what the
 7   letter says.
 8   Q    And the $183,000 roughly was income; is that correct?
 9   A    That's what the letter states.
10   Q    And she -- and the accountant, based on that, reports
11   $183,000 roughly as income?
12   A    Yes.
13   Q    Okay.  So at least Rose's position as shown by her
14   accountant was a significant portion of the money she got
15   from Jude in that year was a loan, and another portion of it
16   was income?
17   A    That's what she told her accountant, yes.
18   Q    And that's what her accountant filed on her return for
19   that year?
20   A    That -- yes, because that's what the client represented
21   to him, correct.
22   Q    And Rose told her lawyer slash tax preparer for the
23   previous year, for the tax year 2000, that about $474,000
24   that she got from Jude was a gift; is that right?
25   A    That paper that was shown states that in parentheses,
```

1    gift, not income.  That's what is shown on the paper.

2    Q    And there's also a letter from Mr. Vogel which says

3    you've assured us that there's a gift, and the gift tax

4    return has been filed?

5    A    Yes, but I haven't seen any evidence that that paper was

6    prepared by Mr. Vogel.  I saw the letter from Mr. Vogel, and

7    I saw the paper listing incomes, but it doesn't say on there

8    that that's prepared by Mr. Vogel.

9    Q    Well, let's take a major leap.  This letter was found --

10   this schedule was found with Mr. Vogel's letter in a

11   search -- in a box labeled Rose Marks, whatever records for

12   certain years, and it says on top of it:  "The following

13   financial information was accumulated in the process of

14   preparing the Marks' 2000 tax returns."

15            Is that true?

16   A    That's true, but if you look at the letter, it's dated

17   October 2001, which would be when the -- if it's on

18   extension, when the 2000 return would be prepared.  And you

19   can put the letter, but I believe it says you told us not to

20   prepare your tax returns, so we're closing our files.

21   Q    Correct, not to go further.  But would that indicate

22   that even if they closed their file and somebody else did the

23   return, the document was prepared by Mr. Vogel?

24   A    I don't know who prepared that document.

25   Q    Okay.  We'll be here a while.

```
 1              But this is consistent, the report here, gift not
 2    reported as income, gift not reported as income, is
 3    consistent with the statement number, I think six, five or
 4    six in Mr. Vogel's letter; is that right?
 5    A    Yes.
 6    Q    Okay.  And let me go back to what I said before.  Do you
 7    have any evidence from Jude Deveraux's testimony, whether we
 8    believe it all or not, that any of this money that she paid
 9    to Rose was paid as earned income?
10    A    Yes, I do have evidence from her testimony that it was
11    income to Ms. Marks.
12    Q    I didn't say income to her.  I said earned income.
13    Income in the form of payments for services, let me put it
14    that way.
15    A    She did not testify that it was payment for services.
16    To the contrary.
17    Q    She said something else.
18              So the only way we can construe this money as
19    income to Rose, if we believe Ms. Deveraux, is if we say that
20    it's money obtained through fraud; is that fair?
21    A    Whether or not it's obtained through fraud, if it's
22    money that is not specifically excluded under any other code
23    section, loan, gift, any of the other items I said, it's
24    income.
25    Q    Well, Mrs. Marks has indicated through the information
```

1    we see from her accountants, that some of Deveraux's money is

2    a loan and some of Deveraux's money is gift, and some of it,

3    which is reported on her returns, is income, is that a fair

4    statement?

5    A    That's the information based on those letters that was

6    provided to the accountants, yes.

7    Q    So if Deveraux's money is a loan to Rose, then it comes

8    under a specific exclusion in the Internal Revenue Service of

9    the Department of Treasury's regulation, doesn't it?

10   A    Yes, but just as I did not hear her testify that it was

11   for services, she did not use the words "taxable income," she

12   also did not use the word "loan."

13   Q    I understand.

14        I'm saying based upon the letters and information

15   from Rose's accountant, if it's a loan it's excludible from

16   income tax; is that correct?

17   A    If you're asking me if somebody receives a loan, is that

18   excludible?  Yes.

19   Q    Okay.

20   A    But it wasn't the accountant's position.  That was

21   information provided by the client.

22   Q    So if it's Rose's position that this is a loan, and that

23   position is truthful, then that's excludible from income tax;

24   is that correct?

25   A    If that -- that position is not, in my opinion,

```
 1   supported by the witness testimony.
 2   Q    Well, I think it's the jury's opinion that's going to
 3   count, not your opinion, isn't it?
 4   A    Absolutely.
 5   Q    So let's talk about what the law and the rules are and
 6   not what your opinion is.  Is that okay?
 7   A    That's fine.
 8   Q    Am I think too obnoxious?
 9   A    No, you're being about the same.
10   Q    As I usually am.
11   A    Yes.
12   Q    Okay.  I agree.
13            And, again, I was told never argue with a revenue
14   officer or agent.
15   A    Or a woman.
16   Q    Well, my wife tells me that regularly, and I ask her if
17   a tree falls -- I'm sorry -- if a man says something and
18   there's no woman around, is he still wrong, and she says,
19   yes.
20            But let's forget the homilies and let's talk about
21   the law, not opinion.  Okay?
22   A    Okay.
23   Q    If Rose is correct and some of the money from Jude was a
24   loan, that money wouldn't be taxable as income, would it?
25   A    A loan is not taxable.
```

1    Q    Okay.

2    A    However, just so that we follow it through, a loan that

3    is never repaid and is forgiven does become taxable income as

4    cancellation of debt.

5    Q    Do you think Jude forgave this loan?

6    A    I don't believe it was -- she said it was a loan, so it

7    wouldn't be forgiven.

8    Q    Okay.  So that's not relevant, is it?

9    A    Well, you said you wanted to talk about law.

10   Q    Okay.  Now, similarly, a gift.  We saw in her letter, in

11   the letter from her lawyer, tax preparer, and in the schedule

12   that he may or may not have prepared, that she believed -- or

13   she stated that some of these payments from Jude was gifts;

14   is that correct?

15   A    That's what the letters state, yes.

16   Q    A proper gift is also one of those items that, under the

17   Internal Revenue Service of the Department of Treasury's

18   regulation is excludible from income; is that true?

19   A    Gifts are not taxable to the recipient, correct.

20   Q    So with those two legal theories as our bases, the only

21   way that these monies would be taxable is under the statement

22   that Mr. Stefin brought out from you earlier in direct

23   examination, if the monies were as a result of a fraud, then

24   there's a tax responsibility on those monies; is that right?

25   A    If the monies were as a result of a fraud, if they were

```
 1    for services rendered, if they were paid for any other reason

 2    not excluded, they are taxable income.

 3              MR. SCHWARTZ:  Your Honor, I'm sorry, I don't want

 4    to be guilty of arguing with a revenue officer or agent.

 5    Could Your Honor direct her to answer the questions?

 6              THE COURT:  Could you just answer his question,

 7    please?

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  Thank you.

10    BY MR. SCHWARTZ:

11    Q    So let's look to the indictment in this case.  Have you

12    seen it?

13    A    I read it a while ago.

14    Q    Okay.  Rose is charged with certain conspiracy counts,

15    and she's charged with mail fraud and wire fraud counts.

16    Money laundering is a separate matter, but as to the question

17    of fraud or whether she obtained this money fraudulently, the

18    jury would have to believe that Rose is guilty of the fraud

19    to also believe that she's guilty of getting -- failing to

20    pay taxes on income, is that fair?

21              MR. STEFIN:  Objection.

22              THE COURT:  Sustained.  Rephrase your question.

23    You're asking for a legal conclusion.

24    BY MR. SCHWARTZ:

25    Q    I'm going to show you count 1A in the indictment.  And
```

```
 1    forgive me, I've highlighted it.
 2            The indictment charges that Rose Marks confederated
 3    and conspired with other people, that's the conspiracy, to
 4    knowingly and with intent to defraud -- knowingly, and with
 5    intent to defraud, devise and intend to devise a scheme or
 6    artifice to defraud, and to obtain money and property from
 7    others by means of material false and fraudulent pretenses,
 8    representations, promises, and omissions of material facts,
 9    and for the purpose of executing and attempting to execute
10    the scheme and artifice to defraud and cause a matter or --
11    I'm sorry.  She did cause a matter or thing to be delivered
12    by the U.S. Postal Service and by private or commercial
13    interstate carriers.
14            Have you read that before?
15    A    Yes.
16    Q    Okay.
17    A    This is a Title 18, it states.
18    Q    Correct.
19    A    Income tax is Title 26.
20    Q    I realize that.
21    A    Okay.
22    Q    And I thank you for the information, but in order for
23    Rose to be under the scenario we discussed earlier, if
24    certain payments by Jude were gifts and certain payments of
25    Jude were loans and certain payments of -- by Jude were
```

```
 1    payments for services that were declared on her returns, in

 2    order for her to be guilty of filing a false tax return, the

 3    jury would also have to believe that Rose was guilty of

 4    fraud; is that correct?

 5                MR. STEFIN:  Objection.

 6                THE COURT:  Sustained.

 7    BY MR. SCHWARTZ:

 8    Q    You stated earlier that if -- withdrawn.  I'll leave

 9    this for argument at the end of the case.

10                Let's talk about your chart, Government

11    exhibit 722.  Did you prepare that?

12    A    Yes.

13    Q    Now, you labeled your chart unreported income.

14    A    Yes.

15    Q    But we've discussed whether all of these amounts are

16    income or not, haven't we?

17    A    We've discussed it?  I'm not clear about the question.

18    Q    We've already determined that if some of this money is

19    loans and some of this money is gifts, then it would be

20    excluded under the Internal Revenue Service of the Treasury

21    Department's regulations as income, right?

22    A    We stated that gifts and loans are not taxable income.

23    Q    Okay.  Well, let's look to the relevant years.

24                Again, whether we believe her or not, you have in

25    your schedule that Jude gave in 2006 1,310,858.34, not
```

```
 1    rounded, to various accounts which you are suggesting are for

 2    Rose; is that right?

 3    A     Yes.

 4    Q     And Deanna Wolfe gave $6000?

 5    A     Yes.

 6    Q     As to those specific sums of money, did either Jude or

 7    Deanna Wolfe testify that those were payments to Rose for

 8    services rendered?

 9    A     No.

10    Q     Okay.  And let's look at the specific tax year 2007.

11    You totaled up here that Jude and Deanna, between them, gave

12    to Rose $2,239,615.  I'm sorry, that was Jude.  And $30,000.

13    I guess I don't have to round either of those.

14            Did you hear in your presence in the courtroom

15    either of them testify that those were payments to Rose for

16    services?

17    A     No.

18    Q     Did you hear testimony this morning from accountant Van

19    Vorst?

20    A     Yes.

21    Q     Did you hear testimony that because of Rose's husband's

22    illness and her grieving, et cetera, for her husband's death,

23    that she told them she didn't work in 2006 and 2007?

24            MR. STEFIN:  Objection to the form of the question.

25            THE COURT:  Overruled.
```

1           THE WITNESS:  What I heard from his testimony is

2    that she told him that there was no activity in 2007 and

3    2008.  I don't specifically remember that he said it was due

4    to grieving.

5    BY MR. SCHWARTZ:

6    Q    Was that 2006 and 2007?  Or 2007 and 2008?

7    A    There was no tax return filed for the corporation for

8    tax years 2007 and 2008.

9    Q    I understand, but I'm talking about whether Rose said

10   because her husband's illness and traveling to hospitals and

11   him passing away and then her attitude afterwards, that she

12   didn't do work in those years.

13   A    Well, she did do work in 2006 because Joyce Michael,

14   Inc. filed a form 1120S.

15   Q    Right.  And what did it show?

16   A    For gross receipts?

17   Q    Yes.

18   A    $93,803.

19   Q    Forgive me.  She didn't do substantial work in those

20   years.

21   A    The part that I'm not clear on is I don't remember

22   specifically Mr. Van Vorst saying that she told him due to

23   grieving she wasn't doing work.

24   Q    Okay.  Then I'll withdraw that part of the question.

25           Do you know what, if any, part of the money from

1    Jude in 2007 was a loan or gift?

2    A    Based on her testimony, none of it was.

3    Q    And do you believe all of her testimony?

4    A    I found her testimony to be credible, yes.

5    Q    You did?

6    A    Yes.

7    Q    Okay.  Now, in your analysis for the years that we're

8    not specifically concerned about for taxes, you listed, for

9    instance, in 2009, Gary Tschetter for $240,000.

10   A    Yes.

11   Q    And in 2010, you listed Gary Tschetter for another

12   $11,900; is that right?

13   A    Yes.

14   Q    Do you know if Gary Tschetter's money to Rose was a

15   loan?

16   A    Not based on his testimony.

17   Q    Well, his testimony, I suggest, was that he gave her the

18   money and she promised she would return it; is that right?

19   A    Yes, but he didn't state he gave it to her as a loan.

20   He stated that he gave it to her for the cleansing and for

21   the negativity.

22   Q    Did he ever say cleansing -- I'm sorry.  I talked over

23   you.

24          Did he ever say he gave her money for cleansing?

25   A    I don't specifically recall if he used those words, but

1    he said that the money was given, it was to be kept in a safe

2    place because of the negativity, and then it would be

3    returned to him when the work was done.  He may not have

4    specifically used cleansing.  I apologize if I said that

5    incorrectly.

6    Q    Okay.  And didn't he testify that at some point in 2009

7    he asked for some of that money back?  I'm sorry, 2010, he

8    asked for some of that money back.

9    A    He asked for money back.  He said he had to -- he needed

10   money back for business purposes, yes.

11   Q    And that money was returned?

12   A    Part of the money was returned.  He got a payment in

13   2010 and another payment in 2011.

14   Q    And you reflect those on your schedule?

15   A    I reflect the repayment in 2010, of course.

16   Q    And do you remember also that on his cross-examination,

17   he said that he didn't ask for the remainder of his money

18   back until after Rose had been arrested and the Government

19   had seized her assets?

20   A    That he didn't ask for the remainder until after -- no,

21   I don't recall that.

22   Q    Okay.  Well, that will be in the recollection of the

23   jury.

24   A    Okay.

25   Q    But how is that different from a loan?

```
 1   A     It's quite different.  He didn't go to Rose to make a
 2   loan based on his testimony.  He went there for psychic
 3   services, he paid some initial services, he was told that he
 4   needed to give some money for the work that would be held and
 5   then be returned to him.  He never stated it was represented
 6   to him that, make a loan to me and I'll pay you back later.
 7   That was not part of his testimony.
 8   Q     Well, if I say to you, give me some money and I'll
 9   return it to you later, is that taxable income?
10   A     If you ask me for a loan and I give you a loan, it's not
11   taxable income to you unless you default.
12   Q     And if I say, give me money and I'll return it to you
13   later, and when you ask for money I start returning it to
14   you, how is that income?
15   A     When a loan is made, the courts are specific that there
16   are certain characteristics that a loan has, and I would say
17   the first one is that both parties have to consider it a
18   loan.  If both parties do not consider it a loan, then it's
19   not a loan.
20   Q     And where did you go to law school?
21   A     I did not.
22   Q     Okay.
23   A     But I do have to cite court decisions in my cases.
24   Q     Okay.  So you're saying that when Gary Tschetter gave
25   her some money for services, as she says Jude did, and some
```

```
 1   money which she promised to return, and she did, in fact,

 2   return the money when he asked for it, that's not a loan?

 3   A    It's not a loan based on his testimony.

 4   Q    Were you here for Andrea Walker's testimony?

 5   A    Yes, I was.

 6   Q    And Andrea Walker is an attorney, isn't she?

 7   A    Yes, she is.

 8   Q    And she gave certain money to Jude, didn't she?  To

 9   Rose, forgive me.

10   A    Yes.

11   Q    And you listed on your schedule of unreported income,

12   Government's exhibit 722, in the years 2009 and 2010, a total

13   of $263,904 to Andrea Walker in '09, and -- from Andrea

14   Walker in '09, and $555,862.51, not rounded, in 2010.

15   A    Yes.

16   Q    Okay.  Now, here, Andrea Walker drafted a note,

17   promissory note, didn't she?

18   A    She -- yes, she drafted a note.  She testified that she

19   wanted to in some way memorialize the monies.

20   Q    Okay.  She drafted a note.  The note was to be repaid at

21   the end of the year without interest, or if it couldn't be

22   repaid at the end of the year, it would bear interest

23   thereafter; is that correct?

24   A    The note would bear interest if it were not repaid, yes.

25   Q    How is that not a loan?
```

```
 1   A     Based on her testimony, those monies were not intended
 2   to be a loan.  The way I understood it from her testimony,
 3   that that note was drawn to memorialize the funds, that it
 4   was getting to be such a large amount of money, she wanted to
 5   memorialize it in some way.  She did testify that that's not
 6   her area of law, as far as notes.  Based on her testimony, it
 7   was not a loan.
 8   Q     She -- you said that she said it was getting to be so
 9   big, the first monies she gave, she gave to Nancy Marks,
10   right?
11   A     Yes.
12   Q     She was originally Nancy Marks' client, right?
13   A     Yes.
14   Q     And then the type of problem she had changed a bit,
15   correct?
16   A     Her problems expanded exponentially, yes.
17   Q     First, her problems were she wanted to get back with her
18   husband, and she was worried about him dying; is that fair?
19   A     Yes.
20   Q     And subsequent to that, she found out that her husband
21   entered into a contract with a lady to have his baby after he
22   died, and she (sic) had cut her out of the will; is that
23   correct?
24   A     Yes.
25   Q     And she said Rose was different than Nancy.  Rose wasn't
```

1    taking money to cleanse it and take curses off it and return

2    it.  Rose was interested in getting the papers from the

3    lawyers, getting the papers from the solicitor -- from the

4    estate, and praying and meditating regarding those

5    situations; is that a fair characterization?

6              MR. STEFIN:  Objection, Your Honor.

7              THE COURT:  What's the objection?

8              MR. STEFIN:  Relevance.

9              THE COURT:  Relevance?

10             Can we talk up here, please?

11        (The following proceedings were held at sidebar:)

12             THE COURT:  Here's the problem.  If your summary

13   witness would just come up here and say these are the numbers

14   and then, we wouldn't have -- we wouldn't be needing to deal

15   with this.  But your witness, rather than just saying what

16   the numbers are, she's giving opinion testimony and

17   conclusory testimony and basing her testimony on her

18   interpretation of the evidence and how the evidence should --

19   the jury should find the evidence, so that it gives him the

20   opportunity to challenge her theories behind the numbers that

21   she's coming up with.

22             She's drawing conclusions that these are not loans.

23   She's drawing conclusions that this is not income.  She's not

24   just saying what the numbers are.  So if she's going to say

25   this is not a loan, this is the income, this is taxable, this

```
 1   isn't taxable, then he should be allowed to challenge her

 2   underlying basis for her conclusions.  But she's not doing

 3   that.  She wants to be an advocate up there.  She wants to,

 4   you know, stick it to him.  Every time he says something and

 5   makes a point, she's got to come back with the thing -- the

 6   advocacy and start being a lawyer and arguing closing

 7   argument up there as a witness.

 8           MR. STEFIN:  But these are in response to the

 9   questions the defense counsel has asked.  And correct me if

10   I'm wrong, but I didn't ask her for any of these opinions as

11   far as whether this constitutes a loan or whether -- you

12   know.  So I don't know if the defense can bootstrap -- first

13   of all, he asked her these questions, you know, and argues

14   with her about whether it would be a loan or not.  She has

15   her opinions about that, but these are the questions he

16   asked, and now he wants to review every piece of testimony

17   with the --

18           THE COURT:  Yeah, but the problem is you like her

19   answers when she's -- you know, she's giving your side of the

20   story, hey, that's fine, I'll let her testify.  And as soon

21   as it gets a little touchy going the other way, well, I'm

22   going to object, it's not relevant.  I mean, she opened the

23   door to this, so I'm going to let it go.

24           She should have been just up here and say, that's

25   what the numbers add up to, that's what I found in the bank
```

```
 1    accounts, and that's how I categorized it.  And if she left

 2    it at that, I'd say we're wasting time, Mr. Schwartz.

 3               She's being an advocate.

 4               MR. STEFIN:  Well, so my mistake was not objecting

 5    from the get-go to just cut this off, but I understand.

 6               THE COURT:  Yeah, because it was working in your

 7    favor.  You liked the answers when she was saying --

 8               MR. STEFIN:  No, I wouldn't say that.

 9               THE COURT:  Sure you would.  So you were going to

10    let it go as long as it was helpful to you.

11               So overruled.

12         (Sidebar conference concluded.)

13               MR. SCHWARTZ:  I'm sorry, could you read me back

14    the last question and answer?

15         (The court reporter read back the requested portion of

16    the transcript.)

17    BY MR. SCHWARTZ:

18    Q    Okay.  Do you want to answer the question?

19    A    She did testify that Rose was different, that Rose

20    wanted to see the papers and ask for the will.  Yes, she did

21    testify to that.

22    Q    And virtually at the inception of Rose starting to work

23    with  her, Rose asked for a hundred thousand dollars; is that

24    right?

25    A    I believe so, yes.
```

1    Q    And at that point, Andrea said, let's have a note that

2    requires you to pay me back the hundred thousand and any

3    additional funds that you get from me in the future?

4    A    I don't recall if the note was drawn up right at that

5    point, but I do recall that it said this amount plus a future

6    funds, yes.  If it was done at that exact time I don't

7    recall.

8    Q    Would that type of note qualify as a loan under the

9    rules of the Internal Revenue Service?

10   A    If it was a bona fide loan and the two parties

11   understood it to be a loan, then yes.

12   Q    Now, let's talk about some other numbers that you dealt

13   with on direct examination.  Let's talk about Government's

14   exhibit 715-1.  Those are the Jude Deveraux payments to Rose

15   and to other people.

16        Did you hear the testimony of Mr. Van Vorst earlier

17   today?

18   A    Yes.

19   Q    Did you hear me ask him, did you discuss with Rose, did

20   she ask you or did you tell her whether payments to third

21   parties were taxable to you as income?

22   A    Yes, I did.

23   Q    And did you hear him say he never discussed that?

24   A    Yes.

25   Q    And you know that Rose never went past third grade; is

 1    that correct?

 2    A    I have heard you state that.  I don't know it for a

 3    fact, but I have heard you state that.

 4    Q    And, again, the payments to Wolofsky or to Atlas or to

 5    buy gold or for Victoria Eli, Victoria Somers, to Donnie Eli,

 6    to Joyce Michael, do you have any testimony from the payor,

 7    Jude Deveraux, that these were payments to Rose for services?

 8    A    No.

 9    Q    Okay.  There was some question raised by Mr. Stefin

10    regarding the letter that Rose wrote to her accountant

11    saying, I believe that it was -- that for a period of time

12    she didn't have a bank account.

13    A    The letter that Rose wrote to her accountant?

14    Q    The letter that the accountant wrote to Rose

15    commemorating the fact that for a period from January, I

16    believe through May, and I forget the tax year, that she

17    didn't have a bank account.

18    A    Yes, I think it was the 2002 tax year.

19    Q    We then referenced your schedule, and I believe that was

20    a schedule marked Government's exhibit 715-1, and starting at

21    the bottom of page 2 and going on to page 3, between January

22    and May of that year, are there any payments from

23    Ms. Deveraux to any bank account of Rose Marks?

24    A    No.  And I testified that I didn't see in our records an

25    account for her for that time period.

```
 1    Q    Now, we're clear that even if a taxpayer loses a million

 2    dollars a year, if they only get income of 200,000 from

 3    gambling and they lose a million, they can only deduct

 4    200,000?

 5    A    Correct.

 6    Q    So for somebody who lost more than they won, it's not

 7    unreasonable, and, as a matter of fact, it's following the

 8    IRS code, that the loss would be equal to the revenue from

 9    gambling?

10    A    Right.

11    Q    Okay.  And were you here when the folks from the casino

12    came in and testified about Rose's wonderful gambling record?

13    A    Yes.  Tracy?

14    Q    Yes.  And Tracy testified that at least over a period of

15    a few years, Rose was losing an average -- I don't say any

16    particular year, but an average of about 150,000 a year?

17    A    Yes, she had the schedule for the players card, and then

18    I think that you averaged it out and you said it was about

19    150 per year.

20    Q    Well, she lost about $600,000 more than she won over a

21    four-year period.

22    A    Correct, based on the player card records, yes.

23    Q    Right.

24         And then there was some question about whether the

25    card properly reflects or doesn't reflect winnings or
```

```
 1   losings, but do you have any evidence -- withdrawn.

 2            Have you testified in -- before this jury as to any

 3   evidence that Rose misstated her winnings or losings on her

 4   tax returns?

 5   A    For gambling?  No.

 6   Q    Okay.  Then can I ask -- withdrawn.

 7            You talked about how in one particular year her

 8   account was audited.

 9   A    Yes.

10   Q    And you told us how random audits occur.

11   A    They're not random.

12   Q    Okay.  How audits occur based on certain factors that

13   the computer recognizes?

14   A    Right, from being scored, yes.

15   Q    Can you tell us how to avoid those audits?

16   A    I guess file your tax return as accurately as possible.

17   Q    But if I gamble a lot -- and I don't.  But if I did and

18   I filed it accurately, I still could be subject to an audit?

19   A    You know, we're not told how those --

20   Q    I'm --

21   A    -- returns are scored.

22   Q    This really isn't relevant, so let me withdraw the

23   question.  I'm sorry.

24   A    Okay.  Okay.

25   Q    Now, do you know or did your investigation reveal
```

1    whether, in the early 2000s, Jude cashed in a retirement

2    account?

3    A    I don't know about that.

4    Q    Okay.  And you don't know whether she gave Rose the

5    retirement account as a gift, do you?

6    A    No, I don't.

7    Q    Okay.  Jude testified that she sold some houses?

8    A    Yes.

9    Q    Do you know if she gave the proceeds of the sale of

10   those houses to Rose as a gift?

11   A    No.

12           MR. SCHWARTZ:  May I have a moment, Judge?

13           THE COURT:  Yes.

14           MR. SCHWARTZ:  I have no other questions, Judge.

15           THE COURT:  Thank you.

16           Any redirect?

17           MR. STEFIN:  No redirect.

18           THE COURT:  Thank you.

19           THE WITNESS:  Thank you.

20           THE COURT:  Ladies and gentlemen, it's really too

21   late in the day to start another witness, so we're going to

22   recess for the evening.

23           Let me just kind of give you some scheduling

24   information.  I know that you've been asking about how much

25   longer the case is going to go.  We expect, and these are

```
 1   just estimates, and I can't guarantee you that this is going

 2   to be the way it plays itself out, but we're expecting the

 3   Government to rest its case tomorrow, sometime tomorrow.  I'm

 4   not sure exactly when, but hopefully by -- before the end of

 5   the day the Government will finish putting on its witnesses,

 6   and then we'll go to the defense case, which, again, these

 7   are estimates, is going to take three or four days of

 8   additional testimony from the defense.

 9            So we're looking at, hopefully, the end of next

10   week finishing with the evidence, and then we're going to

11   have closing arguments, which is going to take half a day

12   probably, if not a little bit more, and then it's up to you,

13   how long you take to deliberate.

14            So that gives you some idea of where we are.

15            All right.  So if we could see you tomorrow at

16   9:00, have a pleasant evening, and thank you for your

17   patience.

18       (The jury exits the courtroom.)

19            THE COURT:  All right.  Thank you, Agent.  You can

20   step down.  Watch your step.

21            I guess we had some issues we wanted to talk about?

22   What was it about the attorney/client issue, if he calls the

23   lawyers, if he calls the lawyers for some of the

24   Codefendants, is that going to open the door to waiver of the

25   attorney/client privilege, I guess that's one issue; and what
```

```
1     other issues do we have to talk about?

2          MR. SCHWARTZ:  Your Honor, I think that's the only

3     other issue other than questions about whether I can call

4     Kelly Cook and talk -- question her, and how far I can go

5     regarding my allegations of Government misconduct on the

6     defense case.

7          THE COURT:  Okay.  Well, I fail to see any

8     relevance to calling Agent Cook.  What is the relevance to

9     the case of calling Cook, to say that she may have either

10    intentionally or accidentally put a false statement in an

11    affidavit.  Was it an affidavit for a --

12         MR. STEFIN:  Search warrant.

13         THE COURT:  -- for a search warrant for

14    tape-recordings or -- that represented what was on

15    tape-recordings or mistakenly or falsely represented what was

16    on tape-recordings for a search warrant that -- what does

17    that have to do with the evidence that's been presented by

18    the Government?

19         MR. SCHWARTZ:  I want to be clear, Judge.  I don't

20    think Kelly Cook did that intentionally, and I think that the

21    senior members of the investigative team gave her a search

22    warrant with information in it, an affidavit, and told her to

23    sign it, and she signed it.  I don't think she knew that

24    there were facts in there that were clearly -- that were

25    misstated.  But there were facts in there that were
```

```
 1    misstated, and she basically acknowledged it when she was

 2    here the other day testifying.

 3              The search warrant said, the affidavit said that

 4    the Defendants took money, offered to cleanse it and gave

 5    it -- and promised to give it back, they never returned it,

 6    and it said that undercover officers -- and I'm paraphrasing,

 7    but undercover officers were utilized to verify this, they

 8    made calls, and these facts were verified.

 9              The truth is that the undercover agents called two

10    of the defendants, not my client, or three of the defendants,

11    and they did not get that kind of conversation from them.

12              I have suggested that that was the theme of the

13    investigation and that many of the witnesses -- and this is

14    where we got into our discussion last night -- many of the

15    witnesses came to the agents without saying cleanse or

16    cleanse and return, and that they were influenced by the

17    agents into saying that.  I've said I can't prove it, Judge,

18    because, as I said in our submission, the early conversations

19    with these witnesses were not memorialized.

20              For instance, the ones you asked for, Sylvia Roma,

21    said that she called and had a conversation, I believe, with

22    the Fort Lauderdale police, and on or around August 16th, the

23    first time that Ms. -- I'm drawing a blank -- Ms. Watts, who

24    I've seen every day for the last almost four weeks, talked to

25    her or corroborated or talked about her story, was in
```

1    October, about a month and a half after the first

2    conversations, and even then she doesn't say anything about

3    cleansing the money in the first report, which was given to

4    Your Honor.  Now, in court, Sylvia Roma talked about taking

5    the money and cleansing it.

6           I want to try, and Your Honor will either let me or

7    not let me, and I get the drift of what Your Honor's going to

8    do, I want to try to argue to the jury that at least as to my

9    client, and since the others are charged with her in a

10   conspiracy, as to the others, that other than one witness,

11   Jennifer Hill, this cleanse and return language didn't exist

12   until the Defendants -- the victims talked to the Government.

13   And I want to impeach their testimony about, I'm going to

14   cleanse the money of curses and give it back to you by

15   showing a series of Government acts creating this cleanse and

16   return falsehood.  I'm calling it a falsehood.

17          Including having up to four people who didn't

18   testify in the grand jury and who weren't interviewed before

19   the grand jury indictments were -- first and second

20   indictments returned, but having manners and means clause in

21   the indictments which said these people promised or promised

22   that their money would be taken, it would be cleansed of a

23   curse and returned, and it was never returned.

24          That language appears in the first and second

25   indictment as to John Cleary, as to somebody named CC whose

```
 1     name I could never pronounce, as to Nicole -- rather than

 2     using names, ND, and another witness.

