```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                      Case No. 11-80072-CR-MARRA
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
          GOVERNMENT,              )
 5                                 )
          -v-                      )
 6                                 )
    ROSE MARKS,                    )
 7                                 )
          DEFENDANT.               )    West Palm Beach, Florida
 8                                 )    September 24, 2013
    _____)
 9

10                   Volume 17, Pages 1 - 239

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12           BEFORE THE HONORABLE KENNETH A. MARRA

13                 UNITED STATES DISTRICT JUDGE

14

15  Appearances:

16  FOR THE GOVERNMENT          Laurence M. Bardfeld, AUSA, and
                                Roger H. Stefin, AUSA
17                              United States Attorney's Office
                                500 East Broward Boulevard
18                              7th Floor
                                Fort Lauderdale, FL 33301
19
    FOR THE DEFENDANT           Fred A. Schwartz, ESQ.
20                              Kopelowitz, Ostrow, Ferguson
                                Weiselberg, Keechl
21                              700 South Federal Highway,
                                Suite 200
22                              Boca Raton, FL 33432

23  Reporter                    Stephen W. Franklin, RMR, CRR, CPE
    (561)514-3768               Official Court Reporter
24                              701 Clematis Street
                                West Palm Beach, Florida  33401
25                              E-mail:  SFranklinUSDC@aol.com
```

```
 1        (Call to the order of the Court.)

 2             THE COURT:  Good morning, everyone.  Please be

 3   seated.

 4             We're back on the record.  Ms. Marks is present

 5   with counsel.

 6             MR. SCHWARTZ:  Yesterday when -- I think it was

 7   yesterday when we were talking about whether fortune telling

 8   was protected under the First Amendment, I promised you case

 9   law.  I would hand up to you, but I would also cite from

10   Docket Entry 441 a motion to dismiss predicated on the First

11   Amendment of the United States Constitution filed by Michael

12   Gottlieb on behalf of Nancy Marks from pages 19 to 24, his

13   section, the free speech clause and establishment of the

14   United States Constitution, where he cites cases starting in

15   the last paragraph on page 19 about fortune telling being

16   protected speech.  I can hand it up or . . .

17             THE COURT:  No, I'll take a look at it.

18             Is that it?

19             MR. SCHWARTZ:  The only other point I wanted to

20   raise, Judge, and I think Mr. Stefin and I have, through a

21   spirit of cooperation, which there really has been during the

22   trial, I think, have solved a problem, but I bring it to the

23   Court's attention.  Because we didn't know whether Your Honor

24   would allow Professor Sutherland to testify or not, she is

25   not returning from her trip to Montenegro until the 27th.  I
```

 1    only wanted to call her for two items.

 2            One, to establish that Roma families are more

 3    sharing with money than the average American family, and,

 4    second, that the practice of spiritual advising is passed

 5    from mother to daughter, and mothers train their daughters in

 6    it at an early age.

 7            I believe Mr. Stefin and I have to work out the

 8    language, but I believe we can have a stipulation as to those

 9    facts so I don't have to prostrate myself before the Court

10    and beg for time to wait for Dr. Sutherland to return on the

11    27th.

12            THE COURT:  Okay.  Hopefully, you can work that

13    out.

14            So with that, are we ready to call the next

15    witness?

16            MR. SCHWARTZ:  I'm ready.  I want to publish a few

17    documents that are already in evidence from the Government to

18    the jury before that witness, and offer some documents that

19    we've agreed to into evidence, then I would call my next

20    witness is Charles Stack.

21            THE COURT:  Okay.  So we ready for the jury if

22    they're all here?  I don't know if they're all here.

23            Can we bring the jurors in?

24            MR. SCHWARTZ:  Yes, Your Honor.

25        (The jury enters the courtroom, after which the following

```
 1    proceedings were had:)
 2            THE COURT:  Good morning, everyone.  Welcome back.
 3    Please be seated, ladies and gentlemen.  Hope you had a
 4    pleasant weekend and appreciate you being back again this
 5    morning.
 6            Has anyone read or heard anything about the case
 7    since we were last together?  Great.
 8            So we are ready to proceed.
 9            Mr. Schwartz.
10            MR. SCHWARTZ:  Yes, Your Honor.  With the Court's
11    permission, before I call my next witness, I wanted to do a
12    few housekeeping chores of introducing some items that have
13    been stipulated to, and then publish to the jury some pages
14    of a document that the Government introduced into evidence.
15            So I would start -- I believe Defendant's
16    exhibit 39 and 40, the Jude Deveraux book, Remembrance, and
17    the Jude Deveraux book, An Angel for Emily, are already in
18    evidence, but if they're not, I would offer them into
19    evidence pursuant to stipulation.
20            THE COURT:  Any objection?
21            MR. STEFIN:  No, Your Honor.
22            THE COURT:  Admitted without objection.
23       (Defendant's Exhibit No. 39 and 40 entered into
24    evidence.)
25            MR. SCHWARTZ:  And then for the jury's further
```

```
 1    reading pleasure, I would offer into evidence exhibit --
 2    Defendant's exhibits 58 through 68; 58 being the book
 3    Lavender Morning, 59 being the book Scarlet Nights, 60 being
 4    the book Moonlight Masquerade, 61 being the book Summerhouse,
 5    62 being the book Heart Wishes, 63 being the book Forever, 64
 6    being the book Someone to Love, 65 the book True Love, 66
 7    Moonlight in the Morning, 67 Secrets, and 68 Return to
 8    Summerhouse.
 9              THE COURT:  Any objection?
10              MR. STEFIN:  I haven't read them.
11              MR. SCHWARTZ:  I don't mind taking a break and
12    letting . . .
13              THE COURT:  Any objection?
14              MR. STEFIN:  No, there's no objection.
15              THE COURT:  Admitted without objection.
16       (Defendant's Exhibit No. 58 through 68 entered into
17    evidence.)
18              MR. SCHWARTZ:  Your Honor, at this time I'd like to
19    publish to the jury certain pages of Government's exhibit 21,
20    particularly a -- pages 73 through -- I'm sorry, IRS1-0073 to
21    IRS1-0092.  I'm not going to publish all of them, but it's a
22    stipulation of settled issues in an appeal in United States
23    Tax Court between Nicholas Marks and Rose Joyce Marks versus
24    Commissioner of the Internal Revenue Service.
25              THE COURT:  I don't have that in evidence.  Is that
```

```
1    in evidence?

2            MR. SCHWARTZ:  I believe you have Government's

3    exhibit 21 in evidence.

4            THE COURT:  I don't.  I don't have it in my list of

5    evidence.  Maybe I missed it.

6            MR. SCHWARTZ:  I think it was admitted by

7    stipulation, but I'll ask the Government to check.

8            My notes, and obviously your notes control, Judge.

9            THE COURT:  Not if I'm wrong.

10            MR. SCHWARTZ:  I'm usually wrong, but never in

11    doubt.

12            MR. STEFIN:  Was that part of the tax audit?

13            MR. SCHWARTZ:  Yes.

14            MR. STEFIN:  I think it's part of Government's

15    exhibit 611.  I would have to verify that.

16            MR. SCHWARTZ:  Well, if it's not already in

17    evidence, I would move into evidence the stipulation of

18    settlement issues.  I can give it a defendant's number if we

19    don't have it.

20            MR. STEFIN:  Judge, I do believe that's part of the

21    tax audit.

22            THE COURT:  Well, 611's in evidence.  If it's part

23    of 611, that's fine, but I don't have it as a separate

24    exhibit 21.

25            MR. STEFIN:  No, it's not.
```

1          MR. SCHWARTZ:  Okay.  Thank you, Judge.

2          THE COURT:  Okay.  So are we marking it as 21, or

3    are we saying it's part of 611?

4          MR. SCHWARTZ:  In deference to my colleague, I

5    would say it's part of 611 and publish it to the jury.

6          THE COURT:  All right.  Then go ahead.

7          MR. SCHWARTZ:  And just the cover page to show that

8    it is a stipulation of settled issues in tax court under

9    docket number 8970-06 in a matter between Nicholas Marks and

10   Joyce Rose Marks, Petitioners, and the Commissioner of

11   Internal Revenue Service.

12          And as part of this stipulation, there is certain

13   information starting at IRS-1-0076, and I would read from the

14   second paragraph of the background section:  "The issues

15   involved in this case involve a~-- the Schedule C activity

16   for Mrs. Marks.  She is a fortune teller who has been in

17   business for over 20 years.  She has a third grade education

18   and was brought up in the business by her parents, who were

19   also fortune tellers.  She says her parents were Gypsies.

20   She has since trained her daughter in the trade.

21          "The taxpayer has two business locations; one in

22   Fort Lauderdale, Florida, and one in Manhattan, New York.

23   For this tax period, Mrs. Marks reported income from this

24   activity of $221,021.  Exam accepted this as correct.

25   Ms. Marks has also had $473,287 of gambling winnings in this

 1    year as another source of income."

 2            Then it goes on to talk about her expenses.

 3            "Issue one:  Is the taxpayer allowed to deduct

 4    $109,339 as Schedule C expenses under IRC, Internal Revenue

 5    Code, 1627?"  That might be 1827, but I don't read very well,

 6    Judge.

 7            THE COURT:  I think it's 162 with a question mark.

 8            MR. SCHWARTZ:  Okay.  162 with a question mark.

 9            Young eyes.

10            "The taxpayer has verified through receipts and

11    oral testimony that she is entitled to claim all of her

12    claimed expenses under Section 162.

13            "During the course of the conference, we limited

14    the verification issues to three issues," and then it goes on

15    to talk about the rent in her New York location, the two

16    months' rent she had in her Fort Lauderdale location, and the

17    property she had for six months at another Fort Lauderdale

18    location.

19            The next issue is is she entitled to a $93,129

20    deduction Schedule A for mortgage interest.  And without

21    reading everything, it goes on to state that she's verified

22    her mortgage interest expense paid for Seminole Drive on a

23    13 percent below the mortgage, and a mortgage expense on a

24    second property located on Bayview Drive, in Fort Lauderdale,

25    also a 13 percent mortgage.

1           Finally, it goes on to say:  "As the taxpayer has

2    verified all issues determined by examination, the accuracy

3    related penalty no longer applies.  We cannot sustain the

4    assertion of the penalty, as there is no longer a deficiency.

5    The self-employment tax adjustment no longer applies.

6    Although there is still a recommendation of an adjustment to

7    taxable income of $102 for interest from Bank of America, it

8    has little tax effect"-- I thought it should be affect --

9    "and at this time, we are conceding this issue.  The same is

10   true for the prepayment credit of six dollars.  Appeals

11   recommends the return be accepted as filed."

12          Also from that exhibit, IRS1-0124 through IRS-0142

13   contains certain balloon promissory notes between the

14   Defendant and her husband and Peter Wolofsky on the property

15   located on Seminole Drive, and on June 28th, 2001, it was in

16   the amount of $515,000.  I'm not going to go through the

17   entire note, but I would publish the fact that that note

18   exists in that exhibit.

19          Your Honor, at this time we would call to the stand

20   as Defendant's witness former detective Charles Stack.

21          THE COURT:  Good morning, sir.  Would you raise

22   your right hand for me.

23       Charles John Stack, Defendant's witness, sworn.

24          THE COURT:  Please be seated.

25          Sir, if you could pull that microphone towards you,

```
 1    please, and tell us your name and spell your last name for

 2    us.

 3              THE WITNESS:  My name is -- last name is Stack,

 4    S-t-a-c-k.  First name is Charles, middle name is John.

 5              THE COURT:  Thank you, sir.

 6                        Direct Examination

 7    BY MR. SCHWARTZ:

 8    Q    Good morning.  Is it Mr. Stack now?  Is that the

 9    appropriate --

10    A    Or you can call me Charlie if you want.

11    Q    Thank you, sir.

12              By whom are you employed?

13    A    Right now I'm employed with the Broward Public

14    Defender's Office with Howard Finkelstein.

15    Q    And what's your position with the Broward Public

16    Defender's Office?

17    A    I'm an investigator.

18    Q    And subsequent, or after you were a security guard at a

19    nuclear plant in New York, did you apply for and obtain a

20    position in Fort Lauderdale, Florida?

21    A    Yes, sir.

22    Q    What was that position?

23    A    A police officer with the City of Fort Lauderdale.

24    Q    And when did you become a police officer with the City

25    of Fort Lauderdale?
```

1    A     It was May 14th, 1984.

2    Q     And did you continue to work in various positions with

3    the City of Fort Lauderdale Police Department until sometime

4    in 2011?

5    A     Yes, sir.

6    Q     When and under what circumstances did you leave the Fort

7    Lauderdale Police Department?

8    A     I retired in -- on June 30th, 2011.  I had a little over

9    27 years of police experience with them.  I got hired by the

10   Broward Public Defender's Office, and then I started to work

11   there on, I think it was the next day, July 1st of --

12   Q     2011?

13   A     Yes, sir.

14   Q     And you've held a number of positions in the Fort

15   Lauderdale Police Department, haven't you?

16   A     Yes, sir.

17   Q     You were a patrolman for a period of time?

18   A     Yes, sir.

19   Q     About how many years?

20   A     About three.

21   Q     And subsequent to that, were you a plainclothes officer?

22   A     Yes, you would say that I was assigned to the tactical

23   impact unit, special weapons and tactics.  Our job was

24   designed to go out and to try to catch violent crimes in

25   progress, whether it be burglaries, armed robberies, anything

```
 1    of that nature.  It was a 14-man squad.  If there was a swat
 2    call out, then we were the Swat Team, as well.  So then we
 3    would then get our swat gear and take action if it had to.
 4    Q    And you received a number of commendations for your work
 5    in that unit, didn't you?
 6    A    Yes, sir.
 7    Q    And after that, did you go to what I would refer to the
 8    detective division or the Criminal Investigation Division?
 9    A    No, after that I went to the -- at that time we called
10    it the organized crime division.  It's now called special
11    investigations division.  I started off with the street level
12    narcotics unit.  I then moved up to the mid level narcotics
13    unit, and then I got deputized with DEA and worked a task
14    force operation and moved to the upper level section.
15          And then from there I went to metro intelligence,
16    where I worked with the -- or I was deputized with the FBI to
17    work Operation Odessa and worked undercover with Russian
18    organized crime.
19    Q    Was that technically as a patrolman, or was that -- were
20    a detective by then?
21    A    You would be considered a detective, yes, sir.
22    Q    In those positions you also received a number of
23    commendations, didn't you?
24    A    Yes, sir.
25    Q    Then did you go from that unit or the organized crime
```

```
 1   unit to a different unit?

 2   A    Yes.

 3   Q    What unit was that?

 4   A    It's called the Criminal Investigations Division, and my

 5   first assignment as a detective in that division was

 6   burglary.

 7            THE COURT:  Mr. Stack, can you pull that microphone

 8   just a little bit closer to you, please?

 9            THE WITNESS:  I'm sorry, Your Honor.

10            THE COURT:  Thank you.

11   BY MR. SCHWARTZ:

12   Q    And you worked burglary and also violent crimes, I

13   believe?

14   A    Yes, violent crimes slash robbery; yes, sir.

15   Q    And how long were you in that unit of the Criminal

16   Investigation Division?

17   A    I believe it was three years.

18   Q    You got a number of commendations there, too, didn't

19   you?

20   A    Yes, sir.

21   Q    And did you leave that unit for another unit?

22   A    Yes, I went to the economic crimes unit.

23   Q    And about when was that?

24   A    I think it was maybe the middle or the latter part of

25   2004.
```

```
 1   Q     And you remained in that unit until you retired in 2011?

 2   A     Yes, sir.

 3   Q     And you got commendations in that unit, too?

 4   A     Yes, sir.

 5   Q     And you mentioned that you worked with the Federal

 6   Government on a number of cases; is that correct?

 7   A     Yes.

 8   Q     And how many cases did you work with on -- with agents

 9   of the Federal Government before the Operation Crystal Ball

10   case?

11   A     I worked a DEA case.  It was called Operation

12   Georgetown.  It was an organization of crack cocaine and

13   marijuana.  It stemmed from Fort Lauderdale, and then we made

14   it a task force operation with the Customs, Immigration, ATF,

15   and DEA.  I got deputized with DEA, and I worked from Miami

16   all the way up to Brooklyn, New York, as well as the city of

17   Fort Lauderdale.

18            Eventually, approximately 30 defendants were

19   indicted, 25 on one indictment, four on another, and I think

20   it was one on one other charge.

21   Q     Okay.  And in doing that, did you learn the various

22   procedures of the Federal Government and how it operates,

23   federal agents, how they operate?

24   A     Well, my job was to gather, you know, whatever I was

25   doing the undercover work, and then there were DEA agents
```

```
 1    that completed, I guess they call them sixes, and that, and
 2    they fill out the reports and stuff like that.
 3    Q     And the DEA-6 is a report of investigation, isn't it?
 4    A     Yes, sir.
 5    Q     And each time you had an undercover meeting or
 6    encounter, you would come back, meet with the agents.  If you
 7    bought drugs you'd turn over the drugs, if you got money for
 8    the future delivery of drugs, you would turn over the money
 9    to the agents; is that correct?
10    A     Well, exactly this operation was a little unique,
11    Mr. Schwartz.  We had an undercover apartment videotaped with
12    informants inside.  So we had them come up and deliver the
13    crack cocaine, the guns, whether they be shotguns or
14    firearms, semiautomatic pistols, et cetera, and then the
15    agents would gather that evidence, and the evidence was
16    placed into, you know, the appropriate place, which was Group
17    21, which is out of Fort Lauderdale.
18    Q     Okay.  And as to each encounter, you would tell the
19    agents what happened, or they would have it on videotape, and
20    a DEA report of investigation on DEA form DEA-6 would be
21    dictated and be on file to commemorate what occurred?
22    A     Yes, sir.
23          MR. SCHWARTZ:  May I have a moment?
24  BY MR. SCHWARTZ:
25    Q     Is that the operation where an Assistant U.S. Attorney
```

```
 1    wrote a letter commending you for the work that you had done
 2    in that case?
 3    A    Yes, sir.
 4    Q    And who was that assistant DA, do you remember,
 5    Assistant U.S. Attorney?
 6    A    U.S. Attorney was James Boma, B-o-m-a.
 7    Q    And did he compliment you on your organizational skills
 8    and your work as an undercover officer?
 9    A    Yes, sir.
10    Q    And what was the other operation you worked with the
11    Federal Government?
12    A    Operation Odessa.
13    Q    And was that an FBI agent -- FBI operation?
14    A    Yes, sir.
15    Q    And that was to try to gather evidence against members
16    of the alleged Russian mafia; is that correct?
17    A    My job was to gather intelligence and to try to
18    infiltrate the particular organization and then report back.
19    There was a BSO deputy that was deputized, as well, and he
20    did most of the reports in that case.
21    Q    Okay.  And BSO is?
22    A    I'm sorry.  It's Broward Sheriff's Office, yes.
23    Q    And, again, for each meeting or each piece of
24    intelligence that was gathered, the BSO officer wrote a
25    report commemorating what occurred; is that correct?
```

```
 1    A    If something of value, yes.

 2    Q    And then you got involved in another federal operation;

 3    is that correct?

 4    A    Oh, this one?

 5    Q    Before this one.

 6    A    No, not that I'm aware of.

 7    Q    Had you worked any cases with Assistant U.S. Attorney

 8    Bardfeld before?

 9    A    No.

10    Q    Okay.  So the only two federal operations you were

11    involved with were Georgetown and Odessa?

12    A    Yes, sir.

13    Q    Okay.

14    A    Unless my memory's slipping me.

15    Q    I could be wrong.  I'm not . . .

16         And was Operation Odessa the case that you worked

17    on with Assistant United States Attorney Barry Saban?

18    A    I'm trying to remember exactly, because it's been a

19    while back on that case.  But we met in Miami, I know that,

20    and it might be, it might not be.  I just don't remember.

21    Q    Well, let me approach, because I might have my cases

22    confused, too.

23    A    Yes, sir.

24         MR. SCHWARTZ:  May I approach?

25         THE COURT:  Yes.
```

```
1   BY MR. SCHWARTZ:

2   Q    Let me show you what's been marked for identification as

3   composite exhibit 69, a two-page document.

4   A    Mr. Schwartz, I'm reading it, but to be honest with you,

5   I don't remember this one.

6   Q    Is that in 1995, a letter from Assistant United States

7   Attorney Saban to your chief?

8   A    Yes, sir.

9   Q    Does he again commend you for your organizational

10  ability and your ability to keep records and document

11  matters?

12  A    Yes, yes.  But I apologize, I don't remember the case.

13  Q    I don't remember yesterday.

14       I apologize for the trip down memory lane, but

15  let's talk about this case.

16       Did there come a time when you received information

17  that a lady named Jennifer Hill had a possible complaint

18  regarding fraud?

19  A    Yes, sir.

20  Q    And where were you working at that time?

21  A    I was in the major case squad of the economic crimes

22  unit.

23  Q    And how did that call get routed to you?

24  A    When police reports come into the police department --

25  I'm sorry, Your Honor, I keep backing away -- it goes to case
```

```
 1   management.  Then case management will take those reports and

 2   send them to the sergeant of our unit.  And the sergeant of

 3   our unit, who was at the time Sergeant Randy Pelham, would

 4   then decide who would take the cases, and that particular

 5   case came to me.

 6   Q    Is that Randy with a "Y"?

 7   A    Yes, sir.

 8   Q    And P-e-l-h-a-m?

 9   A    Yes, sir.

10   Q    And the case was started, I guess, by a call in to your

11   unit, which was taken by another member of your unit and

12   referred to you?

13   A    No, the call came in through patrol, and I believe it

14   was a public service aide, and she took the call via phone

15   and did the police report, and I received the police report,

16   and then that's where I would come in.

17   Q    And when you got the report, you made a telephone call

18   to Jennifer Hill; is that correct?

19   A    No, I believe she called me, if I remember correctly.

20   And then she had called in, and we talked about the case.  I

21   said I wanted to read the report.  I got the report, and then

22   I then took a formal statement from her, I believe it was

23   somewhere in May of 2007.

24   Q    Did you recall your initial conversation with her?

25   A    No, I think she was -- started with the case, you know,
```

1  explaining that, what had happened, and I said that I would

2  prefer to read the report, you know.  We may have talked

3  somewhat generally over the case, but I wanted to read the

4  report, and once I got the report, then either I called her

5  or then she called me again, and then I took a statement from

6  her.

7  Q    And when you say you took a statement, does that mean

8  you recorded the conversation?

9  A    Yes, sir.

10 Q    And you recorded the conversation you had with Ms. Hill

11 for what reason?

12 A    Well, with the State, we normally take recorded

13 statements to have the victim tell us what had happened and

14 then swear to the report, and then we'll use that as a

15 document of their -- of what they felt happened to them.

16 Q    And it was certainly totally legal for you to record

17 that conversation, wasn't it?

18 A    Yes.

19 Q    You were a police officer, and you had the right as an

20 exclusion to the Florida law on recording communications to

21 make a recording of that conversation?

22 A    Yes, yes, sir.

23 Q    Now, you have spoken to a number of other clients of

24 Rose Marks, Nancy Marks, Rosie Marks, Cynthia Miller,

25 Victoria Eli, and Vivian Marks, haven't you?

```
 1    A     Yes.
 2    Q     And you spoke to them -- the ones you spoke to, I
 3    believe, were primarily prior to the arrests being made in
 4    this case; is that fair to say?
 5    A     Except for Victoria Eli.
 6    Q     Except for clients of Victoria Eli?
 7    A     Yes, sir.
 8    Q     And the arrests in this case were made on what date?
 9    A     If my memory serves me right, it was August 16th, 2011.
10    Q     And you were present for those arrests, weren't you?
11    A     Yes.
12    Q     Were you still working for the Fort Lauderdale Police
13    Department?
14    A     No.
15    Q     You had retired already about a month and a half --
16    about a month before that; is that right?
17    A     Yes.
18    Q     And you were already working for the Broward Public
19    Defender's Office?
20    A     Yes.
21    Q     You weren't there in any capacity for the public
22    defender's office?
23    A     No, I got permission to go along and be as like a -- I
24    guess a consultant with the Government, and plus, I knew a
25    lot about the case, and the Government would want me there
```

1    to -- in case there's certain evidence that the other agents

2    are not sure that should be taken, the agents could show me

3    that evidence, and I could tell them that I would want that

4    evidence taken.

5    Q    So you were present the morning that Rose Marks was

6    arrested in her house, weren't you?

7    A    Yes, sir.

8    Q    About what time was that?

9    A    I think it was in the morning.  I'm not quite sure how

10   early, but I'm pretty sure it was the morning.

11   Q    Was it about 5:00 a.m.?

12   A    It was early, yes.

13   Q    And that's for a reason, arrests are made that early,

14   isn't it?

15   A    Sometimes, yes.

16   Q    And the reason is?

17   A    Well, I think, A, to make sure everybody's in there, and

18   also surprise, so we have the upper hand.  You never know

19   what you're going to encounter in a search warrant, so

20   sometimes surprise is a good tactic.

21   Q    And about how many officers of various agencies, state,

22   local, federal, were there with you at the time the arrests

23   were made at Rose Marks' house?

24   A    Well, if I could just back up just a little bit, because

25   to clarify, I was not there when they knocked on the door and

1    went in.  I wasn't present there at all.  I came after the

2    fact.  So I know there were Secret Service and Fort

3    Lauderdale and maybe some agents from IRS, but I couldn't

4    tell you the exact amount.

5    Q    Okay.  And you said you came after the initial entry

6    into the house; is that correct?

7    A    Yes, sir.

8    Q    And about how long after the initial entry did you come,

9    if you remember?

10   A    I think when they started the search.  So I came up, so

11   I guess say maybe within 30 minutes maybe.

12   Q    And the Defendants were still in the house, or Defendant

13   Rose Marks was still in the house; is that correct?

14   A    Yes, sir.

15   Q    And, as a matter of fact, you had a conversation with

16   her in the house, didn't you?

17   A    I don't think I had a conversation with Rose.  I know I

18   looked over and seen her nephew, Remi, and, and I just looked

19   at him and said, you're Remi.  But I don't recall having a

20   conversation with Ms. Marks.

21   Q    Do you recall going upstairs and talking to Mrs. Marks

22   and calming her down a bit and having a conversation with

23   her?

24   A    No.

25   Q    Do you remember saying to her, Gary Goon caused this?

```
 1   A     No.

 2   Q     And that wouldn't be true.  Gary Goon is a local Gypsy,

 3   and he didn't cause the arrest, did he?

 4   A     No.

 5   Q     Did you, in the course of the investigation, meet any

 6   other members of Rose's family?

 7   A     I believe -- at the arrest site, right, sir?

 8   Q     No, prior to the arrest.

 9         You investigated this case from 2007 until you

10   retired in 2011; is that correct?

11   A     Yes, sir.

12   Q     And it was around March or April, I think, of 2007 when

13   you started your investigation?

14   A     It would have been -- yeah, I guess the formal part of

15   the investigation would have started once I took the

16   statement from Ms. Hill.

17   Q     Okay.  And at that time, it was a investigation by the

18   Fort Lauderdale police, and you were looking to make a State

19   case; is that correct?

20   A     Yes, sir.

21   Q     With the state attorney's office?

22   A     Yes, sir.

23   Q     Did there come a time that that changed?

24   A     Yes, sir.

25   Q     About when was that?
```

```
 1    A     In August, I -- well, after I got the -- I did a

 2    subpoena duces tecum, which is to obtain bank records, I

 3    found that from what Ms. Hill gave me, that $8000 was wired

 4    in to Ricky Marks' bank account, and she had various Western

 5    Unions sent and certain other monies sent.  I knew of some

 6    cashier's checks that were sent to 1319 Seminole, and also, a

 7    check to Joyce Michaels that was written, I believe -- don't

 8    quote the date, please, Mr. Schwartz, but I think it was

 9    October 5th of 2005, and the other two checks, cashier's

10    checks, were January 6th of '06, both checks for 9000, and

11    they were FedExed to 1319 Seminole in the name of Vivian

12    White.

13          The other check was a regular check that was

14    written for 9000 to Joyce Michaels.

15    Q    And you learned of all of those checks originally from

16    Jennifer Hill; is that correct?

17    A    Yes, sir.

18    Q    And then did you -- you mentioned that you obtained a

19    subpoena duces tecum.

20    A    Yes, sir.

21    Q    Can you tell the jury what a subpoena duces tecum is?

22    A     In the state, a subpoena duces tecum is -- you cannot --

23    no police officer, no investigator, no attorney can obtain

24    bank records without either a court order or a subpoena duces

25    tecum.  With that subpoena duces tecum, I would take it over
```

```
 1   to the state attorney's office, I would explain what I
 2   needed, and I'd have a probable cause section of that, which
 3   would be the second page, outlining why I need it.
 4           I would have a time period on it, and I would have
 5   the bank account that I wanted to subpoena.
 6           The head of the economic crimes unit at the state
 7   attorney's office reviewed it, and it was signed, and then I
 8   sent it to the bank, and then the bank, in turn, would send
 9   me the records.
10   Q   And that was for the records of Ricky Marks' bank
11   account at Bank of America 005-6073-1636; is that correct?
12   A   If that's on the subpoena, yes, sir.
13   Q   I'm not trying to trick you.
14   A   No, no.  What I'm saying is I don't have it memorized,
15   but I trust you, Mr. Schwartz.
16   Q   That's a mistake.
17           And with that subpoena, you got bank records from
18   the account used by Ricky and Nancy Marks; is that correct?
19   A   I believe that was at the time, you may correct me, but
20   I believe that was Ricky Marks' account.
21   Q   Okay.  And from those records, did you become interested
22   in other bank records?
23   A   Yes.  When I started to notice that there were a number
24   of wires going into that bank, and one is, in the indictment,
25   she's listed as YL, and also in the indictment, the person
```

 1    listed as LB, and actually Ms. Hill had told me that she knew

 2    one of the persons, which was YL, which I contacted later on.

 3         But I also seen from Ricky Marks' bank account

 4    money going to a Debra Bower (phonetic), a wire out, if I

 5    remember correctly.  And with my conversation with Ms. Hill,

 6    according to her, Nancy Marks explained to her that Debbie

 7    Bower was her accountant, the person that would hold the

 8    money.  And I also seen an -- a payment being made out of

 9    that account for Rose Marks.

10         So I did go to the state attorney's office and

11    explain to him that we had these -- this particular thing

12    going on.  I was aware that it appeared to be a fraud, or a

13    possible fraud, and needed to be investigated.  When they

14    realized that these wires were coming from out of state, they

15    felt that it'd be a lot -- very difficult for them to work.

16    So I eventually went over and spoke to Larry Bardfeld, the

17    United States Attorney.

18         I explained to him what I had and the possibility

19    of where it could lead to, and I believe eventually -- we may

20    have had a second meeting, but eventually, he decided that,

21    yes, he'd like to take the case.  He asked me what I would

22    like to term the case, and I said Operation Crystal Ball.

23    And then eventually, I believe it was August 21st, 2007, I

24    got the authority to start taking or audio-taping

25    conversations between Jennifer Hill and at that time the

```
1    person of interest or the suspect, Nancy Marks.

2    Q    And you got permission to do that from Mr. Bardfeld

3    because the conversations were across state lines; is that

4    correct?

5    A    Yes.  But just so I can add a little bit into that, too,

6    is that shortly after that, getting permission from

7    Mr. Bardfeld, we went over to the Secret Service, because

8    Secret Service wanted to become involved in the operation, as

9    well.  And at that time, myself and Darren Ogden was sworn in

10   by the supervisor of Secret Service -- I was going to say

11   IRS, but it's Secret Service -- and the investigation began.

12   Q    And that was in or about what month?  I know you said

13   it.

14   A    August.

15   Q    August of '07?

16   A    Yes, sir.

17   Q    And after that, Mr. Bardfeld issued grand jury subpoenas

18   for various other bank records which you obtained?

19   A    Yes.

20   Q    And did you know Mr. Bardfeld before this case?

21   A    I know of Mr. Bardfeld.  Yes, I would say, yes, I know

22   him, because I know various people over there at the office.

23   But I know he's working economic crimes.  So I have personal

24   friends over there that I could have taken this case to, but

25   he was in economic crimes, and I wanted to take the case to
```

 1   that particular unit.

 2   Q     Okay.  So that's how this investigation started; is that

 3   correct?

 4   A     Yes, sir.

 5   Q     Now, let me go back.  During the course of the

 6   investigation, from roughly 2007 through 2011, without going

 7   into the names at this moment, you had an opportunity to

 8   interview many clients of Rose Marks; her daughter-in-laws,

 9   Cynthia Miller and Nancy Marks; her granddaughter, Vivian

10   Marks; her daughter, Rosie Marks; and her sister, Victoria

11   Eli.  But you stated as to Victoria, they were interviewed

12   after August of 2011; is that fair?

13   A     Yes, sir.

14   Q     And did you follow the same procedure that you did and

15   that you said you followed regarding victims, of recording

16   the statements of the victims or the clients when you first

17   spoke to them?

18   A     Well, I think the second victim I spoke to was LB in the

19   indictment, and after that, I was advised that the Government

20   would prefer if I would write the affidavits and not record

21   them.  It's not the policy of the Government to record the

22   conversations.

23   Q     Who told you that?

24   A     Mr. Bardfeld.

25   Q     And so you stopped recording your initial contacts with

 1    these witnesses; is that correct?

 2    A    Yes, it's the policy of the Government to, I guess,

 3    write out the affidavits.

 4    Q    Write out a report of what they say?

 5    A    Yes, yes.

 6    Q    Because you're calling them an affidavit, but oftentimes

 7    they weren't signed, they were just --

 8    A    Yes.

 9    Q    -- a report of what the people said?

10    A    Yes.

11    Q    And did Mr. Bardfeld tell you to write a report of each

12    time you spoke to these individuals, or did he tell you wait,

13    talk to them two, three, maybe four times and then do a

14    report that was a summary of what you learned?

15    A    No, what I did is Mr. Bardfeld didn't -- I went on and

16    decided to talk to the victims, and what I did specifically

17    was talk to the victim.  Sometimes --

18    Q    Can we call them alleged victims?

19    A    Whatever you like, sir.

20    Q    Thank you.

21    A    Yes.

22    Q    Or clients, either one.

23    A    So the alleged victims, I don't personally myself when

24    I'm talking to a victim actually sit down and use a notepad

25    and write, and write, and write, because I'll be honest with

1    you --

2    Q    Thank you.

3    A    No, what I mean by that is that I have to write out the

4    statement, and then I gotta go to the computer, and I have to

5    sit there with my two fingers and hunt and peck.  So it would

6    take me a really long time to, you know, write the statement

7    and then type it in.  So it was much easier for me to, you

8    know, on the computer you go to Word, you create a folder,

9    and then you start writing what the victim is telling you.

10            And, yes, if you're asking me I would write it out

11   or type it out after I heard it, and then I would read it

12   back to the victim, and if I miss something I would add it in

13   there, and that's what we would do along the way.

14            Because you have to understand I'm also recording

15   statements.  I'm also going out and doing visual surveillance

16   on my own.  I'm also taking pictures.  I think I've taken

17   over -- don't quote me on this, but over 4000 pictures.  And

18   so I'm surveilling them, I'm trying to watch their movements,

19   I'm trying to see who is associated with who, who works at

20   what particular location.  And at the same time I'm dealing

21   with victims.  In this case, Jennifer Hill was dead broke.

22            So we had to establish, reestablish the concept

23   with Nancy Marks that, you know, she eventually was going to

24   come into money.  And that took a little time.

25   Q    But let me go back to where I was asking you about.

```
 1    A     I'm sorry, did I miss --
 2    Q     No, no, you're helping us to understand, and I thank
 3    you.  But initially, with Jennifer Hill you recorded the
 4    statement, and maybe with a couple of other people you
 5    recorded the initial statement, and then Mr. Bardfeld told
 6    you, no, we don't record statements in the Federal
 7    Government; write a report or what you call an affidavit; is
 8    that correct?
 9    A     There was only one other person that I did that with,
10    and that was LB.
11    Q     Okay.
12    A     And also, even when I was with the -- deputized with the
13    FBI with Operation Odessa, also with DEA, nobody recorded it.
14    So it was a policy of the Federal Government.
15    Q     And I'm not arguing with that, but what I'm asking you
16    is you went out, you would talk to, let's say a client of
17    Nancy's to get information.  Did you, when you got back to
18    your office, make a report of that initial conversation with
19    her, or did you wait, talk to her maybe one or two more times
20    until you firmed up the facts and then make the report?
21    A     No, see, what I did is, I -- like I said, I would put a
22    file, make a file, put it on Word, and the end product of
23    that thing would be the affidavit.  I would keep, you know,
24    case notes in the sense of going out on surveillances and
25    trying to piece together.  I'm also going through bank
```

1    documents.  And as you know, the volume of bank documents.  I

2    also had to copy these bank documents to get a working copy,

3    and then the original documents were placed into evidence,

4    and then I would have to go through those documents to find

5    the specific transactions that the victims were talking

6    about.

7    Q    And I'm not criticizing your work ethic.  I think all of

8    your evaluations talk about how hard you work and how many

9    hours you work, without getting paid overtime.  So don't feel

10   I'm being critical of that.

11   A    Oh, I didn't -- I didn't think you were being critical.

12   I'm just trying to answer the questions, so I'm sorry.

13   Q    But what I'm trying to find out is, we have some of the

14   what you call affidavits or statements of witnesses, and they

15   appear to be something that was not a report of each time you

16   spoke to them, but rather an amalgamation of those talks.  Do

17   I understand that you would initially make some entry onto

18   Word on your computer and then update that entry as you learn

19   more or different facts.

20        If something was incorrect you would delete the

21   incorrect fact and correct it, and that resulted in the final

22   statement or affidavit?

23   A    Well, the -- the statement itself is when I wrote was

24   much easier for me to go and then follow what the victim was

25   telling me and then look at the -- when I got the bank

```
 1    statements, follow the bank statements and then get a final
 2    product.  If I went outside that -- it's the same thing with
 3    a surveillance note.  If I wanted to go over to a particular
 4    area dealing with Nancy Marks, or whoever, and try to verify
 5    all that was happening.  My main objective in this case was
 6    to get all the victims to talk to the alleged suspects,
 7    because I feel the words of the suspect and the victim on the
 8    audiotape is more powerful than my specific report.
 9           My objective in this case was to talk to the
10    victims, put it on paper as an affidavit, and a number of the
11    affidavits that were completed, I had them sworn to.
12    Q    Okay.  But let me go back, because I think we may be at
13    a little bit of cross purposes with each other.
14           What I'm asking is, let's say Jennifer -- not
15    Jennifer Hill, because you recorded it, but Nancy Marks'
16    client X gave you information and said, I gave Nancy Marks a
17    check for $5000 on January 5th.  You would type it into your
18    initial Word document.  Then when you got the bank statement,
19    you would see it was really 5500, and it was on January 20th.
20    You'd go back to her, confirm the difference and change it in
21    what you call the affidavit until you had your facts correct;
22    is that fair?
23    A    No, that's not fair at all, because the bottom line on
24    transactions and money transactions, if they tell me that
25    they received money or sent money, I waited for the bank
```

1    statement, I searched for the document, and then that was put

2    on a separate sheet, not into the Word report that we're

3    talking about.

4            The Word report is, what I was trying to find out

5    is exactly what was said to them and what made them give the

6    money, and what was promised to them, and what was promised

7    in return.  That was my sole purpose of those reports.

8    Q    And let's say client X told you initially that Nancy

9    Marks promised her that she would live forever, and then a

10   day or two later she said, you know, I've thought about it,

11   and what she really promised me was I would fall in love

12   forever, not live forever.  Did you type on your initial

13   report -- and I understand this is hypothetical -- Nancy

14   Marks promised client X she would live forever, and then when

15   client X corrected it, would you correct your~-- the

16   affidavit or the draft of the affidavit to say she would be

17   in love forever?

18   A    You know, to be honest, the basis of my affidavit was

19   their words to me.  I don't remember a lot of changes being

20   made, because my objective, again, Mr. Schwartz -- and I know

21   what you're saying.  If I was doing a particular report, did

22   I keep -- did I change it, delete it.  But I put in what the

23   victim said, and for the majority of the time it was very

24   rarely changed.

25           My main objective, and it was very important to me,

1    because I think the most powerful statement ––

2    Q    Are the words of the witness and the victim, is that ––

3    and the Defendant; is that right?

4    A    Yes, on tape.

5    Q    And I'm not trying to interrupt you, but you've said

6    that, and I don't want to waste time with things that are

7    repetitious.  So I apologize for cutting you off.

8              But what I'm asking is this.  Let's assume that

9    there were one, maybe two, maybe three people who, the first

10   time you visited them, did not feel they were a victim, they

11   believed they were getting good service from Nancy, and you

12   went back a second time and talked to them and showed them

13   some documentation and provided them with other information,

14   and at that point they decided that they were a victim.  Did

15   you make a report of the first meeting when they said they

16   weren't a victim?

17   A    The only person that did that was LB, and that –– you

18   got the recording that states that she said to me that she

19   didn't feel she was a victim.

20   Q    Well, what –– I'm sorry, go ahead.

21   A    She made the statement she had only lost 30,000.

22             Now, what I said to her is, I said if you're happy

23   with Nancy and fine with Nancy, I just would like you not to

24   let Nancy know that I got an ongoing investigation, and if

25   you decide that you are a victim, to call me back.

```
 1                    Now, I spoke to LB on October 31st of 2007.  She

 2       called me back on November 4th of 2007 and stated that she

 3       wanted to cooperate, that she felt she was a victim.

 4       Q    But let's, for instance, talk about Jude Montassir.  Am

 5       I pronouncing that right?

 6       A    Yes.

 7       Q    And you had an initial meeting with her in January of

 8       2008; is that right?

 9       A    It was January 15th, 2008.

10       Q    And then at that point, she made a statement that she

11       didn't want to talk about this, she wasn't interested in

12       anything like this, she just wanted to die and be with her

13       son?

14       A    She never made the statement that she didn't want to

15       talk about that.

16       Q    What did she say?

17       A    When I made contact, when I went to 7920 Glades Road,

18       Room 224, and it was close to the afternoon, I knocked on the

19       door, and a small, you know, woman, a little heavyset, came

20       to the door.  I identified myself, and I said that I'm doing

21       an investigation in which you may or may not be a victim.

22       And then I explained to her that -- I showed her a picture of

23       Rose Marks.  I didn't have no name on it.  I folded it up,

24       and I looked and I said, do you know this person?  And she

25       goes, that's Joyce Michael.
```

1       And I said, well, who is Rose Marks?  And she told

2   me that's her mother-in-law.

3       Now, I said that to her, I said, well, according to

4   the records that I have, I see that you've been giving close

5   to a little over $3 million from what I see right now, and

6   then she looked at me and she says, I don't care about the

7   money, I just want to die and be with my son.

8   Q    What did you do then?

9   A    So I talked to her and I said, you know, I asked her,

10  you know, why do you want to die and be your son?  Then she

11  started to proceed to tell me that her son was being held

12  between heaven and hell, and she sat down at one point, she

13  said she wanted to show me pictures of her son.  And I

14  hesitated a little bit, because I knew this was a very

15  emotional thing for her for the son, but I sat and she went

16  through the pictures of a beautiful young boy and a proud

17  mother, and then she started to cry.

18       So, you know, I put my arm around her shoulder and

19  I just said, Ms. Montassir, your son is in heaven, and

20  whoever's telling you that he's being caught between heaven

21  and hell, you know, I think you're being misled.

22       So Darren talked to her a little bit, I talked to

23  her a lot more, and she asked me a question which I think may

24  have been the turning point of the conversation, because she

25  asked me who Cynthia Miller is.  So I said to her Cynthia

1    Miller is her daughter-in-law, she's married to Michael

2    Marks, and that she's a -- also a psychic that operates a

3    shop at 2000 East Sunrise.  And she was somewhat taken back.

4    Q    Did you have a concern about her mental state at that

5    time?

6    A    I was -- I would say this.  When I first walked in,

7    Mr. Schwartz, I seen a woman with -- that shuffled her feet,

8    she was nice, polite, her shoulders were rounded, her face,

9    you know, I don't want to say gray, but, you know that

10   grayish look that you have, Ashton (sic) or something like

11   that.  And she looked like for a better lack of words, like

12   the life was sucked right out of her.

13           And the only reason why I say that now is the Jude

14   Montassir that I see today, the vibrant life that's inside

15   her, compared to what I'd seen then are two different people.

16   Q    But were you concerned about her mental state?

17   A    Yes, I was concerned, but towards the end of our

18   conversation, we had her smile a little bit, and then I asked

19   her, I said, Ms. Montassir, may I come back tomorrow.  And

20   she said, yes.  And before we left, she mentioned that she

21   was concerned about a very famous friend, and we didn't

22   discuss that until the next day.

23   Q    Did you ask her if she had any relatives?  She appeared

24   to be isolated to you, right?

25   A    I asked her if she had any family down here, and she

```
 1    said, no.  She had one sister, I believe -- I don't know if

 2    it was in Charlotte or further up northeast, and then another

 3    sister, I want to say towards the northwest, if I remember

 4    correctly.

 5    Q    Did you call either of them and express your concern

 6    about her?

 7    A    She said she was not close with them.

 8    Q    Did you call any of them and express your concern about

 9    her?

10    A    I'm going to be honest with you, Mr. Schwartz.  It

11    didn't enter my mind.  I was more concerned about her, and I

12    came back the next day and I believe if my memory serves me

13    well, we took her out to lunch.

14    Q    Well, you found a woman who was ashen, I guess is your

15    word, and shuffling her feet, obviously distraught, just

16    wanting to die.  Did you -- are you familiar with the Baker

17    Act?

18    A    Yes, I'm very familiar with the Baker Act.

19    Q    And what is that Act?

20    A    If you feel or witness that somebody's in danger to

21    themselves, and by the end of the conversation, I fully

22    believed -- and I can look anyone in this courtroom and say

23    that I do not believe Mrs. Montassir was going to hurt

24    herself.

25    Q    You told her her son was in heaven?
```

```
1    A    Yes.

2    Q    How did you know that?

3    A    It's an easy way to make somebody feel better.

4    Q    Now -- excuse me.

5              During the course of your conversation, did you

6    find out from her when her son had passed away?

7    A    Her son had passed away, yes, we learned October --

8    don't quote me on this, but it was 2005, I think.

9    Q    So that would be roughly two years and some months prior

10   to this meeting; is that right?

11   A    Yes.

12   Q    You came back and you saw Ms. Montassir another time?

13   A    Yes.

14   Q    Did you make a report of your first meeting with

15   Ms. Montassir?

16   A    No, what I did is I started a Word -- I'm not sure what

17   Darren did, but I know Darren may have kept something going,

18   too, as well.  But I started keeping notes on~-- you know,

19   that I went to 7920.  I put that into my report, and then I

20   started putting her affidavit together.  And I knew this was

21   going to take a lot of time, because the second time she said

22   to me that, when we met with her, that --

23   Q    I wasn't asking what she said.  I was asking did you

24   make a report, a separate report of that first meeting?

25   A    All~-- the only thing I put into my work product or my
```

1    thing was, met Montassir at 7920 Glades Road, Room 224, and

2    then I opened up a file to start, again, like I said, the

3    affidavit.

4    Q    And that affidavit encompassed three or four additional

5    meetings; is that correct?

6    A    Well, that -- to be honest with you, that affidavit

7    covered -- because we did -- also, I had to pull her

8    transactions, we did tape-recordings.  So I just -- that

9    affidavit was never completed until the -- her recordings and

10   her contacts with Rose Marks, AKA Joyce Michael, and then the

11   final product is what you received.

12   Q    And that covers a number of months; is that correct?

13   A    Well, I'd say that covered, yeah, a very long time.

14   Q    Did you keep individual notes of each encounter you had

15   with her?

16   A    No.

17   Q    Did you make individual notes of each encounter you had

18   with her?

19   A    No, what I would put in is in the affidavit.  I was

20   trying to extract what I felt was personality.  I didn't -- I

21   can tell you that day I met with her.  She also corresponded

22   with anything that happened via e-mail, and we kept those

23   e-mails.

24   Q    Okay.

25   A    So not to drag this out, that's just the way I worked

1    this particular case, and I felt it was the best way to work

2    it so I could continue doing the various different tests that

3    I had to do with this case, and I also had other cases, as

4    well.

5    Q    But weren't you aware -- because you've taken various

6    courses in police training; is that correct?

7    A    Yes, sir.

8    Q    And you're aware that anything that could be helpful to

9    the defense should be preserved; is that correct?

10   A    Well, I'll tell you in the State system with the city of

11   Fort Lauderdale, the only time that every piece of paper gets

12   preserved is in a homicide case.  When I do a economic crimes

13   case, it's the follow the money.  So I did a lot of tracing

14   of the money.  I put into words what the victims felt happen

15   to them.  I think I did a very good job on putting each one

16   of those affidavits together.

17           I think I was accurate and truthful in every single

18   one of them, and at the end also, to be honest with you,

19   Mr. Schwartz, my objective, my objective was to get those

20   recordings.

21   Q    I understand that, and we've discussed that a number of

22   times.  But you were seconded to the Federal Government; is

23   that correct?  You were deputized?

24   A    Yes.

25   Q    And this wasn't the first time you were deputized to

```
 1    work with the Federal Government, was it?

 2    A    Yes.

 3    Q    It wasn't?  It wasn't the first time?

 4    A    No.

 5    Q    It was at least the third time?

 6    A    No.

 7              Yes.

 8    Q    Can we throw in a "maybe" and we'll cover the range?

 9              (Laughter.)

10              And I'm sorry.  If my questions are confusing, I

11    apologize.

12              This is the third time you were deputized to work

13    with the Federal Government?

14    A    Yes.

15    Q    Had you become acquainted with the fact that in the

16    Federal Government, agents are required to preserve any

17    evidence that they run across that maybe helpful to a

18    Defendant?

19    A    Well, if there was -- I kept everything as far as, you

20    know -- there was nothing that I kept out, I don't feel, that

21    either helped or didn't help a Defendant.  I didn't exclude

22    something, Mr. Schwartz, and I can tell you and look you

23    straight in the face and say I didn't leave nothing out.  I

24    took each victim's word.  Each one of these victims, as far

25    as I was concerned was straightforward and honest, and I took
```

```
 1    their statement, and along with their statement I would then

 2    have the audiotaped statement, and everything they said in

 3    their affidavit I can confirm in the audiotaped statement.

 4           So it's not like I'm leaving anything out.

 5    Q    So let me ask you this, Mr. Stack.  And let's assume --

 6    we're doing this as a hypothetical.  You came upon somebody

 7    who said I'm not a victim, I'm happy with the services of

 8    Nancy Marks or somebody else, and I don't want to be a

 9    witness, I don't want to be involved.  Would you write a

10    report and say that?

11    A    Yes.

12    Q    Did you do that for John Cleary?

13    A    John Cleary was after the fact, and Agent Watts wrote

14    the report, and I was there.  And to be honest with you, I

15    still think John Cleary is a victim.

16    Q    You think he is, but he didn't, did he?

17    A    No, he didn't think he was a victim, but, you know, do

18    you want to get into John Cleary now, Mr. Schwartz?

19    Q    I want to ask you.  John Cleary was a client of Victoria

20    Eli; is that correct?

21    A    That's correct.

22    Q    And John Cleary was somebody who said, I'm not a victim,

23    I'm happy with Victoria Eli's work.

24           Did you write a report, or did you ever see a

25    report which said that?
```

```
 1              MR. STEFIN:  Objection to the compound nature of
 2  that question.
 3              THE COURT:  Rephrase the question.
 4              MR. STEFIN:  It assumes facts that are incorrect.
 5  BY MR. SCHWARTZ:
 6  Q    Did you ever see a report where John Cleary is quoted as
 7  saying I'm not a victim?
 8  A    I know Beth Watts wrote a report.  I read it.  It's been
 9  a long time since I reread it, so if that's what you're
10  asking me, there's a report there.
11              MR. SCHWARTZ:  May we approach for a moment, Judge?
12              THE COURT:  Yes.
13              Why don't we take our break now.
14              Ladies and gentlemen, let's take a 15-minute
15  recess.  Don't discuss the case or form any opinions.  Leave
16  everything at your seat, and we'll see you shortly.  Thank
17  you.
18              THE WITNESS:  Your Honor --
19              THE COURT:  Hold on one second.  Do we need the
20  witness here?
21              MR. SCHWARTZ:  No, Your Honor.
22              THE COURT:  You can step down, sir.  Just don't
23  discuss your testimony during the recess, please.
24              THE WITNESS:  No, Mr. Schwartz, is it all right if
25  I go to the men's room?
```

1             MR. SCHWARTZ:  Oh, no, sure.

2             THE COURT:  You can leave.  Just don't discuss your

3    testimony.

4             MR. SCHWARTZ:  Your Honor has told me, and I always

5    follow Your Honor's instructions, that we should not go into

6    items that were in the first or second~-- the first

7    indictment or the first superseding indictment in this case.

8             THE COURT:  Or the removal of items.

9             MR. SCHWARTZ:  Or the removal of items.

10            And I didn't highlight -- he mentioned a couple of

11   alleged victims who are not in the current indictment, and I

12   didn't want to highlight that because of Your Honor's

13   instructions.

14            But I would tell the Court, and I would just hand

15   up to Your Honor two paragraphs from the manners and means

16   clauses of the first two indictments where Mr. Stack was the

17   witness in the grand jury, Mr. Bardfeld conducted the grand

18   jury, and the indictment, in turn -- returned by the grand

19   jury said:

20            "As to John Cleary, it was further part of the

21   conspiracy that the Defendant, Victoria Eli, would tell JC

22   that in order to rid him and his family of evil spirits, bad

23   luck and curses, JC would have to make sacrifices, would

24   involve money -- that which would involve money, because

25   money was the root of all evil.  JC would provide Victoria

1    Eli with large sums of money after Defendant Victoria Eli

2    assured him that it was a sacrifice, not a payment, and

3    promised that the money would be returned.  The sacrifice

4    entailed money being set aside and prayed upon.

5            "Defendant Victoria Eli promised that while she

6    prayed on the money, it would start relieving JC and his

7    family and friends of all evil spirits, the end of bad luck

8    and the end of curses.  Victoria Eli assured JC that he would

9    get the money back.  The money was never returned."

10           Also, Mr. Stack was asked in his grand jury

11   testimony, a prior sworn statement by Mr. Stack about JC and

12   said in the grand jury testimony that JC was a victim of

13   Victoria Eli.  I have the pages, and I can show them to Your

14   Honor.

15           None of that was true.  JC was never interviewed by

16   anybody to do with this case until months after that first

17   indictment was returned.  That was totally made up and false,

18   and I'd like permission now to ask Mr. Stack about his

19   testimony in the grand jury regarding JC being a victim and

20   the resultant statement in the manner and means clause about

21   JC.

22           The same is true for a woman whose name hasn't come

23   up in this case, so I won't mention it, but whose initials

24   were CC.  The paragraph in the indictments was virtually the

25   same.  The testimony about CC being a victim in the

```
 1    indictments was the same, but she had never been interviewed
 2    either when the indictment was drafted and when Stack's
 3    testimony was put in the grand jury.
 4             I believe that this should be a valid area for me
 5    to be allowed to go to cross-examine Mr. Stack.  Of course,
 6    in light of Your Honor's previous rulings before all this
 7    information was on the record, I didn't do that, and I
 8    wouldn't do that in front of the jury without your consent.
 9             THE COURT:  What did he testify to in the grand
10    jury?
11             MR. SCHWARTZ:  Let me pull it up, Your Honor.
12             THE COURT:  Why don't you let me see it, and during
13    the break I can look at it during the break, and then we can
14    discuss it further.
15             MR. SCHWARTZ:  Thank you, Your Honor.  I will do
16    that.
17             May I approach?
18             THE COURT:  Is this for both witnesses in here?
19             MR. SCHWARTZ:  This one is Cleary, and then I'll
20    pull up -- yes, this is extensive grand jury testimony, but
21    I'm showing you the one for John Cleary.
22             THE COURT:  And is CC in this same?
23             MR. SCHWARTZ:  It is.  As a matter of fact, it's on
24    the same page.
25             THE COURT:  All right.  Why don't we get back
```

```
 1    together in about 15 minutes, and then we'll go from there.

 2    Okay?

 3       (A recess was taken from 10:32 a.m. to 10:49 a.m., after

 4    which the following proceedings were had:)

 5                THE COURT:  Please be seated.

 6                MR. SCHWARTZ:  Just for Your Honor's edification, I

 7    would hand up to you an affidavit of John Cleary's if Your

 8    Honor's interested in it.

 9                THE COURT:  I'm not sure that really matters based

10    upon what the witness said.  I think he said that he told him

11    he wasn't a victim or didn't believe he was a victim.

12                MR. SCHWARTZ:  Correct.

13                THE COURT:  Isn't that what Mr. Stark said?

14                MR. SCHWARTZ:  Yes.

15                THE COURT:  I'm asking Mr. Stefin.

16                Didn't Mr. Stack say that Mr. Cleary told him he

17    wasn't a victim?

18                MR. STEFIN:  No, no.

19                THE COURT:  He didn't say that?

20                He said he believed he was a victim.

21                MR. STEFIN:  He said he believed he was a victim.

22    And I don't believe Mr. Stack testified that John Cleary told

23    him he wasn't a victim.

24                THE COURT:  All right.  Well, I guess we can

25    clarify that with him.
```

1          MR. STEFIN:  Okay.

2          THE COURT:  And so what is it you want to go over?

3     I don't see -- even if you take these statements here from --

4     in front of the grand jury -- first of all, the question was

5     phrased by Mr. Bardfeld, one of the victims was so-and-so,

6     and he agreed.

7          MR. SCHWARTZ:  Okay.

8          THE COURT:  And then they're just talking about the

9     amount of money that went into these accounts or that these

10    victims, alleged victims, transferred to --

11         MR. SCHWARTZ:  Correct.

12         THE COURT:  So, I mean, it's really only the

13    question that Mr. Bardfeld poses about one of the victims was

14    so-and-so, and he says "yes" to that.

15         MR. SCHWARTZ:  And then I want to bring out from

16    him that at the time he made that statement, he had never --

17    neither he nor any other agent involved in the investigation

18    had ever talked to John Cleary.

19         THE COURT:  I thought the point of this line of

20    questioning or the calling him was to show that people told

21    him that they weren't victims, and he never recorded that or

22    failed to make a record of it.

23         MR. SCHWARTZ:  Correct.  Subsequent to the grand

24    jury, about I guess a month or so after the arrests, about

25    six months, five months after the grand jury presentation, he

```
 1    went out and interviewed John Cleary with Beth Watts -- I'm

 2    sorry, forgive me.  He telephonically interviewed John Cleary

 3    with Beth Watts and Larry Bardfeld, and I don't know if

 4    anybody else was involved in the interview, where Cleary said

 5    he was not a victim, and he did say that he had paid money to

 6    her, he talked about the relationship, money was to go to

 7    charity, et cetera.  But he continued to insist, although

 8    it's not in the report, that he was not a victim.

 9            And I see no report that says John Cleary says he

10    was not a victim.  I want to bring that out, even in

11    Ms. Watts' report.  And I have an affidavit of John Cleary

12    dated --

13            THE COURT:  Well, the fact that you have an

14    affidavit of John Cleary is really --

15            MR. SCHWARTZ:  Irrelevant.

16            THE COURT:  -- is immaterial.

17            We're talking about his testimony, this witness'

18    testimony as to what happened.  So I'm confused.

19            What is it you want to bring out?

20            MR. SCHWARTZ:  I want to bring out that there were

21    alleged victims of Rose or her family who the Government

22    interviewed and who said they were not victims.

23            THE COURT:  Okay.  And that's why I allowed you to

24    bring this testimony up in the first place.  So, okay, go

25    ahead, you can do that.
```

1           MR. SCHWARTZ:  Okay.

2           THE COURT:  But what does that have to do with the

3    grand jury testimony?

4           MR. SCHWARTZ:  Then I want to ask him, isn't it a

5    fact that you were asked in the grand jury, is John Cleary

6    one of the victims, and you said "yes," and isn't it a fact

7    that John Cleary has denied he was a victim?

8           THE COURT:  All right.  So if you ask him, isn't it

9    true that John Cleary denied he was a victim and he says yes,

10   what else do you need to establish?

11          MR. SCHWARTZ:  Then I would show him the police

12   report~-- the investigative report of Beth Watts dated

13   September 13th, 2011, which took place months after his

14   testimony in the grand jury, where it doesn't say John Cleary

15   says he was not a victim.

16          THE COURT:  Okay.  But you're assuming he's going

17   to say, yes, he told me he wasn't a victim, I guess.

18          MR. SCHWARTZ:  I'm hoping he'll tell the truth,

19   Judge.

20          THE COURT:  But why do you think it's not the

21   truth?

22          MR. SCHWARTZ:  Because I have an affidavit, which

23   you say is not relevant, but --

24          THE COURT:  Well, I mean, just because you have an

25   affidavit where someone else is saying it's not true doesn't

 mean that this witness doesn't believe his statement is true.

MR. SCHWARTZ: Okay. If he says it, then he says it.

Then I was going to ask him about some other people who -- I'm going to go into the fact that he visited some of the other people who claim they were happy with the Defendant's services, and he referred them to a website called gypsyscam.com and tried to persuade them they were victims.

THE COURT: All right. So I guess we have -- have we established whether or not he admitted that John Cleary told him he was not a victim?

MR. SCHWARTZ: I thought he had said that -- I thought that he said that he felt John Cleary was a victim.

THE COURT: Right. But did he say John Cleary told him he was not a victim?

MR. SCHWARTZ: I thought he did. The Government doesn't think so, Judge.

THE COURT: Let me go back and see if I can find it.

MR. SCHWARTZ: And I don't take the notes when I'm up here.

THE COURT: No, he never said that. What he said was -- you asked him a hypothetical, "If a person said he or she wasn't a victim, would you write a report and say that."

```
 1                  MR. SCHWARTZ:  Uh-huh.

 2                  THE COURT:  He said:  "Yes."

 3             Then you asked him:  "Did you do that for John

 4     Cleary?"

 5                  And he said:  "John Cleary was after the fact, and

 6     Agent Watts wrote the report, and I was there.  And to be

 7     honest with you, I still think John Cleary is a victim."

 8                  Then you say:  "You think he is, but he didn't, did

 9     he?"

10                  And then he says:  "No, he didn't think he was a

11     victim, but, you know, do you want me to get into John Cleary

12     now, Mr. Schwartz."

13                  So he says he didn't think he was a victim.  He did

14     say that.

15                  And then you ask him:  "And John Cleary was someone

16     who said I'm not a victim, I'm happy with Victoria Eli's

17     work.  Did you write a report or did you ever see a report

18     which said that?"

19                  There was an objection which I sustained being

20     compound, and you rephrase the question, and you said:  "Did

21     you ever see a report where John Cleary was quoted as saying

22     I'm not a victim?"

23                  "I know that Beth Watts wrote a report.  I read --

24     it's been a long time since I read it."

25                  So I guess he did say that John Cleary -- he didn't
```

 1   think he was a victim.  He said he didn't think he was a

 2   victim.  I don't know what he bases that on.

 3           MR. SCHWARTZ:  Okay.  May I follow up with the

 4   report of interview that he said he participated in and saw

 5   the report?

 6           THE COURT:  But what does the report say?

 7           MR. SCHWARTZ:  It doesn't say anywhere that John

 8   Cleary said he was not a victim.

 9           MR. STEFIN:  May I approach with the report?

10           THE COURT:  Yes.

11           All right.  I guess we need to get him back on the

12   stand and go from there.  I'm not sure what it is that you

13   want to ask him.

14           MR. SCHWARTZ:  I am.

15           I want -- what I'm trying to show, Judge -- and

16   you've now read the report, and before he comes in, with all

17   due respect to Ms. Watts, I believe this report misrepresents

18   what John Cleary told to Beth Watts and Charlie Stack and

19   Mr. Bardfeld.  And we have a lot of reports from the agents

20   and Mr. Stack which make it sound like the -- from the very

21   beginning, these witnesses were adamant about being victims

22   of fraud.

23           If I just read this report and I hadn't spoken to

24   both Mr. Cleary and his attorney, who were present at this

25   interview, I would think that from reading the report.

```
 1              Mr. Cleary's version of the interview was very

 2    different, and I'd like to confront Mr. Stack with other --

 3    another -- I can't put the affidavit into evidence obviously,

 4    but with whether Mr. Cleary told them that he believed that

 5    Ms. Eli was his personal life coach, that he's only given her

 6    money for fees, that he believed he got fair value with --

 7    from the payments he made to Ms. Eli, that she did not engage

 8    in fortune telling, her relationship was exclusively one of

 9    counseling, coupled with prayer and meditation.

10              None of that seems to -- or at least that doesn't

11    seem to be the gist of the report that you have before you,

12    Judge.  And if that report is non-reflective of the true

13    facts, then I think we can reasonably believe that other

14    reports may not be reflective of the true facts.

15              THE COURT:  I guess I'm not sure how you're going

16    to prove they're not reflective of the true facts.

17              MR. SCHWARTZ:  I'll ask him and see what he says.

18    That's what I'm limited to, Judge.

19              MR. STEFIN:  Judge, my objection would be -- he can

20    ask him questions about what John Cleary said at an interview

21    if he recalls, and he can even give him the memorandum of the

22    interview to refresh his recollection.  But then to try to

23    impeach him on a statement that was prepared by somebody else

24    I think is completely improper.

25              MR. SCHWARTZ:  I obviously can't offer the
```

1    statement.

2            THE COURT:  I guess he can ask him if he said this,

3    or do you recall if he said this or that, or this or that, or

4    didn't he also say this or that, and he can say, no, and

5    that's -- you know, he's left with a "no."

6            MR. SCHWARTZ:  Right.

7            THE COURT:  I think he can try and refresh his

8    memory or suggest to him that other things have been said or

9    were said, and see what his answer is.  I don't think he can,

10   you know, put that document in evidence.

11           MR. SCHWARTZ:  I can't.

12           THE COURT:  All right.  Let's bring the witness

13   back in, and we'll go from there.

14           MR. STEFIN:  I assume the Court's ruling is he

15   can't try to impeach him with a statement that was made in an

16   early version of the indictment in this case.

17           THE COURT:  If he says something inconsistent with

18   what he testified to in the grand jury, he can impeach him

19   with his prior grand jury statements, but we're not getting

20   into the fact that something was put in the indictment.  I

21   don't see how any of this opens the door into getting into

22   the prior indictments.

23           MR. SCHWARTZ:  And I only asked you if I could do

24   that.  With Your Honor's ruling, I won't do it.

25           THE COURT:  Again, I think you can use the grand

 1    jury testimony if he gives a statement inconsistent with what

 2    is said here.

 3              MR. SCHWARTZ:  Thank you.

 4              THE COURT:  But otherwise, I don't think it opens a

 5    door for talking about prior versions of the grand jury

 6    indictment and why somebody was listed as a victim in the

 7    earlier version and whether that was a valid assertion in the

 8    indictment or not, so . . .

 9              MR. SCHWARTZ:  May I approach and get back the

10    grand jury minutes?

11              THE COURT:  Yes.  Let's bring the jurors back in,

12    please.

13              MR. SCHWARTZ:  Thank you.

14              THE COURT:  You're still under oath, Mr. Stack.

15    Have a seat.

16       (The jury enters the courtroom, after which the following

17    proceedings were had:)

18              THE COURT:  Welcome back, everyone.  Please be

19    seated, ladies and gentlemen.  Sorry for the delay getting

20    started, but we had some issues we needed to talk about, so

21    that's why we kept you waiting.  I apologize.

22              Mr. Schwartz, you may continue.

23              MR. SCHWARTZ:  Thank you.

24    BY MR. SCHWARTZ:

25    Q    Now, Mr. Stack, you testified on a number of occasions

```
 1    in the grand jury that returned indictments in this case; is

 2    that correct?

 3    A    Yes, sir.

 4    Q    And do you remember being asked the following -- well,

 5    before that, you met telephonically, I believe, on or about

 6    September 13th with the gentleman I mentioned before, John

 7    Cleary; is that correct?

 8    A    Yeah, that was after the indictments.

 9    Q    After the arrests also.

10    A    Let me correct myself, sir.  It's after the arrests on

11    August 16th.

12    Q    Right.  And this is September 13th of that same year?

13    A    Yes.

14    Q    Okay.  And present for that telephonic conversation I

15    believe -- was it a telephone conversation?

16    A    Yes, sir.

17    Q    Were John Cleary, his attorney, Joseph Malley,

18    M-a-l-l-e-y, Beth Watts, you, and Larry Bardfeld; is that

19    correct?

20    A    Yes, sir.

21    Q    And in that conversation, did Mr. Cleary say that he

22    wasn't a victim, he was happy with the services of

23    Ms. Victoria Eli?

24    A    Yes.  And just to -- I thought you were referring to

25    pre-indictment.  So my statement was reference to my work
```

```
 1   before.

 2   Q    And no one's saying that you misstated.  I believe it's

 3   clear that no one talked to John Cleary before the

 4   indictments were returned in this case, is that --

 5   A    Yes, sir, yes.

 6   Q    Is that fair?

 7   A    Yes.

 8   Q    But afterwards, he was interviewed, and he said he was

 9   not a victim; is that correct?

10   A    That's correct, sir.

11   Q    Let me show you a memorandum of conversation of that

12   interview by Beth Watts and review it and tell me if it says

13   in there that John Cleary is not a victim of Victoria Eli?

14            MR. STEFIN:  Objection, Your Honor.

15            THE COURT:  Overruled.

16            THE WITNESS:  I'm done, sir.

17   BY MR. SCHWARTZ:

18   Q    Thank you.

19            Does it say in that affidavit that John Cleary said

20   he was not a victim of Victoria Eli?

21   A    Yes, sir.

22   Q    Where does it say that?  I'll give it back to you.

23   A    Says he does not.

24   Q    Does not what?

25   A    He's not a victim, right?
```

```
 1   Q    Yes.

 2   A    Well, he's saying he's very happy with her work.

 3   Q    But does he say he's not a victim?

 4   A    Do you want the exact paragraph?

 5   Q    I know he says --

 6          THE COURT:  We can't hear you, sir.  Can you speak

 7   into the microphone?

 8          THE WITNESS:  I'm wondering if he wants the exact

 9   paragraph.

10   BY MR. SCHWARTZ:

11   Q    Yeah, why don't you, if the Court will allow, read us

12   the paragraph you say says he's not a victim.

13          MR. STEFIN:  Objection.

14          THE COURT:  Sustained.

15          THE WITNESS:  It doesn't say specifically.

16   BY MR. SCHWARTZ:

17   Q    Now, do you remember testifying in the grand jury that

18   returned the first indictment and the first superseding

19   indictment?

20          MR. STEFIN:  Objection, improper.

21          THE COURT:  Sustained.

22   BY MR. SCHWARTZ:

23   Q    Okay.  When you testified in the grand jury in this

24   case --

25          MR. STEFIN:  Objection.
```

```
 1              THE COURT:  Can we talk up here, please?

 2        (The following proceedings were held at sidebar:)

 3              MR. SCHWARTZ:  I was going to ask him when he

 4    testified in the grand jury, was he asked, was one of the

 5    victims that Victoria Eli received a lot of money from is

 6    John Cleary; is that correct?  And he says, yes.

 7              THE COURT:  Okay.  But that was before the

 8    interview that you asked him about.

 9              MR. SCHWARTZ:  I understand.

10              THE COURT:  What does that have to do with whether

11    or not the reports that were prepared -- were prepared by the

12    Government accurately reflected whether alleged victims

13    reported that they were not victims?

14              MR. SCHWARTZ:  I'm finished with the report now,

15    Judge, and I'm going to ask him, did he mislead the grand

16    jury.

17              THE COURT:  Well, you're not getting into whether

18    he misled the grand jury, because the grand jury issues are

19    irrelevant to this indictment.

20              MR. SCHWARTZ:  I'm asking him if he made a prior

21    inconsistent sworn statement.

22              THE COURT:  How it could have been inconsistent if

23    he made the statement before he had the conversation with

24    Cleary where he said he wasn't a victim?

25              MR. SCHWARTZ:  Because he told the grand jury that
```

```
 1    the -- that John Cleary was a victim under oath.  He had no
 2    information upon which to base that statement.
 3              THE COURT:  Whether that's true or not is
 4    irrelevant to what we're talking about in this trial.  Now,
 5    we're getting into the issue of whether or not the grand~--
 6    the prior indictment was properly obtained and whether John
 7    Cleary was or was not a victim.  What does that -- you know,
 8    the reason I allowed this testimony to come in at all is
 9    because you argued to me that you wanted to make -- your
10    theory of defense is that the Government found out that
11    these -- these alleged victims really weren't victims, and
12    that the idea of them being victims was placed into their
13    mind by Mr. Stack and the Government agents who convinced
14    them that they were victims.
15              And so I allowed this line of testimony to the
16    extent that you're able to show that people said they weren't
17    victims and the Government was aware of that and possibly
18    the -- these people were convinced by the government agents
19    that they were victims.  So that's what you've just been
20    allowed to do.  What does that have to do with whether or not
21    he made a statement about somebody else before he ever spoke
22    to him that he was a victim?
23              MR. SCHWARTZ:  Doesn't it go to his credibility,
24    whether he made a false statement in the grand jury?
25              THE COURT:  But, first of all, you heard him say --
```

 1     and maybe the Government wants to let this in, that he said

 2     he believed he was a victim, and if you ask him that

 3     question, if I allow you to ask him that question, you're

 4     going to have to let him explain why he thinks he was a

 5     victim and why that was a truthful statement at the time.  Do

 6     you want him to explain --

 7              MR. SCHWARTZ:  I understand what Your Honor said.

 8     That's why I said I'm going off this line of questioning.

 9              MR. STEFIN:  Okay.

10              MR. SCHWARTZ:  But --

11              THE COURT:  So just so I'm clear here, you're

12     withdrawing your request to get into the grand jury statement

13     because you don't want to open the door to allowing him to

14     explain why he thinks that was a truthful statement; am I

15     correct?

16              MR. SCHWARTZ:  Correct.

17              MR. STEFIN:  Okay.

18              THE COURT:  So do we have anything else to talk

19     about?

20              MR. SCHWARTZ:  Yes.

21              I don't want to go beyond what Your Honor will

22     allow me to go beyond in front of the jury, so I'm going to

23     ask you one other thing.

24              In the grand jury, he also testified that the

25     reason he had April Reddish call Rosie Marks, had that call

```
 1   played, was to verify that the Defendants or the targets

 2   would act in the same manner with the undercover officers as

 3   they did with the alleged victims, and then he says, and

 4   Rosie Marks did act in that manner.  That's not true.  We've

 5   heard the testimony of April Reddish, we've heard the tapes

 6   of April Reddish, and I want to go into his -- the fact that

 7   he made a false statement in the grand jury as to that.

 8            THE COURT:  Um --

 9            MR. SCHWARTZ:  And the reason that they were

10   calling was to make -- to get consistent conversations with

11   what the witnesses were telling them, to verify what the

12   witnesses were saying, and he says -- and the conversations

13   with April Reddish verify what the witnesses were saying.

14            THE COURT:  Well, I guess you could ask him -- I

15   think it would be legitimate to ask him why he had April

16   Reddish go in and what his goal was.

17            MR. SCHWARTZ:  Right.

18            THE COURT:  And then I guess you could ask him

19   whether or not it was successful.

20            MR. SCHWARTZ:  Right.

21            THE COURT:  And if he says something different from

22   what he said here, then I guess you can impeach him with it.

23            MR. SCHWARTZ:  That's how I was going to do it,

24   Judge.

25            THE COURT:  But you have to say something different
```

```
 1    than what's in the grand jury testimony.
 2              MR. SCHWARTZ:  Okay.
 3              THE COURT:  If he says something that's consistent
 4    with --
 5              MR. SCHWARTZ:  If he says something consistent, the
 6    jury's heard April Reddish's testimony and the tapes.
 7              THE COURT:  And the tapes, so then . . .
 8              MR. SCHWARTZ:  I don't need the grand jury
 9    testimony.
10              MR. STEFIN:  But isn't this whole line of
11    questioning simply to impeach the witness that he called,
12    which, again, if he asks him the questions in order to
13    impeach what April Reddish said, that would be entirely
14    proper.  But he's actually asking the questions in order to
15    possibly impeach the detective, who he has called as his
16    witness, which I think is improper.
17              THE COURT:  Well, I see it as he's trying to show
18    some type of improper investigation that was basically
19    created by the Government to manufacture a case where it
20    didn't exist.  So I think, you know, in that vein he should
21    be allowed to have the witness explain why he did certain
22    things in the investigation to try and paint the picture that
23    this was a, you know, fraudulent investigation.
24              MR. STEFIN:  Okay.
25              THE COURT:  So for that reason I will allow it.
```

```
 1    And then I guess it depends on what happens whether or not --

 2              MR. SCHWARTZ:  What the answers are.

 3              THE COURT:  Right.  Okay.

 4              MR. SCHWARTZ:  Thank you.

 5         (Sidebar conference concluded.)

 6              MR. SCHWARTZ:  May I proceed?

 7              THE COURT:  Yes, thank you.

 8    BY MR. SCHWARTZ:

 9    Q    Mr. Stack, in the course of your investigation, did you

10    and the another -- I don't know that I established this.

11    Were you what was called the case agent or the case detective

12    from the Fort Lauderdale Police Department on this case?

13    A    Yes, sir.

14    Q    What does that mean?

15    A    I'm the lead agent from Fort Lauderdale.

16    Q    Were there a couple of other lead agents in the case?

17    A    There were -- Darren Ogden was with me, so he would be

18    my co-agent 'til he got promoted.

19    Q    When I say other lead agents, was there someone in

20    charge of the contingent from the Secret Service?

21    A    They had changed because of their -- depending on their

22    presidential details.

23    Q    Duties?

24    A    Yes.

25              It started with Chris Hersey (phonetic), and then
```

1    it went to Shawn Holbrook, and then the last one towards the

2    end was Kelly Cook.

3    Q    And was there a lead agent from the IRS when the IRS got

4    involved in the investigation?

5    A    Yeah, the IRS came in, I think, towards the end of the

6    investigation.

7    Q    And who was it?

8    A    2010, I think.

9    Q    And who was the lead agent from the IRS?

10   A    It was Beth Watts.

11   Q    And as lead agent or case agent from the Fort Lauderdale

12   Police Department, did you get involved with formulating a

13   strategy to have undercover officers or agents place

14   telephone calls to various targets of your investigation?

15   A    Yes.

16   Q    And were those people who made those calls, was one of

17   them a lady by the name of April Reddish?

18   A    Yes.

19   Q    Was she a patrol officer for the Fort Lauderdale Police

20   Department?

21   A    Yes.

22   Q    And you were aware that she had experience in undercover

23   work both in Fort Lauderdale and in Georgia, right?

24   A    That's what she told me, yes.

25   Q    And what was the purpose of having April Reddish or

1    another undercover officer make telephone calls to the

2    targets of your investigation?

3    A    It was three-fold.  The agent and/or the detective was

4    to go undercover, go under a different name, and the first

5    thing, we wanted to prove that the alleged suspects had no

6    psychic ability whatsoever.

7         Secondly, that they would somewhere along the line

8    tell the possible or alleged client or however you want to

9    term the agent, that they had negativity or blockages, and,

10   et cetera, and that they could help them.

11        And then third was for them to cause, you know,

12   them to send money either via by wire or by mail.

13   Q    In order to have that money -- with the promise that

14   that money would be cleaned or maintained in some manner and

15   eventually returned, right?

16   A    No, that was never our -- our intention for the agents

17   were very specific, that we already established the returning

18   of the money with the undercover phone calls with the

19   victims.  We wanted the agents to go in, and we wanted the

20   agents to go under assumed names, make up a story and show

21   that these people are victims -- I don't want to say these

22   people, because I don't think that's appropriate, the alleged

23   suspects.

24   Q    The targets.

25   A    Of the investigation.

```
 1   Q      Right.

 2   A      Thank you very much, Mr. Schwartz.

 3   Q      Anytime, Mr. Stack.

 4   A      No, but that was the idea.  The idea was we just didn't

 5   have the money and the resources to continue to send that

 6   kind of money and then start asking, you know, what are you

 7   going to do with the money, get it returned.  I think in one

 8   instance with Stephanie Kerby, if you listen to the tape on

 9   September 8th and 9th --

10   Q      But I was asking you about April Reddish, wasn't I?

11   A      The agents, I thought you said.

12   Q      But I said when April Reddish made these calls, what was

13   the purpose?

14   A      My apologies, sir.

15   Q      That's okay.

16   A      I thought you meant not only April but the other agents.

17          But the idea was to just show that she didn't have

18   Rosie as it -- was the target of that investigation.  It was

19   to show that Rosie didn't have any psychic abilities.  And

20   she went in, you know, she told her her problems, and then

21   she was told that, you know, that there was certain

22   negativities and blockages, and that she could help her.

23          And then at one point she asked -- April asked how

24   much would this cost, and she said probably a few thousand.

25   Don't quote me on that, but . . .
```

```
 1    Q     Right.

 2    A     And then --

 3    Q     And she said that was her fee, her fee, right?

 4    A     Yeah.  Regardless of what the fee or in that particular

 5    instance, we just wanted to show that, A, they were -- they

 6    didn't have the ability that they were claiming they had,

 7    and, B, that right away they're telling somebody that they

 8    have blockages and negativity, and this person is made up, so

 9    how -- if you're a psychic, how do you see this.

10    Q     Wasn't there a part of that conversation where Rosie was

11    telling April, are you telling me everything, is there

12    something you're not telling me, I'm having problems getting

13    through, is there something you're not telling me?

14    A     There's a possibility, you know.

15          THE COURT:  Mr. Stack, can you stay near the

16    microphone, please?

17          THE WITNESS:  I'm messing up here, Your Honor.  I'm

18    sorry.

19          THE COURT:  That's all right.

20  BY MR. SCHWARTZ:

21    Q     And you said you wanted to prove they didn't have

22    psychic powers.  If somebody believes they have psychic

23    powers, is there -- is it a crime not to be right or not to

24    actually have psychic powers?

25    A     It's a crime to mislead and lie to the client.  And in
```

1    this case, Mr. Schwartz, I don't believe there's any one of

2    these clients that have psychic ability.

3    Q    Any one of these targets?

4    A    I'm sorry, I keep saying that.  I apologize to the

5    Court.  These targets.  I think we have established that.  I

6    think I was able to establish that.

7    Q    Well, let me then ask you, is the fact that one of these

8    ladies might not have psychic abilities relevant to this

9    case, to your knowledge?

10             MR. STEFIN:  Objection.

11             THE COURT:  Sustained.

12   BY MR. SCHWARTZ:

13   Q    Do you know of your own knowledge whether Rose Marks

14   believes she has psychic abilities?

15             MR. STEFIN:  Objection.

16             THE COURT:  Sustained.

17   BY MR. SCHWARTZ:

18   Q    Was Michael Gordon one of the targets of your

19   investigation?

20   A    Fort Lauderdale Collection and Michael Gordon, Peter

21   Wolofsky were targets, and Mr. Wolofsky -- am I allowed to

22   say, that Your Honor, that he was --

23             THE COURT:  They already know.  The jury already

24   knows that he was a Defendant.

25             THE WITNESS:  And then the charges were later

```
 1    dropped, sir.
 2    BY MR. SCHWARTZ:
 3    Q    So would it be correct to say that the object of your
 4    investigation was to show that the Defendants unjustly
 5    enriched themselves by falsely and fraudulently claiming to
 6    tell the future, to cure people of diseases and to chase away
 7    evil spirits from homes and bodies and to remove curses and
 8    to cleanse the souls of clients and their family in exchange
 9    for money?  Is that a fair summary?
10    A    I would say it's somewhat of a fair summary, but it
11    doesn't entail everything.  It -- you're looking at chasing
12    evil spirits and cleansing each client or each alleged victim
13    in this case.  You weren't chasing evil spirits away from
14    Jude Montassir.  You were promising her, you were making a
15    false promise to her that Sam was going to be put in or
16    transferred to another body, and that body would have been
17    Cynthia Miller.  So I think that's a little different than
18    exactly what you're saying specifically.
19            In some cases, people were talked about or said --
20    given elaborate schemes of past life.
21            Now, in that case, Cynthia Miller had told Atsuko,
22    Ms. Atsuko Ueda.
23    Q    How about AU?
24    A    All right.  AU, from Japan, and she has strong beliefs
25    in the past and the present and the future life.  And with
```

1    that, you have to, in your past life, if you had done

2    something wrong, as it was said to her by Cynthia Miller,

3    that now you have to correct it in your present life in order

4    to have a future life.

5    Q    Thank you, Mr. Stack.  And I understand that you want to

6    give a complete answer, but sometimes your answer goes beyond

7    my question.

8              MR. STEFIN:  Objection.

9              THE COURT:  Overruled.

10   BY MR. SCHWARTZ:

11   Q    So I'd ask you to confine your answer to my question if

12   you don't mind.

13   A    Okay.

14   Q    Were you asked -- were you ever asked the following

15   question and give the following answer?

16             MR. STEFIN:  Objection.

17             THE COURT:  Can I see counsel, please?

18        (The following proceedings were held at sidebar:)

19             THE COURT:  I understand he may have made the

20   statement in front of the grand jury, but I don't see what

21   the relevance is.  I mean, you're trying to get him -- he's

22   your witness.

23             MR. SCHWARTZ:  Okay.

24             THE COURT:  And you're trying to get him to

25   basically define what the Government's case is about or what

```
 1    the fraud is or what -- and I don't know why we're using this

 2    witness to define the scope of the fraud or define what is or

 3    is not part of the case.  And what I'm concerned about is

 4    you're going to get him to answer some question about what he

 5    thinks about the case and then try and, well, now the door's

 6    open for me to bring in some psychic expert who's going to

 7    say there really is psychic ability.

 8              And now this case really has to do with whether

 9    psychics do exist or don't exist, or they really have power

10    or don't have power because of what this witness says in your

11    case about what the Government's case is.  I mean, I just

12    don't see where we're going with this or the relevancy of

13    this.

14              MR. SCHWARTZ:  Does Your Honor have psychic

15    ability?

16              THE COURT:  I don't think so.

17              MR. SCHWARTZ:  Well, you just predicted what I was

18    going to do, Judge.

19              Look, Judge --

20              THE COURT:  What is the point of this line of

21    questioning?

22              MR. SCHWARTZ:  The -- in the grand jury,

23    Mr. Bardfeld asked him, is that the fraud, and he said yes.

24    And that's the fraud that at least at some point in the case

25    the Government was alleging.  If they're not alleging it now,
```

```
 1    and I guess they're not, then I'll abandon this line of

 2    questioning.  But I suggest to Your Honor that we're going to

 3    hear about this again later.

 4              THE COURT:  What difference does it make if he says

 5    this is the -- what the case is about or not?  What

 6    difference does it make?  How does it relate to your defense?

 7              MR. SCHWARTZ:  I was going to use this to ask Your

 8    Honor to reconsider, as you predicted.

 9              THE COURT:  So I do have psychic ability.

10              MR. SCHWARTZ:  That's why I asked you if you had

11    psychic ability, Judge.

12              And that's -- okay.  I guess I have to accept

13    Mr. Stefin's representation that this case is not about the

14    client's lack of psychic ability.

15              THE COURT:  Well, I think it's not about whether

16    psychic ability exists or doesn't exist.  That's what I

17    believe the Government conceded the case is not about.

18              MR. STEFIN:  Right.

19              MR. SCHWARTZ:  But, again, if they're going to

20    argue that my client doesn't have psychic ability, then I

21    think I have a right to prove that psychic ability exists.

22    We've been over this.  I don't like to re-litigate things

23    more than three or four times, Judge.

24              THE COURT:  All right.

25              MR. STEFIN:  I thought six was your limit, Fred.
```

```
 1                THE COURT:  I'm going to ask you to move on,
 2    because I don't see how this line of questioning or attempt
 3    to impeach is relevant to the reason this witness is
 4    testifying, or to the case.
 5                MR. SCHWARTZ:  Thank you, Judge.
 6         (Sidebar conference concluded.)
 7    BY MR. SCHWARTZ:
 8    Q    Now, Mr. Stack, when you visited people who you
 9    considered to be victims of your targets, and if they doubted
10    that they were victims, did you direct them to any particular
11    website?
12    A    It wasn't so much in the sense of doubting,
13    Mr. Schwartz, but I did direct them to a website, and my
14    reasoning for the website was to let them know that they
15    weren't alone, that there were other people out there that
16    felt like they did.  Because in this particular case, the
17    victims feel embarrassed, they felt like, I can't believe I
18    fell for something like this.
19                So I would tell them to go to this particular
20    website and see that you're -- you know, read it and see that
21    you're not alone, that there's other people out there that
22    may have gone through the same thing that you have.
23    Q    But this website didn't refer to -- or primarily to Rose
24    Marks or any of her family, did it?
25    A    It referred to specifically -- am I allowed to say this,
```

```
 1    Your Honor?

 2              THE COURT:  I'm not sure.

 3              MR. STEFIN:  Say it and then we'll tell you what

 4    you can say.

 5              MR. SCHWARTZ:  And we can un-ring the bell and

 6    strike it from the record if it's improper.

 7              THE COURT:  What is it?

 8              THE WITNESS:  What I was going to say, I'll leave a

 9    particular word out, but psychic scams.

10    BY MR. SCHWARTZ:

11    Q    You were going to say Gypsy scams, right?

12    A    Gypsy psychic scams, yes.

13    Q    And we've used the word "Gypsy" in the trial before.

14              So the name of the website was Gypsy psychic scams,

15    right?

16    A    Yes.

17    Q    And was that because there were people who did not at

18    first believe they were victims of any crime?

19    A    I'm going to reiterate exactly what I said to you

20    before, Mr. Schwartz.  And I don't mean to frustrate you.

21              MR. STEFIN:  Well, objection.  Asked and answered

22    then.

23              THE COURT:  Overruled.

24              THE WITNESS:  The victims that I spoke to, I would

25    speak to them, and then I would give them an opportunity if
```

```
 1    they wanted to, to call me back.  So once I did that, and if
 2    they called me back, then I moved on.  It's not like I sat
 3    there and said you have to be a victim.  I just explained the
 4    situation, explained to them, I said you can also go on this
 5    particular site, look at it and see how other people felt.
 6    And you can call me back or you can continue.  The only thing
 7    I asked him was that if I would -- I'm doing an ongoing
 8    investigation, I would really appreciate it if you do
 9    continue, just please don't let these individuals know.
10    Q    And did you also, you or members of your department,
11    also write letters to people who you thought might be
12    victims?
13    A    After the indictment, we had various people that we
14    didn't contact to, and Anthony Wynns, and I helped him, you
15    know, mail some of the stuff out, but we mailed letters out
16    to possible victims, and let them see that, and if they
17    called us, fine.  If they didn't call us, they didn't call
18    us.
19    Q    And there were any victims -- you're calling them
20    victim, and you have me doing it, too, so you're very
21    persuasive -- any alleged victims who didn't call you back?
22    A    Well, on those letters --
23    Q    Before the letters.  On the phone calls.
24    A    Okay.  Before the letters, now, you're asking me did
25    anybody call me.
```

```
 1    Q    Not call you back.  You told us that you called them,
 2    you told them that you thought they were victims, you
 3    referred them to a website and told them to call you back,
 4    and if they called you back, you followed up, if they didn't
 5    call you back, you didn't follow up, is that fair?
 6    A    Yes, to my knowledge, I remember Andrea Walker I spoke
 7    to after I got permission through the embassies to talk,
 8    because I -- and when I talked to her I didn't have to tell
 9    her to go onto any site, because she said that she came to
10    the United States.
11    Q    Mr. Stack, forgive me, and I interrupted you, and I'm
12    being rude, and I apologize, but I ask you to try to answer
13    my questions rather than giving speeches.
14         Were there any of the people who you called and
15    told them you thought they were victims and directed them to
16    a website and said, call me back if you want to talk about
17    it, who didn't call you back?
18    A    No.
19    Q    Every one of them called you back?
20    A    That I spoke to.  Prior to the indictment, now.
21    Q    Prior to the indictment.
22    A    Yeah.
23    Q    And --
24    A    Unless there's somebody I'm forgetting.  But to my
25    knowledge --
```

1    Q    It's not a trick question.  I'm asking you for

2    information.

3    A    No, no.  What I'm saying is --

4    Q    Okay.  And were there any who you had to talk to two or

5    three times before they accepted the fact from you that they

6    were victims?

7    A    No --

8         MR. STEFIN:  Object to the form of the question.

9    Assuming facts.

10        THE COURT:  Overruled.

11        THE WITNESS:  Can I answer, Your Honor?

12        THE COURT:  Yes, you can answer.

13        THE WITNESS:  No.  I mean, when I talked to them,

14   they had more than willing -- more than willing for me to

15   talk to them.  They called back.  So I'm trying to think real

16   hard here if anybody did not call or -- but I didn't have to

17   sit there and persuade anyone to be a victim.

18   BY MR. SCHWARTZ:

19   Q    You didn't have to hit anybody over the head?

20   A    I never even used that term.

21   Q    Did you ever have to -- withdrawn.

22        Did you make reports of the first calls when people

23   were reluctant to acknowledge they were victims, for whatever

24   reason they were reluctant?

25   A    If there was anyone that was reluctant prior after the

1    indictment, I believe Beth Watts would have done a report.

2    Q    How about before the indictment?

3    A    Before the indictment, I don't recall anyone being

4    reluctant, not calling me back.

5         If you have somebody in mind, please tell me and

6    I'll tell you.

7    Q    I'm asking you if, when you made calls to people and

8    gave them information and referred them to a website and said

9    if you want to keep talking about this, call me back, did you

10   make a record of that first call?

11   A    Well, the first call on that one would have been LB.

12   Q    On any of them, anybody.

13   A    Now -- no, I would say no.

14   Q    Now, we talked about a lady by the name of Jude

15   Montassir.

16   A    Yes.

17   Q    And we talked about how you met her, and you said in the

18   first meeting she told you her son, Sam, was between heaven

19   and hell; is that correct?

20   A    Yes.

21   Q    Are you certain she said that to you on that first

22   meeting?

23   A    I can say this.  I'm --

24   Q    I'm just asking are you certain she told that to you?

25   A    I'm certain she said -- you're asking me now two

1    questions here.  On the first meeting or the second meeting,

2    in my mind to this day, I believe it was the first meeting,

3    to the best of my recollection.  And I can say without a

4    doubt, 100 percent certainty, that that's what she told me.

5    Q    But you're certain that she told you that, and in your

6    mind it's at the first meeting?

7    A    I'm saying that for some reason it's in my mind at the

8    first meeting, so . . .

9    Q    And did you spend any time with her after your second

10   meeting?

11   A    Yes, you know, I spent time with Ms. Montassir.  That's

12   true, yes.

13   Q    And did you help her, in your mind, reorganize her life?

14   A    Well, I would say that I would -- Darren Ogden probably

15   handled the financial end of it, and then the physical end of

16   it, yes, I did help her in that side of it.

17   Q    And did she ever acknowledge your help?

18   A    She acknowledged me once in one of her books, yes.

19   Q    And did you ever help her by reviewing sections of her

20   books?

21   A    I'm going to be very clear on this.  She wrote a

22   particular thing in Scarlet Nights, and I will tell the jury,

23   and I will tell this courtroom to this day I have never read

24   any of Jude Deveraux's books.  I'm a fighter, a kickboxer.  I

25   don't read love novels.  Not that it's bad, but it's just not

1    one of my things.

2    Q    I'm sure she'll thank you for that endorsement.

3    A    But specifically to the question is she had a fight

4    scene, and that particular book, Scarlet Nights, she was

5    fascinated with Jason Statham.  And if you're not familiar

6    with Jason Statham, he's one of the action fighters in a lot

7    of the movies now.  The Expendables, I believe he was in at

8    one time.

9            But there was a fight scene in the movie, and

10   because of my prior kickboxing experience, I think it was

11   like a two-page written thing or typewritten thing that she

12   had.  She asked me, Charlie, does this make sense.  And I

13   said -- I explained to her, well, there's a couple of things

14   that need to be changed here to make it more realistic.

15           And later on she sent it to her editor, and she

16   said I think it was knocked down to a couple of sentences.

17   So I guess I didn't do a very good job at editing.

18   Q    I don't want to embarrass you by suggesting you read

19   romance novels, and that wasn't my suggestion.  But on the

20   last two pages of her book, Scarlet Nights, which is in

21   evidence as exhibit 59, does she say:  "I'd like to thank the

22   person who made this book possible, my consultant and most of

23   all my friend, Detective Charles J. Stack of the economic

24   crimes unit of the Fort Lauderdale Police Department.

25   Charlie, a former" and then goes into your background with

 1    the Fort Lauderdale Police Department.

 2    A     Oh, please don't skip that.

 3    Q     Okay.  Then I'll read it.

 4          "Charlie, a former national champion kickboxer

 5    and -- of kickboxing and Karate, and I, work out together.

 6    In between pushing me to lift ever heavier weights and hit

 7    that big bag with gloves, he answered all my questions.

 8    Charlie instantly replied to my many text messages, no matter

 9    where he was, in a courtroom or a meeting with the Attorney

10    General.  He explained everything from FLPD retirement plans

11    to the latest Supreme Court ruling on what the heck -- to

12    what the heck Motai."

13          Did I pronounce that right?

14    A     Motai, yes.

15    Q     "He told me truly fascinating stories about his very

16    dangerous undercover work, paren, UMC wants to do a

17    documentary about one of them, exclamation point, closed

18    paren.  He read the scenes I had written of the fights and

19    about the real Mitzi's work and did a great job in editing

20    them.  His insights into how the minds of criminals, such as

21    the real Vandlo family work was brilliant, and spellbinding

22    to hear.  The magnitude of the crimes he works on and the

23    absent of public knowledge of these criminals horrified me.

24          "I can never adequately express my gratitude to

25    Charlie for his help, his intelligence, his kindness, and his

1   never-ending patience.  Thank you, Charlie, you're a true

2   hero."

3   A    Thank you, Fred.

4   Q    Anytime.  Anytime.

5        And you have a lot of commendations to show you're

6   a hero, don't you?

7   A    I don't like accolades, sir.  I mean, it was very kind

8   that Jude wrote that, and some of it may be a little bit

9   embellished.

10  Q    She's a fiction writer.

11  A    No.  Well, yes, I -- but as far as the Mitzi thing --

12  Q    You knew I was going there, right?

13  A    No, no, because I heard that, and I'm like, I'm trying

14  to remember anything about Mitzi.  But she had asked me one

15  time about how does the gypsy work, and I had no idea really,

16  to be honest at the time, it was specifically about the book

17  she was writing, but I had explained to her that in the cold

18  readings, there's a specific thing that takes place.

19  Q    But let me ask you, then, the following question.  When

20  she refers to Mitzi, the protagonist in her book, Scarlet

21  Nights, is a fortune teller named Mitzi, right?

22  A    I have no idea.  I didn't read the book.

23  Q    Okay.

24  A    Now, even when she talked about Mitzi, you know, she

25  talked about Mitzi.  I didn't know she was -- if you're

```
 1    referring to that she referred it to Rose Marks, I didn't
 2    know that.
 3    Q    And the Vandlo family are the villains in the book, a
 4    family of Gypsy fortune tellers, right?
 5    A    Yes, and when I read, when this case got done and
 6    completed, she said that she wrote the book based on her
 7    experiences.  And I had no idea, first of all, that the book
 8    was based on that solely, and, second of all, I didn't know I
 9    was going to have a dedication in that book.
10    Q    But the book is fiction, right?
11    A    Yes.
12    Q    And she deals, to your knowledge, in fiction,
13    correction?
14    A    Yes.
15    Q    Now, you referenced earlier a famous friend of hers who
16    she was frightened for.  Remember that, when the -- when you
17    came to see her in the first or second time?
18    A    Oh, yeah.
19    Q    And you're talking about Brad Pitt; is that correct?
20    A    That's right.  Yes, sir.
21    Q    Were you aware that her alleged conversations or written
22    conversations with Brad Pitt was an exercise to help her in
23    her romance writing?
24            MR. STEFIN:  Objection to the way the question is
25    phrased.
```

```
 1              THE COURT:  Sustained.  Rephrase the question.
 2   BY MR. SCHWARTZ:
 3   Q     Were you ever told by Ms. Montassir that the alleged
 4   writing back and forth between her and Brad Pitt was an
 5   exercise to help her with her romance writing?
 6   A     No, it's just the opposite.
 7   Q     How about, were you aware that she had some
 8   correspondence allegedly with former Secretary of State Colin
 9   Powell?
10   A     Yes.
11   Q     Were you ever told by Ms. Montassir that that was also
12   an exercise in romance writing?
13   A     No, and --
14   Q     Just the opposite, right?
15   A     No, no.
16              See, the thing of it is -- I shouldn't say that.  I
17   have a habit of saying "the thing of it is."
18              THE COURT:  The answer is no?
19              THE WITNESS:  The answer is no, Your Honor.
20              THE COURT:  Okay.  Let's go to the next question.
21              MR. SCHWARTZ:  Thank you, Judge.
22   BY MR. SCHWARTZ:
23   Q     Did you -- did any of the information that Ms. Montassir
24   gave you turn out to be false or fiction?
25   A     No.  Actually, just the opposite.  I found Ms. Montassir
```

1    to be very truthful, and this is based on my investigation,

2    because I did the undercover conversations, and if you pay

3    attention or if you had listened to January 29th --

4    Q    Mr. Stack, thank you.

5              And, again --

6    A    I'm going --

7    Q    -- I'm going to ask you to answer my question.  My

8    question was -- and I'm sure the prosecutor will give you

9    ample opportunity to give your theory of what happened, but I

10   asked you, did you ever find her to be untruthful, and you

11   said no; is that correct?

12   A    No.  Yes.

13   Q    Did you ever, other than recording conversation --

14   withdrawn.

15             Did there come a time when you traveled to New

16   Mexico with Ms. Montassir?

17   A    Yes.

18   Q    And was that you and Mr. Ogden?

19   A    Yes.

20   Q    And was that in or around the end of December 2008?

21   A    Yes.

22   Q    And when you went there, what was your purpose in

23   traveling -- and this is an open-ended question.  What was

24   your purpose in traveling to New Mexico?

25   A    It was twofold.  We wanted to speak to Claude, Claude

 1   White, her husband, and we wanted to talk to a subject by the

 2   name of Eddie Lewis.  Claude White, in the end, decided

 3   through his attorney, that he did not want to converse with

 4   us, and on his recommendation of his attorney.  So then we

 5   served him with a grand jury subpoena.

 6   Q    And did you do anything else while you were in New

 7   Mexico?

 8   A    Did I sit in a deposition?

 9   Q    Did you?

10   A    Yes.

11   Q    And was that part of your original purpose in going

12   there?

13   A    Absolutely not.

14   Q    And what was the reason you sat in on two depositions?

15   A    Not two, just one.

16   Q    Didn't you also sit in in the deposition of Claude

17   White?

18   A    Absolutely not.  And even if I was invited in, at the

19   time he was served with a grand jury subpoena.  I don't think

20   it would have been appropriate for me to be sitting in on

21   his.  But I was never intending to, nor did I want to sit in

22   to his deposition.  I was asked by Ms. Montassir, and

23   unfortunately, she was very, very scared and upset, and she

24   asked -- she would feel more comfortable if myself and Darren

25   would sit in.

```
 1              I know the two attorneys talked, and we were

 2    allowed to sit in on the deposition.

 3    Q     And if Detective Ogden said that he and you did sit in

 4    on Claude White's deposition, he would be mistaken; is that

 5    correct?

 6    A     That's correct.

 7    Q     Apparently, you're suggesting that Ms. Montassir feared

 8    Claude White.

 9    A     I could say she -- be honest with you, I thought the guy

10    was going to be like 6'5, 260 when I met him, and when I

11    walked into the deposition he's a tiny little guy.  And I

12    turned to Jude and I looked at her.  I said, with all your

13    boxing lessons, you can knock this guy out.  But she was

14    deathly afraid of the guy.

15    Q     And she told you that he and Rose were involved in the

16    conspiracy to defraud her, didn't she?

17    A     There were things -- let me just say yes.

18    Q     Okay.

19    A     Let me just say yes.

20    Q     Fine.

21              And based upon her telling you that, you told that

22    to a psychologist who her attorney had hired to examine her,

23    didn't you?

24    A     There was a forensic psychologist that we just wanted

25    to -- just gave him the background that she was involved in a
```

```
1    particular case.  And then he told me that he ran a prison
2    for the criminally insane, I believe it was, and something
3    else, and he says, I'm aware of these type of scams, and he
4    said a scam's a scam.  And then we left, and he went in and
5    spoke to --
6    Q    But did you tell her that you believe -- did you tell
7    him that you believe that Claude was part of the fraudulent
8    conspiracy based on what Jude told you?
9    A    I don't remember talking about that.
10   Q    Okay.  And did you also assist Mr. Ogden in helping Jude
11   get her accounting or her tax matters done?
12   A    No, I did not.
13   Q    Mr. Ogden and his wife did that without you?
14   A    Yes.
15   Q    Okay.  Do you know of your own knowledge whether, based
16   on what you said, Detective Ogden told the accountant that
17   fraud -- that Claude was part of the fraud?
18   A    I have no -- she never told me that, and I have no idea
19   if he said that to the accountant.
20   Q    Okay.  She told you Claude was part of the fraud.  She
21   never told you about them saying that to the accountant?
22   A    No, Jude suspected that Claude was involved in the
23   fraud.  That's what she told me.  What she told the
24   accountant I have no idea.
25   Q    And was that a misstatement on Jude's part?
```

```
 1    A    No, I would say based on~---

 2              MR. STEFIN:  Objection, objection.

 3              THE COURT:  Sustained.

 4              MR. SCHWARTZ:  I'll withdraw the question.

 5              Is this a good time to break, Judge?

 6              THE COURT:  If you have more.

 7              MR. SCHWARTZ:  I do.

 8              THE COURT:  All right.  Then ladies and gentlemen

 9    of the jury, let's take our lunch recess.  Don't discuss the

10    case or form any opinions.  Leave your notes, and we'll see

11    you at 1:15.  Thank you.

12       (The jury exits the courtroom.)

13              THE COURT:  All right.  Sir, if you would not

14    discuss your testimony during the lunch break.  Okay?

15              THE WITNESS:  I respect that, Your Honor.

16              THE COURT:  Thank you.

17              We'll see you at 1:15.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  Anything else we need to discuss right

20    now?

21              MR. SCHWARTZ:  No.

22              THE COURT:  See you at 1:15.

23       (A recess was taken from 12:00 p.m. to 1:17 p.m., after

24    which the following proceedings were had:)

25              THE COURT:  Please be seated, everyone.
```

```
 1                    Back on the record.  Ms. Marks is present with

 2      counsel.

 3                    We ready to proceed?  Mr. Stefin, you ready?

 4                    MR. STEFIN:  Yes, I am, yes.

 5                    THE COURT:  Mr. Schwartz, you ready?

 6                    MR. SCHWARTZ:  Yes, I am, Your Honor.

 7                    THE COURT:  Let's bring the jurors in, please.

 8                    You're still under oath, sir.

 9                    THE WITNESS:  Yes, Your Honor.

10                    THE COURT:  Thank you.

11           (The jury enters the courtroom, after which the following

12      proceedings were had:)

13                    THE COURT:  Welcome back, everyone.  Please be

14      seated, ladies and gentlemen.

15                    Mr. Schwartz, you may proceed.

16                    MR. SCHWARTZ:  Thank you, Your Honor.

17      BY MR. SCHWARTZ:

18      Q    We were talking about your conversations with Jude

19      Montassir Deveraux when we took a break, and then I asked you

20      about your trip to New Mexico.

21      A    Yes, sir.

22      Q    Okay.  Did you go to New Mexico to act as a bodyguard

23      for Jude Deveraux?

24      A    Absolutely not.

25      Q    And if she had said that that would be untrue; is that
```

```
 1   correct?

 2   A    That would be untrue, yes.

 3           MR. STEFIN:  Objection.

 4           THE COURT:  I'm sorry, did I hear something?

 5           MR. STEFIN:  There was an objection to the form of

 6   the question.

 7           THE COURT:  Sustained.

 8   BY MR. SCHWARTZ:

 9   Q    Did Jude tell you -- withdrawn.

10           When Jude was working with you, did she send you

11   various e-mails and notes regarding phone calls that she had

12   from Rose Marks?

13   A    Yes, there were e-mails that were sent, and then I~--

14   the U.S. Attorney's Office should have copies of that.

15           THE COURT:  Mr. Stack, again, can you pull that

16   microphone closer, please?

17           THE WITNESS:  I'm sorry, Your Honor.

18           THE COURT:  That's better.  Thank you.

19   BY MR. SCHWARTZ:

20   Q    Well, let me show you what's been marked as Defendant's

21   exhibit 34 for identification, and it's three pages we got

22   from the Government Bates stamped CStack-016, 017, and 018

23   and ask you if you recognize it.

24   A    (Perusing documents.)

25           Yes, sir.
```

```
 1    Q     What do you recognize them as, without telling us the

 2    content?

 3    A     No, I could just tell with the -- I remember -- about

 4    the headline --

 5               THE COURT:  Start again.  You recognize what?

 6               THE WITNESS:  By the top, Jude contacted me via

 7    e-mail, and then I remember the thing about Scott's bill.

 8    BY MR. SCHWARTZ:

 9    Q     Are these e-mails sent to you by Jude, or your summary

10    of them?

11    A     No, no.  This would be her writing.

12               MR. SCHWARTZ:  I'd move these into evidence, Your

13    Honor.

14               MR. STEFIN:  Can I just look at them again?

15               THE COURT:  Yes.

16               Mr. Stack, are you finished looking at them?

17               THE WITNESS:  Yeah, I'm just looking at the second

18    and third page.  Sorry, Mr. Schwartz.

19               MR. STEFIN:  No objection.

20               THE COURT:  What exhibit number?

21               MR. SCHWARTZ:  Thirty-four, Your Honor.  I think

22    they've been previously used for identification purpose.

23               THE COURT:  Thirty-four is admitted without

24    objection.

25          (Defendant's Exhibit No. 34 entered into evidence.)
```

```
1   BY MR. SCHWARTZ:

2   Q    Mr. Stack, did you tell Jude that Rose had killed her

3   husband?

4   A    Absolutely not.

5   Q    Well, let me show you something on the third page of

6   this document and direct your attention to the second

7   paragraph from the bottom, the last sentence.  Can you read

8   that?

9   A    This is very difficult.

10  Q    There's a screen in front of you.  If it's not on, you

11  can just press the switch to turn it on.

12  A    So am I looking at the second paragraph?

13  Q    The second paragraph from the bottom, the last sentence

14  in that paragraph.

15  A    "It was very, very difficult for me" --

16        THE COURT:  Sir, can you move that microphone over

17  so you can -- we can hear you, please?

18  BY MR. SCHWARTZ:

19  Q    Where it says "it was new that."

20  A    "It was new that she told me that I was the cause of the

21  deaths of her grandson and her husband."

22  Q    Next sentence.

23  A    "It was very, very difficult for me not to ask her if it

24  was true that she had killed her husband."

25  Q    Now, who besides you was talking to Jude about Rose?
```

```
 1    A    Darren.  But to be honest with you, I have no idea
 2    how -- oh, you know where this may have come from?
 3    Q    If you know.  I don't want you to guess.
 4    A    No, no, no.  I remember a conversation that I definitely
 5    did not tell her -- I can tell you I never told her that
 6    Ms. Marks killed her husband.  That I can tell you with a
 7    guarantee.  But there may have been a conversation with Sammy
 8    Marks who believed that she hit him over the head with a golf
 9    club.
10    Q    And who's Sammy Marks?
11    A    That's her brother-in-law.
12    Q    Whose brother-in-law?
13    A    Rose's.  He's the brother to her husband, Nicholas
14    Marks.
15    Q    And Sammy Marks told you in a conversation you recorded
16    with him that Rose had killed her husband by hitting him over
17    the head with a golf club; is that correct?
18    A    Yeah.  And that was never -- when I had talked to other
19    members of the community, that was totally untrue.
20    Q    And Sammy Marks was an informant of yours, right?
21    A    No.  An informant with the City of Fort Lauderdale has
22    to be documented, and he was -- and the reason why -- and if
23    I had an informant --
24    Q    Yes or no is fine.
25    A    No.
```

```
 1   Q     If he wasn't an informant, he was somebody with whom you
 2   recorded hundreds of hours of conversations, is that fair?
 3   A     Yes, because I did not trust everything he was telling
 4   me.
 5   Q     Okay.  And Sammy Marks was, for lack of a better term,
 6   an enemy of Rose and her family, is that fair?
 7   A     I would say that it eventually got to that point,
 8   because in the beginning he came to the police department
 9   originally to protect the family, and it had changed over the
10   years.
11   Q     Okay.  And Sammy Marks in a recorded conversation
12   between you and him told you that Rose had killed her husband
13   by hitting him over the head with a golf club, right?
14   A     Yeah, he also said --
15            MR. STEFIN:  Your Honor, objection, relevance.
16            THE COURT:  What's the relevance?
17   BY MR. SCHWARTZ:
18   Q     Did you tell that to Jude Deveraux?
19   A     I don't even remember having that conversation with
20   Jude.
21   Q     Well, then how -- you said a moment ago that Jude
22   Deveraux must have got this because Sammy Marks said it.  How
23   would Jude Deveraux learn this from Sammy Marks?
24   A     No, no.  What I'm saying is is that that could have been
25   a conversation, and it also could have been a conversation
```

```
 1   with me, myself, Darren and Scott and maybe Jude sitting at
 2   the table.  Me talking about what Sam had he just told me.
 3   But I never looked -- I never told her that this was a
 4   factual basis that this woman killed her husband at all.  And
 5   if I had any factual basis of that, that would be different.
 6   But all I'm saying is that's where -- you asked me where this
 7   could have come from.  I said, well, that is the only -- that
 8   could be a possibility, not a factual.
 9   Q    So let me understand something.  Jude, I'm calling her
10   Deveraux or Montassir, was a witness in a major case you were
11   working on?
12   A    Yes.
13   Q    And you would sit with her and Darren Ogden, another
14   officer with whom you were working on this major case, and
15   somebody named Scott?
16   A    I'm just saying the possibility.
17   Q    Okay.  But you would sit with them around a table, and
18   you would gossip about things that Sammy Marks, who was a
19   Gypsy providing you information about the Gypsy community,
20   told you?
21   A    No, I wouldn't say we're gossipping.
22   Q    What would you call it?
23   A    You asked me, Mr. Schwartz, how this could have came
24   about, and the only person I ever heard that said that Rose
25   had killed her husband was Sammy Marks.  I don't even ever
```

```
 1    remember telling Jude.  I'm just surmising that the
 2    possibility was there, but very rarely was -- that we were in
 3    that predicament where we would be saying that, but I just
 4    said I never told the woman this.
 5    Q    But you read the e-mails you got from Jude, didn't you?
 6    A    Yes.
 7    Q    And when you read this sentence, "It was very, very
 8    difficult for me not to ask her if it was true that she had
 9    killed her husband," did you say, what do you mean by that,
10    Jude, that's crazy?  Did you say that?
11    A    I didn't have this conversation with her.
12    Q    You didn't remark on this at all?
13    A    I don't even remember having this conver -- I'm sorry,
14    Your Honor.  I don't even remember having this conversation
15    with Jude, period.  You asked me how did this come up, and I
16    just surmised that a possibility is because the only one I
17    ever heard say this was Sammy Marks, and he mentioned a golf
18    club.  Period.  That was it.
19    Q    But I'm not referring to Sammy Marks, I'm not referring
20    to Darren Ogden or someone named Scott.  You, Charlie Stack,
21    received this e-mail from Jude Montassir somewhere in May of
22    2009; is that correct?
23    A    I believe so.  Is that what it's dated?
24    Q    Well, on exhibit number 34, it says -- it's an e-mail
25    regarding a phone call from Rose Marks to Jude May 26, 2009.
```

```
 1   I'll show you the document, because I only have one page up.

 2   A    5/26/09, yes.

 3   Q    And when you got that e-mail, you, of course, read it,

 4   didn't you?

 5   A    Uh-huh.

 6             THE COURT:  Is that a "yes"?

 7             THE WITNESS:  Yes.

 8   BY MR. SCHWARTZ:

 9   Q    And you saw a line near the last page saying, it was

10   very difficult not to ask her if she had killed -- ask her if

11   it was true that she killed her husband.  Didn't you --

12   didn't this strike you as strange to be in an e-mail from

13   Jude Montassir?

14   A    It might have been -- to be honest with you, I'm looking

15   at it.  I don't even remember it per se, but I know I never

16   had a conversation with Jude about, you know, the death of

17   her husband.  The only one I remember having this

18   conversation was with -- is with Sammy.

19             Now, it's in the e-mail, you know, I read it, and

20   maybe I just left it at that.

21   Q    Were you used to getting strange nonsensical statements

22   in e-mails from Jude?

23   A    No.  Your point is very well taken, but I just don't

24   remember this particular e-mail about, you know, Jude -- me

25   talking to Jude about Rose killing her husband.
```

```
 1   Q    Okay.  And just so -- I know you said that you -- there

 2   was no truth to that, but just so that we're clear, I would

 3   move into evidence a certified copy of a -- as Defendant's

 4   exhibit 70, a certified copy of a death certificate.

 5               THE COURT:  Any objection?

 6               MR. STEFIN:  Yes.

 7               THE COURT:  What's the objection?

 8               MR. STEFIN:  Relevance.

 9               THE COURT:  Overruled.

10        (Defendant's Exhibit No. 70 entered into evidence.)

11   BY MR. SCHWARTZ:

12   Q    And is this the death certificate of Nicholas G. Marks?

13   A    Is this something I --

14               THE COURT:  Mr. Stack, you can look right in front

15   of you there.

16               THE WITNESS:  Is this something I obtained?

17   BY MR. SCHWARTZ:

18   Q    No.

19   A    Okay.

20   Q    Does it identify Nicholas G. Marks and the address of

21   1319 Seminole Drive?

22   A    Yes.

23   Q    And does it have a cause of death on it?

24   A    Can you tell me what line that's on there, Mr. Schwartz?

25   Q    It's the handwritten part on line 41.
```

1    A    Cardiopulmonary --

2    Q    Arrest.

3    A    Yes, it looks like a heart attack.

4    Q    And what's the next one under that?

5    A    I can't read that one.  Can you tell me what it is, sir?

6    Q    Would it be -- and I can't pronounce it, glioblastoma

7    multiforme tumor?

8    A    If that's what it says, I imagine that's what it is,

9    sir.

10   Q    Which is brain cancer?

11   A    Is that what it is?

12   Q    I'm asking you if you know.

13   A    I don't know, sir, no.

14   Q    Now, did Jude Montassir tell you within the first week

15   or two of you getting to know her that she knew Rose was

16   being truthful to her in her predictions because she told her

17   husband was going to come to the apartment in New York, and

18   he came to the apartment in New York and he caused a

19   tremendous scene.  So tremendous that even New York doormen

20   and building superintendents were shocked?

21   A    Well, the way it was relayed to me is somewhat what you

22   just said, but she had relayed the fact that Rose had

23   predicted that her husband would show up and that she needed

24   to get out of the apartment and go somewhere else, because --

25   until he left.

```
 1    Q    Did you check to see if any part of that story by Jude
 2    Montassir was true?
 3    A    That was 1991.  That was in New York City.  So . . .
 4    Q    But you were a deputized federal officer who had the
 5    resources of the Federal Government behind you, weren't you?
 6    A    You're asking me one --
 7    Q    I just asked you one question.  Were you a deputized New
 8    York -- U.S. officer?
 9    A    Well, you asked me two.
10    Q    Okay.  I'll ask you the second one after that.
11    A    Yes, I was.
12    Q    And could you have contacted the Secret Service office
13    in New York and asked them to go to this building and
14    interview the superintendent and the doorman to see if they
15    were there in 1991?
16    A    No, and I don't think Jude knew who their names were.
17    Q    Could you have asked the Secret Service office in New
18    York to go to the building and see if the employees who were
19    there were still there from '91?
20    A    I didn't see the need to do that, sir.
21    Q    Didn't you see a need to corroborate, find out if this
22    witness who, days before, had been distraught and on the
23    verge of wanting to die, was being truthful with you?
24    A    Well, I don't know if that was said the next day, what
25    you're telling me.
```

```
1    Q    Didn't you see a need to verify whether anything this
2    fiction writer told you was true?
3    A    I will answer that, Mr. Schwartz.
4    Q    Thank you.
5    A    Everything that woman told me is true based on the taped
6    conversations.  Every single -- you gotta pay attention to
7    every single taped conversation.  Start with January 29,
8    2008, then go to 2/9/08, then go to 2/12, then go to 2/15,
9    then go to 3/10, then you go 7/10/2008, go to 8/4.  These
10   taped conversations actually tell us what Jude was telling us
11   is true.
12   Q    Thank you.  And forgive me if I was being disrespectful.
13   I was waiting for you to finish.
14        But let me ask you, did you think it was important
15   to corroborate whether what she said Rose told her about what
16   happened in the building was true?
17   A    I didn't think that the incident in New York was very
18   possible to be able to find out, since it was so long ago.
19   So what we did is we decided to use the taped conversations,
20   and we talked about Brad Pitt, we talked about Sam, we talked
21   about Cynthia, we talked about --
22        MR. SCHWARTZ:  Your Honor, may I ask you to direct
23   the witness to answer the questions instead of making
24   speeches?
25        THE COURT:  What was the question again?
```

```
 1              MR. SCHWARTZ:  Did he find it necessary -- did he
 2     think it was necessary to corroborate what she told her about
 3     the New York apartment was true.
 4              THE COURT:  Just answer yes or no.
 5              THE WITNESS:  No.
 6     BY MR. SCHWARTZ:
 7     Q    Okay.  Did you, when you went to New Mexico, interview a
 8     friend of Jude and Claude's?
 9     A    Yes, sir.
10     Q    And what was his name?
11     A    Eddie Lewis.
12     Q    Eddie Lewis?
13     A    Yes, sir.
14              THE COURT:  Can you speak into the microphone,
15     please.
16              THE WITNESS:  Eddie Lewis.
17     BY MR. SCHWARTZ:
18     Q    And did you ask Eddie Lewis whether to his knowledge
19     Claude had ever been verbally or psychologically abusive to
20     Jude?
21     A    No, I think we -- supposedly there was a -- we were
22     under the impression that Eddie Lewis and Claude had split as
23     friends.  So then we thought we could talk to Eddie Lewis and
24     shed some light on some of the things; and he said he was
25     still very close friends with Claude, and he didn't have -- I
```

1    know Darren had asked him a number of questions, but it

2    didn't really pan out.

3    Q    Well, you know Darren had asked him a number of

4    questions, right?

5    A    Asked him questions, yes.

6    Q    And you and Darren were there together?

7    A    Yes, sir.

8    Q    Because you try when possible to interview witnesses

9    with two people instead of one; is that right?

10   A    Yes, sir.

11   Q    And Darren asked him, to his knowledge, was Claude

12   verbally or emotionally or psychologically abusive to Jude,

13   didn't he?

14   A    If Darren answered that question, I just don't recall

15   it.  You know, I'm going to be honest with you.

16   Q    But you said because he was friends with Claude, it

17   didn't pan out.  That means you didn't -- you weren't able to

18   corroborate what Jude had told you; is that correct?

19   A    That's to the best of my knowledge, yes.

20   Q    So you made -- withdrawn.

21        Did you interview anybody else who knew Jude and

22   Claude before Jude got divorced from Claude in New Mexico?

23   A    No, those are the only two.

24   Q    Did you make any attempt to verify whether what Jude was

25   telling you about Claude was true?

1    A    We had nobody to talk to except for Claude himself.

2    Q    When you were investigating street crimes, didn't you go

3    and talk to neighbors, friends, people associated with the

4    victim or the subject and ask them what they knew?

5    A    The subject of this investigation, you know, I mean, we

6    just looked at Claude as, you know, a better word would be a

7    person of interest.  We suspected maybe there was some -- we

8    could never solidify anything between Claude and Rose.  We

9    were dealing with a fraud, and our concentration was on Rose

10   Marks and Jude Montassir or any other alleged victim that was

11   associated with Ms. Marks.

12   Q    Jude told you that she believed 100 percent that she was

13   corresponding with Colin Powell; is that correct?

14   A    Yes.

15   Q    And Jude told you -- I'm sorry, withdrawn.

16         All you had to rely on that Jude was telling you

17   the truth was what she told you, because she was telling you

18   about the function of her mind, right?

19   A    Now, are you talking about in reference to Brad Pitt and

20   Colin Powell?

21   Q    Yes.  I know you had letters.  I know you had e-mails.

22   But as to what Jude thought was going on, all you had was

23   what she told you, right?

24   A    Okay.  This is what I found out.  And she had told me in

25   reference to -- because I didn't see anything from Colin

```
 1    Powell, but she said she was corresponding with Brad Pitt and

 2    that she would mail some of these correspondences to a P.O.

 3    Box in Arizona.

 4              So on August 8th of 2008 -- am I answering your

 5    question or am I being rude?

 6    Q    You're not answering my question, but I didn't want to

 7    interrupt you.

 8    A    You asked me if I investigated something and I'm asking

 9    you --

10    Q    I'm asking you, did you have any way to verify what Jude

11    said, which was that she believed she was really

12    corresponding with Brad Pitt?

13    A    Outside the taped conversations?

14    Q    Yeah.

15    A    All right.  So she told me she was sending the

16    correspondence to a P.O. Box in Arizona.  So during the --

17    Q    Mr. Stack, please forgive me.  And I know I'm being

18    rude.

19              MR. STEFIN:  He's answering the question.

20              THE COURT:  I think he's answering the question.

21              MR. SCHWARTZ:  Okay.

22              THE COURT:  Go ahead.

23              THE WITNESS:  So with that, I had a P.O. Box in

24    Arizona.  So what I did is during my surveillances, I would

25    go by 1319 Seminole Drive and the other various locations.
```

1    On August 8th of 2008, I went by 1319 Seminole.  There was a

2    white Jeep with an Arizona plate of AAC5092.  I ran that

3    plate, and it came back to a Debbie Von Beulen with a P.O.

4    Box in Arizona.  So that -- I continued to keep surveillance

5    on that car.  I seen that vehicle all the way up into

6    November of 2008 being at times at 1319 Seminole.

7            That same vehicle at one time I seen Ms. Marks and

8    a lady that I never seen before that I suspected might be

9    Debbie Von Beulen.  And they, on October 21st of 2008, they

10   went to a Starbucks.  Ms. Marks went into the Starbucks.  The

11   lady stayed outside in the car, and then she came back out,

12   and then they went back, at about 1:00 o'clock in the

13   afternoon, to 1319 Seminole.  That woman was a petite woman

14   with curly reddish hair.

15           Now, I don't know who Debbie Von Beulen is, but I

16   suspected at that time, based on the fact that she was

17   sending correspondences to a P.O. Box, plus in bank

18   transactions I seen money going from there to Ms. Marks, I

19   think there was one, and also, there was FedExes coming from

20   Debbie Von Beulen to 1319 Seminole.

21           So eventually, I passed that information on to

22   Special Agent Watts, and I know later on the jury has maybe

23   heard from Debbie Von Beulen, but I don't know what was said.

24   BY MR. SCHWARTZ:

25   Q    Thank you.

```
 1              But now can I ask you my question again?  Did you
 2    have any way to verify that, not who sent the e-mails and who
 3    got them back and whether it was Brad Pitt or not Brad Pitt
 4    or Debbie Von Beulen or Cha Cha Cha Rabinowitz, did you have
 5    any way to verify what Jude Montassir told you, which is that
 6    she believed that she was getting these e-mails from Brad
 7    Pitt?
 8    A    Yeah, the conversations on 1/29 of '08 she's talking to
 9    Rose Marks, and she's talking about Brad Pitt.
10    Q    I understand that.
11              And if Brad Pitt was being used by Rose and Jude,
12    and Colin Powell was being used by Rose and Jude as an
13    exercise to help with themes for romantic novels, and if Jude
14    was lying to you and saying she truly believed that she had
15    e-mails from Brad Pitt, would you have any way of knowing
16    that?
17              And may I say yes or no and then give an
18    explanation?
19    A    Yes.
20    Q    You would?
21    A    Yes.
22    Q    How did you know whether Jude was telling you the truth
23    when she said she believed that these were coming from Brad
24    Pitt?
25    A    When we did the undercover conversations, I'll go back
```

```
 1    to them again, and the conversation on January 29, 2008, she
 2    even asked Rose, when's the last time you've talked to Brad
 3    and she said, it's been months.
 4           Now, in those conversations, starting in January
 5    and going all the way 'til August, there was always some type
 6    of reference to Brad Pitt and the conversations.  So based on
 7    when I listened to those tapes, it's very obvious that
 8    there's nothing, nothing talked about a writing exercise.
 9    Jude is explaining to Rose that how dare Jude -- Brad Pitt
10    tell me how to write, and then she turns to Jude and says --
11    I mean, turns to Rose and says, in all the years that we've
12    known each other, you've never told me how to write.  And the
13    answer was "yes" from Rose.
14           So based on those conversations, I would say
15    without a doubt she believed she was always talking to Brad.
16    Q    Are you aware that many times on her website, Jude has
17    told her readers that she starts to live her characters, and
18    her characters do and say things that she never anticipated
19    they would do when she's writing her books?
20    A    I have no idea how Jude -- I know she does a lot of
21    research on her books.  But if you're asking me how she
22    writes her books, like I said, I have no idea.
23    Q    Has she ever told you that basically the fictional
24    characters come alive, and she starts to believe who the
25    characters are and what they're doing?
```

```
 1    A     No.

 2    Q     And you've never seen her website where she corresponds

 3    with her readers, have you?

 4    A     No.

 5    Q     You don't know anything about that, right?

 6    A     No.  You feel free to look at any of my computers,

 7    Mr. Schwartz, to see if I ever went on her website.  I don't

 8    go on her website, I don't read her books.  But I will tell

 9    you as a police officer for over 27 years --

10    Q     I'm not asking you for your opinion as a police officer

11    for over 27 years.

12          Now, in your dealings with Jude, did you and she

13    become friendly?

14    A     Yes, of course.

15    Q     And did you and she have an opportunity to train

16    together?

17    A     Yes.

18    Q     At your gym?

19    A     Not my gym.

20    Q     What gym did you train together at?

21    A     At the LA Fitness at 56th Avenue, in Hollywood.

22    Q     And do you have a gym?

23    A     I have a gym now, yes.

24    Q     What's the name of your gym?

25    A     It's called Ring Fit USA, LLC.
```

```
 1    Q    And when did you open your gym?

 2    A    It was October 1st of 2011.

 3    Q    And did you have any partners in your gym?

 4    A    Yes.

 5    Q    And before you opened it, were you raising money for it?

 6    A    We were getting our own money.

 7    Q    And who put in money?

 8    A    Jude Deveraux sent my partner $35,000.

 9    Q    And how much was your entire initial investment in the

10    gym?

11    A    After that money was --

12    Q    Without Jude's money, how much did you and your partners

13    invest in this gym?

14    A    I invested 20,000.

15    Q    How much did your other two partners invest?

16    A    They're investing their time.

17    Q    So the total amount of money that was invested in this

18    gym was $20,000?

19    A    Yes.

20    Q    And Jude Deveraux decided to invest 35,000 into it?

21    A    Jude Deveraux -- Jude Deveraux had spoken to one of my

22    partners, and my partners did not know that Jude Deveraux was

23    a victim in any case at this particular case.  I kept her --

24    when we were at LA Fitness, I also introduced her as a

25    friend, and they got to know that she was a famous writer.
```

```
 1    And one of my partners was corresponding with her and said
 2    that we were going to start a gym, and I think that was July.
 3    I had already retired.  And she sent him -- or wanted to
 4    invest and sent him $35,000.
 5            When my partner told me that Jude was investing
 6    $35,000, I called Jude and I asked her, I said, Jude, there's
 7    one thing I want to know.  I want to know if any of my
 8    partners asked you for that money.  Did they solicit that
 9    money?  And she said, no, Charlie, I didn't solicit -- they
10    didn't solicit.  I just wanted to invest.  And I think it was
11    probably out of the kindness of her heart for maybe some of
12    the stuff that I did.
13            But the bottom line is ethically and morally, I
14    could not keep that money.  So I sat down with my partners, I
15    told them that she was a victim in the case, and they totally
16    agreed that that money had to go back.
17  Q    So she just wanted to give it to you as a gift, or help
18    you out?
19            MR. STEFIN:  Objection.
20            THE COURT:  Overruled.
21            THE WITNESS:  All I know is that she said that she
22    wanted to invest in the business through my partner, but the
23    bottom line was, that money was not going to stay in that
24    account.
25  BY MR. SCHWARTZ:
```

1    Q    Okay.  But she was being generous.  You were her friend,

2    you helped her, she leaned on you, and she wanted to give

3    this to you to help you?

4    A    She may have, you know, over the years for the things

5    I've done, and she was very grateful, you know, she sent the

6    money.  She certainly didn't ask me, because probably, she

7    probably knew I'd say no, and she probably thought maybe --

8    you talked to her.  I don't know.  She probably thought it

9    was okay to go through my partner.  But I'm going to tell you

10   something, that money didn't stay in that bank account very

11   long, and the thing is, the money was returned.

12   Q    I agree it didn't stay very long, but did you ever ask

13   her, Jude, why did you put this money in the business?

14   A    She said she wanted to invest in the business.

15   Q    To help you?

16   A    No, she said -- she actually says, by giving it to

17   Carmine, she thought it would be okay, and invest in the

18   business.  And it's my business, so I can't sit in this

19   courtroom and say, oh, no, it's Carmine and Ralphie's

20   business.  No, the three of us are in business together.  But

21   they had no idea that Jude Deveraux was a victim in this

22   case, but they did know that Jude Deveraux was a famous

23   writer.

24             But I'm going to tell you something, Carmine Tufano

25   is a police officer, and when he found out, the poor guy

 1    turned white.  And he even looked at me and he said, Charlie

 2    this money needs to go back.

 3             So we were all in agreement.  And, yes, on the

 4    surface it looks ethically and morally wrong, but there's no

 5    way that I was going to keep that money in my bank account.

 6    No way.

 7    Q    And you realized that if she had made an investment in

 8    your business, some nasty, obnoxious defense attorney in a

 9    courtroom, could raise this to suggest that there was some

10    wrongdoing, correct?

11    A    Well, first of all, I don't think you're nasty and rude.

12    I think you're doing your job.  And, second of all, I did

13    advise the U.S. Attorney's Office of such a transaction.  I

14    didn't keep it hidden because I, as a police officer, feel

15    that that needs to be told, and it's part of Brady, and

16    that's the bottom line.  So there's nothing -- I wasn't

17    hiding anything, sir.

18    Q    So you would agree that it's something the defense

19    should learn about?

20    A    Of course.

21             MR. STEFIN:  Objection.

22             THE COURT:  Overruled.

23    BY MR. SCHWARTZ:

24    Q    Would it surprise you to learn --

25             MR. STEFIN:  Objection.

```
 1              THE COURT:  Sustained.
 2  BY MR. SCHWARTZ:
 3  Q    -- that today is Tuesday?
 4  A    I don't know.
 5  Q    You said it was something called Brady.  What is that?
 6              MR. STEFIN:  Objection.
 7              THE COURT:  Sustained.
 8  BY MR. SCHWARTZ:
 9  Q    Was this an investment or a loan?
10  A    Well, you know, to tell you the truth, I wouldn't call
11  it a loan or an investment, but I know on the memo I put back
12  return -- what did I say, Mr. Schwartz, just to make sure I
13  say it right?  Repayment of loan.  And Carmine's wife is our
14  accountant.
15          So I said, you know what, I don't know how to
16  explain to the IRS how I got this 35,000, so I said just put
17  repayment of loan, and I said we'll deal with it later.  And
18  I told Carmine, I said I'm going to go and tell the
19  Government.  I said, this has to be disclosed.  I don't know
20  how fast~-- the Government can tell you how fast I came to
21  them and disclosed it, but Mr. Schwartz, this is something I
22  wish never even came into my bank account.
23  Q    Did you disclose it to the Government anytime before the
24  end of 2012?
25              MR. STEFIN:  Objection, Your Honor.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. SCHWARTZ:
 3   Q    Did you tell Jude that you were treating it as a loan
 4   and returning it?
 5   A    No, I just told Jude the money's coming back.
 6   Q    But the check you gave her said it was repayment of
 7   loan?
 8   A    Yes, that was our paperwork, and I'm sure you talked to
 9   her about it, but I just said we can't have it.
10   Q    Now, when you were at the depositions in New Mexico, did
11   you receive a subpoena to testify at a deposition in Jude's
12   matrimonial case?
13   A    Absolutely not.
14   Q    Did you hear any discussion regarding subpoenaing you
15   and Darren Ogden to appear in that matrimonial case?
16   A    Absolutely not.
17   Q    So you were not given by hand delivery a subpoena by
18   Larry D. Maldegan, M-a-l-d-e-g-a-n, when you were at the
19   depositions in New Mexico?
20   A    No, sir.
21   Q    And just to be clear, you were in New Mexico on
22   December 3rd -- on or about December 3rd, 2008, weren't you?
23   A    I know it was 2008, sir, but for me to swear under oath
24   that I know it was the third, I'm not sure.  But I will say
25   it was December, yes.
```

```
 1    Q     Now, you mentioned that Jude told you about her son Sam
 2    either the first or second time that you met; is that
 3    correct?
 4    A     That he was caught between heaven and hell.
 5    Q     You told us that, right?
 6    A     Yes.
 7    Q     Would you like to tell us again?
 8    A     No, sir.  I thought that's what you were referring to.
 9    Q     Yes, you mentioned that she mentioned Sam when first you
10    met her; is that correct?
11    A     Yes.
12    Q     And did she ever tell you that Sam was adopted?
13    A     No, I think she got him through intro, whatever they
14    call that.
15    Q     In vitro fertilization?
16    A     Yeah.  That's what I thought.  So I really didn't ask
17    her how she had it.  I just remember she was trying to do it
18    intro, and . . .
19              THE COURT:  Again, Mr. Stack, can you please try
20    and pull that microphone toward you, please.  Thank you.
21              THE WITNESS:  Your Honor, I'm giving you a lot of
22    trouble with this.  I'm sorry.
23              THE COURT:  It's all right.  It's not your fault.
24    BY MR. SCHWARTZ:
25    Q     Did she ever tell you that she had been married to
```

1   someone named Mohammed Montassir?

2   A    I know she seen a man by that name in Egypt.

3   Q    Did she ever tell you she was married to him?

4   A    If she did I don't recall it, nor did I dwell on it or

5   dive into it.

6   Q    Did she ever tell you that Sam Alexander Montassir was

7   the son of herself and Mohammed Montassir?

8   A    No.

9   Q    Let me show you something and see if it refreshes your

10   memory.

11   A    I never seen this, sir.

12        MR. SCHWARTZ:  For the record, I showed Mr. Stack a

13   document marked Defendant's exhibit 71 for identification.

14   BY MR. SCHWARTZ:

15   Q    To your knowledge, if Jude had said that Sam was the son

16   of herself and Mohammed Montassir, would that be a lie?

17        MR. STEFIN:  Objection.

18        THE COURT:  Sustained.

19   BY MR. SCHWARTZ:

20   Q    Jude told you that the son was born through in vitro

21   fertilization; is that correct?

22   A    No, I want to be quite frank on this, like I said

23   before.  I said I know she was trying to get pregnant through

24   intro --

25   Q    In vitro?

```
 1    A      In vitro.  I'm sorry.  I've been punched a little too

 2    much.  But it's, I guess maybe it was my assumption that

 3    that's where Sam was born, through intro.

 4    Q      In vitro.

 5    A      In vitro.

 6    Q      Well, through the course of your investigation, didn't

 7    you learn that Jude, in fact, got pregnant from in vitro

 8    fertilization with someone else's egg and someone else's

 9    sperm at New York Presbyterian Hospital?

10    A      No, I didn't know about that, sir.

11    Q      That's not something you and she discussed?

12    A      Like I said, if she discussed that with me, I don't even

13    remember that.

14    Q      Did she discuss with you that Rose Marks was present

15    with her on the day the baby was born?

16            MR. STEFIN:  Objection to this line of questioning.

17            THE COURT:  Sustained.

18    BY MR. SCHWARTZ:

19    Q      Did Jude tell you that it was Rose's fault that she paid

20    a lot of money to Claude on a marital settlement?

21            MR. STEFIN:  Objection.

22            THE COURT:  Overruled.

23            THE WITNESS:  She told me that she had hired an

24    attorney, and that Rose had her fire that attorney, and that

25    they hired this attorney that had no real expertise in that
```

```
1    area, and then this thing was drawn up, and she had advised
2    me that Jude -- I mean Rose had said to sign it, because
3    Claude was going to die soon anyway.
4    BY MR. SCHWARTZ:
5    Q    Did Jude tell you that she was the one who proposed the
6    terms of this marital settlement to Claude and that Claude
7    accepted it?
8    A    I have no idea about that.
9    Q    If that were the fact, would the information Jude gave
10   you be incorrect?
11             MR. STEFIN:  Objection.
12             THE COURT:  Sustained.
13             MR. SCHWARTZ:  Excuse me for a moment, Your Honor.
14   BY MR. SCHWARTZ:
15   Q    You testified earlier that the people that you had
16   contact with other than John Cleary, none of them told you
17   they weren't victims; is that correct?
18   A    Well, LB, I told you that --
19   Q    Correct.
20             I'm sorry.  Other than John Cleary and the person
21   you referred to as LB, no one else told you they weren't
22   victims; is that correct?
23   A    To the best of my recollection.
24             Are you talking about pre-indictment or after?
25   Q    After indictment.
```

1    A    Because I think there was a Neil-something that at first

2    felt he was a victim, but I think later on he rescinded that.

3    Q    Anybody else?

4    A    Unless you got a name there and I could tell you yes or

5    no.

6    Q    Didn't Debbie Von Beulen tell you she wasn't a victim?

7    A    Yes, that's true.  Yes.

8    Q    Okay.  So that's now three.

9         Anybody else?

10   A    You got some other name there?  Honestly.

11   Q    Well, I'm asking you.  I'm not here to testify.

12   A    This is after the indictment?

13   Q    Correct.

14   A    My best recollection is while I was working full-time,

15   not working at the gym and at my other job, at times I would

16   go over and help out the U.S. Attorney's Office.

17        So if there's a name that I forgot somewhere

18   afterwards, with all due respect, Mr. Schwartz, I apologize,

19   but I'm not trying to hide anything from you.

20   Q    Are you aware that on Jude's MySpace page she referred

21   to Sam as her adopted son?

22             MR. STEFIN:  Objection.

23             THE COURT:  Sustained.

24   BY MR. SCHWARTZ:

25   Q    Let me show you what's been marked into evidence as

```
 1    Defendant's exhibit 27.
 2              You mentioned when you were in New Mexico you
 3    visited with a psychologist who Jude's attorney had examine
 4    her, correct?
 5    A    Yes.
 6    Q    And I'll represent to you that Defendant's exhibit 27 is
 7    a redacted report of that psychologist.
 8    A    Yes.
 9    Q    And just first, let me show you the first page, second
10    paragraph of the report.
11    A    Yes, I read it.
12    Q    Could you tell us why, if you went to New Mexico for the
13    purpose of trying to interview Claude and interview this
14    Eddie Lewis, why you were sitting, providing confidential
15    information from your secret investigation to this
16    psychologist?
17    A    Well, I mean, the attorneys in the divorce settlement
18    knew of it, and so this psychologist was going to evaluate
19    her, and all we did was just, since he's going to evaluate
20    her, we just provided him a background on the federal case
21    that we were working.  And he actually informed me that he
22    was aware of these type of scams, as well, but he realized
23    and said that he took this into consideration, but he went
24    back and then finished his evaluation.
25    Q    Well, this was a grand jury investigation, right?
```

1    A    Well, we weren't before a grand jury yet.

2    Q    Were you serving grand jury subpoenas?

3    A    Yes, sir.

4    Q    And hadn't grand jury subpoenas been served the year

5    before in this investigation?

6    A    But enlighten me on what I did that is out of place

7    here, sir.

8    Q    Well, when I'm a witness I'll let you ask me questions,

9    but now I'm asking you questions.

10   A    Oh, no, because I didn't know if she's going before a

11   forensic psychologist and we went in and spoke to the

12   gentleman about -- we didn't name names or anything.  We just

13   said that she was swindled in a particular scam, and he took

14   that in his consideration on writing this.

15   Q    Well, let me ask you this.  You said you weren't before

16   a grand jury yet; is that true?

17   A    Yes.

18   Q    Were these the first grand jury subpoenas that were

19   being served?

20   A    I was talking to people even outside that, you know.

21   I'm trying to understand your question.

22   Q    I'm sorry.  I guess I'm speaking a different language,

23   and I apologize.  Let me ask the question again.

24        Were these the first grand jury subpoenas that you

25   served in this investigation?

```
 1    A     No.

 2    Q     Had you served previous grand jury subpoenas?

 3    A     Yes.

 4    Q     And pursuant to those previous grand jury subpoenas, had

 5    you obtained documents?

 6    A     Uh-huh.

 7            THE COURT:  Is that a "yes"?

 8            THE WITNESS:  Yes.

 9    BY MR. SCHWARTZ:

10    Q     And had you submitted those documents to the U.S.

11    Attorney's Office after you analyzed them?

12    A     Yes.

13    Q     So when you said you weren't before a grand jury yet,

14    hadn't a grand jury investigation already started?

15    A     I don't know what the rules of the grand jury is, but I

16    know I was serving grand jury subpoenas, but I didn't know I

17    couldn't speak to somebody.

18    Q     Well, I'm not suggesting you could or couldn't speak.

19    I'm asking you if this was a secret investigation, and you

20    didn't want Rose and her friends to find out about it, why

21    were you telling the psychologist?

22    A     Because the psychologist -- if we were doing a secret

23    investigation, my concern would only be talking to people

24    that would be associated with the family.  I didn't think

25    that this psychologist would be calling up Rose Marks to tell
```

1    her that we were investigating her.

2    Q    Well, didn't you think Claude White at this point at

3    least was somehow associated with Rose Marks?

4    A    We only suspected, and we served him with a grand jury

5    subpoena, and evidently, they never found out about it.

6    Q    But if this investigation was a secret grand jury

7    investigation that you didn't want Rose and her family to

8    find out about, why would you give Claude White a grand jury

9    subpoena?

10   A    Because we wanted to talk to Claude.  We wanted to talk

11   to Claude.

12   Q    And why would you and Ogden and Larry Bardfeld tell

13   Claude's attorney -- tell Rose's attorney --

14            MR. STEFIN:  Objection.

15   BY MR. SCHWARTZ:

16   Q    -- that you were starting a grand jury investigation?

17            THE COURT:  Overruled if he knows.

18   BY MR. SCHWARTZ:

19   Q    Sorry, tell Jude's attorney, forgive me.

20            THE COURT:  You can answer if you know the answer.

21            THE WITNESS:  I don't think we told him we were

22   doing a grand jury investigation.  We may have told him that

23   we were doing -- he wanted to know what two Fort Lauderdale

24   police officers were doing down there, and then we told them

25   that we were doing an investigation, federal investigation.

```
 1   BY MR. SCHWARTZ:

 2   Q    But well before you came down there, didn't Jude's

 3   attorney meet with Larry Bardfeld and two Fort Lauderdale

 4   detectives and be told that Jude was a victim of a swindle,

 5   and a grand jury investigation was commencing in this matter?

 6              MR. STEFIN:  Objection, compound.

 7              THE COURT:  Overruled, if you know.

 8              THE WITNESS:  I don't know, Your Honor.

 9   BY MR. SCHWARTZ:

10   Q    Would it surprise you that she put it in a public

11   document filed in the courts of New Mexico?

12              MR. STEFIN:  Objection.

13              THE COURT:  Sustained.

14   BY MR. SCHWARTZ:

15   Q    Let me show you the last paragraph of page 5 of this

16   redacted report.  Do you see that?

17   A    Yes.

18   Q    I'll turn the page when you tell me you're ready.

19   A    Yes.

20   Q    Does it say:  "And she has since come to find out, Joyce

21   and her ex-husband were, of course, working together.  Joyce

22   would tell Claude what to do, when to do it, and how to do

23   it, and he would do so.  Providing Ms. Montassir with the

24   obvious appearance of this woman possessing great power to

25   predict the future events with uncanny accuracy?"  Is that
```

```
 1    what you told the psychologist?

 2    A     No.  Is that what Ms. Montassir said?  Is that what

 3    Ms. Montassir said to the --

 4    Q     I'm asking you who told it to the psychologist who

 5    interviewed you, Ogden, and Ms. Montassir.

 6    A     Now you're showing me page 5 of a document, and I'm

 7    asking you is that the doctor's findings.

 8    Q     I'll show you the whole document if you want.  I'm not

 9    trying to hide anything from you.

10              MR. SCHWARTZ:  Can I approach the witness?

11              THE COURT:  Yes.

12              THE WITNESS:  Thank you.

13              I'm looking here --

14              THE COURT:  Sir, we can't hear you when you're

15    speaking down like that.

16              THE WITNESS:  From my reading here, it looks like

17    it's the doctor's conversation with Ms. Montassir.

18    BY MR. SCHWARTZ:

19    Q     So it wasn't you who told that to the doctor.  You're

20    saying that you believe it was Ms. Montassir?

21    A     I wasn't in the room with the doctor, but this appears

22    to be the conversation between the doctor and Ms. Montassir,

23    and if -- and the only one that can authenticate this is

24    probably Jude and/or the doctor, as far as that segment, sir.

25    Q     Now, to the best of your knowledge as a result of your
```

```
 1    investigation, that statement is untrue, isn't it?

 2    A    About Claude?

 3    Q    Yeah.

 4    A    We could find no evidence of that.  And so, you know, I

 5    pulled his bank records, his phone records, and I could not

 6    find from the time she was convinced that -- and always has

 7    been convinced and maybe still is convinced, that Claude had

 8    something to do with Ms. Marks.  But I couldn't prove it.

 9    Q    You checked his telephone records, Claude's?

10    A    Yes, sir.

11    Q    And you checked Rose Marks' telephone records, didn't

12    you?

13    A    Yeah, the only problem is we couldn't go back to 1991.

14    Q    Okay.  But you found for the years you could check, no

15    evidence of any contact?

16    A    I think the furthest we could go back was, if I remember

17    right, was around '04.

18          I mean, the only evidence that I thought was a

19    little unsettling was in the taped conversation, Jude had

20    said to Rose, you had put somebody in the apartment or

21    something with Claude, and she had answered, yes.  And then

22    she says, well, what is that person -- what is that

23    person -- I think Rose said she hadn't heard from that

24    person.  So I was wondering, you know, that was something

25    that, you know, was unsettling.
```

1    Q    And you concluded that that was made up, didn't you?

2    A    It was made up, I don't know that.  I mean, Jude

3    acknowledged -- Rose acknowledged that she did.

4    Q    But, now, let's go back.  This is was important if they

5    were communicating with each other, because that would be how

6    Rose knew that Claude was going to show up in New York,

7    right?

8    A    You know, there's various things that, you know, maybe

9    she called the law office.  I don't know.  You know, I can't

10   say.

11   Q    Well, at that time there was no lawsuit going on, was

12   there?

13   A    No.  What I'm trying to say is that if Jude was going to

14   get served with papers and then she would come out and the

15   person was there, either the person found her or maybe --

16   because the one person that knew where she always was was

17   Rose.  So is there a possibility that somebody had

18   communicated with Rose?  Possible.  Couldn't prove it.

19   Q    Okay.

20   A    Can't prove it.

21   Q    Now, let me ask you.  The importance of corroborating

22   that Rose and Claude were in -- to use a New Mexico word --

23   cahoots, was that it would show that what Jude was telling

24   you was a fact, that Rose knew and told her in advance of the

25   lawsuit, and that Rose knew and told her in advance that

1    Claude was coming to New York, right?

2    A    She always felt that, you know, somehow she couldn't

3    figure out how Rose always knew where to serve the papers,

4    you know.  She would say the papers -- according to Jude, she

5    would say Rose would predict where the papers were going to

6    be served.

7    Q    And I would emphasize in my question to you part of your

8    last statement.  This was all according to Jude, wasn't it?

9    A    Yes.

10   Q    And these were things that Jude told you, that there was

11   no independent proof that Jude was telling you the truth,

12   right?

13   A    What Jude was telling us is that she felt that she had

14   psychic powers.

15   Q    And you've said that Rose doesn't have psychic powers,

16   right?

17   A    Uh-huh.

18            THE COURT:  Is that a "yes"?

19            THE WITNESS:  Yes.

20   BY MR. SCHWARTZ:

21   Q    Okay.  But let's talk about some of the incidents that

22   Jude told you about.  She told you that Claude had a bailiff

23   come and check to see where she was living in England, didn't

24   she?

25   A    Yes.

```
 1    Q     Were you aware that at that time there was a court order

 2    in place requiring Jude's attorney to tell Claude's attorney

 3    where she was?

 4              MR. STEFIN:  Objection.

 5              THE COURT:  Sustained.

 6    BY MR. SCHWARTZ:

 7    Q     Did you believe that Rose told Claude where Jude was in

 8    England in order to allow this bailiff to come and serve her

 9    papers?

10    A     I don't know, because I -- that would be me guessing.  I

11    have no factual basis to say that.

12    Q     Well, you have Jude telling you that, don't you?

13    A     Yes.  And, you know, as far as I'm concerned, most of

14    the stuff that we dealt with outside of that realm, Jude was

15    telling the truth.

16    Q     Well, let's stay inside that realm.  These things that

17    were only from Jude's mind that she was telling you and you

18    believed.

19              MR. STEFIN:  Objection.

20              THE COURT:  Sustained.

21    BY MR. SCHWARTZ:

22    Q     Did Jude tell you that she had lived with Mohammed in

23    England?

24              MR. STEFIN:  Objection.

25    BY MR. SCHWARTZ:
```

```
 1    Q     I'm sorry, in Egypt.
 2               MR. STEFIN:  Objection.
 3               THE COURT:  Overruled.
 4               THE WITNESS:  Yes.
 5    BY MR. SCHWARTZ:
 6    Q     Did Jude tell you that it was Rose who made her sell her
 7    house in England?
 8    A     I don't know about the house in England.  I know she
 9    said the New York place and the North Carolina place.
10    Q     How about the Connecticut place?
11    A     I don't remember that.
12    Q     Did Jude tell you that the New York apartment that she
13    was left with after the divorce wasn't worth anything?  That
14    just had a big mortgage on it and no value?
15    A     I don't know anything about that, sir.
16    Q     Did Jude tell you that she got nothing out of the
17    divorce other than a New York apartment with a big mortgage?
18    A     No, she told me that a large amount of the house in
19    Santa Fe, I believe it was the cars and maybe a cottage, I
20    think, is what Claude got.  And then Claude also got a
21    certain amount of money each year that would increase
22    sometimes, and that she would have to pay the taxes on that,
23    as well.
24    Q     And did Claude -- did Jude tell you that she got -- she
25    got nothing other than the apartment in New York?
```

1   A     No, she told me she got the house in New York.  She just

2   said he got the better deal.

3   Q     Did she tell you that the value of Montassir -- I'm

4   sorry, Deveraux, Inc, with the copyrights and the residuals

5   and the royalties and everything else was worth much more

6   than the property that Claude got, and that's why she had to

7   pay him money?

8               MR. STEFIN:  Objection.

9               THE COURT:  Sustained.  We're not going to, you

10  know, ask every statement that she made whether --

11              MR. SCHWARTZ:  It's true or not?

12              THE COURT:  Yes.

13  BY MR. SCHWARTZ:

14  Q     You mentioned before that Jude said she had to pay the

15  taxes on the money Claude got; is that correct?

16  A     Yes.

17  Q     Were you aware that the attorney that Darren Ogden

18  got -- I'm sorry, the accountant that Darren Ogden got for

19  her deducted those payments as part of the fraud in the IRS

20  return?

21  A     I have no idea about that, sir.

22  Q     Did Jude tell you that the IRS allowed her to write off

23  as a bad debt -- to write Rose's money off as a bad debt, and

24  that Rose was going to be responsible for the taxes on that?

25              MR. STEFIN:  Objection.

```
 1                THE COURT:  Sustained.
 2                If you have a statement that you believe is
 3      inconsistent, ask him about the statement.
 4                MR. SCHWARTZ:  Sure.
 5                THE COURT:  Don't ask him if everything she's
 6      testified to, did she tell him that, too.
 7      BY MR. SCHWARTZ:
 8      Q    Let me direct your attention to Defendant's exhibit 34,
 9      which has not yet been admitted into evidence, and ask you to
10      look at the third page, which is labeled CStack-014 and
11      direct your attention to the next to the last paragraph.
12      A    This e-mail that you're --
13                MR. STEFIN:  I'm going to object.
14      BY MR. SCHWARTZ:
15      Q    I'm just showing you the document and asking you to look
16      at it.
17      A    All I'm saying is I don't remember this document, so I
18      don't even know if this document was sent to me.  This
19      document could have been sent to Darren, and then Darren
20      could have forwarded over or had me save it.  But I don't
21      remember this document whatsoever.
22      Q    If you'll let me have it, I'll show it to the
23      Government.
24      A    I'm just trying to finish this here and see.
25                Do you want it back, sir?
```

```
 1   Q    After reading the whole thing, do you recognize it?

 2   A    No, I don't, sir.

 3   Q    So you don't recognize this -- these e-mails?

 4   A    No, sir.

 5   Q    Okay.  And is it your testimony that you weren't aware

 6   that the IRS was letting Jude write off the money that she

 7   had paid to Rose?

 8             MR. STEFIN:  Objection.

 9             THE COURT:  Overruled if you knew.

10             THE WITNESS:  No, I didn't know.  All I -- that was

11   handled by Darren and Jude, so I wasn't -- I wasn't privy to

12   that stuff.

13   BY MR. SCHWARTZ:

14   Q    Now, did you have an opportunity to speak to a lady by

15   the name of Andrea Walker?

16   A    Yes.

17   Q    And how did you happen to speak to her?

18   A    We went through the embassy, and finally, the embassy

19   gave us permission to call her.  And then the embassy gave us

20   permission to record conversations after we talked to her.

21   She advised me that -- well, might as well let you ask the

22   questions, sir.

23   Q    Thank you.  I'm so used to you just going forward.

24   A    Rambling on.

25   Q    How did you -- how did she come to your attention?
```

```
 1    A     The large amounts of money that were going into Nancy's

 2    bank accounts and into Joyce Michael, Rose Marks' accounts.

 3    Q     So she wasn't called to your attention by any other law

 4    enforcement agency; is that correct?

 5    A     No.

 6    Q     And did you make a report of your first conversation

 7    with her?

 8    A     I started -- if I remember, I'm the one who did the

 9    affidavit of Andrea Walker.  So that would be when I started

10    writing the affidavit.

11    Q     Okay.  But that affidavit, rather than memorializing or

12    showing one conversation, would be a compendium or made up of

13    a lot of conversations, is that fair?

14    A     It was -- yes, it was because we were doing controlled

15    phone calls, and then transcribing them.  So we wanted to get

16    the exact what conversations between her and Rose and Nancy

17    and then write in the affidavit what she felt had taken place

18    with her.

19    Q     But just so we're clear for the record, there would be

20    no independent report of each individual call that led up to

21    that final affidavit?

22    A     Like I said, I always done -- place the thing on Word

23    and place it on my computer and moved right along from there.

24    Q     And did she send you a batch of documents and proof as

25    to the money that she paid?
```

```
 1   A     Yes.

 2   Q     Did those documents include a promissory note?

 3   A     Yes.

 4   Q     And that was a promissory note signed by Rose Marks,

 5   right?

 6   A     No, absolutely not.

 7   Q     I'm sorry, signed by Joyce Michael.

 8   A     That's true, sir.

 9   Q     Okay.  And you know Joyce Michael to be Rose Marks and

10   vice versa?

11   A     I know --

12   Q     I'll withdraw that.  You're correct.  Joyce Michael was

13   a lot of people; is that right?

14   A     Yes.

15   Q     Okay.  But Rose Marks on occasion used the name Joyce

16   Michael; is that right?

17   A     Yes, but it's not a legal name to sign.

18   Q     I see.

19         Have you ever seen any documents signed on books or

20   things of that sort Jude Deveraux?

21   A     Well, Jude never did anything in a contractual basis

22   when it came to money.  You've seen maybe in a book she wrote

23   Jude Deveraux, but her contracts with -- or her checks were

24   always signed -- Deveraux, Inc. was signed Jude Montassir.

25   Q     And you've seen the checks Deveraux, Inc.?
```

```
 1   A     Yes.

 2   Q     And you've seen her contracts with Deveraux, Inc.,

 3   right?

 4   A     No, I said contracts, but I meant to say checks.

 5   Q     And talking about that, how did she get the name

 6   Montassir, to your knowledge?

 7               MR. STEFIN:  Objection.

 8               THE COURT:  Sustained.

 9   BY MR. SCHWARTZ:

10   Q     Was that a real name or was it a made up name?

11               MR. STEFIN:  Objection.

12               THE COURT:  Overruled if you know.

13               THE WITNESS:  Your Honor, she told me that she was

14   at the divorce proceedings, that Claude White didn't want her

15   to use the name anymore.  So it was my understanding it was a

16   legal name, Jude Montassir, Jude Gilliam Montassir.

17   BY MR. SCHWARTZ:

18   Q     She told you she took the name Montassir because Claude

19   didn't want her to use the name White; is that correct?  Is

20   that what you're saying?

21   A     Either that she didn't want to use it or Claude didn't

22   want to use it, but I don't want to get too detailed, because

23   I really didn't pay much attention to the exact name, but I

24   know she took the name Jude Montassir.

25               MR. SCHWARTZ:  May I have a moment, Your Honor?
```

```
1   BY MR. SCHWARTZ:

2   Q    Now, with Andrea Walker, to your knowledge, in the

3   course of your investigation, you learned that Andrea gave

4   Rose a lot of money, right?

5   A    Yes.

6   Q    And a good portion of this money was covered by a

7   promissory note?

8   A    From my experience, looking at that promissory note,

9   Mr. Schwartz, is a promissory note based on fraud, is null

10  and void.

11  Q    I'm sorry, it's a promissory note based on~--

12  A    Any contract or promissory note based on fraud is null

13  and void.

14  Q    And which law school did you go to?

15  A    That's in business law 101.

16  Q    So you're saying the note wasn't worth anything?

17  A    It was signed by somebody by the name of Joyce Michaels.

18  If it was going to be a real contract, it would have been

19  signed, or promissory note, it would have been signed by Rose

20  Marks.  She was under the assumption that when she went to an

21  attorney to find out about the house at 1319 Seminole, they

22  said it didn't belong to Joyce Michaels, it belongs to a Rose

23  Marks.

24  Q    Are you aware that there was a Florida corporation

25  called Joyce Michaels, Inc.?
```

```
 1    A      There's also a Jude Deveraux, Inc., and Jude signs her

 2    name Jude Montassir.

 3    Q      I'm glad of that, but I'm asking you, were you aware

 4    that there's a Florida corporation Joyce Michaels, Inc.?

 5    A      Yes, and also the owner of that corporation on the

 6    documents is Rose Marks.

 7    Q      So in your legal opinion, wouldn't this have been a

 8    binding document?

 9             MR. STEFIN:  Objection.

10             THE COURT:  Sustained.

11  BY MR. SCHWARTZ:

12    Q      This document set out certain conditions and term for

13    repayment, didn't it?

14             MR. STEFIN:  Objection.

15             THE COURT:  Can I see counsel, please?

16             Why don't we take our afternoon break, ladies and

17    gentlemen.  Don't discuss the case, and we'll see you in

18    about 15 minutes.  Thank you.

19        (The jury exits the courtroom.)

20             THE COURT:  Sir, if you could, again, not discuss

21    your testimony during the break, and try and use the

22    microphone while you're testifying.  Thank you.

23             What does this have to do with attacking the

24    credibility of the victims and the story and whether or not

25    the government agents placed into the mind of the victims
```

```
 1    that they were victims, and they never believed they were

 2    victims until the Government told them?  What does this have

 3    to do with that?

 4         MR. SCHWARTZ:  Well, that's not the only reason

 5    that I have Detective Stack on the stand.  He was the case

 6    agent of the investigation.  He was the one who all of these

 7    victims had the initial contact with.  And if the victims

 8    such as, for instance, Jude Montassir, told him something

 9    different than what she told us in the courtroom, then it's

10    impeaching Jude's testimony.

11         THE COURT:  But you don't have any idea whether

12    they told him something different.  Basically, you're

13    conducting a deposition here in the middle of a trial?

14         MR. SCHWARTZ:  I do have certain documents

15    showing -- for instance, the document that he suddenly didn't

16    recognize, he claimed that he didn't know anything about the

17    tax write-off.  This document, Jude is telling him about,

18    that she was able to write off her taxes.

19         THE COURT:  Say that again?

20         MR. SCHWARTZ:  I'm sorry.  On the e-mail that he

21    didn't recognize, which the Government provided to us as

22    e-mails between Stack and Montassir, she says to him

23    something like, I wish I could tell her that the IRS was

24    allowing me to write off all the money I gave to her and that

25    she's going to have to pay it in taxes.  He claims he had
```

```
 1    never heard of that.  That's impeaching his credibility, not

 2    hers.

 3              But he just said, although he changed his

 4    testimony, that Jude Deveraux told him that she took the name

 5    Montassir because Claude White didn't want her to use the

 6    name White anymore.  That's a contradiction.

 7              THE COURT:  We're on to Andrea Walker now.  Do you

 8    have anything that you believe Andrea Walker said under oath

 9    in this trial that you believe he knows is inconsistent, or

10    you're just going to ask him like you did or were trying to

11    do with his testimony about Montassir, asking him, well,

12    did -- go through her entire direct testimony and ask her

13    whether or not, did she tell you this, or did she tell you

14    this, and did she tell you this?

15              Do you have any basis to believe that there's an

16    inconsistency, or you're just going to ask him everything

17    that she testified to on direct and say, well, did she tell

18    you that, too?

19              MR. SCHWARTZ:  No, I have two inconsistencies that

20    I will ask him about, and that's all I'm going to ask him

21    about Andrea Walker.

22              THE COURT:  But do you have a belief that there's

23    some inconsistency based upon what she said versus what he

24    knows, and not just looking to see if you're going to hit the

25    jackpot.
```

```
 1              MR. SCHWARTZ:  I would love to hit the jackpot,
 2    Judge, but I believe that there are two inconsistencies, and
 3    that's all I'm going to ask him about Andrea Walker.
 4              THE COURT:  What else?
 5              MR. SCHWARTZ:  And then I have about 10 more
 6    minutes of questioning after that.
 7              THE COURT:  All right.  And after that?
 8              MR. SCHWARTZ:  After that, I assume the Government
 9    might want to ask him one or two questions, and subsequent to
10    that, if there's minimal redirect, after I confer with my
11    client, we may be resting our case.
12              THE COURT:  All right.  Anything else?
13              All right.  We'll see you in about 10 minutes.
14        (A recess was taken from 2:49 p.m. to 3:02 p.m., after
15    which the following proceedings were had:)
16              THE COURT:  Please be seated, everyone.
17              MR. STEFIN:  Judge, I'm ready any time.
18              THE COURT:  We're back on the record.  Ms. Marks is
19    present with counsel.
20              Let's bring the jury back in, please.
21        (The jury enters the courtroom, after which the following
22    proceedings were had:)
23              THE COURT:  Welcome back, everyone.  Please be
24    seated, ladies and gentlemen.
25              Mr. Schwartz, you may continue.
```

```
1    BY MR. SCHWARTZ:

2    Q    Do you know a lady by the name of Rosanna Stanley?

3    A    Yes, sir.

4    Q    Have you spoken to her recently?

5    A    No, sir.

6    Q    Is she a Gypsy fortune teller primarily from New York?

7    A    Yes.

8    Q    Did you have a conversation with her or a number of

9    conversations with her regarding Rose Marks?

10   A    Yes.

11   Q    And Rose Marks' family?

12   A    Yes.

13   Q    Was she somewhat critical of them?

14   A    From my -- yes, I would say I guess she was somewhat

15   critical after the thing that occurred between Dallas and

16   Frankie.

17   Q    And did she ask you to get them arrested because they're

18   competing with her in New York?

19   A    Oh, she made a lot of requests, and the investigation

20   was already underway.

21   Q    I understand that, could you answer my question?

22   A    That's what I said, yes.

23   Q    She did?  She asked you to have them arrested because

24   their shop in New York was in competition with hers?

25   A    Yeah, but if I remember right, then she'd take it back,
```

```
 1    she'd go, hold off, you know, and it was just conversation
 2    because she was someone that would be able to tell me where
 3    they were, because we were getting close to the arrest, so I
 4    just sat and placated her a lot of times.
 5    Q    And what was the -- you said the thing about Dallas.
 6    I'm not sure what you mean by that.
 7    A    Rosie --
 8              MR. STEFIN:  Objection.
 9              MR. SCHWARTZ:  Okay.
10  BY MR. SCHWARTZ:
11    Q    Did there come a time when you and Jude Deveraux
12    discussed having Rose Marks arrested?
13    A    I'm sure there may have came a time that I might have
14    said that we're getting very close, yes.
15    Q    And did she tell you that she wanted to see -- she
16    wanted a picture of her in handcuffs?
17    A    I remember getting that like after, if I remember right.
18    It may have been before, Mr. Schwartz, but I do remember her
19    saying it.  But I thought it was after more than before.
20    Q    And just one more series of questions, and that is, you
21    participated in a number of meetings with various potential
22    victims after the arrest in this case, didn't you?
23    A    Sitting with Beth Watts, yes.
24    Q    And at that time you were no longer a law enforcement
25    official, were you?
```

```
 1    A    Yes, but the Government was using me as a consultant

 2    to -- you know, because I knew a lot about the case, and I

 3    was probably the most knowledgeable, and so I would assist

 4    them.

 5    Q    In your meeting with Debbie Von Beulen, did you -- do

 6    you remember your meeting with Debbie Von Beulen?

 7    A    Yes.

 8    Q    Did you threaten to have her arrested as a

 9    coconspirator?

10    A    No.

11    Q    Did you threaten any of the potential victims?

12    A    No.

13    Q    Did you ever or were you ever present when anyone said

14    to these potential victims -- withdrawn.

15         Were you present when an IRS agent asked one of the

16    potential victims, can you justify where you got your money

17    that you gave to the subject?

18    A    I don't recall that conversation, sir.

19    Q    Did that occur during the conversation with John Cleary?

20    A    I remember, you know, a lot of the conversation, but I'm

21    not going to say I remember that.

22    Q    Do you remember saying to John Cleary, does your wife

23    know about all this money you gave to Victoria Eli?

24    A    That may have -- I may have asked that question, yes.

25    Q    Do you think that that's somewhat threatening?
```

```
 1   A    No, I think the most important thing is -- am I allowed

 2   to expand on this, or do you want just a yes-no, sir?

 3   Q    I'm sure Mr. Stefin will allow you to expand on

 4   everything that you want.

 5   A    No, you just tell me what you want, sir.

 6   Q    I'd rather wait for Mr. Stefin to have that opportunity.

 7   I don't want to deprive him of it.

 8         Did you say to Mr. Cleary that if the Defendants

 9   are convicted he would be entitled to money from a victims

10   compensation fund?

11   A    No.  As a matter of fact, I don't recall that at all.

12   And, secondly, Mr. Cleary, like I said, felt he was content

13   with Victoria Eli's services.  In reference to the wife, I

14   don't think it was threatening based on the fact it is

15   that --

16   Q    I thought you were going to let me get a yes or no.

17   A    I'm sorry.

18   Q    I thought we had an agreement.

19         Let me ask you --

20   A    I'm sorry, though, Mr. Schwartz.  I have to apologize,

21   because I thought I was still answering that question.

22   Q    That's okay.

23         And as to any of these alleged victims, did you

24   tell them that if they helped in convicting Rose or her

25   family, that they would be entitled to money from either
```

```
 1    forfeited money or victims' compensation money?

 2    A    No, more or less, I told -- they would ask if, you know,

 3    I asked them if they were willing to prosecute, and then they

 4    would ask about being able to get money back, and I said I

 5    can't guarantee that.

 6    Q    But did you tell them there was a procedure where they

 7    could get -- possibly get their money back?

 8    A    I said it could be pennies on the dollar, and I said I

 9    really -- you know, I can't guarantee anything like that.

10              MR. SCHWARTZ:  No further questions.

11              THE COURT:  Thank you.

12              Redirect?  I'm sorry, actually cross.

13              THE WITNESS:  Can you hear me now, Your Honor?

14              THE COURT:  Yes, thank you.

15              MR. STEFIN:  I get confused, too, when he calls my

16    witnesses.

17                        Cross-examination

18    BY MR. STEFIN:

19    Q    Mr. Stack, you testified you had worked several joint

20    investigations with federal law enforcement agencies; is that

21    correct?

22    A    Yes, sir.

23    Q    And you mentioned that you did an operation with the

24    Drug Enforcement Administration?

25    A    Yes, sir.
```

1    Q     And how long did that investigation last?

2    A     About three years.

3    Q     Was that -- were you in an undercover role during some

4    portion of that investigation?

5    A     Yes, sir.

6    Q     And you mentioned that you had worked with the FBI on a

7    task force, as well.  I guess that was the Russian organized

8    crime investigation?

9    A     Yes, sir.

10   Q     And how long were you involved in that investigation?

11   A     I believe it was about a year and a half.

12   Q     And you indicated that you became involved in this

13   investigation I believe April of 2007?

14   A     Yeah.  About that time, yes, sir.

15   Q     And the investigation continued until the arrest of the

16   Defendants, which I believe you testified was in August of

17   2011?

18   A     Yes, sir, August 16th.

19   Q     But you had actually retired about a month and a half or

20   two months before the conclusion of the investigation leading

21   to the arrests?

22   A     That is true, sir.

23   Q     Now, with respect to the way you prepared reports or

24   investigation reports or the statements of the witnesses, is

25   that -- was that untypical of the way that you would approach

1    your report writing?

2    A    Yes.

3    Q    It was untypical?

4    A    No, it was typical.

5    Q    And, in fact, in the other investigations, were you the

6    lead investigative agent in either the DEA case or the FBI

7    case?

8    A    I was the lead agent in Operation Georgetown.

9    Q    Which was what, the drug case?

10   A    The DEA case, yes.

11   Q    And did you prepare reports in the same manner that you

12   prepared reports in this particular case?

13   A    Yeah, and then they had an analyst that would write the

14   sixes.

15   Q    And the sixes is what the DEA calls their investigative

16   reports?

17   A    Yes, sir.

18   Q    And after you had spoken to a victim over a period of

19   time, you would put together a summary of what they had told

20   you?

21   A    Yes, sir.

22   Q    Then would you then go over it with the victim or even

23   send it to them to see if it was accurate?

24   A    Yes, sir.

25   Q    And as part of that report, you would also include

```
 1    financial information you had gathered independently of your

 2    conversations with the victim?

 3    A    Yes.

 4    Q    So, for example, if you had done a spreadsheet showing a

 5    number of financial transactions that you got from the bank

 6    accounts, you would put that into the report, that same

 7    interview report, as well?

 8    A    That's correct.

 9    Q    Now, do you know who's been presented as a witness in

10    this case, the particular individuals that were called to

11    testify on behalf of the United States?

12    A    Some of them, not all of them.

13    Q    You indicated you spoke to a number of individuals, some

14    of whom may not have been called to testify in this

15    particular proceeding?

16    A    Yes.

17    Q    For example, you mentioned a woman, her initials are

18    known as YL?

19    A    Yes.

20    Q    And does she also go by the first name Jean?

21    A    Yes.

22    Q    The "Y" stands for, I believe it's -- strike that.

23         The shortened version of it is Jean, right?

24    A    Yes.

25    Q    And based on your interviews with her, how much money
```

1    did she claim to have lost?

2    A    300 --

3              MR. SCHWARTZ:  Objection.

4              THE COURT:  Sustained.

5    BY MR. STEFIN:

6    Q    But she was someone who had dealt with which one of the

7    members of the Marks family?

8    A    Nancy.

9    Q    You also mentioned several times a person whose initials

10   have been identified as LD?

11   A    Yes.

12   Q    And who was she -- who had she dealt with in the Marks

13   family?

14   A    Nancy.

15   Q    And there were other individuals who you interviewed

16   that may or may not have testified in this matter?

17   A    Yes.

18   Q    And after the initial indictment came out in this

19   matter, did other people come forward contacting law

20   enforcement?

21   A    Yes.

22   Q    And did you participate in interviewing some of those

23   people, as well?

24   A    Yes, I did.

25   Q    And you said that even though you had been retired, you

```
 1   were still helping out in a consultant capacity?

 2   A    Yes, sir.

 3   Q    Were you being paid for that?

 4   A    No, sir, I did it for free.

 5   Q    You were volunteering your time?

 6   A    Yes, sir.

 7   Q    In fact, after you had retired from the Fort Lauderdale

 8   Police Department, you immediately started work as an

 9   investigator for the Broward Public Defender's Office,

10   correct?

11   A    That's correct, sir.

12   Q    And that started around July of 2011?

13   A    Yes, sir.

14   Q    Would you just explain, as an investigator for the

15   public defender's office, what your role is?

16   A    These are clients that are indigent, and they're

17   represented by attorneys when they were arrested, and the

18   attorneys then will ask the investigator to go out and try to

19   find witnesses and/or certain people that could corroborate

20   what the arrested or the client is saying.  And we would go

21   out and try to find them, interview them.  And then the

22   attorney would decide whether they're going to call him as a

23   witness or not.

24           We'd also serve subpoenas, and we'd also try to

25   obtain bank records and et cetera when we were asked.
```

```
 1    Q    So you're working for attorneys who represent people

 2    that have been accused of crimes?

 3    A    That's correct.

 4    Q    And in doing investigations on behalf of the accused to

 5    try to locate evidence that may be helpful to that person's

 6    defense?

 7    A    That's true.

 8    Q    Did you find it difficult after serving for so many

 9    years as a law enforcement officer to switch over to the

10    other side and do investigative work on behalf of people that

11    have been accused of crimes?

12              MR. SCHWARTZ:  Objection, relevance.

13              THE COURT:  Overruled.

14              THE WITNESS:  I think, you know, based on the fact

15    that --

16    BY MR. STEFIN:

17    Q    Did you find it difficult to make that switch, first of

18    all?

19    A    A little bit.

20    Q    Okay.  And how have you handled that?

21    A    It's good, because now, you know, you see there's two

22    sides to every story, and it's good to go out there and, you

23    know, if you can find something that somebody's really

24    innocent, I'm going to put a hundred percent of my heart into

25    it, and I'm going to try to get that person free.  And if
```

1    they're guilty and the law enforcement has done their job, so

2    be it.

3    Q     So when you were interviewing potential witnesses in

4    this case, did you -- well, how did you go about locating

5    potential victims, people that you thought might have been

6    victims of the Defendant or other family members?

7    A     Through the bank records.

8    Q     So you would see from bank records that deposits were

9    coming into the Defendant's bank accounts from certain

10   individuals or companies?

11   A     Yes, I targeted the more large amounts.

12   Q     And did you have a cutoff number because of the volume

13   of deposits that were going into some of these accounts?

14   A     I couldn't keep up with it.

15   Q     What do you mean?

16   A     There's a lot of people that I didn't contact.

17   Q     Why not?

18   A     Because I just didn't have the time.

19   Q     Were the people that you contacted who acknowledged that

20   they had given large sums of money to either the Defendant or

21   a member of the Defendant's family but nevertheless did not

22   want to become implicated in a -- in being a witness

23   publicly?

24   A     Well, they were a little nervous about coming forward,

25   because a lot of their personal things were going to be

1    aired.

2    Q    And did you personally deal with any who just said flat

3    out, look, I was a victim, but I just really don't want to be

4    involved in this particular matter?

5    A    Well, there was maybe one or two eventually that backed

6    away.

7    Q    Now, it was pointed out by Mr. Schwartz that you

8    contacted, along with Agent Watts, an individual by the name

9    of John Cleary.

10   A    That's correct.

11   Q    And, in fact, Mr. Cleary was interviewed in a telephone

12   interview where he was located out of state, correct?

13   A    Yes, with his attorney.

14   Q    Mr. Cleary had an attorney representing him who also

15   participated in the telephone interview?

16   A    That's correct.

17   Q    Now, Mr. Cleary -- this interview actually took place

18   after the indictment had come out and the Defendants had been

19   arrested in this case, or at least most of the Defendants had

20   already been arrested?

21   A    Yes, the one that we're dealing with with John Cleary,

22   Victoria Eli, was not yet arrested.

23   Q    And this interview took place about a month after the

24   Defendant, Rose Marks, and Cynthia Miller and Nancy Marks and

25   other members of the family had been arrested?

```
 1    A     That's correct, sir.

 2    Q     And at that time, Victoria Eli had not been located, and

 3    she was a fugitive?

 4    A     That's correct.

 5              MR. SCHWARTZ:  Objection, Your Honor.

 6              THE COURT:  Sustained.

 7              MR. SCHWARTZ:  Ask that it be stricken.

 8              THE COURT:  Disregard that statement, ladies and

 9    gentlemen.

10  BY MR. STEFIN:

11    Q     Well, Mr. Cleary in that interview, he did acknowledge

12    that he had given money to Victoria Eli, correct?

13    A     That's correct.

14    Q     In fact, he ultimately acknowledged that he had given

15    approximately $500,000 to Victoria Eli?

16    A     That's correct.

17    Q     And what was the stated purpose?  What was his

18    explanation for having given that amount of money to Victoria

19    Eli?

20    A     He's suffering from alcoholism and some other related

21    problems, and he felt that she could just speak to God and

22    that he was helping her -- helping him greatly.

23    Q     She was helping him?

24    A     Yeah.  And I believe, if I remember right, he was under

25    the impression the money was being donated.
```

1    Q    Did she tell him that money would have to be given as a

2    sacrifice in order to do the work --

3    A    Yes.

4    Q    -- for Mr. Cleary?

5    A    Yes.

6    Q    And did she also tell him that the money would not be

7    personally used by Ms. Eli?

8    A    Yes.

9    Q    But the money would be cleansed and eventually would be

10   donated?

11   A    Yes.

12   Q    And he was told that the donation he assumed was going

13   to go to a church?

14   A    Yes.

15   Q    And that Ms. Eli had represented that she had a gift

16   from God and was required to use that gift to help people

17   like Mr. Cleary?

18   A    That's correct.

19   Q    Did he also tell you that he was told that if he didn't

20   make the sacrifices, that something bad could happen to his

21   family?

22   A    That's correct.

23   Q    And was he also told that he shouldn't discuss, it was

24   not necessary to discuss the work that she was doing with

25   other people?

```
 1   A     That's correct.

 2   Q     And he also acknowledged that even though he had given

 3   $500,000, that he had never discussed this with his wife or

 4   anyone else?

 5   A     That's correct.

 6   Q     But Mr. Cleary in this interview with his lawyer

 7   indicated that he still believed in Victoria Eli and thought

 8   is that that she did -- that she was a psychic, so he was

 9   satisfied with her?

10   A     Yes.

11   Q     Did you do or say -- did you say anything to try to

12   convince him that he was actually a victim in this case?

13   A     No.  He was convinced that, you know, she was talking to

14   God, so . . .

15   Q     Do you recall in this conversation, did you try to

16   persuade him by telling him about negative information about

17   Ms. Eli, such as the fact that she actually has three

18   identities?

19   A     No, no.  I was -- somebody that's helping somebody, I

20   couldn't understand would have three different names, one

21   being Victoria Eli --

22           MR. SCHWARTZ:  I object, Judge.

23           THE COURT:  Sustained.

24   BY MR. STEFIN:

25   Q     But was this something that was discussed with
```

```
 1    Mr. Eli -- I'm sorry, Mr. Cleary?

 2    A    Yes.

 3    Q    And did Mr. Cleary tell you that the lawyer that was on

 4    the phone call was someone who had been referred to him

 5    through Victoria Eli?

 6    A    That's correct.

 7    Q    And do you recall him also stating that Ms. Eli had told

 8    him that the reason he was being contacted by Government was

 9    because she had some tax issues?

10    A    Yes.

11    Q    Not that she had an outstanding warrant for her arrest?

12    A    No.

13              MR. SCHWARTZ:  Objection.

14              THE COURT:  Sustained.

15              MR. SCHWARTZ:  I'd like to approach, Judge.

16              THE COURT:  Okay.

17       (The following proceedings were held at sidebar:)

18              MR. SCHWARTZ:  Judge, I objected last time when he

19    said that she was a fugitive.  Your Honor sustained my

20    objection and struck it from the record.  And Mr. Stefin

21    continues to do that.  I would therefore move for a mistrial.

22              THE COURT:  All right.  Well, I'm going to sustain

23    your objection.  If you wish, I'll instruct the jury to

24    disregard the statement, as I did the last time.  And

25    although I think it was an inappropriate question in view of
```

```
 1   my last ruling, I don't think it rises to the level that
 2   warrants a mistrial.  So I'll ask you whether you want me to
 3   instruct the jurors to disregard that, or to leave it be.
 4            MR. SCHWARTZ:  Unfortunately, I guess I have to ask
 5   Your Honor to leave it be, because I think instructing them
 6   again to disregard it just emphasizes it.
 7            MR. STEFIN:  And I'm --
 8            MR. BARDFELD:  Done.
 9            THE COURT:  If I sustain an objection, don't try
10   and backdoor it.  Okay?
11            MR. STEFIN:  I'm sorry.
12            THE COURT:  Thank you.
13        (Sidebar conference concluded.)
14            MR. STEFIN:  May I proceed?
15            THE COURT:  Yes.
16   BY MR. STEFIN:
17   Q    Now, you testified about the day you found Jude
18   Montassir in the hotel room in Boca Raton, Florida?
19   A    Yes, sir.
20   Q    And you've already related the things that she said to
21   you in that first meeting.  But you also -- one of the things
22   you mentioned that we didn't really go into was she, in
23   addition to the statements that she made about her son in
24   wanting to die, she also expressed some concern about a
25   friend of hers, a famous friend is what you said.
```

```
 1   A     That's correct.

 2   Q     And did you later learn -- or in that same conversation,

 3   did you learn the name of this person that she thought was

 4   her friend that she was talking about, or was it a subsequent

 5   conversation that you found out the name of this person?

 6   A     I believe it was a subsequent, the next day.

 7   Q     Who did you learn or who did she tell you this person

 8   she was concerned about?

 9   A     Brad Pitt.

10   Q     You say she was concerned about him.  What was she

11   concerned about?

12   A     I guess he was talking to Rose, too.

13   Q     That's what she's telling you?

14   A     Yes.

15   Q     And?

16   A     He's giving money, too.  So I think that's where she was

17   concerned, in finding all this out.

18   Q     Now, when you heard from her, when she told you that she

19   believed she was communicating with Brad Pitt, was that

20   something that you thought was completely ridiculous, or did

21   you consider that that was actually a possibility based on

22   her background?

23   A     I thought it was a real possibility, based on the fact

24   that she's a famous romance novelist, and I think at that

25   time she might have had 34 or 35 books on the New York Times
```

1   Best Seller List, and it's not unusual for somebody of that

2   status to be in that kind of circle.

3   Q    And how long did it take to realize that she was not

4   communicating -- apparently not communicating with Brad Pitt?

5   A    I know from our conversation on January 29, 2008, that

6   there was a possibility there that --

7   Q    You have to talk into the mike, because I'm losing you

8   now.

9   A    January 29th, when we did the undercover conversation?

10  Q    Well, you've talked about the undercover conversation a

11  few times, and we're going to talk about it in a minute, but,

12  I mean, did you go out and try to contact Brad Pitt to find

13  out if he was really talking to her, or did you realize that

14  this was not real some other way?

15  A    Well, I believe somewhere along the line Darren took

16  over the e-mails, too, so we kind of figured it out.  I was

17  kind of hoping that she was so Darren could talk to him and I

18  could talk to Angelina Jolie.

19  Q    Is that how you were going to divvy this up?

20  A    Yes.

21  Q    She also told you that she thought she had in the past

22  communicated with Colin Powell?

23  A    That is true, yes.

24  Q    And it was based on the information she furnished that

25  led you to finding a P.O. Box in Santa Fe, New Mexico, or

1    finding out there was a P.O. Box in Santa Fe, New Mexico?

2    A    Not for the -- for Brad Pitt, it was a P.O. Box in

3    Arizona.

4    Q    I'm sorry.  I stand corrected, an Arizona P.O. Box.

5    A    Yes.

6    Q    And had Ms. Montassir indicated when she was

7    communicating with the person she thought as Colin Powell,

8    that she was also sending the e-mails to an Arizona P.O. Box?

9    A    No, I don't recall that.

10   Q    At this point in time, did she have any copies of her

11   correspondence with Colin Powell that she was able to turn

12   over to you?

13   A    No.  I can say I didn't receive them.

14   Q    And you mentioned that Detective Ogden then took over or

15   participated in taking over her e-mail account to continue

16   the correspondence with whoever that person was?

17   A    Yes.

18   Q    And were you a participant to this, drafting responses

19   or drafting, you know, what to say to this person?

20   A    No, I think Darren was much better at it than I was.

21   Q    Was Ms. Montassir and Detective Ogden engaging in an

22   exercise of fictional writing to promote a future book of

23   Ms. Montassir?

24   A    No.

25             MR. SCHWARTZ:  Objection, it's two questions,

1    Judge.

2         THE COURT:  Overruled.

3    BY MR. STEFIN:

4    Q    Is your answer no to both questions?

5    A    Yes.

6    Q    Now, with regard to the books, Mr. Schwartz asked you

7    about a book called Scarlet Nights?

8    A    Yes.

9         MR. STEFIN:  May I approach, Your Honor?

10        THE COURT:  Yes.

11   BY MR. STEFIN:

12   Q    This is Defendant's exhibit 59, which indicates that the

13   paperback edition came out in June 2011?

14   A    Yes.

15   Q    And, again, this is the book in which she, in the

16   acknowledgment section of the book, talked about you and

17   thanked you for everything you had done, correct?

18   A    Yes.

19   Q    So this book came out June of 2011, which is about three

20   and a half years after you had first met Ms. Montassir and

21   you were well into the events that have been testified to in

22   this case?

23   A    I just want to make sure, because there was a hardback.

24   So I don't know if there's a difference when the hardback

25   comes out and when the soft cover comes back (sic).

```
 1   Q     Fair enough.

 2               But the book was written after the time that

 3   Ms. Montassir first met you?

 4   A     Yes.

 5   Q     And defense counsel -- I haven't read the book, but

 6   defense counsel says that there's some references to, I

 7   forget the name of the lady.  Mitzi?

 8   A     Yes.

 9   Q     Who's supposed to be a fortune teller in the book?

10   A     I guess.

11   Q     You haven't read it either, so what am I talking about?

12               But Ms. Montassir was asking you questions about

13   Gypsy culture?

14   A     No -- well, she asked me sometimes about the con, and

15   I'll be honest with you, I didn't even know it was about the

16   book, but I know she was talking -- she was doing something

17   with something to do with crime, because she was using Jason

18   Statham, and she would ask me, you know, in reference to cold

19   readings, what happens with the victim when they go inside,

20   what is the con.

21               So I explained to her that there's a number of

22   things that has to happen.

23   Q     And I don't mean to interrupt you, but she asked you

24   about cold readings, and when you first got involved in this

25   case, did you know much about the Roma or Romani culture or
```

1    their involvement in fortune telling in particular,

2    fraudulent schemes involving fortune telling?

3    A    Yes, I've known that for some time.

4    Q    And how had you learned about that?

5    A    Well, you know, first, the first important thing is that

6    in burglary, we learn about distraction burglaries.  And not

7    that every distraction burglary is done by a particular

8    group, but there is, at a certain time of year, that certain

9    clans come down and do distraction burglaries.

10   Q    And what do you mean by distraction burglary?

11   A    A distraction burglary would be that --

12            MR. SCHWARTZ:  Objection, relevance.

13            THE COURT:  Sustained.  Let's move off of this.

14   BY MR. STEFIN:

15   Q    Let's get back to -- explain what a cold reading is,

16   then, in the fortune telling parlance.

17   A    In the ofisa --

18   Q    The what?

19   A    Ofisa, the office.  When you go in and you sit down, you

20   can choose between a tarot card readings, a palm reading, a

21   spiritual reading, and sometimes in certain situations

22   they're asked for three wishes.  Two, you keep to --

23            MR. SCHWARTZ:  Object, Your Honor.

24            THE COURT:  Sustained.

25            Can we just not talk about what he knows about this

1    area?  Let's focus on this case.

2  BY MR. STEFIN:

3    Q    But you did furnish Ms. Montassir with information that

4  you had learned through your years of law enforcement

5  experience?

6    A    Yes.

7    Q    And, in fact, during the three and a half years or more

8  that you were involved in the investigation of this matter,

9  did you happen to speak with individuals who were members of

10  the Romani culture?

11   A    Yes.

12   Q    And one of those individuals was asked about -- that

13  defense counsel asked about, was a woman by the name of

14  Rosanne Stanley?

15   A    Yes.

16   Q    And she was a woman running a fortune-telling business

17  in New York?

18   A    Yes.

19   Q    Did she tell you about the fortune-telling business from

20  the side of the -- from the dishonest side of things?

21   A    Yes.

22   Q    Did she acknowledge that she herself had --

23            MR. SCHWARTZ:  Objection, Your Honor.

24            THE COURT:  Sustained.

25

1    BY MR. STEFIN:

2    Q    You were asked about your participation in a grand jury

3    investigation.  As part of an investigation, don't you

4    necessarily have to talk to people and interview them to get

5    information?

6    A    Yes.

7    Q    And in the course of talking to people, isn't it --

8    doesn't it get revealed the fact that you're conducting an

9    investigation?

10   A    Yes.

11   Q    And don't you serve grand jury subpoenas, a subpoena

12   which would tell the recipient of a subpoena that there's

13   obviously an investigation going on?

14   A    Yes.

15   Q    So you can't -- you obviously can't keep the existence

16   of an investigation a complete secret if you're going to

17   conduct an investigation, can you?

18   A    No, you can't.

19   Q    Now, you said from time to time you would talk to people

20   and ask them, look, you know, whether you're a witness or

21   not, please don't pass on the fact that we're conducting this

22   investigation?

23   A    That's correct.

24   Q    But people can do whatever they want with that

25   information.  They can listen to what you ask them to do or

 1    they can go, five minutes later, and make a phone call and

 2    tell the targets of the investigation that they're under

 3    investigation?

 4    A     That's true.

 5    Q     And those are the risks that you take when you go out

 6    and interview people?

 7    A     That's correct.

 8    Q     But isn't true to say that there are some people you may

 9    avoid talking to in the early stages of an investigation due

10    to the higher likelihood that those people might reveal the

11    existence of the investigation to the targets?

12    A     That's true.

13    Q     So, for example -- strike that.

14          Now, a grand jury secrecy refers to the fact that

15    you can't reveal to the outside world something that took

16    place in front of the grand jury?

17    A     That's true.

18    Q     But it doesn't refer to events that occurred outside the

19    grand jury room?

20    A     Right.

21    Q     Now, you were asked multiple questions about whether or

22    not you sought to confirm various statements that Jude

23    Montassir had told you about various stages of her life?

24    A     Yes.

25    Q     And you were asked specifically with regards to whether

1    or not in 2008 you made efforts to try to track down people

2    who might have witnessed an event that occurred in a

3    apartment lobby or place where Ms. Montassir lived back in

4    1991, I believe it was?

5    A    Yes.

6    Q    And did you find that to be a fruitful avenue for

7    investigation?

8    A    No.

9    Q    You indicated that you thought you were able to

10   corroborate much of what Ms. Montassir said simply by

11   arranging for her to have conversations with the Defendant,

12   Rose Marks?

13   A    That's correct.

14   Q    And, in fact, Ms. Montassir made a number of recordings

15   with Rose Marks?

16   A    That's correct.

17   Q    And you listened to these recordings after the fact,

18   after they had been made?

19   A    Yes.

20   Q    And in your view, did those conversations corroborate

21   much of what Ms. Montassir had been telling you?

22   A    Yes.

23   Q    Now, before you testified here today, in preparation for

24   your testimony, did you go back and either listen to the

25   tapes or review transcripts of the tapes again to refresh

```
 1   your memory as to the conversations that took place?

 2   A    Yes, I did.

 3   Q    And you mentioned specifically a conversation that took

 4   place on January 29th of 2008?

 5   A    That's correct.

 6   Q    Now, you mentioned that, and do you know which tapes the

 7   United States had offered into evidence in this case?

 8   A    (No response.)

 9   Q    Do you know what's on our exhibit list, Agent,

10   Detective?

11   A    No, no.

12   Q    So you may have been talking about a tape that we didn't

13   play before this jury?

14   A    That's true.

15   Q    But you did review the conversations of January 29th,

16   2008?

17   A    That's correct.

18             MR. STEFIN:  Your Honor, at this time, the United

19   States would like to offer into evidence Government's

20   exhibit 106-7A, which is the tape of the January 29th, 2008

21   conversations.

22             MR. SCHWARTZ:  No objection.

23             THE COURT:  Admitted without objection.

24      (Government's Exhibit No. 106-7A entered into evidence.)

25
```

BY MR. STEFIN:

Q    Now, your recollection -- and the tape will indicate the accuracy of this, but you recall that there was discussion with -- between Ms. Montassir and the Defendant regarding Brad Pitt?

A    Yes.

          MR. STEFIN:  Your Honor, at this time I'd like to publish 106-7A.  I do not have a transcript, and I only want to play the first several minutes of the tape.

          THE COURT:  All right.  You may proceed.

          MR. STEFIN:  I just need one minute.

     (Audio played.)

          MR. STEFIN:  That's all I have on that tape.

          Just one last question.

BY MR. STEFIN:

Q    This conversation took place on January 29th, so that was approximately two weeks after you first met with Jude Montassir?

A    That's correct.

Q    Was this the first conversation that was taped, or was there one that preceded it?

A    That's the first one.

          MR. STEFIN:  That's all I have on cross.

          THE COURT:  Thank you.

          Any redirect?

```
 1              MR. SCHWARTZ:  I'd say briefly, but no one would

 2    believe me.

 3                      Redirect Examination

 4    BY MR. SCHWARTZ:

 5    Q    Now, you said that the procedure you followed here

 6    regarding reports on cross-examination was your typical

 7    procedure regarding reports; is that correct?

 8    A    Yes.

 9    Q    Do you know a Sergeant Patrick French of the Criminal

10    Investigations Division?

11    A    Yes, he was my sergeant in violent crimes and robbery.

12    Q    And did he write your evaluation report?

13    A    Yes.

14    Q    And do you remember him saying Charlie's written reports

15    are always complete, concise, and turned in on time?

16    A    That's when I did written reports.

17    Q    And how about captain Kevin Sheehan (phonetic)?

18    A    He was my captain.  I believe he was my sergeant in

19    burglary.

20    Q    Did he become a captain?

21    A    I think he's a captain now, sir.

22    Q    Did he write in one of your evaluation supplements,

23    Detective Stack's reports are accurate, complete, and

24    concise, his reports are some of the most detailed I've ever

25    seen?
```

1    A     Yes.

2    Q     And in another year, I guess he's consistent, did he

3    also say your reports are factual, concise, and complete?

4    A     Yes.

5    Q     Do you know Sergeant Townsend?

6    A     Wow, we're going back to patrol.

7    Q     Do you know him?

8    A     Yes, sir.

9    Q     Did he write in your evaluation report, Officer Stack's

10   work product is well-written, listing the events,

11   chronological order and containing the elements of the crime?

12   A     Yes.

13   Q     And did he also say that you observed the rules and

14   regulations and procedures of the department consistently?

15   A     Yes.

16   Q     Let me draw your attention to Sergeant Brian McCoy.  Do

17   you know him?

18   A     Yes, sir.

19   Q     And he was your supervisor in or about June of 1996,

20   wasn't he?

21   A     Yes.

22   Q     Do you remember if he criticized you because you would

23   fall behind on your reports because you wanted to wait for

24   the last piece of information?

25   A     I don't remember that one, but if it's there, it's

1     there.

2              MR. SCHWARTZ:  Let me approach for a moment.

3              THE WITNESS:  He's referring to intelligence

4     reports, sir.

5     BY MR. SCHWARTZ:

6     Q     Right.

7     A     Intelligence reports don't get disseminated to the

8     public.

9     Q     But didn't he tell you that it's more important to have

10    the report in on time than to wait for the last piece of

11    information to do the report?

12    A     Yes, sir.

13    Q     But in this case you didn't do your reports

14    contemporaneously with the events, you waited for the last

15    piece of information?

16    A     This was an ongoing long investigation.  It's a longterm

17    investigation, which is a lot different than doing a robbery

18    report, that the robbery happens, and then immediately I go

19    in, I collect the evidence and then I start documenting what

20    officers are on the scene, what transpired, you know, things

21    like that.

22              When I did longterm investigations, as in the case

23    with Operation Georgetown, these cases take time, while

24    filming, we've got people in undercover houses, we're

25    videotaping, we're doing traps and traces, sometimes in some

```
 1    cases we're doing wiretapping.

 2            And the same thing in this case, I was recording

 3    conversations with members of the community, of the Romani

 4    community that was talking to me and then getting them

 5    transcribed, and I think I was also having -- not them

 6    transcribed, I should say the transcriptions of the victims'

 7    records and transcribed.

 8    Q    Well, let me ask you, is this the kind of answer you

 9    gave Mr. Stefin?

10            MR. STEFIN:  Objection.

11            THE COURT:  Sustained.

12    BY MR. SCHWARTZ:

13    Q    You mentioned you had other cases with members of the

14    Romani culture and Gypsies prior to this case; is that true?

15    A    No, I didn't have other cases.  We would have in our

16    burglaries -- you know, there were distraction burglaries --

17    Q    So you became aware --

18    A    Yes.

19    Q    -- of various other members of the Romani community?

20    A    Yes.

21    Q    In the course of this investigation, did you say you

22    interviewed many members of the Romani community?

23    A    Yes.

24    Q    And you had calls from many of them?

25    A    Yes.
```

```
 1    Q     You've already mentioned Sam Marks, and I think you
 2    mentioned on cross-examination and direct, Rosanna Stanley?
 3    A     Yes.
 4    Q     I mentioned someone before with a strange name, Gary
 5    Goon?
 6    A     Gary the Goon Alvarez.
 7    Q     Gary Alvarez?
 8    A     Yes.
 9    Q     Have you had conversations with him?
10    A     Yes.
11    Q     And you've recorded conversations with him, haven't you?
12    A     Yes.
13    Q     And Rosanna Stanley recorded conversations with him,
14    didn't she?
15    A     Yes.
16    Q     You said you didn't have time to invest and contact
17    everyone who you thought might be a victim in the case, on
18    cross-examination?
19    A     Yes.
20    Q     Well, you started this investigation in '07, right?
21    A     Yes, sir.
22    Q     And you got out of it sometime in 2011?
23    A     Yes, sir.
24    Q     You had four years on the investigation, right?
25    A     It's not my only case, sir.
```

```
1    Q    How many other cases were you working?

2    A    I was working a mortgage fraud case; a Ponzi scheme; and

3    then I was working a case involving a large embezzlement, one

4    of the like a chicken kitchen type of thing, restaurant

5    chain.

6    Q    Now, you said on direct examination of Mr. Stefin that

7    you thought it was possible --

8              MR. STEFIN:  Cross-examination.

9              MR. SCHWARTZ:  I'm sorry, cross-examination.

10   Sounded like direct.

11   BY MR. SCHWARTZ:

12   Q    With Mr. Stefin, that you thought it was possible that

13   Brad Pitt and Jude were having conversations; is that right?

14   A    I said that it sounded like they were having

15   conversations when she was talking to me.  Is that what

16   you're referring to?

17   Q    Yes.  Mr. Stefin asked you, did you think it was

18   possible that Jude knew and was having conversations with

19   Brad Pitt, and you said yes.

20   A    Yes.

21   Q    And did she tell you these were romantic conversations?

22   A    No, she just, you know, told us that she was having

23   conversations.  She turned over the conversation -- I mean,

24   the text things to us.  I know Darren did most of the reading

25   on them, sir, so I can't say for sure in detail what every
```

1   one of those things said.

2   Q    Well, did they appear to be romantic conversations?

3   A    Some did, I guess.  I don't know.  I'll be honest with

4   you, I don't remember reading those e-mails.

5   Q    And Jude was about 60, 5-foot, weighed about 200 pounds

6   at the time?

7   A    She's 4'11.  I would say, yes, about that, yes.

8   Q    And Brad Pitt was much younger, a multi-millionaire,

9   married to Angelina Jolie at the time, or with Angelina Jolie

10  at the time?

11  A    Well, with all due respect, if you go to the back of her

12  book cover, and you look at Jude Deveraux, and maybe they've

13  never met in person, and you're already making her out to be

14  a short, fat, dumpy woman.  And in the back of the book she

15  looks like a very attractive woman.

16  Q    Didn't you say something about describing what she

17  looked like when you came into the apartment?

18  A    No, you just said that how --

19  Q    I did, but I'm asking you back on your direct

20  examination, didn't you describe what she looked like when

21  you met her coming into the apartment?

22  A    Yes, but we're talking about what Brad Pitt would have

23  seen, because they never met.

24  Q    You were asked, and I objected that it was a two-part

25  question, on your cross-examination, whether this was --

1   whether you had any reason to believe that this was fictional

2   writing, and I forgot what the second part was, and you said

3   no.  Do you remember that?

4   A    Fictional writing between who?

5   Q    Between Jude and the person pretending to be Brad Pitt.

6   A    No, I believed that Jude really believed that she was

7   writing Brad Pitt.

8   Q    And when Detective Ogden was writing, that was fictional

9   writing?

10   A    Well, you may want to call that, I guess.  I don't know.

11   I'm not going to argue that point, sir.

12   Q    The conversation which we heard here, and I can play it

13   again for you if you don't remember it, but was Jude leading

14   Rose on to have a conversation about Brad Pitt; is that

15   right?

16   A    I don't know if you want to call it -- they sounded like

17   they were having a regular conversation to me.

18   Q    And had you had a meeting with Jude before the telephone

19   call?

20   A    We asked her to call Rose, and then just, you know,

21   strike up a conversation and talk about the things that you

22   would normally talk about.

23   Q    Did you ask her to talk about Brad Pitt?

24   A    Probably, yes.

25   Q    And she started talking about Brad Pitt?

1    A     Uh-huh.

2    Q     And if this was a regular type of conversation where

3    Jude and Rose talked in a fantasy conversation about Brad

4    Pitt's life, would that fit into the conversation they were

5    having?

6    A     I don't know.  I just know that that conversation we had

7    that day would be, Rose didn't know that we were taping that

8    conversation.

9    Q     Of course not.

10   A     So I wanted to catch that moment in time on how Rose was

11   speaking with Jude.

12   Q     Okay.  And --

13   A     And also to confirm the fact that she's talking about

14   Brad Pitt.

15   Q     And if they had, for months and months and months, been

16   having these fantasy conversations to help Jude with her

17   writing, would this conversation be inconsistent with that

18   type of a scenario?

19           MR. STEFIN:  Objection.

20           THE COURT:  Overruled.  You can answer.

21           THE WITNESS:  From the conversations -- I mean, the

22   only way I can answer that is from January all the way until

23   August 14th, '08, Rose Marks never mentions anything about

24   anything fictional about Brad Pitt.  She talks about giving

25   Jude back her money.  We spent seven months with undercover

```
1    conversations between Brad Pitt, body transfers, and in that

2    seven-month period, there's nothing about book contracts,

3    there's nothing about, this is a writing exercise.  As a

4    matter of fact, in one of the conversations, Jude gets upset

5    about how dare Brad tell her how to write.

6   BY MR. SCHWARTZ:

7    Q    Well, let me cover some of these things you've raised.

8    By the way, are you reading from something?

9    A    Oh, no, sir.  This is what I have right here.  You want

10   to examine it, sir?

11   Q    No, I'm just asking you.  I assume you're telling the

12   truth.

13   A    I didn't say you thought I was lying, I just wanted to

14   make sure you wanted to see.

15   Q    I don't want to examine your tissue.

16        You talked about conversations, and if these were

17   fantasy conversations and they were into the role playing,

18   why would they discuss the fact that they were into role

19   playing?

20        MR. STEFIN:  Objection, Your Honor.

21        THE COURT:  Sustained.

22   BY MR. SCHWARTZ:

23   Q    You say that Jude also asked for her money back?

24   A    Yes.

25   Q    And she told Rose that Rose had promised to give her her
```

```
 1    money back, right?

 2    A    Yes.

 3    Q    And did Rose acknowledge that she had made a promise to

 4    give money back?

 5    A    Yes.

 6              And the gold, too.

 7    Q    And the gold, too.

 8    A    Yes.

 9    Q    And she acknowledged this?

10    A    Yes.

11    Q    And did you know that in her tax return, Rose treated

12    some of this money from Jude as income, some of it as gifts,

13    and some of as loans, which she would have to give back?

14              MR. STEFIN:  Objection.

15              THE COURT:  Sustained.

16    BY MR. SCHWARTZ:

17    Q    Jude asked you questions about certain life experiences

18    that you had had so she could use them in your books; is that

19    right?

20    A    I don't know if she used them in the book or not, but

21    she would ask me about, you know, my undercover experiences,

22    because in Operation Georgetown, she thought it was a little

23    bit fascinating, because I was undercover as a black Jamaican

24    male, and I had infiltrated the group.

25    Q    Was this on the telephone?
```

```
 1   A     No, sir.  I got a picture right here if you want to see

 2   it.

 3   Q     I would suggest that you share it with the folks in the

 4   back.

 5         Do I have to say "yeah mon"?

 6         Anyway, the question I have for you about this is,

 7   you testified that Jude asked you about fortune tellers, and

 8   you at least now know that there was a fortune teller by the

 9   name of Mitzi in Scarlet Nights?

10   A     Was there a fortune teller?

11   Q     I'm asking you.  If you don't know, say you don't know.

12   A     I don't know.

13         I know she said she acknowledged in the paper, I

14   know there was an acknowledgment that Scarlet Nights kind of

15   represented what she had gone through.  So I don't know so

16   much as if she particularly made it fortune tellers.  I'm not

17   really sure, sir.

18   Q     And did you discuss with her that many of her books

19   between 1993 or '4 and 2007 were based on information about

20   psychics and psychic readings and life exchanges and things

21   of that sort?

22         MR. STEFIN:  Objection.

23         THE COURT:  Sustained.

24         MR. SCHWARTZ:  I just asked if he talked to her

25   about it, Judge.
```

```
 1              THE COURT:  Well, what does this have to do with

 2   redirect?

 3              MR. SCHWARTZ:  Okay.

 4   BY MR. SCHWARTZ:

 5   Q    You talked about life exchange or exchanging bodies.

 6   You remember that?

 7   A    The body transfer?

 8              MR. STEFIN:  Objection.

 9              THE COURT:  I'm sorry?

10              MR. STEFIN:  Objection.

11              THE COURT:  What's the objection?

12              MR. STEFIN:  Relevance.

13              THE COURT:  Overruled.

14              MR. STEFIN:  Beyond the scope.

15   BY MR. SCHWARTZ:

16   Q    On cross-examination you talked about that, right?

17   A    Well, we mentioned it, yes.

18   Q    Were you aware that that was a theme in one of Jude's

19   books?

20              MR. STEFIN:  Objection.

21              THE COURT:  Sustained.

22   BY MR. SCHWARTZ:

23   Q    You said you spoke to a number of members of the Romani

24   culture.  Was one of them someone named Poochie?

25   A    Poochie Yawonowich (phonetic)?
```

```
 1    Q    Yeah.

 2    A    If it's documented in my recordings, I talked to so many

 3    people I can't remember anymore.

 4    Q    On the tape we heard Jude tell Rose that she was broke

 5    and had no food to eat.  Do you remember that?

 6    A    Yes.

 7    Q    Were you aware that at the time, Jude had a bank account

 8    with $1.4 million in it?

 9              MR. STEFIN:  Objection.

10              THE COURT:  Sustained.

11    BY MR. SCHWARTZ:

12    Q    Did you tell Jude to tell Rose that she was broke and

13    had no food to eat?

14    A    No, I think that she did that on her own.

15    Q    To your knowledge, was Jude at that time broke with no

16    food to eat?

17              MR. STEFIN:  Objection.

18              THE COURT:  Overruled.

19              You can answer if you know.

20              THE WITNESS:  The only thing I know is that I

21    believe on January 15th, she made a wire of 3700, and I think

22    she had, like, 37,000 in the bank.  Now, if some money had

23    moved from pocketbooks to her bank account, I have no idea.

24    BY MR. SCHWARTZ:

25    Q    So to your knowledge, she was not broke with no food to
```

```
 1    eat at that time?

 2    A    I don't know, sir.

 3              MR. SCHWARTZ:  May I have a moment, Your Honor?

 4              THE COURT:  Yes.

 5    BY MR. SCHWARTZ:

 6    Q    Last question:  Were you aware that Scarlet Nights was

 7    published in hardback in or around January of 2010?

 8    A    I know it came out sometime in 2010, but I'm not sure

 9    about January, sir.

10              MR. SCHWARTZ:  No other questions.

11              THE COURT:  Thank you, sir.

12              MR. STEFIN:  May I?  Just a couple.

13              MR. SCHWARTZ:  Sounds like my statement.

14              THE COURT:  We'll see.  Go ahead.  As long as it's

15    recross and not --

16              MR. STEFIN:  Well, it's topics that were covered,

17    but maybe not relevant.

18                         Recross-examination

19    BY MR. STEFIN:

20    Q    Black Jamaican male, sir?

21    A    Yes, sir.

22    Q    Do you have a photograph?  Is it with you or did you

23    leave it out?

24    A    No, it's with me.

25    Q    May I?
```

```
 1   A      The only reason I brought this is because --

 2              MR. SCHWARTZ:  Objection, relevance.

 3              THE COURT:  Sustained.

 4              It's interesting, but --

 5              MR. STEFIN:  It is, I have to admit.

 6   BY MR. STEFIN:

 7   Q      The photograph you mentioned of Ms. Montassir on the

 8   Government's -- Defendant's exhibit 59, may I publish?

 9              THE COURT:  Yes.

10   BY MR. STEFIN:

11   Q      That's what you're referring to, sir?

12   A      Yes.

13              MR. STEFIN:  That's all.

14              THE COURT:  Thank you, sir.

15              THE WITNESS:  Am I done, Your Honor?

16              THE COURT:  Yes.

17              Should we take a recess?

18              MR. SCHWARTZ:  I think we should.

19              THE COURT:  Ladies and gentlemen, let's take a

20   recess, 10 or 15 minutes.  We'll let you know when we finish,

21   how we're proceeding.  All right?  Thank you.  Don't discuss

22   the case or form any opinions.

23          (The jury exits the courtroom.)

24              THE COURT:  Where are we now?

25              MR. SCHWARTZ:  Your Honor, I'm going to read this,
```

```
 1    but I'll type it up subsequent.
 2            We have a stipulation that if Professor Anne
 3    Sutherland were called as a witness, she would be qualified
 4    as an expert on Romani, paren, Gypsy culture, and she would
 5    testify that in some family groups, Gypsy mothers train their
 6    daughters from an early age to be fortune tellers --
 7            THE COURT:  I'm sorry.  Can I interrupt for a
 8    second?
 9            MR. SCHWARTZ:  I'm going to read it to the jury.
10            THE COURT:  So we don't need to read it twice.
11            So you're going to read that.  That's a
12    stipulation?
13            MR. STEFIN:  Yes, Your Honor.
14            THE COURT:  Anything else that we're going to
15    present?
16            MR. SCHWARTZ:  I have no other witnesses at this
17    time, Your Honor.  I assume you want to ask Mrs. Marks some
18    questions.
19            THE COURT:  Yes.  I also want to know before I do,
20    is the Government going to have any rebuttal?
21            MR. STEFIN:  No.
22            THE COURT:  Ms. Marks, can you just raise your
23    right hand for me, please.
24            Your name, please?
25            THE DEFENDANT:  Rose Marks, alias Joyce Michaels.
```

```
 1              THE COURT:  Ms. Marks, you've been here throughout
 2    the trial, correct?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Okay.  Your attorney has just advised
 5    me that you intend to rest your case, which means you're not
 6    going to testify; is that correct?
 7              THE DEFENDANT:  Do I have to answer that right now?
 8              THE COURT:  Well, I mean, we need to know what your
 9    decision is going to be.
10              THE DEFENDANT:  Can I have a little bit of time to
11    think about it?  I wasn't told that you were going to ask me
12    this question right this minute, Your Honor.
13              THE COURT:  Okay.  Well, yes, you can have sometime
14    to think about it, but I need to know what your decision is,
15    whether it is to testify or not.  And so I just want to --
16    that's why I'm asking you the questions.  I understood from
17    your attorney that he was -- didn't have any other witnesses,
18    so I made the assumption, maybe incorrectly, that that meant
19    you were not going to testify.
20              THE DEFENDANT:  Because I just found out --
21              THE COURT:  I don't want you to say anything other
22    than you need some time.  Talk to your attorney, and then
23    we'll talk about it again when you're ready.  Okay?
24              THE DEFENDANT:  Okay.  Thank you.
25              THE COURT:  All right.  So let's take a recess, and
```

```
 1    we'll go from there.

 2         (A recess was taken from 4:21 p.m. to 4:34 p.m., after

 3    which the following proceedings were had:)

 4              THE COURT:  All right.  We're back on the record.

 5    Ms. Marks is present with counsel.

 6              Do you need more time to speak with your client,

 7    Mr. Schwartz?

 8              MR. SCHWARTZ:  I do, and I don't know that she's

 9    going to make a decision immediately.  We've had a number of

10    conversations about the possibility of her testifying, and I

11    assumed that we had reached a decision, and in Mrs. Marks'

12    mind we haven't.

13              THE COURT:  Here's what we'll do.  We'll excuse the

14    jurors.  She can have overnight I guess to decide, and

15    tomorrow morning we'll know the answer.  She will have to

16    make a decision by tomorrow morning, one way or the other.

17    I'm not going to keep the jury here, and I don't want to

18    pressure her, feel like she's under pressure to make a

19    decision in short notice, although she's had weeks to think

20    about this.  But, still, I'm not going to put her in a

21    situation where she feels like she's under pressure to have

22    to make a decision on very short notice.

23              So we'll excuse the jurors.  I guess we should

24    discuss what time to let the jurors come back.  We still have

25    some issues about jury instructions to deal with, which
```

1    hopefully we can resolve this evening, and hopefully, we'll

2    have the jury instructions in order, one way or the other.

3    If she testifies, we have to make some changes.  If she

4    doesn't testify, we can leave it the way they are.

5           That would be the, hopefully, only change we have

6    to make if we can kind of resolve all the other issues this

7    evening.  So then we could either put her on and then close

8    the case, or start off tomorrow morning closing the case if

9    she decides not to testify.  Any problem with that?

10          MR. SCHWARTZ:  Let me confer with my client, Your

11   Honor.

12       (Brief pause in proceedings.)

13          MR. SCHWARTZ:  Your Honor, Ms. Marks would like to

14   ask you a question, if she could.

15          THE COURT:  I'd rather you ask through your

16   attorney.  I don't feel comfortable you asking me directly.

17   So it makes more sense for you to talk to your lawyer first

18   and see if he thinks it's a good question for you to ask me.

19          MR. SCHWARTZ:  Your Honor, although we've gone over

20   a number of things, Mrs. Marks doesn't feel that she's ready

21   yet to be able to testify, if she's going to testify.  She

22   feels that there are more things that she and I need to go

23   over if she wants to testify, and frankly, Judge -- I

24   shouldn't say frankly.  Judge, I assumed that she wasn't

25   going to testify, so I didn't finish preparing her to

```
 1    testify, and reviewing items.  We started, but we never

 2    finished.

 3              THE COURT:  Okay.

 4              MR. SCHWARTZ:  She's asking if she could have a

 5    little more time before she decides when we review matters.

 6              THE COURT:  I mean, a little more time.  What does

 7    that mean?  I'm saying 'til tomorrow she can have.  What's

 8    wrong with 'til tomorrow?  Is that -- that's not enough time

 9    to decide, tomorrow morning?

10              MR. SCHWARTZ:  Well, it may be enough time to

11    decide, but if she decides she wants to testify, she feels

12    she needs a little more time to prepare to testify.

13              THE COURT:  And how much time does she feel she

14    needs to prepare to testify?  Assuming she decides she wants

15    to testify?

16              MR. SCHWARTZ:  May we have a few more minutes,

17    Judge?

18              THE COURT:  Yes.  Why don't you go outside and

19    discuss it privately.

20        (A recess was taken from 4:38 p.m. to 4:43 p.m., after

21    which the following proceedings were had:)

22              THE COURT:  We're back on the record.  Ms. Marks is

23    present with counsel.

24              MR. SCHWARTZ:  Your Honor, thank you for giving us

25    the leeway to come back and make that decision tomorrow
```

```
 1    morning.
 2          THE COURT:  Okay.  And it's going to be she
 3    testifies tomorrow or we go to closing.
 4          MR. SCHWARTZ:  I believe so, but I need to wait
 5    'til tomorrow morning to talk to my client.
 6          THE COURT:  Yeah, I understand, but I don't want to
 7    mislead anyone to think that if she comes back tomorrow and
 8    says she wants to testify, I need more time to -- before we
 9    start the testimony.  I'm not inclined to do that.
10          MR. SCHWARTZ:  I think Ms. Marks hears you, Your
11    Honor.
12          THE COURT:  Okay.  All right.  So let's bring the
13    jurors in.
14          Oh, what time do we want them to come back so we
15    can make sure we're ready to go?  You think we're going to be
16    able to wrap everything else up one way or the other tonight?
17          MR. SCHWARTZ:  You mean on the questions of --
18          THE COURT:  Jury instructions.
19          MR. SCHWARTZ:  I think we could finish up the jury
20    instructions tonight, Judge.
21          THE COURT:  Okay.  So why don't I ask them to come
22    back at 9:30 tomorrow.  Okay?  Just in case we need more time
23    tomorrow if the Defendant decides not to testify and we are
24    going to go to closing arguments and make sure we have
25    everything lined up so we don't have the jurors waiting.
```

```
 1    Sometimes there are delays.  Does that make sense?

 2              MR. SCHWARTZ:  Yes, Judge.

 3              THE COURT:  How much time do you think, assuming

 4    we're going to close the case either tomorrow -- how much

 5    time are you going to need for your closing, Government?

 6              MR. STEFIN:  The United States at this point would

 7    ask for 90 minutes total.

 8              THE COURT:  And how much?

 9              MR. SCHWARTZ:  I don't want to seem like I talk a

10    lot, Judge, but I was going to ask for two and a half hours.

11              THE COURT:  Two and a half hours?

12              MR. SCHWARTZ:  Yes.  I might take less, but there

13    was a lot of evidence submitted over a period of more than

14    four weeks.

15              THE COURT:  Okay.  All right.  Let's tell the jury

16    9:30.  We'll bring the jurors in.

17              MR. SCHWARTZ:  And also, they didn't finish going

18    over the exhibits yesterday, so I guess they'll have to do

19    that tomorrow morning, or tonight.

20              THE COURT:  Okay.  So do you want to read the

21    stipulation now, Mr. Schwartz, and then we'll excuse the

22    jurors?  Does that make sense?

23              MR. SCHWARTZ:  That's fine, Judge.

24              THE COURT:  But there's no other evidence.  Either

25    your client or not, and that will be the end?
```

```
 1              MR. SCHWARTZ:  That's correct.

 2              I'd like to reserve if I find that some document

 3    that hasn't been admitted yet, then I assume Mr. Stefin does,

 4    too.

 5              THE COURT:  Okay.

 6              MR. SCHWARTZ:  Until tomorrow.

 7              THE COURT:  But no other witnesses?

 8              MR. SCHWARTZ:  Correct.

 9       (The jury enters the courtroom, after which the following

10    proceedings were had:)

11              THE COURT:  Welcome back, everyone.  Please be

12    seated, ladies and gentlemen.

13              All right.  Sorry for the delay, but we were,

14    again, trying to figure out logistically how to go forward

15    from here.  And Mr. Schwartz has some additional evidence he

16    wants to present.

17              MR. SCHWARTZ:  Your Honor, Mr. Stefin, on behalf of

18    the Government, and I entered into the following stipulation,

19    and we'd ask to read it to the jury, and we'll do a typed

20    stipulation to be included with the evidence:

21              "If Professor Anne Sutherland were called as a

22    witness, she would be qualified as an expert in Romani, or

23    Gypsy culture.  And she would testify that in some family

24    groups, Gypsy mothers train their daughters from an early age

25    to be fortune tellers.
```

```
 1                 "Second, that Gypsy families tend to share money

 2      between adult family members more than the average American

 3      family does."

 4                 And we'll reduce it to a typed version.

 5                 THE COURT:  All right.  Again, ladies and

 6      gentlemen, that's evidence that you can consider in rendering

 7      your verdict in the case.

 8                 Again, in view of the time, ladies and gentlemen,

 9      we're not going to have anything else for you this evening.

10      So I'm going to again thank you for your cooperation, ask you

11      not to discuss the case or form any opinions, leave

12      everything at your seat, and if you can be back tomorrow at

13      9:30, and we'll start at that time.

14                 Thank you.  9:30.  9:30 tomorrow, all right?

15                 Thank you.  Have a nice evening.

16         (The jury exits the courtroom.)

17                 THE COURT:  Please be seated, everyone.

18                 All right.  Should we try and finish up on the jury

19      instructions?  Does that make sense?

20                 Let me just tell you some of what I've concluded

21      after thinking about what we've talked about yesterday and

22      looking at the submissions, and we can narrow down what's

23      still left to resolve.

24                 First of all, on page, I believe it's seven, but

25      anyway, it's the introduction to the substantive
```

1    instructions.  I think it's on my packet, page 7.  I don't

2    know if it's the Government's packet.

3           We have to change where it said counts 3 through

4    10, it has to be 4 through 10, because three has been

5    dismissed.  And then it talks about, I believe somewhere it

6    mentions that there are 15 counts.  No, I'm sorry, that's the

7    wrong page.

8           MR. STEFIN:  Page 15, introduction.

9           THE COURT:  Also page 9.  It says the indictment

10   charged 15 separate counts.  That should be 14, because three

11   has been dismissed.

12          MR. STEFIN:  So then the second paragraph would say

13   counts four through 10 charge wire fraud?

14          THE COURT:  Yes.  It should be four through 10 on

15   page 9.  So that's a very minor matter.

16          When we were talking yesterday about the issue of

17   whether or not the fraud statute protects the gullible and

18   the naive, and adding that language to the jury instruction,

19   and then the Defendant wanted some, I guess, counterpart to

20   that.  I reread the standard instruction, and the standard

21   instruction says, for example, in the -- I think it's

22   page 13, where it defines material fact, the last sentence of

23   that paragraph says:

24          "It doesn't matter whether the decision-maker

25   actually relied on the statement or knew or should have known

```
 1    that the statement was false."
 2              It seems that that really encompasses the whole
 3    concept that we're talking about or have been talking about,
 4    the gullible or the -- someone who knew about -- even if you
 5    knew that it was fraudulent, or if you should have known,
 6    which was the negligence instruction that the Government
 7    prepared, "negligence is not a defense to a criminal act,"
 8    why isn't that encompassed in the standard instruction?
 9              MR. STEFIN:  I just think --
10              THE COURT:  I know it's more explicit.
11              MR. STEFIN:  It's a little more explicit, it's a
12    little more expansive, and this is one of these odd cases
13    where the initial reaction from anybody hearing this case,
14    and I've heard this from the beginning of this matter, is
15    like what's wrong with these people and how stupid can you
16    be.  And I just want to be able to, even in a sentence or
17    two, explain that the language in one of the cases, the law
18    protects the naive as well as the gullible.  Something along
19    those lines.
20              I think it's an accurate statement of the law, but
21    it just reinforces the fact that there is no contributory
22    negligence theory in criminal law.
23              THE COURT:  The standard jury instructions, in the
24    comments it makes specific reference to the Svette case.  So
25    when they drafted this they were aware of that decision.  So
```

```
1    I guess I'm a little bit concerned about modifying the

2    standard instruction favorable to the Government.

3               MR. STEFIN:  What number is that, Judge, that

4    you're looking at?  Because I don't --

5               THE COURT:  The standard instruction or the page?

6               MR. STEFIN:  Yeah, because the page -- my pages are

7    completely different, so I've lost --

8               THE COURT:  It's 50, I think, .1.  Let me double

9    check.

10              51 is wire fraud, 50.1 is mail fraud, and they

11   both, I believe, have the same definition of material fact,

12   which includes the sentence I just read.  And as I've

13   mentioned, they both mention the Svette, S-v-e-t-t-e for the

14   reporter, decision of the Eleventh Circuit.

15              So, anyway, I just -- I'm just raising that because

16   I'm somewhat concerned about modifying a standard instruction

17   that might appear to be favorable to the Government over the

18   Defendant's objection and what issues it might cause, when

19   you can point to that sentence to make the argument that you

20   want to make.  And I think, Mr. Schwartz would agree that it

21   would be objectionable for him to argue in closing that these

22   people got what they deserved.  I mean, if they were stupid

23   enough to give her the money, then that's their problem.

24              I mean, you're not -- you're certainly not going to

25   make any argument like that.
```

```
 1              MR. SCHWARTZ:  I had a whole half hour for caveat
 2    emptor, Your Honor.
 3              No, I'm not going to make that argument.  I said
 4    that yesterday.
 5              THE COURT:  So I think with that combination of
 6    he's not going to make the argument and you have the right to
 7    point that out to the jurors, with this language in the
 8    instruction, I'm a little bit --
 9              MR. STEFIN:  I'm sorry, I just wanted to grab
10    something while we're talking.
11              THE COURT:  Yeah, I'm just a little concerned about
12    whether I should add that to the standard instructions.
13              MR. STEFIN:  I understand the Court's position.  I
14    think as long as it's an accurate statement of the law we're
15    in safe grounds, and, you know, maybe I can come up with one
16    sentence to add to it, and maybe the Court will agree to it,
17    or maybe the Court will think that that's sufficient.
18              But what bothers me about the standard, off the
19    bat, is it says a material fact is a important fact that a
20    reasonable person would use to decide whether to do or not to
21    do something.  And again, the law, the cases have clarified
22    that, because there was this body of law before that which
23    talked about what a reasonable person would do, and so it was
24    an objective standard.
25              So a reasonable -- you know, one would argue that
```

```
 1    none of these people were reasonable, so they shouldn't have

 2    relied upon any of these representations.

 3              MR. SCHWARTZ:  And I think the instruction --

 4              THE COURT:  I'm sorry, I didn't mean to interrupt

 5    you, but there's a difference between a material fact which

 6    has a reasonable standard, meaning that what's represented

 7    has to be important to a reasonable person.  For example, I'm

 8    going to give you the money back.  That would be, you know,

 9    probably, I would think, arguable that that's a material

10    fact, that I'm going to give you the money back is a material

11    fact, or I'm not going to spend the money, I'm going to keep

12    it in a safe place.  Those are material facts because a

13    reasonable person would rely on that kind of representation.

14              But in terms of whether it's fraudulent or not,

15    it's not -- you don't have a reasonableness standard.  It's

16    whether or not it was fraudulent, yes or no.  Was there an

17    intent to defraud?  Yes or no.  Doesn't matter if you

18    actually believe it or if you should not have believed it.

19    If it's fraudulent, it's fraudulent.

20              Anyway, that's, I think, the distinction, and

21    that's what I think the cases talk about in terms of

22    distinguishing the objective standard of what's a material

23    fact versus the nonobjective standard of whether it's

24    fraudulent.

25              MR. SCHWARTZ:  Your Honor, I think if I recollect
```

```
 1   correctly, that the committee that revised the pattern jury

 2   instructions in 2010 relied on the Svette case to modify and

 3   add that sentence that Your Honor pointed out to the standard

 4   instruction.

 5            THE COURT:  That's why I think it's -- that's why

 6   I'm raising the issue in terms of my hesitancy to modify what

 7   arguably could be an issue on appeal, that I modified the

 8   standard instruction favorable to the Government.

 9            Anyway, at this point I'm not going to do it.  If

10   you want to present to me something tomorrow, I guess I'll

11   reconsider.

12            I am going to give the good faith defense

13   instruction, not the good faith reliance instruction.  So I'm

14   going to include that.  I think we still have to talk about

15   the issue of loan, gift, which I know the Government has

16   submitted a proposed instruction; and we have to talk about

17   the other defense instruction that's been presented with the

18   issue about First Amendment protection.  And I'm still not

19   sure what the relevance of that instruction is.

20            So why don't we talk about the proposed instruction

21   from the Government regarding a definition of tax -- a gift,

22   I'm sorry, and loan and all of those various things that the

23   Government submitted.

24            Have you seen that, Mr. Schwartz?

25            MR. SCHWARTZ:  I think Mr. Stefin handed it to me
```

1   this morning, and I really didn't get a chance to look at it,

2   Judge.  Or e-mailed it to me last night.

3               THE COURT:  Have you had a chance to review it?

4               MR. SCHWARTZ:  Yes, I have no objection to the

5   first sentence, Your Honor.

6               THE COURT:  All right.  What about the first

7   sentence and then also the   second and third sentence up to

8   the word "advances"?

9               MR. SCHWARTZ:  I have no objection to that either,

10  Judge.

11              MR. STEFIN:  Well, I think subjective intent is

12  really important to the whole idea of a loan because there

13  has to be a meeting of the minds on such an agreement.  So I

14  wouldn't mind if the Court eliminated, you know, my -- all

15  the subparagraphs but just took it all the way to the end of

16  that sentence, "advances, comma including the subjective

17  intent of the parties, period," and end there, if the Court

18  thinks the rest of it is too wordy.

19              MR. SCHWARTZ:  Actually, I have no objection to

20  that sentence -- that subjective intent of the parties

21  either.

22              THE COURT:  All right.  So what I would propose is

23  that on the Government's tax instruction, where the

24  Government has included the, what we discussed yesterday:

25  "An unlawful gain, as well as a lawful one, constitutes

```
 1   taxable income when its recipient has such control over it

 2   that as a practical matter she derives readily realizable

 3   economic value from it."

 4           I think we add there:  "However, gross income does

 5   not include," and I would say it should -- I think it should

 6   say the value of --

 7               MR. STEFIN:  It's a type O.

 8               THE COURT:  I would say property or money.

 9               MR. SCHWARTZ:  Correct.

10               THE COURT:  Because they may make a distinction in

11   their mind between property and money.  I think it should

12   cover property or money acquired by gift, bequest, devise or

13   inheritance.  Property or money received from a bona fide

14   loan is not taxable.  The presence of a bona fide loan is

15   determined, et cetera, as we discussed up to that.  Put that

16   right after that sentence that the Government included.

17           Do you have a problem with that, Mr. Schwartz?

18               MR. SCHWARTZ:  I don't, Judge.

19               THE COURT:  Do you have a problem with that?

20               MR. STEFIN:  No, Your Honor.

21               THE COURT:  So we'll add that here.

22           I think the only issue other is this instruction

23   the defense wanted regarding the First Amendment protections,

24   and unless there's some other outstanding issues that we

25   haven't talked about.
```

 1              MR. SCHWARTZ:  I don't know.  I think we discussed

 2     it yesterday, but if we didn't, the 404(b) instruction.

 3              THE COURT:  I'm including that.  That's in here.

 4     The good faith is in.

 5              MR. SCHWARTZ:  And you gave an instruction

 6     regarding how to utilize transcripts.

 7              THE COURT:  I can include that, too.

 8              MR. SCHWARTZ:  I think since there are transcripts

 9     in the case, I'd ask Your Honor to include that instruction

10     also.

11              THE COURT:  Okay.  I'll include the transcript

12     instruction.

13              MR. STEFIN:  Judge, I don't know if you noticed on

14     proposed instruction 17, which is the willfully filing a

15     materially false tax return, I submitted last night that

16     instruction with one slight modification, or proposed

17     modification.

18              THE COURT:  Yeah, I saw that you added how it can

19     be established through circumstantial evidence?

20              MR. STEFIN:  Right.

21              THE COURT:  I'm not inclined to include that.  We

22     already tell the jurors up front in the introductory

23     instructions that they can rely on direct and circumstantial

24     evidence, and you can argue this, but I don't think I want to

25     put it in an instruction.

```
 1                MR. STEFIN:  Okay.

 2                THE COURT:  I think the only outstanding issue is

 3     the defense requested instruction for this First

 4     Amendment-related issue, and actually, I don't have a copy in

 5     front of me.  I don't know why, but . . .

 6                MR. SCHWARTZ:  May I approach?

 7                THE COURT:  Yes.

 8                I haven't had a chance to review the motion that

 9     was filed that you directed me to.  So do you, Mr. Stefin or

10     Mr. Bardfeld, do you know about these cases that he's --

11                MR. STEFIN:  No.

12                THE COURT:  -- referring you to that talks about

13     the fortune telling being an exercise of free speech?

14                MR. SCHWARTZ:  I think Judge Hopkins made a report

15     and recommendation to deny the motion filed by Gottlieb

16     because the Government in its response conceded that this was

17     not about~-- the case was not about fortune telling or

18     psychic ability or things of that sort that I cite in that

19     paragraph, but rather was about taking money, laundering, or

20     cleansing it and promising to return it and not return it.

21                I'm quoting approximately from their response.

22                MR. STEFIN:  Judge, I'd -- and, again, I haven't

23     seen these cases, but they had a witness, a lawyer, come in

24     and testify that they were able to obtain occupational

25     licenses based on overcoming objections by municipalities on
```

```
 1    First Amendment grounds.  So they have that evidence in to
 2    argue that to the jury, but to kind of put some kind of stamp
 3    of legitimacy on the activity of these Defendants, it really
 4    I don't think would be appropriate.
 5            THE COURT:  I guess I'll reserve it.  I want to
 6    read those cases and we can talk about this tomorrow morning
 7    when we come back.
 8            Are there any other jury instruction matters that
 9    we need to talk about?
10            MR. SCHWARTZ:  None, Your Honor.
11            THE COURT:  Mr. Stefin?
12            MR. STEFIN:  No, Your Honor.
13            THE COURT:  Okay.  All right.
14            So let me look at this over the evening, and then
15    we'll -- why don't we get back at 9:00 o'clock tomorrow, even
16    though the jurors are coming back at 9:30.  If we can get
17    back at 9:00 so we can figure out where we are with the
18    Defendant, whether she's going to testify or not.  If she's
19    not, then everybody can rest, we can deal with any last
20    minute matters, and put everything in order to start closing
21    arguments.  If she's going to testify, then we'll go from
22    there.
23            Does that make sense?
24            MR. SCHWARTZ:  Yes, sir.
25            THE COURT:  Okay.  All right.  So we'll see you
```

1    tomorrow at 9:00.

2              Thank you.  Have a good evening.

3         (The evening recess was taken at 5:11 p.m.)

4                        *  *  *  *  *

```
1                           * * * * *

2                         I N D E X

3   Testimony of Charles John Stack

4             Direct by Mr. Schwartz

5             Cross by Mr. Stefin

6             Redirect by Mr. Schwartz

7             Recross by Mr. Stefin

8                         * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          * * * * *

 2                      E X H I B I T S

 3   Government's Exhibits in Evidence:

 4          Government's 106-7A                    177

 5   Defendant's Exhibits in Evidence:

 6          Defendant's 39 and 40                  4

 7          Defendant's 58-68                      5

 8          Defendant's 34                         97

 9          Defendant's 70                         104

10                          * * * * *

11                        CERTIFICATE

12        I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16        Dated this 12th day of NOVEMBER, 2013.

17

18        /s/Stephen W. Franklin
          _____
19        Stephen W. Franklin, RMR, CRR

20

21

22

23

24

25
```

**$**

$1.4 [1] 192/8
$1.4 million [1] 192/8
$102 [1] 9/7
$109,339 [1] 8/4
$20,000 [1] 116/18
$221,021 [1] 7/24
$3 [1] 38/5
$3 million [1] 38/5
$35,000 [3] 116/8 117/4 117/6
$473,287 [1] 7/25
$500,000 [2] 162/15 164/3
$5000 [1] 34/17
$515,000 [1] 9/16
$8000 [1] 25/3
$93,129 [1] 8/19

**'**

'04 [1] 133/17
'06 [1] 29/3
'07 [2] 28/15 183/20
'08 [2] 113/8 187/23
'4 [1] 190/19
'91 [1] 106/19
'til [5] 68/18 114/5 199/7 199/8 200/5

**-**

-v [1] 1/5

**.**

.1 [1] 206/8

**/**

/s/Stephen [1] 217/18

**0**

005-6073-1636 [1] 26/11
0073 [1] 5/20
0076 [1] 7/13
0092 [1] 5/21
0124 [1] 9/12
014 [1] 139/10
0142 [1] 9/12
016 [1] 96/22
017 [1] 96/22
018 [1] 96/22
06 [1] 7/9
08 [1] 107/8
09 [1] 103/2

**1**

1/29 [1] 113/8
10 [8] 107/9 148/5 148/13 194/20 204/4
 204/4 204/13 204/14
100 percent [2] 84/4 110/12
101 [1] 144/15
104 [1] 217/9
106-7A [3] 177/24 178/8 217/4
10:32 [1] 50/3
10:49 [1] 50/3
11-80072-CR-MARRA [1] 1/2
12 [1] 107/8
12:00 [1] 94/23
12th [1] 217/16
13 [1] 204/22
13 percent [2] 8/23 8/25
1319 [9] 25/6 25/11 104/21 111/25 112/1
 112/6 112/13 112/20 144/21
13th [3] 53/13 60/6 60/12

14 [1] 204/10
14-man [1] 12/1
14th [2] 11/1 187/23
15 [7] 50/1 107/8 145/18 194/20 204/6 204/8
 204/10
15-minute [1] 46/14
15th [2] 37/9 192/21
162 [3] 8/7 8/8 8/12
1627 [1] 8/5
1636 [1] 26/11
16th [3] 21/9 60/11 154/18
17 [2] 1/10 212/14
177 [1] 217/4
1827 [1] 8/5
19 [2] 2/12 2/15
1984 [1] 11/1
1991 [4] 106/3 106/15 133/13 176/4
1993 [1] 190/19
1995 [1] 18/6
1996 [1] 180/19
1:00 o'clock [1] 112/12
1:15 [3] 94/11 94/17 94/22
1:17 [1] 94/23
1st [2] 11/11 116/2

**2**

2/12 [1] 107/8
2/15 [1] 107/8
2/9/08 [1] 107/8
20 [1] 7/17
20,000 [1] 116/14
200 [1] 1/21
200 pounds [1] 185/5
2000 [1] 39/3
2001 [1] 9/15
2004 [1] 13/25
2005 [2] 25/9 41/8
2007 [9] 19/23 24/9 24/12 27/23 29/6 37/1
 37/2 154/13 190/19
2008 [17] 37/8 37/9 90/20 107/8 107/9 111/4
 112/1 112/6 112/9 114/1 121/22 121/23
 168/5 176/1 177/4 177/16 177/20
2009 [2] 102/22 102/25
2010 [4] 69/8 193/7 193/8 209/2
2011 [15] 11/4 11/8 11/12 14/1 21/9 24/10
 29/6 29/12 53/13 116/2 154/17 158/12
 170/13 170/19 183/22
2012 [1] 120/24
2013 [2] 1/8 217/16
20th [1] 34/19
21 [5] 5/19 6/3 6/24 7/2 15/17
21st [2] 27/23 112/9
224 [2] 37/18 42/1
239 [1] 1/10
24 [2] 1/8 2/12
25 [1] 14/19
26 [1] 102/25
260 [1] 92/10
27 [5] 11/9 115/9 115/11 127/1 127/6
27th [2] 2/25 3/11
28th [1] 9/15
29 [4] 107/7 113/8 114/1 168/5
29th [6] 90/3 168/9 177/4 177/15 177/20
 178/16
2:49 [1] 148/14

**3**

3/10 [1] 107/9
30 [2] 14/18 23/11
30,000 [1] 36/21

300 [1] 157/2
30th [1] 11/8
31st [1] 37/1
33301 [1] 1/18
33401 [1] 1/24
33432 [1] 1/22
34 [6] 96/21 97/25 102/24 139/8 167/25
 217/8
35 [1] 167/25
35,000 [2] 116/20 120/16
37,000 [1] 192/22
3700 [1] 192/21
3768 [1] 1/23
39 [3] 4/16 4/23 217/6
3:02 [1] 148/14
3rd [2] 121/22 121/22

**4**

4'11 [1] 185/7
40 [3] 4/16 4/23 217/6
4000 [1] 31/17
404 [1] 212/2
41 [1] 104/25
441 [1] 2/10
4:21 [1] 197/2
4:34 [1] 197/2
4:38 [1] 199/20
4:43 [1] 199/20
4th [1] 37/2

**5**

5-foot [1] 185/5
5/26/09 [1] 103/2
50 [1] 206/8
50.1 [1] 206/10
500 [1] 1/17
51 [1] 206/10
514-3768 [1] 1/23
5500 [1] 34/19
561 [1] 1/23
56th [1] 115/21
58 [3] 5/2 5/2 5/16
58-68 [1] 217/7
59 [4] 5/3 85/21 170/12 194/8
5:00 [1] 22/11
5:11 [1] 215/3
5th [2] 25/9 34/17

**6**

6'5 [1] 92/10
60 [2] 5/3 185/5
61 [1] 5/4
611 [4] 6/15 6/23 7/3 7/5
611's [1] 6/22
62 [1] 5/5
63 [1] 5/5
64 [1] 5/5
65 [1] 5/6
66 [1] 5/6
67 [1] 5/7
68 [4] 5/2 5/7 5/16 217/7
69 [1] 18/3
6th [1] 25/10

**7**

7/10/2008 [1] 107/9
70 [3] 104/4 104/10 217/9
700 [1] 1/21
701 [1] 1/24
71 [1] 123/13

**7**

73 [1]  5/20
7920 [3]  37/17 41/19 42/1
7A [4]  177/20 177/24 178/8 217/4
7th [1]  1/18

**8**

8/4 [1]  107/9
8th [3]  71/9 111/4 112/1

**9**

90 [1]  201/7
9000 [2]  25/10 25/14
97 [1]  217/8
9:00 [1]  215/1
9:00 o'clock [1]  214/15
9:00 so [1]  214/17
9:30 [6]  200/22 201/16 203/13 203/14 203/14 214/16
9th [1]  71/9

**A**

a.m [3]  22/11 50/3 50/3
AAC5092 [1]  112/2
abandon [1]  77/1
abilities [1]  71/19 73/8 73/14
ability [14]  18/10 18/10 70/6 72/6 73/2 76/7 76/15 77/9 77/11 77/14 77/16 77/20 77/21 213/18
able [13]  64/16 73/6 107/18 109/17 146/18 150/2 153/4 169/11 176/9 198/21 200/16 205/16 213/24
above [1]  217/15
above-entitled [1]  217/15
absent [1]  86/23
absolutely [7]  91/13 91/18 95/24 98/4 121/13 121/16 142/6
abusive [2]  108/19 109/12
accept [1]  77/12
accepted [4]  7/24 9/11 82/5 125/7
accolades [1]  87/7
according [4]  27/6 38/3 135/4 135/8
account [14]  25/4 26/5 26/11 26/18 26/20 27/3 27/9 117/24 118/10 119/5 120/22 169/15 192/7 192/23
accountant [7]  27/7 93/16 93/19 93/21 93/24 120/14 138/18
accounting [1]  93/11
accounts [6]  51/9 141/2 141/2 156/6 160/9 160/13
accuracy [3]  9/2 131/25 178/3
accurate [5]  43/17 155/23 179/23 205/20 207/14
accurately [1]  63/12
accused [3]  159/2 159/4 159/11
acknowledge [5]  82/23 84/17 162/11 173/22 189/3
acknowledged [8]  84/18 134/3 134/3 160/19 162/14 164/2 189/9 190/13
acknowledgment [2]  170/16 190/14
acquainted [1]  44/15
acquired [1]  211/12
across [2]  28/3 44/17
act [7]  40/17 40/18 40/19 66/2 66/4 95/22 205/7
action [2]  12/3 85/6
activity [1]  7/15 72/24 214/3
actually [18]  27/1 30/24 67/14 72/24 89/25 107/10 118/16 127/21 153/12 154/19 161/17

164/12 164/17 167/21 204/25 208/18 210/19 213/4
adamant [1]  56/21
add [7]  28/5 31/12 207/12 207/16 209/3 211/4 211/21
added [1]  212/18
adding [1]  204/18
addition [1]  166/23
additional [2]  42/4 202/15
address [1]  104/20
adequately [1]  86/24
adjustment [2]  9/5 9/6
Administration [1]  153/24
admit [1]  194/5
admitted [8]  4/22 5/15 6/6 54/11 97/23 139/9 177/23 202/3
adopted [2]  122/12 126/21
adult [1]  203/2
advance [2]  134/24 134/25
advances [2]  210/8 210/16
advise [1]  119/13
advised [4]  29/19 125/1 140/21 196/4
advising [1]  3/4
affect [1]  9/8
affidavit [28]  30/6 32/7 32/23 33/22 34/10 34/21 35/16 35/16 35/18 41/20 42/3 42/4 42/6 42/9 42/19 45/3 50/7 52/11 52/14 53/22 53/25 57/3 61/19 141/9 141/10 141/11 141/17 141/21
affidavits [5]  29/20 30/3 33/14 34/11 43/16
afraid [1]  92/14
after [66]  3/25 10/18 12/7 12/9 23/1 23/5 23/8 25/1 28/6 28/17 29/12 29/19 31/11 45/13 48/1 48/16 50/3 51/24 51/25 53/13 55/5 59/16 60/8 60/9 60/10 80/13 81/7 82/25 84/9 94/23 95/11 106/10 116/11 125/24 125/25 126/12 129/11 137/13 140/1 140/20 148/6 148/7 148/8 148/10 148/14 148/21 149/15 150/17 150/19 150/22 155/18 157/18 158/7 159/8 161/18 161/23 170/20 171/2 176/17 176/18 178/17 197/2 199/20 202/9 203/21 211/16
afternoon [3]  37/18 112/13 145/16
afterwards [1]  61/8 126/18
again [33]  4/4 16/23 18/9 20/5 35/20 42/2 58/25 67/12 77/3 77/19 90/5 96/15 97/5 97/14 107/25 113/1 114/1 122/7 122/19 128/23 145/20 146/19 166/6 170/15 176/25 186/13 196/23 202/14 203/5 203/8 203/10 207/21 213/22
against [1]  16/15
age [3]  3/6 195/6 202/24
agencies [2]  22/21 153/20
agency [1]  141/4
agent [20]  16/13 45/13 51/17 55/6 68/11 68/15 68/18 69/3 69/9 69/11 69/11 70/3 70/9 112/22 146/6 151/15 155/6 155/8 161/8 177/9
agents [23]  14/8 14/23 14/25 15/6 15/9 15/15 15/19 22/1 22/2 23/3 44/16 56/19 64/13 64/18 68/16 68/19 69/13 70/16 70/19 70/20 71/11 71/16 145/25
ago [2]  100/21 107/18
agree [4]  118/12 119/18 206/20 207/16
agreed [4]  3/19 51/6 117/16
agreement [3]  119/3 152/18 210/13
ahead [5]  7/6 36/20 52/25 111/22 193/14
aide [1]  19/14
aired [1]  161/1
AKA [1]  42/10

alcoholism [1]  162/20
Alexander [1]  123/6
alias [1]  195/25
alive [1]  114/24
alleged [19]  16/16 30/18 30/23 34/6 47/11 51/10 52/21 63/12 64/11 66/3 70/5 70/8 70/22 74/12 80/21 88/21 89/3 110/10 152/23
allegedly [1]  89/8
alleging [2]  76/25 76/25
allow [7]  2/24 62/11 65/3 65/22 67/25 136/8 152/3
allowed [12]  8/3 49/5 52/23 64/8 64/15 64/20 67/21 73/21 78/25 92/2 138/22 152/1
allowing [2]  65/13 146/24
alone [2]  78/15 78/21
along [8]  21/23 31/3 45/1 70/7 141/23 161/8 168/15 205/18
already [16]  3/17 4/17 6/16 21/15 21/18 70/17 73/23 73/23 117/3 129/14 149/20 161/20 166/20 183/1 185/13 212/22
also [66]  2/9 7/19 7/25 8/25 9/12 12/22 13/12 22/18 25/6 26/25 27/3 27/8 31/14 31/15 31/16 32/12 32/13 32/25 33/2 39/2 42/7 42/21 43/3 43/18 48/10 58/4 60/9 65/24 80/4 80/10 80/11 89/11 91/16 93/10 100/14 100/25 112/19 116/24 137/20 145/1 145/5 155/25 156/20 157/9 158/24 158/24 161/14 163/6 163/19 163/23 164/2 165/7 166/21 166/24 168/21 169/8 180/3 180/13 182/5 187/13 188/23 195/19 201/17 204/9 210/7 212/10
although [6]  9/6 52/7 147/3 165/25 197/19 198/19
Alvarez [2]  183/6 183/7
always [10]  47/4 114/5 114/15 133/6 134/16 135/2 135/3 141/22 142/24 179/15
am [14]  37/4 56/14 65/14 73/21 78/25 95/4 95/6 98/12 111/4 111/5 152/1 171/11 194/15 209/12
amalgamation [1]  33/16
Amendment [2]  2/8 2/11 209/18 211/23 213/4 214/1
Amendment-related [1]  213/4
AMERICA [3]  1/3 9/7 26/11
American [2]  3/3 203/2
amount [7]  9/16 23/4 51/9 116/17 137/18 137/21 162/18
amounts [2]  141/1 160/11
ample [1]  90/9
analyst [1]  155/13
analyzed [1]  129/11
and/or [3]  70/3 132/24 158/19
Andrea [9]  81/6 140/15 141/9 144/2 144/3 147/7 147/8 147/21 148/3
Angel [1]  4/17
Angelina [3]  168/18 185/9 185/9
Anne [2]  195/2 202/21
another [14]  8/1 8/17 13/21 14/19 17/2 19/11 40/2 41/12 57/3 68/10 70/1 74/16 101/13 180/2
answer [27]  33/12 58/9 75/6 75/6 75/11 75/15 76/4 81/12 82/11 82/12 89/18 89/19 90/7 107/3 107/23 108/4 114/13 130/20 130/20 149/21 170/4 182/8 187/20 187/22 192/19 196/7 197/15
answered [4]  79/21 86/7 109/14 133/21
answering [5]  111/4 111/6 111/19 111/20 152/21
answers [1]  68/2
Anthony [1]  80/14

## A

anticipated [1]  114/18
any [65]  4/20 5/9 5/13 17/7 21/21 24/5 39/23
  39/25 40/8 44/16 46/15 51/17 58/21 71/19
  73/1 73/3 78/10 78/24 79/18 80/19 80/21
  81/9 81/14 82/4 83/12 84/9 84/24 89/23
  94/10 101/5 104/5 106/1 109/24 110/10
  111/10 113/2 113/5 113/15 115/6 116/3
  116/23 117/7 121/14 133/15 141/3 142/19
  144/12 146/11 147/15 148/17 151/11 152/23
  161/2 169/10 178/25 186/1 194/22 195/20
  196/17 198/9 203/11 206/25 208/2 214/8
  214/19
anybody [10]  48/16 52/4 80/25 82/16 82/19
  83/12 109/21 126/3 126/9 205/13
anymore [3]  143/15 147/6 192/3
anyone [8]  4/6 40/22 82/17 82/25 83/3
  151/13 164/4 200/7
anything [32]  4/6 11/25 37/12 42/22 43/8
  45/4 65/18 87/14 91/6 94/19 107/1 110/8
  110/25 115/5 119/17 126/19 128/12 132/9
  137/13 137/15 142/21 144/16 146/16 147/8
  148/12 153/9 164/11 187/23 187/24 195/14
  196/21 203/9
anytime [4]  71/3 87/4 87/4 120/23
anyway [6]  125/3 190/6 203/25 206/15
  208/20 209/9
anywhere [1]  56/7
aol.com [1]  1/25
apartment [12]  15/11 105/17 105/18 105/24
  108/3 133/20 137/12 137/17 137/25 176/3
  185/17 185/21
apologies [1]  71/14
apologize [10]  18/12 18/14 36/7 44/11 59/21
  73/4 81/12 126/18 128/23 152/20
apparently [2]  92/7 168/4
appeal [2]  5/22 209/7
Appeals [1]  9/10
appear [4]  33/15 121/15 185/2 206/17
appearance [1]  131/24
Appearances [1]  1/15
appeared [2]  27/12 39/23
appears [1]  132/21
applies [2]  9/3 9/5
apply [1]  10/19
appreciate [2]  4/4 80/8
approach [12]  17/21 17/24 46/11 49/17 56/9
  59/9 132/10 154/25 165/15 170/9 181/2
  213/6
appropriate [5]  10/9 15/16 70/22 91/20
  214/4
approximately [4]  14/18 162/15 178/17
  213/21
April [16]  24/12 65/25 66/5 66/6 66/13 66/15
  67/6 67/13 69/17 69/25 71/10 71/12 71/16
  71/23 72/11 154/13
area [4]  34/4 49/4 125/1 173/1
arguable [1]  208/9
arguably [1]  209/7
argue [2]  77/20 186/11 206/21 207/25
  212/24 214/2
argued [1]  64/9
arguing [1]  32/15
argument [4]  206/19 206/25 207/3 207/6
arguments [2]  200/24 214/21
Arizona [8]  111/3 111/16 111/24 112/2
  112/4 169/3 169/4 169/8
arm [1]  38/18
armed [1]  11/25

around [7]  24/12 38/18 90/20 101/17 133/17
  158/12 193/7
arranging [1]  176/11
arrest [8]  24/3 24/7 24/8 105/2 150/3 150/22
  154/15 165/11
arrested [11]  22/6 149/17 149/23 150/12
  151/8 158/17 158/20 161/19 161/20 161/22
  161/25
arrests [9]  21/3 21/8 21/10 22/13 22/22
  51/24 60/9 60/10 154/21
ashen [1]  40/14
Ashton [1]  39/10
aside [1]  48/4
ask [83]
asked [64]  27/21 38/9 38/23 38/25 39/18
  39/25 48/10 53/5 54/24 55/3 58/23 60/4 63/4
  63/8 71/23 71/23 75/14 75/14 76/23 77/10
  79/21 80/7 85/12 87/14 90/10 91/22 91/24
  95/19 101/6 101/23 102/15 106/7 106/9
  106/13 106/17 109/1 109/3 109/5 109/11
  111/8 114/2 117/6 117/8 149/23 151/15
  151/24 153/3 158/25 170/6 171/14 171/23
  172/22 173/12 173/13 174/2 175/21 175/25
  184/17 185/24 186/20 188/23 189/17 190/7
  190/24
asking [39]  31/10 31/25 32/15 34/14 36/8
  41/23 41/23 46/10 50/15 63/20 67/14 71/6
  71/10 80/24 82/1 83/7 83/24 83/25 105/12
  106/6 111/8 111/10 114/21 115/10 126/11
  128/9 129/19 132/4 132/7 139/15 145/3
  147/11 171/12 185/19 188/11 190/11 196/16
  198/16 199/4
asks [1]  67/12
assertion [2]  9/4 59/7
assigned [1]  11/22
assignment [1]  13/5
assist [2]  93/10 151/3
assistant [6]  15/25 16/4 16/5 17/7 17/17 18/6
associated [5]  31/19 110/3 110/11 129/24
  130/3
assume [7]  36/8 45/5 58/14 148/8 188/11
  195/17 202/3
assumed [4]  70/20 163/12 197/11 198/24
assumes [1]  46/4
assuming [4]  53/16 82/9 199/14 201/3
assumption [3]  124/2 144/20 196/18
assured [2]  48/2 48/8
ATF [1]  14/14
Atsuko [2]  74/21 74/22
attack [1]  105/3
attacking [1]  145/23
attempt [2]  78/2 109/24
attention [2]  2/23 90/3 98/6 107/6 139/8
  139/11 140/25 141/3 143/23 180/16
attorney [34]  15/25 16/5 16/6 17/7 17/17
  18/7 25/23 27/17 56/24 60/17 86/9 91/3 91/4
  92/22 119/8 124/24 124/24 124/25 127/3
  130/13 130/13 130/19 131/3 136/2 136/2
  138/17 144/21 158/22 161/13 161/14 196/4
  196/17 196/22 198/16
attorney's [9]  1/17 24/21 26/1 26/7 27/10
  96/14 119/13 126/16 129/11
attorneys [5]  92/1 127/17 158/17 158/18
  159/1
attractive [1]  185/15
AU [2]  74/23 74/24
audio [2]  27/24 178/12
audio-taping [1]  27/24
audiotape [1]  34/8
audiotaped [2]  45/2 45/3

audit [2]  6/12 6/21
August [13]  21/9 25/1 27/23 28/14 28/15
  29/12 60/11 111/4 112/1 114/5 154/16
  154/18 187/23
August 14th [1]  187/23
August 16th [3]  21/9 60/11 154/18
August 21st [1]  27/23
August 8th [2]  111/4 112/1
AUSA [2]  1/16 1/16
authenticate [1]  132/23
authority [1]  27/24
avenue [2]  115/21 176/6
average [2]  3/3 203/2
avoid [1]  175/9
aware [22]  17/6 27/12 43/5 43/8 64/17 69/22
  88/21 89/7 93/3 114/16 126/20 127/22 136/1
  138/17 140/5 144/24 145/3 182/17 191/18
  192/7 193/6 205/25
away [7]  18/25 41/6 41/7 72/7 74/6 74/13
  161/6

## B

B-o-m-a [1]  16/6
baby [1]  124/15
back [95]
backdoor [1]  166/10
backed [1]  161/5
background [5]  7/14 85/25 92/25 127/20
  167/22
backing [1]  18/25
bad [6]  47/22 48/7 84/25 138/23 138/23
  163/20
bag [1]  86/7
bailiff [2]  135/22 136/8
Baker [2]  40/16 40/18
Ball [2]  14/9 27/22
balloon [1]  9/13
bank [35]  9/7 25/2 25/4 25/24 26/5 26/8 26/8
  26/10 26/11 26/17 26/22 26/24 27/3 28/18
  32/25 33/1 33/2 33/25 34/1 34/18 34/25
  112/17 118/10 119/5 120/22 133/5 141/2
  156/5 158/25 160/7 160/8 160/9 192/7
  192/22 192/23
Bardfeld [22]  1/16 17/8 27/16 28/2 28/7
  28/17 28/20 28/21 29/24 30/11 30/15 32/5
  47/17 51/5 51/13 52/3 56/19 60/18 76/23
  130/12 131/3 213/10
Barry [1]  17/17
base [1]  64/2
based [24]  50/9 88/6 88/8 90/1 92/21 93/8
  93/15 94/1 107/5 112/16 114/6 114/14 144/9
  144/11 144/12 147/23 152/14 156/25 159/14
  167/21 167/23 168/24 190/19 213/25
bases [1]  56/2
basically [4]  67/18 75/25 114/23 146/12
basis [6]  35/18 101/4 101/5 136/11 142/21
  147/15
bat [1]  207/19
batch [1]  141/24
Bates [1]  96/22
Bayview [1]  34/22
Beach [2]  1/7 1/24
beautiful [1]  38/16
became [2]  154/12 182/17
because [97]
become [7]  10/24 26/21 28/8 44/15 115/13
  160/22 179/20
before [51]  1/12 3/9 3/18 4/11 14/9 17/5 17/8
  21/16 28/20 39/20 49/6 56/16 57/11 60/5
  60/6 61/1 61/3 63/7 63/23 64/21 79/13 79/20

**B**

before... [29]  80/23 80/24 82/5 83/2 83/3 106/22 109/22 112/8 116/5 120/23 123/23 128/1 128/5 128/10 128/15 129/13 131/2 138/14 150/18 150/19 154/20 176/23 177/13 183/4 186/18 195/19 199/5 200/8 207/22

beg [1]  3/10

began [1]  28/11

beginning [1]  56/21 100/8 205/14

behalf [5]  2/12 156/11 159/4 159/10 202/17

behind [2]  106/5 180/23

being [43]  2/15 4/4 5/2 5/3 5/3 5/4 5/5 5/5 5/6 21/3 27/8 33/10 33/11 35/19 38/11 38/20 38/21 48/4 48/19 48/25 55/19 56/21 60/4 64/12 81/12 83/3 105/16 106/23 107/12 111/5 111/17 112/6 113/11 113/12 118/1 128/19 153/4 158/3 160/22 162/25 164/21 165/8 213/13

belief [1]  147/22

beliefs [1]  74/24

believe [66]  3/7 3/8 4/15 6/2 6/20 13/13 13/17 19/13 19/19 19/22 21/3 24/7 25/7 26/19 26/20 27/19 27/23 40/1 40/12 40/23 49/4 50/11 50/22 54/1 56/17 57/13 60/5 60/15 61/2 73/1 77/17 78/17 79/18 83/1 84/2 85/7 93/2 93/6 93/7 102/23 114/24 132/20 136/7 137/19 139/2 147/8 147/9 147/15 148/2 154/11 154/13 154/16 156/22 162/24 167/6 168/15 176/4 179/2 179/18 186/1 192/21 200/4 203/24 204/5 206/11 208/18

believed [21]  36/11 40/22 50/20 50/21 57/4 57/6 65/2 99/8 110/12 111/11 113/6 113/14 113/23 114/15 136/18 146/1 164/7 167/19 186/6 186/6 208/18

believes [2]  72/22 73/14

bell [1]  79/5

belong [1]  144/22

belongs [1]  144/22

below [1]  8/23

bequest [1]  211/12

besides [1]  98/25

best [7]  43/1 84/3 109/19 125/23 126/14 132/25 168/1

Beth [11]  46/8 52/1 52/3 53/12 55/23 56/18 60/18 61/12 69/10 83/1 150/23

better [7]  39/11 41/3 96/18 100/5 110/6 138/2 169/20

between [25]  5/23 7/9 9/13 27/25 38/12 38/20 83/18 86/6 89/4 100/12 110/8 122/4 132/22 141/16 146/22 149/15 172/20 178/4 186/4 186/5 188/1 190/19 203/2 208/5 211/11

Beulen [9]  112/3 112/9 112/15 112/20 112/23 113/4 126/6 151/5 151/6

beyond [4]  65/21 65/22 75/6 191/14

big [3]  86/7 137/14 137/17

bill [1]  97/7

binding [1]  145/8

bit [14]  13/8 22/24 23/22 28/5 34/13 38/14 38/22 39/18 87/8 159/19 189/23 196/10 206/1 207/8

black [2]  189/23 193/20

blockages [3]  70/9 71/22 72/8

Boca [2]  1/22 166/18

bodies [2]  74/7 191/5

body [5]  74/16 74/16 188/1 191/7 207/22

bodyguard [1]  95/22

Boma [1]  16/6

bona [2]  211/13 211/14

book [35]  4/16 4/17 5/2 5/3 5/4 5/4 5/5 5/5 5/6 5/6 85/4 85/20 85/22 87/16 87/20 87/22 88/3 88/6 88/7 88/9 88/10 142/22 169/22 170/7 170/15 170/16 170/19 171/2 171/5 171/9 171/16 185/12 185/14 188/2 189/20

books [13]  84/18 84/20 84/24 114/19 114/21 114/22 115/8 142/19 167/25 170/6 189/18 190/18 191/19

born [3]  123/20 124/3 124/15

both [7]  25/10 49/18 56/24 69/23 170/4 206/11 206/13

bothers [1]  207/18

bottom [6]  34/23 98/7 98/13 117/13 117/23 119/16

bought [1]  15/7

Boulevard [1]  1/17

Bower [2]  27/4 27/7

Box [10]  111/3 111/16 111/23 112/4 112/17 168/25 169/1 169/2 169/4 169/8

boxing [1]  92/13

boy [1]  38/16

Brad [38]  88/19 88/22 89/4 107/20 110/19 111/1 111/12 113/3 113/3 113/6 113/9 113/11 113/15 113/23 114/2 114/6 114/9 114/15 167/9 167/19 168/4 168/12 169/2 178/5 184/13 184/19 185/8 185/22 186/5 186/7 186/14 186/23 186/25 187/3 187/14 187/24 188/1 184/9 185/9

Brady [2]  119/15 120/5

brain [1]  105/9

break [9]  5/11 46/13 49/13 49/13 94/5 94/14 95/19 145/16 145/21

Brian [1]  180/16

Brief [1]  198/12

briefly [1]  179/1

brilliant [1]  86/21

bring [14]  2/22 3/23 51/15 52/10 52/19 52/20 52/24 58/12 59/11 76/6 95/7 148/20 200/12 201/16

broke [5]  31/21 192/4 192/12 192/15 192/25

Brooklyn [1]  11/16

brother [3]  99/11 99/12 99/13

brother-in-law [2]  99/11 99/12

brought [2]  7/18 194/1

Broward [7]  1/17 10/13 10/15 11/10 16/22 21/18 158/9

BSO [3]  16/19 16/21 16/24

building [4]  105/20 106/13 106/18 107/16

burglaries [5]  11/25 172/6 172/9 182/16 182/16

burglary [7]  13/6 13/12 172/6 172/7 172/10 172/11 179/19

business [14]  7/17 7/18 7/21 117/22 118/13 118/14 118/18 118/18 118/20 118/20 119/8 144/15 173/16 173/19

**C**

cahoots [1]  134/23

called [31]  12/9 12/10 13/4 14/11 19/19 19/20 20/4 20/5 37/2 54/8 67/11 67/15 68/11 80/2 80/17 81/1 81/4 81/14 81/19 82/15 115/25 117/6 120/5 134/9 141/3 144/25 156/10 156/14 170/7 195/3 202/21

calling [7]  30/6 51/20 66/10 80/19 83/4 101/9 129/25

calls [13]  69/14 69/16 70/1 70/18 71/12 80/23 82/22 83/7 96/11 141/15 153/15 155/15 182/24

calming [1]  23/22

came [27]  19/5 19/13 23/1 23/5 23/10 37/19

40/12 41/12 45/6 69/5 81/9 88/17 100/8 101/23 105/18 112/3 112/11 120/20 120/22 131/2 142/22 150/13 157/18 170/13 170/19 185/17 193/8

can't [21]  57/3 57/25 58/11 58/15 62/6 78/17 105/5 105/6 118/18 121/9 132/14 134/9 134/20 153/5 153/9 174/15 174/15 174/18 175/15 184/25 192/3

cancer [1]  105/10

cannot [2]  9/3 25/22

capacity [2]  21/21 158/1

captain [4]  177/17 179/18 179/20 179/21

car [2]  112/5 112/11

card [1]  172/20

Cardiopulmonary [1]  105/1

care [1]  38/6

Carmine [4]  118/17 118/19 118/24 120/18

Carmine's [1]  120/13

Carolina [1]  137/9

cars [1]  137/19

case [120]

cases [20]  2/14 14/6 14/8 17/7 17/21 19/4 43/3 74/19 181/23 182/1 182/13 182/15 184/1 205/12 205/17 207/21 208/21 213/10 213/23 214/6

cashier's [2]  25/6 25/9

catch [2]  11/24 187/10

caught [2]  38/20 122/4

cause [6]  24/3 26/2 70/11 98/20 104/23 206/18

caused [2]  23/25 105/18

caveat [1]  207/1

CC [3]  48/24 48/25 49/22

certain [20]  5/19 7/12 9/13 22/1 25/5 67/21 71/21 83/21 83/24 83/25 84/5 137/21 145/12 146/14 158/19 160/9 172/8 172/8 172/21 189/17

certainly [3]  20/16 118/6 206/24

certainty [1]  84/4

certificate [3]  104/4 104/12 217/11

certified [3]  104/3 104/4 217/13

certify [1]  217/13

cetera [5]  15/14 52/7 70/10 158/25 211/15

Cha [3]  113/4 113/4 113/4

chain [1]  184/5

champion [1]  86/4

chance [3]  210/1 210/3 213/8

change [4]  34/20 35/22 198/5 204/3

changed [6]  24/23 35/24 68/21 85/14 100/9 147/3

changes [2]  35/19 198/3

characters [4]  114/17 114/18 114/24 114/25

charge [3]  14/20 68/20 204/13

charged [1]  204/10

charges [1]  73/25

charity [1]  52/7

Charles [5]  3/20 9/20 9/23 10/4 85/23 216/3

Charlie [11]  10/10 56/18 85/12 85/25 86/4 86/8 86/25 87/1 102/20 117/9 119/1

Charlie's [1]  179/14

Charlotte [1]  40/2

chase [1]  74/6

chasing [2]  74/11 74/13

check [10]  6/7 25/7 25/13 25/13 34/17 106/1 121/6 133/14 135/23 206/9

checked [2]  133/9 133/11

checks [8]  25/6 25/9 25/10 25/10 25/15 142/23 142/25 143/4

chicken [1]  184/4

chief [1]  18/7

**C**

choose [1]  172/20
chores [1]  4/12
Chris [1]  68/25
chronological [1]  180/11
church [1]  163/13
circle [1]  168/2
Circuit [1]  206/14
circumstances [1]  11/6
circumstantial [2]  212/19 212/23
cite [2]  2/9 213/18
cites [1]  2/14
city [7]  10/23 10/24 11/3 14/16 43/10 99/21
106/3
claim [3]  8/11 54/6 157/1
claimed [2]  8/12 146/16
claiming [2]  72/6 74/5
claims [1]  146/25
clans [1]  172/9
clarified [1]  207/21
clarify [2]  22/25 50/25
Claude [48]  90/25 90/25 91/2 91/16 92/4
92/8 93/7 93/17 93/20 93/22 108/19 108/22
108/25 109/11 109/16 109/22 109/22 109/25
110/1 110/6 110/8 124/20 125/3 125/6 125/6
127/13 130/2 130/8 130/10 130/11 131/22
133/2 133/7 133/21 134/6 134/22 135/1
135/22 136/7 137/20 137/20 137/24 138/6
138/15 143/14 143/18 143/21 147/5
Claude's [4]  108/8 130/13 133/9 136/2
clause [2]  2/13 48/20
clauses [1]  47/16
cleaned [1]  70/14
cleanse [1]  74/8
cleansed [1]  163/9
cleansing [2]  74/12 213/20
clear [6]  61/3 65/11 84/21 104/2 121/21
141/19
Cleary [65]  45/12 45/13 45/15 45/18 45/19
45/22 46/6 47/20 49/19 49/21 50/16 50/22
51/18 52/1 52/2 52/4 52/9 52/11 52/14 53/5
53/7 53/9 53/14 54/11 54/14 54/15 55/4 55/5
55/7 55/11 55/15 55/21 55/25 56/8 56/18
56/24 57/4 57/20 60/7 60/17 60/21 61/3
61/13 61/19 63/6 63/24 64/1 64/7 125/16
125/20 151/19 151/22 152/8 152/12 161/9
161/11 161/14 161/17 161/21 162/11 163/4
163/17 164/6 165/1 165/3
Cleary's [2]  50/7 57/1
Clematis [1]  1/24
client [16]  32/16 34/16 35/8 35/14 35/15
45/19 70/8 72/25 74/12 77/20 148/11 158/20
197/6 198/10 200/5 201/25
client's [1]  77/14
clients [8]  20/23 21/6 29/8 29/16 30/22 73/2
74/8 158/16
close [8]  37/18 38/4 40/7 108/25 150/3
150/14 198/7 201/4
closed [1]  86/17
closer [2]  13/8 96/16
closing [6]  198/8 200/3 200/24 201/5 206/21
214/20
club [4]  99/9 99/17 100/13 102/18
co [1]  68/18
co-agent [1]  68/18
coach [1]  57/5
cocaine [2]  14/12 15/13
coconspirator [1]  151/9
Code [1]  8/5

cold [4]  87/17 171/18 171/24 172/15
Colin [8]  89/8 110/13 110/20 110/25 113/12
168/22 169/7 169/11
colleague [1]  7/4
collect [1]  181/19
Collection [1]  73/20
combination [1]  207/5
comes [4]  56/16 170/25 170/25 200/7
comfortable [2]  91/24 198/16
coming [9]  27/14 112/19 113/23 121/5 135/1
160/9 160/24 185/21 214/16
comma [1]  210/16
commemorate [1]  15/21
commemorating [1]  16/25
commencing [1]  131/5
commend [1]  18/9
commendations [5]  12/4 12/23 13/18 14/3
87/5
commending [1]  16/1
comments [1]  205/24
Commissioner [2]  5/24 7/10
committee [1]  209/1
communicated [2]  134/18 168/22
communicating [5]  134/5 167/19 168/4
168/4 169/7
communications [1]  20/20
community [6]  99/19 101/19 182/3 182/4
182/19 182/22
companies [1]  160/10
compared [1]  39/15
compendium [1]  141/12
compensation [2]  152/10 153/1
competing [1]  149/18
competition [1]  149/24
complaint [1]  18/17
complete [5]  75/6 174/16 179/15 179/23
180/3
completed [4]  15/1 34/11 42/9 88/6
completely [3]  57/24 167/20 206/7
compliment [1]  16/7
composite [1]  18/3
compound [3]  46/1 55/20 131/6
computer [4]  31/4 31/8 33/18 141/23
computers [1]  115/6
con [2]  171/14 171/20
conceded [2]  77/17 213/16
conceding [1]  9/9
concentration [1]  110/9
concept [2]  31/22 205/3
concern [5]  39/4 40/5 40/8 129/23 166/24
concerned [14]  39/16 39/17 39/21 40/11
44/25 76/3 136/13 167/8 167/10 167/11
167/17 206/1 206/16 207/11
concise [3]  179/15 179/24 180/3
concluded [5]  68/5 78/6 134/1 166/13 203/20
conclusion [1]  154/20
conditions [1]  145/12
conduct [1]  174/17
conducted [1]  47/17
conducting [3]  146/13 174/8 174/21
confer [2]  148/10 198/10
conference [4]  8/13 68/5 78/6 166/13
confidential [1]  127/14
confine [1]  75/11
confirm [4]  34/20 45/3 175/22 187/13
confront [1]  57/2
confused [3]  17/22 52/18 153/15
confusing [1]  44/10
Connecticut [1]  137/10
consent [1]  49/8

consider [2]  167/21 203/6
consideration [2]  127/23 128/14
considered [2]  12/21 78/9
consistent [4]  66/10 67/3 67/5 180/2
consistently [1]  180/14
conspiracy [3]  47/21 92/16 93/8
constitutes [1]  210/25
Constitution [2]  2/11 2/14
consultant [4]  21/24 85/22 151/1 158/1
contact [8]  37/17 80/14 125/16 133/15 146/7
160/16 168/12 183/16
contacted [6]  27/2 97/6 106/12 160/19 161/8
165/8
contacting [1]  157/19
contacts [2]  29/25 42/10
containing [1]  180/11
contains [1]  9/13
contemporaneously [1]  181/14
content [2]  97/2 152/12
contingent [1]  68/20
continue [8]  11/2 43/2 59/22 71/5 80/6 80/9
148/25 169/15
continued [3]  52/7 112/4 154/15
continues [1]  165/21
contract [2]  144/12 144/18
contracts [4]  142/23 143/2 143/4 188/2
contractual [1]  142/21
contradiction [1]  147/6
contributory [1]  205/21
control [2]  6/8 211/1
controlled [1]  141/14
conver [1]  102/13
conversation [65]  19/24 20/8 20/10 20/17
20/21 23/15 23/17 23/20 23/22 27/5 32/18
38/24 39/18 40/21 41/5 60/14 60/15 62/1
61/11 63/23 72/10 90/13 99/4 99/7 99/15
100/11 100/19 100/25 100/25 102/11 102/14
103/16 103/18 107/7 114/1 132/17 132/22
133/19 141/6 141/12 149/8 150/1 151/18
151/19 151/20 164/15 167/2 167/5 168/5
168/9 168/10 177/3 178/16 178/20 184/23
186/12 186/14 186/17 186/21 187/2 187/3
187/4 187/6 187/8 187/17
conversations [46]  27/25 28/3 29/22 66/10
66/12 88/21 88/22 90/2 95/18 100/2 107/6
107/10 107/19 111/13 113/8 113/25 114/4
114/6 114/14 140/20 141/13 141/16 149/9
156/2 176/11 176/20 177/1 177/15 177/21
182/3 183/9 183/11 183/13 184/13 184/15
184/18 184/21 184/23 185/2 187/16 187/21
188/1 188/4 188/16 188/17 197/10
converse [1]  91/3
convicted [1]  152/9
convicting [1]  152/24
convince [1]  164/12
convinced [6]  64/13 64/18 133/6 133/7 133/7
164/13
Cook [1]  69/2
cooperate [1]  37/3
cooperation [2]  2/21 203/10
copies [2]  96/14 169/10
copy [5]  33/2 33/2 104/3 104/4 213/4
copyrights [1]  138/4
corporation [3]  144/24 145/4 145/5
correct [100]
corrected [2]  35/15 169/4
correction [1]  88/13
correctly [4]  19/19 27/5 40/4 209/1
corresponded [1]  42/21
correspondence [4]  89/8 111/16 169/11

**C**

correspondence... [1] 169/16
correspondences [2] 111/2 112/17
corresponding [4] 110/13 111/1 111/12
  117/1
corresponds [1] 115/2
corroborate [7] 106/21 107/15 108/2 109/18
  158/19 176/10 176/20
corroborating [1] 134/21
cost [1] 71/24
cottage [1] 137/19
couldn't [9] 23/3 129/17 129/18 133/8
  133/13 134/18 135/2 160/14 164/20
counsel [10] 2/5 75/17 95/2 145/15 148/19
  171/5 171/6 173/13 197/5 199/23
counseling [1] 57/9
counterpart [1] 204/19
counts [4] 204/3 204/6 204/10 204/13
counts 3 [1] 204/3
couple [6] 32/4 47/10 68/16 85/13 85/16
  193/12
coupled [1] 57/9
course [15] 8/13 24/5 29/5 41/5 49/5 68/9
  103/3 115/14 119/20 124/6 131/21 144/3
  174/7 182/21 187/9
courses [1] 43/6
court [16] 1/1 1/23 2/1 3/9 5/23 7/8 25/24
  47/14 62/11 73/5 86/11 136/1 207/16 207/17
  210/14 210/17
Court's [4] 2/23 4/10 58/14 207/13
courtroom [18] 3/25 40/22 59/16 84/23 86/9
  94/12 95/11 118/19 119/9 145/19 146/9
  148/21 194/23 202/9 203/16
courts [1] 131/11
cover [6] 7/7 44/8 170/25 185/12 188/7
  211/12
covered [4] 42/7 42/13 144/6 193/16
covers [1] 42/12
CPE [1] 1/23
CR [1] 1/2
crack [2] 14/12 15/13
crazy [1] 102/10
create [1] 31/8
created [1] 67/19
credibility [3] 64/23 145/24 147/1
credit [1] 9/10
crime [9] 12/10 12/18 12/25 72/23 72/25
  79/18 154/8 171/17 180/11
crimes [15] 11/24 13/12 13/14 13/22 18/21
  26/6 28/23 28/25 43/12 85/24 86/22 110/2
  159/2 159/11 179/11
criminal [6] 12/8 13/4 13/15 179/9 205/7
  205/22
criminally [1] 93/2
criminals [2] 86/20 86/23
critical [4] 33/10 33/11 149/13 149/15
criticized [1] 180/22
criticizing [1] 33/7
cross [13] 34/13 49/5 153/12 153/17 178/23
  179/6 183/2 183/18 184/8 184/9 185/25
  191/16 216/5
cross-examination [8] 153/17 179/6 183/2
  183/18 184/8 184/9 185/25 191/16
cross-examine [1] 49/5
CRR [2] 1/23 217/19
cry [1] 38/17
Crystal [2] 14/9 27/22
CStack [2] 96/22 139/10
CStack-014 [1] 139/10

CStack-016 [1] 96/22
culture [7] 171/13 171/25 173/10 182/14
  191/24 195/4 202/23
cure [1] 74/6
curly [1] 112/14
current [1] 47/11
curses [3] 47/23 48/8 74/7
Customs [1] 14/14
cutoff [1] 160/12
cutting [1] 36/7
Cynthia [9] 20/24 29/9 38/25 38/25 74/17
  74/21 75/2 107/21 161/24

**D**

DA [1] 16/4
Dallas [2] 149/15 150/5
danger [1] 40/20
dangerous [1] 86/16
dare [2] 114/9 188/5
Darren [26] 28/9 38/22 41/17 41/17 68/17
  84/14 91/24 99/1 101/1 101/13 102/20 109/1
  109/3 109/6 109/11 109/14 121/15 138/17
  138/18 139/19 139/19 140/11 168/15 168/17
  169/20 184/24
date [2] 21/8 25/8
dated [4] 52/12 53/12 102/23 217/16
daughter [5] 3/5 7/20 29/8 29/10 39/1
daughter-in-law [1] 39/1
daughter-in-laws [1] 29/8
daughters [3] 3/5 195/6 202/24
days [1] 106/22
DEA [13] 12/13 14/11 14/15 14/15 14/25
  15/3 15/20 15/20 15/20 32/13 155/6 155/10
  155/15
DEA-6 [2] 15/3 15/20
dead [1] 31/21
deal [5] 120/17 138/2 161/2 197/25 214/19
dealing [4] 31/20 34/4 110/9 161/21
dealings [1] 11/19
deals [1] 88/12
dealt [3] 136/14 157/6 157/12
death [4] 103/16 104/4 104/12 104/23
deathly [1] 92/14
deaths [1] 98/21
Debbie [10] 27/6 112/3 112/9 112/15 112/20
  112/23 113/4 126/6 151/5 151/6
Debra [1] 27/4
debt [2] 138/23 138/23
December [4] 90/20 121/22 121/22 121/25
December 2008 [1] 90/20
December 3rd [2] 121/22 121/22
decide [7] 19/4 36/25 158/22 197/14 199/9
  199/11 207/20
decided [6] 27/20 30/16 36/14 91/2 107/19
  116/20
decides [5] 198/9 199/5 199/11 199/14
  200/23
decision [11] 196/9 196/14 197/9 197/11
  197/16 197/19 197/22 199/25 204/24 205/25
  206/14
decision-maker [1] 204/24
dedication [1] 88/9
deduct [1] 8/3
deducted [1] 8/20
deduction [1] 8/20
DEFENDANT [19] 1/7 1/19 9/14 23/12 36/3
  44/18 44/21 47/21 48/1 48/5 73/24 160/6
  160/20 161/24 176/11 178/4 200/23 204/19
  214/18
defendant's [26] 4/15 4/23 5/2 5/16 6/18

9/20 9/23 54/7 96/20 97/25 104/3 104/10
  123/13 127/1 127/6 139/8 160/9 160/21
  170/12 194/8 206/18 217/5 217/6 217/7
  217/8 217/9
defendants [19] 14/18 23/12 66/1 74/4 152/8
  154/16 161/18 161/19 214/3
defender's [7] 10/14 10/16 11/10 21/19 21/22
  158/9 158/15
defense [14] 43/9 64/10 77/6 119/8 119/18
  159/6 171/5 171/6 173/13 205/7 209/12
  209/17 211/23 213/3
deference [1] 7/4
deficiency [1] 9/4
define [3] 75/25 76/2 76/2
defines [1] 204/22
definitely [1] 99/4
definition [2] 206/11 209/21
defraud [2] 92/16 208/17
delay [2] 59/19 202/13
delays [1] 201/1
delete [2] 33/20 35/22
deliver [1] 15/12
delivery [2] 15/8 121/17
denied [2] 53/7 53/9
deny [1] 213/15
department [14] 11/3 11/7 11/15 18/24
  21/13 68/12 69/12 69/20 80/10 85/24 86/1
  100/8 158/8 180/14
depending [1] 68/21
depends [2] 68/1
deposition [8] 91/8 91/16 91/22 92/2 92/4
  92/11 121/11 146/13
depositions [3] 91/14 121/10 121/19
deposits [2] 160/8 160/13
deprive [1] 152/7
deputized [10] 12/13 12/16 14/15 16/7
  32/12 43/23 43/25 44/12 106/4 106/7
deputy [1] 16/19
derives [1] 211/2
describe [1] 185/20
describing [1] 185/16
deserved [1] 206/22
designed [1] 11/24
detail [1] 184/25
detailed [2] 143/22 179/24
details [1] 68/22
detective [17] 9/20 12/8 12/20 12/21 13/5
  67/15 68/11 70/3 85/23 92/3 93/16 146/5
  169/14 169/21 177/10 179/23 186/8
detectives [1] 131/4
determined [2] 9/2 211/15
Deveraux [25] 4/16 4/17 95/19 95/23 100/18
  100/22 100/23 101/10 116/8 116/20 116/21
  116/21 116/22 118/21 118/22 138/4 142/20
  142/23 142/24 142/25 143/2 145/1 147/4
  150/11 185/12
Deveraux's [1] 84/24
devise [1] 211/12
dictated [1] 15/21
didn't [132]
die [7] 37/12 38/7 38/10 40/16 106/23 125/3
  166/24
difference [5] 34/20 77/4 77/6 170/24 208/5
different [16] 13/1 33/19 39/15 43/2 57/2
  66/21 66/25 70/4 74/17 101/5 128/22 146/9
  146/12 164/20 181/17 206/7
difficult [8] 27/15 98/9 98/15 98/23 102/8
  103/10 159/8 159/17
direct [15] 10/6 78/10 78/13 98/6 107/22
  139/8 139/11 147/12 147/17 183/2 184/6

**D**

direct... [4] 184/10 185/19 212/23 216/4
directed [2] 81/15 213/9
directly [1] 198/16
disclose [1] 120/23
disclosed [2] 120/19 120/21
discuss [19] 39/22 46/15 46/23 47/2 49/14
 94/9 94/14 94/19 124/14 145/17 145/20
 163/23 163/24 188/18 190/18 194/21 197/24
 199/19 203/11
discussed [9] 43/21 124/11 124/12 150/12
 164/3 164/25 210/24 211/15 212/1
discussion [2] 121/14 178/3
diseases [1] 74/6
dishonest [1] 173/20
dismiss [2] 2/10
dismissed [2] 204/5 204/11
disregard [4] 162/8 165/24 166/3 166/6
disrespectful [1] 107/12
disseminated [1] 181/7
distinction [2] 208/20 211/10
distinguishing [1] 208/22
distraction [6] 172/6 172/7 172/9 172/10
 172/11 182/16
distraught [2] 40/15 106/22
DISTRICT [3] 1/1 1/1 1/13
dive [1] 123/5
division [8] 12/8 12/8 12/10 12/11 13/4 13/5
 13/16 179/10
divorce [4] 127/17 137/13 137/17 143/14
divorced [1] 109/22
divvy [1] 168/19
docket [2] 2/10 7/9
doctor [4] 132/19 132/21 132/22 132/24
doctor's [2] 132/7 132/17
document [23] 4/14 18/3 18/10 20/15 34/18
 35/1 58/10 98/6 103/1 123/13 131/11 132/6
 132/8 139/15 139/17 139/18 139/19 139/21
 145/8 145/12 146/15 146/17 202/2
documentary [1] 86/17
documentation [1] 36/13
documented [2] 99/22 192/2
documenting [1] 181/19
documents [15] 3/17 3/18 33/1 33/1 33/2
 33/3 33/4 96/24 129/5 129/10 141/24 142/2
 142/19 145/6 146/14
does [38] 18/9 20/7 53/2 56/6 61/19 61/22
 61/23 61/24 62/3 63/10 64/7 64/20 68/14
 76/14 77/4 77/6 77/6 85/12 85/21 87/15
 104/20 104/23 114/20 131/20 145/23 146/2
 151/22 156/20 191/1 199/6 199/13 201/1
 201/22 202/3 203/3 203/19 211/4 214/23
doesn't [18] 53/14 53/25 54/1 54/18 56/7
 57/10 62/15 64/23 74/11 77/16 77/20 135/15
 174/8 175/18 198/4 198/20 204/24 208/17
doing [23] 14/21 14/25 31/15 35/21 37/20
 43/2 45/6 80/7 80/20 114/25 119/12 129/22
 130/22 130/23 130/24 130/25 141/14 159/4
 163/24 171/16 181/17 181/25 182/1
dollar [1] 153/8
dollars [1] 9/10
don't [167]
donated [2] 162/25 163/10
donation [1] 163/12
done [16] 16/1 61/16 75/1 83/1 88/5 93/11
 118/5 141/22 156/4 160/1 166/8 170/17
 172/7 194/15
door [6] 22/25 37/19 37/20 58/21 59/5 65/13
door's [1] 76/5

doorman [1] 106/14
doormen [1] 105/19
double [1] 206/8
doubt [3] 6/11 84/4 114/15
doubted [1] 78/11
doubting [1] 78/12
down [15] 18/14 23/22 30/24 38/12 39/25
 46/22 85/16 117/14 130/24 131/2 132/15
 172/9 172/19 176/1 203/22
Dr. [1] 3/10
Dr. Sutherland [1] 3/10
draft [1] 35/16
drafted [2] 49/2 205/25
drafting [2] 169/18 169/19
drag [1] 42/25
draw [1] 180/16
drawn [1] 125/1
Drive [5] 8/22 8/24 9/15 104/21 111/25
dropped [1] 74/1
drug [2] 153/24 155/9
drugs [3] 15/7 15/7 15/8
duces [6] 25/2 25/19 25/21 25/22 25/24 25/25
due [4] 56/17 126/18 175/9 185/11
dumpy [1] 185/14
during [14] 2/21 8/13 29/5 41/5 46/23 49/12
 49/13 94/14 111/16 111/24 145/21 151/19
 154/3 173/7
Duties [1] 68/23
dwell [1] 123/4

**E**

e-mail [12] 1/25 42/22 97/7 102/21 102/24
 103/3 103/12 103/19 103/24 139/12 146/20
 169/15
e-mailed [1] 210/2
e-mails [15] 42/23 96/11 96/13 97/9 102/5
 102/22 110/21 113/2 113/6 113/15 140/3
 146/22 168/16 169/8 185/4
each [18] 15/5 15/18 16/23 16/23 30/11
 33/15 34/13 42/14 42/17 43/15 44/24 44/24
 74/12 74/12 114/12 134/5 137/21 141/20
earlier [3] 59/7 88/15 125/15
early [8] 3/6 22/10 22/12 22/13 58/16 175/9
 195/6 202/24
easier [2] 31/7 33/24
East [2] 1/17 39/3
easy [1] 41/3
eat [4] 192/5 192/13 192/16 193/1
economic [8] 13/22 18/21 26/6 28/23 28/25
 43/12 85/23 211/3
Eddie [8] 91/2 108/11 108/12 108/16 108/18
 108/22 108/23 127/14
edification [1] 50/6
editing [2] 85/17 86/19
edition [1] 170/13
editor [1] 85/15
education [1] 7/17
effect [1] 9/8
efforts [1] 176/1
egg [1] 124/8
Egypt [2] 123/2 137/1
either [20] 20/4 25/24 30/22 40/5 44/21 49/2
 70/12 122/2 134/15 143/21 152/25 155/6
 160/20 171/11 176/24 198/7 201/4 201/24
 210/9 210/21
elaborate [1] 74/20
elements [1] 180/11
Eleventh [1] 206/14
Eli [31] 20/25 21/5 21/6 29/11 45/20 47/21
 48/1 48/1 48/5 48/8 48/13 57/5 57/7 60/23

61/13 61/20 63/5 151/23 161/22 162/2
 162/12 162/15 162/19 163/7 163/15 164/7
 164/17 164/21 165/1 165/5 165/7
Eli's [3] 45/23 55/16 152/13
eliminated [1] 210/14
else [22] 45/8 52/4 53/10 53/25 57/23 64/21
 65/18 91/6 93/3 94/19 105/24 109/21 125/21
 126/3 126/9 138/5 148/4 148/12 164/4
 195/14 200/16 203/9
else's [2] 124/8 124/8
embarrass [1] 85/18
embarrassed [1] 78/17
embassies [1] 81/7
embassy [3] 140/18 140/18 140/19
embellished [1] 87/9
embezzlement [1] 184/3
Emily [1] 4/17
emotional [1] 38/15
emotionally [1] 109/12
emphasize [1] 135/7
emphasizes [1] 166/6
employed [2] 10/12 10/13
employees [1] 106/18
employment [1] 9/5
emptor [1] 207/2
encompassed [2] 42/4 205/8
encompasses [1] 205/2
encounter [5] 15/6 15/18 22/19 42/14 42/17
end [16] 32/22 39/17 40/21 43/18 48/7 48/8
 69/2 69/5 84/15 84/15 90/20 91/2 120/24
 201/25 210/15 210/17
ended [1] 90/23
ending [1] 87/1
endorsement [1] 85/2
enemy [1] 100/6
enforcement [8] 141/4 150/24 153/20 153/24
 157/20 159/9 160/1 173/4
engage [1] 57/7
engaging [1] 169/21
England [5] 135/23 136/8 136/23 137/7
 137/8
enlighten [1] 128/6
enough [4] 171/1 199/8 199/10 206/23
enriched [1] 74/5
entail [1] 74/11
entailed [1] 48/13
enter [1] 40/11
entered [6] 4/23 5/16 97/25 104/10 177/24
 202/18
enters [5] 3/25 59/16 95/11 148/21 202/9
entire [3] 9/17 116/9 147/12
entirely [1] 67/13
entitled [5] 8/11 8/19 152/9 152/25 217/15
entry [5] 2/10 23/5 23/8 33/17 33/18
ESQ [1] 1/19
establish [4] 3/2 31/22 53/10 73/6
established [5] 54/11 68/10 70/17 73/5
 212/19
establishment [1] 2/13
et [5] 15/14 52/7 70/10 158/25 211/15
et cetera [5] 15/14 52/7 70/10 158/25 211/15
ethic [1] 33/7
ethically [2] 117/13 119/4
evaluate [2] 127/18 127/19
evaluation [4] 127/24 179/12 179/22 180/9
evaluations [1] 33/8
even [26] 32/12 51/3 52/10 57/21 82/20
 87/24 91/18 100/19 101/25 102/13 102/14
 103/15 105/19 114/2 119/1 120/22 124/12
 128/20 139/18 155/22 157/25 164/2 171/15

**E**

even... [3]  205/4 205/16 214/15
evening [7]  198/1 198/7 203/9 203/15 214/14
215/2 215/3
event [1]  176/2
events [5]  131/25 170/21 175/18 180/10
181/14
eventually [11]  14/18 27/16 27/19 27/20
27/23 31/23 70/15 100/7 112/21 161/5 163/9
ever [30]  45/24 46/6 51/18 55/17 55/21 64/21
75/14 82/21 84/17 84/19 86/6 89/3 89/11
90/10 90/13 101/24 101/25 102/17 108/19
114/23 115/7 118/12 122/12 122/25 123/3
123/6 142/19 151/13 151/13 179/24
every [9]  43/11 43/17 81/19 107/6 107/7
138/10 159/22 172/7 184/25
everybody [1]  214/19
everybody's [1]  22/17
everyone [10]  2/2 4/2 59/18 94/25 95/13
148/16 148/23 183/17 202/11 203/17
everything [18]  8/21 44/19 45/2 46/16 72/11
74/11 86/10 100/3 107/5 138/5 139/5 147/16
152/4 170/17 200/16 200/25 203/12 214/20
evidence [50]  3/17 3/19 4/14 4/18 4/19 4/24
5/1 5/17 5/25 6/1 6/3 6/5 6/17 6/17 6/22
15/15 15/15 16/15 22/1 22/3 22/4 33/3 44/17
57/3 58/10 85/21 97/12 97/25 104/3 104/10
126/25 133/4 133/15 133/18 139/9 159/5
177/7 177/19 177/24 181/19 201/13 201/24
202/15 202/20 203/6 212/19 212/24 214/1
217/3 217/5
evidently [1]  130/5
evil [6]  47/22 47/25 48/7 74/7 74/12 74/13
ex [1]  131/21
ex-husband [1]  131/21
exact [5]  23/4 62/4 62/8 141/16 143/23
exactly [5]  15/10 17/18 35/5 74/18 79/19
Exam [1]  7/24
examination [14]  9/2 10/6 153/17 179/3
179/6 183/2 183/18 184/6 184/8 184/9
185/20 185/25 191/16 193/18
examine [5]  49/5 92/22 127/3 188/10 188/15
example [5]  156/4 156/17 175/13 204/21
208/7
except [3]  21/5 21/6 110/1
exchange [2]  74/8 191/5
exchanges [1]  190/20
exchanging [1]  191/5
exclamation [1]  86/17
exclude [1]  44/21
exclusion [1]  20/20
exclusively [1]  57/8
excuse [5]  41/4 125/13 197/13 197/23 201/21
exercise [8]  88/22 89/5 89/12 113/13 114/8
169/22 188/3 213/13
exhibit [27]  4/16 4/23 5/1 5/16 5/19 6/3 6/15
6/24 9/12 9/18 18/3 85/21 96/21 97/20 97/25
102/24 104/4 104/10 123/13 127/1 127/6
139/8 170/12 177/9 177/20 177/24 194/8
exhibit 106-7A [1]  177/20
exhibit 21 [3]  5/19 6/3 6/24
exhibit 27 [2]  127/1 127/6
exhibit 34 [2]  96/21 139/8
exhibit 39 [1]  4/16
exhibit 59 [3]  85/21 170/12 194/8
exhibit 611 [1]  6/15
exhibit 69 [1]  18/3
exhibit 70 [1]  104/4
exhibit 71 [1]  123/13

exhibits [4]  5/2 201/18 217/3 217/5
exhibits 58 [1]  5/2
exist [4]  67/20 76/9 76/9 77/16
existence [2]  174/15 175/11
exists [3]  9/18 77/16 77/21
exits [4]  94/12 145/19 194/23 203/16
expand [2]  152/2 152/3
expansive [1]  205/12
Expendables [1]  85/7
expense [2]  8/22 8/23
expenses [3]  8/2 8/4 8/12
experience [5]  11/9 69/22 85/10 144/8 173/5
experiences [3]  88/7 189/17 189/21
expert [3]  76/6 195/4 202/22
expertise [1]  124/25
explain [10]  26/1 27/11 65/4 65/6 65/14
67/21 120/16 158/14 172/15 205/17
explained [9]  27/6 27/18 37/22 80/3 80/4
85/13 86/10 87/17 171/21
explaining [2]  20/1 114/9
explanation [2]  113/18 162/18
explicit [2]  205/10 205/11
express [3]  40/5 40/8 86/24
expressed [1]  166/24
extensive [1]  49/20
extent [1]  64/16
extract [1]  42/20
eyes [1]  8/9

**F**

face [2]  39/8 44/23
fact [48]  9/17 23/2 23/15 33/21 44/15 45/13
49/23 52/13 53/5 53/6 54/5 55/5 58/20 66/6
73/7 82/5 105/22 112/16 124/7 125/9 134/24
152/11 152/14 155/5 158/7 159/14 161/11
162/14 164/17 167/23 173/7 174/8 174/21
175/14 176/14 176/17 187/13 188/4 188/18
204/22 205/21 206/11 207/19 207/19 208/5
208/10 208/11 208/23
facts [10]  3/9 32/20 33/19 34/21 46/4 57/13
57/14 57/16 82/9 208/12
factual [5]  101/4 101/5 101/8 136/11 180/3
failed [1]  51/22
fair [13]  21/4 29/12 34/22 34/23 57/6 61/6
74/9 74/10 81/5 100/2 100/6 141/13 171/1
faith [3]  209/12 209/13 212/4
fall [2]  35/11 180/23
false [7]  48/17 64/24 66/7 74/15 89/24 205/1
212/15
falsely [1]  74/5
familiar [3]  40/16 40/18 85/5
families [2]  3/2 203/1
family [27]  3/3 24/6 39/25 47/22 48/7 52/21
74/8 78/24 86/21 88/3 88/4 100/6 100/9
129/24 130/7 149/11 152/25 157/7 157/13
160/6 160/21 161/25 163/21 195/5 202/23
203/2 203/3
famous [6]  39/21 88/15 116/25 118/22
166/25 167/24
fantasy [3]  187/3 187/16 188/17
far [5]  44/19 44/24 87/11 132/24 136/13
fascinated [1]  85/5
fascinating [2]  86/15 189/23
fast [2]  120/20 120/20
fat [1]  185/14
fault [2]  122/23 124/19
favorable [3]  206/2 206/17 209/8
FBI [6]  12/16 16/13 16/13 32/13 154/6 155/6
Fe [3]  137/19 168/25 169/1
feared [1]  92/7

federal [20]  1/21 14/5 14/9 14/22 14/23
16/11 17/2 17/10 22/22 32/6 32/14 43/22
44/1 44/13 44/16 106/4 106/5 127/20 130/25
153/20
FedExed [1]  25/11
FedExes [1]  112/19
fee [3]  72/3 72/3 72/4
feel [15]  33/9 34/7 36/10 36/19 40/20 41/3
44/20 78/17 91/24 115/6 119/14 197/18
198/16 198/20 199/13
feels [3]  197/21 198/22 199/11
fees [1]  57/6
feet [2]  39/7 40/15
fell [1]  78/18
felt [16]  20/15 27/15 37/3 42/20 43/1 43/14
54/14 78/16 78/17 80/5 126/2 135/2 135/13
141/17 152/12 162/21
Ferguson [1]  1/20
fertilization [3]  122/15 123/21 124/8
few [5]  3/16 4/12 71/24 168/11 199/16
fiction [5]  87/10 88/10 88/12 89/24 107/2
fictional [6]  114/23 169/22 186/1 186/4
186/8 187/24
fide [2]  211/13 211/14
fight [2]  85/3 85/9
fighter [1]  84/24
fighters [1]  85/6
fights [1]  86/18
figure [3]  135/3 202/14 214/17
figured [1]  168/16
file [4]  15/21 32/22 32/22 42/2
filed [5]  2/11 9/11 131/11 213/9 213/15
filing [1]  212/14
fill [1]  15/2
filming [1]  181/24
final [4]  33/21 34/1 42/11 141/21
finally [2]  9/1 140/18
financial [3]  84/15 156/1 156/5
finding [3]  167/17 168/25 169/1
findings [1]  132/7
fine [6]  6/23 36/23 80/17 92/20 99/24 201/23
fingers [1]  31/5
finish [7]  107/13 139/24 194/20 198/25
200/19 201/17 203/18
finished [4]  63/14 97/16 127/24 199/2
Finkelstein [1]  10/14
fire [1]  124/24
firearms [1]  15/14
firmed [1]  32/20
first [65]  2/8 2/10 10/4 13/5 29/16 36/9 36/15
39/6 41/14 41/24 43/25 44/3 47/6 47/6 47/7
47/16 48/16 51/4 52/24 62/18 62/18 64/25
70/4 79/18 82/22 83/10 83/11 83/18 83/21
84/1 84/2 84/6 84/8 88/7 88/17 105/14
119/11 122/2 122/9 126/1 127/9 127/9
128/18 128/24 141/6 156/20 159/17 166/21
170/20 171/3 171/24 172/5 172/5 178/9
178/17 178/20 178/22 198/17 203/24 209/18
210/5 210/6 211/23 213/3 214/1
fit [2]  115/25 187/4
Fitness [2]  115/21 116/24
five [2]  51/25 175/1
FL [2]  1/18 1/22
flat [1]  161/2
Floor [1]  1/18
FLORIDA [9]  1/1 1/7 1/24 7/22 10/20 20/20
144/24 145/4 166/18
FLPD [1]  86/10
focus [1]  173/1
fold [1]  70/3

**F**

folded [1]  37/23
folder [1]  31/8
folks [1]  190/3
follow [7]  29/14 33/24 34/1 43/13 47/5 56/3 81/5
followed [3]  29/15 81/4 179/5
following [18]  3/25 50/4 59/16 60/4 63/2 75/14 75/15 75/18 87/19 94/24 95/11 148/15 148/21 165/17 197/3 199/21 202/9 202/18
food [4]  192/5 192/13 192/16 192/25
foot [1]  185/5
force [3]  12/14 14/14 154/7
foregoing [1]  217/13
forensic [2]  92/24 128/11
forever [6]  5/5 35/9 35/12 35/12 35/14 35/17
forfeited [1]  153/1
forget [1]  171/7
forgetting [1]  81/24
forgive [5]  52/2 81/11 107/12 111/17 130/19
forgot [2]  126/17 186/2
form [7]  15/20 46/15 82/8 94/10 96/5 194/22 203/11
formal [2]  19/22 24/14
former [4]  9/20 85/25 86/4 89/8
formulating [1]  69/12
Fort [30]  1/18 7/22 8/16 8/17 8/24 10/20 10/23 10/25 11/3 11/6 11/14 14/13 14/17 15/17 21/12 23/2 24/18 43/11 68/12 68/15 69/11 69/19 69/23 73/20 85/24 86/1 99/21 130/23 131/3 158/7
forth [1]  89/4
fortune [22]  2/7 2/15 7/16 7/19 57/8 87/21 88/4 149/6 171/9 172/1 172/2 172/16 173/16 173/19 190/7 190/8 190/10 190/16 195/6 202/25 213/13 213/17
fortune-telling [2]  173/16 173/19
forward [4]  140/23 157/19 160/24 202/14
forwarded [1]  139/20
found [12]  25/3 40/14 64/10 89/25 110/24 118/25 130/5 133/14 134/15 166/17 167/5 196/20
four [10]  14/19 30/13 42/4 77/23 97/21 97/23 183/24 201/14 204/13 204/14
frank [1]  123/22
Frankie [1]  149/16
Franklin [4]  1/23 217/12 217/18 217/19
frankly [2]  198/23 198/24
fraud [21]  18/18 27/12 27/13 56/22 76/1 76/2 76/23 76/24 93/17 93/17 93/20 93/23 110/9 138/19 144/9 144/12 184/2 204/13 204/17 206/10 206/10
fraudulent [9]  67/23 93/7 172/2 205/5 208/14 208/16 208/19 208/19 208/24
fraudulently [1]  74/5
Fred [3]  1/19 77/25 87/3
free [5]  2/13 115/6 158/4 159/25 213/13
French [1]  179/9
friend [9]  39/21 85/23 88/15 108/8 116/25 118/1 166/25 166/25 167/4
friendly [1]  115/13
friends [7]  28/24 48/7 108/23 108/25 109/16 110/3 129/20
frightened [1]  88/16
front [9]  49/8 51/4 65/22 75/20 98/10 104/14 175/16 212/22 213/5
fruitful [1]  176/6
frustrate [1]  79/20
fugitive [2]  162/3 165/19

full [1]  126/14
full-time [1]  126/14
fully [1]  40/21
function [1]  110/18
fund [1]  152/10
furnish [1]  173/3
furnished [1]  168/24
further [5]  4/25 40/2 47/20 49/14 153/10
furthest [1]  133/16
future [6]  15/8 74/6 74/25 75/4 131/25 169/22

**G**

gain [1]  210/25
gambling [1]  7/25
Gary [5]  23/25 24/2 183/4 183/6 183/7
gather [4]  145/8 15/15 16/15 16/17
gathered [2]  16/24 156/1
gave [16]  25/3 34/16 83/8 89/24 92/25 121/6 125/9 140/19 140/19 144/3 146/24 151/17 151/23 182/9 212/5
gear [1]  12/3
General [1]  86/10
generally [1]  20/3
generous [1]  118/1
gentleman [2]  60/6 128/12
gentlemen [12]  4/3 46/14 59/19 94/8 95/14 145/17 148/24 162/9 194/19 202/12 203/6 203/8
Georgetown [5]  14/12 17/11 155/8 181/23 189/22
Georgia [1]  69/23
gets [2]  43/11 188/4
getting [17]  28/6 33/9 36/11 58/19 58/21 59/19 63/17 64/5 72/12 103/21 105/15 113/6 116/6 150/3 150/14 150/17 182/4
gift [6]  117/17 163/15 163/16 209/15 209/21 211/12
gifts [1]  189/12
Gilliam [1]  143/16
gist [1]  57/11
give [20]  6/18 35/5 57/21 61/22 75/6 75/15 79/25 90/8 90/9 113/17 117/17 118/2 130/8 188/25 189/4 189/13 206/23 208/8 208/10 209/12
given [9]  57/5 74/20 121/17 160/20 162/12 162/14 162/18 163/1 164/2
gives [1]  59/5
giving [7]  38/4 81/13 118/16 122/21 167/16 187/24 199/24
glad [1]  145/3
Glades [2]  37/17 42/1
glioblastoma [1]  105/6
gloves [1]  86/7
goal [1]  66/16
God [3]  162/21 163/16 164/14
goes [8]  8/2 8/14 8/21 9/1 18/25 37/25 75/6 85/25
going [128]
gold [2]  189/6 189/7
golf [4]  99/8 99/17 100/13 102/17
gone [3]  78/22 190/15 198/19
good [17]  2/4 4/2 9/21 10/8 22/20 36/11 43/15 85/17 94/5 144/6 159/21 159/22 198/18 209/12 209/13 212/4 215/2
Goon [4]  23/24 24/2 183/5 183/6
Gordon [2]  73/18 73/20
gossip [1]  101/18
gossipping [1]  101/21
got [56]  11/9 12/13 13/18 14/3 14/15 15/7

17/2 19/17 19/21 20/4 21/23 25/1 26/17 27/24 28/2 32/17 33/25 34/18 36/18 36/24 57/6 68/18 69/3 81/7 88/5 96/21 100/7 100/22 102/5 103/3 109/22 113/3 116/25 120/16 122/13 124/7 126/4 126/10 137/16 137/20 137/20 137/24 137/25 138/1 138/2 138/6 138/15 138/18 138/18 151/16 156/5 171/24 181/24 183/22 190/1 206/22
gotta [2]  31/4 107/6
Gottlieb [2]  2/12 213/15
government [56]  1/4 1/16 3/17 4/14 6/7 14/6 14/9 14/22 16/11 21/24 29/19 29/21 30/2 32/7 32/14 43/22 44/1 44/13 44/16 52/21 54/17 63/12 64/10 64/13 64/17 64/18 65/1 67/19 76/25 77/17 96/22 106/5 120/19 120/20 120/23 139/23 145/25 146/2 146/21 148/8 151/1 165/8 195/20 201/5 202/18 205/6 206/2 206/17 209/8 209/15 209/21 209/23 210/24 211/16 213/16
Government's [12]  5/19 6/2 6/14 75/25 76/11 177/19 177/24 194/8 204/2 210/23 217/3 217/4
grab [1]  207/9
grade [1]  7/17
grand [64]  28/17 47/17 47/17 47/18 48/10 48/12 48/19 49/3 49/9 49/20 51/4 51/23 51/25 53/3 53/5 53/14 58/18 58/19 58/25 59/5 59/10 60/1 62/17 62/23 63/4 63/15 63/18 63/18 63/25 64/5 64/24 65/12 65/23 66/7 67/1 67/8 75/20 76/22 91/5 91/19 127/25 128/1 128/2 128/4 128/16 128/18 128/24 129/2 129/4 129/13 129/14 129/15 129/16 130/4 130/6 130/8 130/16 130/22 131/5 174/2 174/11 175/14 175/16 175/19
granddaughter [1]  29/9
grandson [1]  98/21
grateful [1]  118/5
gratitude [1]  86/24
gray [1]  39/9
grayish [1]  39/10
great [3]  4/7 86/19 131/24
greatly [1]  162/22
gross [1]  211/4
grounds [2]  207/15 214/1
group [3]  15/16 172/8 189/24
groups [2]  195/5 202/24
guarantee [3]  99/7 153/5 153/9
guard [1]  10/18
guess [40]  15/1 19/10 21/24 23/11 24/14 30/2 40/14 50/24 51/24 53/17 54/10 55/25 56/11 57/15 58/2 66/14 66/18 66/22 68/1 77/1 77/12 85/17 99/3 124/2 128/22 149/14 154/7 166/4 167/12 171/10 180/2 185/3 186/10 197/14 197/23 201/18 204/19 206/1 209/10 214/5
guessing [1]  136/10
guilty [1]  160/1
gullible [3]  204/17 205/4 205/18
guns [1]  15/13
guy [5]  92/9 92/11 92/13 92/14 118/25
gym [13]  115/18 115/19 115/20 115/22 115/23 115/24 116/1 116/3 116/10 116/13 116/18 117/2 126/15
Gypsies [2]  7/19 182/14
gypsy [16]  24/2 79/11 79/12 79/13 79/14 87/15 88/4 101/19 101/19 149/6 171/13 195/4 195/5 202/23 202/24 203/1
gypsyscam.com [1]  54/8

# H

hadn't [4]  56/23 128/4 129/14 133/23
hair [1]  112/14
half [8]  21/15 154/11 154/19 170/20 173/7
 201/10 201/11 207/1
hand [8]  2/9 2/16 9/22 22/18 47/14 50/7
 121/17 195/23
handcuffs [1]  150/16
handed [1]  209/25
handled [3]  84/15 140/11 159/20
handwritten [1]  104/25
happen [5]  43/14 140/17 163/20 171/22
 173/9
happened [8]  15/19 20/1 20/13 20/15 42/22
 52/18 90/9 107/16
happening [1]  34/5
happens [3]  68/1 171/19 181/18
happy [7]  36/22 45/7 45/23 54/6 55/16 60/22
 62/2
hard [2]  33/8 82/16
hardback [3]  170/23 170/24 193/7
hasn't [2]  48/22 202/3
haven't [10]  5/10 11/15 20/25 171/5 171/11
 183/11 197/12 211/25 213/8 213/22
having [18]  23/19 23/22 69/25 72/12 100/19
 102/13 102/14 103/17 150/12 162/18 182/5
 184/13 184/14 184/18 184/22 186/17 187/5
 187/16
he'd [1]  27/21
he'll [1]  53/18
he's [26]  28/23 38/20 53/16 57/5 58/5 61/25
 62/2 62/2 62/3 62/12 67/14 67/17 75/21 85/6
 92/11 99/13 111/19 111/20 127/19 162/20
 167/16 179/21 180/2 181/3 207/6 213/10
head [5]  26/6 82/19 99/8 99/17 100/13
headline [1]  97/4
hear [8]  62/6 77/3 86/22 96/4 98/17 121/14
 132/14 153/13
heard [16]  4/6 31/11 64/25 66/5 66/5 67/6
 87/13 101/24 102/17 112/23 133/23 147/1
 167/18 186/12 192/4 205/14
hearing [1]  205/13
hears [1]  200/10
heart [4]  5/5 105/3 117/11 159/24
heaven [6]  38/12 38/19 38/20 40/25 83/18
 122/4
heavier [1]  86/6
heavyset [1]  37/19
heck [2]  86/11 86/12
held [5]  11/14 38/11 63/2 75/18 165/17
hell [4]  38/12 38/21 83/19 122/4
help [17]  44/21 70/10 71/22 84/13 84/16
 84/17 84/19 86/25 88/22 89/5 113/13 117/17
 118/3 118/15 126/16 163/16 187/16
helped [4]  44/21 80/14 118/2 152/24
helpful [3]  43/8 44/17 159/5
helping [7]  32/2 93/10 158/1 162/22 162/22
 162/23 164/19
here [31]  3/22 3/22 39/25 46/20 49/18 51/3
 54/22 59/2 63/1 65/11 66/22 72/17 82/16
 84/1 85/14 126/11 128/7 132/13 132/16
 139/24 146/13 176/23 179/5 186/12 188/9
 190/1 196/1 197/17 202/15 211/21 212/3
Here's [1]  197/13
hero [2]  87/2 87/6
hers [4]  88/15 147/2 149/24 166/25
herself [4]  40/24 123/7 123/16 173/22
Hersey [1]  68/25
hesitancy [1]  209/6
hesitated [1]  38/14
hidden [1]  119/14
hide [2]  126/19 132/9
hiding [1]  119/17
higher [1]  175/10
highlight [2]  47/10 47/12
Highway [1]  1/21
Hill [12]  18/17 19/18 20/10 24/16 25/3 25/16
 27/1 27/5 27/25 31/21 32/3 34/15
himself [1]  110/1
hired [4]  11/9 92/22 124/23 124/25
hit [5]  82/19 86/6 99/8 147/24 148/1
hitting [2]  99/16 100/13
Holbrook [1]  69/1
hold [3]  27/7 46/19 150/1
Hollywood [1]  115/21
homes [1]  74/7
homicide [1]  43/12
honest [16]  18/4 30/25 35/18 40/10 42/6
 43/18 44/25 45/14 55/7 87/16 92/9 99/1
 103/14 109/15 171/15 185/3
Honestly [1]  126/10
Honor [73]
Honor's [6]  47/5 47/12 49/6 50/6 50/8 58/24
HONORABLE [1]  1/12
Hope [1]  4/3
hopefully [4]  3/12 198/1 198/1 198/5
hoping [2]  53/18 168/17
Hopkins [1]  213/14
horrified [1]  86/23
Hospital [1]  124/9
hotel [1]  166/18
hour [1]  207/1
hours [4]  33/9 100/2 201/10 201/11
house [11]  22/6 22/23 23/6 23/12 23/13
 23/16 137/7 137/8 137/18 138/1 144/21
housekeeping [1]  4/12
houses [1]  181/24
Howard [1]  10/14
however [2]  70/8 211/4
huh [5]  55/1 103/5 129/6 135/17 187/1
hundred [1]  159/24
hundreds [1]  100/2
hunt [1]  31/5
hurt [1]  40/23
husband [18]  9/14 91/1 98/3 98/21 98/24
 99/6 99/13 99/16 100/12 101/4 101/25 102/9
 103/11 103/17 103/25 105/17 105/23 131/21
hypothetical [3]  35/13 45/6 54/24

# I

I'd [18]  5/18 26/2 39/15 42/13 48/18 57/2
 75/11 85/21 97/12 118/7 152/6 165/15 178/7
 179/1 198/15 202/2 212/9 213/22
I'll [29]  2/17 6/7 30/25 43/10 49/19 57/17
 61/22 77/1 79/8 83/6 86/3 94/4 103/1 106/10
 113/25 127/6 128/8 131/18 132/8 139/22
 142/12 165/23 166/2 171/15 185/3 195/1
 200/19 212/11 214/5
I'm [217]
I've [10]  31/16 35/10 118/5 124/1 172/3
 179/24 203/20 205/14 206/7 206/12
idea [18]  64/12 71/4 71/4 71/17 87/15 87/22
 88/7 93/18 93/24 99/1 114/20 114/22 118/21
 125/8 138/21 146/11 192/23 210/12
identification [4]  18/2 96/21 97/22 123/13
identified [2]  37/20 157/10
identify [1]  102/10
identities [1]  164/18
imagine [1]  105/8
immaterial [1]  52/16
immediately [3]  158/8 181/18 197/9
Immigration [1]  14/14
impact [1]  11/23
impeach [8]  57/23 58/15 58/18 66/22 67/11
 67/13 67/15 78/3
impeaching [2]  146/10 147/1
implicated [1]  160/22
importance [1]  134/21
important [9]  35/25 107/14 134/4 152/1
 172/5 181/9 207/19 208/7 210/12
impression [2]  108/22 162/25
improper [5]  57/24 62/20 67/16 67/18 79/6
inappropriate [1]  165/25
Inc [7]  138/4 142/24 142/25 143/2 144/25
 145/1 145/4
incident [1]  107/17
incidents [1]  135/21
inclined [2]  200/9 212/21
include [8]  142/2 155/25 209/14 211/5 212/7
 212/9 212/11 212/21
included [3]  202/20 210/24 211/16
includes [1]  206/12
including [2]  210/16 212/3
income [6]  7/23 8/1 9/7 189/12 211/1 211/4
inconsistencies [1]  147/19 148/2
inconsistency [2]  147/16 147/23
inconsistent [7]  58/17 59/1 63/21 63/22
 139/3 147/9 187/17
incorrect [4]  33/20 33/21 46/4 125/10
incorrectly [1]  196/18
increase [1]  137/21
independent [2]  135/11 141/20
independently [1]  156/1
indicate [1]  178/2
indicated [5]  154/12 156/13 164/7 169/6
 176/9
indicates [1]  170/12
indicted [1]  14/19
indictment [31]  14/19 26/24 26/25 29/19
 47/7 47/7 47/11 47/18 48/17 49/2 58/16
 58/20 59/6 59/8 60/25 62/18 62/19 63/19
 64/6 80/13 81/20 81/21 83/1 83/2 83/3
 125/24 125/25 126/12 157/18 161/18 204/9
indictments [7]  47/16 48/24 49/1 58/22 60/1
 60/8 61/4
indigent [1]  158/16
individual [4]  42/14 42/17 141/20 161/8
individuals [8]  30/12 80/9 156/10 156/13
 157/15 160/10 173/9 173/12
infiltrate [1]  16/18
infiltrated [1]  189/24
informant [4]  99/20 99/21 99/23 100/1
informants [1]  15/12
information [24]  7/13 18/16 32/17 34/16
 36/13 49/7 64/2 82/2 83/8 89/23 101/19
 112/21 125/9 127/15 156/1 164/16 168/24
 173/3 174/5 174/25 180/24 181/11 181/15
 190/19
informed [1]  127/21
inheritance [1]  211/13
initial [13]  19/24 23/5 23/8 29/25 32/5 32/18
 34/18 35/12 37/7 116/9 146/7 157/18 205/13
initially [3]  32/3 33/17 35/8
initials [3]  48/23 156/17 157/9
innocent [1]  159/24
insane [1]  93/2
inside [4]  15/12 39/14 136/16 171/19
insights [1]  86/20
insist [1]  52/7

# I

instance [5]  37/4 71/8 72/5 146/8 146/15
instantly [1]  86/8
instead [2]  107/23 109/9
instruct [2]  165/23 166/3
instructing [1]  166/5
instruction [29]  204/18 204/20 204/21 205/6
205/8 206/2 206/5 206/16 207/8 208/3 209/4
209/8 209/13 209/13 209/16 209/17 209/19
209/20 210/23 211/22 212/2 212/5 212/9
212/12 212/14 212/16 212/25 213/3 214/8
instructions [12]  47/5 47/13 197/25 198/2
200/18 200/20 203/19 204/1 205/23 207/12
209/2 212/23
intelligence [6]  12/15 16/17 16/24 86/25
181/3 181/7
intend [1]  196/5
intending [1]  91/21
intent [4]  208/17 210/11 210/17 210/20
intention [1]  70/16
interest [5]  8/20 8/22 9/7 28/1 110/7
interested [3]  26/21 37/11 50/8
interesting [1]  194/4
Internal [3]  5/24 7/11 8/4
interrupt [5]  36/5 111/7 171/23 195/7 208/4
interrupted [1]  81/11
interview [25]  29/8 52/4 56/4 56/25 57/1
57/20 57/22 61/12 63/8 106/14 108/7 109/8
109/21 127/13 127/13 156/7 158/21 161/12
161/15 161/17 161/23 162/11 164/6 174/4
175/6
interviewed [1]  29/11 48/15 49/1 52/1 52/2
52/22 61/8 132/5 157/15 161/11 182/22
interviewing [2]  157/22 160/3
interviews [1]  156/25
intro [4]  122/13 122/18 123/24 124/3
introduced [2]  4/14 116/24
introducing [1]  4/12
introduction [2]  203/25 204/8
introductory [1]  212/22
invest [9]  116/13 116/15 116/20 117/4
117/10 117/22 118/14 118/17 183/16
invested [2]  116/14 116/17
investigated [3]  24/9 27/13 111/8
investigating [2]  110/2 130/1
investigation [74]
investigations [7]  12/11 13/4 153/20 155/5
159/4 179/10 181/22
investigative [4]  53/12 155/6 155/15 159/10
investigator [5]  10/17 25/23 158/9 158/14
158/18
investing [2]  116/16 117/5
investment [4]  116/9 119/7 120/9 120/11
invited [1]  91/18
involve [3]  7/15 47/24 47/24
involved [17]  7/15 17/2 17/11 28/8 45/9
51/17 52/4 69/4 69/12 92/15 92/25 93/22
154/10 154/12 161/4 171/24 173/8
involvement [1]  172/1
involving [2]  172/2 184/3
IRC [1]  8/4
irrelevant [3]  52/15 63/19 64/4
IRS [14]  7/13 9/12 23/3 28/11 69/3 69/3 69/5
69/9 120/16 138/19 138/22 140/6 146/23
151/15
IRS-0142 [1]  9/12
IRS-1-0076 [1]  7/13
IRS1 [3]  5/20 5/21 9/12
IRS1-0073 [1]  5/20
IRS1-0092 [1]  5/21
IRS1-0124 [1]  9/12
isn't [11]  15/3 22/14 50/13 53/4 53/6 53/8
67/10 133/1 174/7 175/8 205/8
isolated [1]  39/24
issue [12]  8/3 8/19 9/9 64/5 204/16 209/6
209/7 209/15 209/18 211/22 213/2 213/4
issued [1]  28/17
issues [14]  5/22 6/18 7/8 7/14 8/14 8/14 9/2
59/20 63/18 165/9 197/25 198/6 206/18
211/24
it'd [1]  27/15
it's [96]
items [6]  3/1 4/12 47/6 47/8 47/9 199/1
itself [1]  33/23

# J

jackpot [2]  147/25 148/1
Jamaican [2]  189/23 193/20
James [1]  16/6
January [19]  25/10 34/17 34/19 37/7 37/9
90/3 107/7 114/1 114/4 168/5 168/9 177/4
177/15 177/20 178/16 187/22 192/21 193/7
193/9
January 15th [2]  37/9 192/21
January 20th [1]  34/19
January 3 [1]  107/7 114/1 168/5
January 29th [6]  90/3 168/9 177/4 177/15
177/20 178/16
January 5th [1]  34/17
January 6th [1]  25/10
Japan [1]  74/24
Jason [3]  85/5 85/6 171/17
JC [10]  47/21 47/23 47/25 48/6 48/8 48/11
48/12 48/15 48/19 48/21
Jean [2]  156/20 156/23
Jeep [1]  112/2
Jennifer [8]  18/17 19/18 25/16 27/25 31/21
32/3 34/14 34/15
job [9]  11/23 14/24 16/17 43/15 85/17 86/19
119/12 126/15 160/1
John [51]  9/23 10/4 45/12 45/13 45/15 45/18
45/19 45/22 46/6 47/20 49/21 50/7 50/22
51/18 52/1 52/2 52/9 52/11 52/14 53/5 53/7
53/9 53/14 54/11 54/14 54/15 55/3 55/5 55/7
55/11 55/15 55/21 55/25 56/7 56/18 57/20
60/6 60/17 61/3 61/13 61/19 63/6 64/1 64/6
125/16 125/20 151/19 151/22 161/9 161/21
216/3
joint [1]  153/19
Jolie [3]  168/18 185/9 185/9
Joseph [1]  60/17
Joyce [18]  5/23 7/10 25/7 25/14 37/25 42/10
131/20 131/21 141/2 142/7 142/9 142/12
142/15 144/17 144/22 144/25 145/4 195/25
Jude [148]
Jude -- I [2]  114/20 125/2
Jude's [11]  93/25 116/12 121/11 126/20
127/3 130/19 131/2 136/2 136/17 146/10
191/18
JUDGE [43]  1/13 2/20 6/8 6/20 7/1 8/6
46/11 53/19 54/18 56/15 57/12 57/18 57/19
63/15 66/24 76/18 76/19 77/11 77/23 78/5
89/21 94/5 148/2 148/17 164/22 165/15
165/18 170/1 190/25 198/23 198/24 199/17
200/20 201/2 201/10 201/23 206/3 210/2
210/10 211/18 212/13 213/14 213/22
July [3]  11/11 117/2 158/12
July 1st [1]  11/11
June [5]  9/15 11/8 170/13 170/19 180/19
June 2011 [1]  170/13
June 28th [1]  9/15
June 30th [1]  11/8
jurors [14]  3/23 59/11 95/7 166/3 197/14
197/23 197/24 200/13 200/25 201/16 201/22
207/7 212/22 214/16
jury [102]
jury's [2]  4/25 67/6
just [121]
justify [1]  151/16

# K

Karate [1]  86/5
Keechl [1]  1/20
keep [16]  18/10 18/25 32/23 35/22 42/14
73/4 83/9 112/4 117/14 119/5 119/14 160/14
172/22 174/15 197/17 208/11
keep to [1]  172/22
keeping [1]  41/18
Kelly [1]  69/2
KENNETH [1]  1/12
kept [6]  41/17 42/22 44/19 44/20 59/21
116/23
Kerby [1]  71/8
Kevin [1]  179/17
kickboxer [2]  84/24 86/4
kickboxing [2]  85/10 86/5
killed [10]  98/2 98/24 99/6 99/16 100/12
101/4 101/25 102/9 103/10 103/11
killing [1]  103/25
kind [11]  71/6 87/7 168/2 168/16 168/17
182/8 190/14 198/6 208/13 214/2 214/2
kindness [2]  86/25 117/11
kitchen [1]  184/4
knew [23]  21/24 25/5 27/1 38/14 41/20 87/12
105/15 106/16 109/21 110/4 118/7 127/18
134/6 134/16 134/24 134/25 135/3 140/9
151/2 184/18 204/25 205/4 205/5
knock [1]  92/13
knocked [3]  22/25 37/18 85/16
know [216]
knowing [1]  113/15
knowledge [16]  73/9 73/13 81/6 81/25 86/23
88/12 93/15 108/18 109/11 109/19 123/15
132/25 143/6 144/2 192/15 192/25
knowledgeable [1]  151/3
known [5]  114/12 156/18 172/3 204/25 205/5
knows [5]  73/24 130/17 147/9 147/24 172/25
Kopelowitz [1]  1/20

# L

LA [2]  115/21 116/24
labeled [1]  139/10
lack [3]  39/11 77/14 100/5
ladies [13]  4/3 46/14 59/19 73/8 94/8 95/14
145/16 148/24 162/8 194/19 202/12 203/5
203/8
lady [8]  18/17 69/17 83/14 112/8 112/11
140/14 149/2 171/7
lane [1]  18/14
language [15]  3/8 128/22 204/18 205/17 207/7
large [6]  48/1 137/18 141/1 160/11 160/20
184/3
Larry [6]  27/16 52/3 60/18 121/18 130/12
131/3
last [26]  2/15 4/7 10/1 10/3 69/1 85/20 98/7
98/13 103/9 114/2 131/15 135/8 139/11
154/1 165/18 165/24 166/1 178/14 180/24
181/10 181/14 193/6 204/22 210/2 212/15
214/19

**L**

later [10]  27/2 35/10 73/25 77/3 85/15 112/22 120/17 126/2 167/2 175/1
latest [1]  86/11
latter [1]  13/24
Lauderdale [30]  1/18 7/22 8/16 8/17 8/24 10/20 10/23 10/25 11/3 11/7 11/15 14/13 14/17 15/17 21/12 23/3 24/18 43/11 68/12 68/15 69/11 69/19 69/23 73/20 85/24 86/1 99/21 130/23 131/3 158/7
Laughter [1]  44/9
laundering [1]  213/19
Laurence [1]  1/16
Lavender [1]  5/3
law [22]  2/9 20/20 38/2 39/1 99/11 99/12 134/9 141/3 144/14 144/15 150/24 153/20 157/19 159/9 160/1 173/4 205/17 205/20 205/22 207/14 207/21 207/22
lawful [1]  210/25
laws [1]  29/8
lawsuit [2]  134/11 134/25
lawyer [4]  164/6 165/3 198/17 213/23
LB [8]  27/1 29/18 32/10 36/17 37/1 83/11 125/18 125/21
LD [1]  157/10
lead [9]  27/19 68/15 68/16 68/19 69/3 69/9 69/11 155/6 155/8
leading [2]  154/20 186/13
leaned [1]  118/2
learn [10]  14/21 33/18 100/23 119/19 119/24 124/7 167/2 167/3 167/7 172/6
learned [6]  25/15 30/14 41/7 144/3 172/4 173/4
least [6]  44/5 57/10 76/24 130/3 161/19 190/8
leave [12]  11/6 13/21 44/23 46/15 47/2 79/8 94/10 166/3 166/5 193/23 198/4 203/11
leaving [1]  45/4
led [2]  141/20 168/25
leeway [1]  199/25
left [7]  39/20 58/5 93/4 103/20 105/25 137/13 203/23
legal [4]  20/16 142/17 143/16 145/7
legitimacy [1]  214/3
legitimate [1]  66/15
less [2]  153/2 201/12
lessons [1]  92/13
let [48]  17/21 18/2 29/5 31/25 34/12 36/24 45/5 49/11 49/12 54/19 60/10 61/11 65/1 65/4 73/7 78/14 80/9 80/16 87/19 92/17 92/19 96/20 98/5 101/9 107/14 123/9 126/25 127/9 128/8 128/15 128/23 131/15 134/21 139/8 139/22 140/21 152/16 152/19 180/16 181/2 182/8 188/7 194/20 197/24 198/10 203/20 206/8 214/14
let's [24]  18/15 32/16 34/14 35/8 36/8 37/4 45/5 46/14 58/12 59/11 89/20 94/9 95/7 134/4 135/21 136/16 148/20 172/13 172/15 173/1 194/19 196/25 200/12 201/15
letter [2]  16/1 18/6
letters [6]  80/11 80/15 80/22 80/23 80/24 110/21
letting [2]  5/12 140/6
level [4]  12/11 12/12 12/14 166/1
Lewis [8]  91/2 108/11 108/12 108/16 108/18 108/22 108/23 127/14
licenses [1]  213/25
lie [2]  72/25 123/16
life [14]  39/12 39/14 57/5 74/20 74/25 75/1

75/3 75/4 84/13 175/23 187/4 189/17 190/20 191/5
lift [1]  86/6
light [2]  49/6 108/24
likelihood [1]  175/10
limit [1]  77/25
limited [2]  8/13 57/18
line [17]  34/23 51/19 64/15 65/8 67/10 70/7 76/20 77/1 78/2 103/9 104/24 104/25 117/13 117/23 119/16 124/16 168/15
line 41 [1]  104/25
lined [1]  200/25
lines [2]  28/3 205/19
list [3]  6/4 168/1 177/9
listed [2]  26/25 27/1 59/6
listen [3]  71/8 174/25 176/24
listened [3]  90/3 114/7 176/17
listing [1]  180/10
litigate [1]  77/25
little [30]  9/8 11/8 13/8 15/10 22/24 28/5 31/24 34/13 37/19 38/5 38/14 38/22 39/18 74/17 87/8 92/11 124/1 133/19 159/19 160/24 189/22 196/10 199/5 199/6 199/12 205/11 205/12 206/1 207/8 207/11
live [4]  35/9 35/12 35/14 114/17
lived [2]  136/22 176/3
living [1]  135/23
LLC [1]  115/25
loan [12]  120/9 120/11 120/13 120/17 121/3 121/7 209/15 209/22 210/12 211/14 211/14
loans [1]  189/13
lobby [1]  176/3
local [2]  22/22 24/2
locate [1]  159/5
located [4]  8/24 9/15 161/12 162/2
locating [1]  160/4
location [4]  8/15 8/16 8/18 31/20
locations [2]  7/21 111/25
logistically [1]  202/14
long [15]  13/15 23/8 31/6 42/13 46/9 55/24 107/18 118/11 118/12 154/1 154/10 168/3 181/16 193/14 207/14
longer [4]  9/3 9/4 9/5 150/24
longterm [2]  181/16 181/22
looked [11]  23/18 23/18 37/24 38/6 39/11 92/12 101/3 110/6 119/1 185/17 185/20
looking [11]  24/18 74/11 97/16 97/17 98/12 103/14 132/13 144/8 147/24 203/22 206/4
looks [4]  105/3 119/4 132/16 185/15
losing [1]  168/7
lost [3]  36/21 157/1 206/7
lot [25]  21/25 27/15 35/19 38/23 41/21 43/13 56/19 63/5 85/6 87/5 114/20 122/21 124/20 141/13 142/13 144/4 149/19 150/4 151/2 151/20 160/16 160/25 181/17 201/10 201/13
love [6]  5/6 5/6 35/11 35/17 84/25 148/1
luck [2]  47/23 48/7
lunch [3]  40/13 94/9 94/14
lying [2]  113/14 188/13

**M**

M-a-l-d-e-g-a-n [1]  121/18
M-a-l-l-e-y [1]  60/18
mafia [1]  16/16
magnitude [1]  86/22
mail [16]  1/25 42/22 70/12 80/15 97/7 102/21 102/24 103/3 103/12 103/19 103/24 111/2 139/12 146/20 169/15 206/10
mailed [2]  80/15 210/2
mails [1]  42/23 96/11 96/13 97/9 102/5

103/22 110/21 113/2 113/6 113/15 140/3 146/22 168/16 169/8 185/4
main [2]  34/5 35/25
maintained [1]  70/14
major [3]  18/21 101/10 101/14
majority [1]  35/23
maker [1]  204/24
makes [2]  198/17 205/24
making [3]  74/14 107/23 185/13
Maldegan [1]  121/18
male [2]  189/24 193/20
Malley [1]  60/17
man [2]  12/1 123/2
management [2]  19/1 19/1
Manhattan [1]  7/22
manner [5]  48/20 66/2 66/4 70/14 155/11
manners [1]  47/15
manufacture [1]  67/19
March [1]  24/12
marijuana [1]  14/13
marital [2]  124/20 125/6
mark [2]  8/7 8/8
marked [4]  18/2 96/20 123/13 126/25
marking [1]  7/2
MARKS [96]
Marks' [10]  22/23 25/4 26/10 26/20 27/3 34/15 133/11 141/2 149/11 197/11
MARRA [2]  1/2 1/12
married [4]  39/1 122/25 123/3 185/9
Masquerade [1]  5/4
material [8]  204/22 206/11 207/19 208/5 208/9 208/10 208/12 208/22
materially [1]  212/15
matrimonial [2]  121/12 121/15
matter [17]  7/9 23/15 49/23 86/8 131/5 152/11 157/16 157/19 161/4 173/8 188/4 204/15 204/24 205/14 208/17 211/2 217/15
matters [6]  18/11 50/9 93/11 199/5 214/8 214/20
May 14th [1]  11/1
May 26 [1]  102/25
maybe [32]  6/5 13/24 23/3 23/11 23/11 30/13 32/4 32/19 36/9 36/9 44/8 44/17 65/1 101/1 103/20 110/7 112/22 117/11 118/7 124/2 133/7 134/8 134/15 137/19 142/22 161/5 185/12 193/17 196/18 207/15 207/16 207/17
McCoy [1]  180/16
me [189]
mean [32]  20/7 31/3 51/12 53/24 54/1 68/14 75/21 76/11 79/20 82/13 87/7 102/9 110/5 114/11 125/2 127/17 133/18 134/2 150/6 160/15 168/12 171/23 172/10 184/23 187/21 196/8 199/6 199/7 200/17 206/22 206/24 208/4
meaning [1]  208/6
means [4]  47/15 48/20 109/17 196/5
meant [3]  71/16 143/4 196/18
meditation [1]  57/9
meet [3]  15/6 24/5 131/3
meeting [22]  15/5 16/23 27/20 36/15 37/7 41/10 41/14 41/24 83/18 83/22 84/1 84/1 84/2 84/6 84/8 84/10 86/9 151/5 151/6 166/21 186/18 210/13
meetings [2]  42/5 150/21
member [2]  19/11 160/21
members [14]  16/15 24/6 80/10 99/19 157/7 160/6 161/25 173/9 182/3 182/13 182/19 182/22 191/23 203/2
memo [1]  120/11
memorandum [2]  57/21 61/11

## M

memorializing [1]  141/11
memorized [1]  26/14
memory [6]  18/14 21/9 40/12 58/8 123/10
177/1
memory's [1]  17/14
men's [1]  46/25
mental [2]  39/4 39/16
mention [2]  48/23 206/13
mentioned [26]  14/5 25/18 39/20 47/10 60/6
102/17 122/1 122/9 122/9 127/2 138/14
153/23 154/6 156/17 157/9 166/22 169/14
177/3 177/6 182/13 183/1 183/2 183/4
191/17 194/7 206/13
mentions [2]  187/23 204/6
Merit [1]  217/12
messages [1]  86/8
messing [1]  72/17
met [15]  17/19 41/22 42/1 42/21 60/5 83/17
92/10 122/2 122/10 170/20 171/3 178/17
185/13 185/21 185/23
metro [1]  12/15
Mexico [16]  90/16 90/24 91/7 95/20 95/22
108/7 109/22 121/10 121/19 121/21 127/2
127/12 131/11 134/22 168/25 169/1
Miami [2]  14/15 17/19
Michael [11]  2/11 37/25 39/1 42/10 73/18
73/20 141/2 142/7 142/9 142/12 142/16
Michaels [7]  25/7 25/14 144/17 144/22
144/25 145/4 195/25
microphone [9]  9/25 13/7 62/7 72/16 96/16
98/16 108/14 122/20 145/22
mid [1]  12/12
middle [3]  10/4 13/24 146/13
might [19]  8/5 17/20 17/20 17/21 73/8 80/11
103/14 112/8 140/21 148/9 150/13 160/5
167/25 175/10 176/2 183/17 201/12 206/17
206/18
mike [1]  168/7
Miller [8]  20/24 29/9 38/25 39/1 74/17 74/21
75/2 161/24
million [2]  38/5 192/8
millionaire [1]  185/8
mind [15]  5/11 40/11 64/13 75/12 83/5 84/2
84/6 84/7 84/13 110/18 136/17 145/25
197/12 210/14 211/11
minds [2]  86/20 210/13
minimal [1]  148/10
minor [1]  204/15
minute [5]  46/14 168/11 178/11 196/12
214/20
minutes [11]  23/11 50/1 59/10 145/18 148/6
148/13 175/1 178/9 194/20 199/16 201/7
mislead [3]  63/15 72/25 200/7
misled [2]  38/21 63/18
misrepresents [1]  56/17
miss [2]  31/12 32/1
missed [1]  6/5
misstated [1]  61/2
misstatement [1]  93/25
mistake [1]  26/16
mistaken [1]  92/4
mistrial [2]  165/21 166/2
Mitzi [8]  87/11 87/14 87/20 87/21 87/24
87/25 171/7 190/9
Mitzi's [1]  86/19
modification [2]  212/16 212/17
modified [1]  209/7
modify [2]  209/2 209/6

modifying [2]  206/1 206/16
Mohammed [4]  123/1 123/7 123/16 136/22
moment [9]  15/23 29/7 46/11 100/21 125/13
143/25 181/2 187/10 193/3
mon [1]  190/5
money [98]
money's [1]  121/5
monies [1]  25/5
Montassir [65]  37/4 38/19 39/14 39/19 40/23
41/12 41/15 42/1 74/14 83/15 84/11 89/3
89/11 89/23 89/25 90/16 91/22 92/7 95/19
101/10 102/21 103/13 105/14 106/2 110/10
113/5 123/1 123/6 123/7 123/16 131/23
132/2 132/3 132/5 132/17 132/20 132/22
138/3 142/24 143/6 143/16 143/16 143/18
143/24 145/2 146/8 146/22 147/5 147/11
166/18 169/6 169/21 169/23 170/20 171/3
171/12 173/3 175/23 176/3 176/10 176/14
176/21 178/4 187/18 194/7
Montenegro [1]  2/25
month [7]  21/15 21/16 28/12 51/24 154/19
161/23 188/2
months [13]  41/7 41/9 42/12 48/16 51/25
51/25 53/13 114/3 154/20 187/15 187/15
187/15 187/25
months' [1]  8/16
Moonlight [2]  5/4 5/7
morally [2]  117/13 119/4
morning [19]  2/2 4/2 4/5 5/3 5/7 9/21 10/8
22/5 22/9 22/10 197/15 197/16 198/8 199/9
200/1 200/5 201/19 210/1 214/6
mortgage [8]  8/20 8/22 8/23 8/23 8/25
137/14 137/17 184/2
most [9]  16/20 36/1 85/22 136/13 151/3
152/1 161/19 179/24 184/24
Motai [2]  86/12 86/14
mother [3]  3/5 38/2 38/17
mother-in-law [1]  38/2
mothers [3]  3/5 195/5 202/24
motion [3]  2/10 213/8 213/15
move [7]  6/17 78/1 97/12 98/16 104/3 165/21
172/13
moved [5]  12/12 12/14 80/2 141/23 192/23
movements [1]  31/18
movie [1]  85/9
movies [1]  85/7
Mr [6]  18/4 214/11 216/4 216/5 216/6 216/7
Mr. [122]
Mr. Bardfeld [15]  28/2 28/7 28/17 28/20
28/21 29/24 30/11 30/15 32/5 47/17 51/5
51/13 56/19 76/23 213/10
Mr. Cleary [15]  50/16 56/24 57/4 60/21
152/8 152/12 161/11 161/14 161/17 162/11
163/4 163/17 164/6 165/1 165/3
Mr. Cleary's [1]  57/1
Mr. Eli [1]  165/1
Mr. Ogden [3]  90/18 93/10 93/13
Mr. Schwartz [39]  4/9 15/11 25/8 26/15
35/20 39/7 40/10 43/19 44/22 45/18 46/24
55/12 59/22 71/2 73/1 78/13 79/20 95/5
95/15 97/18 101/23 104/24 107/3 115/7
120/12 120/21 126/18 144/9 148/25 150/18
152/20 161/7 170/6 197/7 201/21 202/15
206/20 209/24 211/17
Mr. Stack [30]  10/8 13/7 45/5 47/16 48/10
48/11 48/18 49/5 50/16 50/22 56/20 57/2
59/14 59/25 64/13 68/9 71/3 72/15 75/5 78/8
81/11 90/4 96/15 97/16 98/2 104/14 111/17
122/19 123/12 153/19
Mr. Stark [1]  50/13

Mr. Stefin [15]  2/20 3/7 50/15 95/3 152/3
152/6 165/20 182/9 184/6 184/12 184/17
202/3 202/17 209/25 213/9
Mr. Stefin's [1]  77/13
Mr. Wolofsky [1]  73/21
Mrs. [7]  7/16 7/23 23/21 40/23 195/17
197/11 198/20
Mrs. Marks [5]  7/16 7/23 23/21 195/17
198/20
Mrs. Marks' [1]  197/11
Mrs. Montassir [1]  40/23
Ms. [64]  2/4 7/25 20/10 23/20 24/16 25/3
27/1 27/5 38/19 39/19 41/12 41/15 52/11
56/17 57/5 57/7 60/23 74/22 84/11 89/3
89/11 89/23 89/25 90/16 91/22 92/7 95/1
99/6 110/11 112/7 112/10 112/18 131/23
132/2 132/3 132/5 132/17 132/20 132/22
133/8 148/18 163/7 163/15 164/17 165/7
169/6 169/21 169/23 170/20 171/3 171/12
173/3 176/3 176/10 176/14 176/21 178/4
194/7 195/22 196/1 197/5 198/13 199/22
200/10
Ms. Atsuko [1]  74/22
Ms. Eli [6]  57/5 57/7 163/7 163/15 164/17
165/7
Ms. Hill [5]  20/10 24/16 25/3 27/1 27/5
Ms. Marks [17]  2/4 7/25 23/20 95/1 99/6
110/11 112/7 112/10 112/18 133/8 148/18
195/22 196/1 197/5 198/13 199/22 200/10
Ms. Montassir [32]  38/19 39/19 41/12 41/15
84/11 89/3 89/11 89/23 89/25 90/16 91/22
92/7 131/23 132/2 132/3 132/5 132/17
132/20 132/22 169/6 169/21 169/23 170/20
171/3 171/12 173/3 176/3 176/10 176/14
176/21 178/4 194/7
Ms. Victoria [1]  60/23
Ms. Watts [1]  56/17
Ms. Watts' [1]  52/11
much [22]  31/7 33/24 71/2 71/24 78/12 116/9
116/12 116/15 124/2 138/5 143/23 156/25
169/20 171/25 176/10 176/21 185/8 190/16
199/13 201/3 201/4 201/8
multi [1]  185/8
multi-millionaire [1]  185/8
multiforme [1]  105/7
multiple [1]  175/21
municipalities [1]  213/25
must [1]  100/22
myself [7]  3/9 28/9 30/23 37/20 60/10 91/24
101/1
MySpace [1]  126/20

## N

naive [2]  204/18 205/18
name [47]  10/1 10/1 10/3 10/3 10/4 10/4
25/11 37/23 48/22 69/17 70/4 79/14 83/14
91/2 108/10 115/24 123/2 126/4 126/10
126/17 128/12 140/15 142/15 142/17 143/5
143/10 143/10 143/15 143/16 143/18 143/19
143/23 143/24 144/17 145/2 147/4 147/6
149/2 156/20 161/8 167/3 167/5 171/7
173/13 183/4 190/9 195/24
named [6]  18/17 87/21 101/15 102/20 123/1
191/24
names [5]  29/7 70/20 106/16 128/12 164/20
Nancy [21]  2/12 20/24 26/18 27/6 28/1 29/9
31/23 34/4 34/15 34/16 35/8 35/13 36/11
36/23 36/23 36/24 45/8 141/16 157/8 157/14
161/24
Nancy's [2]  32/17 141/1

**N**

narcotics [2] 12/12 12/12
narrow [1] 203/22
nasty [1] 119/11
national [1] 86/4
nature [2] 12/1 46/1
near [2] 72/15 103/9
necessarily [1] 174/4
necessary [3] 108/1 108/2 163/24
need [22] 26/3 46/19 53/10 56/11 67/8 85/14 94/19 106/20 106/21 107/1 178/11 195/10 196/8 196/14 196/22 197/6 198/22 200/4 200/8 200/22 201/5 214/9
needed [4] 26/2 27/13 59/20 105/23
needs [4] 119/2 119/15 199/12 199/14
negative [1] 164/16
negativities [1] 71/22
negativity [2] 70/9 72/8
negligence [3] 205/6 205/7 205/22
neighbors [1] 110/3
Neil [1] 126/1
Neil-something [1] 126/1
neither [1] 51/17
nephew [1] 23/18
nervous [1] 160/24
never [40] 6/10 22/18 37/14 42/9 48/9 48/15 49/1 51/16 51/21 54/23 70/16 82/20 84/23 86/24 87/1 91/21 93/18 93/21 99/5 99/18 101/3 101/3 102/4 103/15 110/8 112/8 114/12 114/18 115/2 120/22 123/11 130/5 142/21 146/1 147/1 164/3 185/13 185/23 187/23 199/1
never-ending [1] 87/1
nevertheless [1] 160/21
new [44] 7/22 8/15 10/19 14/16 90/15 90/24 91/6 95/20 95/22 98/19 98/20 105/17 105/18 105/19 106/3 106/7 106/13 106/17 107/17 108/3 108/7 109/22 121/10 121/19 121/21 124/9 127/2 127/12 131/11 134/6 134/22 135/1 137/9 137/12 137/17 137/25 138/1 149/6 149/18 149/24 167/25 168/25 169/1 173/17
next [13] 3/14 3/19 4/11 8/19 11/11 39/22 40/12 89/20 98/22 105/4 106/24 139/11 167/6
nice [2] 39/8 203/15
Nicholas [5] 5/23 7/9 99/13 104/12 104/20
night [2] 210/2 212/15
Nights [9] 5/3 84/22 85/4 85/20 87/21 170/7 190/9 190/14 193/6
no [222]
nobody [2] 32/13 110/1
non [1] 57/12
non-reflective [1] 57/12
none [5] 48/15 57/10 125/16 208/1 214/10
nonobjective [1] 208/23
nonsensical [1] 103/21
normally [2] 20/12 186/22
North [1] 137/9
northeast [1] 40/2
northwest [1] 40/3
note [12] 9/17 9/17 34/3 142/2 142/4 144/7 144/8 144/9 144/11 144/12 144/16 144/19
notepad [1] 30/24
notes [10] 6/8 6/8 9/13 32/24 41/18 42/14 42/17 54/21 94/10 96/11
nothing [9] 44/20 44/23 114/8 114/8 119/16 137/16 137/25 188/2 188/3
notice [3] 26/23 197/19 197/22

noticed [1] 212/13
novelist [1] 167/24
novels [3] 84/25 85/19 113/13
November [3] 37/2 112/6 217/16
November 4th [1] 37/2
nuclear [1] 10/19
null [2] 144/9 144/12
number [28] 6/18 7/9 11/14 12/4 12/22 13/18 14/6 20/23 26/23 34/10 42/12 43/21 59/25 97/20 102/24 109/1 109/3 149/8 150/21 156/5 156/13 160/12 171/21 176/14 191/23 197/9 198/20 206/3
number 34 [1] 102/24
number 8970-06 [1] 7/9

**O**

o'clock [2] 112/12 214/15
oath [5] 59/14 64/1 95/8 121/23 147/8
object [5] 74/3 82/8 139/13 164/22 172/23
objected [2] 165/18 185/24
objection [81]
objectionable [1] 206/21
objections [1] 213/25
objective [8] 34/5 34/9 35/20 35/25 43/19 43/19 207/24 208/22
obnoxious [1] 119/8
observed [1] 180/13
obtain [5] 10/19 25/2 25/23 158/25 213/24
obtained [5] 25/18 28/18 64/6 104/16 129/5
obvious [2] 114/7 131/24
obviously [6] 6/8 40/15 57/3 57/25 174/13 174/15
occasion [1] 142/15
occasions [1] 59/25
occupational [1] 213/24
occur [1] 151/19
occurred [5] 15/21 16/25 149/15 175/18 176/2
October [5] 25/9 37/1 41/7 112/9 116/2
October 1st [1] 116/2
October 21st [1] 37/1
October 31st [1] 37/1
October 5th [1] 25/9
odd [1] 205/12
Odessa [5] 12/17 16/12 17/11 17/16 32/13
off [13] 12/11 36/7 65/8 138/22 138/23 140/6 146/17 146/18 146/24 150/1 172/13 198/8 207/18
offer [5] 3/18 4/18 5/1 57/25 177/19
offered [1] 177/7
office [23] 1/17 10/14 10/16 11/10 16/22 21/19 21/22 24/21 26/1 26/7 27/10 28/22 32/18 96/14 106/12 106/17 119/13 126/16 129/11 134/9 158/9 158/15 172/19
officer [18] 10/23 10/24 11/21 16/8 16/24 20/19 25/23 69/19 70/1 101/14 106/4 106/8 115/9 115/10 118/25 119/14 159/9 180/9
officers [5] 22/21 66/2 69/13 130/24 181/20
official [2] 1/23 150/25
ofisa [2] 172/17 172/19
oftentimes [1] 30/6
Ogden [18] 28/9 68/17 84/14 90/18 92/3 93/10 93/13 93/16 101/13 102/20 121/15 130/12 132/5 138/17 138/18 169/14 169/21 186/8
oh [11] 17/4 33/11 47/1 86/2 88/18 99/2 118/19 128/10 149/19 188/9 200/14
okay [92]
once [4] 20/4 24/15 80/1 84/18
one [99]

one's [1] 61/2
ones [1] 21/2
ongoing [3] 36/24 80/7 181/16
only [35] 2/19 3/1 17/10 32/9 36/17 36/21 39/13 41/25 43/11 51/12 57/5 58/23 71/16 80/6 101/7 101/24 102/16 103/1 103/17 109/23 129/23 130/4 132/23 133/13 133/18 136/17 146/4 178/8 183/25 187/22 192/20 194/1 198/5 211/22 213/2
open [44] 65/13 76/6 90/23 116/1
open-ended [1] 90/23
opened [2] 42/2 116/5
opens [2] 58/21 59/4
operate [1] 14/23
operates [2] 14/22 39/2
operation [19] 12/14 12/17 14/9 14/11 14/14 15/10 15/25 16/10 16/12 16/13 17/2 17/16 27/22 28/8 32/13 153/23 155/8 181/23 189/22
operations [1] 17/10
opinion [2] 115/10 145/7
opinions [4] 46/15 94/10 194/22 203/11
opportunity [6] 29/7 79/25 90/9 115/15 140/14 152/6
opposite [3] 89/6 89/14 89/25
oral [1] 8/11
order [13] 2/1 25/24 47/22 67/12 67/14 70/13 75/3 136/1 136/8 163/2 180/11 198/2 214/20
organization [2] 14/12 16/18
organizational [2] 16/7 18/9
organized [4] 12/10 12/18 12/25 154/7
original [2] 33/3 91/11
originally [2] 25/15 100/9
Ostrow [1] 1/20
otherwise [1] 59/4
our [18] 11/23 12/3 19/2 19/3 39/17 46/13 70/16 70/16 94/9 110/9 116/6 120/13 121/8 145/16 148/11 168/5 177/9 182/15
outlining [1] 26/3
outside [8] 34/2 111/13 112/11 128/20 136/14 175/15 175/18 199/18
outstanding [3] 165/1 211/24 213/2
over [43] 7/17 11/8 15/7 15/8 20/3 23/18 25/25 27/16 28/7 28/22 28/24 31/17 31/17 34/3 38/5 51/2 77/22 82/19 98/16 99/8 99/16 100/9 100/13 115/9 115/11 118/4 126/16 139/20 155/18 155/22 159/9 168/16 169/12 169/14 169/15 184/23 198/19 198/23 201/13 201/18 206/17 211/1 214/14
overcoming [1] 213/25
overnight [1] 197/14
Overruled [18] 61/15 75/9 79/23 82/10 104/9 117/20 119/22 124/22 130/17 131/7 137/3 140/9 143/12 159/13 170/2 187/20 191/13 192/18
overtime [1] 33/9
own [5] 31/16 73/13 93/15 116/6 192/14
owner [1] 145/5

**P**

P-e-l-h-a-m [1] 19/8
p.m [9] 94/23 94/23 148/14 148/14 197/2 197/2 199/20 199/20 215/3
P.O [10] 111/2 111/16 111/23 112/3 112/17 168/25 169/1 169/2 169/4 169/8
packet [2] 204/1 204/2
page [25] 2/15 7/7 18/3 26/3 49/24 85/11 97/18 98/5 103/1 103/9 126/20 127/9 131/15 131/18 132/6 139/10 203/24 204/1 204/7 204/8 204/9 204/15 204/22 206/5 206/6

**P**

page 13 [1] 204/22
Page 15 [1] 204/8
page 19 [1] 2/5
page 5 [2] 131/15 132/6
page 7 [1] 204/1
page 9 [2] 204/9 204/15
pages [9] 1/10 2/12 4/13 5/19 5/20 48/13
85/20 96/21 206/6
pages 19 [1] 2/12
pages 73 [1] 5/20
paid [7] 8/22 33/9 52/5 124/19 140/7 141/25
158/3
paint [1] 67/22
palm [3] 1/7 1/24 172/20
pan [2] 109/2 109/17
paper [3] 34/10 43/11 190/13
paperback [1] 170/13
papers [5] 134/14 135/3 135/4 135/5 136/9
paperwork [1] 121/8
paragraph [16] 2/15 7/14 48/24 62/4 62/9
62/12 98/7 98/12 98/13 98/14 127/10 131/15
139/11 204/12 204/23 213/19
paragraphs [1] 47/15
paren [3] 86/16 86/18 195/4
parents [2] 7/18 7/19
parlance [1] 172/16
participant [1] 169/18
participate [1] 157/22
participated [4] 56/4 150/21 161/15 169/15
participation [1] 174/2
particular [26] 16/18 19/4 27/11 29/1 31/20
34/3 35/21 43/1 72/4 78/10 78/16 78/19 79/9
80/5 84/22 85/4 93/1 103/24 116/23 128/13
155/12 156/10 156/15 161/4 172/1 172/7
particularly [2] 5/20 190/16
parties [2] 210/17 210/20
partner [4] 116/8 117/5 117/22 118/9
partners [8] 116/3 116/12 116/15 116/22
116/22 117/1 117/8 117/14
pass [1] 174/21
passed [4] 3/4 41/6 41/7 112/21
past [4] 74/20 74/25 75/1 168/21
patience [1] 87/1
Patrick [1] 179/9
patrol [3] 19/13 69/19 180/6
patrolman [2] 11/17 12/19
pattern [1] 209/1
pause [1] 198/12
pay [7] 90/2 107/6 137/22 138/7 138/14
143/23 146/25
payment [2] 27/8 48/2
payments [2] 57/7 138/19
peck [1] 31/5
Pelham [1] 19/3
penalty [2] 9/3 9/4
pennies [1] 153/8
people [54] 28/22 30/9 32/4 36/9 39/15 51/20
54/4 54/6 64/16 64/18 69/16 70/21 70/22
74/6 74/19 78/8 78/15 78/21 79/17 80/5
80/11 80/13 81/14 82/22 83/7 109/9 110/3
125/15 128/20 129/23 142/13 157/19 157/23
158/19 159/1 159/10 160/5 160/16 160/19
163/16 163/25 174/4 174/7 174/19 174/24
175/6 175/8 175/10 176/1 181/24 192/3
205/15 206/22 208/1
per [1] 103/15
percent [5] 8/23 8/25 84/4 110/12 159/24
period [9] 7/23 11/17 26/4 102/15 102/18

155/18 188/2 201/13 210/17
permission [8] 4/11 21/23 28/2 28/6 48/18
81/7 140/19 140/20
person [32] 26/25 27/7 28/1 32/9 36/17 37/24
54/24 72/8 85/22 101/24 110/7 125/20
133/22 133/23 133/24 134/15 134/15 134/16
157/9 159/25 167/3 167/5 167/7 169/7
169/16 169/19 185/13 186/5 207/20 207/23
208/7 208/13
person -- I [1] 133/23
person's [1] 159/5
personal [3] 28/23 57/5 160/25
personality [1] 42/20
personally [3] 30/23 161/2 163/7
persons [1] 27/2
persuade [3] 54/8 82/17 164/16
persuasive [1] 80/21
Perusing [1] 96/4
Peter [2] 9/14 73/20
petite [1] 112/13
Petitioners [1] 7/10
phone [9] 19/14 70/18 80/23 96/11 102/25
133/5 141/15 165/4 175/1
phonetic [4] 27/4 68/25 179/17 191/25
photograph [2] 193/22 194/7
phrased [2] 51/5 88/25
physical [1] 84/15
picture [4] 37/22 67/22 150/16 190/1
pictures [4] 31/16 31/17 38/13 38/16
piece [6] 16/23 32/25 43/11 180/24 181/10
181/15
pistols [1] 15/14
Pitt [34] 88/19 88/22 89/4 107/20 110/19
111/1 111/12 113/3 113/3 113/7 113/9
113/11 113/15 113/24 114/6 114/9 167/9
167/19 168/4 168/12 169/2 178/5 184/13
184/19 185/8 185/22 186/5 186/7 186/14
186/23 186/25 187/14 187/24 188/1
Pitt's [1] 187/4
placated [1] 150/4
place [21] 15/16 52/24 53/13 69/13 87/18
128/6 136/2 137/9 137/9 137/10 141/17
141/22 141/23 161/17 161/23 175/16 176/3
177/1 177/4 178/16 208/12
placed [4] 15/16 33/3 64/12 145/25
plainclothes [1] 11/21
plans [1] 86/10
plant [1] 10/19
plate [2] 112/2 112/3
play [3] 177/13 178/9 186/12
played [2] 66/1 178/12
playing [2] 188/17 188/19
pleasant [1] 4/4
please [34] 2/2 4/3 9/24 10/1 13/8 25/8 46/23
50/5 59/12 59/18 63/1 72/16 75/17 80/9 83/5
86/2 94/25 95/7 95/13 96/16 98/17 108/15
111/17 122/19 122/20 145/15 148/16 148/20
148/23 174/21 195/23 195/24 202/11 203/17
pleasure [1] 5/1
plus [2] 21/24 112/17
pocketbooks [1] 192/23
point [19] 2/19 36/14 37/10 38/12 38/24
51/19 71/23 76/20 76/24 86/17 100/7 103/23
130/2 169/10 186/11 201/6 206/19 207/7
209/9
pointed [2] 161/7 209/3
police [28] 10/23 10/24 11/3 11/7 11/9 11/15
18/24 18/24 19/15 19/15 20/19 21/12 24/18
25/23 43/6 53/11 68/12 69/12 69/19 85/24
86/1 100/8 115/9 115/10 118/25 119/14

130/24 158/8
policy [3] 29/21 30/2 32/14
polite [1] 39/8
Ponzi [2] 184/2
Poochie [2] 191/24 191/25
poor [1] 118/25
portion [2] 144/6 154/4
poses [1] 51/13
position [4] 10/15 10/20 10/22 207/13
positions [3] 11/2 11/14 12/22
possessing [1] 131/24
possibility [11] 27/18 72/14 101/8 101/16
102/2 102/16 134/17 167/21 167/23 168/6
197/10
possible [11] 18/17 27/13 70/8 80/16 85/22
107/18 109/8 134/18 184/7 184/12 184/18
possibly [3] 64/17 67/15 153/7
potential [6] 150/21 151/11 151/14 151/16
160/3 160/5
pounds [1] 185/5
Powell [8] 89/9 110/13 110/20 111/1 113/12
168/22 169/7 169/11
power [3] 76/9 76/10 131/24
powerful [2] 34/8 36/1
powers [5] 72/22 72/23 72/24 135/14 135/15
practical [1] 211/2
practice [1] 3/4
prayed [2] 48/4 48/6
prayer [1] 57/9
pre [2] 60/25 125/24
pre-indictment [2] 60/25 125/24
preceded [1] 178/21
predicament [1] 102/3
predicated [2] 2/10
predict [2] 131/25 135/5
predicted [3] 76/17 77/8 105/23
predictions [1] 105/16
prefer [2] 20/2 29/20
pregnant [2] 123/23 124/7
preparation [1] 176/23
prepare [3] 155/11 199/12 199/14
prepared [6] 57/23 63/11 63/11 154/23
155/12 205/7
preparing [1] 198/25
prepayment [1] 9/10
Presbyterian [1] 124/9
presence [1] 211/14
present [18] 2/4 21/10 22/5 23/1 56/24 60/14
74/25 75/3 95/1 124/14 148/19 151/13
151/15 195/15 197/5 199/23 202/16 209/10
presentation [1] 51/25
presented [2] 156/9 209/17
preserve [1] 44/16
preserved [1] 43/9 43/12
presidential [1] 68/22
press [1] 98/11
pressure [3] 197/18 197/18 197/21
pretending [1] 186/5
pretty [1] 22/10
previous [3] 49/6 129/2 129/4
previously [1] 27/22
primarily [3] 21/3 78/23 149/6
prior [14] 21/3 24/8 41/9 48/11 58/19 58/22
59/5 63/20 64/6 81/20 81/21 82/25 85/10
182/14
prison [1] 93/1
privately [1] 199/19
privy [1] 140/11
probable [1] 26/2
probably [11] 71/24 84/14 117/11 118/6

**P**

probably... [7]  118/7 118/7 118/8 132/24
151/3 186/24 208/9
problem [6]  2/22 133/13 198/9 206/23
211/17 211/19
problems [3]  71/20 72/12 162/21
procedure [4]  29/14 153/6 179/5 179/7
procedures [2]  14/22 180/14
proceed [7]  4/8 38/11 68/6 95/3 95/15 166/14
178/10
proceeding [2]  156/15 194/21
proceedings [17]  1/11 4/1 50/4 59/17 63/2
75/18 94/24 95/12 143/14 148/15 148/22
165/17 197/3 198/12 199/21 202/10 217/14
product [5]  32/22 34/2 41/25 42/11 180/10
Professor [3]  2/24 195/2 202/21
progress [1]  11/25
promise [3]  70/13 74/15 189/3
promised [9]  2/8 35/6 35/6 35/9 35/11 35/14
48/3 48/5 188/25
promising [2]  74/14 213/20
promissory [9]  9/13 142/2 142/4 144/7 144/8
144/9 144/11 144/12 144/19
promote [1]  169/22
promoted [1]  68/18
pronounce [2]  86/13 105/6
pronouncing [1]  37/5
proof [2]  135/11 141/24
proper [1]  67/14
properly [1]  64/6
property [8]  8/17 8/24 9/14 138/6 211/8
211/11 211/12 211/13
propose [1]  210/22
proposed [5]  125/5 209/16 209/20 212/14
212/16
prosecute [1]  153/3
prosecutor [1]  90/8
prostrate [1]  3/9
protagonist [1]  87/20
protect [1]  100/9
protected [2]  2/8 2/16
protection [1]  209/18
protections [1]  211/23
protects [2]  204/17 205/18
proud [1]  38/16
prove [7]  57/16 70/5 72/21 77/21 133/8
134/18 134/20
provide [1]  47/25
provided [3]  36/13 127/20 146/21
providing [3]  101/19 127/14 131/23
psychic [27]  39/2 70/6 71/19 72/9 72/22
72/22 72/24 73/2 73/8 73/14 76/6 76/7 76/14
77/9 77/11 77/14 77/16 77/20 77/21 79/9
79/12 79/14 135/15 164/8 190/20
213/18
psychics [2]  76/9 190/20
psychologically [2]  108/19 109/12
psychologist [12]  92/22 92/24 127/3 127/7
127/16 127/18 128/11 129/21 129/22 129/25
132/1 132/4
public [11]  10/13 10/15 11/10 19/14 21/18
21/21 86/23 131/10 158/9 158/15 181/8
publicly [1]  160/23
publish [8]  3/16 4/13 5/19 5/21 7/5 9/17
178/8 194/8
published [1]  193/7
pull [7]  9/25 13/7 42/7 49/11 49/20 96/15
122/20
pulled [1]  133/5

punched [1]  124/1
purpose [9]  35/7 69/25 71/13 90/22 90/24
91/11 97/22 127/13 162/17
purposes [1]  34/13
pursuant [2]  4/19 129/4
pushing [1]  86/6
put [30]  32/21 32/22 34/10 35/1 35/22 38/18
41/19 41/25 42/19 43/14 49/3 57/3 58/10
58/20 74/15 116/7 118/13 120/11 120/16
131/10 133/20 155/19 156/6 159/24 197/20
198/7 211/15 212/25 214/2 214/20
printed [2]  41/20 43/15

**Q**

qualified [2]  195/3 202/22
question [48]  8/7 8/8 38/23 46/2 46/3 51/4
51/13 55/20 65/3 65/3 75/7 75/11 75/15 76/4
82/1 82/8 85/3 87/19 88/24 89/1 89/20 90/7
90/8 90/23 94/4 96/6 106/7 107/25 109/14
111/5 111/6 111/19 111/20 113/1 128/21
128/23 135/7 149/21 151/24 152/21 165/25
178/14 185/25 190/6 193/6 196/12 198/4
198/18
questioning [8]  51/20 65/8 67/11 76/21 77/2
78/2 124/16 148/6
questions [27]  33/12 44/10 57/20 67/12
67/14 81/13 84/1 86/7 107/23 109/1 109/4
109/5 128/8 128/9 140/22 148/9 150/20
153/10 169/25 170/4 171/12 175/21 189/17
193/10 195/18 196/16 200/17
quite [2]  22/9 123/22
quote [4]  25/8 31/17 41/8 71/25
quoted [2]  46/6 55/21
quoting [1]  213/21

**R**

Rabinowitz [1]  113/4
raise [4]  2/20 9/21 119/9 195/22
raised [1]  188/7
raising [3]  116/5 206/15 209/6
Ralphie's [1]  118/19
Rambling [1]  140/24
ran [2]  93/1 112/2
Randy [2]  19/3 19/6
range [1]  44/8
rarely [2]  35/24 102/2
rather [6]  33/16 81/13 141/11 152/6 198/15
213/19
Raton [2]  1/22 166/18
re [1]  77/22
re-litigate [1]  77/22
reached [1]  197/11
reaction [1]  205/13
read [40]  4/6 5/10 7/13 8/5 19/21 20/2 20/3
31/11 46/8 55/23 55/24 56/16 56/23 62/11
78/20 84/23 84/25 85/18 86/3 86/18 87/22
88/5 98/7 102/5 102/7 103/3 103/19 105/5
115/8 127/11 171/5 171/11 194/25 195/9
195/10 195/11 201/20 202/19 206/12 214/6
readers [2]  114/17 115/3
readily [1]  211/2
reading [12]  5/1 8/21 18/4 56/25 132/16
140/1 172/15 172/20 172/21 184/24 185/4
188/8
readings [5]  87/18 171/19 171/24 172/20
190/20
ready [12]  3/14 3/16 3/21 4/8 95/3 95/3 95/5
131/18 148/17 196/23 198/20 200/15
real [8]  82/15 86/19 86/21 124/25 143/10
144/18 167/23 168/14

realistic [1]  85/14
realizable [1]  211/2
realize [2]  168/3 168/13
realized [3]  27/14 119/7 127/22
really [28]  2/21 31/6 34/19 35/11 50/9 51/12
52/14 64/11 76/7 76/8 76/9 80/8 87/15 109/2
111/11 122/16 143/23 153/9 159/23 161/3
166/22 168/13 186/6 190/17 205/2 210/1
210/12 214/3
realm [2]  136/14 136/16
Realtime [1]  217/13
reason [17]  20/11 22/13 22/16 39/13 64/8
65/25 66/9 67/25 78/3 82/24 84/7 91/14
99/22 146/4 165/8 186/1 194/1
reasonable [7]  207/20 207/23 207/25 208/1
208/6 208/7 208/13
reasonableness [1]  208/15
reasonably [1]  57/13
reasoning [1]  78/14
rebuttal [1]  195/20
recall [13]  19/24 23/19 23/21 58/3 83/3
109/14 123/4 151/18 152/11 164/15 165/7
169/9 178/3
recalls [1]  57/21
receipts [1]  8/10
receive [2]  121/11 169/13
received [9]  12/4 12/22 18/16 19/15 34/25
42/11 63/5 102/21 211/13
recently [1]  149/4
recess [12]  46/15 46/23 50/3 94/9 94/23
148/14 194/17 194/20 196/25 197/2 199/20
215/3
recipient [2]  174/12 211/1
recognize [7]  96/23 97/1 97/5 140/1 140/3
146/16 146/21
recollect [1]  208/25
recollection [5]  57/22 84/3 125/23 126/14
178/2
recommendation [3]  9/6 91/4 213/15
recommends [1]  9/11
reconsider [2]  77/8 209/11
record [18]  2/4 20/16 29/20 29/21 32/6 49/7
51/22 79/6 83/10 95/1 123/12 140/20 141/19
148/18 165/20 197/4 199/22 217/14
recorded [13]  20/8 20/10 20/12 32/3 32/5
32/13 34/15 51/21 99/15 100/2 100/11
183/11 183/13
recording [8]  20/20 20/21 29/15 29/25 31/14
36/18 90/13 182/2
recordings [6]  42/8 42/9 43/20 176/14
176/17 192/2
records [18]  18/10 25/2 25/24 26/9 26/10
26/17 26/21 26/22 28/18 38/4 133/5 133/5
133/9 133/11 158/25 160/7 160/8 182/7
recross [3]  193/15 193/18 216/7
Recross-examination [1]  193/18
redacted [2]  127/7 131/16
reddish [11]  65/25 66/5 66/6 66/13 66/16
67/13 69/17 69/25 71/10 71/12 112/14
Reddish's [1]  67/6
redirect [6]  148/10 153/12 178/25 179/3
191/2 216/6
reduce [1]  203/4
reestablish [1]  31/22
refer [3]  12/7 78/23 175/18
reference [7]  60/25 110/19 110/25 114/6
152/13 171/18 205/24
referenced [1]  88/15
references [1]  171/6
referred [9]  19/12 54/7 78/25 81/3 83/8 88/1

# R

referred... [3]  125/21 126/20 165/4
referring [9]  60/24 88/1 102/19 102/19 122/8
181/3 184/16 194/11 213/12
refers [2]  87/20 175/14
reflected [1]  63/12
reflective [3]  57/12 57/14 57/16
refresh [3]  57/22 58/7 176/25
refreshes [1]  123/9
regard [1]  170/6
regarding [13]  18/18 29/15 48/19 96/11
102/25 121/14 149/9 178/4 179/6 179/7
209/21 211/23 212/6
Regardless [1]  72/4
regards [1]  175/25
Registered [1]  217/12
regular [3]  25/13 186/17 187/2
regulations [1]  180/14
reinforces [1]  205/21
reiterate [1]  79/19
relate [1]  77/6
related [4]  9/3 162/20 166/20 213/4
relationship [2]  52/6 57/8
relatives [1]  39/23
relayed [2]  105/21 105/22
relevance [9]  75/21 100/15 100/16 104/8
159/12 172/12 191/12 194/2 209/19
relevancy [1]  76/12
relevant [4]  53/23 73/8 78/3 193/17
reliance [1]  209/13
relied [3]  204/25 208/2 209/2
relieving [1]  48/6
reluctant [4]  82/23 82/24 82/25 83/4
rely [3]  110/16 208/13 212/23
remained [1]  14/1
remark [1]  102/12
remember [53]  16/4 17/18 17/20 18/5 18/12
18/13 19/19 23/9 23/25 27/5 35/19 40/3 60/4
62/17 81/6 87/14 88/16 93/9 97/3 97/7 99/4
100/19 102/1 102/13 102/14 103/15 103/17
103/24 122/17 124/13 133/16 137/11 139/17
139/21 141/8 149/25 150/17 150/17 150/18
151/6 151/20 151/21 151/22 162/24 179/14
180/22 180/25 185/4 186/3 186/13 191/6
192/3 192/5
Remembrance [1]  4/16
Remi [2]  23/18 23/19
removal [2]  47/8 47/9
remove [1]  74/7
rendering [1]  203/6
rent [2]  8/15 8/16
reorganize [1]  84/13
repayment [4]  120/13 120/17 121/6 145/13
repetitious [1]  36/7
rephrase [3]  46/3 55/20 89/1
replied [1]  86/8
report [76]
reported [2]  7/23 63/13
reporter [5]  1/23 1/23 206/14 217/12 217/13
reports [25]  15/2 16/20 18/24 19/1 35/7
56/19 57/14 63/11 82/22 154/23 154/24
155/11 155/12 155/16 179/6 179/7 179/14
179/16 179/23 179/24 180/3 180/23 181/4
181/7 181/13
represent [2]  127/6 159/1
representation [2]  77/13 208/13
representations [1]  208/2
represented [4]  158/17 163/15 190/15 208/6
representing [1]  161/14

request [1]  65/12
requested [1]  213/3
requests [1]  149/19
required [2]  44/16 163/16
requiring [1]  136/2
reread [2]  46/9 204/20
rescinded [1]  126/2
research [1]  114/21
reserve [2]  202/2 214/5
residuals [1]  138/4
resolve [3]  198/1 198/6 203/23
resources [2]  71/5 106/5
respect [5]  56/17 94/15 126/18 154/23
185/11
response [3]  177/8 213/16 213/21
responses [1]  169/18
responsible [1]  138/24
rest [3]  196/5 210/18 214/19
restaurant [1]  184/4
resting [1]  148/11
result [1]  132/25
resultant [1]  48/20
resulted [1]  33/21
retired [8]  11/8 14/1 21/15 24/10 117/3
154/19 157/25 158/7
retirement [1]  86/10
return [10]  3/10 5/7 9/11 35/7 120/12 138/20
189/11 212/15 213/20 213/20
returned [10]  47/18 48/3 48/9 48/17 60/1
61/4 62/18 70/15 71/7 118/11
returning [3]  2/25 70/17 121/4
reveal [2]  175/10 175/15
revealed [1]  174/8
Revenue [3]  5/24 7/11 8/4
review [6]  61/12 176/25 177/15 199/5 210/3
213/8
reviewed [1]  24/7
reviewing [2]  84/19 199/1
revised [1]  209/1
Ricky [5]  25/4 26/10 26/18 26/20 27/3
rid [1]  47/22
ridiculous [1]  167/20
right [115]
ring [2]  79/5 115/25
rises [1]  166/1
risks [1]  175/5
RMR [2]  1/23 217/19
Road [2]  37/17 42/1
robberies [1]  11/25
robbery [4]  13/14 179/11 181/17 181/18
Roger [1]  1/16
role [4]  154/3 158/15 188/17 188/18
Roma [2]  3/2 171/25
romance [5]  85/19 88/23 89/5 89/12 167/24
Romani [9]  171/25 173/10 182/3 182/14
182/19 182/22 191/23 195/4 202/22
romantic [3]  113/13 184/21 185/2
room [6]  37/18 42/1 46/25 132/21 166/18
175/19
root [1]  47/25
Rosanna [3]  149/2 183/2 183/13
Rosanne [1]  173/14
ROSE [93]
Rose's [5]  24/6 99/13 124/19 130/13 138/23
Rosie [8]  20/24 29/10 65/25 66/4 71/18 71/19
72/10 150/7
roughly [2]  29/6 41/9
rounded [1]  39/8
routed [1]  18/23
royalties [1]  138/5

rude [4]  81/12 111/5 111/18 119/11
rules [2]  129/15 180/13
ruling [4]  58/14 58/24 86/11 166/1
rulings [1]  49/6
run [1]  44/17
running [1]  173/16
Russian [3]  12/17 16/16 154/7

# S

S-t-a-c-k [1]  10/4
S-v-e-t-t-e [1]  206/13
Saban [2]  17/17 18/7
sacrifice [3]  48/2 48/3 163/2
sacrifices [2]  47/23 163/20
safe [2]  207/15 208/12
Sam [12]  74/15 83/18 101/2 107/20 122/1
122/9 122/12 123/6 123/15 124/3 126/21
183/1
same [18]  9/9 29/14 31/20 34/2 48/22 48/25
49/1 49/22 49/24 60/12 66/2 78/22 112/7
155/11 156/6 167/2 182/2 206/11
Sammy [13]  99/7 99/10 99/15 99/20 100/5
100/11 100/22 100/23 101/18 101/25 102/17
102/19 103/18
Santa [3]  137/19 168/25 169/1
sat [6]  38/12 38/15 80/2 91/14 117/14 150/4
satisfied [1]  164/9
save [1]  139/20
saw [4]  41/12 56/4 103/9 212/18
say [115]
saying [32]  7/3 23/25 26/14 35/21 46/7 53/25
55/21 61/2 62/2 66/12 66/13 73/4 74/18 82/3
84/7 89/17 93/21 100/24 101/6 101/16 102/3
103/9 113/14 132/20 139/17 143/20 144/16
150/19 151/22 158/20 179/14 199/7
says [40]  7/19 38/6 51/14 52/9 52/9 53/9
53/15 54/2 54/2 55/10 55/13 57/17 58/17
61/12 61/23 62/5 62/12 63/6 66/3 66/12
66/21 67/3 67/5 76/10 77/4 93/3 98/19
102/24 105/8 114/10 114/11 118/16 133/22
146/22 171/6 200/8 204/9 204/21 204/23
207/19
scam [2]  93/4 128/13
scam's [1]  93/4
scams [6]  79/9 79/11 79/12 79/14 93/3
127/22
scared [1]  91/23
Scarlet [9]  5/3 84/22 85/4 85/20 87/20 170/7
190/9 190/14 193/6
scenario [1]  187/18
scene [4]  85/4 85/9 105/19 181/20
scenes [1]  86/18
Schedule [3]  7/15 8/4 8/20
scheme [1]  184/2
schemes [2]  74/20 172/2
school [1]  144/14
Schwartz [43]  1/19 4/9 15/11 18/4 25/8
26/15 35/20 39/7 40/10 43/19 44/22 45/18
46/24 55/12 59/22 71/2 73/1 78/13 79/20
95/5 95/15 97/18 101/23 104/24 107/3 115/7
120/12 120/21 126/18 144/9 148/25 150/18
152/20 161/7 170/6 197/7 201/21 202/15
206/20 209/24 211/17 216/4 216/6
scope [2]  76/2 191/14
Scott [3]  101/1 101/15 102/20
Scott's [1]  97/7
screen [1]  98/10
se [1]  103/15
search [2]  22/19 23/10
searched [1]  35/1

**S**

seat [3]  46/16 59/15 203/12
seated [11]  2/3 4/3 9/24 50/5 59/19 94/25
 95/14 148/16 148/24 202/12 203/17
second [27]  3/4 7/14 8/24 26/3 27/20 29/18
 36/12 41/21 46/19 47/6 84/1 84/9 88/8 88/17
 97/17 98/6 98/12 98/13 106/10 119/12 122/2
 127/9 186/2 195/8 203/1 204/12 210/7
seconded [1]  43/22
secondly [2]  70/7 152/12
secrecy [1]  175/14
secret [13]  23/2 28/7 28/8 28/10 28/11 68/20
 106/12 106/17 127/15 129/19 129/22 130/6
 174/16
Secretary [1]  89/8
Secrets [1]  5/7
section [6]  2/13 7/14 8/12 12/14 26/2 170/16
sections [1]  84/19
security [1]  10/18
seem [2]  57/11 201/9
seems [2]  57/10 205/2
seen [20]  23/18 27/3 27/8 39/7 39/15 112/5
 112/7 112/8 112/18 115/2 123/2 123/11
 142/19 142/22 142/25 143/2 179/25 185/23
 209/24 213/23
segment [1]  132/24
self [1]  9/5
self-employment [1]  9/5
sell [1]  137/6
Seller [1]  168/1
semiautomatic [1]  15/14
Seminole [11]  8/22 9/15 25/6 25/11 104/21
 111/25 112/1 112/6 112/13 112/20 144/21
send [7]  19/2 26/8 70/12 71/5 96/10 141/24
 155/23
sending [3]  111/15 112/17 169/8
sense [8]  32/24 78/12 85/12 198/17 201/1
 201/22 203/19 214/23
sent [15]  25/5 25/5 25/6 26/8 34/25 85/15
 96/13 97/9 113/2 116/8 117/3 117/4 118/5
 139/18 139/19
sentence [16]  98/7 98/13 98/22 102/7 204/22
 205/16 206/12 206/19 207/16 209/3 210/5
 210/7 210/7 210/16 210/20 211/16
sentences [1]  85/16
separate [4]  6/23 35/2 41/24 204/10
September [5]  1/8 53/13 60/6 60/12 71/9
September 13th [3]  53/13 60/6 60/12
September 8th [1]  71/9
sergeant [8]  19/2 19/2 19/3 179/9 179/11
 179/18 180/5 180/16
series [1]  150/20
serve [4]  135/3 136/8 158/24 174/11
served [9]  91/5 91/19 128/4 128/19 128/25
 129/2 130/4 134/14 135/6
serves [2]  21/9 40/12
service [12]  5/24 7/11 19/14 23/2 28/7 28/8
 28/10 28/11 36/11 68/20 106/12 106/17
services [4]  45/7 54/7 60/22 152/13
serving [3]  128/2 129/16 159/8
set [2]  48/4 145/12
settled [2]  5/22 7/8
settlement [4]  6/18 124/20 125/6 127/17
seven [3]  187/25 188/2 203/24
seven-month [1]  188/2
several [3]  153/19 157/9 178/9
SFranklinUSDC [1]  1/25
share [2]  190/3 203/1
sharing [1]  3/3

Shawn [1]  69/1
she'd [2]  149/25 150/1
she'll [1]  85/2
she's [25]  8/21 26/25 39/1 39/2 87/10 113/8
 113/9 114/19 128/10 139/5 146/25 167/13
 167/24 185/7 187/13 197/8 197/18 197/19
 197/21 198/20 198/21 199/4 214/18 214/18
 214/21
shed [1]  108/24
Sheehan [1]  179/17
sheet [1]  35/2
Sheriff's [1]  16/22
shocked [1]  105/20
shop [2]  39/3 149/24
short [3]  185/14 197/19 197/22
shortened [1]  156/23
shortly [2]  28/6 46/16
shotguns [1]  15/13
should [22]  9/8 22/2 43/9 47/5 49/4 67/20
 96/14 119/19 182/6 194/17 194/18 197/23
 203/18 204/10 204/14 204/25 205/5 207/12
 208/18 211/5 211/5 211/11
should -- I [1]  211/5
shoulder [1]  38/18
shoulders [1]  39/8
shouldn't [4]  89/16 163/23 198/24 208/1
show [29]  7/7 18/2 22/2 38/13 48/13 51/20
 53/11 56/15 61/11 64/16 67/17 70/20 71/17
 71/19 72/5 74/4 87/5 96/20 98/5 103/1
 105/23 123/9 126/25 127/9 131/15 132/8
 134/6 134/23 139/22
showed [3]  36/12 37/22 123/12
showing [6]  49/21 132/6 139/15 141/12
 146/15 156/4
shuffled [1]  39/7
shuffling [1]  40/15
sic [2]  39/10 170/25
side [4]  84/16 159/10 173/20 173/20
sidebar [6]  63/2 68/5 75/18 78/6 165/17
 166/13
sides [1]  159/22
sign [2]  125/2 142/17
signed [10]  26/7 30/7 142/4 142/7 142/19
 142/24 142/24 144/17 144/19 144/19
signs [1]  145/1
simply [2]  67/11 176/10
since [8]  4/7 7/20 46/9 55/24 107/18 127/19
 131/20 212/8
single [3]  43/17 107/6 107/7
sir [137]
sister [3]  29/10 40/1 40/3
sit [13]  30/24 31/5 82/17 91/8 91/16 91/21
 91/25 92/2 92/3 101/13 101/17 118/18
 172/19
site [3]  24/7 80/5 81/9
sitting [4]  91/20 101/1 127/14 150/23
situation [2]  80/4 197/21
situations [1]  172/21
six [4]  8/17 9/10 51/25 77/25
sixes [3]  5/1 155/14 155/15
skills [1]  16/7
skip [1]  86/2
slash [1]  13/14
slight [1]  122/16
slipping [1]  17/14
small [1]  37/19
smile [1]  39/18
so -- I [1]  104/1
so-and-so [2]  51/5 51/14
soft [1]  170/25

sole [1]  35/7
solely [1]  88/8
solicit [3]  117/8 117/9 117/10
solidify [1]  110/8
solved [1]  2/22
somebody [20]  41/3 45/6 45/8 45/22 57/23
 59/6 64/21 72/7 72/22 81/24 83/5 100/1
 101/15 129/17 133/20 134/17 144/17 164/19
 164/19 168/1
somebody's [2]  40/20 159/23
somehow [2]  130/3 135/2
someone [14]  5/6 53/25 55/15 68/19 102/20
 123/1 124/8 124/8 150/2 157/6 165/4 183/4
 191/24 205/4
something [51]  17/1 31/12 33/15 33/20 39/10
 41/17 44/22 58/17 58/20 66/21 66/25 67/3
 67/5 72/12 72/13 75/2 78/18 93/2 96/4 98/5
 101/9 104/13 104/16 111/8 118/10 118/24
 119/18 120/5 120/21 123/9 124/11 126/1
 133/8 133/21 133/24 146/8 146/12 146/23
 159/23 163/20 164/25 167/20 171/16 171/17
 175/15 185/16 188/8 205/18 207/10 207/21
 209/10
sometime [4]  11/3 183/22 193/8 196/13
sometimes [9]  22/15 22/20 30/17 75/6 137/22
 171/14 172/21 181/25 201/1
somewhat [8]  20/3 39/3 74/10 105/21 149/13
 149/14 151/25 206/16
somewhere [7]  19/23 70/7 102/21 105/24
 126/17 168/15 204/5
son [17]  37/13 38/7 38/10 38/11 38/13 38/15
 38/19 40/25 41/6 41/7 83/18 122/1 123/7
 123/15 123/20 126/21 166/23
soon [1]  125/3
sorry [42]  5/20 13/9 16/22 18/25 32/1 33/12
 36/20 44/10 52/2 59/19 72/18 73/4 96/4
 96/17 97/18 102/13 110/15 122/22 124/1
 125/20 128/22 130/19 137/1 138/4 138/18
 142/7 144/11 146/20 152/17 152/20 153/12
 165/1 166/11 169/4 184/9 191/9 195/7
 202/13 204/6 207/9 208/4 209/22
sort [3]  142/20 190/21 213/18
sought [1]  175/22
souls [1]  74/8
sound [1]  56/20
sounded [3]  184/10 184/14 186/16
Sounds [1]  193/13
source [1]  8/1
South [1]  1/21
SOUTHERN [1]  1/1
speak [11]  62/6 79/25 90/25 108/14 129/17
 129/18 140/14 140/17 162/21 173/9 197/6
speaking [3]  128/22 132/15 187/11
special [3]  11/23 12/10 112/22
specific [5]  33/5 34/8 70/17 87/18 205/24
specifically [8]  30/16 62/15 74/18 78/25 85/3
 87/16 175/25 177/3
speech [3]  2/13 2/16 213/13
speeches [2]  81/13 107/24
spell [1]  10/1
spellbinding [1]  86/21
spend [2]  84/9 208/11
spent [2]  84/11 187/25
sperm [1]  124/9
spirit [1]  2/21
spirits [5]  47/22 48/7 74/7 74/12 74/13
spiritual [2]  3/4 172/21
split [1]  108/22
spoke [16]  21/2 21/2 27/16 29/17 29/18
 30/12 33/16 37/1 64/21 79/24 81/6 81/20

**S**

spoke... [4] 93/5 128/11 156/13 191/23
spoken [5] 20/23 56/23 116/21 149/4 155/18
spreadsheet [1] 156/4
squad [2] 12/1 18/21
Stack [40] 3/20 9/20 9/23 10/3 10/8 13/7 45/5
47/16 48/10 48/11 48/18 49/5 50/16 50/22
56/18 56/20 57/2 59/14 59/25 64/13 68/9
71/3 72/15 75/5 78/8 81/11 85/23 90/4 96/15
97/16 98/2 102/20 104/14 111/17 122/19
123/12 146/5 146/22 153/19 216/3
Stack's [3] 49/2 179/23 180/9
stages [2] 175/9 175/23
stamp [1] 214/2
stamped [1] 96/22
stand [4] 9/19 56/12 146/5 169/4
standard [16] 204/20 204/20 205/8 205/23
206/2 206/5 206/16 207/12 207/18 207/24
208/6 208/15 208/22 208/23 209/3 209/8
stands [1] 156/22
Stanley [4] 149/2 173/14 183/2 183/13
Starbucks [2] 112/10 112/10
Stark [1] 50/13
start [14] 4/15 27/24 31/9 42/2 48/6 71/6
97/5 107/7 117/2 181/19 198/8 200/9 203/13
214/20
started [24] 11/10 12/11 19/10 19/25 23/10
24/13 24/15 26/23 29/2 38/11 38/17 41/16
41/18 41/20 59/20 68/25 129/14 141/8 141/9
158/8 158/12 183/20 186/25 199/1
starting [4] 2/14 7/13 114/14 130/16
starts [2] 114/17 114/24
state [16] 8/21 20/12 22/21 24/18 24/21
25/22 26/1 26/6 27/10 27/14 28/3 39/4 39/16
43/10 89/8 161/12
stated [3] 29/11 37/2 162/17
statement [51] 19/22 20/5 20/7 24/16 31/4
31/6 32/4 32/5 33/22 33/23 34/18 35/1 36/1
36/21 37/10 37/14 45/1 45/1 45/2 45/3 48/11
48/20 51/16 54/1 57/23 58/1 58/15 59/1
60/25 63/21 63/23 64/2 64/21 64/24 65/5
65/12 65/14 66/7 75/20 133/1 135/8 138/10
139/2 139/3 162/8 165/24 193/13 204/25
205/1 205/20 207/14
statements [13] 20/13 29/16 31/15 32/6
33/14 34/1 34/1 51/3 58/19 103/21 154/24
166/23 175/22
states [16] 1/1 1/3 1/13 1/17 2/11 2/14 5/22
17/17 18/6 27/17 36/18 81/10 156/11 177/7
177/19 201/6
Statham [3] 85/5 85/6 171/18
stating [1] 165/7
status [1] 168/2
statute [1] 204/17
stay [5] 72/15 117/23 118/10 118/12 136/16
stayed [1] 112/11
Stefin [19] 1/16 2/20 3/7 50/15 95/3 152/3
152/6 165/20 182/9 184/6 184/12 184/17
202/3 202/17 209/25 213/9 214/11 216/5
216/7
Stefin's [1] 77/13
stemmed [1] 14/13
step [1] 46/22
Stephanie [1] 71/8
Stephen [4] 1/23 217/12 217/18 217/19
still [19] 9/6 21/12 23/12 23/13 45/15 55/7
59/14 95/8 106/19 108/25 137/7 152/21
158/1 164/7 197/20 197/24 203/23 209/14
209/18

stipulated [1] 4/13
stipulation [12] 3/8 4/19 5/22 6/7 6/17 7/8
7/12 195/2 195/12 201/21 202/18 202/20
stopped [1] 29/25
stories [1] 86/15
story [4] 70/20 106/1 145/24 159/22
straight [1] 44/23
straightforward [1] 44/25
strange [3] 103/12 103/21 183/4
strategy [1] 69/13
street [3] 1/24 12/11 110/2
stricken [1] 162/7
strike [5] 79/6 103/12 156/22 175/13 186/21
strong [1] 74/24
struck [1] 165/20
stuff [5] 15/2 80/15 117/12 136/14 140/12
stupid [2] 205/15 206/22
subject [4] 91/1 110/4 110/5 151/17
subjective [3] 210/11 210/16 210/20
submissions [1] 203/22
submitted [5] 129/10 201/13 209/16 209/23
212/15
subparagraphs [1] 210/15
subpoena [17] 25/2 25/19 25/21 25/22 25/24
25/25 26/5 26/12 26/17 91/5 91/19 121/11
121/17 130/5 130/9 174/11 174/12
subpoenaing [1] 121/14
subpoenas [10] 26/17 128/2 128/4 128/18
128/24 129/2 129/4 129/16 158/24 174/11
subsequent [7] 10/18 11/21 51/23 148/9
167/4 167/6 195/1
substantive [1] 203/25
successful [1] 66/19
such [6] 86/20 119/13 146/8 164/17 210/13
211/1
sucked [1] 39/12
suddenly [1] 146/15
suffering [1] 162/20
sufficient [1] 207/17
suggest [4] 58/8 77/2 119/9 190/3
suggesting [3] 85/18 92/7 129/18
suggestion [1] 85/19
Suite [1] 1/21
summary [5] 30/14 74/9 74/10 97/9 155/19
Summerhouse [2] 5/4 5/8
sums [2] 48/1 160/20
Sunrise [1] 39/3
superintendent [1] 106/14
superintendents [1] 105/20
superseding [2] 47/7 62/18
supervisor [2] 28/10 180/19
supplements [1] 179/22
supposed [1] 171/9
supposedly [1] 108/21
Supreme [1] 86/11
sure [27] 22/2 22/9 22/10 22/17 41/16 47/1
50/9 56/12 57/15 79/2 85/2 90/8 120/12
121/8 121/24 139/4 150/6 150/13 152/3
170/23 184/25 188/14 190/17 193/8 200/15
200/24 209/19
surface [1] 119/4
surmised [1] 102/16
surmising [1] 102/1
surprise [4] 22/18 22/20 119/24 131/10
surveillance [3] 31/15 34/3 112/4
surveillances [2] 32/14 111/24
surveilling [1] 31/18
suspect [2] 28/1 34/7
suspected [5] 93/22 110/7 112/8 112/16
130/4

suspects [3] 34/6 70/5 70/23
sustain [3] 9/3 165/22 166/9
sustained [37] 55/19 62/14 62/21 73/11
73/16 89/1 94/3 96/7 120/1 120/7 121/1
123/18 124/17 125/12 126/23 131/13 136/5
136/20 138/9 139/1 143/8 145/10 157/4
162/6 164/23 165/14 165/19 172/13 172/24
173/24 182/11 188/21 189/15 190/23 191/21
192/10 194/3
Sutherland [4] 2/24 3/10 195/3 202/21
Svette [3] 205/24 206/13 209/2
swat [3] 12/1 12/2 12/3
swear [2] 20/14 121/23
swindle [1] 131/4
swindled [1] 128/13
switch [3] 98/11 159/9 159/17
sworn [5] 9/23 28/9 34/11 48/11 63/21
system [1] 43/10

**T**

table [2] 101/2 101/17
tactic [1] 22/20
tactical [1] 11/23
tactics [1] 11/23
take [24] 2/17 12/3 19/1 19/4 20/12 25/5
27/21 28/25 31/6 41/21 46/13 46/14 51/3
54/21 94/9 145/16 149/25 168/3 175/5
181/23 194/17 194/19 196/25 201/12
taken [15] 19/11 22/2 22/4 28/24 31/16 39/3
43/5 50/3 94/23 103/23 141/17 148/14 197/2
199/20 215/3
takes [1] 87/18
taking [5] 5/11 27/24 31/16 169/15 213/19
talk [49] 8/2 8/15 18/15 30/13 30/16 30/17
32/16 32/19 33/8 34/6 34/9 37/4 37/11 37/15
59/20 63/1 65/18 81/7 81/16 82/4 82/15 91/1
108/23 110/1 110/3 130/10 130/10 135/21
168/7 168/11 168/17 168/18 172/25 174/4
174/19 186/21 186/22 186/23 196/22 196/23
198/17 200/5 201/9 208/21 209/14 209/16
209/20 214/6 214/9
talked [38] 19/20 20/2 36/12 38/9 38/22
38/22 51/18 52/6 61/3 74/19 81/8 82/13
83/14 83/17 87/24 87/25 92/1 99/18 107/20
107/20 107/20 107/21 114/2 114/8 118/8
121/8 140/20 168/10 170/16 187/3 188/16
190/24 191/5 191/16 192/2 203/21 207/23
211/25
talking [42] 2/7 23/21 30/24 33/5 35/3 51/8
52/17 59/5 64/4 83/9 88/19 93/9 95/18 98/25
101/2 103/25 110/19 113/8 113/9 114/15
125/24 128/20 129/23 143/5 164/13 167/4
167/12 168/13 171/11 171/16 174/7 175/9
177/12 182/4 184/15 185/22 186/25 187/13
204/16 205/3 205/3 207/10
talks [4] 33/16 187/24 204/5 213/12
tape [9] 36/4 42/8 71/8 177/12 177/20 178/2
178/9 178/13 192/4
tape-recordings [1] 42/8
taped [7] 107/5 107/7 107/10 107/19 111/13
133/19 178/20
tapes [7] 66/5 67/6 67/7 114/7 176/25 176/25
177/6
taping [2] 27/24 187/7
target [1] 71/18
targeted [1] 160/11
targets [11] 66/1 69/14 70/2 70/24 73/3 73/5
73/18 73/21 78/9 175/2 175/11
tarot [1] 172/20
task [3] 12/13 14/14 154/7

**T**

tax [14]  5/23 6/12 6/21 7/8 7/23 9/5 9/8 93/11
146/17 165/9 189/11 209/21 210/23 212/15
taxable [3]  9/7 211/1 211/14
taxes [5]  137/22 138/15 138/24 146/18
146/25
taxpayer [4]  7/21 8/3 8/10 9/1
Team [1]  12/2
technically [1]  12/19
tecum [6]  25/2 25/19 25/21 25/22 25/25
25/25
telephone [10]  19/17 60/15 69/14 70/1 133/9
133/11 161/11 161/15 186/18 189/25
telephonic [1]  60/14
telephonically [2]  52/2 60/5
tell [99]
teller [6]  7/16 87/21 149/6 171/9 190/8
190/10
tellers [6]  7/19 88/4 190/7 190/16 195/6
202/25
telling [41]  2/7 2/15 31/9 33/25 38/20 57/8
66/11 72/7 72/11 72/11 72/12 72/13 92/21
97/1 100/3 102/1 106/25 107/10 109/25
110/16 110/17 113/22 129/21 134/23 135/11
135/13 136/12 136/15 136/17 146/17 164/16
167/13 172/1 172/2 172/16 173/14 173/19
176/21 188/11 213/13 213/17
tend [1]  203/1
term [5]  27/22 70/9 82/20 100/5 145/12
terms [4]  125/6 208/14 208/21 209/6
testified [16]  50/22 58/18 59/25 62/23 63/4
65/24 125/15 139/6 147/17 153/19 154/16
157/16 166/17 170/21 176/23 190/7
testifies [2]  198/3 200/3
testify [27]  2/24 49/9 121/11 126/11 156/11
156/14 195/5 196/6 196/15 196/19 198/4
198/9 198/21 198/21 198/23 198/25 199/1
199/11 199/12 199/14 199/15 200/8 200/23
202/23 213/24 214/18 214/21
testifying [4]  62/17 78/4 145/22 197/10
testimony [31]  8/11 46/23 47/3 48/11 48/12
48/19 48/25 49/3 49/20 52/17 52/18 52/24
53/3 53/14 59/1 64/8 64/15 66/5 67/1 67/6
67/9 94/14 140/5 145/21 146/10 147/4
147/11 147/12 176/24 200/9 216/3
tests [1]  43/2
text [2]  86/8 184/24
thank [51]  7/1 10/5 10/11 13/10 30/20 31/2
32/2 46/16 49/15 59/3 59/13 59/23 61/18
68/4 68/7 71/2 75/5 78/5 85/2 85/21 87/1
87/3 89/21 90/4 94/11 94/16 94/18 95/10
95/16 96/18 107/4 107/12 112/25 122/20
132/12 140/23 145/18 145/22 153/11 153/14
166/12 178/24 193/11 194/14 194/21 196/24
199/24 203/10 203/14 203/15 215/2
thanked [1]  170/17
that's [119]
theme [1]  191/18
themes [1]  113/13
themselves [2]  40/21 74/5
theory [3]  64/10 90/9 205/22
there's [32]  5/14 22/1 46/10 72/14 73/1 78/21
81/24 85/13 87/18 98/10 114/8 117/6 119/4
119/16 126/17 134/8 145/1 145/4 147/15
147/22 148/10 159/21 160/16 170/24 171/6
171/21 174/12 188/2 188/3 201/24 208/5
211/24
therefore [1]  165/21
they'll [1]  201/18

they're [17]  3/22 3/22 4/18 51/8 57/16 72/7
76/25 77/1 77/19 114/25 116/16 149/17
158/16 158/22 160/1 172/22 175/2
they've [2]  97/22 185/12
thing [30]  27/11 32/23 34/2 38/15 41/25 42/1
65/23 70/5 78/22 80/6 84/22 85/11 85/11
87/11 87/18 89/16 89/17 97/7 117/7 118/11
125/1 140/1 141/22 149/15 150/5 152/1
172/5 182/1 184/4 192/20
things [30]  36/6 58/8 67/22 77/22 85/1 85/13
92/17 101/18 108/24 114/18 118/4 134/8
135/10 136/16 142/20 160/25 166/20 166/21
171/22 173/20 181/20 184/24 185/1 186/21
188/7 190/20 198/20 198/22 209/22 213/18
think [137]
thinking [1]  203/21
thinks [5]  65/4 65/14 76/5 198/18 210/18
third [9]  7/17 44/5 44/12 70/11 97/18 98/5
121/24 139/10 210/7
Thirty [2]  97/21 97/23
Thirty-four [2]  97/21 97/23
those [34]  3/8 12/22 19/1 21/10 25/15 26/21
33/4 33/16 35/7 42/22 43/16 43/19 69/16
69/16 80/22 109/23 114/4 114/7 114/14
129/4 129/10 138/19 142/2 157/22 173/12
175/5 175/10 176/20 185/1 185/4 205/19
208/12 209/22 214/6
though [4]  152/20 157/25 164/2 214/16
thought [39]  9/8 35/10 51/19 54/13 54/14
54/17 60/24 71/11 71/16 77/25 80/11 81/2
81/15 92/9 108/23 110/22 118/7 118/8
118/17 122/8 122/16 133/18 150/19 152/16
152/18 152/21 160/5 164/7 167/3 167/20
167/23 168/21 169/7 176/9 183/17 184/7
184/12 188/13 189/22
thousand [1]  71/24
threaten [2]  151/8 151/11
threatening [2]  151/25 152/14
three [20]  8/14 11/20 13/17 30/13 36/9 42/4
70/3 77/23 82/5 96/21 118/20 126/8 154/2
164/17 164/20 170/19 172/22 173/7 204/4
204/10
three-fold [1]  70/3
through [35]  2/20 5/2 5/16 5/20 8/10 9/12
9/16 19/13 29/6 32/25 33/4 38/16 72/13
78/22 81/7 91/3 117/22 118/9 122/13 123/20
123/23 124/3 124/6 140/18 147/12 160/7
165/5 173/4 190/15 198/15 204/3 204/4
204/13 204/14 212/19
throughout [1]  196/1
throw [1]  44/8
times [12]  30/13 32/19 43/22 77/23 82/5
112/6 114/16 126/15 150/4 157/9 167/25
168/11
tiny [1]  92/11
tissue [1]  188/15
today [3]  39/14 120/3 176/23
together [12]  4/7 32/25 41/20 43/16 50/1
86/5 109/6 115/16 115/20 118/20 131/21
155/19
told [112]
tomorrow [22]  39/19 197/15 197/16 198/8
199/7 199/8 199/9 199/25 200/3 200/5 200/7
200/22 200/23 201/4 201/19 202/6 203/12
203/14 209/10 214/6 214/15 215/1
tonight [3]  200/16 200/20 201/19
too [19]  13/18 14/3 17/22 28/5 41/18 80/20
124/1 139/6 143/22 147/18 153/15 167/12
167/16 168/16 189/6 189/7 202/4 210/18
212/7

took [25]  19/14 19/22 20/5 20/7 24/15 31/24
40/13 44/24 44/25 53/13 95/19 127/23
128/13 143/18 143/24 147/4 161/17 161/23
168/15 169/14 175/15 177/1 177/3 178/16
210/15
top [1]  97/6
topics [1]  193/16
total [2]  116/17 201/7
totally [4]  20/16 48/17 99/19 117/15
toward [1]  122/20
towards [5]  9/25 39/17 40/3 69/1 69/5
Townsend [1]  180/5
traces [1]  181/25
tracing [1]  43/13
track [1]  176/1
trade [1]  7/20
train [5]  3/5 115/15 115/20 195/5 202/24
trained [1]  7/20
training [1]  43/6
transaction [1]  119/13
transactions [6]  33/5 34/24 34/24 42/8
112/18 156/5
transcribed [3]  182/5 182/6 182/7
transcribing [1]  141/15
transcript [4]  1/11 178/8 212/11 217/14
transcriptions [1]  182/6
transcripts [3]  176/25 212/6 212/8
transfer [1]  191/7
transferred [2]  51/10 74/16
transfers [1]  188/1
transpired [1]  181/20
traps [1]  181/25
traveled [1]  90/15
traveling [2]  90/23 90/24
treated [1]  189/11
treating [1]  121/3
tremendous [2]  105/19 105/19
trial [7]  1/11 2/22 64/4 79/13 146/13 147/9
196/2
trick [2]  26/13 82/1
tried [1]  54/8
trip [3]  2/25 18/14 95/20
trouble [1]  122/22
true [38]  5/6 9/10 24/2 48/15 48/22 53/9
53/25 54/1 57/12 57/14 57/16 64/3 66/4
84/12 87/1 98/24 102/8 103/11 106/2 107/2
107/5 107/11 107/16 108/3 109/25 126/7
128/16 138/11 142/8 154/22 159/7 168/23
175/4 175/8 175/12 175/17 177/14 182/14
truly [2]  86/15 113/14
trust [2]  26/15 100/3
truth [9]  53/18 53/21 104/2 110/17 113/22
120/10 135/11 136/15 188/12
truthful [6]  43/17 65/5 65/14 90/1 105/16
106/23
try [24]  11/24 16/15 16/17 34/4 57/22 58/7
58/15 67/22 76/5 81/12 109/8 122/19 145/21
158/18 158/21 158/24 159/5 159/25 164/11
164/15 166/9 168/12 176/1 203/18
trying [26]  17/18 26/13 31/18 31/19 32/25
33/12 33/13 35/4 36/5 42/20 56/15 67/17
75/21 75/24 82/15 87/13 122/17 123/23
126/19 127/13 128/21 132/9 134/13 139/24
147/10 202/14
Tuesday [1]  120/3
Tufano [1]  118/24
tumor [1]  105/7
turn [8]  15/7 15/8 26/8 47/18 89/24 98/11
131/18 169/11
turned [4]  92/12 119/1 179/15 184/23

**T**

turning [1] 38/24
turns [2] 114/10 114/11
twice [1] 195/10
two [42] 3/1 7/21 8/15 17/10 18/3 25/9 30/13
31/5 32/19 35/10 36/9 39/15 41/9 47/15
47/16 82/4 83/25 85/11 85/20 91/14 91/15
92/1 105/15 106/9 109/9 109/23 116/15
130/23 131/3 147/19 148/2 148/9 154/20
159/21 161/5 169/25 172/22 178/17 185/24
201/10 201/11 205/17
two-page [2] 18/3 85/11
two-part [1] 185/24
twofold [1] 90/25
type [13] 31/7 31/11 34/17 35/12 67/18 93/3
114/5 127/22 184/4 187/2 187/18 195/1
211/7
typed [2] 202/19 203/4
typewritten [1] 85/11
typical [2] 155/4 179/6

**U**

U.S [9] 15/25 16/5 16/6 17/7 96/14 106/8
119/13 126/16 129/10
Ueda [1] 74/22
Uh [5] 55/1 103/5 129/6 135/17 187/1
Uh-huh [5] 55/1 103/5 129/6 135/17 187/1
ultimately [1] 162/14
Um [1] 66/8
UMC [1] 86/16
un [1] 79/5
un-ring [1] 79/5
uncanny [1] 131/25
under [19] 2/8 7/8 8/4 8/12 11/6 59/14 64/1
70/4 70/20 95/8 105/4 108/22 121/23 144/20
147/8 162/24 175/2 197/18 197/21
undercover [21] 12/17 14/25 15/5 15/11 16/8
66/2 69/13 69/22 70/1 70/4 70/18 86/16 90/2
113/25 154/3 168/9 168/10 181/24 187/25
189/21 189/23
understand [16] 31/14 32/2 33/17 35/13
43/21 63/9 65/7 75/5 75/19 101/9 113/10
128/21 149/21 164/20 200/6 207/13
understanding [1] 143/15
understood [1] 196/16
underway [1] 149/20
unfortunately [2] 91/23 166/4
Unions [1] 25/5
unique [1] 15/10
unit [22] 11/23 12/5 12/12 12/13 12/25 13/1
13/1 13/3 13/15 13/21 13/21 13/22 14/1 14/3
18/22 19/2 19/3 19/11 19/11 26/6 29/1 85/24
UNITED [15] 1/1 1/3 1/13 1/17 2/11 2/14
5/22 17/17 18/6 27/17 81/10 156/11 177/7
177/18 201/6
unjustly [1] 74/4
unlawful [1] 210/25
unless [4] 17/14 81/24 126/4 211/24
unsettling [1] 133/19 133/25
until [14] 2/25 11/3 14/1 24/9 32/20 34/21
39/22 42/9 48/16 105/25 146/2 154/15
187/22 202/6
untrue [4] 95/25 96/2 99/19 133/1
untruthful [1] 90/10
untypical [2] 154/25 155/3
unusual [1] 168/1
update [1] 33/18
upon [7] 45/6 48/4 50/10 64/2 92/21 147/23
208/2

upper [2] 12/14 22/18
upset [2] 91/23 188/4
upstairs [1] 23/21
us [25] 10/1 10/2 20/13 32/2 62/11 80/17
80/17 80/18 81/1 91/4 97/1 107/10 107/10
118/20 122/5 122/7 127/12 135/13 140/19
140/19 146/9 146/21 184/22 184/24 199/24
USA [1] 115/25
used [11] 26/18 79/13 82/20 97/22 103/21
113/11 113/12 140/23 142/15 163/7 189/20
using [3] 76/1 151/1 171/17
usually [1] 6/10
utilize [1] 212/6

**V**

valid [2] 49/4 59/7
value [6] 17/1 57/6 137/14 138/3 211/3 211/6
Vandlo [2] 86/21 88/3
various [18] 11/2 14/21 22/21 25/4 28/18
28/22 43/2 43/5 69/14 80/13 96/11 111/25
134/8 150/21 175/22 175/23 182/19 209/22
vehicle [2] 112/5 112/7
vein [1] 67/20
verbally [2] 108/19 109/12
verdict [1] 203/7
verge [1] 106/23
verification [1] 8/14
verified [3] 8/10 8/21 9/2
verify [10] 6/15 34/4 66/1 66/11 66/13 107/1
109/24 111/10 113/2 113/5
versa [1] 142/10
version [5] 57/1 58/16 59/7 156/23 203/4
versions [1] 59/5
versus [3] 5/23 147/23 208/23
very [42] 8/5 27/15 35/23 35/25 38/14 39/21
40/18 42/13 43/15 56/20 57/1 62/2 70/17
71/2 80/20 84/21 85/17 86/15 87/7 90/1
91/23 91/23 98/9 98/15 98/15 98/23 98/23
102/2 102/7 102/7 103/10 103/23 107/17
108/25 114/7 118/5 118/10 118/12 150/14
185/15 197/22 204/15
via [4] 19/14 42/22 70/12 97/6
vibrant [1] 39/14
vice [1] 142/10
victim [83]
victim's [1] 44/24
victims [63] 29/15 29/16 30/16 30/18 30/23
31/21 33/5 34/6 34/10 43/14 44/24 47/11
51/5 51/10 51/10 51/13 51/21 52/21 52/22
53/6 54/9 56/15 63/12 63/13 64/11
64/11 64/12 64/14 64/17 64/19 66/3 70/19
70/21 78/9 78/10 78/17 78/19 79/24 80/12
80/16 80/19 80/21 81/2 81/15 82/6 82/23
125/17 125/22 145/24 145/25 146/1 146/2
146/7 146/7 150/22 151/11 151/14 151/16
152/9 152/23 160/5 160/6
victims' [1] 153/1 182/6
Victoria [28] 20/25 21/5 21/6 29/10 29/11
45/19 45/23 47/21 47/25 48/1 48/8 48/8
48/13 55/16 60/23 61/13 61/20 63/5 151/23
152/13 161/22 162/2 162/12 162/15 162/18
164/7 164/21 165/5
videotape [1] 15/19
videotaped [1] 15/11
videotaping [1] 181/25
view [3] 165/25 176/20 203/8
villains [1] 88/3
violent [4] 11/24 13/12 13/14 179/11
virtually [1] 48/24
visited [4] 36/10 54/5 78/8 127/3

visual [1] 31/15
vitro [7] 122/15 123/20 123/25 124/1 124/4
124/5 124/7
Vivian [3] 20/25 25/11 29/9
void [2] 144/10 144/13
volume [3] 1/10 33/1 160/12
volunteering [1] 158/5
Von [9] 112/3 112/9 112/15 112/20 112/23
113/4 126/6 151/5 151/6

**W**

wait [7] 3/10 30/12 32/19 152/6 180/23
181/10 200/4
waited [2] 34/25 181/14
waiting [3] 59/21 107/13 200/25
walked [2] 39/6 92/11
Walker [8] 81/6 140/15 141/9 144/2 147/7
147/8 147/21 148/3
want [83]
wanted [41] 2/19 3/1 4/11 19/21 20/3 26/5
28/8 28/25 34/3 37/3 37/12 38/13 64/9 70/5
70/19 70/19 72/5 72/21 80/1 90/25 91/1
92/24 117/3 117/10 117/17 117/22 118/2
118/14 130/10 130/10 130/23 141/15 150/15
150/16 180/23 187/10 188/13 188/14 204/19
207/9 211/23
wanting [3] 40/16 106/23 166/24
wants [8] 62/8 65/1 86/16 198/23 199/11
199/14 200/8 202/16
warrant [2] 22/19 165/11
warrants [1] 166/2
wasn't [32] 20/17 23/1 37/11 41/23 43/25
44/3 44/3 50/11 50/17 50/23 53/17 54/25
60/22 63/24 71/10 72/10 78/12 85/19 100/1
119/16 126/6 132/19 132/21 135/8 137/13
140/11 140/11 141/3 144/16 180/20 196/11
198/24
waste [1] 36/6
watch [1] 31/18
Watts [16] 45/13 46/8 52/1 52/3 53/12 55/6
55/23 56/17 56/18 60/18 61/12 69/10 83/1
112/22 150/23 161/8
Watts' [1] 52/11
we'd [3] 158/24 158/24 202/19
we'll [29] 20/14 44/8 46/16 50/1 58/13 79/3
94/10 94/17 120/17 145/17 148/13 193/14
194/20 196/23 197/1 197/13 197/13 197/15
197/23 198/1 201/16 201/21 202/19 203/4
203/13 211/21 214/15 214/21 214/25
we're [36] 2/4 35/2 45/6 52/17 58/19 64/4
64/5 76/1 76/12 77/2 101/21 104/2 138/9
141/19 147/7 148/18 150/14 161/21 168/11
174/21 180/6 181/24 181/25 182/1 185/22
194/21 195/14 197/4 199/22 200/15 200/15
201/4 203/9 205/3 207/10 207/14
we've [11] 3/19 43/21 66/4 66/5 77/22 79/13
114/11 181/24 197/9 198/19 203/21
weapons [1] 11/23
website [14] 54/7 78/11 78/13 78/14 78/20
78/23 79/14 81/3 81/16 83/8 114/16 115/2
115/7 115/8
week [1] 105/14
weekend [1] 4/4
weeks [3] 178/17 197/19 201/14
weighed [1] 185/5
weights [1] 86/6
Weiselberg [1] 1/20
Welcome [5] 4/2 59/18 95/13 148/23 202/11
well [109]
well-written [1] 180/10

**W**

went [30]  12/9 12/15 13/22 23/1 27/16 28/7 30/15 32/16 34/2 36/12 37/17 38/15 41/19 51/9 52/1 69/1 71/20 90/22 93/4 108/7 112/1 112/10 112/10 112/12 115/7 127/12 127/23 128/11 140/18 144/20
weren't [20]  21/10 21/21 22/6 30/7 36/16 43/5 51/21 64/1 64/16 74/13 78/15 106/5 109/17 121/22 125/17 125/21 128/1 128/15 129/13 140/5
West [2]  1/7 1/24
Western [1]  25/4
what's [16]  10/15 18/2 67/1 96/20 100/16 104/7 105/4 115/24 126/25 177/9 191/11 199/7 203/22 205/15 208/6 208/22
whatever [5]  14/24 30/19 82/23 122/13 174/24
whatsoever [2]  70/6 139/21
when's [1]  114/2
where [46]  2/14 12/16 15/25 18/20 19/16 27/19 31/25 46/6 47/16 52/4 53/14 53/25 55/21 61/22 63/24 67/19 72/10 76/12 86/9 98/19 99/2 101/6 101/6 102/3 115/2 124/3 134/16 135/3 135/5 135/23 136/3 136/7 150/2 151/16 153/6 161/12 167/16 176/3 187/2 194/24 197/21 204/3 204/22 205/13 210/23 214/17
whether [47]  2/7 2/23 11/25 15/13 54/11 57/4 59/7 63/10 63/12 63/17 64/3 64/5 64/6 64/20 64/24 66/19 68/1 73/13 76/8 77/15 93/15 107/1 107/15 108/18 109/24 113/3 113/22 138/10 145/24 146/11 147/13 158/22 166/2 174/20 175/21 175/25 185/25 186/1 196/15 204/17 204/24 207/12 207/20 208/14 208/16 208/23 214/18
while [7]  17/19 48/5 91/6 126/14 145/22 181/23 207/10
white [13]  25/12 91/1 91/2 91/7 92/8 112/2 119/1 130/2 130/8 143/14 143/19 147/5 147/6
White's [1]  92/4
who's [4]  76/6 99/10 156/9 171/9
whoever [2]  34/4 169/16
whoever's [1]  38/20
whole [6]  67/10 132/8 140/1 205/2 207/1 210/12
whom [4]  10/12 100/1 101/14 156/14
whose [4]  48/22 48/23 99/12 157/9
why [39]  26/3 38/10 39/13 46/13 49/12 49/25 52/23 53/20 59/6 59/21 62/11 65/4 65/5 65/8 65/14 66/15 67/21 76/1 77/10 99/22 118/13 127/12 127/14 129/20 130/8 130/12 138/6 145/16 160/17 188/18 196/16 199/18 200/21 205/8 209/5 209/20 213/5 214/15
wife [5]  93/13 120/13 151/22 152/13 164/3
willfully [1]  212/14
willing [3]  82/14 82/14 153/3
winnings [1]  7/25
wire [5]  27/4 70/12 192/21 204/13 206/10
wired [1]  25/3
wires [2]  26/24 27/14
wiretapping [1]  182/1
wish [3]  120/22 146/23 165/23
wishes [2]  5/5 172/22
withdraw [2]  94/4 142/12
withdrawing [1]  65/12
withdrawn [6]  82/21 90/14 96/9 109/20 110/15 151/14
within [2]  23/11 105/14

without [14]  4/22 5/15 8/20 25/24 29/6 33/9 49/8 84/3 93/13 97/1 97/23 114/15 116/12 177/23
witness [33]  3/15 3/18 3/20 4/11 9/20 9/23 36/2 40/20 45/9 46/20 47/17 50/10 54/1 58/12 67/11 67/16 67/21 75/22 76/2 76/10 78/3 101/10 106/22 107/23 128/8 132/10 156/9 158/23 160/22 174/20 195/3 202/22 213/23
witness' [1]  52/17
witnessed [1]  176/2
witnesses [15]  30/1 33/14 49/18 56/21 66/11 66/12 66/13 109/8 153/16 154/24 158/19 160/3 195/16 196/17 202/7
Wolofsky [3]  9/14 73/21 73/21
woman [15]  37/19 39/7 40/14 48/22 101/4 102/4 107/5 112/13 112/13 131/24 156/17 173/13 173/16 185/14 185/15
won't [2]  48/23 58/24
wondering [2]  62/8 133/24
words [5]  34/7 35/19 36/2 39/11 43/14
wordy [1]  210/18
work [33]  3/7 3/12 11/2 11/10 12/4 12/17 14/8 14/25 16/1 16/8 27/15 33/7 33/8 33/9 41/25 43/1 44/1 44/12 45/23 55/17 60/25 62/2 69/23 86/5 86/16 86/19 86/21 87/15 158/8 159/10 163/2 163/24 180/10
worked [11]  12/13 12/16 12/17 13/12 14/5 14/11 14/15 16/10 17/7 17/16 42/25 153/19 154/6
working [16]  18/20 21/12 21/18 28/23 33/2 96/10 101/1 101/14 126/14 126/15 127/21 131/21 159/1 184/1 184/2 184/3
works [2]  31/19 86/22
world [1]  175/15
worth [3]  137/13 138/5 144/16
wouldn't [6]  24/2 49/8 101/21 120/10 145/7 210/14
Wow [1]  180/6
wrap [1]  200/16
write-off [1]  146/17
writer [4]  87/10 107/2 116/25 118/23
writes [1]  114/22
writing [20]  31/9 87/17 88/23 89/4 89/5 89/12 97/11 114/8 114/19 128/14 141/10 155/1 169/22 186/2 186/4 186/7 186/8 186/9 187/17 188/3
written [19]  25/7 25/14 85/11 86/18 88/21 171/2 179/14 179/16 180/10
wrong [8]  6/9 6/10 17/15 75/2 119/4 199/8 204/7 205/15
wrongdoing [1]  119/10
wrote [11]  16/1 16/24 33/23 45/13 46/8 55/6 55/23 84/21 87/8 88/6 142/22
Wynns [1]  80/14

**Y**

Yawonowich [1]  191/25
yeah [26]  24/14 42/13 60/8 62/11 69/5 72/4 81/22 88/18 97/17 99/18 100/14 111/14 113/8 122/16 133/3 133/13 149/25 154/14 155/13 162/24 190/5 192/1 200/6 206/6 207/11 212/18
year [7]  8/1 60/12 128/4 137/21 154/11 172/8 180/2
years [17]  7/17 11/9 11/19 13/17 41/9 100/10 114/11 115/9 115/11 118/4 133/14 154/2 159/9 170/20 173/4 173/7 183/24
yes [353]
yes-no [1]  152/2

yesterday [9]  2/6 2/7 18/13 201/18 203/21 204/16 207/4 210/24 212/2
yet [7]  128/1 128/16 129/13 139/9 161/22 198/21 202/3
YL [3]  26/25 27/2 156/18
York [26]  7/22 8/15 10/19 14/16 105/17 105/18 105/19 106/3 106/8 106/13 106/18 107/17 108/3 124/9 134/6 135/1 137/9 137/12 137/17 137/25 138/1 149/6 149/18 149/24 167/25 173/17
you'd [2]  15/7 34/20
you'll [1]  139/22
you're [72]  22/19 23/19 30/6 31/10 32/2 35/21 36/22 38/21 43/8 46/9 53/16 57/15 59/14 63/17 64/16 65/3 65/11 72/9 72/12 72/13 74/11 74/18 75/21 75/24 76/4 78/20 78/21 80/19 80/20 80/24 83/25 84/5 85/5 87/1 87/5 87/25 88/19 92/7 95/8 106/6 106/25 111/6 114/21 119/11 119/12 131/18 132/6 132/14 132/19 139/12 142/12 143/20 144/16 145/22 146/12 147/10 147/16 147/24 159/1 174/8 174/16 174/20 184/16 185/13 188/11 194/11 195/11 196/5 196/23 206/4 206/24 206/24
you're -- you [1]  78/20
you've [19]  11/14 36/5 38/4 43/5 56/16 64/19 114/2 114/12 115/2 135/15 142/22 142/25 143/2 166/20 168/10 183/1 183/11 188/7 196/1
young [2]  8/9 38/16
younger [1]  185/8
yours [1]  99/20