1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     CASE NO. 11-80072-CR-MARRA
3
UNITED STATES OF AMERICA,
4                                       West Palm Beach, Florida
                 Plaintiff(s),
5                                       September 23, 2013
           vs.
6
ROSE MARKS,
7
                 Defendant(s).
8    ------------------------------------------------------------

9                      EXCERPT OF JURY TRIAL
           HEARING ON JURY CHARGE AND EXPERT WITNESSES
10            BEFORE THE HONORABLE KENNETH A. MARRA
                  UNITED STATES DISTRICT JUDGE
11
APPEARANCES:
12
FOR THE PLAINTIFF(S):   Roger Stefin, Esquire
13                      Laurence M. Bardfeld, Esquire
                        United States Attorney's Office
14                      500 East Broward Boulevard
                        Seventh Floor
15                      Fort Lauderdale, Florida 33301

16

17   FOR THE DEFENDANT(S):   Fred A. Schwartz, Esquire
                         Kopelowitz Ostrow
18                       700 South Federal Highway
                         Suite 200
19                       Boca Raton, Florida 33432

20

21   REPORTED BY:            Tammy Nestor, RPR
                         Nestor Court Reporting, Inc.
22                       tammynestor@yahoo.com

23

24

25

```
 1   Thereupon,

 2   the following proceedings began at 9:51 a.m.:

 3            THE COURT:  Good morning, everyone.  Please be seated.

 4   We are back on the record.  Ms. Marks is present with counsel.

 5   Are we ready to discuss jury instructions or are we going to

 6   discuss the expert witnesses first?  Which do you want to deal

 7   with first?

 8            MR. SCHWARTZ:  Why don't we do -- if Your Honor

 9   doesn't mind, I think we are pretty close on the jury

10   instructions.  Maybe we can get those out of the way and

11   then --

12            THE COURT:  Okay.  Let's do that.

13            I've got, I guess, the government's most recent

14   submission and I've got a number of special instructions

15   requested by the defense.  So why don't we start with the

16   government's packet and then we can talk about the defendant's

17   requested instructions after we finish.  Is that all right?

18            MR. SCHWARTZ:  Sure.

19            THE COURT:  All right.  So I've got the government's

20   first proposed instruction, the introductory instruction.  Any

21   objection to that?

22            MR. SCHWARTZ:  No, Your Honor.

23            THE COURT:  How about page -- I have a packet that

24   starts with page 3.  Is that the right packet?

25            MR. STEFIN:  Yes.  The packet starts because pages 1
```

1    and 2 were the United States notice of filing.

2          THE COURT:  So is that everybody --

3          MR. SCHWARTZ:  That's what I have, Judge.

4          THE COURT:  Okay.  So let's go to page 4, the standard

5    instruction, duty to follow instructions, presumption of

6    innocence.  Any objection to that?

7          MR. SCHWARTZ:  No, Your Honor.

8          THE COURT:  I guess we are going to have to figure out

9    what version we are going to use of 2.1.  Is it 2.1 or 2.2?  I

10   have a packet that has both 2.1 and 2.2.  Is that the right

11   packet or the wrong packet?

12         MR. SCHWARTZ:  Your Honor, I believe that 2.1 is the

13   defendant does testify.  2.2 is the defendant does not testify.

14   At this point it's highly, highly unlikely that the defendant

15   will testify unless something changes.

16         THE COURT:  All right.  So we are going to assume at

17   this point that we are going to use 2.2.  And if that changes,

18   we can modify the instruction.

19         MR. SCHWARTZ:  Yes, Your Honor.

20         THE COURT:  Does that make sense?

21         MR. SCHWARTZ:  Yes, sir.

22         MR. STEFIN:  Yes.

23         THE COURT:  Okay.  All right.  The reasonable doubt

24   instruction, any objection?

25         MR. SCHWARTZ:  No, Your Honor.

 1             THE COURT:  The definitions of direct and
 2   circumstantial evidence instruction, any objection?
 3             MR. SCHWARTZ:  None.
 4             THE COURT:  Credibility of witnesses, any objection?
 5             MR. SCHWARTZ:  No, sir.
 6             THE COURT:  Impeachment instruction, any objection?
 7   And again, we have two different versions.  We will presume
 8   that the defendant is not going to testify and use the one
 9   without discussing the defendant testifying.
10             MR. SCHWARTZ:  Yes, 6.1, Judge.
11             THE COURT:  Okay.  Any objection to the aiding and
12   abetting instruction?
13             MR. SCHWARTZ:  I believe that there is one count that
14   includes aiding and abetting and that's the wire fraud count.
15   Am of correct, Mr. Stefin?
16             MR. STEFIN:  Well, I think it applies to all the wire
17   fraud counts.
18             MR. SCHWARTZ:  The wire fraud counts.  It doesn't
19   apply to the mail fraud count.
20             MR. STEFIN:  I will have to go back and look.
21             MR. SCHWARTZ:  I don't object to it as long as it's
22   applicable only to the counts that charge section 2 in the
23   indictment.
24             MR. STEFIN:  Well, the case law says section 2 doesn't
25   have to be charged for aiding and abetting theory to occur.

1          MR. SCHWARTZ:  The mail fraud counts, I believe my

2    client is alleged to have acted alone as to the particular mail

3    frauds charged in the indictment.

4          The wire fraud counts, she's either acted alone or

5    charged with aiding and abetting her alleged coconspirators.

6    So the aiding and abetting would be applicable there.  I don't

7    remember --

8          THE COURT:  I have it alleged --

9          MR. SCHWARTZ:  -- as to the money laundering.

10         THE COURT:  I have it alleged relative to Count 2 and

11   Counts 4 through 10 and Counts 12 and 13.  Those are the counts

12   that I see expressly alleged.

13         MR. SCHWARTZ:  You are correct, Your Honor.  And it

14   wouldn't apply obviously to conspiracy.

15         THE COURT:  I'm sorry?

16         MR. SCHWARTZ:  It obviously wouldn't apply to the

17   conspiracy counts.

18         THE COURT:  So you want me to say, as to or relative

19   to Counts 2, 4 through 10, and -- what were the other ones --

20   12 and 13, it's possible to prove the defendant guilty of a

21   crime, et cetera?  Do you have any objection if we introduce

22   the instruction with that clause.

23         MR. SCHWARTZ:  No, Your Honor.

24         MR. STEFIN:  I mean, I think the standard is pretty

25   clear, but the Court's -- it's not incorrect to put it the way

```
 1    the Court wants to do it.
 2            THE COURT:  So you don't have any objection to doing
 3    that, Mr. Stefin?
 4            MR. STEFIN:  Or maybe a sentence that precedes it
 5    which says the defendant is charged in Counts 2 through 10 and
 6    13 to 40 -- well, 12 and 13 -- no, I don't like that either.
 7    Your way is probably better.
 8            THE COURT:  Okay.  All right.  How about the
 9    definition of knowingly, willfully, et cetera?
10            MR. SCHWARTZ:  Your Honor, the standard jury
11    instruction I would suggest includes the instruction on
12    willfully in Count -- in instruction 8.
13            Mr. Stefin, because I asked for more detailed
14    willfully instructions, has included the willfully instructions
15    in the conspiracy count and the more detailed willfully
16    instruction which applies to tax counts in the tax counts.
17            I have a concern that that will confuse the jury as to
18    the application of the willfully instructions on the
19    substantive mail fraud and wire fraud counts.  So I would ask
20    Your Honor to include willfully in 8 and then include it again,
21    if Mr. Stefin wishes, in the conspiracy count, and of course,
22    the more detailed willfully in the tax count.  So I'm asking
23    for three willfullies rather than two.
24            THE COURT:  I'm sorry.  Is the definition different in
25    the conspiracy count versus the general standard?
```

 1          MR. STEFIN:  Yes, it is, because it's the more

 2   specific willful instruction, I think it's -- what is it, 9.1?

 3          MR. SCHWARTZ:  9.1B and 9.1A.

 4          MR. STEFIN:  It's under special instructions, isn't

 5   it?

 6          MR. SCHWARTZ:  I think it's the regular instructions,

 7   9.1B and A.

 8          MR. STEFIN:  Okay.  Judge, in the pattern jury

 9   instruction book, they provide two different instructions for

10   willfulness.  And it depends on the type of offense.  The less

11   onerous willfulness is for most crimes, but there are cases or

12   crimes that require more specific intent, so they have 9.1A and

13   9.1B.

14          Mr. Schwartz pointed out to me that in tax law, it's

15   generally understood that the more onerous willful instruction,

16   that is, intentional violation of known legal duty, applies to

17   tax cases.  In my discussions with other people in my office,

18   they agree with that.

19          But that doesn't mean that that more onerous

20   instruction applies across the board.  It only applies to that

21   specific offense, the tax violations.  So I proposed removing

22   the definition of willfulness from instruction 8, so the

23   heading should just say on or about knowingly, I remove the

24   willfulness instruction there, but then I inserted the general

25   willfulness instruction on page 17 of my proposed instructions

 1    which is the end, the tail end of the conspiracy instruction.

 2            And then when we get to the tax instruction, I again

 3    inserted the definition of willfulness as it pertains to that

 4    count to include the more specific intent.

 5            THE COURT:  What do we do about all the others, all

 6    the other counts?  You've got conspiracy covered and you've got

 7    the tax charges covered.  What about the substantive wire fraud

 8    and mail fraud and money laundering willfulness charges?  What

 9    definition is applying to those?

10            MR. STEFIN:  Well, the mail fraud and wire fraud

11    counts do not include the willfulness.  It's knowingly and

12    intentionally -- knowingly with intent to defraud.

13            THE COURT:  So you are saying willfulness is not a

14    requirement for those counts?