 3             That's made up.  That's fiction that was put in

 4     indictments to perpetrate this theory of prosecution.  I

 5     think I should be able to tell the jury in order to impeach

 6     the credibility of the witnesses here, that the prosecution

 7     fictionalized two indictments.  And I think there are

 8     findings by magistrates that the prosecution -- that those

 9     facts were in indictments when witnesses were never

10     interviewed before the indictments were returned.  And the

11     other items, Judge.

12             THE COURT:  But I'm having trouble understanding

13     how possible problems that existed with other alleged victims

14     affects the victims or alleged victims or witnesses that

15     actually testified where these issues don't come up.  I mean,

16     I don't see the connection.  Because they planted in the idea

17     of Witness A, this idea of cleansing, who is not testifying,

18     or they got an indictment that alleged that A was a victim of

19     a fraud based upon this cleansing idea, when that wasn't

20     true, how does that affect another witness who doesn't have

21     that same issue?

22             MR. SCHWARTZ:  Judge, and you're going to perhaps

23     think that I'm being unduly repetitious or frivolous or

24     whatever, but if I had the initial reports of interviews, I

25     could impeach these witnesses with those initial reports of
```

```
 1    interviews, assuming they were proper.  I don't have them.

 2    They don't exist.  We don't know what was said in the initial

 3    interviews of the witnesses who are before us.

 4          My only other way to impeach these witnesses and

 5    try to show the jury that the Government has a pattern of

 6    making up facts regarding cleansing money and returning it is

 7    to show that in two indictments they made up those facts and

 8    in this affidavit they made up the facts that Nancy and Rosie

 9    said that, when they didn't say it, and in other instances

10    they've made up these facts.

11          How else, absent having reports, to at least see

12    what they say, can I show that -- can I try to impeach the

13    witnesses we have who were not the original witnesses as to

14    the credibility of these facts?

15          THE COURT:  I guess you're assuming that your

16    theory is correct.

17          MR. SCHWARTZ:  Well, the only --

18          THE COURT:  And you're saying the only way I can

19    prove it is by showing alleged misconduct over here, on the

20    assumption that it actually happened that way.

21          MR. SCHWARTZ:  Well --

22          THE COURT:  Maybe you can't impeach it because it

23    didn't happen that way.

24          MR. SCHWARTZ:  And that might be the case, and the

25    jury might -- and Mr. Stefin can argue it didn't happen that
```

1    way.  But I do have facts, proof, that it happened that way

2    at least in two very sacred documents, two documents that

3    come down to us from the Magna Carta, that two indictments

4    that are supposed to be pure and based on facts, and were

5    based on pure fiction.  If it was put in there, and if there

6    was statements given to this nice young agent to swear to,

7    also corroborating those type of facts, which weren't true,

8    then the jury, I suggest, is entitled to believe that these

9    witnesses were also poisoned in that manner.  Whether they'll

10   believe it, or not I don't know.

11           THE COURT:  All right.  Mr. Stefin?

12           MR. STEFIN:  Judge, where do I begin?

13           What the Defendant wants to do, defense lawyer

14   wants to do is basically call Government witnesses to try to

15   impeach them and impeach the integrity of the Government's

16   case, the Government's investigation, as to matters that have

17   nothing to do with the evidence that was presented, as the

18   Court is well aware.

19           He wants to call Ms. Cook to confront her with a

20   statement in an affidavit on a search warrant which she would

21   probably concede contained a sentence or two that was

22   inaccurate.  So it has nothing to do with the testimony

23   that's been presented in this case.

24           Defense counsel has talked about these multiple

25   indictments so many times, and I've listened to this

```
1    patiently.  The Government filed a superseding indictment
2    because there was some factual inaccuracies in its first
3    indictment.  He talks about two indictments containing
4    falsehoods.  We filed -- the Government filed an indictment,
5    and before the Defendants were arrested, the Government filed
6    a superseding indictment to amend some facts in the case.  So
7    it was the same indictment.  So those are two indictments
8    before the Defendant was arrested.
9            After the Defendants were arrested, there were some
10   factual inaccuracies which were detected.  So a superseding
11   indictment was filed to eliminate those factual inaccuracies.
12           There were a couple of additional superseding
13   indictments, but that was to add new victims who came to
14   the -- came to our knowledge subsequent to the indictment.
15   And then finally, the final indictment was filed superseding
16   because the other Defendants had pled guilty and the
17   Government decided it was going to add the two tax charges.
18   So we filed the superseding indictment to add tax charges and
19   to eliminate the names of the other Defendants who had
20   already pled guilty.
21           So all this about multiple indictments and the
22   Government trying to cover up something is completely
23   misleading, and it should not be a road that the defense is
24   allowed to go down.  You know, if there was a factual
25   inaccuracy in a search warrant, that's a question of law for
```

1   the Court, and there are appropriate motions and sanctions if

2   such a thing had happened, and that's a question of law, and

3   that's not for a jury determination when it has nothing to do

4   with the evidence presented or the admissibility of the

5   evidence presented.

6          So this is just -- again, and I don't mean to be

7   disrespectful to the defense counsel.  It's a longstanding

8   smoke screen where he basically wants to try to put the

9   Government on trial, whether it's Detective Stack,

10  allegations of misconduct, or Ms. Cook, which he concedes was

11  probably an inadvertent mistake, or inaccuracies in earlier

12  indictments which are not before this jury, and that just

13  should not be part of this case.

14         THE COURT:  All right.  Well, I tend to agree with

15  the Government.  I really don't see any basis for getting

16  into having Agent Cook testify.  I think that would be

17  completely irrelevant and inappropriate.  I can see some

18  potential basis for having Stack testify, but I'm not sure

19  what I -- in my mind what would be permissible is what the

20  defense wants to do, or I certainly wouldn't -- is not going

21  to go as far as what the defense wants me to allow her to go.

22  I think --

23         I mean, I'll ask the Government if you disagree.  I

24  think they should be allowed to call Stack to ask why there

25  weren't reports of these various other conversations and what

```
1    happened and what was said in those earlier conversations
2    to -- I think that would be permissible to suggest that the
3    testimony that was given is not necessarily accurate or
4    correct, and even to suggest that maybe Stack put the ideas
5    in the witnesses' minds about how these things went.  But
6    beyond that, I'm not sure what I would allow him to present.
7              I don't think I would allow him to go into all the
8    things that he's talking about, the indictments, and the
9    changes in the indictments and the affidavits.  But those
10   basic facts, I don't know why he wouldn't be allowed to
11   present Stack and ask him, well, how many conversations did
12   you have with Witness A?  Well, how come the first time you
13   reported it was, you know, six months later, or whatever the
14   facts were?  Some of the witnesses said they had, like,
15   45-minute conversations with him, and there were no --
16   apparently, no reports for those conversations.
17             I don't know why that wouldn't be permissible, to
18   suggest that these reports aren't necessarily accurate, and
19   he can maybe lay the foundation for Stack, you know, again,
20   planted the idea in their head.  I'm sure he would deny it,
21   and I think they're going to have to live with his answers,
22   and also, again, let the jury decide whether he's credible or
23   not in terms of his explanation of how things went.  But why
24   wouldn't -- why shouldn't they be allowed to do that?
25             MR. STEFIN:  Well, I don't know that they shouldn't
```

1    be, but I think the defense is then stuck with his answers.

2          THE COURT:  Well, that's what I just suggested.

3          MR. STEFIN:  Right.  So -- but I think what the

4    defense would want to do -- and I don't even know if they

5    still intend to call Detective Stack or not, so this might be

6    a moot discussion, but hypothetically, if they did that, and

7    they said, isn't it a fact the witness told you X, Y, and Z,

8    and you didn't put it down, they deny they were a victim and

9    you didn't write a report to that; and he says, no, that

10   didn't happen.

11         Well, sir, isn't it a fact that with respect to JC,

12   this other person, you tried to pressure him into giving a

13   statement and saying you were a victim.  And he says, no, I

14   didn't do that, and then he'll want to call JC perhaps to

15   have him testify, oh, yes, I felt Detective Stack pressured

16   me.

17         THE COURT:  Well, I don't know that that may not

18   be -- why couldn't he bring that witness in even without

19   Stack and say, isn't it true that Stack came to you and said

20   that you were a victim and you told him you weren't a victim?

21   He tried to suggest you or pressure you into being a victim.

22         MR. STEFIN:  But the whole point of that is trying

23   to say there was agent misconduct with respect -- you know,

24   with respect to the investigation then?  So that therefore

25   the jury can infer that if he did it with someone else, then

```
 1    they should conclude that maybe he did it with the victims in
 2    this case, when they have all denied it and he denies it?
 3              THE COURT:  Well, if he denies ever do doing it
 4    with any victim, I assume if he calls Stack and say, well,
 5    didn't you do that with all the victims?  No, I didn't do
 6    that with anyone.
 7              MR. STEFIN:  Right.  But I know of one individual
 8    who was the client of Victoria Eli, who, when he was
 9    contacted by phone by Detective Stack and Detective Watts, he
10    gave a statement, he then went and called the Defendant and
11    came and gave an affidavit saying that he felt that he was
12    pressured.  So now, do we have to have a mini trial on
13    whether we pressured this individual to say he was a victim
14    or not?
15              I mean, you know, again, the Court controls the
16    order and relevance of evidence.
17              THE COURT:  Well, that's what I'm saying, I think I
18    might allow that.  But in terms of getting into the
19    affidavits and the indictments, I'm inclined not to allow
20    that.  But I think he probably should be allowed to call
21    Stack and attack the lack of reports of the various
22    interviews, and if he's got someone who's going to say he did
23    plant this idea and Stack's going to deny ever doing that,
24    then maybe they can impeach him with that.
25              But that would be --
```

```
 1          MR. STEFIN:  But then they're calling him to
 2   impeach him, and that just doesn't -- case law holds that to
 3   be inappropriate.
 4          Again, if they call him to impeach the testimony of
 5   a witness who's already testified, the Court has made it
 6   clear that that's appropriate, and I don't disagree.  But if
 7   his testimony's consistent, so that really what they're
 8   trying to do is catch him in something that they can then try
 9   to impeach him with collateral evidence, that's where I think
10   case law says you can't do that.
11          THE COURT:  Well, I guess I would have to decide at
12   the time, after I've heard the testimony, whether or not I
13   would allow the impeachment of his testimony, or they're
14   going to be stuck with whatever answer he gives.  But I think
15   that I'm inclined to allow them to at least call Stack to try
16   and attack the manner in which he gathered his reports, and
17   should be allowed to suggest that he didn't -- he didn't
18   prepare the reports because he was waiting to, you know,
19   brainwash them into thinking his way, and then he prepared
20   the report.
21          I guess I don't see why they shouldn't be allowed
22   to do that, but I'm not going to allow things about Agent
23   Cook and the indictments and the various provisions of the
24   indictments.
25          Anyway, so that's where I'm -- I think I am on
```

1    that, Mr. Schwartz.

2            MR. SCHWARTZ:  Thank you for your guidance, Your

3    Honor.

4            THE COURT:  Okay.  I don't know how that affects

5    your timing on how much time you think this case is going

6    to --

7            MR. SCHWARTZ:  Since I always thought you would

8    rule that way, it doesn't affect.

9            THE COURT:  It doesn't.

10           All right.  So what else do we need to talk about?

11   What else do we need to talk about?

12           MR. STEFIN:  The Court asked a question of when the

13   report of Adrian Raley was prepared.  Adrian Raley was the

14   accountant.

15           THE COURT:  Yes.

16           MR. STEFIN:  And I think the date on the interview

17   was in March, March the 18th, or something like that.  And

18   you wanted to know when the report was prepared.  That was in

19   connection with Mr. Schwartz's --

20           THE COURT:  I don't know that I wanted to know.  He

21   wanted to know.

22           MR. SCHWARTZ:  You did.

23           MR. STEFIN:  I think you had asked me if we could

24   find out when the report was prepared.  Because the issue was

25   by Mr. Schwartz, to refresh Your Honor's recollection, that I

1    hadn't turned over Mr. Raley's report because I wasn't

2    intending to call him as a witness, and he felt that he had

3    been blindsided because the report explained that he

4    basically acknowledged that it was his mistake that he listed

5    the deductions for the payments made on Ms. Montassir's bank

6    account -- on her tax return, he put it in Schedule A as

7    opposed to treating it in some other fashion.

8           THE COURT:  As a fraud loss.

9           MR. STEFIN:  Right.  But he put it as a business

10   deduction, and that's where Mr. Schwartz said, aha, that

11   proves that my client was an employee or had earned this as

12   income.  Of course, now it's changed from income to gift, to

13   loan.

14          But at any rate --

15          MR. SCHWARTZ:  Or all three.

16          MR. STEFIN:  -- his initial theory was that it was

17   income, justly earned, and so I'm just giving you the

18   backdrop of that.

19          But the issue was when the report was prepared, and

20   if the Court remembers, I had sent an e-mail to Mr. Schwartz

21   saying I didn't have any statements of the witness, and I

22   maintain that my belief as to my thought process was is that

23   I had no statements of Mr. Raley.

24          I now know that I didn't have the report either,

25   because Ms. Watts hadn't completed the report.  She sent a

1    draft on April the 18th to one of the other investigators for

2    their review of the report.  So it hadn't been completed yet

3    or finalized as of April the 18th, and my e-mail to

4    Mr. Schwartz I think was on either the 18th or the 19th where

5    I said I didn't have a statement of Mr. Raley.

6              THE COURT:  So the date on the report was the date

7    of the interview?

8              MR. STEFIN:  Date of the interview.  It wasn't

9    prepared for about a month later.  I don't know if that

10   matters anymore.

11             THE COURT:  It may.

12             MR. SCHWARTZ:  I'm not going to argue it any

13   further, but I would just say that I asked for any reports or

14   rough notes, and Mr. Stefin said that there are no written

15   reports, and he's just verified that the report hadn't yet

16   been completed.

17             MR. STEFIN:  I didn't say report.

18             MR. SCHWARTZ:  No written statements.

19             MR. STEFIN:  I mean, there's a difference.

20             THE COURT:  I understand.

21             MR. SCHWARTZ:  And I asked for any statements or

22   rough notes.

23             THE COURT:  All right.

24             MR. SCHWARTZ:  And he said there are no written

25   statements, and he declines to produce any rough notes.  We

```
1    know there were rough notes.

2              THE COURT:  Okay.  Thank you.

3              MR. SCHWARTZ:  The other issue that we discussed a

4    little earlier, Judge, was I'm going to be calling Norman

5    Kent and his partner, Russell Cormican, and maybe one other

6    lawyer.  These attorneys all handled matters for either Nancy

7    Marks, Cynthia Miller --

8              THE COURT:  I remember the discussion.  I guess we

9    are going to need to sort out whether or not if they call the

10   lawyer to testify -- and as I understand it, you're just

11   going to have them testify that they reached an agreement

12   with some of these individuals?

13             MR. SCHWARTZ:  Well, they interacted with clients

14   of either Marks or Miller, and some of them they reached

15   agreements with.  Others, as we heard on a tape-recording

16   with Jennifer Hill, they tried to reach an agreement with her

17   and they couldn't reach an agreement.  She hung up on them or

18   ripped up the check, or whatever.  So that would be part of

19   their testimony.  Not what their client told them to do.

20             THE COURT:  But what is the point of presenting

21   this?

22             MR. SCHWARTZ:  Well, the theory of the Government's

23   case is that the Defendants, not necessarily -- well, all the

24   Defendants took the money, were going to cleanse it, promised

25   to return it, and never intended to return it.  I want to
```

```
 1    show other instances where they've tried -- for Jennifer Hill
 2    in this case and other people, where people wanted money back
 3    and they either returned it or tried to return it.  Which I
 4    think defeats or goes toward undermining to some extent one
 5    of their theories of fraud, took the money never intending to
 6    return it.
 7              MR. STEFIN:  Well, I --
 8              THE COURT:  So you want to suggest that because
 9    they attempted to resolve the dispute with the person, that
10    suggests that they never intended to take the money under
11    false pretenses in the first place?
12              MR. SCHWARTZ:  That they never intended to not
13    return the money.  And I know it's a double negative.
14              THE COURT:  And I presume the Government's going to
15    want to say, well, if you get the chance -- if you had the
16    opportunity to lay that out in front of the jury, why can't
17    they attack the credibility of that by saying, well, it's
18    just an attempt to minimize the damage and cover up the fraud
19    and hopefully brush it under the rug?
20              MR. SCHWARTZ:  Pay off a victim.
21              THE COURT:  Pay off a victim, and they would
22    want -- I guess their argument's going to be, we're entitled
23    to find out what the client told the lawyer in terms -- in
24    terms of the instructions going forward.
25              MR. SCHWARTZ:  I don't think that last extension is
```

```
 1    a viable one.  I think they certainly can argue, look, these
 2    people stole the money.  When they got caught, they tried to
 3    return it to not get in trouble, like a bank robber who robs
 4    a bank, and when he's going to get caught goes to return the
 5    money.  That's a viable argument.  They can argue it.  It's a
 6    fact question for the jury.
 7            What the -- Nancy Marks told her attorney about
 8    that, I don't think that --
 9            THE COURT:  Well, let me ask you this.  If you're
10    allowed to throw out the idea that because they worked out or
11    attempted to work out a resolution through agreement in a
12    civil context, why can't they come back and say, isn't it
13    true your client pled guilty in this case?
14            MR. SCHWARTZ:  They might be able to.  I don't
15    think they can, but if Your Honor lets them --
16            THE COURT:  But you're trying to lay the -- you're
17    trying to lay in front of the jury the idea that this was an
18    innocent attempt to resolve a civil dispute, and yet, these
19    same people, they pled guilty in this case, which kind of
20    undercuts the idea that this was just a civil --
21            MR. SCHWARTZ:  I'm sorry you had that idea, Judge,
22    but I anticipated you might, and that might open the door to
23    the Government bringing out the fact somehow that Nancy Marks
24    pled guilty.  And then I would have to call Nancy Marks as a
25    witness and ask her, Nancy, why did you plead guilty?  And
```

```
 1    she might testify, I pled guilty because I faced 15 to 20

 2    years in jail under a sentence, and the Government offered me

 3    a plea with a cap of 51 months, and it was a plea of

 4    accommodation.

 5              THE COURT:  Well, she might say that, and she might

 6    also say I'm asserting my right under the Fifth Amendment not

 7    to testify because I haven't been sentenced yet.

 8              MR. SCHWARTZ:  She might say that, too.  And maybe,

 9    we should sentence her first.

10              All of those are possibilities, and we've

11    considered all those possibilities.  I hope we don't get to

12    Your Honor ruling that we opened the door as to whether she

13    pled guilty.

14              THE COURT:  I think it's more likely that I'd rule

15    that than that the attorney/client privilege was waived.  I

16    mean, I think that's more -- that's less intrusive than --

17    because that's a public fact, a matter of fact that they pled

18    guilty.  You know, conversations between her and her attorney

19    on directions how to resolve this case, I'm not sure that

20    that's waived by them merely coming up and testifying, but

21    I'm a little bit concerned about you being able to lay out,

22    oh, this was just, you know, a civil dispute that they're

23    trying to resolve innocently, without any wrongdoing being

24    involved, and knowing full well that they've actually pled

25    guilty in this case.
```

```
1              It's kind of -- I'm not sure that that's equatable
2    to the Government.
3              MR. SCHWARTZ:  Sometimes I anticipate things, and I
4    have discussed this possible scenario with the attorneys for
5    the Defendants, and I don't know how that plays out.  And
6    maybe if Your Honor is saying that's the way Your Honor's
7    going to rule, maybe I have to reconsider whether to call
8    them or not.  I don't think that opens the door.
9              THE COURT:  Well --
10             MR. SCHWARTZ:  I think that --
11             THE COURT:  Well, I guess, why don't you see if you
12   can come up with something to convince me that it doesn't
13   open the door.
14             MR. SCHWARTZ:  I'll work on that.
15             MR. STEFIN:  Well, to further complicate it,
16   Mr. Kent, one of the two attorneys, came in and represented
17   one of the Defendants in the criminal case initially until it
18   was pointed out to him that he had a potential conflict of
19   interest, and he withdrew from the representation.  I don't
20   remember if it was Nancy.  Was it Nancy?
21             MR. SCHWARTZ:  No, he represented Michael.  I think
22   at the initial appearance he even represented Rose.
23             MR. BARDFELD:  Yes, he did.
24             MR. SCHWARTZ:  But we pointed out to him that he
25   may be a witness, and Judge Hopkins pointed that out to him
```

```
 1   at a Garcia hearing, and he withdrew so as to avoid a
 2   conflict.
 3               THE COURT:  All right.  Well, I guess I would want
 4   to have some case law to support either position, but it
 5   seems to me like the more likely opening of the door is to
 6   bringing in the fact that they pled guilty as opposed to the
 7   fact that -- to opening the door to the attorney/client
 8   privilege being waived.
 9               MR. SCHWARTZ:  I understand, Judge.  I was hoping
10   no one would go there.
11               MR. STEFIN:  We've gone where no man has gone
12   before in this case, I can tell you that.
13               THE COURT:  Anything else for today?
14               MR. SCHWARTZ:  No.
15               MR. STEFIN:  I don't think so.
16               THE COURT:  All right.  Thank you.  Have a good
17   evening.
18         (The evening recess was taken at 5:28 p.m.)
19                              * * * * *
20
21
22
23
24
25
```

```
1                          *  *  *  *  *

2                         I N D E X

3   Testimony of John Van Vorst (Continued)

4           Cross by Mr. Schwartz              3

5           Redirect by Mr. Stefin            19

6           Recross by Mr. Schwartz           22

7   Testimony of Susan Utstein

8           Direct by Mr. Bardfeld            26

9           Cross by Mr. Schwartz             44

10  Testimony of Joanne Leavitt

11          Direct by Mr. Stefin              54

12          Cross by Mr. Schwartz            150

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          * * * * *

 2                       E X H I B I T S

 3  Government's Exhibits in Evidence:

 4          Government's 201-234 and 301-318        49

 5          Government's 722                        72

 6          Government's 611                        94

 7          Government's 712-721 and 712-1-721-1   100

 8          Government's 404                       133

 9                          * * * * *

10                       CERTIFICATE

11      I, Stephen W. Franklin, Registered Merit Reporter, and

12  Certified Realtime Reporter, certify that the foregoing is a

13  correct transcript from the record of proceedings in the

14  above-entitled matter.

15      Dated this 12th day of NOVEMBER, 2013.

16

17      /s/Stephen W. Franklin
        _____
18      Stephen W. Franklin, RMR, CRR