15            MR. SCHWARTZ:  I would suggest, Your Honor, it is, and

16    it's assumed within the knowingly and that's why the definition

17    on what the government includes as their basic 8 would also

18    generally include a willfulness instruction.  And I would ask

19    that it be included there, the 9.1A instruction be included

20    there as it normally would be rather than just under the

21    conspiracy count.

22            THE COURT:  Well, I guess I need to look at the

23    elements of the offenses.  For example, in substantive, I need

24    to look at the substantive mail fraud and wire fraud charges to

25    see if willfulness is an element.  If it's not an element, I

1    guess we don't need that definition for those offenses.  Let me

2    read it.

3            I don't see willfully as an element of the substantive

4    mail fraud, wire fraud, or money laundering charges.  So if the

5    willfulness is not an element, then why do we need to define it

6    other than as specific for the conspiracy counts and the tax

7    counts?  Because under the general instruction, it says,

8    willfulness as defined or as used in these instructions means

9    X.  So if it doesn't -- it's not an element for those offenses,

10   and we have willfulness defined in the counts where it is an

11   element, why do we need a general willfulness that doesn't

12   apply to anything?

13           MR. SCHWARTZ:  And, Your Honor, what you are

14   suggesting now is what the revision of the 11th Circuit pattern

15   jury instructions also would suggest.  Prior to that revision,

16   which was a few years ago, willfulness was included within the

17   context of knowingly and the 11th -- the committee in the

18   revision took it out except where willfulness was specifically

19   charged.

20           I would suggest that that approach hasn't been tested.

21   And while Your Honor might properly feel that you need to

22   challenge -- to accept what the 11th Circuit revised pattern

23   jury instructions say, I would object and urge the earlier

24   instructions.

25           MR. STEFIN:  Judge, can I intervene?

```
 1              THE COURT:  Just one second.  The only other thing I
 2    would point out is I don't see the willfulness definition in
 3    the conspiracy to commit money laundering instruction which you
 4    added in the other.
 5              MR. STEFIN:  You didn't get my version last night?
 6              THE COURT:  Well, I thought I did, but...
 7              MR. STEFIN:  On page 17, I have a paragraph, the last
 8    paragraph that -- mine reads, in this instruction, the word --
 9              THE COURT:  I see it on page 17, but that's in the
10    conspiracy to commit mail and wire fraud.  It's not in the
11    conspiracy to commit money laundering.
12              MR. STEFIN:  No, it's not in the money laundering.
13    It's in the tax count, Your Honor.  This specific instruction
14    is in the tax counts.
15              THE COURT:  That's a different instruction.
16              MR. STEFIN:  Yes, sir.
17              THE COURT:  Why is it --
18              MR. STEFIN:  Oh, oh, oh, I'm sorry.
19              THE COURT:  Why isn't willfulness which is mentioned
20    in the conspiracy to commit money laundering count, there is no
21    definition of willfulness in that charge is what I'm saying.
22    It seems like it's missing from that charge.
23              MR. STEFIN:  You're right.
24              THE COURT:  Okay.  So if we are going to go with the
25    government's version and what I just articulated, we need to
```

1  add willfulness, the definition, to the money laundering

2  conspiracy charge.  If I'm going to go with Mr. Schwartz's

3  argument, then we just should probably --

4          MR. STEFIN:  May I make a suggestion?

5          THE COURT:  Yes.

6          MR. STEFIN:  To reinsert it, as Mr. Schwartz has

7  requested, back in the proposed general instruction No. 8 on,

8  you know, knowingly and willfully, that is the general

9  instruction, but then when we do the tax one specifically, the

10  Court uses the more precise instruction for that one count.

11          In other words, we will take it out of the conspiracy.

12  We will just move it back to the general instruction.  That way

13  willfulness will be understood to apply to all the instructions

14  or counts except for the tax counts in which there was more

15  restrictive definition of willfulness.

16          MR. SCHWARTZ:  I have no objection to that.  So we

17  would put 9.1A after the defendant's -- the willfulness of 9.1A

18  back into government's proposed jury instruction 8.

19          THE COURT:  All right.  But should we say except as to

20  counts such and such, the two tax counts, willfully means?

21  Because, again, then you have two definitions that might

22  confuse the jury that we should at least tell them willfully

23  means this as to various counts and willfulness means something

24  else as to the tax count.

25          MR. SCHWARTZ:  We might be able to -- I would suggest,

```
 1    Judge, that in the tax count where we are giving the more
 2    specific 9.1B definition, we say, I have previously given you a
 3    definition as to willfulness.  As to this count, and then go
 4    into the definition of willfulness, unless Mr. Stefin objects.
 5              THE COURT:  I think at some point we should clarify
 6    that there is a different definition for the tax counts versus
 7    everything else.  So we can do it any number of ways.  But do
 8    you both agree that we should at least do that at some point?
 9              MR. SCHWARTZ:  Yes, your Honor.
10              MR. STEFIN:  Right.  And on page 30, that's where the
11    willfulness instruction is for the tax counts.  And I might
12    suggest, I know we are jumping ahead, my last paragraph
13    started, in this instruction, the word willfully means.  May I
14    propose instead of, in this instruction, we just insert the
15    words, as to Counts 14 and 15, the word willfully means?
16              MR. SCHWARTZ:  I have that on my page 29, Judge,
17    starting on my page 29.
18              MR. STEFIN:  It starts on 29, but the paragraph is on
19    page 30 that I'm talking about?  I think it continues on --
20              THE COURT:  Do you have any objection to that
21    suggestion?
22              MR. SCHWARTZ:  No, Your Honor.
23              THE COURT:  So was it as to Counts 14 and 15, is that
24    what you said?
25              MR. STEFIN:  That's correct.
```

```
 1              THE COURT:  Then we are going to put willfully back in

 2    government's proposed instruction No. 8 on page 14 of their

 3    packet.

 4              MR. SCHWARTZ:  And you would take it out on page 17, I

 5    assume?

 6              THE COURT:  Yes.  Do you agree with that, Mr. Stefin?

 7              MR. STEFIN:  Yes.

 8              THE COURT:  All right.  Are we all in agreement on

 9    that now?

10              MR. STEFIN:  Yes, Your Honor.

11              THE COURT:  Mr. Schwartz?

12              MR. SCHWARTZ:  Yes, Your Honor.

13              THE COURT:  Okay.  So I'm up to page 15 of the

14    government's packet, the introduction to offense instructions.

15    Any objection to that?

16              MR. SCHWARTZ:  No, Your Honor.

17              THE COURT:  Next instruction, conspiracy to commit

18    mail and wire fraud, any objection?

19              MR. SCHWARTZ:  No, Your Honor.

20              THE COURT:  Taking out the willfully definition that

21    was included originally.

22              All right.  Now we are to the substantive mail fraud

23    instruction.  Any objection?

24              MR. SCHWARTZ:  No, sir.

25              THE COURT:  The substantive wire fraud instruction,
```

```
 1    any objection?

 2            MR. SCHWARTZ:  No, sir.

 3            THE COURT:  The conspiracy to commit money laundering

 4    instruction, any objection?

 5            MR. SCHWARTZ:  No, sir.

 6            THE COURT:  The substantive money laundering

 7    instruction, any objection?

 8            MR. SCHWARTZ:  No, sir.

 9            THE COURT:  The substantive tax fraud or tax return --

10            MR. SCHWARTZ:  Willfully filing material, false tax

11    return?

12            THE COURT:  Right.  Any objection to --

13            MR. SCHWARTZ:  No objection, Judge.

14            THE COURT:  With the modification that we have

15    discussed earlier.

16            MR. SCHWARTZ:  Yes.

17            THE COURT:  Adding the intro to the willful

18    definition.

19            MR. SCHWARTZ:  But I would -- as to their definition,

20    Judge, there's a line of cases under James versus the United

21    States, and it's really James versus Commissioner of Internal

22    Revenue, there's a U.S. Supreme Court case that -- and then a

23    line after that that holds that where somebody evidences a

24    consensual agreement to return the money, then it would not --

25    the Rutkin case and the Marks versus Commissioner of IRS case
```

```
 1   would not apply.

 2          THE COURT:  You lost me.  I don't know what you are

 3   talking about.

 4          MR. SCHWARTZ:  If you look in the middle of page 29,

 5   the government says and they have added a sentence to the

 6   normal instruction, an unlawful gain as well as a lawful one,

 7   constitutes taxable income when its recipient has such control

 8   over it that in a particular matter she --

 9          MR. STEFIN:  That is a practical matter.

10          MR. SCHWARTZ:  I'm sorry.  As a practical matter, she

11   derives a readily realizable economic value from it.

12          I would object to that sentence being charged because

13   I think it confuses the issue as to whether this was, in fact,

14   income or not.

15          But if Your Honor is going to add that, then I would

16   ask Your Honor to add a sentence from a line of cases that

17   start with James versus the United States where it says, if the

18   money has been obtained by the taxpayer and the taxpayer has

19   evidenced a consensual agreement to return the money when

20   obtaining it, then it would not be illegally earned income and

21   in this --

22          THE COURT:  It would not be taxable income.

23          MR. SCHWARTZ:  It would not be taxable as illegally

24   earned income.  In this case, I believe the evidence would show

25   whether it was intended or not, that Mrs. Marks acknowledged
```

1    her intent to return the money.  The victims say that and

2    Mrs. Marks even says that in a conversation with Jude Deveraux

3    that the government played for the jury.

4          They might argue that she was lying, she never

5    intended to return it, but that's another question.  I would at

6    least like to insert -- I think this whole sentence should be

7    out.  But if it's not out, then I think the James line of cases

8    and I will -- I don't have with me those cites, but I will have

9    them to you by this afternoon should -- the cite on James is

10   366 U.S. 213.  It's U.S. Supreme Court case decided in 1961.

11   But there are some cases after it that are more specific that I

12   would like to provide the Court.