19

20

21

22

23

24

25
```

**$**

$1,000,035 [1]  115/22
$1,053,254 [1]  95/3
$1,122,553 [1]  141/19
$1,122,553.62 [1]  10/20
$1,173,750 [2]  115/10 138/7
$1,192,305 [2]  116/5 142/20
$1,223,055 [1]  74/7
$1,251,479 [1]  79/22
$1,310,858 [2]  116/9 143/14
$1,416,251 [1]  82/17
$1,468,500 [1]  116/1
$1,776,656 [1]  116/3
$1.3 [1]  143/13
$1.3 million [1]  143/13
$1.45 [1]  124/4
$10,000 [2]  40/20 151/8
$100 [1]  40/21
$109,860 [2]  120/2 120/10
$11,900 [2]  122/1 165/12
$111,000 [1]  80/15
$115,040 [1]  135/10
$12,000 [1]  149/1
$12,049 [1]  104/11
$126,330 [1]  84/3
$13,000 [4]  6/10 70/6 127/15 151/7
$132,000 [1]  116/20
$134,716 [1]  119/9
$14,000 [1]  122/9
$1500 [1]  127/12
$156,856 [1]  119/5
$16,288 [1]  136/5
$176,744 [1]  119/16
$18,550 [1]  119/11
$180,000 [1]  143/21
$1800 [3]  109/1 109/18 109/19
$183,000 [3]  136/9 154/8 154/11
$183,980 [5]  134/24 134/25 135/9 136/9 137/14
$184,000 [1]  5/11
$189,682 [2]  121/6 121/7
$1900 [1]  87/14
$2,239,615 [1]  163/12
$2,269,615 [1]  77/21
$20,795 [1]  136/7
$200 [2]  121/22 121/24
$2000 [1]  40/21
$202 [1]  136/1
$209,671.48 [1]  11/5
$212,509 [1]  33/1
$2176 [1]  110/14
$220,340.78 [3]  32/5 32/21 40/3
$221,021 [1]  79/12
$221,532 [2]  76/20 76/24
$23,000 [1]  122/24
$23,535 [1]  121/9
$240,000 [1]  165/9
$240,300 [1]  121/24
$25,195 [1]  69/22
$263,904 [2]  124/24 168/13
$264,592 [1]  105/7
$267,000 [2]  105/19 105/24
$27,000 [1]  113/17
$2700 [1]  103/21
$276,640 [2]  105/9 105/16
$2871 [1]  77/10
$29,467 [1]  106/22
$29,810 [1]  149/10
$292,211 [3]  69/9 69/12 69/14

$2978 [1]  123/23
$30,000 [1]  163/12
$300 [1]  103/3
$300,000 [2]  4/19 154/6
$3038 [1]  105/20
$305,616 [2]  124/21 124/22
$31,900 [2]  135/7 135/9
$3700 [1]  117/12
$3850 [1]  12/24
$387,069 [1]  97/6
$39,475 [2]  68/11 69/5
$3900 [1]  134/14
$3921 [1]  134/5
$40 [2]  70/12 70/18
$42,570 [1]  110/25
$432,000 [1]  39/15
$432,450 [1]  32/21
$445 [1]  113/4
$447,677 [1]  149/3
$4500 [1]  109/23
$4507 [1]  136/7
$46,200 [1]  68/2
$473,000 [1]  92/25
$473,287 [4]  94/15 94/18 94/22 95/1
$474,000 [1]  154/23
$483,000 [1]  23/13
$483,980 [5]  4/18 19/17 19/20 137/16 137/22
$486,008 [2]  122/21 122/22
$500 [1]  40/21
$500,000 [1]  5/1
$5000 [5]  40/21 120/7 120/8 148/25 149/10
$507,929 [1]  87/25
$51,897 [1]  108/24
$515,114 [2]  115/8 149/20
$54,782 [1]  112/23
$555,862 [1]  124/25
$555,862.51 [1]  168/14
$567,687 [1]  128/7
$5800 [1]  111/22
$59,975 [1]  127/24
$600,000 [1]  175/20
$6000 [2]  112/17 163/4
$625,000 [1]  140/24
$66,000 [1]  122/7
$6800 [3]  106/15 106/25 108/3
$681.17 [1]  104/5
$7000 [1]  110/19
$7250 [1]  140/4
$79,792 [1]  136/3
$792,831 [1]  135/20
$793,826 [1]  120/23
$798,586 [1]  84/15
$8000 [1]  112/8
$8127 [1]  68/4
$821,898 [1]  87/21
$856,490 [2]  123/19 125/22
$857.79 [1]  102/14
$877,687 [2]  4/16 135/18
$88,886 [1]  149/6
$89,000 [1]  40/22
$9000 [4]  110/4 111/9 111/10 111/15
$93,803 [3]  67/19 67/23 164/18
$97,798 [1]  113/9
$988 [1]  110/16

**'**

'05 [4]  15/14 15/15 63/13 110/13
'06 [7]  14/4 14/6 15/15 24/11 63/14 72/20 112/8
'07 [2]  15/15 72/20

'09 [3]  127/21 168/13 168/14
'10 [1]  64/4
'4 [1]  29/13
'5 [2]  29/13 29/23
'6 [4]  24/12 24/16 29/13 29/23
'7 [1]  65/10
'8 [1]  15/20
'84 [2]  125/25 126/5
'85 [2]  126/1 126/5
'88 [1]  126/5
'9 [2]  64/4 64/5
'93 [2]  126/10 126/14
'94 [1]  126/14
'96 [1]  126/16
'97 [1]  126/16
'til [1]  62/2

**-**

-758 [1]  37/23
-v [1]  1/5

**/**

/s/Stephen [1]  201/17

**0**

000753 [2]  19/13 137/10
000754 [1]  138/25
000755 [1]  141/17
000757 [1]  141/25
000759 [1]  142/24
00522 [1]  144/4
00551 [1]  148/12
006 [1]  123/25
00757 [1]  37/23
00759 [1]  41/15
018 [2]  103/6 103/8
05 [4]  109/21 109/25 110/16 110/18
0528 [1]  52/9
06 [5]  111/5 111/9 112/3 112/3 116/11
08 [1]  111/12
09 [3]  108/2 123/21 127/22
0985 [1]  51/11

**1**

1,053,200 [1]  95/10
1,171,928 [1]  118/9
1,192,305 [1]  84/11
1,304,500 [1]  118/10
1,310,858.34 [1]  162/25
1,316,858 [1]  74/4
1,379,536 [1]  118/10
1,472,500 [1]  79/18
1,776,656 [1]  141/24
1,796,656 [1]  82/5
1/18/06 [1]  111/5
1/25/06 [1]  111/9
1/3/06 [1]  116/11
10 [8]  6/1 69/22 98/1 102/24 103/3 117/6 117/7 117/22
10,000 [1]  39/1
10-page [1]  114/3
10/12/05 [1]  109/25
100 [1]  201/7
100,000 [1]  118/7
1040 [19]  12/20 24/5 38/9 67/7 67/8 80/8 81/20 82/9 83/15 83/19 85/1 86/11 86/20 86/22 133/20 135/15 139/6 142/2 143/1
1040s [1]  55/10
1042 [1]  78/15
105,925 [1]  119/1

**1**

1099 [1]  140/2
1099s [2]  4/16 34/16
10th [2]  121/19 127/14
11 [3]  98/1 104/24 128/7
11-80072-CR-MARRA [1]  1/2
111,682 [2]  79/13 80/6
1111 [1]  120/7
1120S [21]  66/16 67/6 67/7 67/8 67/12 69/3
69/6 74/6 76/10 76/11 81/20 82/11 83/3
84/21 86/11 86/17 87/5 87/6 89/12 133/20
164/14
115,000 [1]  80/24
118,716 [1]  82/1
1184 [1]  50/4
11:51 [1]  59/16
11th [2]  127/7 127/8
12 [1]  135/15
12,123,612 [1]  117/21
12/1/05 [1]  110/16
12/1/09 [1]  127/22
12/22/97 [1]  118/21
12/6/05 [1]  110/18
121,560 [1]  87/11
1231 [1]  50/2
12th [3]  11/23 141/25 201/15
13 [1]  76/15
1319 [1]  144/11
133 [2]  120/8 201/8
134,500 [1]  118/7
1373 [1]  52/12
13th [1]  127/21
14 [1]  1/10
1456 [1]  53/18
147,813 [1]  148/21
14th [2]  112/8 122/17
15 [4]  6/1 129/6 144/8 197/1
15,000 [1]  39/2
150 [2]  175/19 200/12
150,000 [1]  175/16
157,300 [1]  118/20
15th [4]  86/4 117/9 139/2 144/8
160 [1]  86/23
160,000 [2]  87/4 87/8
160,395 [1]  86/21
161,756 [1]  85/6
1636 [2]  51/24 112/13
1653 [1]  107/6
1677 [1]  54/10
16th [2]  122/14 180/22
17 [2]  69/2 121/3
170,734 [1]  82/13
17th [3]  10/14 121/4 141/17
18 [3]  1/8 113/14 161/17
183 [1]  5/11
183,000 [1]  5/4
183,980 [2]  135/11 137/20
186,000 [1]  118/8
18th [5]  106/6 191/17 193/1 193/3 193/4
19 [4]  55/4 74/22 103/13 200/5
19,970 [1]  149/9
1951 [1]  52/25
1984 [1]  125/23
1989 [3]  126/7 126/9 126/10
1990s [1]  64/20
1991 [1]  114/13
1997 [6]  114/8 114/20 114/20 117/17 118/19
118/20
1998 [2]  114/22 119/2

1999 [3]  114/20 114/24 119/6
19th [1]  193/4
1:00 o'clock [3]  58/18 58/20 130/1
1:01 [1]  59/16
1A [1]  160/25
1st [1]  123/9

**2**

2,239,615 [1]  117/6
2,383,615 [1]  77/16
2,383,355 [1]  118/11
2/19/06 [1]  112/3
2/24/09 [1]  123/21
20 [11]  3/19 3/24 10/11 19/13 37/22 41/15
137/3 137/4 139/1 142/22 197/1
200 [1]  1/21
200,000 [3]  5/3 175/2 175/4
2000 [16]  64/3 96/4 115/5 119/8 122/14
126/24 135/25 148/7 148/17 148/19 149/16
149/17 151/18 154/23 155/14 155/18
2000s [2]  46/22 177/1
2001 [23]  4/3 4/22 18/13 19/22 21/13 115/9
115/11 119/10 119/12 132/12 132/15 133/10
133/18 133/25 134/1 134/15 136/25 138/5
143/24 144/8 144/22 154/3 155/17
2002 [13]  115/16 115/18 139/6 139/10
139/10 139/11 139/12 139/15 139/17 139/21
139/23 140/2 174/18
2003 [30]  3/25 4/22 18/13 57/25 57/25 58/7
64/3 64/10 64/13 72/3 72/11 77/25 78/6 79/6
79/9 79/16 79/17 79/21 80/10 81/15 81/16
90/23 91/13 91/17 93/11 94/14 94/25 115/23
139/2 153/24
2004 [16]  10/15 10/17 12/20 58/9 81/8 81/17
81/21 81/25 82/3 82/9 82/16 82/20 82/21
116/2 141/15 141/21
2005 [29]  10/14 11/15 11/24 12/2 12/21 15/8
29/24 29/25 31/6 31/25 33/12 38/9 41/9
41/10 82/18 82/25 83/4 84/4 84/7 109/16
113/14 116/4 141/17 142/2 142/6 142/6
142/17 142/20 153/15
2006 [49]  11/23 13/13 13/19 15/1 15/8 18/6
22/8 23/20 24/5 29/24 29/25 41/19 42/5 58/1
65/9 65/12 65/14 65/15 65/18 65/21 65/25
66/7 66/11 66/17 67/17 68/9 71/15 71/21
72/3 72/11 73/7 73/20 84/16 112/1 112/1
112/20 113/15 116/8 116/11 116/11 141/25
143/1 143/6 143/12 153/15 162/25 163/23
164/6 164/13
2007 [41]  7/2 13/9 14/2 14/9 15/19 15/20
18/6 22/4 23/19 41/16 58/2 65/12 65/14
65/15 65/18 65/21 65/25 66/7 66/11 75/18
76/7 76/11 76/13 77/6 77/11 77/15 84/16
84/23 89/11 112/24 117/4 142/23 142/24
153/15 163/10 163/23 164/2 164/6 164/6
164/8 165/1
2008 [20]  18/6 84/17 84/21 85/1 85/4 85/13
85/18 85/19 85/21 85/24 86/4 89/12 117/7
117/18 121/3 121/4 121/10 164/3 164/6
164/8
2009 [34]  14/1 14/2 15/24 17/21 57/25 58/2
64/10 86/8 86/9 87/15 87/24 90/22 106/6
106/11 106/16 106/16 106/21 107/4 119/12
119/15 121/4 121/16 121/23 122/17 123/6
124/18 124/19 126/25 127/7 127/8 127/14
165/9 166/6 168/12
201 [3]  48/25 49/6 49/12
201-234 [1]  201/4
2010 [33]  17/21 88/2 88/5 88/15 90/1 90/16
90/23 90/25 91/4 101/6 102/14 104/3 104/7

104/8 105/10 105/20 106/8 119/25 120/7
120/8 120/9 121/19 121/25 122/6 123/9
124/25 126/23 165/11 166/7 166/13 166/15
168/12 168/14
2011 [14]  17/9 88/18 104/12 104/13 104/15
104/15 105/7 105/10 105/22 106/9 120/11
122/8 123/15 166/13
2012 [1]  128/14
2013 [3]  1/8 6/24 201/15
202 [1]  49/15
203 [1]  49/17
204 [1]  49/20
205 [1]  49/22
2050 [1]  123/25
206 [1]  49/24
207 [1]  50/1
208 [1]  50/3
209 [1]  50/5
20th [2]  104/14 120/7
21 [3]  68/5 76/19 83/19
210 [1]  50/7
211 [1]  50/9
212 [1]  50/12
213 [1]  50/14
214 [1]  50/16
215 [1]  50/18
216 [1]  50/20
217 [1]  50/23
218 [1]  50/25
219 [1]  51/2
21st [1]  107/4
22 [3]  33/2 139/11 200/6
22,772 [1]  80/19
220 [1]  51/5
220,000 [1]  39/15
220,341 [1]  83/20
221 [1]  51/10
221,532 [1]  77/1
222 [1]  51/12
223 [3]  1/10 51/15 110/11
224 [1]  51/17
225 [1]  51/19
226 [1]  51/21
227 [1]  51/23
2275 [1]  109/25
228 [1]  51/25
229 [1]  52/2
23 [3]  109/16 126/7 139/9
230 [1]  52/4
230,178 [1]  148/22
231 [1]  52/6
232 [1]  52/10
233 [1]  52/13
234 [4]  48/25 49/6 52/16 201/4
2373 [5]  42/9 51/16 117/16 143/11 143/19
2379 [2]  51/4 51/7
24,200 [1]  119/7
2498 [2]  51/14 143/17
24th [1]  123/6
25 [1]  74/22
25,000 [1]  69/21
254 [1]  95/11
254,000 [1]  114/21
2571 [1]  49/23
26 [2]  161/19 200/8
26 percent [1]  113/23
264,592 [1]  105/22
268,000 [1]  105/19
27 [2]  69/13 69/14
27 percent [1]  113/21

**2**

27,000 [2] 113/13 149/1
27th [1] 120/8
28 [2] 76/25 77/2
2848 [1] 92/18
28th [5] 3/25 104/15 122/6 122/8 138/20
29th [2] 110/13 121/10
2G [3] 30/22 40/3 139/6
2Gs [4] 28/15 31/5 32/4 32/7
2s [1] 27/13

**3**

300 [1] 52/18
300,000 [7] 5/5 5/21 19/17 23/13 137/17
 137/19 137/23
3000 [1] 81/6
301 [3] 49/1 49/6 52/18
301,936 [1] 118/8
301-318 [1] 201/4
302 [2] 52/21 52/21
303 [1] 52/24
304 [1] 53/1
305 [1] 53/4
306 [1] 53/6
307 [1] 53/8
308 [1] 53/13
309 [1] 53/15
31 [1] 139/10
31,000 [1] 135/11
310 [1] 53/17
311 [1] 53/19
312 [1] 53/23
313 [1] 53/25
313,969 [1] 86/18
314 [1] 54/3
315 [1] 54/6
316 [1] 54/9
317 [1] 54/11
318 [4] 49/1 49/7 54/14 201/4
331,747 [1] 83/16
33301 [1] 1/18
33401 [1] 1/24
33432 [1] 1/22
3452 [1] 51/18
3531 [1] 54/4
3612 [1] 52/15
3700 [1] 86/1
3768 [1] 1/23
3777 [1] 50/15
38,000 [1] 87/9
38,932 [1] 87/3
39 [1] 136/2
393,000 [1] 84/14
393,652 [1] 82/22
393,719 [1] 83/12
3:05 [1] 130/5
3:22 [1] 130/5

**4**

4,716,608 [1] 118/12
40 [1] 78/14
40,372 [1] 77/7
4017 [1] 50/17
403 [1] 144/2
404 [9] 63/13 89/17 90/6 95/24 132/8 132/11
 132/23 132/2 201/8
4052 [4] 144/3 144/4 148/11 148/11
406 [1] 148/10
4104 [1] 53/7

413 [6] 30/4 30/7 31/1 32/2 39/16 40/15
41301555 [1] 32/16
42,453 [1] 76/16
43 [3] 8/20 70/8 77/7
44 [1] 200/9
4400 [1] 85/10
4417 [1] 50/13
445,250 [1] 118/9
45-minute [1] 187/15
457,566 [1] 86/24
4706 [1] 53/21
4718 [1] 53/24
473,287 [2] 78/18 78/20
49 [1] 201/4

**5**

5/9/08 [1] 111/12
50 [1] 96/15
500 [1] 1/17
5002 [1] 49/21
51 [1] 197/3
510,000 [1] 114/22
514-3768 [1] 1/23
54 [1] 200/11
5522 [2] 51/22 124/13
5523 [2] 50/6 139/9
561 [1] 1/23
576,121 [1] 80/20
5782 [1] 54/8
5908 [5] 22/9 41/19 49/19 142/5 143/5
5:28 [1] 199/18

**6**

6000 [5] 51/8 51/9 52/1 56/13 103/24
601 [2] 65/1 91/10
602 [2] 81/18 81/20
6026 [1] 52/17
602A [3] 81/18 81/18 81/20
603 [2] 82/19 82/25
603A [2] 83/5 83/6
604 [3] 68/16 68/18 68/20
604A [2] 66/14 66/16
605 [2] 75/19 76/8
606 [1] 84/19
607 [2] 86/13 86/22
607A [1] 86/14
609 [1] 89/25
61,275 [1] 85/14
61,800 [1] 135/25
610 [1] 65/2
611 [4] 93/13 94/9 94/12 201/6
641 [1] 105/16
643,000 [1] 114/24
663 [1] 110/11
6658 [1] 50/19
6766 [2] 52/20 53/12
6th [1] 106/8

**7**

7/10 [1] 102/24
7/19 [1] 103/13
7/29/11 [1] 104/24
7/30/2010 [1] 104/3
7/9 [1] 102/24
7/9/10 [1] 103/3
7/9/2010 [1] 101/6
70 [1] 17/12
700 [1] 1/21
701 [1] 1/24
709 [4] 147/25 150/24 151/5 151/14

712 [6] 98/10 98/16 98/20 99/1 100/5 102/1
712-1 [5] 98/20 99/2 100/5 100/8 100/19
712-1-721-1 [1] 201/7
712-721 [1] 201/7
715-1 [1] 114/3
717-1 [1] 120/24
72 [1] 201/5
721 [6] 98/10 98/17 99/1 100/5 102/1 201/7
721-1 [6] 98/22 99/2 100/6 100/8 125/8
 125/23
722 [7] 72/13 72/16 72/23 73/10 162/11
 168/12 201/5
753 [1] 137/10
758 [1] 37/23
759 [1] 22/3
7658 [2] 50/11 142/6
7709 [1] 50/8
7862 [1] 54/15
7994 [1] 50/22
7th [1] 1/18

**8**

8/18/06 [1] 112/3
8/21/09 [1] 108/2
8/23 [1] 126/7
8028 [2] 51/1 51/7
8337 [6] 49/13 108/8 124/17 125/3 127/6
 128/3
8456 [1] 53/14
8476 [1] 53/16
8509 [2] 51/20 125/5
8565 [1] 52/5
8607 [1] 53/5
8694 [1] 54/2
8936 [1] 53/3
8986 [3] 49/16 110/7 116/23

**9**

9/27/05 [1] 109/21
912,999 [1] 139/8
93,129 [1] 80/19
93,803 [1] 74/6
9396 [1] 54/13
94 [1] 201/6
95,509 [1] 84/6
9658 [1] 49/25
9662 [1] 50/24
97 [1] 118/21
97,000 [1] 113/10
982,692 [1] 139/6
9882 [1] 52/3
9:00 [1] 178/16
9th [6] 17/9 22/4 41/15 102/14 142/23
 142/24

**A**

A-k-e-m-i [1] 148/25
a.m [1] 59/16
ability [1] 88/21
able [22] 17/13 61/1 87/8 90/23 94/3 95/5
 95/7 96/7 98/6 113/7 113/19 115/6 117/19
 120/21 125/25 132/15 133/4 133/8 137/14
 182/5 196/14 197/21
above [4] 41/7 61/7 83/22 201/14
above-entitled [1] 201/14
Abraham [11] 98/19 99/5 100/21 101/5
 101/8 103/5 103/14 103/15 104/8 104/25
 105/2
Abraham's [1] 104/16
Abrahams [1] 104/3

**A**

absent [1]  183/11
Absolutely [3]  20/11 109/6 158/4
accept [2]  147/8 153/13
accepted [1]  8/22
access [2]  64/19 114/10
accessed [1]  133/9
accident [1]  66/4
accidentally [1]  179/10
accommodation [1]  197/4
accompanying [1]  99/2
according [11]  66/3 76/20 78/25 92/22 97/5
 105/17 134/7 140/24 141/17 144/23 149/12
account [182]
accountant [18]  31/13 45/6 45/7 45/15
 151/18 153/6 153/10 153/21 154/10 154/14
 154/17 154/18 157/15 163/18 174/10 174/13
 174/14 191/14
accountant's [1]  157/20
accountants [7]  27/5 27/16 28/1 44/19 55/18
 157/1 157/6
accounting [10]  5/24 8/17 8/21 8/22 8/25
 9/14 9/15 125/8 153/6 153/11
accounts [37]  14/24 22/5 22/14 23/11 23/14
 23/20 23/21 24/1 24/6 38/10 42/5 43/9 43/21
 43/22 51/6 57/12 70/22 71/1 71/4 71/17
 105/13 105/17 113/11 115/19 118/17 119/14
 122/23 124/23 142/3 142/10 143/2 143/7
 143/9 152/3 152/4 163/1 172/1
accumulated [2]  148/18 155/13
accurate [3]  42/24 187/3 187/18
accurately [3]  136/22 176/16 176/18
acknowledged [3]  5/7 180/1 192/4
acquired [1]  41/1
across [6]  36/10 39/11 101/6 103/13 104/3
 123/7
act [4]  88/15 89/1 92/20 92/21
acted [1]  66/3
acting [2]  55/18 94/21
activity [10]  15/22 22/7 24/3 24/7 38/12
 42/16 142/4 143/3 147/19 164/2
acts [7]  65/16 65/17 65/21 65/25 66/1 66/4
 181/15
actual [10]  32/11 32/12 58/3 64/14 77/9
 77/13 79/16 82/4 84/9 85/11
actually [26]  22/14 32/25 51/5 52/7 53/9
 53/11 55/20 66/19 70/5 85/10 88/4 89/24
 94/24 101/25 102/3 109/8 112/2 132/19
 133/6 135/21 138/4 149/5 149/16 182/15
 183/20 197/24
Adae [7]  99/5 106/4 106/12 107/6 108/3
 108/20 109/1
add [6]  30/19 135/6 171/25 185/13 185/17
 185/18
added [3]  23/16 31/12 31/13
adding [7]  31/12 93/2 93/3 93/5 113/6
 117/17 123/13
addition [9]  6/17 8/25 55/13 58/3 80/18
 133/11 134/14 134/25 143/10
additional [14]  18/25 20/5 22/14 22/15 40/20
 40/25 53/11 53/22 112/2 121/25 143/7 173/3
 178/8 185/12
addressed [1]  144/10
adjust [1]  26/5
adjusted [1]  149/9
administrative [2]  26/20 26/22
admissibility [1]  186/4
admissible [1]  145/20
admission [1]  99/4

admit [6]  65/4 72/21 89/4 100/3 132/25
 146/7
admitted [6]  49/4 65/13 66/6 89/6 94/11
 100/4
Adrian [2]  191/13 191/13
advance [1]  109/21
advances [1]  93/8
advantage [2]  110/14 152/6
advising [1]  56/6
advocacy [1]  171/6
advocate [2]  171/3 172/3
affect [2]  182/20 191/8
affects [2]  182/14 191/4
affidavit [7]  179/11 179/11 179/22 180/3
 183/8 184/20 189/11
affidavits [1]  187/9 189/19
after [15]  2/19 59/16 62/11 62/16 79/12
 83/13 86/19 130/5 131/21 166/18 166/20
 169/21 181/1 185/9 190/12
afternoon [1]  59/18
afterwards [1]  164/11
again [55]  10/21 15/5 15/24 15/24 19/12
 22/10 22/24 24/18 25/6 33/21 41/24 67/21
 68/20 69/20 72/19 77/2 79/24 82/2 83/7 84/7
 94/20 100/24 103/7 103/24 105/4 105/9
 108/2 108/9 109/10 111/3 111/4 111/18
 112/1 114/3 116/2 117/17 124/18 125/6
 129/9 134/15 136/24 139/2 141/16 142/24
 145/3 149/16 158/13 162/24 174/4 178/6
 186/6 187/19 187/22 189/15 190/4
against [3]  42/17 99/10 99/16
age [1]  17/23
agent [18]  54/25 55/3 55/4 55/7 55/9 55/13
 56/1 145/7 146/15 150/15 158/14 160/4
 178/19 179/8 184/6 186/16 188/23 190/22
agents [2]  55/16 145/9 180/9 180/15 180/17
aggrieved [1]  56/16
ago [7]  13/1 13/1 13/2 57/11 146/13 150/19
 160/13
agree [4]  67/5 89/20 158/12 186/14
agreed [3]  41/7 48/22 89/4
agreement [4]  194/11 194/16 194/17 196/11
agreements [2]  24/24 194/15
Ah [1]  150/16
aha [1]  192/10
ahead [7]  66/15 73/18 96/17 100/14 118/4
 127/17 138/11
airline [2]  112/25 113/3
Akemi [1]  148/25
alive [2]  13/16 13/24
allegations [2]  179/5 186/10
allege [1]  90/22
alleged [5]  80/25 182/13 182/14 182/18
 183/19
allocated [1]  4/16
allow [9]  141/9 186/21 187/6 187/7 189/18
 189/19 190/13 190/15 190/22
allowed [12]  61/12 128/12 152/7 171/1
 185/24 186/24 187/10 187/24 189/20 190/17
 190/21 196/10
almost [7]  5/1 5/11 6/1 6/2 105/19 115/16
 180/24
along [1]  133/20
already [22]  4/25 30/3 33/24 37/21 39/17
 40/8 52/23 52/25 59/3 59/10 63/14 63/16
 64/15 80/17 84/16 84/23 132/7 137/3 144/1
 162/18 185/20 190/5
also [53]  3/12 5/8 9/4 11/1 12/23 12/25 14/11
 16/2 23/18 24/14 31/9 41/14 57/5 57/7 58/5
 58/8 64/6 69/16 74/12 74/12 74/20 81/7

81/13 88/1 91/13 92/7 97/10 97/13 98/4
 108/25 120/8 120/11 124/14 129/23 132/13
 132/23 138/9 139/8 143/19 143/22 148/6
 151/17 153/5 155/2 157/12 159/16 160/19
 162/3 166/16 184/7 184/9 187/22 197/6
although [5]  10/21 18/19 113/1 114/12
 153/21
always [5]  59/12 191/7
am [7]  17/12 56/1 58/25 98/11 158/8 158/10
 190/25
amend [1]  185/6
Amendment [1]  197/6
AMERICA [41]  1/3 22/7 41/18 49/12 49/15
 49/18 49/20 49/22 49/24 50/1 50/3 50/5 50/7
 50/9 51/21 51/23 52/2 52/6 52/13 52/16
 95/20 108/8 110/6 111/11 111/19 112/12
 116/3 119/23 124/8 124/15 124/17 125/3
 127/4 127/20 128/2 139/8 139/22 142/5
 142/10 142/11 143/5
American [3]  52/19 53/8 110/1
amongst [1]  62/6
amount [91]
amounted [1]  94/22
amounts [18]  12/23 14/20 18/22 38/20 38/21
 38/23 39/4 41/23 71/11 74/13 76/2 110/11
 118/6 147/23 151/5 151/11 152/1 162/15
analysis [18]  60/21 70/19 70/21 70/21 70/22
 71/8 77/11 77/22 79/14 82/2 84/7 87/15
 87/19 88/1 90/6 97/11 111/1 165/7
analyzed [1]  70/25
and/or [2]  42/16 85/12
Andrea [13]  73/8 87/20 99/15 123/4 123/10
 124/20 125/12 168/4 168/6 168/13 168/13
 168/16 173/1
another [20]  7/5 7/10 51/2 51/17 75/7 88/15
 104/2 110/18 111/15 112/17 113/3 128/15
 130/24 134/6 154/15 165/11 166/13 177/21
 182/2 182/20
answer [14]  33/11 34/10 35/12 43/16 43/18
 47/20 61/14 90/15 146/14 160/5 160/6
 172/14 172/18 190/14
answered [2]  84/24 106/23
answering [2]  31/17 33/6
answers [6]  35/25 61/4 171/19 172/7 187/21
 188/1
anticipate [1]  198/3
anticipated [1]  196/22
anticipating [2]  62/6 130/18
any [76]
anybody [2]  11/10 42/2
anymore [1]  193/10
anyone [4]  3/3 9/19 42/1 189/6
anything [15]  3/3 27/22 28/22 35/25 37/1
 38/21 42/8 45/4 47/6 47/9 57/23 129/11
 139/21 181/2 199/13
Anyway [1]  190/25
aol.com [1]  1/25
apologize [6]  3/1 13/8 33/10 106/19 129/25
 164/4
apparently [2]  135/22 187/16
appeal [6]  16/6 16/17 16/19 16/22 58/8 92/19
appear [1]  138/20
appearance [1]  198/22
Appearances [1]  1/15
appears [4]  138/1 144/5 148/12 181/24
appoints [1]  92/20
appreciate [2]  131/11 141/12
approach [5]  30/1 33/21 63/10 88/11 131/7
appropriate [3]  147/25 186/1 190/6
approximately [5]  29/22 29/23 70/6 113/20

# A

approximately... [1] 130/24
approximation [1] 7/4
April [4] 104/14 123/14 193/1 193/3
April 20th [1] 104/14
ARB [1] 8/20
area [1] 169/6
areas [1] 23/18
aren't [2] 12/7 187/18
argue [7] 150/12 158/13 181/8 183/25
193/12 196/1 196/5
argues [1] 171/13
arguing [2] 160/4 171/6
argument [4] 99/15 162/9 171/7 196/5
argument's [1] 195/22
arguments [1] 178/11
around [6] 13/19 56/13 61/1 85/23 158/18
180/22
arrest [1] 88/21
arrested [4] 166/18 185/5 185/8 185/9
arrive [3] 74/7 80/4 137/19
artifice [2] 161/6 161/10
ask [56] 5/15 7/10 11/9 11/12 17/9 20/14
20/17 20/19 25/9 25/16 27/15 28/20 28/23
34/21 35/3 35/3 35/7 35/14 35/20 35/23
35/24 36/4 43/16 47/10 56/8 59/22 60/16
61/4 65/6 66/5 67/2 88/11 88/16 88/17 90/14
90/22 105/12 107/13 116/10 117/22 144/16
158/16 166/17 166/20 167/10 167/13 171/10
172/20 173/19 173/20 176/6 186/23 186/24
187/11 196/9 196/25
asked [35] 10/21 11/16 12/10 22/1 23/15
23/16 23/18 23/25 42/19 43/12 43/13 47/9
57/3 57/4 57/6 61/2 62/1 97/10 107/10 117/8
133/11 147/5 166/7 166/8 166/9 168/2 171/9
171/13 171/16 172/23 180/20 191/12 191/23
193/13 193/21
asking [4] 61/1 157/17 160/23 177/24
aspects [1] 57/14
asserting [1] 197/6
assets [1] 166/19
assigned [4] 55/25 56/2 56/19 56/22
assist [4] 33/14 56/2 56/7 56/22
assistance [1] 56/5
assistant [2] 26/20 26/23
assisted [1] 41/11
assisting [2] 29/9 42/12
associated [1] 110/23
assume [9] 5/12 5/13 17/3 21/9 59/3 59/10
62/3 101/8 189/4
assumed [1] 99/10
assumes [1] 44/3
assuming [9] 73/20 75/25 77/17 79/19 82/14
84/12 85/15 183/1 183/15
assumption [3] 74/1 76/4 183/20
assured [7] 12/23 14/19 38/19 40/22 41/21
147/23 155/3
asterisk [1] 148/22
astrology [2] 10/19 11/2
Atlantic [1] 50/12
Atlas [7] 54/10 54/12 74/19 97/22 118/9
142/18 174/4
ATM [7] 28/13 31/8 40/24 41/2 46/24 93/1
95/14
Atsuko [2] 122/12 149/1
attached [6] 76/20 79/8 134/7 134/9 134/10
134/11
attack [3] 189/21 190/16 195/17