13          THE COURT:  All right.  Well, you can provide me the

14   cases and I will take a look at it.  You are saying that you

15   don't want that sentence that you mentioned, but if I'm going

16   to give something to that effect, you want it modified or

17   qualified the way you just articulated?

18          MR. SCHWARTZ:  Right.  Basically to say if she's

19   evidenced intent to return the money, then it wouldn't be a

20   taxable income.

21          THE COURT:  Wouldn't that make it a loan?

22          MR. SCHWARTZ:  Yes.

23          THE COURT:  Okay.  Didn't you have a requested

24   instruction that you were saying gifts and loans were not

25   taxable?

```
 1          MR. SCHWARTZ:  Correct.  But I don't want them to

 2     say -- I don't want this to be contradictory to that and the

 3     jury to hold us to this sentence if there are other cases that

 4     say if there's intent to the return it, then it should not be

 5     included as income.

 6          THE COURT:  It seems to me that the purpose for this

 7     sentence in the instruction from the government's standpoint is

 8     to let the jury know that if you -- and I'm not saying these

 9     are the facts, but if you steal something or cheat somebody out

10     of some money or you defraud them, that's taxable income.  Even

11     though it's criminal, it's a crime, it's also taxable.  So that

12     that, I think that's the whole point of this.  Your argument

13     is, well, she never did that because she was -- it was a loan,

14     and she intended to return it.

15          MR. SCHWARTZ:  Correct.

16          THE COURT:  Which is covered by your requested

17     instruction that if it's a loan or a gift, it's not taxable.

18     So I don't know why -- those are kind of different concepts.

19          MR. SCHWARTZ:  And I agree, Judge.  If you give me my

20     defense requested charge, my theory of defense charge, then

21     it's not necessary here.  But if you don't do that, then the

22     language would be necessary in this section.

23          THE COURT:  Okay.  I guess we will discuss -- we will

24     figure it out when we get to your instruction.

25          MR. SCHWARTZ:  Correct.
```

1          THE COURT:  Okay.  So at this point you are

2     questioning whether that sentence should remain in here.  Is

3     that the only objection you have?

4          MR. SCHWARTZ:  Yes, Judge.  The rest is all part of

5     the 11th Circuit pattern.

6          THE COURT:  Okay.  Did you want to be heard on that

7     issue now or later when we talk about the loan gift issue?

8          MR. STEFIN:  I think they are two separate issues,

9     Your Honor.  I think the Court has hit it right on the -- hit

10    the nail on the head, that that's exactly what we were trying

11    to explain in terms of what income is.  I think we should

12    put -- if this is a correct statement of the law, then I think

13    the instruction is correct as stated.  If there is some

14    clarification that the defense wants as part of their

15    instructions, I would agree to some instruction that's

16    accurately based on the law, not exactly as worded in the one

17    sentence by defense counsel.

18         THE COURT:  All right.  Well, shouldn't we put it in

19    this instruction rather than have a separate instruction out

20    there hanging out by itself?  I mean, if we are going to put

21    anything in about loans and gifts not being taxable, shouldn't

22    it be in here rather than somewhere else down the road?

23         MR. STEFIN:  I don't have any objection to a defense

24    special instruction if granted to be inserted at some point

25    within the tax return instruction.

1      THE COURT:  Let's just talk about then the concept of.

2  Do you have an objection to telling the jury that gifts and

3  loans are not taxable to the recipient?

4      MR. STEFIN:  I don't have any objection to the wording

5  of gift to a recipient is not taxable because there is an IRS

6  provision for that.  But loans starts to get into a much more

7  complicated area.  And I haven't -- you know, I got this last

8  night.  I haven't had a chance to do a lot of research, but I

9  have pulled up something on the, you know, tax law.  For

10  example, they talk about the fact that the presence of a debtor

11  creditor relationship is determined on the basis of all

12  relevant facts and circumstances pertinent to the advances

13  including the subjective intent of the parties.  Important

14  factors considered by the courts in finding the presence of a

15  bona fide debt are whether, one, the promise was evidenced by a

16  note or other evidence of indebtedness.  Two, interest was

17  charged.  Three, a fixed maturity date and/or a fixed scheduled

18  payment schedule was set, et cetera, et cetera.

19      What I'm saying is that I don't object to something

20  along the lines of what defense counsel is stating, but I think

21  it has to explain that a bona fide loan would not be considered

22  income, something along those lines.  And I could draft

23  something today that I think would be an accurate statement of

24  the law as opposed to just a blanket statement that loans

25  aren't taxable.

```
 1              THE COURT:  Well, it's a loan or it's not.  I mean,
 2     you are going to be arguing to the jury whether these were
 3     loans or they weren't.  And the jury is going to decide whether
 4     they were loans or not.  But a loan is not taxable.
 5              MR. STEFIN:  The next question is what's the
 6     definition of a loan.  And if we are going to explain that
 7     loans aren't taxable, then maybe citing some case law which
 8     describes what a loan really is.  And then the jury can make a
 9     determination whether or not this was a bona fide loan.
10              THE COURT:  Are you going to define gift too?
11              MR. STEFIN:  No, because, like I said, that's commonly
12     understood and --
13              THE COURT:  You don't think a loan is commonly
14     understood?  People don't know what a loan is, that when you
15     loan somebody something, you are not giving it to them and you
16     expect to get it back?
17              MR. STEFIN:  Judge, I think there are some serious
18     suttleties such as the fact that if somebody borrows my car, I
19     have loaned them my car, but that's not a loan in the sense
20     that defense counsel wants to portray it.  I'm not be facetious
21     here.
22              MR. SCHWARTZ:  I would beg to differ.  If I loaned
23     Mr. Stefin my car and he never intends to return it, then
24     that's taxable to him as income, he got a car.  If I loan him
25     my car and he intends to return it, it's not taxable to him,
```

```
 1   whether we have a note or anything else.  And the jury, as Your
 2   Honor says, is going to decide whether there was intent to
 3   return this or not, and that's the crucial issue in this case.
 4        THE COURT:  All right.  Well, I believe the defense
 5   should be entitled to some instruction and we can worry about
 6   the language of it or the extent of it that indicates that
 7   loans are not taxable and gifts are not taxable to balance the
 8   instruction that the government wants that money obtained
 9   through fraud is taxable.
10        MR. STEFIN:  And, like I said, I'm not fighting that.
11   I just want it to be a more accurate statement than just --
12        THE COURT:  Well, submit something that you think is
13   appropriate.
14        MR. STEFIN:  It may be just tweaking the wording
15   slightly.
16        THE COURT:  Well, why don't you submit what you think
17   is appropriate and we will figure it out.
18        Can we move on then to the next instruction,
19   government's No. 18, page 31, the negligence of a victim
20   failing to discover is not a defense.
21        MR. SCHWARTZ:  Your Honor, I think that might have
22   been appropriate if we had as an issue in this case that all of
23   these victims are totally out of their mind and should never
24   have given this money or some issue of that sort.  That issue
25   is not raised in the case, to my knowledge, so I don't know
```

1    that the instruction is applicable.  We have never argued that

2    these people -- we have never argued a caveat emptor type of

3    defense here and that's what he this really would be applicable

4    to.  So I don't think it should be included.  If it is

5    included, then I think it may even open the door for that type

6    of an argument which we haven't made.

7         MR. STEFIN:  Well, this is a correct statement of the

8    law, we believe.  And if defense counsel says that we don't get

9    the instruction because he's never made the argument, I think

10   there's an undercurrent that runs through the entire case that

11   suggests that people who give large sums of money to a

12   fortuneteller are idiots.  And that's something they did

13   voluntarily, and therefore, you know, what's the crime.  If

14   people want to give away their money and they are stupid, then

15   that's their choice.

16        I mean, I know defense counsel hasn't couched it in

17   those terms, but I do think this is a correct statement of the

18   law and it allows the government to explain to the jury that

19   the law protects people that through either ignorance or

20   gullibility or mental defect or emotional problems that the law

21   is there that protects them as well.