attempt [4] 61/8 61/21 195/18 196/18

attempted [2] 195/9 196/11
attempting [2] 59/25 161/9
attention [8] 3/18 4/12 10/12 13/2 100/17
136/24 137/2 147/15
attitude [1] 164/11
attorney [32] 3/15 9/25 16/2 16/11 16/18
16/21 17/17 60/8 60/10 60/12 60/17 61/14
92/14 92/15 92/17 93/1 94/21 144/5 145/17
145/20 145/22 146/1 146/2 146/9 146/10
168/6 178/22 178/25 196/7 197/15 197/18
199/7
Attorney's [2] 1/17 56/22
attorney/client [12] 60/8 60/10 60/12 61/14
145/17 145/20 145/22 146/1 178/22 178/25
197/15 199/7
attorneys [6] 55/17 59/24 60/11 194/6 198/4
198/16
audit [16] 20/13 55/12 58/5 58/7 91/11 91/13
91/16 91/18 91/21 91/23 91/24 91/25 92/3
92/18 96/5 176/18
audited [4] 20/22 136/16 136/20 176/8
auditing [1] 150/11
auditor [6] 55/6 55/8 55/11 92/12 93/22 96/4
auditor's [2] 92/5 93/19
audits [6] 55/12 56/10 56/13 176/10 176/12
176/15
August [13] 13/9 17/9 22/4 41/15 106/6
106/6 106/9 107/4 127/14 140/2 142/23
142/24 180/22
August 10th [1] 127/14
August 16th [1] 180/22
August 18th [1] 106/6
August 2007 [1] 13/9
August 6 [1] 140/2
August 9th [5] 17/9 22/4 41/15 142/23
142/24
AUSA [2] 1/16 1/16
authenticate [1] 48/23
average [2] 175/15 175/16
averaged [1] 175/18
avoid [3] 59/14 176/15 199/1
AW [1] 123/25
AW-006 [1] 123/25
aware [6] 15/8 21/17 21/25 42/18 69/11
184/18
away [2] 15/9 164/11

# B

baby [1] 169/21
back [53] 2/4 2/18 2/21 5/19 8/12 8/19 8/20
9/9 14/1 17/5 17/23 28/20 31/1 45/18 58/18
59/19 60/1 62/18 64/12 64/20 79/4 94/14
96/7 109/2 116/15 120/4 122/3 125/14
125/17 130/7 131/23 138/3 139/16 140/4
141/11 151/8 153/1 156/6 166/7 166/8 166/9
166/10 166/18 167/6 169/17 171/5 172/13
172/15 173/2 180/5 181/14 195/2 196/12
backdrop [1] 192/18
background [1] 5/24
backs [1] 74/12
bad [4] 2/23 2/25 88/15 89/1
badly [1] 153/12
bag [1] 30/15
balances [2] 128/8 128/13
bands [2] 46/22 46/23
bank [196]
Barclays [4] 103/11 103/14 104/4 104/18
Bardfeld [5] 1/16 45/17 47/2 47/9 200/8
Barnes [1] 127/19
base [1] 103/4

based [50] 11/6 24/24 37/10 39/4 47/3 63/18
69/24 70/18 71/13 74/9 74/11 74/11 74/22
77/8 77/11 79/14 82/2 84/7 87/15 87/19 91/3
92/4 95/2 96/7 96/21 97/2 100/24 102/5
102/25 103/5 106/13 121/10 130/1 136/4
141/7 142/7 154/10 157/5 157/14 165/2
165/16 167/2 168/3 169/1 169/6 175/22
176/12 182/19 184/4 184/5
bases [1] 159/20
basic [2] 64/22 187/10
basically [13] 49/8 75/5 93/9 95/7 97/10
97/25 98/4 98/6 98/13 180/1 184/14 186/8
192/4
basing [1] 170/17
basis [6] 35/16 99/18 107/7 171/2 186/15
186/18
Bate [6] 101/21 102/2 102/4 102/10 103/6
134/18
Bates [1] 103/24
BB [5] 51/19 52/21 52/22 52/24 125/4
Beach [2] 1/7 1/24
bear [2] 168/22 168/24
became [1] 13/12
because [69]
become [1] 159/3
before [34] 1/12 3/3 10/21 26/19 30/5 30/8
31/17 33/6 34/11 40/8 43/16 43/17 48/14
55/5 62/5 82/20 121/20 123/20 126/6 132/9
133/20 146/17 151/7 156/6 161/14 176/2
178/4 181/18 182/10 183/3 185/5 185/8
186/12 199/12
began [6] 109/16 114/12 121/15 122/13
123/5 125/23
begin [4] 3/3 66/12 121/1 184/12
beginning [3] 106/6 117/17 126/25
behalf [10] 10/2 11/7 11/10 11/13 11/18
70/23 77/14 92/21 97/16 106/13
behind [1] 170/20
being [24] 2/18 21/21 65/7 65/13 66/6 66/22
75/11 88/8 95/4 95/7 103/8 117/1 126/18
126/19 133/23 158/9 171/6 172/3 176/14
182/23 188/21 197/21 197/23 199/8
belabor [1] 102/12
belief [1] 192/22
believe [45] 3/24 9/24 12/6 13/20 14/4 14/11
14/15 20/12 24/16 24/21 28/15 29/4 30/14
31/4 36/14 45/5 45/21 60/7 64/3 68/16 81/18
85/22 94/14 109/14 138/15 141/23 143/12
145/24 152/10 155/19 156/8 156/19 159/6
160/18 160/19 162/3 162/24 165/3 172/25
174/11 174/16 174/19 180/21 184/8 184/10
believed [2] 151/16 159/12
believes [1] 138/14
below [8] 41/7 85/10 104/2 109/21 127/9
127/14 149/2 149/9
benefit [4] 95/7 114/6 120/22 128/6
benefits [1] 75/10
besides [1] 86/23
best [4] 27/11 33/20 45/25 109/3
betting [1] 139/7
between [7] 21/2 60/17 67/7 102/17 163/11
174/21 197/18
beyond [4] 61/7 65/23 83/22 187/6
big [1] 169/9
bills [6] 7/13 10/23 12/4 12/7 14/25 45/2
binder [1] 148/10
bingo [1] 46/5
bit [6] 5/23 37/25 150/13 169/14 178/12
197/21
blank [1] 180/23

**B**

blindsided [1]  192/3
blue [4]  98/12 102/4 102/5 112/25
board [1]  133/24
Boca [1]  1/22
bona [1]  173/10
book [9]  93/10 94/4 95/23 102/3 102/11 103/6 120/16 124/7 127/11
books [5]  98/4 98/12 98/13 102/4 102/5
bootstrap [1]  171/12
borrowing [3]  18/20 18/25 45/2
both [10]  13/23 14/8 17/15 18/9 33/7 43/8 86/12 97/11 167/17 167/18
bottom [14]  100/19 104/7 104/24 106/17 112/9 117/22 120/18 122/18 122/18 128/4 139/18 140/23 143/20 174/21
Boulevard [1]  1/17
Bower [8]  53/20 53/23 109/19 110/18 110/19 111/4 112/5 112/19
box [3]  52/7 52/8 155/11
boxes [1]  145/9
brainwash [1]  190/19
branch [4]  55/25 119/20 127/4 127/4
branches [1]  55/21
break [6]  48/15 48/15 58/17 105/12 117/23 136/8
breaking [1]  58/14
Briefly [1]  22/18
bring [7]  2/11 27/21 34/4 62/14 131/16 131/20 188/18
bringing [2]  196/23 199/6
British [1]  123/25
brought [7]  49/10 60/4 93/1 93/3 93/4 93/5 159/22
Broward [1]  1/17
Bruce [4]  74/20 114/16 118/5 118/7
brush [1]  195/19
Bulgari [1]  110/13
bunch [1]  138/8
business [21]  4/7 10/19 11/2 13/2 15/10 55/17 60/5 67/22 68/6 68/9 76/14 77/20 79/8 79/25 80/4 83/13 134/3 147/20 149/9 166/10 192/9
buy [3]  40/25 109/3 174/5
buy-in [1]  40/25

**C**

calculate [1]  120/21
calculation [1]  77/9
called [15]  26/17 28/15 47/11 47/16 53/1 53/19 64/7 66/23 81/21 91/11 96/25 101/21 180/9 180/21 189/10
calling [5]  179/8 179/9 181/16 190/1 194/4
calls [4]  178/22 178/23 180/8 189/4
came [26]  10/3 10/4 23/12 30/14 30/16 39/6 41/11 57/21 92/11 92/15 101/14 104/10 104/15 105/3 124/2 136/9 136/19 137/14 150/18 175/12 180/15 185/13 185/14 188/19 189/11 198/16
can't [26]  3/20 6/5 7/3 11/25 13/5 15/17 17/3 19/1 28/6 29/10 29/19 33/7 33/16 39/12 46/8 47/20 61/14 67/11 85/10 143/6 178/1 180/17 183/22 190/10 195/16 196/12
cancellation [1]  159/4
cannot [1]  79/4
cap [1]  197/3
capital [4]  53/13 76/15 81/6 149/11
card [16]  46/24 51/5 93/8 101/7 101/7 104/2 104/2 109/3 110/14 112/25 126/21 128/10

128/12 175/17 175/22 175/25
cards [2]  128/9 128/11
care [1]  151/19
career [1]  56/9
carried [4]  79/3 79/4 80/5 87/4
carriers [1]  161/13
carryover [1]  81/6
cars [1]  21/15
Carta [1]  184/3
Cartier [1]  111/21
case [56]  1/2 3/4 5/1 17/2 56/16 56/18 56/21 56/24 58/19 61/8 61/18 61/21 67/14 70/20 72/11 77/23 81/12 90/17 90/18 91/17 97/16 97/23 102/9 115/21 128/15 129/6 129/15 130/14 130/17 132/4 146/2 160/11 162/9 177/25 178/3 178/6 179/6 179/9 183/24 184/16 184/23 185/6 186/13 189/2 190/2 190/10 191/5 194/23 195/2 196/13 196/19 197/19 197/25 198/17 199/4 199/12
cases [2]  56/8 167/23
cash [18]  31/7 32/10 39/17 40/15 40/19 40/23 41/1 46/22 46/23 93/8 97/3 103/3 103/8 103/11 109/21 111/9 115/21 128/15 129/6 129/15 130/14 109/21 115/25 177/1
casher [1]  97/1
cashier's [6]  111/7 111/14 115/14 122/6 122/8 138/12
cashing [2]  139/24 140/7
casino [5]  40/18 46/5 46/24 93/3 175/11
casinos [1]  31/24
casualty [1]  83/25
catch [1]  190/8
categorized [1]  172/1
categorizing [1]  40/11
caught [2]  196/2 196/4
cause [2]  161/10 161/11
CC [1]  181/25
cents [1]  33/2
certain [21]  9/7 20/10 24/21 28/21 35/11 57/18 64/22 66/23 75/9 116/25 143/23 146/12 151/5 155/12 160/14 161/24 161/24 161/25 167/16 168/8 176/12
certainly [2]  186/20 196/1
certificate [7]  89/4 89/10 89/11 89/21 89/22 111/21 201/10
certification [1]  88/7
certified [2]  63/6 201/12
certify [1]  201/12
cetera [3]  88/23 129/25 163/22
challenge [2]  170/20 171/1
chance [2]  129/21 195/15
change [2]  9/14 141/4
changed [3]  5/25 169/14 192/12
changes [1]  187/9
changing [2]  9/22 9/23
characteristics [1]  167/16
characterization [2]  72/6 170/5
charge [1]  131/4
charged [12]  46/8 65/8 65/18 65/21 65/24 66/3 66/4 70/16 77/23 160/14 160/15 181/9
charges [4]  66/10 161/2 185/17 185/18
chart [2]  162/10 162/13
Chase [4]  50/16 50/18 52/4 104/20
check [30]  40/24 89/10 89/25 95/18 95/19 95/19 97/1 107/6 108/3 109/25 109/25 111/7 111/14 116/11 116/14 116/18 116/20 116/22 120/7 120/8 120/16 122/6 122/8 127/19 139/24 140/2 140/4 140/7 141/8 194/18

checked [1]  133/10
checking [2]  44/19 148/20
checks [25]  1/5 25/3 41/1 42/17 93/4 93/24 94/3 94/4 94/5 94/6 95/16 95/21 96/3 96/8 96/22 96/24 97/2 97/4 97/7 108/16 115/14 120/3 138/12 139/23 140/12
Childcare [1]  134/8
children's [1]  147/11
chose [1]  4/8
cite [1]  167/23
CitiGroup [1]  53/15
citizens [1]  67/10
civil [6]  55/24 56/1 196/12 196/18 196/20 197/22
claim [2]  92/23 94/24
claimed [1]  68/8
claiming [1]  137/21
clarification [1]  75/22
clarify [1]  108/10
classification [1]  92/4
clause [1]  181/20
cleanse [8]  170/1 180/4 180/15 180/16 181/11 181/14 181/15 194/24
cleansed [1]  181/22
cleansing [10]  152/24 165/20 165/22 165/24 166/4 181/3 181/5 182/17 182/19 183/6
clear [7]  95/23 96/3 162/17 164/21 175/1 179/19 190/6
cleared [5]  14/18 15/1 38/18 41/20 153/1
clearly [1]  179/24
Cleary [1]  181/25
Clematis [1]  31/24
client [37]  20/20 20/21 20/22 20/23 21/3 27/2 27/6 34/4 36/15 60/8 60/10 60/12 60/16 60/17 61/14 61/23 61/24 99/14 145/17 145/20 145/22 146/1 146/10 154/20 157/21 169/12 178/22 178/25 180/10 181/9 189/8 192/11 194/19 195/23 196/13 197/15 199/7
client's [3]  20/9 42/22 43/1
clients [13]  21/22 22/11 24/21 24/23 36/12 37/19 60/1 60/7 60/8 61/2 61/6 99/14 194/13
close [1]  147/5
closed [2]  56/19 155/22
closing [3]  155/20 171/6 178/11
code [10]  75/2 75/4 75/5 75/7 75/8 75/11 78/25 153/17 156/22 175/8
Codefendants [1]  178/24
coins [2]  118/23 140/25
collateral [1]  190/9
collect [1]  56/16
collection [4]  56/20 58/8 92/18 150/14
college [6]  8/15 8/17 8/20 8/25 9/12 9/19
column [3]  101/7 101/17 114/14
combined [1]  148/8
comes [2]  69/3 157/7
comfortable [3]  23/10 26/6 37/18
coming [5]  25/21 86/2 134/6 170/21 197/20
commemorating [1]  174/15
commercial [1]  161/12
commit [1]  66/3
committed [3]  65/21 65/24 66/4
communications [4]  60/16 60/20 145/20 145/24
companies [1]  70/16
company [3]  26/17 96/25 141/6
compare [1]  133/13
compares [1]  55/8
compensation [2]  75/9 138/16
compilation [1]  93/9
complete [4]  17/13 36/22 41/8 56/15

# C

completed [7]  36/19 36/20 43/5 43/10 192/25 193/2 193/16
completely [2]  185/22 186/17
complicate [1]  198/15
composite [41]  3/19 10/12 19/13 30/4 41/14 49/17 49/20 49/24 50/1 50/9 50/12 50/16 50/18 50/20 50/23 50/25 51/2 51/5 51/10 51/12 51/15 51/17 51/19 51/21 51/23 51/25 52/2 52/4 52/6 52/10 52/13 52/16 65/1 94/9 132/8 132/11 137/4 139/1 142/23 144/2 148/10
comprise [1]  93/17
comprised [1]  93/18
computation [2]  90/21 90/24
computer [10]  64/14 64/16 64/19 91/18 91/19 91/21 91/22 131/9 133/9 176/13
concede [2]  88/16 184/21
concedes [1]  186/10
concerned [3]  13/3 165/8 197/21
concise [1]  27/14
conclude [2]  76/4 189/1
concluded [5]  90/13 100/2 107/21 146/24 172/12
conclusion [1]  160/23
conclusions [3]  170/22 170/23 171/2
conclusory [1]  170/17
confederated [1]  161/2
conference [5]  90/13 100/2 107/21 146/24 172/12
confirm [3]  146/17 147/3 150/21
confirmed [1]  39/3
conflict [2]  198/18 199/2
confront [1]  184/19
conjunction [1]  66/5
connection [4]  78/24 148/6 182/16 191/19
consequence [3]  10/23 24/19 45/14
consequences [1]  6/11
consider [13]  47/13 47/19 47/22 65/16 65/19 65/19 65/22 65/25 66/5 90/17 102/20 167/17 167/18
consideration [1]  142/12
considered [1]  197/11
consistent [5]  137/21 137/25 156/1 156/3 190/7
conspiracy [4]  99/16 160/14 161/3 181/10
conspired [1]  161/3
constantly [2]  9/22 9/23
constitute [5]  77/17 79/19 82/15 84/12 86/13
constitutes [1]  171/11
construe [1]  156/18
Consultant [7]  50/17 51/3 51/20 104/21 105/4 122/9 125/4
Consultants [1]  126/23
contact [2]  4/8 147/8
contacted [1]  189/9
contain [1]  64/23
contained [3]  101/21 148/10 184/21
containing [1]  185/3
contending [1]  76/3
contends [1]  153/21
contesting [1]  76/2
context [1]  196/12
continue [7]  3/2 14/21 17/18 62/20 63/18 131/25 147/21
continued [2]  119/25 200/3
continuing [4]  9/10 9/11 9/13 78/8
contract [1]  169/21
contrary [1]  156/16

control [2]  57/7 130/3
controlled [18]  8/22 70/23 71/4 105/13 105/17 108/7 108/11 108/13 113/11 115/19 117/1 118/17 119/14 121/8 122/23 124/9 124/23 125/6
controlling [1]  8/19
controls [1]  189/15
conversation [3]  9/24 180/11 180/21
conversations [11]  16/25 60/6 61/24 180/18 181/2 186/25 187/1 187/11 187/15 187/16 197/18
conversion [3]  124/1 124/3 124/6
convince [1]  198/12
convoluted [1]  153/23
Cook [8]  179/4 179/8 179/9 179/20 184/19 186/10 186/16 190/23
copies [4]  46/1 64/17 94/4 96/3
copy [14]  45/18 64/15 64/22 78/7 81/9 93/23 132/12 132/16 132/18 133/4 137/7
Cormican [1]  194/5
corner [3]  32/2 32/8 100/19
corporate [12]  15/19 15/25 17/15 24/8 24/11 24/15 24/17 67/9 81/19 83/17 111/1 152/3
corporation [9]  64/6 67/9 76/11 81/21 83/10 84/21 114/6 133/21 164/7
corporations [2]  55/10 67/11
correct [74]
correctly [1]  136/21
correspondence [2]  91/24 148/8
corroborated [1]  180/25
corroborating [1]  184/7
cost [1]  12/11
couldn't [4]  11/15 168/21 188/18 194/17
counsel [8]  2/5 19/12 59/20 99/7 130/8 171/9 184/24 186/7
count [3]  96/16 158/3 160/25
count 1A [1]  160/25
counter [1]  127/1
counts [2]  160/14 160/15
couple [5]  29/19 81/5 120/3 138/9 185/12
course [5]  56/9 138/19 142/13 166/15 192/12
courses [1]  9/10
court [17]  1/1 1/23 2/1 60/13 66/11 128/25 129/24 146/2 167/23 172/15 181/4 184/18 186/1 189/15 190/5 191/12 192/20
court-ordered [1]  128/25
courtroom [9]  2/19 3/10 58/22 62/16 66/22 129/8 131/21 163/14 178/18
courts [1]  167/15
cover [2]  185/22 195/18
covered [3]  84/16 141/13 145/25
covers [1]  87/12
CPA [6]  9/1 9/13 26/21 26/23 81/16 148/5
CPE [1]  1/23
CR [1]  1/2
crazy [1]  6/14
create [1]  72/10
creating [1]  181/15
credibility [2]  126/6 183/14 195/17
credible [2]  165/4 187/22
credit [11]  46/24 70/14 70/15 70/17 70/18 93/8 112/25 113/1 126/20 128/8 128/10
crime [5]  46/4 46/6 46/8 46/12 66/4
crimes [1]  66/2
criminal [5]  55/24 56/3 56/5 56/23 198/17
cross [11]  3/5 3/8 44/12 44/13 61/13 88/25 149/25 166/16 200/4 200/9 200/12
cross-examination [7]  3/8 44/12 44/13 61/13 88/25 149/25 166/16
cross-examine [1]  3/5

CRR [2]  1/23 201/18
CSI [1]  93/6
currency [1]  28/13
currently [3]  26/16 56/4 65/18
curse [1]  181/23
curses [2]  170/1 181/14
custodians [1]  48/22
cut [2]  169/22 172/5
Cynthia [6]  52/11 52/14 70/25 97/18 121/22 194/7

# D

damage [1]  195/18
dance [1]  61/1
dash [1]  98/18
data [3]  27/10 27/11 47/3
date [28]  10/13 11/20 11/21 64/21 94/2 95/19 101/6 102/17 102/21 102/22 103/9 103/12 111/15 112/17 117/8 117/10 118/22 120/18 120/19 121/2 122/13 123/5 124/2 124/6 191/16 193/6 193/6 193/8
dated [7]  3/25 22/3 41/15 139/1 144/8 155/16 201/15
dates [3]  102/20 102/20 122/5
days [5]  130/19 130/22 131/6 145/8 178/7
deal [2]  63/20 170/14
dealing [1]  85/1
dealings [1]  110/23
dealt [1]  173/12
Deanna [20]  54/1 54/4 71/17 73/4 73/21 74/4 77/12 79/15 82/3 82/14 85/12 87/19 125/10 126/13 127/4 127/18 128/5 163/4 163/7 163/11
Deanna's [2]  127/11 128/11
death [2]  18/8 163/22
debit [1]  51/5
Debra [8]  53/20 53/23 109/19 110/18 110/19 111/4 112/5 112/19
debt [1]  159/4
deceased [3]  13/12 13/17 13/19
December [7]  22/8 41/19 106/8 139/10 142/6 142/6 143/6
December 2005 [2]  142/6 142/6
December 2006 [2]  22/8 41/19 143/6
December 31 [1]  139/10
December 6th [1]  106/8
decide [8]  65/20 65/23 66/1 76/1 76/5 76/6 187/22 190/11
decided [3]  17/4 92/5 185/17
deciding [1]  90/18
decisions [2]  8/21 167/23
declared [1]  162/1
declines [1]  193/25
declining [1]  67/18
decreased [1]  15/15
deduct [3]  79/5 80/3 175/3
deducted [6]  32/24 80/18 82/23 83/21 85/7 86/25
deductible [2]  12/7 79/1
deducting [1]  87/22
deduction [6]  68/2 68/3 77/4 87/11 87/13 192/10
deductions [19]  67/22 67/25 68/4 68/8 69/16 69/17 69/18 69/24 80/7 80/20 80/23 81/5 83/13 83/22 83/24 86/19 125/17 135/24 192/5
default [1]  167/11
defeats [1]  195/4
DEFENDANT [61]  1/7 1/19 19/15 19/21 20/1 20/5 21/13 57/2 57/16 65/8 65/16 65/17

**D**

DEFENDANT... [49] 65/21 65/24 66/1 71/19 73/22 74/16 77/14 77/14 79/17 81/10 83/6 83/9 84/9 85/3 85/11 86/9 86/16 87/17 88/4 89/20 97/12 97/15 97/16 97/20 102/6 105/14 107/13 109/13 113/11 115/19 115/20 118/17 118/18 119/15 121/8 122/23 124/23 128/6 141/18 141/22 184/13 185/8 189/10

Defendant's [10] 71/16 97/21 102/8 106/21 108/20 108/21 109/13 112/22 113/8 130/8

defendants [14] 60/5 60/9 180/4 180/10 180/10 181/12 185/5 185/9 185/16 185/19 194/23 194/24 198/5 198/17

defense [16] 19/12 48/21 129/15 171/9 171/12 178/6 178/8 179/6 184/13 184/24 185/23 186/7 186/20 186/21 188/1 188/4

definitely [1] 31/15

definition [2] 74/23 75/3

defraud [4] 161/4 161/5 161/6 161/10

deliberate [1] 178/13

delivered [2] 141/1 161/11

Delpozzo [1] 145/5

demonstrate [1] 95/13

demonstrated [1] 94/24

demonstrating [2] 94/21 103/24

denied [1] 189/2

denies [2] 189/2 189/3

denominations [1] 34/3

deny [3] 187/20 188/8 189/23

department [4] 114/16 118/8 157/9 159/17

Department's [1] 162/21

depending [1] 61/3

depends [1] 61/25

deposit [16] 35/13 35/16 35/18 35/20 36/8 36/9 39/4 39/10 52/7 52/8 57/7 57/8 119/21 127/1 127/5 127/19

deposited [8] 35/2 108/6 108/7 110/6 110/20 111/11 111/19 127/3

deposits [11] 4/15 34/20 35/11 39/4 71/3 71/5 71/9 71/16 119/18 148/21 152/2

derive [1] 28/2

derived [2] 75/6 75/13

derives [1] 136/14

describe [1] 132/11

described [3] 83/23 98/14 153/18

description [1] 101/6

designated [1] 109/14

destroyed [1] 64/15

detail [1] 78/5

details [3] 7/24 19/1 22/1

detected [1] 185/10

Detective [5] 186/9 188/5 188/15 189/9 189/9

detectives [1] 86/1

determination [3] 19/15 133/8 186/3

determinations [1] 57/13

determine [6] 22/1 34/13 34/19 113/7 136/20 137/14

determined [1] 162/18

determining [1] 21/24

Deveraux [11] 53/7 114/6 117/5 147/24 149/1 149/13 150/25 156/19 173/14 174/7 174/23

Deveraux's [1] 156/7 157/1 157/2 157/7

devise [2] 161/5 161/5

Dick [2] 16/10 16/11

didn't [63] 5/21 11/9 11/12 13/13 15/9 15/18 20/6 23/2 25/7 25/9 25/15 37/1 42/2 43/11 44/7 44/15 60/22 71/22 71/24 88/21 89/21

95/23 96/15 99/13 107/17 126/6 126/13 128/21 146/15 152/12 152/22 156/12 163/23 164/12 164/19 165/19 166/6 166/16 166/20 167/1 168/8 168/17 171/10 174/12 174/17 174/24 181/11 181/17 183/9 183/23 183/25 188/8 188/9 188/10 188/14 189/5 189/5 190/17 190/17 192/21 192/24 193/5 193/17

died [2] 14/4 169/22

difference [2] 67/7 193/19

differences [1] 101/11

different [7] 30/18 53/12 124/6 166/25 167/1 169/25 172/19

difficult [2] 9/19 31/19

digits [1] 53/16

direct [24] 2/12 2/14 3/18 4/12 10/12 15/18 19/12 26/12 54/22 66/13 71/16 75/18 81/8 82/18 100/16 118/13 147/15 149/23 152/4 159/22 160/5 173/13 200/8 200/11

directing [4] 81/17 106/2 109/7 123/2

directions [1] 197/19

directly [10] 7/12 7/21 8/3 8/8 10/22 79/15 106/12 120/22 121/7 128/5

disability [1] 75/10

disagree [2] 186/23 190/6

disclose [3] 21/13 21/21 139/14

disclosed [2] 19/15 138/21

discovered [1] 85/20

discuss [10] 25/7 58/19 58/23 59/7 62/9 129/6 129/9 147/11 148/2 173/19

discussed [9] 9/25 63/14 147/4 161/23 162/15 162/17 173/23 194/3 198/4

discussing [2] 11/24 146/10

discussion [6] 11/13 15/12 129/24 180/14 188/6 194/8

dispensed [1] 14/24

dispute [4] 153/2 195/9 196/18 197/22

disregard [2] 90/4 90/15

disrespectful [1] 186/7

distracted [1] 12/25

distribute [2] 99/21 100/1

DISTRICT [3] 1/1 1/1 1/13

dividends [1] 27/12

division [2] 56/5 56/20

document [28] 4/10 13/7 13/8 19/13 22/3 34/5 38/2 38/6 41/15 42/8 100/18 101/22 103/7 103/8 109/8 114/18 137/4 137/10 138/25 142/24 144/2 144/4 145/18 148/11 148/11 155/23 155/24

documentation [15] 12/22 20/23 21/1 35/5 35/8 36/7 36/13 36/22 39/8 41/12 42/24 43/4 44/7 95/12 128/23

documents [35] 8/19 12/10 21/4 28/8 28/10 30/17 37/22 48/20 48/23 49/15 49/18 49/21 49/23 49/24 50/3 50/5 50/8 50/10 58/13 59/5 65/7 99/4 100/25 101/1 101/25 132/3 132/9 137/2 143/23 144/21 145/10 145/21 148/6 184/2 184/2

does [27] 32/3 32/8 38/21 42/3 42/8 45/4 55/7 81/14 92/2 92/10 92/16 93/17 108/25 129/13 135/6 136/8 136/8 138/20 141/21 145/21 145/22 151/9 151/11 151/14 159/3 179/16 182/20

doesn't [26] 7/12 7/18 7/24 8/2 8/7 29/16 64/23 90/6 95/19 107/12 140/15 140/20 142/9 142/11 151/8 151/24 153/6 155/7 157/9 175/25 181/2 182/20 190/2 191/8 191/9 198/12

doing [13] 4/11 5/7 22/11 23/19 24/8 27/25 146/16 151/17 151/22 164/23 171/2 189/3 189/23

dollar [1] 68/3

dollars [9] 6/7 7/5 38/24 38/24 80/23 91/9 123/23 172/23 175/2

don't [124]

done [8] 47/6 58/9 65/16 66/1 124/6 147/6 166/3 173/6

Donnie [3] 118/5 118/7 174/5

donor [1] 150/24

door [8] 171/23 178/24 196/22 197/12 198/8 198/13 199/5 199/7

double [2] 89/9 195/13

doubt [1] 65/24

down [18] 17/12 18/19 20/21 27/4 31/18 38/14 87/8 103/13 104/7 105/12 109/25 117/23 147/13 149/5 178/20 184/3 185/24 188/8

dozens [3] 96/18 96/18 96/19

draft [2] 24/23 193/1

drafted [4] 61/19 168/16 168/18 168/20

dramatically [1] 15/16

draw [2] 136/24 137/2

drawing [3] 170/22 170/23 180/23

drawn [2] 169/3 173/4

drift [1] 181/7

Drive [1] 144/4

dry [3] 3/11

due [7] 12/13 12/16 12/19 136/4 136/6 164/3 164/22

during [7] 58/23 66/19 66/20 71/10 71/12 122/19 132/19

dying [1] 169/18

Dylan [1] 112/5

**E**

e-mail [3] 1/25 192/20 193/3

each [12] 9/7 43/15 67/13 72/3 98/1 98/23 101/1 101/9 103/7 104/14 117/23 125/25

earlier [14] 11/16 11/19 18/13 63/19 67/21 70/13 107/23 159/22 161/23 162/8 173/16 186/11 187/1 194/4

early [8] 58/12 64/20 85/24 126/12 126/21 145/5 177/1 180/18

earned [5] 153/20 156/9 156/12 192/11 192/17

earnings [1] 31/5

ease [1] 36/13

easier [3] 37/25 78/7 93/21

East [1] 1/17

easy [1] 9/17

Ed [1] 16/18

education [7] 8/25 9/10 9/11 9/13 9/17 9/19 10/6

Edward [1] 92/14