22        And you shouldn't treat this like a civil case where a

23   victim's failing to conduct more of an investigation or some of

24   these victims said they went on the internet way after the fact

25   and they discovered bad things about the defendant on the

     1    internet.  If they have done that sooner, maybe they wouldn't
     2    have given all this money to the defendants.  They didn't do
     3    that and it's not a defense to the case.  I think it's
     4    appropriate.
     5            MR. SCHWARTZ:  If I can, Judge, and there was an
     6    article on the internet or something on the internet about
     7    something Nancy did using the word name Joyce Michael that you
     8    could find if you looked closely.  But the issue here, I
     9    suggest to the Court, is Jude Deveraux gave money for 17 years.
    10    There's no evidence she ever asked for money back to be
    11    returned right away.  Rose acknowledged that some of it was
    12    loans, some of it was gifts, some of it was income.  Deanna
    13    Wolfe gave her money for 34 years, didn't ask for it back.  Can
    14    that be construed as a gift?  Is it a loan?  Is it income?  Is
    15    it theft?  There's no showing that they negatively gave their
    16    money or something of that sort.  There's been no allegations
    17    of that in the indictment.  And I would suggest it's
    18    inappropriate.  Whatever Your Honor rules.
    19            THE COURT:  All right.  Well, I'm not sure the
    20    negligence is the proper way to frame this.  I think there
    21    is -- I think the jury probably should know that the law
    22    protects even those who are naive or foolish or if they, in
    23    fact, had been defrauded.  So I think that's kind of what the
    24    government's trying to protect against or making sure the jury
    25    understands that even though you are foolish and naive, just

```
 1    use the word stupid in what you have done, if you are, in fact,

 2    a victim of fraud, the law still is there to protect that kind

 3    of activity.  I'm not sure negligence is the right phrase.

 4         MR. STEFIN:  Maybe the first phrase could say, the

 5    failure of a victim to discover a fraudulent scheme is not a

 6    defense to criminal conduct.  The law is protecting against

 7    fraud and needed to protect the careless and the naive from

 8    fraudulent schemes, something along those lines.

 9         THE COURT:  Let me read the cases and I will see if I

10    can modify this in a way that's a little more to the point that

11    I think you are trying to make.  I think something in that vain

12    is probably appropriate.  The Svete case, S-V-E-T-E case, where

13    the Court made it clear, the 11th Circuit, that it's not a

14    reasonable person standard that applies in these fraud claims.

15    The law is there to protect the careless and the naive.

16         MR. SCHWARTZ:  I don't want the jury confused between

17    the beyond a reasonable doubt standard and some sort of

18    criminal negligence standard.

19         THE COURT:  Again, we can try and address that.  So

20    let me work on this one and see what I can come up with.

21         Any objection to the summary charts instruction?

22         MR. SCHWARTZ:  No, Your Honor.

23         THE COURT:  Any objection to the note taking

24    instruction?

25         MR. SCHWARTZ:  No.
```

```
 1          THE COURT:  Any objection to the single defendant
 2    multiple counts instruction?
 3          MR. SCHWARTZ:  No, Your Honor.
 4          THE COURT:  Duty to deliberate?
 5          MR. SCHWARTZ:  No.
 6          THE COURT:  The verdict?
 7          MR. SCHWARTZ:  On the form of verdict, I argued this
 8    one before Your Honor and you ruled against me.  I still urge
 9    it and I urge it vehemently.  I believe since the defendant is
10    presumed to be innocent, that it should say not guilty first
11    and then guilty and that by putting guilty first, we go away
12    from the presumption of innocence standard.
13          MR. STEFIN:  What if the foreperson is left-handed,
14    they may see it completely differently
15          MR. SCHWARTZ:  Or if they are reading in Hebrew.  But
16    I would suggest not guilty first before guilty.
17          THE COURT:  All right.  I'll think about it.
18          MR. SCHWARTZ:  Okay.  Thank you.
19          THE COURT:  All right.  So are there any other
20    proposed instructions from the government?
21          MR. STEFIN:  Mr. Bardfeld pointed out that we have a
22    forfeiture count in the indictment.  My understanding is having
23    talked to our forfeiture person, that because it's a money
24    judgment forfeiture, that it's something that does not go back
25    to the jury.
```

```
 1           THE COURT:  I think the 11th Circuit just recently
 2   decided that within the last month or so, but we can
 3   double-check.
 4           MR. STEFIN:  So I don't think we need anything to do
 5   with forfeiture as far as the jury is concerned.
 6           THE COURT:  Have you seen that case, Mr. Schwartz?
 7           MR. SCHWARTZ:  I have and I think you are correct,
 8   Judge.
 9           THE COURT:  So we don't need to worry about the
10   forfeiture issue.  First of all, usually forfeiture is done
11   after the verdict anyway.
12           MR. STEFIN:  Right, I just brought it up.
13           THE COURT:  So are there any other proposed
14   instructions from the government?
15           MR. STEFIN:  No, Your Honor.
16           THE COURT:  All right.  So I've got a few here from
17   the defense, one of which we have already talked about, the one
18   gifts and loans.  So I'll try and incorporate that based upon
19   our earlier discussion and we will revisit that when I come up
20   with something.  Okay?
21           MR. SCHWARTZ:  Very good, Judge.
22           THE COURT:  All right.  So let's discuss the other
23   ones.
24           MR. SCHWARTZ:  And also I had requested of Mr. -- and
25   first I would like to thank Mr. Stefin.  He was willing to work
```

```
 1   over the weekend with me.  And we ironed out a lot of what
 2   would have taken us a lot of time in court.  So I thank him for
 3   that.
 4            THE COURT:  And I thank him.
 5            MR. SCHWARTZ:  And second, I did send him also a
 6   request for special instruction 17 and 18.  I don't know if
 7   Your Honor has them in front of you.
 8            THE COURT:  I have 17.  Yes, I have them.
 9            MR. SCHWARTZ:  Okay.
10            THE COURT:  Let's talk about the first one, the first
11   theory of defense instruction.  I'm not quite sure I understand
12   it.
13            MR. SCHWARTZ:  Your Honor, I have been trying to pin
14   down for a while what the actual fraud is in this case.  And I
15   think that early on, particularly when Mr. Gottlieb on behalf
16   of Nancy Marks's motion was denied, the government conceded
17   that the fraud in this case wasn't fortunetelling, psychic
18   activity, discussions of curses, or discussions of
19   reincarnation.
20            Mr. Gottlieb had moved, for Nancy Marks, to dismiss
21   the indictment saying it violated her first amendment rights
22   under freedom of speech and freedom of religion to engage in
23   those type of activities.
24            I believe that, as I understand the alleged fraud in
25   this case, it is that the defendant asked for money promising
```

```
1    to cleanse that money of curses and return that money to the
2    alleged victims and never intended to return the money.
3    Succinctly in one sentence, I think that's the fraud that the
4    government's charging.
5            If that's the fraud they are charging, then in order
6    to avoid prejudice, I would ask that the jury be instructed
7    that fortunetelling and the other items I list are not in
8    themselves fraudulent.  And then I go on to the next sentence.
9            THE COURT:  Well, can I interrupt you for a second?
10           MR. SCHWARTZ:  Sure.
11           THE COURT:  I don't think anyone is suggesting that
12   fortunetelling or psychic activity in and of itself is
13   fraudulent.  But they can be used in connection with a fraud.
14   I mean, so you have to be careful how you try and say these
15   things.  I mean, to put it in the terms of protected by the
16   first amendment and freedom of religion, what does that have to
17   do with --
18           MR. SCHWARTZ:  First of all, it is, but then I think
19   it has to be read with the next paragraph which says, the
20   government must prove that at the time the defendant received
21   the money or property from her clients, she willfully,
22   knowingly, and intentionally intended -- deceived them by
23   stating she intended to cleanse the money and return it when,
24   in truth of fact, she had no intention of ever returning any of
25   said money or property.
```

```
 1          If that's the government's case, then I don't want the
 2     jury to somehow be prejudiced by the fact that that was done
 3     within the context of a protected activity, fortunetelling or
 4     psychic advice or talking about curses or past lives, which may
 5     have religious connotations.
 6          THE COURT:  Do you have cases that say that
 7     fortunetelling and psychic activity are protected by the first
 8     amendment?
 9          MR. SCHWARTZ:  Yes, I can give them to you.  They are
10     in Mr. Gottlieb's motion to dismiss the indictment for
11     violation of the first amendment, but I'll send them to you
12     when I get back to my office, Judge.  I'll pull them out and
13     send them.
14          And then the second I think is what the government has
15     to prove in order to convict her and I think that's their case
16     unless they object and say their case is broader than that,
17     Judge.
18          MR. STEFIN:  Of course it is broader than that.  He is
19     parsing down multiple pages of manner and means to one method
20     by which we allege the fraud took place and there were multiple
21     methods.  Some victims were told the money was going to be
22     cleansed.  Some were told the money was being sacrificed and
23     used in rituals.  Some people were told that the money was kept
24     in a safe place but it would be returned back.
25          The indictment is what sets forth the manner and means
```

```
 1    of the offense and I very strongly object to a sentence which

 2    restricts the government to one part of its theory, even -- if

 3    we can't prove she had no intention of ever returning any

 4    money, so that means that if she always intended to give them

 5    back something, then there's no crime, although she intended to

 6    keep all of it, you know, the rest of it.

 7            So it's just a completely inaccurate statement of the

 8    government's burden and the offense that's been charged.  So I

 9    object to this theory of defense instruction.

10            THE COURT:  I tend to agree with the government that

11    this is too restrictive in the way you have laid out that this

12    is what they have to prove, and if they don't prove something

13    else, then it's -- they lose.

14            MR. SCHWARTZ:  Well, I can broaden it and take out the

15    cleanse the money part of it and just say, by stating that she

16    would keep the money and return it when, in truth of fact, she

17    had no intention of returning any of the money or property.

18            MR. STEFIN:  There are so many elements of the fraud.

19    I mean, it goes right from the beginning.  He says the first

20    amendment says that people can do fortunetelling.  That's fine,

21    but if they take large sums of money from people on the pretext

22    that they are communicating with God, Michael the Arc Angel,

23    the spirits, and if the jury believes that that's a lie, that

24    should be sufficient for them to convict; although, you know,

25    we take it many steps down the road further than that which is
```

```
 1   the fact that the promise is to hold money and give them back
 2   the money.
 3         MR. SCHWARTZ:  Well, you see, that's where I -- and
 4   that's why I wanted the instruction, Judge.  I have seen -- my
 5   wife's Catholic.  I have friends who are Protestant, I have
 6   attended many different churches, and I have gone to Protestant
 7   revival meetings where Protestant ministers take money from
 8   people and chase the devil out of them.  That's religious
 9   practice.  That's protected practice.
10         The way Mr. Stefin just said it, take money from them
11   promising to cure them of curses I suggest is protected under
12   the first amendment of the United States Constitution.  Now,
13   taking money from them promising to return it and never
14   intending to return it would be fraud.
15         THE COURT:  Are you saying that if a person takes
16   money from someone saying that they are going to remove a curse
17   knowing full well in their own mind that they have no ability
18   to remove a curse and nothing they do is going to have any
19   effect, just because they are in a church doing it when they
20   know in their own mind that they have no ability to remove a
21   curse or remove demons or remove evil spirits, then it's
22   protected, when they know full well that it's a fraud?
23         MR. SCHWARTZ:  Well, that's the problem with the
24   government's case, Judge.  And that's why I want to take that
25   whole area out of the jury's consideration.  They have not
```

```
 1   looked into Rose Marks's mind and been able to prove that she
 2   knew full well that she didn't have the ability to remove a
 3   curse, the same way they can't look into Jimmy Swaggart's mind
 4   and say that he knew full well when he made his appeal for
 5   money over television that he didn't have the ability to remove
 6   demonic possession from people.
 7         And if you are saying that the government is psychic
 8   and can look into Rose Marks's mind and know what she was
 9   thinking, that's one thing.  But I thought that the crux of
10   their case was, not that she defrauded them by saying I can
11   cure you of a curse, but that she defrauded them by saying give
12   me your money and I'll eventually return it to you.  And that's
13   the difference.  I think one can easily be construed as
14   protected speech either under freedom of speech or freedom of
15   religion.
16         THE COURT:  But it can't be protected if the person
17   doing it knows and intends that they have no ability to do it
18   and they have no intention of actually removing a demon or evil
19   spirit or curse.
20         MR. SCHWARTZ:  So then I guess Your Honor is going to
21   allow me my psychic expert to show that there are people in
22   this world who have psychic abilities and can do those type of
23   things?
24         THE COURT:  We haven't talked about that yet.
25         MR. SCHWARTZ:  I know.  But we have to have it one way
```

```
 1    or the other.  We can't have it both ways.

 2              MR. STEFIN:  Yes, we can.

 3              MR. SCHWARTZ:  The government would like to have it

 4    both ways.

 5              THE COURT:  All right.  I'm -- I'm having difficulty

 6    with this instruction as framed.  So I'm not saying you are not

 7    entitled to some type of instruction that provides your theory

 8    of defense or supports your theory of defense, but I'm just

 9    having trouble with it as framed right now.

10              MR. STEFIN:  And also it's not even a theory of

11    defense.  It's just a special instruction to restrict the

12    government's proof in the case or the consideration of the

13    government's case.  If his theory of defense is -- I think a

14    theory of defense instruction should set forth in the first

15    sentence what the theory of defense is.  And if it did that,

16    then the government for the first time would understand what

17    the theory of defense is in this case.  But seriously --

18              THE COURT:  I mean, I think the theory of defense is

19    that everything the witnesses are saying is not true.  So I

20    mean, I'm not sure other than that that they are all lying.

21              MR. STEFIN:  That's a theory of defense.

22              THE COURT:  Well, it certainly -- it's not true that

23    they were promised that everything was going to be returned to

24    them.

25              MR. SCHWARTZ:  Well, I think they were promised that
```