effect [2] 44/17 146/3

efforts [1] 61/10

eight [1] 13/1

either [10] 10/22 25/3 30/14 37/9 38/3 71/16 75/13 79/14 85/12 104/9 106/12 106/20 108/20 109/13 114/15 115/19 119/2 120/21 152/3 153/10 163/6 163/13 163/15 179/9 181/6 192/24 193/4 194/6 194/14 195/3 199/4

electric [2] 12/12 12/21

Eli [15] 52/3 110/16 112/4 112/4 115/13 115/14 118/5 118/7 118/9 138/9 138/12 149/10 174/5 174/5 189/8

eliminate [5] 80/21 90/23 145/22 185/11 185/19

else [13] 11/10 11/13 34/9 42/1 42/2 64/17 155/22 156/17 183/11 188/25 191/10 191/11

**E**

else... [1] 199/13
elsewhere [1] 82/8
empirical [1] 47/3
employed [2] 26/16 79/25
employee [2] 16/11 192/11
employment [2] 55/11 136/5
enclosed [1] 17/14
end [12] 62/12 111/10 116/22 117/13 128/4
131/1 152/25 162/9 168/21 168/22 178/4
178/9
ended [2] 17/20 111/18
ending [65] 42/9 49/13 49/16 49/18 49/21
49/23 49/25 50/2 50/4 50/8 50/11 50/13
50/15 50/17 50/19 50/21 50/24 51/1 51/4
51/7 51/7 51/8 51/8 51/11 51/14 51/16 51/18
51/20 51/22 51/24 52/1 52/3 52/5 52/8 52/11
52/15 52/17 52/20 53/2 53/5 53/7 53/12
53/14 53/20 53/24 54/7 54/12 54/15 103/23
108/8 110/6 111/11 112/12 112/20 116/23
117/15 124/11 124/17 125/3 125/5 127/6
128/3 139/9 143/11 143/17
endorsed [2] 116/14 140/5
ends [1] 139/19
engaged [8] 13/10 13/15 24/1 24/5 38/9
139/5 142/1 142/25
England [1] 24/22
enough [1] 91/22
entered [7] 49/7 71/9 72/23 94/12 100/6
133/2 169/21
enters [3] 2/19 62/16 131/21
entire [1] 152/7
entities [3] 74/18 97/16 97/21
entitled [5] 100/21 144/22 184/8 195/22
201/14
entity [2] 67/15 141/10
entries [2] 71/17 134/16
envelope [5] 30/25 31/1 31/3 31/4 40/8
envelopes [1] 30/15
equal [2] 92/24 175/8
equaled [1] 30/20
equatable [1] 198/1
equity [2] 44/24 45/1
equivalent [6] 78/19 82/23 83/3 83/20 85/7
86/25
ESQ [1] 1/19
Esquire [1] 148/4
estate [5] 69/21 80/18 83/25 92/9 170/4
estimate [2] 91/3 130/23
estimated [1] 56/13
estimates [2] 17/18 178/7
et [3] 88/23 129/25 163/22
et cetera [3] 88/23 129/25 163/22
even [16] 8/7 13/12 14/7 15/18 24/18 89/20
145/20 146/1 150/16 155/22 175/1 181/2
187/4 188/4 188/18 198/22
evening [4] 177/22 178/16 199/17 199/18
eventually [3] 5/18 56/19 111/24
ever [14] 21/21 35/3 36/7 36/11 36/19 36/20
37/6 45/24 129/18 152/17 165/22 165/24
189/3 189/23
every [11] 6/1 6/2 36/14 36/14 64/23 75/6
91/19 96/11 171/4 171/16 180/24
Everybody [1] 70/14
everyone [4] 2/2 2/21 62/18 131/23
everything [2] 31/18 37/1
evidence [54] 3/19 25/2 30/3 33/24 44/4
48/25 49/7 49/10 52/23 52/25 57/12 65/1
65/14 65/16 65/19 65/19 65/20 65/23 65/25

66/6 72/16 72/23 89/4 94/12 99/1 99/25
100/6 131/2 131/3 132/8 133/2 137/3 141/8
144/2 144/13 144/14 145/4 150/18 155/5
156/7 156/10 170/18 170/18 170/19 176/1
176/3 178/10 179/17 184/17 186/4 186/5
189/16 190/9 201/3
exact [3] 29/18 96/12 173/6
exactly [9] 7/3 13/5 17/3 29/10 29/19 30/16
37/18 39/12 178/4
exam [4] 9/1 9/5 9/13 56/16
examination [14] 3/8 19/9 22/21 26/12 44/12
44/13 54/22 61/13 88/25 149/25 152/4
159/23 166/16 173/13
examinations [2] 55/15 56/15
examine [1] 3/5
examiner [2] 93/24 95/2
examiner's [1] 93/18
examines [1] 55/9
example [50] 77/25 95/4 98/18 101/5 103/3
123/20 124/18 126/10
exceed [1] 79/2
exceeded [3] 33/13 80/25 94/22
exceeds [1] 95/8
except [5] 4/19 34/11 39/8 40/20 137/17
excerpts [5] 53/15 53/23 54/7 54/9 54/11
excess [1] 79/3
Exchange [2] 118/24 119/4
excise [1] 70/14
exciting [2] 48/18 67/5
excluded [7] 71/11 75/7 75/8 153/17 156/22
160/2 162/20
excludible [4] 157/15 157/18 157/23 159/18
excluding [1] 71/9
exclusion [2] 6/6 157/8
excuse [3] 62/12 70/21 135/16
execute [1] 161/9
executed [2] 132/20 144/3
executing [1] 161/9
exhibit [82]
exhibit 20 [5] 3/19 3/24 10/11 137/4 142/22
exhibit 203 [1] 49/17
exhibit 204 [1] 49/20
exhibit 205 [1] 49/22
exhibit 210 [1] 50/7
exhibit 212 [1] 50/12
exhibit 216 [1] 50/20
exhibit 218 [1] 50/25
Exhibit 228 [1] 51/25
Exhibit 230 [1] 52/4
Exhibit 231 [1] 52/6
exhibit 301 [1] 52/18
exhibit 302 [1] 52/21
exhibit 304 [1] 53/1
Exhibit 305 [1] 53/4
Exhibit 306 [1] 53/6
exhibit 308 [1] 53/13
exhibit 310 [1] 53/17
exhibit 312 [1] 53/23
exhibit 313 [1] 53/25
exhibit 314 [1] 54/3
exhibit 315 [1] 54/6
exhibit 316 [1] 54/9
exhibit 317 [1] 54/11
exhibit 403 [1] 144/2
exhibit 413 [6] 30/4 30/7 31/1 32/2 39/16
40/15
exhibit 413-2 [1] 33/25
exhibit 41301555 [1] 32/16
exhibit 601 [1] 91/10
exhibit 603 [2] 82/19 82/25

exhibit 603A [1] 83/5
exhibit 604A [1] 66/14
exhibit 605 [2] 75/19 76/8
exhibit 606 [1] 84/19
exhibit 607 [1] 86/22
exhibit 611 [1] 93/13
exhibit 712 [1] 98/20
exhibit 713-1 [1] 106/2
exhibit 714-1 [1] 109/7
exhibit 715-1 [3] 138/6 173/14 174/20
exhibit 716-1 [1] 118/13
exhibit 718-1 [1] 121/12
exhibit 719-1 [1] 122/11
exhibit 720-1 [1] 123/3
exhibit 722 [3] 72/13 162/11 168/12
exhibits [17] 48/25 49/9 63/9 65/1 65/13
73/13 81/18 86/13 89/5 90/5 98/10 98/16
98/22 99/1 100/3 102/1 201/3
exhibits 201 [1] 48/25
exhibits 601 [1] 65/1
exhibits 602A [1] 81/18
exhibits 607 [1] 86/13
exhibits 712 [4] 98/10 98/16 99/1 102/1
exhibits 712-1 [1] 98/22
exhibits one [1] 49/9
exist [2] 181/11 183/2
existed [1] 182/13
exits [3] 58/22 129/8 178/18
expanded [1] 169/16
expect [1] 177/25
expecting [1] 178/2
expects [1] 130/14
expended [2] 106/12 108/20
expense [8] 12/23 40/20 68/3 83/24 135/2
135/3 135/10 135/16
expenses [18] 12/21 14/19 15/2 27/3 27/13
28/2 35/5 35/9 38/19 41/22 43/5 69/20 79/13
80/3 80/16 83/13 92/8 97/8
experience [1] 74/22
expiration [1] 88/19
explain [10] 6/15 20/24 49/9 55/7 66/15
78/22 79/23 91/15 91/19 153/7
explained [4] 67/6 78/22 93/6 192/3
explanation [1] 187/23
exponentially [1] 169/16
extension [4] 17/22 68/21 155/18 195/25
extensions [1] 17/14
extent [5] 12/7 79/1 89/18 141/7 195/4
extracted [1] 101/22

**F**

F-u-j-i-t-a [1] 148/25
faced [1] 197/1
fact [19] 13/18 21/17 44/15 60/14 88/7 97/25
143/22 168/1 174/3 174/15 175/7 188/7
188/11 196/6 196/23 197/17 197/17 199/6
199/7
factors [1] 176/12
facts [17] 44/3 161/8 179/24 179/25 180/8
182/9 183/6 183/7 183/8 183/10 183/14
184/1 184/4 184/7 185/6 187/10 187/14
factual [4] 185/2 185/10 185/11 185/24
fail [1] 179/7
failed [3] 43/8 43/20 139/14
failing [2] 65/8 160/19
failure [6] 88/15 89/1 89/17 89/19 90/16
90/17
fair [14] 4/9 5/1 10/9 13/6 18/25 25/11 41/10
130/22 153/16 156/20 157/3 160/20 169/18
170/5

**F**

Fairfield [1] 53/6
fairly [1] 116/25
falls [1] 158/17
false [6] 65/9 89/18 161/7 162/2 179/10
 195/11
falsehood [2] 181/16 181/16
falsely [1] 179/15
familiar [5] 67/3 75/13 98/9 137/4 143/22
family [9] 59/25 97/21 102/8 106/21 108/21
 109/13 112/22 113/8 141/1
far [7] 30/24 56/6 64/20 169/6 171/11 179/4
 186/21
fashion [1] 192/7
Fast [1] 96/25
fault [2] 33/10 45/9
favor [1] 172/7
February [1] 123/6
February 24th [1] 123/6
federal [3] 1/21 132/12 147/10
feel [1] 147/7
fellow [1] 18/9
felt [4] 37/17 188/15 189/11 192/2
Ferguson [1] 1/20
few [10] 19/8 49/14 57/11 58/13 96/25 101/3
 137/11 149/8 150/19 175/15
fewer [1] 67/10
fiction [2] 182/3 184/5
fictionalized [1] 182/7
fide [1] 173/10
field [2] 55/16 91/24
fifth [4] 147/15 147/16 147/18 197/6
figure [3] 27/12 128/8 137/14
file [37] 13/24 14/6 15/18 15/20 17/15 58/4
 58/5 64/12 64/14 64/16 64/17 65/9 88/9
 88/15 88/19 88/21 89/2 89/17 89/19 90/16
 90/18 91/11 91/14 91/16 92/2 92/10 92/14
 92/22 133/9 147/5 147/19 151/2 151/5
 151/14 151/25 155/22 176/16
filed [35] 11/7 13/18 17/22 57/18 57/24 64/21
 64/21 66/16 67/8 76/10 76/11 83/3 84/21
 84/23 86/8 133/6 133/25 134/11 138/1 148/1
 150/22 150/24 151/9 154/18 155/4 164/7
 164/14 176/18 185/1 185/4 185/4 185/5
 185/11 185/15 185/18
files [4] 46/1 147/14 151/15 155/20
filing [9] 15/25 65/9 81/22 88/4 89/5 89/18
 89/22 90/1 162/2
fill [1] 136/13
final [3] 33/1 142/23 185/15
finalized [1] 193/3
finally [4] 41/6 118/11 142/22 185/15
financial [8] 56/24 57/14 66/23 140/5 148/13
 148/16 148/17 155/13
finding [1] 60/13
findings [1] 182/8
fine [5] 14/22 58/15 153/8 158/7 171/20
finish [6] 31/17 43/16 43/17 45/8 130/25
 178/5
finished [3] 2/12 2/14 33/6
finishing [2] 130/1 178/10
firm [4] 3/25 16/3 16/22 147/7
first [47] 3/24 10/12 13/15 14/12 23/4 23/7
 24/4 27/6 27/8 28/4 28/6 30/22 38/8 41/17
 62/7 63/24 88/17 100/17 101/5 102/12
 109/18 114/14 114/18 116/10 121/1 121/2
 123/21 123/21 134/3 135/13 139/4 140/1
 145/8 147/5 167/17 169/9 169/17 171/12

180/23 181/1 181/3 181/19 181/24 185/2
 187/12 195/11 197/9
fit [1] 90/6
fits [1] 89/18
five [3] 55/2 118/14 156/3
five-page [1] 118/14
FL [2] 1/18 1/22
floor [2] 1/18 98/12
Florendine [2] 128/16 128/20
FLORIDA [5] 1/1 1/7 1/24 9/3 46/6 92/1
flow [1] 67/15
flows [2] 87/12 87/6
focus [1] 66/12
folder [3] 100/12 144/22 148/7
folks [1] 175/11
follow [4] 15/3 65/6 93/21 159/2
following [13] 2/19 59/17 62/16 88/13 99/8
 107/9 130/6 131/21 144/19 148/17 155/12
 170/11 175/7
Foods [2] 26/18 26/19
foregoing [1] 201/12
forestall [1] 61/7
forgave [1] 159/5
forget [2] 158/20 174/16
forgive [4] 46/4 161/1 164/19 168/9
forgiven [2] 159/3 159/7
form [23] 30/13 38/9 45/16 46/1 55/10 58/19
 66/16 79/7 82/11 92/17 92/17 92/20 129/6
 134/9 139/5 142/2 143/1 146/9 149/12
 150/17 156/13 163/24 164/14
forma [1] 27/3
formation [1] 133/22
formed [2] 92/15 133/21
former [1] 46/2
forms [4] 40/3 45/18 139/6 147/25
Fort [3] 1/18 60/4 180/22
fortune [18] 4/7 4/19 10/19 12/20 15/10
 15/14 22/6 24/3 24/7 38/11 60/5 82/10
 134/20 134/23 136/6 137/17 142/4 143/3
fortune-telling [11] 4/7 10/19 12/20 15/10
 22/6 24/3 24/7 38/11 60/5 142/4 143/3
fortune-telling-income [3] 4/19 15/14 137/17
forward [2] 79/4 195/24
forwarded [4] 119/14 138/4 138/17 138/21
found [12] 4/23 78/1 96/21 102/13 143/23
 144/21 148/6 155/9 155/10 165/4 169/20
 171/25
foundation [1] 187/19
four [10] 53/16 103/13 109/8 130/18 130/22
 146/13 175/21 178/7 180/24 181/17
four-page [1] 109/8
four-year [1] 175/21
fourth [2] 114/21 126/7
Franklin [4] 1/23 201/11 201/17 201/18
fraud [14] 75/14 156/20 156/21 159/23
 159/25 160/15 160/15 160/17 160/18 162/4
 182/19 192/8 195/5 195/18
fraudulent [1] 161/7
fraudulently [1] 160/17
Fred [1] 1/19
free [3] 6/13 7/8 147/7
friend [1] 127/18
frivolous [1] 182/23
front [9] 32/23 66/14 80/5 90/20 90/24 98/9
 135/15 195/16 196/17
Fujita [1] 148/25
full [1] 197/24
fund [1] 44/21
funds [13] 44/18 44/20 44/20 57/5 57/7 57/9
 96/25 115/6 121/5 125/15 169/3 173/3 173/6

furnish [3] 118/17 121/21 141/22
furnished [9] 57/17 57/20 57/24 62/24 64/2
 96/4 110/22 120/1 121/5
further [7] 7/10 44/10 147/9 149/5 155/21
 193/13 198/15
future [3] 147/7 173/3 173/5

**G**

G-o-o-l-d [1] 16/10
GAAP [1] 8/22
gain [2] 76/15 135/21
gamble [2] 46/9 176/17
gambler [1] 46/22
gamblers [3] 46/15 46/19 47/7
gambling [89]
gambling's [1] 46/4
gamblings [1] 32/17
Garcia [1] 199/1
Gary [8] 73/9 87/20 121/14 122/3 165/9
 165/11 165/14 167/24
gather [2] 26/24 27/1
gathered [1] 190/16
gave [43] 6/18 11/6 11/6 22/7 36/24 36/24
 36/25 37/11 40/2 41/18 47/12 47/21 47/23
 47/25 48/4 97/15 139/6 139/8 142/4 143/4
 151/1 152/19 152/20 152/22 153/3 153/14
 162/25 163/4 163/11 165/17 165/19 165/20
 165/24 167/24 168/8 169/9 169/9 177/4
 177/9 179/21 180/4 189/10 189/11
Gemstone [2] 140/5 140/12
general [1] 18/20
generally [3] 8/22 9/12 55/25
gentleman [3] 16/10 31/17 33/7
gentlemen [8] 58/17 62/19 65/5 76/1 90/14
 129/5 131/24 177/20
get-go [1] 172/5
gets [1] 171/21
getting [13] 15/23 18/8 59/5 103/7 146/10
 153/23 160/19 169/4 169/8 170/2 170/3
 186/15 189/18
gift [52] 5/25 5/25 6/3 6/6 6/11 6/13 6/16
 6/16 6/19 6/23 7/6 7/11 7/13 7/14 7/15 7/15
 7/19 7/21 7/24 109/3 111/21 144/25 147/25
 149/2 149/4 150/17 150/22 151/1 151/2
 151/4 151/8 151/14 151/15 151/17 151/19
 151/20 151/24 151/25 154/24 155/1 155/3
 155/3 156/1 156/2 156/23 157/2 159/10
 159/16 165/1 177/5 177/10 192/12
gifts [9] 6/18 75/8 147/24 149/14 159/13
 159/19 161/24 162/19 162/22
give [34] 6/3 6/7 6/10 7/3 7/5 7/12 7/19 8/2
 8/2 8/2 23/2 27/3 27/3 27/5 28/11 28/11
 28/15 34/15 37/4 44/15 56/12 75/1 75/22
 91/3 118/6 126/2 130/11 167/4 167/8 167/10
 167/12 177/23 180/5 181/14
given [22] 9/5 30/11 30/12 45/21 57/5 61/23
 72/1 109/5 113/1 127/13 129/14 131/12
 151/4 151/15 151/24 152/19 152/24 153/3
 166/1 181/3 184/6 187/3
giver [3] 150/22 151/4 151/15
gives [4] 7/11 170/19 178/14 190/14
giving [6] 7/20 60/1 170/16 171/19 188/12
 192/17
glad [1] 46/14
Global [2] 31/7 32/10
goes [15] 8/8 36/14 67/18 110/21 135/15
 139/18 143/4 147/11 147/14 148/2 148/20
 148/22 149/5 195/4 196/4
going [84]
gold [6] 114/15 118/9 140/19 140/24 140/25

**G**

gold... [1] 174/5
golf [1] 17/23
gone [6] 9/9 89/10 89/11 113/11 199/11
 199/11
good [12] 2/2 2/15 2/22 25/20 26/14 26/15
 58/11 59/18 95/4 114/19 129/3 199/16
Goold [5] 16/10 16/15 16/15 16/16 16/25
got [26] 2/24 5/8 6/13 10/22 18/9 23/12 24/17
 34/12 37/4 42/16 44/16 45/11 45/17 62/4
 70/15 70/17 127/18 154/1 154/14 154/24
 166/12 171/5 180/14 182/18 189/22 196/2
gotten [5] 2/23 10/18 47/18 60/23 151/17
GOVERNMENT [34] 1/4 1/16 3/19 13/8
 76/2 81/18 88/16 88/20 89/1 100/18 102/1
 129/13 130/13 162/10 166/18 178/3 178/5
 179/5 179/18 181/12 181/15 183/5 184/14
 185/1 185/4 185/5 185/17 185/22 186/9
 186/15 186/23 196/23 197/2 198/2
Government's [79]
grade [3] 9/17 10/5 173/25
grand [2] 181/18 181/19
granted [1] 68/21
greater [1] 33/18
Greaves [2] 104/25 104/25
Green [5] 74/20 97/22 114/16 118/5 118/7
grief [1] 15/9
grieving [3] 163/22 164/4 164/23
gritty [1] 81/24
gross [21] 67/18 67/19 67/23 74/5 75/6 79/12
 79/16 80/3 82/7 82/7 82/12 83/10 84/14
 86/16 87/17 87/22 92/8 134/22 136/10
 136/21 164/16
group [1] 56/4
guarantee [1] 178/1
Guardia [2] 96/24 97/2
guess [23] 2/24 19/4 29/3 44/7 73/17 88/24
 89/3 89/7 89/13 89/16 108/10 134/18 163/13
 176/16 178/21 178/25 183/15 190/11 190/21
 194/8 195/22 198/11 199/3
guessing [1] 29/17
guidance [1] 191/2
guilty [16] 160/4 160/18 160/19 162/2 162/3
 185/16 185/20 196/13 196/19 196/24 196/25
 197/13 197/18 197/25 199/6

**H**

hadn't [5] 60/23 192/1 192/25 193/2 193/15
half [3] 91/9 178/11 181/1
Halifax [1] 105/3
hand [4] 25/25 100/19 129/23 141/2
handed [1] 34/1
handled [1] 194/6
handwriting [6] 31/2 31/14 31/15 31/23
 31/25 32/4
hang [1] 118/16
happen [3] 183/23 183/25 188/10
happened [5] 64/18 183/20 184/1 186/2
 187/1
happens [1] 146/2
happy [1] 130/15
hard [4] 64/14 64/17 81/9 132/16
haven't [4] 47/6 155/5 162/16 197/7
having [7] 17/11 181/17 181/20 182/12
 183/11 186/16 186/18
Hawaiian [1] 53/17
he'll [2] 131/13 188/14
he's [12] 16/11 33/5 61/16 61/17 61/17 62/1
 146/8 187/8 187/22 189/22 193/15 196/4

head [1] 187/20
headed [1] 148/23
heading [1] 149/7
health [1] 13/4
hear [12] 3/21 26/6 62/2 130/15 152/17
 157/10 163/14 163/18 163/21 173/16 173/19
 173/23
heard [9] 3/3 66/18 152/12 152/16 164/1
 174/2 174/3 190/12 194/15
hearing [2] 58/8 199/11
hearsay [1] 141/7
held [6] 88/13 99/8 107/9 144/19 167/4
 170/11
help [6] 26/24 36/12 46/18 56/5 56/6 75/4
helpful [2] 137/8 172/10
here [26] 31/5 59/1 68/19 89/22 94/6 99/16
 120/18 133/10 134/19 136/2 137/24 144/17
 152/15 153/7 155/25 156/1 163/11 168/4
 168/16 170/10 170/13 171/24 175/11 180/2
 182/6 183/19
Here's [1] 170/12
hers [1] 21/22
hey [1] 171/20
high [1] 92/6
higher [1] 91/20
Highlighted [1] 161/1
Highway [1] 1/21
Hill [16] 52/19 53/9 53/14 53/15 53/18 99/6
 109/9 110/1 110/22 111/24 112/10 112/21
 113/7 181/11 194/16 195/1
hire [1] 92/19
hired [2] 16/21 61/6
hold [3] 38/13 60/22 146/18
holds [1] 190/2
home [5] 44/24 45/1 69/22 83/25 87/10
homilies [1] 158/20
Honor [51] 3/6 30/1 33/21 39/19 48/11 48/20
 49/3 54/16 59/22 62/10 62/21 63/12 63/17
 65/11 72/19 73/8 73/11 73/25 78/9 88/10
 95/22 98/25 99/3 99/9 99/16 100/7 107/1
 107/7 107/24 108/9 115/1 129/23 130/2
 130/18 131/7 131/19 132/1 132/22 140/8
 144/12 144/15 160/3 160/5 170/6 179/2
 181/4 181/6 191/3 196/15 197/12 198/6
Honor's [4] 132/24 181/7 191/25 198/6
HONORABLE [1] 1/12
hope [2] 2/23 197/11
hopefully [4] 27/2 178/4 178/9 195/19
hoping [1] 199/9
Hopkins [1] 189/25
hospitals [1] 164/10
hotel [1] 85/20
house [2] 18/17 88/21
houses [2] 177/7 177/10
Houston [2] 118/23 119/3
however [3] 139/22 147/8 159/2
Hughes [1] 91/9
huh [3] 14/7 16/13 45/3
hundred [6] 6/10 67/9 80/23 96/14 172/23
 173/2
hung [1] 194/17
husband [3] 4/6 169/18 169/20
husband's [6] 12/4 13/4 18/8 163/21 163/22
 164/10
hypothetical [1] 47/11
hypothetically [2] 151/4 188/6
hypotheticals [2] 151/21 151/22

**I**

I'd [10] 8/13 88/11 88/15 88/17 88/24 107/13

126/2 129/23 172/2 197/14
I'll [21] 3/22 4/24 49/13 63/18 72/21 90/11
 95/25 131/5 135/22 135/7 137/9 141/8
 146/19 162/8 164/24 167/6 167/8 167/12
 171/20 186/23 198/14
I'm [114]
I've [15] 4/25 10/21 30/5 34/1 71/11 71/11
 98/14 99/15 131/12 132/23 161/1 180/17
 180/24 184/25 190/12
idea [12] 34/12 106/1 178/14 182/16 182/17
 182/19 187/20 189/23 196/10 196/17 196/20
 196/21
ideas [1] 187/4
identified [3] 23/20 98/17 142/23
identify [1] 33/25
illness [6] 12/4 12/19 15/9 18/8 163/22
 164/10
impeach [14] 140/15 140/21 181/13 182/5
 182/25 183/4 183/12 183/22 184/2 184/15
 189/24 190/2 190/4 190/9
impeachment [1] 190/13
implicate [1] 45/4
improper [1] 88/25
inaccuracies [4] 185/2 185/10 185/11 186/11
inaccuracy [2] 142/8 185/25
inaccurate [1] 184/22
inadvertent [1] 186/11
inappropriate [2] 186/17 190/3
Inc [50] 12/22 49/13 49/16 50/3 50/17 50/21
 51/3 51/13 51/20 53/7 64/7 66/16 67/17
 68/10 74/6 81/22 82/7 82/11 83/7 102/13
 104/5 104/9 104/21 104/21 105/5 107/12
 108/15 110/3 114/6 116/25 117/5 118/11
 119/22 120/1 121/22 122/7 122/9 124/16
 125/2 125/4 126/22 126/23 127/5 127/20
 128/2 133/22 142/10 143/9 143/18 164/14
inception [1] 172/22
inclination [1] 8/10
inclined [2] 189/19 190/15
include [2] 5/21 74/18
included [10] 4/15 4/18 5/11 15/2 71/11 79/7
 103/3 134/11 134/20 137/17
includes [4] 73/8 91/10 93/22 123/17
including [1] 71/8 123/12 128/8 128/10
 147/10 149/8 181/17
income [181]
incomes [1] 155/7
incomplete [1] 44/9
inconvenient [1] 2/24
incorrectly [1] 166/5
incurred [2] 14/25 80/3
indicate [4] 42/3 42/8 119/17 155/21
indicated [5] 19/14 21/17 124/25 127/12
 156/25
indicates [1] 149/3
indication [1] 130/11
indicted [1] 46/8
indictment [15] 66/10 160/11 160/25 161/2
 181/25 182/18 185/1 185/3 185/4 185/6
 185/7 185/11 185/14 185/15 185/18
indictments [20] 181/19 181/20 181/21
 182/4 182/7 182/9 182/10 183/7 184/3
 184/25 185/3 185/7 185/13 185/21 186/12
 187/8 187/9 189/19 190/23 190/24
indirect [1] 71/16
indirectly [1] 79/15
individual [8] 6/3 17/15 67/8 94/21 138/14
 146/15 189/7 189/13
individual's [2] 68/13 80/2
individually [1] 152/3

## I

individuals [19]  6/11 6/24 55/10 55/12 57/10 70/24 71/20 77/16 82/4 98/23 100/22 109/11 109/14 110/23 112/4 115/12 115/20 122/16 194/12
infer [1]  188/25
influenced [1]  180/16
inform [2]  43/8 43/20
information [55]  4/10 11/6 26/24 27/1 27/21 27/23 34/15 34/17 35/4 35/8 35/23 36/12 36/22 36/24 37/5 37/10 37/11 39/6 40/7 41/3 41/8 41/12 41/24 42/1 42/24 43/2 43/4 44/8 44/9 44/15 56/24 57/2 57/8 57/8 57/21 61/5 62/25 64/22 66/24 92/12 101/23 139/13 146/10 146/11 148/14 148/17 148/18 155/13 156/25 157/5 157/14 157/21 161/22 177/24 179/22
initial [8]  61/25 81/23 167/3 182/24 182/25 183/2 192/16 198/22
initially [2]  66/12 198/17
initials [2]  102/2 102/10
innocent [1]  196/18
innocently [1]  197/23
inquiries [1]  130/10
instance [7]  6/22 23/1 81/6 140/1 150/25 165/9 180/20
instances [3]  104/20 183/9 195/1
instead [3]  7/12 7/20 138/17
institutions [1]  139/7
instructed [2]  119/20 147/18
instruction [1]  65/6
instructions [2]  61/23 195/24
integrity [1]  182/5
intend [2]  161/5 188/5
intended [4]  169/1 194/25 195/10 195/12
intending [3]  61/16 192/2 195/5
intent [3]  66/2 161/4 161/5
intentionally [2]  179/10 179/20
interacted [1]  194/13
interest [13]  18/24 68/3 69/22 80/19 83/25 84/2 87/10 92/9 135/25 168/21 168/22 168/24 198/19
interested [1]  170/2
interesting [1]  67/4
interim [1]  147/8
Internal [20]  20/22 54/25 55/20 57/22 58/4 62/24 63/4 63/7 64/2 75/1 75/5 75/11 78/25 88/8 132/16 133/6 157/8 159/17 162/20 173/9
Internet [2]  140/6 141/6
interpretation [1]  170/18
interstate [1]  161/13
interview [6]  129/14 129/17 129/18 191/16 193/7 193/8
interviewed [1]  181/18 182/10
interviews [5]  56/7 182/24 183/1 183/3 189/22
introduced [5]  30/3 33/24 37/21 70/20 97/12
intrusive [1]  197/16
investigation [6]  56/3 56/5 176/25 180/13 184/16 188/24
investigative [1]  179/21
investigator [1]  56/23
investigators [1]  193/1
investment [1]  149/11
involved [3]  37/17 66/11 197/24
involvement [1]  110/1
irregular [1]  46/21
irrelevant [3]  140/13 140/20 186/17

IRS [12]  16/6 16/17 55/1 64/12 64/19 74/23 75/14 78/23 134/11 147/25 148/8 175/8
isn't [11]  23/3 89/8 99/11 158/3 168/6 171/1 176/22 188/7 188/11 188/19 196/12
issue [12]  59/23 60/25 63/20 90/18 147/18 178/22 178/25 179/3 182/21 191/24 192/19 194/3
issued [2]  28/16 122/6
issues [5]  147/10 147/10 178/21 179/1 182/15
it's [114]
item [4]  64/23 69/2 102/3 135/13
item 17 [1]  69/2
itemized [3]  69/18 80/20 80/22
items [13]  14/17 38/17 41/20 45/13 92/13 135/1 135/2 135/3 135/17 147/4 156/23 159/16 182/11
itself [3]  57/22 134/10 178/2

## J

Jacob [2]  99/5 120/25
jail [2]  88/20 197/2
Janice [2]  128/16 128/19
January [17]  22/8 36/14 41/19 85/20 85/22 85/23 86/4 117/9 121/4 121/16 122/8 139/11 142/5 142/6 143/5 174/15 174/21
January 1 [1]  139/11
January 15th [2]  86/4 117/9
January 2009 [1]  121/16
January 28th [1]  122/8
JC [2]  188/11 188/14
Jennifer [15]  52/19 53/9 53/14 53/15 53/18 99/5 109/9 110/1 110/22 112/10 112/21 113/7 181/11 194/16 195/1
Jet [1]  112/25
Joanne [5]  54/16 54/18 54/21 127/18 200/10
job [1]  114/19
John [7]  37/26 20 26/23 46/2 81/16 181/25 200/3
joint [4]  13/25 14/6 58/1 81/12