1   some of the money would be returned to them and that Rose

2   always intended to return some of the money.  Some of the money

3   was fees.  Some of the money was gifts.  Some of the moneys

4   were loaned that were promised to be returned as evidenced by

5   Andrea Walker's loan and other things.

6           THE COURT:  Well, again, I'm having trouble with this

7   instruction the way it's framed, so...

8           MR. SCHWARTZ:  Let me try to reframe it for Your

9   Honor.

10           THE COURT:  All right.  What about the good faith

11   defense?  Is there -- what is your position on the defense's

12   request for a good faith defense?

13           MR. STEFIN:  If I could just find his instruction.

14   No. 17?

15           THE COURT:  Yes.

16           MR. SCHWARTZ:  If I can speak before Mr. Stefin, Your

17   Honor, I think this goes right into our past discussion.  It's

18   not Rose Marks's burden to show that she had good faith.  Good

19   faith means, for example, that she believed she had the ability

20   to look into people's past lives to see what problems may have

21   been caused by past lives and help them with those problems.

22   It's the government must prove that she had the intent to

23   defraud beyond a reasonable doubt in doing that.

24           We have set forth a good faith basis to believe

25   that -- we believe we have set forth that Rose Marks believed

 1   she had the ability -- she had psychic abilities and could help

 2   people, she had abilities to counsel people and could help

 3   people and that she acted in a way consistent with those

 4   abilities.

 5          She was acting in good faith when dealing with her

 6   clients.  The government says she wasn't.  They have to prove

 7   it and that's the nature of the good faith defense.

 8          MR. STEFIN:  Judge, the instruction itself, the

 9   annotations say, the failure to give this instruction when

10   requested is error if there is any evidentiary foundations to

11   support the defendant's claim.  Note, however, that there must

12   be some evidentiary basis for the request.  And again,

13   there's -- at this point, there is no evidentiary basis.

14          THE COURT:  They haven't finished putting their case

15   on.

16          MR. STEFIN:  They haven't and that's why I couch it.

17   If they put on some evidentiary basis, then I will be the first

18   not to object.  I don't want to --

19          THE COURT:  Let's put it this way.  Do you have any

20   objection to the instruction, the format, or anything?  You

21   just don't think at this point there's sufficient evidence to

22   give it.  Assuming I conclude there's sufficient evidence, is

23   there anything about the instruction that you object to?

24          MR. STEFIN:  I think the third paragraph doesn't

25   really apply to anything here.

 1          MR. SCHWARTZ:  I would agree.  That's the standard

 2    instruction, but I have no objection to striking the third

 3    paragraph.

 4          THE COURT:  Okay.  That's usually dealing with a

 5    business type of investment.

 6          MR. SCHWARTZ:  Correct.

 7          THE COURT:  All right.  So I'll reserve on whether I'm

 8    going to give that instruction until the defendant is finished

 9    putting on her case.

10          And then what about the second good faith reliance on

11    advice of counsel?  I guess I'm having a little difficulty

12    understanding how this one would apply.

13          MR. SCHWARTZ:  If Your Honor recollects, I objected

14    and then withdrew my objection to a letter from a tax attorney

15    who was also functioning as a tax preparer where Mrs. Marks --

16    where he stated that Mrs. Marks told him that certain moneys

17    from Devereaux, Inc. or Jude Devereaux were gifts.  And relying

18    on that, she filed a tax return excluding from income for one

19    of the years, not the years charged, gift money from her taxes.

20    She also provided information to her accountant in later years

21    and relied on their advice in filing her tax returns.

22          And those -- that's the two types of advice.  I say

23    counsel, but it really should be counsel or accountant or

24    professionals.  If she relied on their advice after providing

25    them with honest information and filed her returns, then she

```
 1   should not be liable for violation of the tax laws.

 2         THE COURT:  What advice was she given?  What

 3   attorney-client advice was she given that you are saying she

 4   relied upon?

 5         MR. SCHWARTZ:  Three things.  With the tax attorney,

 6   after telling him that it was gifts, clearly he told her not to

 7   include gifts in her tax return as income, and she relied on

 8   that.

 9         THE COURT:  But she told him it was a gift and he said

10   what any normal person would say, well, if it's a gift, it's

11   not taxable.  How is that relying on his advice if she's the

12   one who told him it was a gift?

13         MR. SCHWARTZ:  There's no question, and Mr. Stefin can

14   argue, she provided the information, she gave him false

15   information, therefore she couldn't rely on it.

16         THE COURT:  There's nothing wrong with relying on -- I

17   mean, if it's a gift, it's not taxable.

18         MR. SCHWARTZ:  I agree, and she relied on it.

19         THE COURT:  She relied on him telling her that what

20   you told me is a gift and I'm going to tell you, if you told me

21   it's a gift, then it's not taxable, you are relying on the

22   advice of counsel?

23         MR. SCHWARTZ:  She is, isn't she?

24         THE COURT:  How is she relying on the advice of

25   counsel if she's the one providing the information?
```

```
 1              MR. SCHWARTZ:  She said it was a gift.  He said, you
 2    don't have to file taxes.  Relying on that advice, she didn't
 3    pay taxes on it.  He can argue that it wasn't a gift and he
 4    will.
 5              THE COURT:  Okay.
 6              MR. STEFIN:  What was a gift?
 7              THE COURT:  Hold on.
 8              MR. SCHWARTZ:  More important, and this is dealing
 9    with the accountant, not the attorney, we brought out from the
10    accountability that he never with advised her that she had an
11    obligation to pay taxes on payments to third parties.
12              Now, that's a little bit more convoluted because he
13    didn't say it, but he did say he never told her.  She got
14    moneys paid to third parties.
15              I'm going to argue, unless Your Honor restricts me
16    from doing it, that moneys paid by Jude Devereaux to, for
17    instance, Atlas Leasing, the government is going to say that's
18    taxable.  We are going to say that that's a loan, it's a gift,
19    whatever it is.  But if the jury finds it's not, Mrs. Marks
20    with a third-grade education was not advised by her accountant
21    that she had an obligation to pay taxes on that.
22              THE COURT:  Is there any evidence in the record that
23    the accountant was told about these payments that were --
24              MR. SCHWARTZ:  No.
25              THE COURT:  Well, how can you rely on advice or lack
```

```
 1   of advice of something that the accountant never knew about?

 2            MR. SCHWARTZ:  That's a minor problem, Judge.

 3            But there is not as to Ajax Leasing, but I believe

 4   there is evidence that the accountant knew of Jude Devereaux

 5   making direct mortgage payments.  But I will have to check the

 6   record and be sure of that.  I think the memo on the check is

 7   marked mortgage, et cetera.  So I will have to take a look to

 8   see if the accountant was aware of that or not.

 9            THE COURT:  Assuming that there's some evidence that

10   the accountant was aware that third parties were making

11   payments for the benefit of the defendant, then the argument is

12   that she relied on the advice or the lack of advice of her

13   accountant that that payment should be reported as income?

14            MR. SCHWARTZ:  The lack of advice that the payment

15   should be reported as income.

16            THE COURT:  Or the failure to have advised her.

17            MR. SCHWARTZ:  Right.  But I have to check factually

18   from my notes, Judge.

19            THE COURT:  Okay.  At this point I'm having trouble

20   with that instruction, but I'll reconsider if you can give me

21   some additional information to rely upon.

22            MR. SCHWARTZ:  Thank you, Your Honor.

23            THE COURT:  Anything else about the instructions?

24            MR. SCHWARTZ:  No, sir.

25            THE COURT:  Mr. Stefin?
```

```
 1              MR. STEFIN:  No, Your Honor.

 2              THE COURT:  All right.  Want to the take a short break

 3    and then we will talk about the experts?

 4              MR. SCHWARTZ:  Fine.  Thank you, Judge.

 5              MR. STEFIN:  Thank you, Judge.

 6              THE COURT:  Ten minutes.

 7              (Thereupon, a recess was taken at 11:09 a.m.)

 8              THE COURT:  Please be seated, everyone.

 9              MR. SCHWARTZ:  One last thing on the jury

10    instructions.  It's not a dispute.  I think that the original

11    set that the government sent didn't have the 404(b)

12    instruction.  Mr. Stefin and I had agreed on it, but for some

13    reason it wasn't put back in.

14              THE COURT:  All right.  So is someone going to submit

15    that for me?

16              MR. STEFIN:  Defense counsel had it -- well, actually,

17    I can do it.

18              THE COURT:  If you can just email it to me.

19              MR. SCHWARTZ:  It's in the package I emailed to Irene,

20    but I'll email it anyway.  I'll send it separately.

21              THE COURT:  All right.  Thank you.

22              Let's talk about our expert witnesses.  What do you

23    want this Professor May to testify about?  Why are we having

24    someone come in and try and explain that there really is a

25    psychic phenomenon out there somehow?
```

```
 1          MR. SCHWARTZ:  Just as Your Honor saw, Professor May

 2   is not some -- although Mr. Stefin would like to portray him as

 3   such, not some far out kook; although, he does come from

 4   California, so I guess that's some indicia of craziness.

 5          Mr. May, Professor May, worked for our government for

 6   a long period of time doing experiments on psychic phenomena.

 7   He had a $20 million grant from the CIA to work on that.  And

 8   he's written a number of books and papers to prove that there

 9   are psychic -- that people in our population do have psychic

10   abilities, do have the ability, ESP and other type of psychic

11   ability.  He has and he will testify about that.

12          Now, it may not be an issue in this case whether

13   psychic powers and psychic abilities exist or not.  It seemed

14   to me in our previous discussion about the jury instructions

15   and I somewhat jocularly made that statement about, well, then

16   you will allow me my expert witness.  But if we are dealing

17   with whether Rose Marks believes and has a belief that she did

18   have psychic powers or could anybody reasonably believe they

19   had psychic powers, and if that's an issue in this case, and

20   the government seems to say it's an issue, and the Court

21   indicated it was an issue --

22          THE COURT:  No, what I said was that you made it sound

23   as if you go into a church and someone is performing some kind

24   of ritual and dealing with spirits or demons and you get money

25   for it, that because it's connected to religion, it's not
```