Joyce [60]  12/21 49/13 49/15 50/13 50/17 50/21 51/3 51/7 51/13 51/20 64/7 66/16 67/17 68/9 74/6 81/10 81/21 82/7 82/11 83/7 102/13 104/4 104/9 104/21 104/21 105/4 107/12 108/15 110/3 114/15 115/15 116/16 116/17 116/25 118/10 118/10 119/22 120/1 120/17 121/21 122/7 122/8 124/16 125/2 125/4 126/19 126/22 126/22 126/23 127/5 127/20 128/2 133/22 138/13 140/3 142/9 143/9 143/18 164/13 174/6
Jude [75]
JUDGE [27]  1/13 18/1 19/5 22/18 49/8 58/25 59/13 60/21 63/22 63/24 72/7 72/18 99/21 113/25 145/3 146/19 177/12 177/14 179/19 180/17 182/11 182/22 184/12 194/4 196/21 198/25 199/9
judgment [4]  128/21 128/23 128/25 129/1
July [5]  102/14 104/15 120/7 121/3 121/4
July 17 [1]  121/3
July 17th [1]  121/4
July 20th [1]  120/7
July 9th [1]  102/14
jump [1]  109/25
jumps [1]  119/12
June [1]  121/19
June 10th [1]  121/19
jurors [3]  2/11 99/22 130/9
jurors' [1]  100/16
jury [37]  1/11 2/19 49/9 58/22 62/4 62/12 62/14 62/16 66/15 75/23 90/3 91/15 129/8

131/16 131/20 131/21 132/11 160/18 162/3 166/23 170/19 176/2 178/18 181/8 181/18 181/19 182/5 183/5 183/25 184/8 186/3 186/12 187/22 188/25 195/16 196/6 196/17
jury's [1]  158/2
just [95]
justify [1]  20/24
justly [1]  192/17

## K

Keechl [1]  1/20
keep [5]  33/7 43/15 48/15 48/16 126/13
Kelly [2]  179/4 179/20
KENNETH [1]  1/12
Kent [2]  194/5 198/16
kept [2]  152/25 166/1
kick [1]  91/21
kidding [1]  150/7
kind [13]  21/8 26/22 27/1 28/10 34/17 36/3 95/12 122/25 130/11 177/23 180/11 196/19 198/1
kinda [1]  106/1
kindly [1]  48/21
knew [3]  43/21 179/23
know [97]
knowing [4]  22/13 22/16 89/1 197/24
knowingly [2]  161/4 161/4
knowledge [2]  45/25 185/14
known [1]  43/24
knows [1]  108/10
Kopelowitz [1]  1/20

## L

L-e-a-v-i-t-t [2]  54/21 150/5
l-o-n-e [1]  39/11
labeled [3]  148/7 155/11 162/13
lack [1]  189/21
ladies [8]  58/17 62/19 65/5 76/1 90/14 129/5 131/24 177/20
lady [2]  4/24 169/21
language [2]  181/11 181/24
lapse [2]  102/17 102/19
large [11]  12/4 14/20 14/25 37/19 38/20 41/22 46/15 46/19 92/23 151/11 169/4
larger [1]  124/5
largest [1]  135/10
last [24]  6/1 13/7 17/8 25/6 26/7 53/16 54/20 117/18 121/17 122/15 122/17 123/7 125/4 125/8 125/11 130/1 143/20 143/20 147/4 150/2 172/14 180/14 180/24 195/25
late [1]  177/21
later [13]  15/21 15/23 20/22 38/14 76/23 106/23 119/17 126/20 167/6 167/9 167/13 187/13 193/9
latter [1]  69/11
Lauderdale [3]  1/18 60/4 180/22
laundering [1]  160/16
Laurence [1]  1/16
Lavit [1]  150/6
law [17]  5/25 5/25 9/21 13/23 56/7 144/5 146/3 158/5 158/21 159/9 167/20 169/6 185/25 186/2 190/2 190/10 199/4
lawsuit [2]  60/4 129/1
lawsuits [1]  61/6
lawyer [11]  60/15 61/12 61/13 151/16 154/22 159/11 171/6 184/13 194/6 194/10 195/23
lawyers [3]  170/3 178/23 178/23
lay [5]  187/19 195/16 196/16 196/17 197/21
lead [1]  114/1
leading [1]  115/2

# L

leads [1] 65/23
leap [1] 155/9
learned [2] 141/6 141/9
leased [1] 21/15
Leasing [6] 54/10 54/12 74/19 97/22 118/9
142/18
least [16] 88/16 88/18 89/22 98/1 104/15
118/2 119/17 125/8 149/12 153/23 154/13
175/14 181/8 183/11 184/2 190/15
leave [3] 58/20 82/20 162/8
Leavitt [10] 54/17 54/18 62/23 66/10 66/19
100/16 150/7 150/11 150/17 200/10
left [4] 32/2 62/23 128/11 172/1
legal [5] 17/2 135/5 147/9 159/20 160/23
less [6] 70/4 80/24 124/2 124/5 151/7 197/16
let [37] 3/18 4/12 5/15 7/10 7/10 14/11 16/5
17/9 22/23 23/23 43/16 43/17 45/8 47/10
63/9 65/5 75/18 81/8 82/18 106/19 109/25
125/14 128/4 130/9 144/17 147/13 156/6
156/13 171/20 171/23 172/10 176/22 177/23
181/6 181/7 187/22 196/9
let's [40] 2/11 7/2 7/19 7/20 10/11 11/20 13/7
24/22 28/4 30/6 40/2 45/12 48/17 58/10
59/14 62/3 62/11 62/14 84/16 86/8 102/18
123/7 126/19 126/24 126/24 129/5 136/1
150/12 151/22 155/9 158/5 158/20 158/20
160/11 162/10 162/23 163/10 173/1 173/12
173/13
lets [1] 196/15
letter [55] 3/25 4/4 4/9 4/13 10/13 11/21
11/22 13/9 14/2 14/2 17/11 18/13 19/13 22/3
23/4 23/23 23/24 41/4 42/3 45/16 137/13
138/20 138/20 138/23 138/25 139/1 140/16
140/21 141/18 141/20 141/25 142/9 142/23
142/25 143/8 144/5 144/23 144/23 150/18
153/24 154/3 154/7 154/9 155/2 155/6 155/9
155/10 155/16 155/19 156/4 159/10 159/11
174/10 174/13 174/14
letters [12] 19/11 37/6 37/8 37/9 37/12 37/15
37/18 141/16 153/22 157/5 157/14 159/15
Levit [2] 150/6 150/9
Levitt [2] 54/21 54/24
liability [2] 70/10 147/9
license [1] 60/4
licensed [1] 46/5
lifetime [1] 6/8
lift [1] 37/24
liked [1] 172/7
likelihood [1] 91/20
likely [3] 103/11 197/14 199/5
limit [1] 60/3
limited [2] 65/22 147/10
line [25] 13/15 44/25 45/1 64/23 67/19 68/5
69/2 69/13 69/14 69/22 70/8 76/15 76/19
76/25 77/2 77/7 78/14 83/19 101/5 114/21
135/1 135/13 135/15 135/16 136/2
line 1 [1] 67/19
line 10 [1] 69/22
line 12 [1] 135/15
line 13 [1] 76/15
line 21 [3] 68/5 76/19 83/19
line 27 [2] 69/13 69/14
line 28 [2] 76/25 77/2
line 39 [1] 78/12
line 40 [1] 78/14
line 43 [2] 70/8 77/7
lines [2] 24/4 103/13
list [9] 48/21 57/11 73/13 73/15 89/11 89/23
110/21 136/14 148/23
listed [21] 31/9 69/5 69/19 69/20 69/21 69/21
73/13 75/11 82/10 94/3 94/5 94/6 95/18
118/2 139/22 149/6 149/13 165/8 165/11
168/11 192/4
listened [1] 184/25
listing [6] 32/9 68/24 68/24 89/22 148/13
155/7
lists [3] 31/6 114/14 149/8
literal [1] 133/12
little [9] 5/23 37/25 130/21 130/22 150/13
171/21 178/12 194/4 197/21
live [1] 187/21
LLM [1] 148/5
loan [71]
loaned [2] 5/9 18/23
loans [29] 5/15 6/17 8/1 10/18 10/22 10/25
14/19 15/6 15/23 18/9 18/14 21/18 21/21
23/13 24/17 24/20 24/23 34/25 38/19 41/22
44/16 45/11 47/10 141/19 154/1 161/25
162/19 162/22 170/22
location [1] 132/19
lone [1] 39/1
long [10] 13/1 13/23 26/6 55/1 55/3 57/11
90/25 130/16 172/10 178/13
longer [3] 13/16 130/10 130/21 177/25
longstanding [1] 186/7
looked [8] 23/12 23/11 23/13 35/15 76/16
96/11 97/1 140/6
looking [7] 7/23 35/17 89/10 106/16 134/19
137/13 178/9
looks [3] 131/2 128/8 53/9 67/19 68/21 70/12
100/17 106/8 110/13 111/14 112/24 120/15
126/16
lose [2] 33/8 175/3
loses [1] 175/1
losing [3] 46/11 46/11 175/15
losings [2] 176/1 176/3
loss [12] 33/3 33/3 33/12 39/15 67/12 67/15
68/6 80/4 81/6 84/1 175/8 192/8
losses [51] 4/8 28/12 28/14 31/9 31/13 32/11
32/16 32/20 32/21 33/13 33/18 34/2 34/5
34/13 39/14 39/23 40/10 40/12 46/25 69/12
69/14 76/24 76/25 78/16 78/19 78/23 78/25
79/2 79/3 79/4 80/17 80/21 82/21 82/23
83/18 83/21 85/7 86/25 92/6 92/24 93/1
93/11 93/20 93/22 94/18 94/22 94/25 95/3
95/5 97/8 135/19
lost [3] 32/25 175/6 175/20
lot [11] 3/21 4/7 15/5 15/10 37/17 96/13
96/14 151/21 151/22 152/1 176/17
lots [2] 56/11 56/12
loud [1] 23/9
louder [1] 3/22
love [1] 150/7
love-it [1] 150/7
lunch [3] 48/14 58/12 58/17

# M

ma'am [6] 25/24 26/11 31/16 33/5 44/15
48/12
machine [5] 31/12 46/24 93/2 93/3 93/5
magistrates [1] 182/8
Magna [1] 29/17
mail [4] 1/25 160/15 192/20 193/3
mailed [2] 36/18 45/23
mailing [1] 45/24
maintain [1] 192/12
major [1] 155/9
majored [1] 8/17
makes [2] 60/13 171/5
making [2] 130/9 183/6
man [2] 158/17 199/11
manager [1] 26/17
manner [2] 184/9 190/16
manners [1] 181/20
March [6] 3/25 4/22 85/23 138/20 191/17
191/17
March 28th [2] 3/25 138/20
Marco [4] 114/15 118/9 140/19 140/24
Mark [3] 144/5 148/4 148/4
marked [3] 3/18 123/24 174/20
MARKS [208]
Marks' [9] 12/19 42/9 67/16 142/13 142/16
148/16 148/19 155/14 169/12
MARRA [2] 1/2 1/12
Mary [2] 96/24 97/2
master [1] 133/9
match [1] 73/14
matches [1] 133/10
material [2] 161/7 161/8
math [1] 113/25
matter [18] 7/18 7/25 13/18 57/14 63/1 71/6
82/15 87/16 92/18 97/14 98/2 118/18 160/16
161/10 161/11 175/7 197/17 201/14
matters [11] 16/23 17/2 60/1 60/3 60/3 61/10
132/5 148/2 184/16 193/10 194/6
May 11th [2] 127/7 127/8
May 22 [1] 139/11
May 23 [1] 139/9
May 28th [1] 122/6
maybe [16] 13/13 29/11 62/11 85/23 96/15
124/5 133/18 183/22 187/4 187/19 189/1
189/24 194/5 197/8 198/6 198/7
me [97]
mean [19] 30/22 38/21 44/18 59/4 59/9 61/7
89/16 89/21 90/2 92/16 107/12 107/17
171/22 182/15 186/6 186/23 189/15 193/19
197/16
meaning [3] 74/14 101/13 101/21
meaningful [1] 61/13
means [2] 161/7 181/20
medical [5] 12/4 12/7 14/25 69/20 83/24
meditating [1] 170/4
meet [2] 13/13 42/2
meeting [4] 28/4 28/5 28/6 28/7
members [9] 59/25 91/15 97/20 102/8 106/21
108/21 112/22 113/7 179/21
memorialize [3] 168/19 169/3 169/5
memorialized [1] 180/19
memorize [2] 71/22 71/24
memory [2] 130/3 133/19
mentally [1] 90/25
mention [3] 16/5 142/9 143/4
mentioned [9] 70/13 70/25 95/14 95/16
97/23 117/23 125/14 143/8 150/18
mentions [1] 143/6
merchandise [1] 110/14
mere [1] 60/14
merely [1] 197/20
Merit [1] 201/11
met [5] 3/13 14/7 14/8 14/9 14/10
Metal [2] 114/16 118/8
Metals [1] 149/10
Michael [59] 12/22 49/13 49/15 50/13 50/17
50/21 51/13 52/7 52/11 52/14 52/17 64/7
66/16 67/17 68/9 74/6 81/10 81/22 82/7
82/11 83/7 102/13 103/15 104/4 104/9
107/12 108/15 110/3 114/15 116/16 116/17
116/25 118/10 118/11 119/22 120/1 120/17

# M

Michael... [22]  121/22 122/7 124/16 125/2
125/4 126/19 126/22 126/22 127/5 127/20
128/2 133/22 138/13 140/4 142/9 143/9
143/18 148/21 149/8 164/13 174/6 198/21
Michaels [11]  51/3 51/7 51/20 104/21 104/21
105/4 111/4 111/5 115/15 122/9 126/23
microphone [1]  26/5
mid [2]  46/22 114/21
middle [8]  13/13 13/19 112/20 116/6 117/7
119/8 126/24 131/1
might [6]  6/14 8/11 8/11 18/2 24/22 25/2
25/2 56/7 61/15 70/14 102/19 102/24 130/21
130/21 146/4 183/24 183/25 188/5 189/18
196/14 196/22 196/22 197/1 197/5 197/5
197/8
Mike [1]  17/17
Miller [7]  52/11 52/14 70/25 97/18 121/23
194/7 194/14
million [6]  6/7 7/5 91/9 143/13 175/1 175/3
mind [4]  3/20 66/2 150/8 186/19
minds [1]  187/5
mine [1]  16/11
mini [2]  40/25 189/12
Mini-Tournament [1]  40/25
minimize [1]  195/18
minute [1]  187/15
minutes [2]  58/13 129/7
misconduct [4]  179/5 183/19 186/10 188/23
misleading [1]  185/23
missed [1]  2/25
missing [4]  27/15 28/20 28/21 37/9
misstated [3]  176/3 179/25 180/1
mistake [4]  66/4 172/4 186/11 192/4
mistakenly [1]  179/15
misunderstood [1]  106/18
mom [1]  105/2
moment [4]  72/18 91/5 149/21 177/12
moments [2]  57/11 150/19
money [135]
monies [10]  14/24 73/21 79/14 159/21
159/23 159/24 159/25 168/19 169/1 169/9
Montassir [48]  4/18 4/24 15/24 18/9 18/14
19/16 19/21 20/1 20/6 23/1 45/12 47/11
52/23 52/25 53/2 53/5 71/17 73/4 73/21 74/4
74/9 74/15 77/12 79/15 82/3 82/14 84/8
85/12 85/20 114/5 115/24 116/15 116/16
117/5 137/16 138/4 139/16 139/23 140/3
140/25 141/22 143/13 144/24 147/24 149/3
149/13 149/18 152/12
Montassir's [2]  116/13 192/5
month [4]  12/24 28/21 181/1 193/9
months [3]  147/4 187/13 197/3
moot [1]  188/6
morning [7]  2/2 2/15 2/22 26/14 26/15 62/5
163/18
mortgage [17]  7/20 7/22 8/1 18/17 18/19
18/22 18/23 21/11 21/11 21/12 69/22 80/19
83/25 84/2 87/10 92/8 135/25
mortgages [1]  21/15
most [14]  14/19 14/24 15/15 34/24 38/19
40/18 41/22 101/8 118/2 122/25 123/1 138/8
152/9 152/16
mostly [4]  37/14 112/2 139/17 152/15
motion [2]  145/12 145/14
motions [1]  186/1
Mountain [3]  53/2 53/4 140/3
move [4]  11/25 63/24 123/20 147/13
moved [1]  57/12

moves [1]  26/5
moving [1]  48/25
Mr [8]  45/16 200/4 200/5 200/6 200/8 200/9
200/11 200/12
Mr. [83]
Mr. and [9]  13/9 13/11 13/15 23/25 38/8
139/5 142/1 142/25 144/10
Mr. Bardfeld [3]  45/17 47/2 47/9
Mr. Goold [2]  16/15 16/25
Mr. Green [1]  97/22
Mr. Kent [1]  198/16
Mr. Marks [4]  13/12 13/16 17/1 147/5
Mr. Marks' [1]  12/19
Mr. Phillips [1]  17/3
Mr. Raley [2]  192/23 193/5
Mr. Raley's [1]  192/1
Mr. Schwartz [9]  3/5 61/1 131/18 172/2
191/1 191/25 192/10 192/20 193/4
Mr. Schwartz's [2]  75/23 191/19
Mr. Soendergaard [1]  121/5
Mr. Stefin [18]  22/23 22/24 23/18 23/25 25/6
58/11 60/9 62/20 107/22 113/24 131/12
131/25 133/14 159/22 174/9 183/25 184/11
193/14
Mr. Tschetter [2]  121/17 121/21
Mr. Van [18]  3/10 19/11 27/17 36/11 37/4
38/3 41/11 42/23 43/5 43/8 43/25 46/16
137/3 139/3 141/16 153/24 164/22 173/16
Mr. Vogel [5]  155/2 155/6 155/6 155/8
155/23
Mr. Vogel's [3]  150/18 155/10 156/4
Mrs [4]  4/6 4/17 12/19 144/10
Mrs. [51]  4/19 10/1 10/17 12/3 13/10 13/12
13/15 14/9 14/10 14/13 14/16 14/17 14/18
15/5 16/5 16/21 17/1 20/4 22/5 23/25 24/1
24/5 25/9 25/15 25/15 38/8 38/10 38/15
38/17 38/18 39/5 39/6 40/2 40/17 41/5 41/7
41/18 41/20 41/21 41/25 57/5 57/6 137/18
139/5 139/10 142/1 142/2 142/4 142/25
143/1 156/25
Mrs. Marks [45]  4/19 10/1 10/17 12/3 13/12
13/15 14/9 14/10 14/13 14/16 14/17 14/18
15/5 16/5 16/21 17/1 20/4 22/5 24/1 24/5
25/9 25/15 25/15 38/10 38/15 38/17 38/18
39/5 39/6 40/2 40/17 41/5 41/7 41/18 41/20
41/21 41/25 57/5 57/6 137/18 139/10 142/2
142/4 143/1 156/25
Mrs. Nicholas [6]  13/10 23/25 38/8 139/5
142/1 142/25
Ms [1]  180/23
Ms. [47]  2/4 17/11 17/20 18/6 26/14 28/5
29/9 36/17 46/20 58/6 59/19 62/23
66/10 66/19 76/3 77/5 100/16 101/5 111/24
114/13 115/24 116/16 118/17 120/4 122/16
122/19 123/20 125/14 125/21 140/3 140/25
141/1 142/13 142/16 147/24 147/24 150/11
150/17 156/11 156/19 174/23 180/23 184/19
186/10 192/5 192/25
Ms. Abraham [1]  101/5
Ms. Cook [2]  184/19 186/10
Ms. Deveraux [3]  147/24 156/19 174/23
Ms. Hill [1]  111/24
Ms. Leavitt [6]  62/23 66/10 66/19 100/16
150/11 150/17
Ms. Levitt [1]  54/24
Ms. Marks [15]  2/4 17/11 17/20 18/6 28/5
29/9 36/17 46/20 58/6 59/19 76/3 77/5
114/13 141/1 156/11
Ms. Marks' [2]  142/13 142/16
Ms. Montassir [5]  115/24 116/16 140/3

140/25 147/24
Ms. Montassir's [1]  192/5
Ms. Roma [2]  118/17 120/4
Ms. Ueda [2]  122/16 122/19
Ms. Utstein [1]  26/14
Ms. Walker [3]  123/20 125/14 125/21
Ms. Watts [2]  180/23 192/25
much [39]  10/17 18/7 30/20 30/24 70/16 75/4
79/10 83/6 84/2 86/19 87/12 97/15 105/13
105/16 106/19 106/20 106/24 107/10 113/10
114/15 114/18 117/11 118/16 119/14 119/25
121/7 121/20 121/21 121/25 122/5 122/22
124/22 130/10 131/11 134/22 138/4 141/21
177/24 191/5
muddy [1]  90/7
multiple [3]  97/12 184/24 185/21
mumble [1]  3/21
must [3]  65/18 65/19 151/4
Mutual [8]  42/9 42/11 51/12 51/15 51/17
117/15 143/10 143/17

# N

name [49]  4/25 16/5 16/10 16/18 17/17 18/10
21/18 26/7 26/8 27/18 50/10 50/14 50/16
50/19 50/21 50/24 51/1 51/3 51/11 51/13
51/16 51/18 51/19 51/22 51/24 52/1 52/3
52/5 52/7 52/11 52/17 52/19 52/22 52/24
53/6 53/8 53/14 54/1 54/12 54/14 54/19
54/20 92/14 107/11 109/19 124/16 143/10
150/2 182/1
name's [1]  26/9
named [2]  4/24 181/25
names [5]  51/6 52/14 149/8 182/2 185/19
Nana [7]  99/5 106/4 106/12 107/6 108/3
108/20 109/1
Nancy [32]  51/7 51/22 52/1 70/25 97/17
103/3 103/19 104/9 109/14 110/22 110/24
111/4 111/4 111/5 112/5 112/5 112/16
112/25 124/8 124/9 124/11 169/9 169/12
169/25 183/8 194/6 196/7 196/23 196/24
196/25 198/20 198/20
nationally [1]  9/5
nature [3]  39/3 57/23 59/5
ND [1]  182/2
neat [3]  27/4 27/14 30/16
neatly [1]  27/21
necessarily [4]  60/19 187/3 187/18 194/23
necessary [5]  36/22 42/23 60/7 66/2 102/21
need [26]  2/9 28/1 31/16 33/5 33/17 44/19
44/19 48/15 48/22 53/10 56/7 59/2 59/11
59/14 62/3 62/8 78/4 89/12 129/11 130/11
133/24 137/7 146/2 191/10 191/11 194/9
needed [3]  37/2 166/9 167/4
needing [1]  170/14
negative [4]  70/5 78/15 85/10 195/13
negativity [3]  153/1 165/21 166/2
net [8]  39/15 69/5 79/13 80/4 80/13 80/25
135/7 136/6
never [29]  3/13 9/25 10/3 10/4 11/13 11/16
11/17 15/12 25/9 25/15 34/11 45/17 47/6
47/16 150/8 150/11 158/13 159/3 167/5
173/23 173/25 180/5 181/23 182/1 182/9
194/25 195/5 195/10 195/12
new [6]  12/11 12/24 52/10 73/17 148/20
185/13
next [11]  11/20 14/23 30/19 43/17 48/17
73/14 91/6 122/10 131/1 149/1 178/9
nice [1]  184/6
Nicholas [15]  4/1 13/10 15/1 23/25 38/8
68/22 81/13 82/10 110/16 132/13 134/2

**N**

Nicholas... [4]  139/5 142/1 142/25 144/10
Nicholas' [2]  4/22 15/9
Nick [1]  148/16
Nicole [1]  182/1
night [2]  130/1 180/14
nine [1]  113/14
nitty [1]  81/24
no [105]
non [4]  75/24 89/5 89/22 90/1
non-filing [3]  89/5 89/22 90/1
non-reported [1]  75/24
none [3]  40/22 153/14 165/2
nontaxable [1]  75/11
Norma [2]  104/25 104/25
normal [3]  2/25 4/5 4/5
normally [2]  21/6 27/6
Norman [1]  194/4
Nos [1]  49/6
note [16]  21/8 21/10 21/11 21/12 24/23
 118/21 168/16 168/17 168/18 168/20 168/20
 168/24 169/3 173/1 173/4 173/8
notes [9]  24/21 58/20 130/2 130/3 169/6
 193/14 193/22 193/25 194/1
nothing [4]  138/23 184/17 184/22 186/3
notice [1]  126/6
noting [1]  127/21
November [3]  110/13 127/21 201/15
November 13th [1]  127/21
November 29th [1]  110/13
number [52]  14/25 19/13 22/3 33/1 37/22
 41/15 49/13 49/16 49/18 49/21 49/23 49/25
 50/6 50/8 50/11 50/13 50/21 51/8 51/13
 51/14 52/8 52/14 52/25 54/2 54/4 54/10
 56/12 80/22 92/23 94/14 94/18 95/19 96/12
 101/12 101/13 101/18 101/19 101/21 102/2
 102/10 103/6 103/23 109/25 124/11 137/10
 139/9 142/17 144/2 148/11 149/17 153/22
 156/3
number 1677 [1]  54/10
number 1951 [1]  52/25
number 20 [2]  37/22 41/15
number 2275 [1]  109/25
number 2498 [1]  51/14
number 3531 [1]  54/4
number 5523 [1]  50/6
number 753 [1]  137/10
number 759 [1]  22/3
number 8694 [1]  54/2
numbered [2]  134/18 134/18
numbers [15]  15/17 40/14 40/14 73/14
 101/22 102/4 103/24 125/25 133/5 170/13
 170/16 170/20 170/24 171/25 173/12
numerous [1]  139/23
Numismatic [2]  118/23 119/3
Nursery [1]  134/8

**O**

o'clock [3]  58/18 58/20 130/1
Oakland [1]  144/4
oath [2]  2/16 62/15
object [13]  39/20 72/19 73/25 88/10 95/23
 99/3 99/13 108/9 115/1 132/24 140/8 144/12
 171/22
objecting [1]  172/4
objection [46]  6/25 10/7 25/12 29/2 29/12
 29/15 34/7 40/11 44/3 47/14 49/2 49/3 49/5
 63/13 63/16 65/3 65/4 72/6 72/22 75/23 78/8
 90/3 94/10 94/11 96/1 99/12 99/18 99/19

100/4 100/4 107/1 107/8 108/17 132/23
 133/1 140/13 140/20 141/5 141/10 145/2
 146/20 160/21 162/5 163/24 170/6 170/7
obligation [8]  5/18 6/13 10/1 11/17 22/12
 25/10 25/16 151/19
obnoxious [1]  158/8
obtain [4]  41/24 42/1 88/7 161/6
obtained [5]  40/7 85/12 156/20 156/21
 160/17
obviously [1]  130/3
occasion [1]  27/17
occasions [2]  65/17 66/1
occupation [1]  54/24
occur [2]  176/10 176/12
occurred [1]  91/17
occurring [1]  86/3
October [9]  10/14 121/10 122/14 123/9
 141/17 144/8 144/8 155/17 181/1
October 15th [1]  144/8
October 16th [1]  122/14
October 17th [2]  10/14 141/17
October 1st [1]  123/9
October 2001 [1]  155/17
October 29th [1]  121/10
off [13]  21/15 30/22 32/24 62/23 90/11
 105/16 124/18 146/10 146/18 170/1 172/5
 195/20 195/21
offer [5]  61/17 65/1 72/16 94/9 99/1
offered [5]  65/7 89/5 95/17 180/4 197/2
office [15]  1/17 12/11 12/24 16/10 26/17 46/2
 55/12 55/12 55/14 56/22 58/7 91/24 91/25
 92/11 153/25
officer [5]  150/12 150/14 150/14 158/14
 160/4
officers [2]  180/6 180/7
offices [2]  55/17 144/5
official [2]  1/23 120/16
offset [2]  27/13 76/23
offsets [2]  69/12 80/22
often [3]  3/21 55/16
oh [12]  14/1 14/12 18/2 21/3 23/12 75/20
 80/11 125/22 126/8 142/15 188/15 197/22
okay [120]
older [1]  114/11
omissions [1]  161/8
on-site [1]  54/4
once [4]  3/14 39/10 99/25 150/11
one [84]
one-page [1]  120/24
one-year [1]  70/16
ones [5]  83/22 91/22 99/13 145/11 180/20
only [22]  3/10 14/7 14/9 42/4 42/4 55/12 61/5
 67/14 71/11 79/1 79/2 85/5 91/22 95/4
 156/18 159/20 175/2 175/3 179/2 183/4
 183/17 183/18
open [3]  178/24 196/22 198/13
opened [3]  128/12 171/22 197/12
opening [2]  199/5 199/7
opens [1]  198/8
opinion [8]  10/6 47/4 157/25 158/2 158/3
 158/6 158/21 159/6
opinions [4]  58/19 129/6 171/10 171/15
opportunity [4]  63/3 132/3 170/20 195/16
opposed [4]  10/18 100/11 192/7 199/6
order [10]  2/1 21/2 57/9 100/12 118/2 134/17
 161/22 162/2 182/5 189/16
ordered [1]  128/25
ordinary [2]  68/5 69/6
organize [1]  46/18
organized [2]  27/4 59/5

organizer [5]  36/14 36/16 36/18 36/19 36/20
organizers [1]  36/11
origin [1]  101/12
original [1]  183/13
originally [1]  169/12
Ostrow [1]  1/20
others [6]  37/16 69/19 161/7 181/9 181/10
 194/15
otherwise [2]  102/3 145/21
our [17]  2/24 22/12 48/17 58/17 59/24 64/14
 70/17 131/9 133/9 139/21 147/5 155/20
 159/20 174/24 180/14 180/18 185/14
ourselves [1]  55/16
out-of-state [1]  126/25
outside [1]  57/22
over [31]  5/25 9/9 9/14 14/17 18/8 33/10
 38/17 41/20 43/15 56/9 57/6 65/4 72/21
 80/23 83/14 86/20 87/4 100/3 100/4 100/11
 124/19 129/19 132/25 147/4 151/5 152/6
 165/22 175/14 175/20 183/19 192/1
overrule [3]  63/18 95/25 99/19
overruled [8]  34/8 47/15 74/2 75/23 107/2
 140/22 163/25 172/11
owe [5]  7/14 7/20 7/22 8/3 8/8
owed [1]  56/17
owing [2]  77/9 136/4
own [2]  79/25 129/25
owned [1]  71/4
owners [1]  67/13

**P**

p.m [4]  59/16 130/5 130/5 199/18
PA [2]  81/16 148/4
package [1]  169/12
page [56]  3/24 10/11 13/7 22/24 70/7 100/18
 105/9 105/17 109/8 110/21 111/13 112/1
 112/9 112/20 114/3 114/14 114/18 114/22
 115/5 115/16 115/23 115/24 116/2 116/6
 116/9 116/10 117/3 117/6 117/7 117/22
 118/14 119/8 120/13 120/24 122/18 123/16
 123/21 125/11 125/15 126/6 126/24 126/25
 128/7 135/13 136/2 138/5 139/18 139/19
 140/1 140/23 141/22 141/24 143/14 143/20
 174/21 174/21
page 1 [2]  22/24 105/9
page 10 [3]  117/6 117/7 117/22
page 11 [1]  128/7
page 2 [13]  105/17 110/21 111/13 115/5
 119/8 122/18 123/16 125/15 126/6 138/5
 139/18 140/23 174/21
page 3 [4]  112/1 112/9 140/1 174/21
page 4 [1]  112/20
page 5 [4]  115/16 115/23 120/13 139/19
page 6 [4]  115/24 116/2 141/22 141/24
page 7 [2]  116/6 116/10
page 8 [2]  126/24 143/20
page 9 [3]  116/9 117/3 143/14
pages [3]  1/10 139/17 139/19
pages 3 [1]  139/19
paid [19]  5/4 5/4 5/8 10/2 21/21 70/12 74/3
 109/2 113/7 121/17 122/19 123/10 125/20
 128/5 134/8 156/8 156/9 160/1 167/3
Palm [2]  1/7 1/24
paper [6]  91/3 92/5 154/25 155/1 155/5
 155/7
papers [7]  61/19 93/19 93/19 144/22 170/2
 170/3 172/20
paragraph [18]  4/13 4/22 12/13 12/16 14/12
 19/14 19/18 23/4 38/8 38/14 39/14 40/2
 40/17 41/17 137/15 139/4 144/25 147/11

**P**

paraphrasing [1] 180/6
parentheses [1] 154/25
parenthesis [5] 41/19 101/7 149/2 149/3 149/11
Park [1] 144/4
parlor [1] 46/5
part-year [1] 132/13
partially [1] 21/22
particular [13] 36/7 56/21 60/2 63/1 73/5 87/2 91/25 92/2 102/21 103/9 103/25 175/16 176/7