 1   criminal under any circumstances.  And I gave you a

 2   hypothetical.  If the person knows that he doesn't have psychic

 3   ability and takes money under the false pretenses that he can

 4   and remove curses or demons and knows full well he can't, the

 5   fact that he's a preacher in a church doesn't mean it's

 6   protected.

 7          MR. SCHWARTZ:  Well, and, Judge, I worry about that,

 8   and here's why I worry about it.  I believe we all know and can

 9   reasonably believe, for instance, that a Catholic priest

10   believes in a supreme being, believes in the ability of prayer

11   to help influence what the supreme being does and believes that

12   the supreme being, God, has powers to heal, powers to do

13   certain things that we don't understand but that the priest

14   believes exists, I believe exists.

15          Some people, atheists, believers in other religions

16   don't believe they exist.  With a revivalist minister who is

17   going to have you come up and lay hands on you and heal you and

18   he takes money for it, that's practicing religion because we as

19   a country don't question, really based on the first amendment,

20   whether that minister who is ordained in faith has a belief or

21   doesn't have a belief as to his ability to lay hands on someone

22   and heal them or cast the devil out from them so that they can

23   eventually go to heaven and be with God in paradise.

24          And that's not -- you know, people question that there

25   have been ministers whose have been charged with crimes.  There

```
 1    have been priests.  There have been rabbis who have been

 2    charged with crimes of taking money under false pretenses.  But

 3    the false pretenses really have never been questioning their

 4    faith or their belief in being able to help direct the powers

 5    of God to their parishioners.  Because we as a country don't do

 6    that.  And that's why the fact that they are in a church or out

 7    of the church I don't think should have a difference.

 8            A preacher on the street trying to -- I remember Guys

 9    and Dolls where people are marching down the street saying,

10    follow the fold and stray no more, et cetera.

11            The question then is, is it totally unreasonable, can

12    the government argue Rose Marks could not have believed that

13    she had psychic ability because there's no such thing as

14    psychic ability?  We all know it's a joke.  There's no such

15    thing as reincarnation.  We all know it doesn't exist.

16            THE COURT:  I don't think the government has suggested

17    they are going to make that argument or it seems like they have

18    even presented witnesses who have said themselves that they

19    believe in reincarnation and believe in psychics and spirits

20    and things of that nature.  So their own witnesses support the

21    notion that people believe that, and I don't think they are

22    going to -- I'm quite sure they are not going to get up and say

23    that it doesn't exist.

24            MR. SCHWARTZ:  Okay.  Judge, if in his argument, in

25    closing argument, Mr. Stefin suggests that Ms. Marks defrauded
```

1    these people because she told them that she could cure them of

2    curses from prior generations because of her psychic ability

3    and that has to be a fraud in some way without the next step,

4    and she took money to do this, well, that wouldn't be the

5    fraud.  She promised to return it and didn't.  That would be

6    the fraud.

7          The first two steps, telling people she has the

8    ability to cure them with her psychic abilities and taking

9    money for it, I suggest, wouldn't be a fraud.

10          And if he argues that it is and I am deprived of my

11   right to establish to the jury that there are rational,

12   educated people who believe in psychic ability, not just people

13   who might negligently, to use Mr. Stefin's word, give money to

14   a psychic, then I believe I have been -- my client has been

15   deprived of her right to put on a defense.

16          So unless the Court will restrict Mr. Stefin's closing

17   argument to not argue that, or Mr. Stefin agrees that he won't

18   argue that, I suggest to the Court I should have a right to

19   introduce proof of psychic ability.

20          THE COURT:  There's a difference between whether

21   psychic ability might actually exist or whether people

22   legitimately believe that it exists and whether or not the

23   defendant has that ability.

24          MR. SCHWARTZ:  I understand.  And whether she has it

25   or not, whether she's a psychic or not, or is a pretend or

```
 1   false psychic, may be an issue.  But to argue that based on --
 2   to not allow me -- let me go the other way.  To not allow me to
 3   show that she could reasonably have psychic ability because
 4   intelligent, well-educated, well-researched people say psychic
 5   ability exists, I would suggest deprives me of my right to
 6   present my defense.  And I have made my argument.
 7            THE COURT:  I'm trying to understand how does the fact
 8   that it exists aid the defense without any evidence that she
 9   has the ability?
10            MR. SCHWARTZ:  Well, she said to her clients, her
11   clients have said, she's asserted she has this ability.
12   There's no evidence other than one or two statements when Jude
13   Devereaux, I suggest, is harassing her where she said, okay,
14   I'm not a psychic.  But other than that, she's asserted to all
15   of her clients that she has psychic ability.  There's no
16   evidence in the record that she doesn't believe that.
17            The only way an argument could be made that she
18   doesn't believe she has psychic ability from the record as it
19   exists today is to say there's no such thing as psychic
20   ability.  I want to show there is.
21            THE COURT:  All right.  Mr. Stefin, do you have any
22   intention of arguing that there's no such thing as psychics or
23   psychics or --
24            MR. STEFIN:  No, I have no intention of doing that.
25   And in my opening, I think I said that.  I mean, people believe
```

```
 1   in it.  There are people who believe in religion and they

 2   believe in all of these things, reincarnation.  I have some

 3   belief in that myself.  But that has nothing to do with this

 4   case.  It has nothing to do with this case whether it exists or

 5   not.

 6            THE COURT:  So you are representing and you would

 7   allow me to sustain an objection or limit your closing argument

 8   to in any way suggest that psychics, psychic ability, doesn't

 9   exist, reincarnation doesn't exist, curses don't exist, spirits

10   don't exist, angels don't exist?  You would not make any of

11   those arguments?

12            MR. STEFIN:  No, we will not.

13            THE COURT:  So then --

14            MR. STEFIN:  Whether or not this defendant lied when

15   she said she did all these things and had all these powers,

16   that's a question for the jury.  We don't, you know, obviously

17   agree with the defense that we have to be restricted on our

18   theory of misrepresentations.

19            THE COURT:  You do intend to argue that she lied about

20   having these abilities, but you are not going to argue that

21   she -- it's not possible to have it or that they don't exist,

22   these powers don't exist?

23            MR. STEFIN:  That's pretty accurate.  And honestly, I

24   don't think we are going to dwell on her -- since the defense

25   hasn't made any argument that she does have these powers, I
```

```
 1   don't believe we are going to dwell much on the fact that we
 2   believe she doesn't.  I think there's evidence in the record
 3   which would support the fact that she doesn't.  And her family
 4   members, the predictions that she made, the fact that people --
 5   an undercover agent went in and posed as someone and they made
 6   the same predictions and told the lady she's not going to have
 7   a baby when she already had a baby, that's all evidence to the
 8   fact that they didn't have psychic abilities as represented.
 9          But that doesn't mean it doesn't exist in some fashion
10   somewhere with some people.  And that's like arguing that
11   people's religious beliefs are faulty or false because there's
12   no evidence of it.  I feel very secure that we are going to
13   stay away from that.
14          THE COURT:  Away from what?
15          MR. STEFIN:  The whole idea that anyone's belief
16   system, religious belief system or spiritual belief system, is
17   false.  I mean, the crux of the fraud is the fact that she
18   found people that had these beliefs and took advantage of that.
19   So we will make that argument, but not that the victims' belief
20   systems were wrong or that anybody's belief system is wrong.
21          THE COURT:  All right.  So then is Mr. Schwartz
22   correct that the crux of this fraud is the representation that
23   the money would be returned and it wasn't?
24          MR. STEFIN:  That's -- I would say that's the major
25   element of the government's case, but it's not the sole element
```

1   of the government's case.