particularities [1] 9/8
particularly [1] 23/7
parties [16] 10/2 11/18 21/2 57/9 57/10 70/23 74/15 97/17 118/18 138/24 142/12 142/15 167/17 167/18 173/10 173/21
partly [1] 26/24
partner [1] 194/5
partnerships [2] 55/10 67/11
party [12] 21/14 21/22 25/7 25/10 25/16 74/12 74/14 93/7 97/21 115/20 138/17 138/22
passing [2] 15/9 164/11
past [1] 173/25
patience [1] 178/17
patiently [1] 185/1
pattern [2] 89/17 183/5
Paul [1] 99/5
pay [25] 5/18 6/14 6/19 6/20 7/21 7/21 8/1 10/2 10/22 10/24 11/17 14/25 21/14 21/15 44/21 44/22 45/2 48/4 56/18 128/13 160/20 167/6 173/2 195/20 195/21
payable [8] 96/24 101/16 102/13 104/4 111/15 112/3 114/14 116/15
payees [1] 117/23
paying [3] 12/12 13/2 18/24
payment [11] 6/17 7/20 56/18 57/9 100/21 102/17 106/9 123/21 156/15 166/12 166/13
payments [48] 11/9 11/12 11/18 21/14 21/22 25/7 25/10 25/17 70/22 74/20 106/5 109/8 109/10 110/9 114/5 115/18 115/24 121/13 121/25 122/2 122/11 122/13 124/8 124/14 124/19 125/9 126/18 128/19 138/23 140/19 140/24 142/12 142/15 142/18 156/13 159/13 161/24 161/24 161/25 162/1 163/7 163/15 173/14 173/20 174/4 174/7 174/22 192/5
payoffs [2] 126/21 128/10
payor [1] 174/6
pays [1] 7/12
pennies [1] 38/24
people [13] 16/9 33/7 46/15 46/18 118/3 161/3 173/15 181/17 181/21 195/2 195/2 196/2 196/19
per [3] 64/21 117/22 175/19
percent [2] 113/21 113/23
percentage [1] 113/18
perform [2] 57/3 77/22
performed [5] 56/9 58/6 58/7 96/5 138/15
performs [1] 138/14
perhaps [2] 182/22 188/14
peril [1] 61/11
period [7] 57/18 122/20 174/11 174/15 174/25 175/14 175/21
permissible [3] 186/19 187/2 187/17
permitted [1] 58/25
perpetrate [1] 182/4
person [10] 7/5 27/6 47/21 47/23 60/18 79/25 92/20 93/7 188/12 195/9

personal [17] 15/2 17/1 22/6 23/21 23/21 24/2 24/6 24/14 24/18 38/11 45/13 68/13 68/20 68/21 127/12 142/3 143/2
personnel [1] 91/23
pertain [1] 64/6
pertaining [3] 62/25 92/12 93/10
pertains [1] 118/14
Peter [10] 18/10 18/11 18/16 21/18 54/7 54/15 74/19 97/21 118/10 142/18
Phillips [3] 16/18 17/1 92/15
phone [3] 35/14 70/16 189/9
photocopies [1] 93/18
pick [1] 141/1
picked [2] 45/19 45/21
piece [2] 171/16
pieces [2] 32/11 32/12
piles [1] 30/18
Pink [1] 40/25
place [8] 66/24 92/19 118/22 122/15 123/8 152/25 166/2 195/11
placed [1] 147/6
plan [1] 66/3
plant [1] 189/23
Plantation [1] 92/1
planted [2] 182/16 187/20
play [2] 173/23 69/3
player [1] 175/22
players [1] 175/17
plays [2] 178/2 198/5
plea [2] 197/3 197/3
plead [1] 196/25
pleasant [1] 178/25
please [21] 2/2 2/21 19/24 25/24 26/2 26/5 26/8 33/6 43/18 54/19 58/24 59/18 62/18 72/8 100/14 129/10 131/20 131/23 147/7 160/7 170/10
pled [10] 185/16 185/20 196/13 196/19 196/24 197/1 197/13 197/17 197/24 199/6
plus [2] 113/14 173/5
podium [1] 22/23
point [11] 48/19 102/16 102/23 130/12 141/19 166/6 171/5 173/1 173/5 188/22 194/20
pointed [3] 198/18 198/24 198/25
poisoned [1] 184/9
police [2] 129/25 180/22
Polo [4] 114/15 118/9 140/19 140/24
portion [4] 13/24 154/14 154/15 172/15
position [6] 154/13 157/20 157/22 157/23 157/25 199/4
possession [1] 132/19
possibilities [2] 197/10 197/11
possible [7] 25/5 27/4 27/14 146/5 176/16 182/13 198/4
Postal [1] 161/12
posted [1] 102/18
potential [2] 187/18 198/18
Pounds [1] 123/25
power [3] 92/15 92/17 94/21
practice [4] 4/3 17/5 17/12 17/24
praying [1] 170/4
Precious [3] 114/16 118/8 149/10
precise [1] 102/22
precisely [1] 102/21
preparation [5] 4/2 36/13 42/12 42/24 146/16
prepare [22] 13/10 13/15 24/5 26/25 36/12 36/16 37/6 37/12 37/15 38/9 66/3 72/2 98/4 98/17 105/12 128/24 139/5 142/2 143/1 155/20 162/11 190/18

prepared [29] 27/7 29/5 29/8 38/2 43/22 43/25 44/8 59/3 59/10 61/20 72/14 81/15 93/20 98/13 98/22 148/13 149/13 155/6 155/8 155/18 155/23 155/24 159/12 190/19 191/13 191/18 191/24 192/19 193/9
preparer [5] 146/1 146/11 146/12 154/22 159/11
preparing [10] 13/22 20/21 28/24 33/14 37/10 41/11 145/25 146/9 148/18 155/14
presence [1] 163/14
present [8] 2/5 48/19 59/19 66/19 93/24 130/8 187/6 187/11
presented [9] 92/12 93/22 95/2 95/20 179/17 184/17 184/23 186/4 186/5
presenting [1] 194/20
preserving [2] 63/15 63/16
pressure [2] 188/12 188/21
pressured [3] 188/15 189/12 189/13
presume [1] 195/14
pretenses [2] 161/7 195/11
pretty [3] 87/12 114/14 114/18
previous [4] 14/8 76/10 76/16 154/23
previously [1] 143/12
principal [1] 18/25
principles [2] 8/22 9/15
prior [5] 64/13 86/1 88/19 133/22 139/21
private [1] 161/12
privilege [9] 60/8 60/12 60/15 61/15 145/22 146/1 178/25 197/15 199/8
privileged [1] 145/18
privileges [1] 60/10
prize [1] 40/19
pro [1] 27/2
probably [9] 8/13 8/19 60/11 96/15 146/6 178/12 184/21 186/11 189/20
problem [4] 89/3 169/14 170/12 171/18
problems [3] 169/16 169/17 182/13
procedure [1] 15/3
proceed [5] 2/6 2/7 66/8 146/25 147/1
proceedings [12] 1/11 2/20 59/17 62/17 88/13 99/8 107/9 130/6 131/22 144/19 170/11 201/13
proceeds [1] 177/9
process [5] 17/12 18/20 148/18 155/13 192/22
produce [1] 193/25
produced [1] 63/4
professional [2] 135/5 147/19
profit [4] 79/13 80/4 80/15 80/25
project [1] 3/20
promised [8] 48/1 152/22 165/18 168/1 180/5 181/21 181/21 194/24
promises [1] 161/8
promissory [3] 21/10 21/11 168/17
pronounce [1] 182/1
pronounced [4] 4/25 16/15 150/6 150/7
proof [3] 40/19 46/24 184/1
proper [3] 15/3 159/16 183/1
properly [2] 145/21 175/25
property [2] 76/18 161/6
proprietor [4] 79/8 79/10 80/1 82/11
proprietorship [1] 134/21
prosecution [3] 182/4 182/6 182/8
prove [2] 180/17 183/19
proves [1] 192/11
provide [8] 28/10 36/7 36/11 42/19 42/23 43/1 43/3 56/4
provided [12] 4/17 35/4 35/7 36/21 40/21 41/12 42/5 57/4 133/13 133/15 157/6 157/21
provisions [1] 190/23

**P**

psychic [2] 13/14 167/2
public [1] 197/17
publish [1] 100/8
publisher [1] 116/14
pull [6] 66/14 68/18 78/1 94/3 96/8 133/12
pulled [2] 91/18 91/22
pulling [1] 98/5
purchase [1] 118/23
purchased [3] 40/23 40/24 140/25
purchases [1] 119/3
pure [2] 184/4 184/5
purpose [5] 27/25 37/8 145/25 153/7 161/9
purposes [3] 65/22 71/8 166/10
pursuant [1] 132/4
put [30] 12/10 20/20 27/21 30/19 36/3 44/16
 44/18 46/23 60/10 70/4 85/10 93/9 93/15
 100/24 117/19 120/18 128/22 133/19 133/24
 137/9 155/19 156/13 179/10 182/3 184/5
 186/8 187/4 188/8 192/6 192/9
putting [3] 3/1 178/5
puzzles [1] 27/22

**Q**

qualified [3] 6/18 7/14 9/3
qualify [2] 9/7 173/8
question [44] 6/14 7/11 8/11 18/5 25/6 28/22
 29/6 35/11 35/20 39/19 39/25 43/17 43/17
 44/5 47/20 59/23 60/9 71/10 72/8 89/14 90/9
 90/15 106/23 107/15 107/19 107/23 141/9
 141/11 160/6 160/16 160/22 162/17 163/24
 164/24 172/14 172/18 174/9 175/24 176/23
 179/4 185/25 186/2 191/12 196/6
questioning [1] 19/23
questions [20] 18/1 19/4 19/8 23/16 23/19
 25/19 28/19 35/14 44/10 48/9 60/16 61/4
 62/2 76/4 160/5 171/9 171/13 171/15 177/14
 179/3
Quickbooks [2] 93/23 95/18
Quicken [3] 93/4 93/23 97/5
quite [2] 49/14 167/1

**R**

raise [2] 25/24 59/23
raised [2] 60/9 174/9
Raley [4] 191/13 191/13 192/23 193/5
Raley's [1] 192/1
random [2] 176/10 176/11
rate [1] 192/4
rather [5] 11/7 58/13 126/4 170/15 182/1
Raton [1] 1/22
raw [2] 27/10 27/11
reach [2] 194/16 194/17
reached [2] 194/11 194/14
reaching [1] 57/13
reaction [1] 61/25
read [20] 3/3 4/13 12/16 14/13 14/23 23/5
 23/9 32/21 38/8 41/7 45/17 57/11 120/18
 132/23 146/13 147/17 160/13 161/14 172/13
 172/15
reads [3] 41/17 147/3 148/16
ready [8] 2/6 2/7 2/8 3/1 59/21 62/20 131/18
 131/19
real [5] 69/21 76/17 80/18 83/25 92/9
realize [1] 161/20
really [11] 6/15 17/21 60/25 89/19 90/5 90/8
 105/19 176/22 177/20 186/15 190/7
Realtime [1] 201/12
reason [3] 32/23 92/2 160/1

reasonable [1] 65/24
reasons [1] 146/6
rebuffed [1] 61/22
recall [33] 3/14 6/5 7/3 13/5 15/17 17/3 18/22
 25/18 28/5 28/7 28/24 29/8 29/14 34/23
 34/24 36/16 45/24 57/20 74/19 86/3 86/3
 103/8 103/10 104/25 116/13 119/19 128/10
 148/7 165/25 166/21 173/4 173/5 173/7
receipts [35] 28/12 28/14 32/9 41/1 46/23
 67/19 71/19 72/10 74/5 77/12 77/13 77/17
 79/12 79/17 79/19 80/3 82/2 82/4 82/7 82/7
 82/12 82/14 83/10 84/8 84/9 84/12 84/14
 85/11 87/15 87/17 88/1 92/8 136/10 136/21
 164/16
receive [4] 7/15 8/5 41/3 61/5
received [20] 19/21 20/1 20/5 71/20 73/21
 76/3 77/13 79/14 79/17 84/9 87/17 102/19
 132/7 134/19 137/22 141/19 143/13 144/1
 144/24 147/24
receives [3] 40/18 91/20 157/17
receiving [3] 101/17 101/19 138/16
receptionist [2] 27/8 45/21
recess [6] 58/24 59/16 129/5 130/5 177/22
 199/18
recipient [6] 6/16 101/16 104/20 151/14
 151/24 159/19
recognize [1] 93/13
recognizes [1] 176/13
recollection [5] 33/20 85/24 150/21 166/22
 191/25
recommended [1] 17/17
reconcile [2] 40/10 40/14
reconsider [1] 198/7
record [54] 2/4 59/19 63/12 64/15 88/4 88/16
 89/25 99/3 99/9 103/1 109/4 126/10 130/7
 132/22 175/12 201/13
recording [1] 194/15
recordings [3] 179/14 179/15 179/16
records [73]
recover [1] 56/14
Recross [2] 22/21 200/6
Recross-examination [1] 22/21
red [1] 32/23
redirect [7] 19/7 19/9 22/17 48/10 177/16
 177/17 200/5
reduce [1] 80/6
reduced [2] 81/7 135/8
reference [3] 39/16 121/13 139/4
referenced [1] 174/19
referring [2] 32/12 128/25
reflect [10] 92/2 92/10 106/5 108/5 108/25
 114/3 114/5 166/14 166/15 175/25
reflected [3] 19/2 19/3 68/15 70/7 82/8
 107/4 116/6 134/6 139/25 141/18 142/13
 142/16 144/24
reflecting [2] 109/8 133/5
reflects [4] 103/8 108/25 122/2 175/25
refresh [2] 133/19 191/25
refund [1] 70/18
regard [2] 65/6 139/20
regarding [18] 10/15 12/11 16/6 35/5 35/8
 43/4 57/2 57/5 88/22 90/15 93/19 99/4
 122/11 151/19 170/4 174/10 179/5 183/6
register [2] 39/17 40/15
Registered [1] 201/11
regular [1] 46/21
regularly [1] 158/16
regulation [2] 157/9 159/18
regulations [1] 162/21
reiterate [1] 67/2

related [8] 57/1 57/21 58/5 71/5 115/20
 118/18 120/24 150/8
relates [1] 132/5
relating [2] 42/5 42/19
relation [1] 92/6
relevance [7] 6/25 89/19 170/8 170/9 179/8
 179/8 189/16
relevancy [1] 34/7
relevant [6] 90/8 90/17 159/8 162/23 171/22
 176/22
rely [2] 22/10 133/23
remainder [2] 166/17 166/20
remember [24] 11/15 12/25 16/7 16/8 18/11
 18/11 18/17 19/1 24/10 29/18 29/22 30/15
 33/16 33/17 33/18 36/20 39/12 46/20 70/14
 164/3 164/21 166/16 194/8 198/20
remembered [1] 18/16
remembers [1] 192/20
remitter [2] 120/17
remove [2] 90/5 90/10
rendered [2] 160/1 163/8
rent [5] 12/12 12/21 12/23 68/2 135/10
repaid [4] 159/3 168/20 168/22 168/24
repayment [3] 109/1 120/19 166/15
repayments [4] 121/20 123/12 123/14
 123/17
repeat [1] 53/9
repeatedly [1] 147/23
repetitious [1] 182/23
rephrase [10] 29/6 39/25 44/5 72/8 106/19
 107/14 107/15 107/19 107/22 160/22
replays [1] 40/19
report [37] 20/6 78/5 78/16 79/2 79/6 79/10
 80/2 81/25 82/20 83/6 83/9 83/10 83/17 84/4
 85/3 85/8 86/16 87/1 93/4 129/13 129/14
 156/1 181/3 188/9 190/20 191/13 191/18
 191/24 192/1 192/3 192/19 192/24 192/25
 193/2 193/6 193/15 193/17
reported [54] 20/2 20/3 20/8 67/12 67/15
 69/1 69/13 69/25 70/9 73/23 74/5 75/24
 76/13 76/14 76/15 76/19 77/1 77/5 77/7 77/8
 77/21 78/14 78/18 79/12 80/1 80/13 82/1
 82/12 82/22 83/19 83/19 84/6 84/14 85/5
 85/18 87/3 87/22 94/15 94/17 133/10 134/4
 134/22 135/1 135/19 135/23 136/2 136/21
 137/20 149/2 149/4 156/2 156/2 157/3
 187/13
reporter [5] 1/23 1/23 172/15 201/11 201/12
reporting [1] 43/24
reports [16] 129/16 129/17 129/18 131/10
 154/10 182/24 182/25 183/11 186/25 187/16
 187/18 189/21 190/16 190/18 193/13 193/15
represent [1] 46/16
representation [1] 198/19
representations [3] 22/10 61/9 161/8
representative [2] 92/11 92/19
representatives [1] 55/18
represented [10] 3/15 59/25 97/7 154/20
 167/5 179/14 179/15 198/16 198/21 198/22
requested [1] 172/15
require [1] 147/6
required [8] 9/11 20/11 20/13 20/14 20/17
 20/19 60/13 136/14
requires [2] 60/19 173/2
research [2] 145/24 147/18
resident [1] 132/14
residents [1] 67/11
resolution [1] 196/11
resolve [5] 61/10 195/9 196/18 197/19
 197/23

**R**

respect [29] 19/11 56/21 57/1 57/16 61/10 65/15 67/22 73/20 77/25 84/8 88/8 94/25 97/20 98/14 98/16 108/2 112/22 121/12 122/10 123/3 133/18 139/14 142/8 142/22 143/8 143/24 188/11 188/23 188/24
respective [1] 101/2
response [1] 171/8
responsibility [6] 42/22 42/23 43/1 147/9 151/13 159/24
rest [4] 37/4 130/14 130/16 178/3
result [2] 159/23 159/25
resumed [1] 3/7
retained [1] 16/22
retention [1] 64/15
retirement [3] 151/1 177/1 177/5
return [136]
returned [13] 111/25 120/15 125/17 166/3 166/11 166/12 167/5 180/5 181/20 181/23 181/23 182/10 195/3
returning [3] 147/14 167/13 183/6
returns [52] 4/3 11/7 11/24 15/25 17/14 19/2 19/3 22/11 23/20 24/11 24/14 26/25 28/24 29/5 29/8 36/13 36/23 45/20 45/22 45/23 45/24 46/18 55/9 56/23 57/16 57/17 57/24 58/1 58/2 58/3 62/25 64/12 65/9 67/3 81/9 81/9 81/13 81/14 81/14 81/22 81/25 82/8 88/15 88/19 125/15 147/12 155/14 155/20 157/3 162/1 176/4 176/21
reveal [1] 176/25
revenue [32] 20/22 54/25 54/25 55/3 55/4 55/7 55/9 55/13 55/20 57/22 58/4 62/24 63/4 63/7 64/2 75/1 75/5 75/11 78/25 88/8 132/16 133/6 150/12 150/14 150/15 157/8 158/13 159/17 160/4 162/20 173/9 175/8
review [8] 56/6 57/1 57/4 57/6 65/5 142/7 171/16 193/2
reviewed [4] 57/8 100/25 106/14 139/14
reviewing [2] 56/23 71/2
Ricky [9] 51/8 51/24 52/1 110/9 112/4 112/5 112/10 112/16 112/25
rife [1] 61/11
right [124]
right-hand [1] 100/19
ripped [1] 194/18
RMR [2] 1/23 201/18
road [1] 185/23
robber [1] 196/3
robs [1] 196/3
Roger [1] 1/16
Roma [13] 73/9 87/20 118/15 118/17 119/19 120/4 120/21 129/14 129/15 131/10 149/6 180/20 181/4
room [1] 85/20
ROSE [153]
Rose's [7] 151/13 152/3 154/13 157/15 157/22 163/21 175/12
Rosie [1] 183/8
rough [4] 193/14 193/22 193/25 194/1
roughly [6] 87/14 91/9 105/19 113/18 154/8 154/11
round [10] 14/20 38/20 38/21 38/23 39/1 39/2 39/4 41/22 56/12 163/13
rounded [3] 105/16 163/1 168/14
rounding [3] 82/5 97/6 104/11
rug [1] 195/19
rule [4] 99/10 191/8 197/14 198/7
ruled [3] 99/16 145/12 145/15
rules [4] 6/23 9/14 158/5 173/9

ruling [3] 95/24 132/24 197/12
rulings [2] 141/4 141/4
rush [1] 100/14
Russell [1] 194/5

**S**

SA [2] 103/6 103/8
SA-018 [2] 103/6 103/8
sacred [1] 184/2
safe [3] 52/7 152/25 166/1
safety [1] 52/8
saint [1] 150/8
salary [2] 68/24 69/1
salary-wise [1] 68/24
sale [2] 76/17 177/9
sales [1] 87/13
same [19] 31/18 33/7 51/8 65/3 76/24 77/20 85/16 94/17 94/18 101/9 104/12 111/15 111/19 112/17 132/23 158/9 182/21 185/7 196/19
sanctions [1] 186/1
Sandy [3] 53/19 53/22 110/20
savings [4] 52/19 53/8 110/1 127/12
saw [16] 12/22 15/14 18/13 23/3 23/14 69/20 76/17 89/21 89/21 140/6 152/2 153/22 153/24 155/6 155/7 159/10
say [63] 4/9 7/2 7/19 7/20 8/10 11/15 13/9 18/25 24/22 29/3 31/11 32/3 32/8 32/12 34/24 36/6 36/10 37/4 41/10 45/12 56/12 61/14 61/18 64/16 74/14 80/9 92/24 102/18 118/3 124/14 130/2 152/22 155/7 156/12 156/19 165/22 165/24 167/8 167/12 167/16 170/13 170/24 171/24 172/2 172/8 173/23 175/15 179/9 181/2 183/9 183/12 188/19 188/23 189/4 189/13 189/22 193/13 193/17 195/15 196/12 197/5 197/6 197/8
saying [21] 4/21 13/22 17/11 39/1 39/22 44/25 61/17 64/16 75/24 141/5 152/18 157/14 164/22 167/24 167/15 170/24 172/7 174/11 180/15 180/17 183/18 188/13 189/11 189/17 192/21 195/17 198/6
says [27] 13/15 22/4 23/4 31/4 31/25 32/5 39/15 75/5 76/19 116/11 116/17 130/2 146/12 149/2 149/6 149/11 154/7 155/2 155/12 155/19 158/17 158/18 167/25 171/4 188/9 188/13 190/10
scale [1] 17/4
scaling [2] 17/12 17/23
scenario [2] 161/23 198/4
schedule [43] 12/20 69/13 69/18 71/22 72/2 72/10 72/14 72/20 76/17 76/25 79/7 79/11 79/23 79/24 80/2 82/6 82/9 82/24 83/21 83/24 85/7 86/5 86/25 87/10 92/8 134/19 134/20 135/2 135/3 135/19 135/25 136/10 136/15 147/20 155/10 159/11 162/25 166/14 168/11 174/19 174/20 175/17 192/6
scheduling [1] 177/23
scheme [2] 161/5 161/10
school [3] 9/21 134/8 167/20
Schuster [2] 116/12 116/15
Schwartz [14] 1/19 3/5 61/1 131/18 172/2 191/1 191/25 192/10 192/20 193/4 200/4 200/6 200/9 200/12
Schwartz's [2] 75/23 191/19
scope [1] 95/24
score [1] 91/20
scored [2] 91/19 176/14 176/21
screen [8] 3/20 11/21 11/22 90/12 133/19 137/9 137/12 186/8
search [12] 132/4 132/20 144/3 145/9 155/11

179/12 179/13 179/16 179/21 180/3 184/20 185/25
seat [1] 2/15
seated [6] 2/3 2/22 26/2 59/18 62/19 131/24
second [18] 4/12 19/14 22/4 23/7 23/8 38/13 39/14 40/2 54/5 70/7 111/14 112/9 137/15 137/15 143/6 147/11 181/19 181/24
Secret [3] 132/20 145/7 145/8
section [4] 75/2 75/4 75/7 156/23
seeing [3] 36/20 103/10 114/12
seem [3] 12/25 13/2 13/3
seems [1] 199/5
seen [10] 30/5 30/7 30/10 34/11 40/8 132/8 137/11 155/5 160/12 180/24
seized [5] 88/20 132/4 132/19 145/21 166/19
selected [1] 92/3
self [2] 79/25 136/5
self-employed [1] 79/25
self-employment [1] 136/5
Seminole [3] 31/7 32/9 93/7
senior [1] 179/21
sent [10] 17/11 38/2 45/17 74/15 91/23 91/25 106/12 119/2 192/20 192/25
sentence [12] 14/13 14/14 14/15 14/23 22/4 23/7 23/8 41/17 137/15 184/21 197/2 197/9
sentenced [1] 197/7
separate [2] 145/13 160/16
separated [1] 30/18
September [8] 1/8 11/23 109/16 112/8 120/8 122/17 139/2 141/25
September 12th [2] 11/23 141/25
September 14th [2] 112/8 122/17
September 15th [1] 139/2
September 23 [1] 109/16
September 27th [1] 120/8
series [5] 48/20 52/18 57/17 148/23 181/15
serious [1] 150/3
service [21] 20/23 54/25 55/20 57/22 58/4 62/24 63/4 63/7 64/3 88/8 132/16 132/20 133/6 139/24 145/7 145/8 157/8 159/17 161/12 162/20 173/9
services [18] 5/5 6/17 135/5 138/14 138/15 140/5 147/7 156/13 156/15 157/11 160/1 162/1 163/8 163/16 167/3 167/3 167/25 174/7
ServiRed [1] 101/7
settle [3] 61/8 61/18 61/21
settlement [1] 61/19
settling [1] 60/1
seven [3] 4/25 13/1 91/9
several [5] 96/19 112/24 126/16 147/3 147/4
SFranklinUSDC [1] 1/25
Shall [1] 14/21
shared [1] 99/14
shareholder [1] 67/14
shareholders [2] 67/10 67/13
she's [16] 29/16 59/1 153/5 160/15 160/19 170/16 170/21 170/22 170/23 170/23 170/24 171/2 171/5 171/19 171/19 172/3
sheet [6] 91/1 92/4 95/18 97/5 123/24 148/13
shopping [1] 30/15
shorter [1] 130/22
should [23] 12/20 22/2 23/9 32/11 63/24 91/18 92/24 102/20 124/14 130/25 147/6 170/18 170/19 171/1 171/24 182/5 185/23 186/13 186/24 189/1 189/20 190/17 197/9
shouldn't [5] 89/20 90/17 187/24 187/25 190/21
show [25] 15/17 30/3 31/12 32/25 33/24 35/18 36/7 37/21 63/9 64/20 69/17 81/14

**S**

show... [13]  86/5 86/23 89/17 94/20 132/7
136/17 144/25 160/25 164/15 183/5 183/7
183/12 195/1
showed [5]  13/18 19/12 22/24 67/17 127/11
showing [7]  70/3 72/13 97/19 106/3 144/1
181/15 183/19
shown [8]  33/12 85/9 93/2 113/10 120/17
154/13 154/25 155/1
shows [6]  69/14 92/14 93/24 109/18 142/17
144/23
sic [5]  32/22 39/11 40/25 115/22 169/22
side [2]  56/3 171/19
sidebar [11]  63/21 88/13 90/13 99/8 100/2
107/9 107/21 144/19 146/24 170/11 172/12
sides [1]  55/21
sign [1]  179/23
signature [2]  36/10 116/17
signed [9]  45/18 45/20 46/1 61/19 81/10
81/13 92/15 148/4 179/23
significant [5]  15/23 18/9 18/24 128/13
154/14
signing [3]  41/7 92/20 108/16
signs [1]  48/16
similar [3]  65/17 65/25 77/22
similarly [1]  159/10
Simon [2]  116/11 116/14
simply [1]  20/9
since [8]  3/4 5/12 13/14 80/22 124/3 134/17
181/9 191/7
single [3]  38/24 58/2 96/11
sir [9]  2/15 25/20 25/21 47/5 47/8 48/8 62/13
160/8 188/11
sit [2]  152/7 152/9
site [1]  55/14
sites [1]  55/17
situation [1]  153/18
situations [1]  170/5
six [4]  131/6 156/3 156/4 187/13
Sixth [1]  147/23
skills [1]  113/25
skipped [1]  124/18
skipping [1]  125/11
slash [2]  104/25 154/22
slip [3]  35/12 36/9 39/11
small [4]  37/19 67/9 87/13 110/11
smoke [1]  186/8
so-and-so [2]  61/18 61/22
Soendergaard [3]  99/5 120/25 121/5
sold [1]  177/7
sole [4]  79/8 79/10 80/1 134/20
solely [1]  39/6
solicitor [2]  24/22 170/3
somebody [12]  7/5 7/11 8/1 9/17 11/12 11/13
44/16 48/3 155/22 157/17 175/6 181/25
somehow [2]  88/17 196/23
someone [8]  10/5 21/18 24/22 95/4 109/18
138/15 188/25 189/22
Somer [3]  115/14 118/8 138/13
Somers [1]  174/5
something [22]  10/5 16/8 25/3 28/21 30/21
38/25 59/12 60/19 64/17 90/8 113/21 130/2
133/24 145/13 151/1 156/17 158/17 171/4
185/22 190/8 191/17 198/12
sometime [2]  17/8 178/3
sometimes [7]  6/10 36/1 36/5 55/14 55/17
102/16 198/3
soon [1]  171/20
sorry [33]  2/22 11/11 12/15 14/14 20/16

22/23 31/20 38/14 45/9 70/22 71/23 72/25
73/10 73/16 73/18 75/21 80/11 82/19 85/23
104/17 107/17 134/15 142/14 150/2 158/17
160/3 161/11 163/12 165/22 166/7 172/13
176/23 196/11
sort [4]  4/1 6/22 30/15 194/9
sound [1]  6/14
sounds [1]  98/24
source [4]  35/13 57/22 75/6 79/6
South [1]  1/21
SOUTHERN [1]  1/1
speak [6]  3/15 3/22 26/4 31/18 55/21 142/14
speaking [1]  33/10
specific [6]  98/5 107/13 157/8 163/6 163/10
167/15
specifically [11]  75/7 95/23 103/10 132/5
153/17 156/22 164/3 164/22 165/8 165/25
166/4
spell [5]  26/7 54/19 150/2
spent [1]  45/12
spoken [2]  3/13 3/14
spotty [1]  126/12
spreadsheet [21]  93/23 94/2 96/12 97/5 98/7
98/19 98/20 100/17 100/24 106/18 108/25
122/2 122/10 123/3 128/22 128/24 138/3
139/17 142/17 143/14 148/12
spreadsheets [6]  93/21 97/25 98/17 99/2
99/22 100/8
Spring [1]  110/20
Springs [2]  53/19 53/22
Stack [14]  186/9 186/18 186/24 187/4 187/11
187/19 188/5 188/15 188/19 188/19 189/4
189/9 189/21 190/15
Stack's [1]  189/23
staff [1]  133/12
stamped [1]  140/5
stand [3]  3/7 60/11 61/12
Standard [2]  104/16 104/17
start [9]  31/17 33/6 58/10 58/12 58/16 62/6
167/13 171/6 177/21
started [6]  2/24 15/24 15/25 39/22 114/8
126/4
starting [4]  12/3 40/17 172/22 174/20
starts [9]  12/13 12/16 14/15 139/18 140/2
142/1 142/25 144/10 147/15
state [12]  9/7 28/14 117/8 66/2 69/21 107/7
126/25 136/1 159/15 165/19 174/2 174/3
stated [16]  4/19 12/19 15/5 41/1 85/25 124/5
136/22 137/18 141/18 152/24 154/6 159/13
162/8 162/22 165/20 167/5
statement [23]  28/22 35/15 35/16 35/17 36/3
47/18 76/20 76/20 102/18 134/7 134/12
140/15 140/21 142/5 148/8 156/3 157/4
159/21 179/10 184/20 188/13 189/10 193/5
statements [19]  22/7 28/11 28/19 28/20
34/20 34/21 41/18 42/8 42/19 57/6 93/2