2          THE COURT:  So what else is it that makes this a fraud

3   other than the failure to return the money, the receipt of the

4   money on the representation that it's going to be returned

5   after the work was finished, whatever that work was.  The work,

6   you know, varied among the witnesses.

7          MR. STEFIN:  Well, in the instances where money -- and

8   a lot of victims -- some of the victims were told up front in

9   the early stages, for like Ms. Ueda, Atsuko Ueda, she was told

10  the money was being used in a ritual, in a sacrifice, that that

11  money would not be returned but that this was necessary to lift

12  the curse or appease the spirits or however it was put.

13         But the other misrepresentation on top of -- in

14  addition to the fact that we now know from the analysis of bank

15  records that the money wasn't sacrificed but it deposited and

16  moved around and ultimately in many instances demonstrably used

17  by the defendant for the purchases and the gambling and so

18  forth, and then the representations made by conspirators that

19  the money -- no, no, this money is not for our use, our

20  personal use, that was made multiple times to multiple victims,

21  so that's a major element of the misrepresentation.

22         THE COURT:  All right.  Okay.

23         MR. STEFIN:  And there were others.  I would go

24  through my indictment and go through it.  But I would not want

25  to say, oh, no -- I mean, the jury doesn't have to decide

```
 1    whether Ms. Marks has psychic abilities or not.  Because either

 2    way people were misled and they gave money under false

 3    pretenses.  But the jury does have the option of making a

 4    determination that that aspect of representations to victims

 5    was false as well.

 6         THE COURT:  But if you are not going to use it as, you

 7    know, as part of the fraud, that she lied about having psychic

 8    powers, then we don't need to worry about it.  But if you are

 9    going to mix that in with the argument that she lied about

10    having psychic powers and then she refused to give the money

11    back or she used it for personal purposes or she didn't use it

12    in a ritual sacrifice but actually spent it, then we don't have

13    to get into this issue of psychics and whether they are real or

14    not.  It doesn't seem like you are willing to --

15         MR. STEFIN:  I don't want to abandon a whole avenue of

16    thought by a jury when they are determining what was true and

17    what was a lie.  I don't understand.  Assuming that we suggest

18    to the jury that it's up to them to decide whether or not the

19    defendant and her family members had any psychic abilities, I

20    don't understand how bringing an expert on that would talk

21    about the fact that some people have psychic abilities has

22    anything to do with this case or any of the defendants in this

23    case.

24         THE COURT:  Well, why are we going to even discuss --

25    why is it necessary to even discuss whether they really had
```

```
 1   psychic abilities or not in terms of trying to prove the fraud?
 2   Why is it an aspect of the case?  I mean, that was the business
 3   and they claimed to have it.  But whether they did or not, does
 4   it make a difference?  Let's assume they really have psychic
 5   ability.  Okay.  You still think you have a case, right?
 6             MR. STEFIN:  Absolutely.
 7             THE COURT:  If they had brought in 15 people as
 8   witnesses who said she predicted A, B, C, and D and foresaw
 9   this, would it make a difference to your case if she was able
10   to prove that she had psychic ability and did everything that
11   whatever psychics do and she had, you know, a whole line of
12   witnesses that testified that she was able to prove -- predict
13   all these things and -- I mean, you still say, well, so what?
14   For these people, she lied to them and she cheated them and she
15   didn't give the money back and she didn't use it for the ritual
16   and she --
17             MR. STEFIN:  Spent it on herself.
18             THE COURT:  So --
19             MR. STEFIN:  And I agree.  I agree with you.
20             THE COURT:  So then why can't we just stay away from
21   the issue of whether she has psychic ability or not as part of
22   the fraud or the fact that she did -- she misrepresented that
23   she had psychic ability when she really didn't if it doesn't
24   really make a difference in this case?
25             MR. STEFIN:  Well, is Mr. Schwartz conceding then that
```

```
 1    he will make no effort to portray the defendant as having any

 2    of these psychic abilities?  I think he has actually stayed

 3    away from it pretty much so far.  But if he doesn't make any

 4    suggestion of it, then I guess we don't need to either.

 5              MR. SCHWARTZ:  Judge, Ms. Marks was primarily a life

 6    coach and she helped -- and I think when you look to the five

 7    people who were her actual clients, the evidence would show

 8    that as to Gary Tschetter, as to Jude Devereaux, as to Deana

 9    Wolfe, as to Andrea Walker for the part that Ms. Marks worked

10    with Andrea Walker, and as to the non-crazy cat lady Silvia

11    Roma, she helped them and advised them on her -- on their life

12    problems.  She also offered to meditate and pray for them on

13    those things.

14              She didn't -- I don't see -- I saw no evidence, and

15    maybe Mr. Stefin can correct me, that she offered to cleanse

16    money and take off the curse by cleansing money and returning

17    it to them.  She was a life coach.

18              However, my problem is that Mr. Stefin is not limiting

19    this case to the five people that Mrs. Marks dealt with and had

20    as her clients.  There are another, I think, seven or eight

21    other clients in this case who Mr. Stefin would convict her on

22    who were clients primarily of Nancy's, a couple of Cynthia's,

23    and I think one of Vivian's.  And as to them, there's been a

24    lot of different types of allegations, different than Rose

25    Marks.
```

```
 1        THE COURT:  But if they agree that they are not going
 2   to argue whether she or any of the other codefendants had
 3   psychic ability or not, I mean, if that's off the table, that's
 4   not part of the case, it's all having to do with -- then why do
 5   we have to discuss it?
 6        MR. SCHWARTZ:  I understood Your Honor's position, and
 7   I understood how Your Honor was, to some extent, limiting or
 8   getting an agreement from Mr. Stefin as to what he would do.
 9   But then he said, but, Judge, the jury is free to believe that
10   she couldn't have had psychic powers, and I'm paraphrasing --
11        THE COURT:  They are free to believe that.  But if
12   it's not presented to them by way of argument, then that's just
13   something that they are going to come up with on their own.
14   But it's not going to be an aspect of the case that's going to
15   need to be refuted.
16        MR. SCHWARTZ:  If that, as Mr. Stefin suggests, is an
17   underlying aspect of the case, maybe one not enunciated, but
18   one that he feels the jury is free to believe and decide on,
19   then I should be able to show that there are people who have
20   psychic powers in order to avoid the jury being -- they are
21   still free to believe it, but it's a more informed belief.
22        MR. STEFIN:  Judge, I'm troubled by being restricted
23   because of the fact that there were instances, for example,
24   when Jennifer Hill is now cooperating with the police and she
25   tells Nancy Marks that she came into money because her
```

1    grandmother died and Nancy Marks's response, oh, remember, I

2    predicted that was going to happen, blah, blah, blah, blah,

3    blah.  I mean, there's evidence all over the place that these

4    people are making this stuff up.  I mean, so I don't think it's

5    fair for the government to be prohibited from pointing that out

6    to the jury.

7            But I do agree with the Court that the substantial,

8    the major factor or features of the case are the promises, the

9    way they got money from victims, the representations they made

10   to get money from victims, and then the failure to abide by the

11   promises that they had made to them.

12           You know, again, having somebody come in and testify

13   that he's done scientific research and in his opinion there are

14   people with psychic abilities says -- and I think defense has

15   just conceded that Ms. Marks is not claiming she has psychic

16   abilities.  And if that's the case, then all the

17   representations about psychic abilities is a major part of the

18   scam.

19           But since they are offering no evidence one way or the

20   other, I mean, that limits us to trying -- you know, as well to

21   talk about that.

22           But, you know, to say on one hand that Ms. Marks's

23   contention was that she was a life coach and she helped these

24   people, but we do want to bring in an expert who says he's done

25   scientific research and shows that there are people who have

```
 1    psychic abilities, it has nothing to do with the state of mind

 2    or the actions of the defendant and the codefendants who have

 3    plead guilty in this case.  I think it's just completely

 4    irrelevant, but --

 5                THE COURT:  All right.

 6                MR. STEFIN:  That's the way I feel.

 7                THE COURT:  Okay.  Thanks.

 8                MR. SCHWARTZ:  I don't concede she didn't have psychic

 9    ability.  I said that she didn't do some of the things they

10    were saying.  That's as to Dr. May.

11                Is the government also contesting Dr. Sutherland?

12                THE COURT:  I thought they were.

13                MR. SCHWARTZ:  As to Dr. Sutherland, she's, I think,

14    an acknowledged expert again with academic and other

15    credentials as to knowledge of Romney or Rom culture.  Romney

16    is R-O-M-N-E-Y.  Rom is R-O-M culture.  And there are a number

17    of things that I wanted to have her testify about.  One of the

18    most important is that the Romney families tend to share money

19    with each other as a family trait much more so than, I don't

20    say this in a negative connotation, but regular U.S. citizens.

21                I think that's important because one of the elements

22    of the conspiracy that the government is trying to prove is

23    that money was put into the Joyce Michaels account or given to

24    Rose Marks by her family.  Rose bought things or paid car

25    payments and other payments for members of her family.
```

1          They would also talk -- she would also talk about the

2    fact that there are lines and tribes among the Romney who have

3    traditionally done fortunetelling and claimed psychic ability

4    for well over a thousand years.  And these abilities are

5    allegedly passed down or believed within the culture to be

6    passed down from generation to generation through the women of

7    the generation and that mothers train their daughters as to how

8    to go forward and do fortunetelling and exploit their psychic

9    ability or intuition or whatever we want to call it.