139/8 143/5 184/6 192/21 192/23 193/18
193/21 193/25
states [19]  1/1 1/3 1/13 1/17 9/4 19/18 25/22
40/17 48/24 56/22 64/25 94/9 129/12 137/24
139/10 141/20 154/9 154/25 161/17
stating [3]  34/2 37/9 124/3
statutes [1]  8/12
Stefin [21]  1/16 22/23 22/24 23/18 23/25
25/6 58/11 60/9 62/20 107/22 113/24 131/12
131/25 133/14 159/22 174/9 183/25 184/11
193/14 200/5 200/11
step [2]  178/20 178/20
Stephen [4]  1/23 201/17 201/17 201/18
stick [1]  171/4

sticker [1]  100/18
still [11]  2/12 2/16 13/24 62/15 111/13 112/1
132/24 138/25 158/18 176/18 188/5
stipulate [2]  88/17 88/18
stipulation [1]  48/21
stole [1]  196/2
stolen [1]  153/16
stopped [1]  15/23
storage [1]  147/6
story [2]  171/20 180/25
Street [1]  1/24
stricken [1]  144/16
strike [3]  90/4 90/9 141/15
struck [1]  38/25
stuck [3]  2/23 188/1 190/14
studied [1]  153/11
study [2]  9/1 9/13
stuff [2]  27/15 28/18
subcategory [1]  98/18
subject [4]  60/18 145/12 145/14 176/18
submission [1]  180/18
submitted [1]  92/22
subpoenaed [1]  102/9
subsequent [2]  169/20 185/14
substance [2]  59/6 59/7
substantial [4]  138/21 143/16 143/19 164/19
substantially [1]  135/8
subtract [2]  90/25 137/19
subtracted [3]  74/5 82/12 111/23
subtracting [3]  84/13 91/4 121/24
subtractions [1]  82/6
such [6]  4/4 57/23 78/4 97/17 169/4 186/2
Sue [1]  99/4
sufficient [1]  128/23
suggest [9]  89/1 165/17 184/8 187/2 187/4
187/18 188/21 190/17 195/8
suggested [2]  180/12 188/2
suggesting [3]  16/14 88/14 163/1
suggests [1]  195/10
Suite [1]  1/21
Sullivan [1]  17/18
sum [1]  121/5
summarize [2]  4/8 66/23
summarized [1]  114/18
summarizing [2]  4/1 98/20
summary [14]  4/4 59/1 66/23 73/1 73/3
73/13 93/10 98/4 98/6 98/13 98/18 100/8
117/24 170/12
summation [1]  131/4
sums [2]  138/21 163/6
Suntrust [8]  50/20 50/23 53/25 54/3 54/6
54/9 54/11 54/14
superseding [6]  185/1 185/6 185/10 185/12
185/15 185/18
supplied [1]  41/8
support [3]  92/23 133/12 199/4
supported [1]  158/1
supports [1]  109/4
supposed [4]  126/7 126/8 144/20 184/4
supposedly [1]  70/15
suppress [2]  145/12 145/14
sure [14]  8/12 49/11 64/7 99/17 107/20 118/4
130/15 172/9 178/4 186/18 187/6 187/20
197/19 198/1
Surely [1]  23/6
Susan [21]  14/13 14/16 14/17 25/22 26/1
26/9 38/15 38/15 38/17 41/20 98/19 100/21
101/8 103/5 103/14 104/3 104/8 104/16
104/24 105/2 200/7
sustain [1]  90/3

**S**

sustained [13]  10/8 25/13 39/21 39/24 44/5
115/3 140/10 140/14 140/17 141/5 141/7
160/22 162/6
sustaining [1]  141/10
SW [2]  144/3 148/11
SW-4052 [2]  144/3 148/11
swear [2]  113/24 184/6
sworn [2]  26/1 54/18
Sylvia [11]  73/9 87/20 118/15 119/19 120/21
129/14 129/15 131/10 149/6 180/20 181/4
Sylvia's [1]  120/16
Systems [2]  31/7 32/10

**T**

take [34]  9/1 9/9 12/13 20/9 22/23 27/10
27/11 27/22 30/4 31/18 45/1 58/12 58/17
68/5 69/16 70/15 70/17 83/17 83/22 90/11
91/5 95/5 104/7 129/5 130/10 130/17 142/11
151/18 155/9 170/1 178/7 178/11 178/13
195/10
taken [7]  21/18 59/16 67/23 68/1 130/5
181/22 199/18
takes [4]  114/20 115/16 115/23 117/3
taking [7]  33/7 66/19 68/8 83/13 109/5 170/1
181/4
talk [28]  28/4 39/14 58/25 59/2 59/11 59/15
62/3 62/11 101/4 129/11 144/17 146/15
146/15 147/14 148/20 150/12 158/5 158/20
159/9 162/10 170/10 173/12 173/13 178/21
179/1 179/4 191/10 191/11
talked [16]  11/16 11/19 18/14 22/25 39/17
63/21 80/17 95/12 152/1 165/22 176/7
180/24 180/25 181/4 181/12 184/24
talking [9]  9/15 31/11 43/15 62/23 121/20
146/11 154/3 164/9 187/8
talks [2]  14/11 185/3
tape [15]  31/10 31/11 31/12 32/6 32/7 32/15
39/17 40/15 93/3 93/3 93/5 179/14 179/15
179/16 194/15
tape-recording [1]  194/15
tape-recordings [3]  179/14 179/15 179/16
tapes [2]  30/19 95/14
tax [215]
tax-free [1]  6/13
tax-related [2]  57/1 57/21
taxable [58]  6/16 7/16 7/24 8/6 8/10 8/14
10/25 24/20 70/1 70/2 70/3 70/5 70/9 75/9
75/9 75/10 75/17 75/25 76/5 77/5 77/7 77/7
77/8 78/5 78/11 78/15 80/7 80/9 80/11 81/3
81/7 81/25 82/1 84/4 84/6 85/8 87/1 87/3
87/9 136/1 136/2 138/18 153/18 153/19
153/20 157/11 158/24 158/25 159/3 159/19
159/21 160/2 162/22 167/9 167/11 170/25
171/1 173/21
taxes [24]  6/14 6/20 6/23 7/14 8/3 10/2 11/18
16/6 17/20 44/21 44/22 45/4 55/11 69/21
69/21 80/18 83/25 92/9 148/8 150/12 150/13
151/17 160/20 165/8
taxpayer [7]  27/18 35/3 56/17 92/10 92/11
136/13 175/1
taxpayer's [1]  56/18
taxpayers [5]  35/4 37/13 55/9 55/19 133/25
TB [1]  51/25
TD [5]  50/25 51/2 51/6 103/17 103/23
teacher [2]  134/8 150/11
team [1]  179/21
technically [1]  13/11
telephone [3]  12/12 12/21 70/14

tell [28]  3/21 10/13 10/17 12/13 18/7 18/12
20/10 20/12 26/7 28/6 29/10 29/19 33/16
35/16 36/5 39/12 54/19 67/6 78/1 90/3
130/13 131/5 131/14 135/7 173/20 176/15
182/5 199/12
teller [3]  82/10 134/20 134/23
telling [17]  4/7 4/19 10/19 12/20 15/10 15/14
22/6 22/25 24/3 24/7 38/11 60/5 90/16 136/6
137/17 142/4 143/3
tells [4]  20/20 70/4 134/12 158/16
tend [2]  89/20 186/14
terms [6]  21/24 59/4 187/23 189/18 195/23
195/24
testified [19]  15/18 71/12 71/13 97/14 100/2
111/24 114/11 128/15 143/12 152/18 153/5
168/18 174/24 175/12 175/14 176/2 177/7
182/15 190/5
testify [21]  60/2 60/19 152/12 152/17 156/15
157/10 163/7 163/15 166/6 169/5 171/20
172/19 172/21 181/18 186/16 186/18 188/15
194/10 194/11 197/1 197/7
testifying [3]  180/2 182/17 197/20
testimony [61]  33/8 58/23 59/3 59/10 60/3
61/3 66/18 66/20 67/1 71/5 74/10 74/12
97/23 103/5 109/5 114/12 115/21 116/14
119/19 128/11 129/10 140/9 140/25 152/16
153/3 153/13 156/7 156/10 158/1 163/18
163/21 164/1 165/2 165/3 165/4 165/16
165/17 167/2 167/7 168/3 168/4 169/1 169/2
169/6 170/16 170/17 170/17 171/16 173/16
174/6 178/8 181/13 184/22 187/3 190/4
190/12 190/13 194/19 200/3 200/7 200/10
testimony's [1]  190/7
Texas [1]  119/21
thank [39]  2/18 3/4 3/6 3/23 4/11 19/6 25/20
25/21 26/3 26/11 31/21 33/8 44/11 48/12
48/13 58/20 62/13 62/21 73/6 107/24 126/8
129/7 130/4 131/11 131/15 132/1 141/13
146/23 149/24 160/9 161/22 177/15 177/18
177/19 178/16 178/19 191/2 194/2 199/16
Thanks [2]  129/22 141/12
that's [131]
That's [1]  143/14
the 18th [2]  191/17 193/1
the 21st [1]  107/4
the 28th [1]  104/15
theft [1]  75/14
theme [1]  180/12
themselves [2]  96/4 138/17
theories [3]  159/20 170/20 195/5
theory [5]  89/18 182/4 183/16 192/16 194/22
there's [32]  27/15 30/25 31/10 53/1 53/22
56/17 59/6 61/11 67/14 68/2 68/3 75/8 75/25
87/13 96/12 96/18 99/15 106/9 116/17 117/8
121/22 135/21 138/4 138/9 138/23 139/4
141/8 155/2 155/3 158/18 159/24 193/19
thereafter [1]  168/23
therefore [5]  60/7 70/9 77/4 80/19 188/24
they'll [2]  130/15 184/9
they're [21]  9/22 28/15 55/18 64/8 64/14
64/16 79/4 99/25 100/4 100/12 102/22
102/25 126/19 130/16 138/15 176/11 187/21
190/1 190/7 190/13 197/22
they've [4]  138/14 183/10 195/1 197/24
thing [4]  104/12 161/11 171/5 186/2
things [11]  26/22 41/6 48/4 59/5 75/8 146/12
187/5 187/8 187/23 190/22 198/3
think [80]
thinking [2]  14/1 190/19
third [32]  9/17 10/2 10/5 10/11 11/18 14/12

14/15 21/14 21/22 25/7 25/10 25/16 41/17
57/9 57/9 70/23 74/11 74/14 74/15 93/7
97/21 101/7 113/20 115/20 118/18 138/17
138/22 138/24 142/12 142/15 173/20 173/25
third-party [4]  21/14 21/22 25/10 25/16
those [90]
though [5]  2/10 3/15 13/12 14/8 70/12
thought [6]  85/22 133/17 191/7 192/22
thousand [3]  80/23 172/23 173/2
three [79]  94/3 96/9 96/10 96/21 131/9 143/21
178/7 180/10 192/15
through [57]  3/1 8/7 9/25 22/8 28/7 28/18
40/2 40/23 40/24 41/19 48/25 49/1 49/6 49/7
49/8 49/14 52/25 58/1 58/2 64/3 64/10 65/2
67/21 78/4 98/10 98/16 98/22 99/1 99/2
99/22 100/5 100/6 100/8 100/12 101/3 102/1
106/8 111/3 112/3 114/20 115/16 117/5
118/1 121/4 126/4 139/10 139/11 139/18
142/5 142/6 143/5 156/20 156/21 156/25
159/2 174/16 196/11
throughout [2]  112/1 117/23
throw [1]  196/10
thrown [1]  114/11
Thus [1]  40/19
tickets [3]  112/25 113/3 139/7
Time's [1]  91/8
timeframe [3]  53/12 71/10 123/11
times [6]  4/25 33/11 40/18 137/11 152/15
184/25
timing [1]  191/5
Title [2]  161/17 161/19
to -- I [1]  123/25
today [2]  173/17 199/13
together [8]  12/10 27/21 36/4 93/9 93/15
100/11 100/24 117/19
told [30]  3/21 5/3 5/12 11/17 17/22 25/9
25/15 31/13 32/10 39/8 146/12 150/11
151/16 153/21 154/17 154/22 155/19 158/13
163/23 164/2 164/22 167/3 176/10 176/19
179/22 188/7 188/20 194/19 195/23 196/7
tomorrow [5]  62/5 130/14 178/3 178/3
178/15
too [8]  2/23 21/12 70/16 75/4 97/17 158/8
177/20 197/8
took [10]  31/10 66/24 69/24 86/19 118/21
122/15 123/8 180/4 194/24 195/5
top [10]  32/2 69/8 110/21 114/21 115/16
115/23 115/23 117/3 123/21 155/12
topic [1]  67/5
topics [1]  22/20
total [70]
totaled [3]  40/3 139/6 163/11
totaling [5]  4/18 5/1 19/16 39/14 113/4
137/16 139/7 140/24 142/20
totals [2]  101/4 118/3
touch [2]  11/25 60/18
touchy [1]  171/21
Tournament [1]  40/25
toward [1]  195/4
towards [2]  122/18 131/1
trace [3]  57/7 57/9 113/19
Tracy [2]  175/13 175/14
transaction [27]  101/9 102/13 103/25 104/3
108/2 109/18 110/18 112/8 112/9 112/17
113/3 116/11 117/11 117/18 118/21 121/1
121/2 121/10 121/17 121/22 122/15 122/17
123/8 126/7 126/14 127/7 127/15
transactions [20]  66/24 71/1 71/3 98/5 98/14
103/2 109/16 111/21 112/2 112/12 112/21
112/24 117/19 119/17 121/15 122/25 123/5

**T**

transactions... [3]  126/5 126/11 127/22
transcript [6]  1/11 64/18 133/11 133/12
  172/16 201/13
transfer [7]  69/2 86/20 117/10 117/13
  148/23 149/7 149/9
transferred [3]  68/13 83/14 115/6
transfers [22]  4/17 4/23 19/16 23/1 23/3
  23/14 25/3 34/25 104/12 104/13 104/14
  106/3 110/12 117/4 120/11 123/1 124/15
  137/16 137/22 148/22 149/17 152/2
traveling [1]  164/10
Treasury [1]  162/20
Treasury's [2]  157/9 159/17
treated [4]  75/14 78/23 153/15 153/25
treating [1]  192/7
tree [1]  158/17
trial [10]  1/11 48/19 66/20 67/18 70/13 71/12
  152/7 152/9 186/9 189/12
trial's [1]  130/10
tried [6]  188/12 188/21 194/16 195/1 195/3
  196/2
trouble [2]  182/12 196/3
troubled [1]  21/24
troubling [1]  22/2
truck [1]  141/2
true [8]  41/8 155/15 155/16 159/18 182/20
  184/7 188/19 196/13
Trust [2]  74/21 114/16
trusts [1]  55/10
truth [1]  180/9
truthful [1]  157/23
truthfully [1]  152/18
try [18]  26/4 27/4 27/12 27/23 48/14 56/16
  56/17 59/14 61/6 61/10 181/6 181/8 183/5
  183/12 184/14 186/8 190/8 190/15
trying [11]  27/7 31/18 73/14 89/16 99/11
  185/22 188/22 190/8 196/16 196/17 197/23
Tschetter [9]  73/9 87/20 121/14 121/17
  121/21 122/3 165/9 165/11 167/24
Tschetter's [1]  165/14
turn [1]  129/18
turned [2]  17/11 192/1
turning [1]  100/10
Twenty [1]  55/2
Twenty-five [1]  55/2
two [45]  6/1 6/2 22/5 22/20 23/18 23/20 24/1
  24/4 24/6 36/9 38/10 42/4 55/20 55/21 59/24
  62/7 66/12 71/20 71/20 77/16 82/4 82/6
  93/20 100/18 102/17 102/19 123/14 127/22
  128/1 140/23 142/2 143/1 159/20 173/10
  180/9 182/7 183/7 184/2 184/2 184/3 184/21
  185/3 185/7 185/17 198/16
two-page [1]  100/18
type [5]  21/1 47/18 169/14 173/8 184/7
types [2]  21/4 100/25
typically [3]  21/4 37/12 37/15
typo [1]  126/6

**U**

U-t-s-t-e-i-n [1]  26/10
U.S [4]  67/10 123/23 147/25 161/12
Ueda [4]  122/12 122/16 122/19 149/1
Uh [3]  14/7 16/13 45/3
Uh-huh [3]  14/7 16/13 45/3
ultimately [2]  42/22 76/6
unable [2]  56/18 120/18
under [19]  2/16 6/18 13/23 62/15 144/22
  146/1 149/7 153/17 156/22 157/8 159/16

159/21 161/23 162/20 173/8 195/10 195/19
  197/2 197/6
undercover [3]  180/6 180/7 180/9
undercuts [1]  196/20
underlying [1]  171/2
undermining [1]  195/4
underneath [1]  111/23
understand [20]  4/21 5/24 6/15 9/12 9/18
  9/20 10/6 16/12 19/23 43/11 99/11 153/6
  153/10 153/13 157/13 164/9 172/5 193/20
  194/10 199/9
understandable [1]  27/24
understanding [1]  182/12
understood [4]  9/24 99/17 169/2 173/11
unduly [1]  182/23
Unfortunately [1]  17/13
unidentified [4]  14/18 15/2 38/18 41/21
Union [3]  110/12 110/16 111/5
Unions [2]  112/2 112/3
UNITED [1]  1/1 1/3 1/13 1/17 25/22 48/24
  50/14 56/22 64/25 94/8 129/12
unless [8]  20/8 60/12 60/16 60/17 75/7
  153/15 153/17 167/11
unlimited [1]  6/6
unreasonable [1]  175/7
unreported [11]  72/2 74/7 77/18 79/20 82/16
  84/13 85/16 87/23 90/22 162/13 168/11
until [6]  33/5 104/15 166/18 166/20 181/12
  198/17
unusual [2]  34/4 47/2
upon [9]  11/6 22/10 69/24 77/8 77/11 87/19
  100/24 157/14 182/19
us [59]  4/13 4/17 12/17 12/23 13/10 13/15
  14/19 20/2 20/12 20/24 24/1 24/5 26/5 26/7
  26/8 34/1 37/11 38/9 38/19 40/3 40/21 40/22
  41/8 41/18 41/21 54/19 54/20 56/12 60/22
  67/2 67/6 68/5 78/1 104/7 109/7 114/20
  115/16 115/23 117/3 118/1 128/4 131/14
  134/12 139/5 139/8 142/1 142/4 142/25
  143/4 147/5 147/8 147/18 147/23 155/3
  155/19 176/10 176/15 183/3 184/3
used [10]  79/8 80/2 93/5 93/8 93/25 94/6
  95/21 139/11 165/25 166/4
uses [6]  22/5 24/2 24/6 38/10 142/3 143/2
using [3]  94/2 113/25 182/2
usually [3]  21/1 21/8 158/10
utilize [1]  57/13
utilized [3]  95/13 97/8 180/7
Utstein [5]  25/23 26/1 26/9 26/14 200/7

**V**

Van [25]  3/7 3/10 19/11 26/20 26/23 27/17
  36/11 37/4 38/3 41/11 42/23 43/5 43/8 43/25
  46/2 46/16 81/16 137/3 139/3 141/16 153/24
  163/18 164/22 173/16 200/3
Variety [2]  26/17 26/19
various [16]  34/2 59/25 97/13 100/21 104/12
  109/10 112/4 139/7 148/13 152/1 152/3
  153/22 163/1 186/25 189/21 190/23
vary [1]  21/3
vendor [1]  93/7
verbal [2]  21/12 24/24
verification [4]  20/15 20/17 20/19 128/19
verified [2]  180/8 193/15
verify [8]  21/2 21/5 21/6 35/25 47/10 115/6
  133/4 180/7
very [9]  12/3 31/19 48/18 65/22 67/5 92/6
  94/18 131/11 184/2
veterans [1]  75/10
via [1]  93/6

viable [2]  196/1 196/5
victim [12]  97/19 97/19 182/18 188/8 188/13
  188/20 188/20 188/21 189/4 189/13 195/20
  195/21
victims [11]  61/7 97/13 97/15 98/1 181/12
  182/13 182/14 182/14 185/13 189/1 189/5
Victoria [13]  52/3 115/13 115/14 115/14
  118/7 118/8 138/9 138/12 138/13 149/10
  174/5 174/5 189/8
Virginia [2]  127/5 132/13
virtually [3]  152/9 152/11 172/22
Visa [2]  32/9 110/14
vision [1]  67/18
Vivian [5]  52/5 111/7 111/15 112/4 112/4
Vogel [8]  144/6 148/4 148/4 155/2 155/6
  155/6 155/8 155/23
Vogel's [3]  150/18 155/10 156/4
Volume [1]  1/10
Vorst [29]  3/7 3/10 19/11 19/13 26/20 26/23
  27/17 36/11 37/4 37/23 38/3 41/11 43/5 43/9
  43/25 46/2 46/16 81/16 137/3 137/10 138/25
  139/3 141/16 141/25 142/24 163/19 164/22
  173/16 200/3
Vorst's [2]  42/23 153/25
Vorst-000753 [2]  19/13 137/10
Vorst-000754 [1]  138/25
Vorst-000757 [1]  141/25
Vorst-000759 [1]  142/24
Vorst-00759 [1]  37/23

**W**

W-2 [3]  134/9 134/10 134/13
W-2G [3]  30/22 40/3 139/6
W-2Gs [4]  28/15 31/5 32/4 32/7
W-2s [1]  27/13
Wachovia [1]  51/10
wages [5]  68/25 69/1 134/4 134/5 134/15
wait [3]  18/2 31/16 33/5
waiting [2]  62/4 190/18
waive [1]  60/8
waived [3]  197/15 197/20 199/8
waiver [3]  60/11 60/23 178/24
waives [1]  60/15
waiving [1]  60/10
Walker [13]  73/8 87/20 123/4 123/10 123/20
  124/20 125/12 125/14 125/21 168/6 168/13
  168/14 168/16
Walker's [1]  168/4
want [51]  6/11 8/11 8/13 19/12 37/24 42/12
  42/15 59/22 60/12 60/22 63/20 64/7 66/11
  66/13 67/1 75/1 75/22 78/3 90/7 91/4 95/22
  99/21 100/16 101/3 102/12 102/23 116/10
  118/3 118/13 130/16 132/7 136/24 137/2
  141/3 141/11 146/16 147/15 150/21 160/3
  172/18 179/19 181/6 181/8 181/11 188/4
  188/14 194/25 195/8 195/15 195/22 199/3
want -- I [1]  195/22
wanted [7]  4/10 6/4 17/23 38/5 89/9 92/7
  99/17 159/9 168/19 169/4 169/17 172/20
  178/21 191/18 191/20 191/21 195/2
wants [9]  171/3 171/3 171/16 184/13 184/14
  184/19 186/8 186/20 186/21
warehouse [9]  57/23 132/19 143/23 144/4
  144/22 145/7 145/9 148/7 148/11
warrant [8]  144/3 179/12 179/13 179/16
  179/22 180/3 184/20 185/25
warrants [1]  132/4
Washington [8]  42/9 42/11 51/12 51/15
  51/17 117/15 143/10 143/17
wasn't [14]  2/23 12/4 18/7 23/12 37/19 47/3

# W

wasn't... [8] 47/13 47/21 157/20 164/23
169/25 182/19 192/1 193/8
wasting [1] 172/2
watch [4] 111/22 111/22 111/24 178/20
water [1] 126/2
waters [1] 90/7
Watts [3] 180/23 189/9 192/25
we'll [8] 58/20 86/6 91/2 100/12 101/3 137/9
155/25 178/6
we're [31] 2/4 3/1 4/21 5/23 9/11 9/15 14/1
20/11 20/13 20/19 20/21 37/10 59/19 85/1
90/10 103/13 111/13 112/1 117/7 130/7
131/19 155/20 165/7 172/2 175/1 176/19
177/21 178/2 178/9 178/10 195/22
we've [14] 3/13 34/12 62/4 63/14 66/18 84/16
97/12 98/17 137/10 162/15 162/17 162/18
197/10 199/11
weather [2] 2/23 2/25
website [1] 124/1
week [4] 130/24 131/1 145/5 178/10
weeks [3] 146/13 147/4 180/24
Weiselberg [1] 1/20
Welcome [3] 2/21 62/18 131/23
well [118]
went [41] 8/15 8/20 14/17 18/19 38/17 41/20
64/12 67/21 97/20 103/17 104/9 105/4
105/13 105/17 106/17 106/20 106/24 107/10
107/11 107/12 110/1 112/18 119/22 120/21
121/7 122/22 123/25 124/1 124/22 125/2
127/4 128/1 129/24 135/13 143/16 143/21
167/2 173/25 187/5 187/23 189/10
weren't [8] 20/14 20/17 24/8 38/24 181/18
184/7 186/25 188/20
West [2] 1/7 1/24
Western [5] 110/12 110/16 111/4 112/2
112/3
wet [1] 3/12
what's [16] 3/18 11/20 11/21 29/15 30/3 31/3
32/19 32/20 33/24 37/21 60/24 91/10 133/11
145/2 148/23 170/7
whatever [12] 8/5 8/6 15/17 34/15 36/24
56/7 67/15 155/11 182/24 187/13 190/14
194/18
whatever's [1] 26/6
where [39] 18/14 28/2 30/10 34/21 35/20
39/12 41/24 44/20 62/23 69/2 81/12 97/19
108/5 110/2 111/9 111/18 116/22 136/8
136/9 136/14 136/17 137/14 139/25 141/8
141/25 149/11 167/20 178/14 180/14 182/15
184/12 186/8 190/9 190/25 192/10 193/4
195/1 195/2 199/11
whereas [2] 55/11 144/23
wherever [1] 28/16
whether [37] 10/1 19/20 19/25 21/14 22/13
25/16 34/15 60/9 62/24 65/20 66/1 76/2
133/5 136/20 143/6 156/7 156/21 160/17
162/15 162/24 164/9 171/11 171/11 171/14
173/20 175/24 177/1 177/4 179/3 184/9
186/9 187/22 189/13 190/12 194/9 197/12
198/7
Whichever's [1] 23/10
while [7] 5/23 27/17 39/10 91/5 153/2 155/25
160/13
White [2] 111/7 111/16
who's [2] 189/22 190/5
whoever [1] 149/12
whole [2] 73/12 188/22
whom [6] 20/3 41/3 106/3 121/13 122/11

126/18
whose [2] 127/3 181/25
why [21] 30/21 37/15 38/5 42/15 58/16 58/16
92/2 99/11 145/19 145/19 186/24 187/10
187/17 187/23 187/24 188/18 190/21 195/16
196/12 196/25 198/11
wife [1] 158/16
winning [1] 92/24
winnings [38] 28/16 30/23 31/13 32/20 32/21
32/24 33/13 33/19 34/5 34/5 34/13 34/16
35/1 69/8 76/22 78/16 78/18 78/24 79/1 79/2
79/3 80/22 82/20 82/22 83/17 83/18 83/20
85/6 85/18 86/24 92/6 93/11 94/15 95/5 95/8
135/18 175/25 176/3
wins [2] 4/7 40/18
wire [35] 4/17 4/23 19/16 23/1 23/3 23/14
25/3 85/25 86/1 103/14 103/17 104/12
104/13 104/14 104/24 105/3 110/19 112/9
112/12 112/17 115/15 117/10 122/15 123/1
124/15 127/22 137/16 137/22 138/13 148/22
148/23 149/7 149/17 152/2 160/15
wire-transfer [3] 117/10 148/23 149/7
wire-transfers [17] 4/17 4/23 19/16 23/1
23/3 23/14 25/3 104/12 104/13 104/14 123/1
124/15 137/16 137/22 148/22 149/17 152/2
wires [4] 115/11 115/13 127/24 138/8
wise [1] 68/24
withdraw [5] 88/17 89/14 146/19 164/24
176/22
withdrawal [5] 36/1 40/24 103/9 103/12
127/11
withdrawals [5] 31/8 41/2 93/2 93/6 97/3
withdrawn [4] 153/23 162/8 176/1 176/6
withdrew [2] 198/19 199/1
within [3] 95/23 144/21 148/10
without [11] 7/23 49/5 81/24 94/11 103/7
111/3 123/13 168/21 180/15 188/18 197/23
witness [40] 2/9 3/7 26/1 29/4 48/17 54/18
59/1 60/15 60/22 66/23 70/22 71/5 72/24
73/1 73/2 75/24 76/16 114/1 123/3 128/15
129/15 141/5 145/6 158/1 170/13 170/15
171/7 177/21 181/10 182/1 182/17 182/20
187/12 188/7 188/18 190/5 192/2 192/21
196/25 198/25
witness' [5] 102/2 102/3 102/10 102/11
102/18
witnesses [25] 57/5 59/24 61/8 62/7 70/24
72/10 87/16 87/19 101/1 152/6 178/5 180/13
180/15 180/19 182/6 182/9 182/14 182/25
183/3 183/4 183/13 183/13 184/9 184/14
187/14
witnesses' [1] 187/5
Wolfe [19] 54/1 54/4 71/17 73/4 73/21 74/4
77/13 79/15 82/3 82/15 85/12 87/20 125/10
123/13 127/4 127/18 128/5 163/4 163/7
Wolofsky [11] 18/10 18/12 18/16 21/19 54/7
54/15 74/19 97/22 118/10 142/18 174/4
woman [2] 158/15 158/18
won [5] 28/16 30/24 32/25 175/6 175/20
wonderful [1] 175/12
words [4] 123/14 152/20 157/11 165/25
work [26] 5/7 5/8 15/10 16/17 16/18 16/22
17/18 27/18 47/22 48/6 56/4 56/15 92/5
93/18 93/19 124/1 163/23 164/12 164/13
164/19 164/23 166/3 167/4 172/22 196/11
198/14
worked [2] 55/3 196/10
working [10] 10/18 15/24 16/2 16/9 18/7
26/19 27/17 47/13 55/14 172/6
workman's [1] 75/9

works [2] 55/11 79/24
worried [1] 169/18
worries [1] 59/13
worse [1] 150/16
wouldn't [21] 6/19 6/19 8/13 8/14 10/23
10/24 20/8 21/16 24/18 45/19 148/12 151/13
158/24 159/7 170/14 170/14 172/8 186/20
187/10 187/17 187/24
wrappers [12] 28/13 28/13 31/7 32/9 32/13
32/14 34/1 34/4 40/21 40/22 40/23 93/3
wrinkling [1] 13/8
written [12] 10/13 39/11 41/4 95/16 96/22
108/3 120/4 140/3 153/24 193/14 193/18
193/24
wrong [2] 158/18 171/10
wrongdoing [1] 197/23
wrote [4] 42/17 174/10 174/13 174/14

# Y

yeah [8] 6/6 13/17 44/18 55/16 63/25 126/12
171/18 172/6
year [116]
years [66] 4/4 5/25 6/1 6/3 6/7 6/18 9/9 9/14
13/1 13/1 14/8 18/6 28/24 29/8 29/10 29/16
29/18 29/19 29/22 33/15 33/16 33/17 55/2
55/4 57/20 57/24 57/25 58/5 63/1 63/13 64/3
64/10 65/9 65/14 65/15 65/20 66/6 66/11
66/12 72/3 72/11 72/19 73/8 74/22 74/22
76/10 77/23 77/23 81/12 105/10 108/22
113/6 117/17 126/12 126/20 126/21 153/22
155/12 162/23 164/8 164/12 164/20 165/7
168/12 175/15 197/2
yes [347]
yesterday [3] 3/8 90/7 129/24
yet [4] 193/2 193/15 196/18 197/7
York [4] 12/11 12/24 52/10 148/21
you'd [2] 20/9 21/11
you'll [4] 5/18 111/23 140/2 143/20
you're [30] 2/16 3/10 31/11 45/6 62/15 63/15
63/15 66/22 76/1 76/6 89/16 98/9 109/5
126/8 128/8 128/25 137/4 153/9 154/3
157/17 158/9 160/23 167/24 182/22 183/15
183/18 194/10 196/9 196/16 196/16
you've [16] 30/7 37/4 39/17 47/6 59/3 63/3
63/16 66/19 66/22 83/23 84/23 106/13
106/23 151/22 155/3 177/24
young [2] 17/23 184/6
yourself [2] 93/15 96/8

# Z

zero [11] 70/3 70/4 70/5 70/9 70/11 78/14
80/7 80/9 81/3 85/9 85/10