10          And that's important in the case for two reasons; one,

11   as to the question that Your Honor raised, Mrs. Marks's belief

12   that she has psychic abilities; and second, it's important

13   because it always goes to something I want to argue about the

14   conspiracy.

15          Assuming the methodology, what people do in their

16   fortunetelling is, in fact, passed down from mother to daughter

17   throughout the generations, we have daughter-in-laws who didn't

18   learn from Rose Marks who learned from their mothers who -- or

19   Nancy Marks and Cynthia Miller who are practicing their

20   profession in one way.  Perhaps I can illustrate to the jury in

21   a method different than the way Rose Marks practices.  Nancy

22   apparently passed down to her daughter Vivian, who's Rose's

23   granddaughter, her methods of dealing with her clients;

24   whereas, Rose Marks, I think the testimony will be, acted

25   differently, and secondly, passed down to her daughter Rosey

```
1    Marks a different approach which is illustrated in the recorded

2    conversations with officer Reddish.

3             And I think that's a distinction that I would like to

4    be able to make, and that's -- I'm helped with that with the

5    testimony of Professor Sutherland.

6             And I would note for the record that the only witness

7    that was supposed to be called who dealt with Rosey Marks other

8    than Officer Reddish who I called was a witness whose initials

9    were CC who is in Count 3 of the indictment, and that was

10   dismissed because the government didn't call her as a witness.

11            So those are the things that I want to bring out

12   from -- not about Count 3, but the other things were the things

13   I wanted to bring out from Professor Sutherland.  And I think

14   she has the academic credentials to be able to testify about

15   those if Your Honor feels that those facts are facts, one, not

16   commonly within the knowing and understanding of a jury, and

17   two, would be helpful to the jury in deciding some point or

18   issue in the case.

19            THE COURT:  Thank you.

20            Mr. Stefin?

21            MR. STEFIN:  The way Mr. Schwartz described it today

22   is a little different than what he had furnished to the

23   government.  For example, in the information he furnished to

24   us, he said that she would testify that in Romney culture,

25   traditional children do not go to school past the third grade
```

1    are not schooled in matters regarding the complexities of

2    mainstream American life such as politics, tax laws, business

3    normal social interaction, economic concepts, et cetera.

4    Traditionally the women of the fortunetellers, the men deal

5    with the business details.

6          Again, talking about cultural generalities I think

7    dangerous because it could tend to be irrelevant and mislead a

8    jury unless these cultural traits are somehow connected or

9    established with respect to this defendant and the actions of

10   the defendant and her family.

11         I mean, the fact that culturally -- and defense

12   counsel has made this -- stated this numerous times about how

13   Ms. Marks has only a third grade education, I don't necessarily

14   dispute that, but there's been actually no evidence of that,

15   and defense counsel talks about it as if it is an established

16   fact.

17         And the fact that culturally they -- people of the

18   Romney culture pulling kids out of school by the third grade

19   and therefore they are not educated, I mean, what does that

20   have to do with Ms. Marks based on the evidence in this case

21   where she's running her own businesses, she's buying

22   properties, buying and selling properties, she's leasing

23   vehicles, she entering into multiple mortgages and loan

24   agreements with people, she has lawyers that advise her, she

25   goes to accountants?  The fact that the culture itself doesn't

1    do these things is not relevant to this case.

2         And again, defense counsel says that, well, we want to

3    make the argument that the daughters-in-law did not learn from

4    Mrs. Marks and we want to be able to show how the traditions

5    have passed down from mother to daughter, but there's no

6    evidence that they didn't learn from Mrs. Marks.

7         I mean, factually, not on the record, but my

8    understanding is that these daughters-in-law, Nancy Marks and

9    Cynthia Miller got married to the defendant's sons at a very

10   early age and have been working out of Mrs. Marks's business

11   establishments for many years and that -- I think there was

12   testimony that in a couple of instances the codefendants

13   allegedly told the victim that they had learned from their,

14   quote/unquote, mother.  Of course it's, you know -- which was

15   identified in some instances as Joyce Michael, I believe, the

16   characteristics of their trade or that had been passed down

17   from the generations.

18        So there's no evidence as to that is what I'm trying

19   to say that they didn't -- whether they did or did not learn

20   from the defendant, the defense has offered so far no evidence

21   that that's the case and that's why the actions of the

22   codefendant should be distinguishable from the actions of this

23   defendant.

24        I think the danger of calling an anthropology expert

25   on Romney culture is that I think some of these issues are more

```
 1    appropriate for sentencing really.  Should the jury be

 2    sympathetic then that the defendant was raised in a culture

 3    where she didn't get an advanced education and perhaps that

 4    she's a victim, herself, of her upbringing and so on and the

 5    other defendants.  I mean, I don't know where this all leads.

 6          I will say that -- well, again, I just think it has

 7    very little probative value and has the fair potential to

 8    really go off into a digression of facts and factors that

 9    really don't ultimately bear on the ultimate issue in the case

10    as to whether or not there were misrepresentations made by this

11    defendant to the particular victims.

12          The only one that troubles me a little bit is that the

13    comment that the Romneys tend to share money with each other,

14    Romney families.  I just don't know if that -- if expert

15    testimony should be allowed for the simple purpose of saying

16    that.

17          Obviously in this family, there was a lot of sharing

18    of money.  I don't think that's in dispute.  But if the defense

19    is arguing that they want to be able to establish that's a

20    cultural trend and that explains why the daughters-in-law would

21    give money to her and that she would buy cars for them, I mean,

22    that may -- I mean, I don't know if one draws the conclusion

23    that because culturally people of Romney culture share money

24    with each other, that that in this particular instance, that's

25    the reason why she shared money.
```

```
 1              And again, getting into this whole idea that the
 2    psychic fortunetelling career is passed down from mother to
 3    daughter, again, I guess now he is opening back up the idea
 4    that because this is something cultural, that the defendant
 5    therefore must be believed that she had psychic abilities as
 6    well.
 7              So again, it's like the circular backdoor way of being
 8    able to be say to the jury that Ms. Marks believed -- because
 9    culturally this is passed down, Ms. Marks must have believed
10    that she had psychic abilities as well.  And I think that's
11    just completely misleading to a jury when there's no evidence
12    of that otherwise.
13              THE COURT:  All right.  Thank you.
14              Anything else, Mr. Schwartz?
15              MR. SCHWARTZ:  No, Your Honor.
16              THE COURT:  I'm going to sustain the government's
17    objection to calling Dr. May.  I'll prepare a written order
18    outlining my reasons in more detail.
19              But I'm going to overrule the objection as to
20    Dr. Sutherland and I'm going to allow Dr. Sutherland to
21    testify.  So we will go from there.
22              MR. SCHWARTZ:  Thank you, Your Honor.
23              THE COURT:  All right.  Anything else we need to talk
24    about today?
25              MR. STEFIN:  Judge, I had suggested, depending how
```

```
 1   Dr. Sutherland testifies, I mean, this could open the whole --
 2   if her suggestion is that people of Romney descent, because
 3   their parents passed this down to them, frequently believe that
 4   they have psychic abilities, I then ask, does this not open the
 5   door to the fact that the codefendants who also portrayed
 6   themselves to also have psychic abilities have admitted to the
 7   fact that they don't by virtue of their pleas of guilty in this
 8   particular case.
 9        THE COURT:  I don't think the fact that they pled
10   guilty necessarily means they don't believe they have psychic
11   powers.  The may believe they do or in fact do, but as we
12   discussed earlier, they may have defrauded these people, may
13   have lied to them about what they were going to doing with
14   their money.
15        MR. STEFIN:  That's true except for the factual
16   proffers indicated that they falsely represented -- they sign
17   on with an agreement that they falsely represented that they
18   had psychic abilities.  So I would have to direct you to the
19   proffers.
20        MR. SCHWARTZ:  Well, they couldn't predict what would
21   happen with their proffers, Judge, but...
22        THE COURT:  I would be inclined not to say that that
23   opened the door to bring in the codefendants' admissions of
24   guilt.  That's -- I would be inclined to say no.
25        MR. STEFIN:  Can Mr. Schwartz indicate, and the
```

```
 1   Court's probably heading in this direction, where we are as far
 2   as how many witnesses he expects to call?
 3             THE COURT:  Yes.  Do we need to talk anymore on the
 4   record?
 5             MR. SCHWARTZ:  There was just one other thing I was
 6   going to raise, and I had a thought when Mr. Stefin was
 7   speaking.  And maybe -- and I have to talk to my client about
 8   this -- maybe if it's those two things that we were talking
 9   about without Dr. Sutherland, the fact that psychic training
10   are passed down from generation, from mother to daughter, and
11   that Romney tend to be more sharing of their moneys with their
12   family than non-Romney culture, maybe Mr. Stefin and I can
13   stipulate to that.  And if we can, that might save the expense
14   of putting -- of bringing an expert here from, I think, Texas
15   or California, I forget which one is where, and taking the time
16   of her testimony.  But I'll talk to Mr. Stefin about that.
17             Right now, Judge, I believe --
18             THE COURT:  Do we need to do this on the record?
19             MR. SCHWARTZ:  No, we don't.
20             THE COURT:  Is there anything else on the record we
21   need to discuss, Mr. Stefin?
22             MR. STEFIN:  No, Your Honor.
23             (Thereupon, a discussion was held off the record.)
24             (Thereupon, the trial adjourned at 12:01 p.m.)
25                            - - -
```

```
                    C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



11/27/13              s/ Tammy Nestor
                      Tammy Nestor, RPR
                      Nestor Court Reporting, Inc.
                      tammynestor@yahoo.com
```