# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  11-80072-CR-MARRA(s)(s)(s)(s)

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**vs.**

**ROSE MARKS,**

     **Defendant,**
**----------------------------------------/**


## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND REQUEST FOR ALTERNATIVE SENTENCE

The defendant, Rose Marks, by and through her undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers her Objections to the Presentence Investigation Report (PSR) and Request for Alternative Sentence and as grounds therefore, states as follows:

### I.  INTRODUCTION:

Rose Marks is a 62 year old first-time offender   who had never been arrested, let alone incarcerated, before August 16, 2011.  Nineteen days of trial, between August 26, 2013 and September 26, 2013, concluded when a federal jury in West Palm Beach returned guilty verdicts on a Thursday afternoon against Mrs. Marks.  Mrs. Marks was then remanded for sentencing.

Mrs. Marks now stands convicted of multiple counts of conspiracy, mail fraud, wire fraud, money laundering and income tax offenses.  **The PSR suggests a total offense level 39 which has an *advisory* guideline range of 262 to 327 months, a minimum of almost 22 years**

**which is effectively a Life sentence.**  According to the United States Sentencing Commission's "Sourcebook" of federal sentencing statistics FYE 2012, of 84,173 cases sentenced that year, only 1.4 % of all cases faced a total offense level of 39 or higher and 3 % faced an *advisory* guideline range of at least 262 to 327 months, although many of those 3 % were at the higher criminal history categories.  **Although Mrs. Marks is a first-time offender, assigned to Criminal History category I, we believe such a sentence would not only subject Mrs. Marks to incarceration for the remainder of her life;  it would preclude her designation to the minimum security facility at Coleman and, most likely, have her designated to only four low security and one medium security facilities  available to  female  inmates in the United States.**

Mrs. Marks pled not guilty in this case, and she continues to maintain her innocence. However, Mrs. Marks does accept responsibility and she is profoundly remorseful that the unintended consequences of her actions over the years hurt anyone.  She has always admitted she received money, gifts and loans over the years from clients; however, she always had the best intentions and had hoped to repay the loans.  In fact, there was at least one instance in which she signed a promissory note obligating her to repay money, and in other cases she returned money to her clients.  And although she did repay some money, unfortunately, she was a compulsive gambler between 2003 and at least 2011. She was also addicted to both alcohol and Valium. These factors and some very traumatic events in her life made it all but impossible to keep up with those obligations.   With that said, Mrs. Marks understands this is neither the time nor the forum to pursue her innocence.   Rather, the subject of this procedure is sentencing and, to that

end,  **the guideline enhancements suggested in the PSR are wrong, and their calculations produce a truly "draconian" and "unreasonable" result.**

Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007, *U.S. v. Pugh*, 515 F. 3d 1179 (11th Cir. 2008) and, most recently, Amendment 741 of the Sentencing Guidelines, effective November 1, 2010.   First, the Court is to resolve any disputed guideline issues and determine the *advisory* guideline range.  To that end, Mrs. Marks  agrees the counts of conviction were properly grouped in the PSR under § 3D1.2, § 2B1.1 is the applicable guideline, and a base offense level 7 applies.  However, **Mrs. Marks  objects to the Chapter Two and Three guideline enhancements, either their application, or the extent of their application, as alleged by the Government in the PSR.**

Second, the Court is to consider if there are any factors that may warrant a departure from the *advisory* guideline range. As before *U.S. v. Booker,* 543 U.S. 220 (2005), the court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered," *U.S. v. Jordi,* 418 F. 3d 1212, 1215 (11th Cir. 2005).  **The PSR fails to identify any  factors that may warrant a downward departure in her case and, although Mrs. Marks believes such factors do exist, she will ask this Court to consider them as sentencing factors under 18 USC § 3553,  in determining a** *reasonable but not greater than necessary sentence* **in her case.**

Lastly, the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing

objectives set forth in 18 USC § 3553(a).  **As set forth more fully below, Mrs. Marks  believes there are factors worthy of this Court's consideration.**

## II.  OBJECTIONS/CLARIFICATIONS TO PSR ( NON-GUIDELINE ISSUES):

1.  As to **page two and paragraph 128** of the PSR, Mrs.  Marks objects to the claim that the maximum statutory fine in this case is $40,000,000.  The objection is not to 18 USC § 3571(d), which allows a maximum statutory fine equal to twice the pecuniary loss in the offense, but to the amount of loss alleged by the Government. Mrs. Marks'  argument regarding any loss in this offense is addressed as an objection to the application of the guidelines.

2.  Related to the above,   Mrs. Marks also objects to **paragraphs 67 and 130** of the PSR and the amount of restitution, since the amount of restitution is directly tied to the pecuniary loss used to determine the statutory fine.

3.  As to **paragraphs 3 through 57 (offense conduct) and paragraph 58 (role assessment)** of the PSR, Mrs. Marks pled not guilty in this case and proceeded to trial.  She continues to deny knowingly being involved in this conspiracy and; therefore, she objects to these paragraphs in their entirety.

## III.  OBJECTIONS TO PSR  (GUIDELINE ISSUES):

1.   Mrs.  Marks  objects to **paragraphs 57, 58, 67,  and 77** of the PSR  and the Government's claim that the loss in this case is more than $20,000,000,  but not more than $50,000,000, and is subject to  a 22-level enhancement,  pursuant to § 2B1.1(b)(1)(L).   Mrs. Marks argues that she should not be held responsible for any amount that exceeds $20,000,000 and that a 20-level enhancement would result from such a finding.

The amount of loss, specific to Mrs. Marks, must be determined pursuant to the relevant conduct provisions of § 1B1.3. First, pursuant to § 1B1.3(a)(1)(A), a defendant is responsible for her own relevant conduct, i.e.; "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." In other words, this Court must first determine what Rose Marks did, or intended to do, to cause any loss in this case.

First, as it relates to Mrs. Marks' own conduct, according to paragraph 12 of the PSR, "over the course of approximately 17 years, J.M. sent over $20,000,000 to Rose Marks in the form of cashier's checks, wire transfers and gold coins." No further specifics are offered in the PSR and, at trial, J.M. testified she did not know how much she sent and that it was the Government who told her she gave Rose Marks approximately $20,000,000. The Defense would argue the evidence in this case suggests an amount somewhat less than $10,000,000. Assistant United States Attorney Roger Stefin has conceded to Counsel that all the documents in the possession of the government establish a total loss from all victims of all of the defendants that does not exceed $17,800,000. Certainly a substantial amount, but less than the $20,000,000 guideline cut-off; thus initially reducing the offense level from **39** to **37.**

When Rose Marks first met J.M., she was unhappy with her marriage and sought an affair with a 23 year old Egyptian tour guide she had met earlier that year. J.M. was NOT suicidal, she was involved in a new adventure, and it was at that time she and Rose Marks began a 17 year relationship. That relationship included Rose Marks providing J.M. with background for her books and teaching her about the ways of psychics. During those 17 years, Rose Marks also spent considerable time and effort helping J.M. buy and sell houses, assisting her with obtaining

in-vitro fertilization, and helping J.M. raise her son.  Mrs. Marks   also gave J.R. life coaching advice.  During that time, admittedly, Rose Marks received substantial sums of money from J.M. Some were deemed gifts, some were reported as taxable income, and some were in the form of loans Mrs. Marks was obligated and agreed to pay back.  Unfortunately, Mrs. Marks' depression from events in her life, her addictions to alcohol and Valium, and her compulsive gambling consumed money she would have used to in part repay J.M.  However, even in a light most favorable to the Government, every conversation between Rose Marks and  J.M., every bit of advice offered by Rose Marks to J.M., every deed carried out by Rose Marks on behalf of J.M., every  transaction between Rose Marks and J.M., and every payment received by Rose Marks from J.M. over the course of a 17 year relationship, given the role of Rose Marks as a psychic and spiritual advisor, and  J.M.'s voluntarily seeking and believing in her guidance, cannot be considered fraud and criminal.  Yet, it would require such a finding to accept the Government's reduced claim that all of the approximately $17,800,000 allegedly paid by J.M. and others to Rose Marks was "loss," as defined by the sentencing guidelines.  However, since it is unlikely that even credit for work and gifts would reduce the loss to under $7,000,000, we need not engage in this exercise, unless the government tries to prove a greater loss than the documents establish.

Second, in a conspiracy, which is the case before this Court   and what the sentencing guidelines refer to as jointly undertaken criminal activity, a defendant's relevant conduct also includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity", §  1B1.3(a)(1)(B).  Therefore, this Court must also determine whether Rose Marks is responsible for any of the conduct of her coconspirators that might have

caused, or intended to cause, any additional loss in this case.[1]  In arguments made further in this filing, Rose Marks' involvement with fortune telling and spiritual advice had been limited for years and her family members each operated their own businesses and had their own clients. And although the Government's position is that fraud proceeds were shared with Rose Marks, paragraph 7 of the PSR addresses this.

"The defendants drove expensive automobiles that they leased through Atlas Leasing. Owner Michael Gordon generally conducted business with Rose Marks or Ricky Marks, and he testified at trial that he never would have leased cars to Ricky Marks, Michael Marks or Vivian Marks if Rose Marks was not part of the deal.  Gordon knew, that if any family members defaulted on their leases, Rose Marks would be responsible because Peter Wolosky held a mortgage on her home at 1319 Seminole Drive, Ft. Lauderdale, Florida."  With that said, Rose Marks was the only one in the family with credit and family members paid her rent for properties and made payments through her for the leases on automobiles.  Those monthly payments were substantial, with estimates of approximately $4,300 for rent and $5000 to $8,000 for auto leases, every month.

Amendment 439 of the Sentencing Guidelines, effective November 1, 1992, amended § 1B1.3, comment. (n.2), to include the following: "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).  In making this required determination, "the court may consider any explicit agreement or implicit

---

[1] The Defense believes the Government's position is that Mrs. Marks is responsible for about $20,000,000 in losses, which would include some of the related activities of her family members.

agreement fairly inferred from the conduct of the defendant and others.  In other words,  when determining whether a defendant is responsible for the relevant conduct of his coconspirators, that determination   neither starts nor ends with what was "reasonable foreseeable." *U.S. v. Studley,* 47 F. 3d 569, 574-76 (2nd Cir. 1995), the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation;  *U.S. v. Gilliam*, 987 F. 3d 1009, 1012-13 (4th Cir. 1993), the acts must have been within the scope of the defendant's agreement; *U.S. v. Evbuonwan*, 992 F. 2d 70, 73-74 (5th Cir. 1993), the government must prove that the particular crime was within the scope of the [defendant's] agreement;   *U.S. v. Jenkins,* 4 F. 3d 1338, 1346-1347 (6th Cir.  1993), court must determine not only foreseeability but the scope of criminal activity defendant agreed to jointly undertake;  *U.S. v. Olderbak*, 961 F. 2d 756, 764 (8th Cir. 1992), conduct is relevant only if it is reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake; *U.S. v. Ortiz,* 362 F. 3d 1274 (9th Cir.  2004), jointly undertaken relevant conduct must be reasonably foreseeable and in furtherance of the conspiracy;  *U.S. v. Hunter*, 323 F 3d 1314, 1319 (11th Cir. 2003), remanded because the court did not make particularized findings regarding the scope of the defendant's agreements; *U.S. v. Saro*, 24 F. 3d 283, 288 (D.C. Cir. 1994), mere foreseeability is not enough.

Finally, decided May 24, 2011 in *U.S. v. Kynard,* 2011 WL 2015164 (C.A.11(Ala.)), it was found that the district court erred in its finding regarding Kynard's amount of loss because **before a district court may hold a defendant liable for the acts of others, "the district court must first make individualized findings concerning the scope of criminal activity**

**undertaken by a particular defendant.”** *United States v. Hunter*, 323 F. 3d 1314, 1319 (11th Cir.  2003).

In conclusion, no more than a 20-level enhancement should be applied in this case because Mrs.  Marks never received $20,000,000 from J.M., and the others and what she did receive was not all from conduct which was criminal.  Further, all of the dealings between her family members and their clients, all of those transactions, and all of the payments received from those family members, be it from fortune telling or spiritual advice, also cannot be found to be criminal.  Finally, Rose Marks is not automatically responsible for all of the relevant conduct of those family members without a finding consistent with the Sentencing Guidelines and their amendments.  In general, the Government must prove its loss estimate is within the specified range by a preponderance of evidence,  *United States v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997), using reliable and specific evidence, *United States v. Renick*, 273 F. 3d 1009 (11th Cir. 2001) and *United states v. Wilson*, 993 F. 2d 214, 218 (11th Cir.  1993). However, under § 2B1.1, comment. (n.3(C)), the Court need only make a reasonable estimate of loss. As such, Mrs. Marks believes the evidence and testimony in this case support, at best, a 20 -level enhancement for loss.

**2.**  As to **paragraph 79**, Mrs. Marks objects to the 2-level enhancement for sophisticated means, § 2B1.1(b)(10)(C).  Effective November 1, 1998, the Sentencing Commission added a two-level enhancement for sophisticated means as a temporary emergency amendment to the since deleted fraud guideline of § 2F1.1.   The enhancement was made permanent and incorporated into the new economic crime guideline (see Amendment 617, effective November 1, 2001), now renumbered as § 2B1.1(b)(10).  Previous to the creation of this guideline, both §

2B1.1 and § 2F1.1 provided a two-level enhancement for more than minimal planning (MTMP), defined in § 1B1.1, comment. (n.1(f)), as more planning than is typical for commission of the offense in a simple form, significant affirmative steps taken to conceal the offense, or in a case involving repeated acts over a period of time. This section of the guidelines offer that "in an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning; however, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute MTMP. However, amendment 617 effectively eliminated the MTMP enhancement. The result was that offenders who were accountable for relatively low loss amounts received slightly lower offense levels, but by increasing the number of offense levels the loss table for offenders involved in a moderate to high loss amount, even with the elimination of the MTMP enhancement, these offenders faced an increase in offense levels. The reasoning behind the elimination of the MTMP enhancement was that MTMP almost always existed in offenses involving moderate to high loss amounts and so its elimination obviated the need for judicial fact-finding about this frequently occurring enhancement. Further, it avoided the potential overlap between the MTMP enhancement and the sophisticated means enhancement, clearly elevating the bar of the latter's application standard.

The definition of sophisticated means has remained largely unchanged since its inception. **"For purposes of subsection (b)(10)(C), sophisticated means means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."** Again, the enhancement is reserved for "especially complex" or "especially intricate" **offense conduct** pertaining to the execution or concealment of the offense. **It relates to the "offense" and not the conduct of an individual participant.**

The instant "**offense**" in this case was not a conspiracy to commit mortgage fraud that included participants who offered inflated property appraisals to lenders, had the ability to fraudulently complete all the  necessary financial statements and disclosures necessary to commit the fraud,  or  participants who abused their positions of trust as either mortgage brokers or employees of banks or title companies.  It  did not include straw buyers,  or honest people whose identities were stolen.   The instant **"offense"**   was not  a Medicare fraud that involved organizers and leaders, doctors who were paid for prescriptions when they never saw patients, let alone treated them, recruiters who received kickbacks, so-called patients who leant their Medicare beneficiary information, and others who were trained to complete the necessary paperwork and coding to be submitted to Medicare.  Nor was the offense a telemarketing fraud, which had many layers of management, sellers, closers, singers, and which operated in several jurisdictions, used shell corporations or overseas bank accounts, and utilized multiple layers  of financial transactions Yet, in a more simpler fashion, there are times in which even mortgage fraud, Medicare fraud, telemarketing fraud, or securities fraud might include MTMP, but not rise to sophisticated means.  This **"offense"**  was committed by uneducated  fortune tellers brought up within the Romini culture and lacks the complex elements of more sophisticated offenses. With that said, Rose Marks should not receive the same 2-level enhancement for sophisticated means that was applied to Scott Rothstein in 09-60331-CR-COHN**.  This "offense"  may have involved MTMP, but it was not especially complex or especially intricate and, therefore, sophisticated means should   not apply in this "offense."**  The very fact that everyone who hears of this cases says "how could Jude be so stupid as to give Rose all that money" indicates the belief in the lack of sophistication of the fraud. **Therefore, paragraph 79 of the PSR and**

the two-level enhancement should be deleted.  **The previously reduced level 37 offense level should now be reduced 2 levels to level 35.**

**3**. Mrs. Marks objects to **paragraph 80**  of the PSR  and the 2-level enhancement  for vulnerable victims, §   3A1.1(a).    According to the "Sourcebook," the vulnerable victim enhancement was applied in just 0.4 % of all cases,  just 332 of  74,069 cases FYE 2012. It is a rarely applied enhancement because it  " is primarily concerned with the **impaired capacity of the victim to detect or prevent the crime,** rather than with the quantity of harm suffered by the victim," *United States v. Gill*, 99 F. 3d 484, 486, (1st Cir.  1996).  The fact that the victims suffer great harm does not necessarily make them vulnerable, *United States v. Stover*, 93 F. 3d 1379 (8th Cir.  1996), reversing the enhancement where an adoption agency took thousands of dollars from  young  couples  desperate  to  adopt  a  baby  by  intentionally  misrepresenting   the  actual number of children available for adoption**.  One commentator has argued that the courts should draw a brighter line to ensure that the vulnerable victim enhancement is not manipulated simply as " a means of punishing defendants for victimizing persons who evoke sympathy or have  suffered greatly."** [2]   **It should not apply  in this case.**

Application of §  3A1.1(b)(1) requires that the defendant knew, or should have known, that a victim of the offense was a vulnerable victim.  For a victim to be a vulnerable victim, "the person  must  be  unusually  vulnerable  due  to  age,  physical  or  mental  condition,  or  who  is otherwise particularly susceptible to the criminal conduct."  Again, § 3A1.1, comment. (n.2).

"Subsection  (b)  applies  to  offenses  involving  an  unusually

vulnerable victim  in  which  the  defendant  knows  or  should  have

---

[2]  Jay Dyckman, Brightening the Line: Properly Identifying a Vulnerable Victim for Purposes of § 3A1.1 of the Federal sentencing Guidelines, 98 Colum.  L.  Rev. 1960 (1998)

known of the victim's unusual vulnerability.   The adjustment would apply, for example, in a fraud case in which the defendant **marketed** an ineffective cancer cure or in a robbery in which the defendant **selected** a handicapped victim."

Rose Marks was a fortune teller.  Like her mother, her mother's mother, and beyond, she advertised herself as a fortune teller, a "love adviser" and so forth.  She had no control over who would call her or knock on her door.  Customers were neither targeted or marketed to. However, it is conceded that her customers, those who sought  her services and advice, and were willing to pay for them, were out of the main stream of our community.   That did not make them vulnerable.

Twelve victims testified at trial;  seven never met Rose Marks.  They typically sought out Rose Marks and other family members because they were at a low point in their lives.  J.M. claimed she  was suicidal (she was not) due to a bad marriage, but Rose Marks didn't claim she could cure her.   A.W. learned her husband had pancreatic cancer, but Rose Marks had no involvement with her until after her husband died.   A.U. had a non-cancerous brain tumor but sought advice from Cynthia Miller  regarding her love life, not a medical cure.   A.U. also testified she had absolutely no dealings with Rose Marks.  P.H. was unsatisfied with his love life, he was Nancy's client, and he had no dealings with Mrs. Marks.   G.T. was sad and lonely because his girlfriend broke up with him because her family did not approve of him.   S.R. was lonely and had lost a rewarding job.  D.W. prayed for improvement in her relationship with an alcoholic, non-committal boyfriend.[3]  **Yes, these individuals were at low points in their lives.**

---

[3]  See paragraphs 8 through 19 of PSR.

**Yes, they voluntarily sought "out-of-the-mainstream advice." However, they were never targeted or marketed to, they were not elderly, infirm or mentally ill, and they were not "vulnerable" in that they " lacked the capacity to detect or prevent the crime."**

A generalized finding that a defendant should have known of its victims' vulnerability is not sufficient to support the vulnerable victim enhancement, *United States v. Llamas*, 599 F. 3d 381 (4th Cir. 2010, reversing where court failed to explain how defendant would know victim was vulnerable; the fact that a victim was elderly is not sufficient by itself to support the enhancement, *United States v. Vega-Iturrino*, 565 F. 3d 430 (8th Cir.. 2009, despite victims ages of 70, 83, 83 and 89 years old; The enhancement also did not apply when the defendant passed false money orders in a business he knew was staffed by young and inexperienced clerks, *United States v. Paige*, 923 F. 2d 112 (8th Cir. 1991), or that a government official was vulnerable to defendant's offer to fix the case simply by virtue of the official's indictment, *United States v. Moree*, 897 F. 2d 1329, 30 Fed. R. Evid. Serv. 329, 114 A.L.R. Fed. 807 (5th Cir. 1990) , Indictment made the attempted crime possible but...did not make the victim unusually vulnerable**. The vulnerable victim enhancement did not apply in these cases and it should not be applied in a case in which people seek the advice of fortune tellers. In sum, there were no vulnerable victims, as defined by § 3A1.1 and its commentary, and paragraph 80 of the PSR should be deleted. The offense level previously reduced to level 35 should now be further reduced to level 33.**

4.   As to **paragraphs 58 and 81** of the PSR, Mrs. Marks objects to the 4-level enhancement for role, § 3B1.1(a). According to the "Sourcebook," the enhancement for organizer/leader was only applied in 1.5 % of all federal cases, FYE 2012, and, in Mrs. Marks'

case, serves to enhance the *advisory* guideline range in her case 50 %, from level 35 to level 39, from an *advisory* guideline range of 168 to 210 months....to 262 to 327 months.

According to paragraph 58 of the PSR, "Rose Marks organized the scheme to fraudulently provide spiritual advice." Rose Marks was never the organizer or leader of anything. She learned fortune telling and spiritual advice as a young girl from her mother, just as her mother had done, just as generations of young girls had done within the Romani culture and, admittedly, she passed it down to her own daughters. And although Mrs. Marks is now the "Matriarch" of this family, she could never be considered its "leader."

"Traditionally, the Romani culture is a patriarchal society. Men and women often marry young, marriages are arranged, and the groom's family pays a price to the bride's family." [4] Rose Marks always answered to a man; her father, the husbands she had no choice in marrying, and her brother-in-law for a short time following the death of her husband.[5] By the time Nicholas Marks, who was the leader of the family (the Boss) died in 2006, Mrs. Marks had not worked full-time in years and she rarely did any business in person. She had her own problems with alcohol, Valium and compulsive gambling. Nancy, Ricky and Vivian, Cynthia Miller and Michael, Rosie and Donnie Eli, and Victoria Eli all had their own separately incorporated businesses and their own separate clients. By rights, Ricky Marks should have taken over the family as the oldest male; however, none of Rose Marks' children got along with each other. But at no time was Rose Marks ever the head of this family and she was certainly never an

---

[4] Wikipedia, Romani Society and Culture

[5] Sam Marks, a convicted felon with a drug history, had even tried to strong-arm Mrs. Marks in asserting his rights as family head by forcing her back to work.

organizer or leader of an activity which had been  passed down from generation to generation within this culture.

The fact that a defendant plays an important or even essential role in a criminal enterprise does not necessarily require an aggravating role adjustment, *United States v. Sostre*, 967 F. 2d 728, (1st Cir.  1992) (rejecting manager/supervisor for a  drug steerer who played an essential role in a drug transaction).   Having leadership qualities, such as a strong personality, is not sufficient in itself to support a role increase, *United States v. Jordan*, 291 F. 3d 1091 (9th Cir. 2002) (reversing district court's four-level increase for leadership role).   A defendant must be a supervisor in the actual criminal conduct, *United States v. VanMeter*, 278 F.3d 1156 (10th Cir. 2002), and it is not sufficient  to supervise other participants in the conspiracy in their non-criminal activities, *United States v. DeGovanni,* 104 F. 3d 43 (3rd Cir.  1997).   Thus, where the Government fails to show the defendant managed or supervised any other participant, the increase is improper, *United States v. Woods*, 335 F. 3d 993, 61 fed. R. Evid. Serv.  1695 (9th Cir. 2003).

**Pursuant to § 3B1.1, comment. (n.2), to qualify for an aggravating role adjustment under this section, a defendant must have been the organizer, leader, manager, or supervisor of one or more "criminally liable" participants.**   Mrs. Marks never supervised or directed any family members; however, paragraphs 20 and 21 of the PSR identify Debra Von Buelen as both a friend and client of Rose Marks.  According to paragraph 20, " when victim J.M.   believed that she was in communication with Brad Pitt and Colin Powell, Rose Marks instructed Von Buelen to send emails to J.M.  Due to her limited education, Rose Marks had limited command of the written word. Accordingly, she instructed Von Buelen as to what should

be contained in the communications with J.M.   Von Buelen subsequently wrote what Rose Marks said but fixed the grammar in the emails."   According to paragraph 20, when law enforcement subsequently came to J.M.'s aid, Rose Marks believed she disappeared and asked Von Buelen's assistance in locating J.M.   At Rose Marks' direction, Von Buelen hired a private investigator in an attempt to locate J.M........"

Within paragraphs 3 through 57 (The Offense Conduct) and paragraphs 58 through 66 (Role Assessment) of the PSR, Debra Von Buelen, who performed the simplest of secretarial duties for Mrs. Marks because of her "limited education," is the only individual identified as having been directed/supervised/managed by Mrs. Marks.   Even in a light most favoring the Government, there is no evidence Von Buelen had any idea of the scope of the fraud or that it may have only been limited to fortune telling/spiritual  advice that she knew Mrs. Marks was known for.  **With that said, there is no evidence that Von Buelen's relevant conduct was criminal, or that she meets the definition of a criminally liable participant (see § 3B1.1, comment. (n.1).**

Notwithstanding the above, to apply a 4-level aggravating role enhancement because Rose Marks directed Von Buelen to do what is best described in paragraphs 20 and 21 of the PSR would certainly produce *a most unreasonable and greater than necessary sentence*, effectively increasing the low end of her *advisory* guideline range from 168 to 262 months**. Again, according to the latest federal sentencing statistics, this enhancement was only applied in 1.5 % of all federal cases last year.  It was applied to the organizers/leaders of international drug trafficking organizations, and  large, complex  Medicare, mortgage and securities fraud conspiracies.  Rose Marks' relevant conduct should not include her in that**

same 1.5 %.  **Therefore, paragraph 58 should be amended and paragraph  81 should be deleted.  The previously reduced level 33 offense level should finally be reduced to level 29.**

5.   Consistent with the above objections, Mrs. Marks  believes that **paragraphs 83 and 86**  of the PSR should reflect both an adjusted offense level and a total offense level  of 29, **paragraph 59**   should reflect a total offense level 29, criminal history category I, and an *advisory* guideline range of 87  to 108 months, and **paragraph 129**   should reflect a fine range of $15,000 to $40,000,000.

6.    **The total offense level of 29 guideline would still result in a sentence of approximately TWICE that received by co-defendant Nancy Marks (45 months).  It should be noted that, at Nancy Marks' sentencing hearing, the government asserted that Nancy Marks was the most culpable of the defendants, although Rose Marks received the most money by virtue of having Jude Montassir (Jude Deveraux) as a client for in excess of a decade.**

## IV.  SENTENCING SUBMISSION AND REQUEST FOR ALTERNATIVE SENTENCE:

Rose Marks has been found guilty by a jury of multiple counts of  conspiracy, mail fraud, wire fraud, money laundering and tax violations. **The PSR suggests a total offense level of 39, and, although  Mrs. Marks  is a first time offender assigned to criminal history category I, the PSR further suggests a minimum *advisory* guideline sentence of almost 22 years, effectively a Life sentence for this 62 year old woman who is in poor health.  (However, as established above, that offense level should be 29).**

The United States Sentencing Commission's  Sourcebook   indicates it is not easy to become a level 39 or higher offender, and it is not easy to become an offender facing an *advisory* guideline range of 262 to 327 months, especially for a first-time offender. According to Table 21 of the Sourcebook,  98.6 % of all federal defendants sentenced FYE 2012  fell below level 39. According to Table 23, 97 % fell below an *advisory* guideline range of 262 to 327 months.

**So just how does someone fall at level 39 or higher**  and be included among only 1.4 % of all federal defendants to be assigned to that level or higher?  Committing   second degree murder, voluntary manslaughter, or kidnaping for ransom  and being convicted by a jury will all produce a total offense level less than 39.  Commit healthcare fraud in an amount exceeding $100,000,000,   including enhancements for sophisticated means and the newest guideline amendment (§ 2B1.1(b)(8), will produce a total offense level 39 following conviction by jury.  A defendant who manages or supervises five or more drug traffickers in a conspiracy involving no more than 150 kilograms of cocaine and, again, is convicted at trial, will also find himself at level 39. Mrs. Marks  has been convicted of fraud, money laundering and tax offenses  which, according to the Government, have resulted in a  loss of more than $20,000,000 but not more than $50,000,000.  Mrs. Marks, however,  does not make light of it by offering the above statistics or comparisons.  She too faces   level 39   and an *advisory* guideline range amounting to a Life sentence.  Yet, according to Table 13 of the Sourcebook, the average sentence in a fraud  case was 24 months and even someone convicted of fraud   with the highest Criminal History Category VI (at least 13 criminal history points) was only sentenced to an average 58 months (see Table 14 of Sourcebook).  Courts sentenced  within the *advisory* guideline range 50.4 %  in fraud cases, (see Table 27 of Sourcebook).  Apparently those courts were familiar with Chapter One, Part A, 3.

The Basic Approach,  which has appeared in the beginning of every  Sentencing Guidelines Manual since the first one in 1987. **The basic approach to the sentencing guidelines is, and has always been, to insure honesty, uniformity and proportionality in federal sentencing.**

Mrs. Marks  has already objected to several guideline enhancements.  She does not seek any downward departures pursuant to Chapter Five if the Sentencing Guidelines.  However, she will  identify several sentencing factors to be considered under 18 USC § 3553 in fashioning a *reasonable but not greater than necessary sentence* for this 62 year old first-time female defendant.

As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines,  *U.S. v. Booker,* 543 U.S. 220 (2005).  Subsequent to *Booker, Gall v. United States,* 128 S. Ct. 586, and *Kimbrough v. United States,* 128 S. Ct. 558, both decided on December 10, 2007, and *U.S. v. McBride*, 511 F. 3D 1293 (11TH Cir. 2007),  made clear  that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 USC § 3553 factors, and any attempt to give special weight to the sentencing guidelines is contrary to *Booker*.  In *United States v. Hunt*, 459 F.3d 1180, 1184, (11th Cir.  2006), ("if Booker is to mean anything, it must be that the district courts are obligated to impose a reasonable sentence, regardless of the guideline range, so long as the guidelines have been considered.")  However, the Supreme Court has since gone further in  *Nelson v. United States,* 129 S. Ct. 890 (2009), where the court reiterated what it said in *Rita v. United States,* 551 U.S. 338 (2007), that a sentencing court may not presume that a sentence within the applicable guideline range is reasonable but added "the Guidelines are not only *not mandatory* on sentencing

courts, they are also not to be *presumed reasonable."*   To that end, Mrs. Marks  offers the following:

**Nature and Circumstances of Offense:**  Mrs. Marks  respects the jury's verdict in this  case and the ongoing Fed. R. Crim. P. Rule 32 sentencing process. However, she maintains her innocence. Notwithstanding, the  instant offense is not  the typical criminal case, and it is not the typical fraud this Court sees so often.  It does not involve the typical defendants and even the victims of this offense are out of the main stream.  The Defense further  believes the determination of loss and other guideline enhancements are also challenging, and not  typical.

Pursuant to § 5H1.10, race, sex, national origin, creed, religion, and socio-economic status are "factors not relevant in the determination of a sentence.  While Mrs. Marks does not ask for a departure under Chapter Five of the Sentencing Guidelines, under 18 § 3553, the nature and circumstances of the offense, it is impossible to separate Mrs. Marks' conduct with who she is and where she came from.  It is impossible to ignore that her parents, just as their parents before them, deprived  her of an education and dictated how she would live her life and who she would live it with.  She was raised in a patriarchal, closed community, she had little choice but to be a psychic and spiritual adviser,   just as all other women in that community, and she would marry who are parents arranged for her to marry.  With that said, Mrs. Marks is 62 years old and in poor health.  She is in jail, facing a lifetime sentence.  Her children, their spouses, a grandchild, a sister, are also now all convicted felons.  Those are not excuses.  This just is not a typical case with typical defendants.

This case involves "Gypsies" and fortune telling and spiritual advice.   In many jurisdictions, it is mostly a legal activity that requires a license to operate.  It operates out in the open, in all communities, and typically announces services with a public sign.   Whether it is entertainment, provides a legitimate service to its customers, or become a fraud where there is a false promise to return money.   But there is nothing typical about this case.

Many of us would never seek the services of a psychic or spiritual adviser; however, some intelligent people (like Nancy Reagan) do on a regular basis.  Some did in this case.  Once they open the door, once they put their money down, was it a fair exchange, or was it fraud?   Was all the fortune telling and spiritual advice given by Rose Marks' and family members fraudulent, or was some entertainment or otherwise legal?   Mrs. Marks asks this Court to consider the nature and circumstances of the offense in determining *a reasonable and not greater than necessary sentence*.


**Personal and family History**: Rose Marks is a 62 year old native of Philadelphia and a first-time offender.   She is the daughter of Steve and Rose Eli, the sister of Thomas, John, Flora and Victoria Eli, the wife of Nicholas Marks for some 35 years before he died of cancer in 2006, and the mother of Ricky and Michael Marks and Rosie Eli, all co-defendants in this case.

As this Court is aware, Rose  Marks and other members of her family charged in this case were all raised in the Romani  "Gypsy" culture.   Mrs. Marks understands this is not an excuse for the conduct a jury has now found her responsible for.  Further, she  and her family are aware that courts have repeatedly denied downward departures based on race, sex, national origin, creed, religion, and socio-economic status, § 5H1.10.  However, this Court is to consider the history and

characteristics of the defendant, 18 USC § 3553, in determining a reasonable and not greater than necessary sentence.  To that end, it is impossible to understand Mrs. Marks as a daughter, a sibling, a wife and a mother, without understanding how she has led her life.  Indeed, according to the Sentencing Commission, in FYE 2012, courts imposed below guideline sentences, citing the nature and circumstances of the offense and/or history and characteristics of defendant in 9,719 cases.[6]

Rose Marks is now 62 years old; however, her life was preordained.  Her mother was a fortune teller, as was her grandmother, great grandmother, and generations of women before them.  At a very young age, Mrs. Marks witnessed her mother at her trade in a small room set aside in the family home, just as her mother, her grandmother, and so on had witnessed in earlier generations.  The same  was true for Mrs. Marks' father. "Gypsy" men  do not hold traditional 9 to 5 jobs.  They collect and sell scrap metal, work as roofers or traders and, in the case of men in Mrs. Marks' family, act as "peacemakers" or "judges" within the Gypsy community.  Such was the case with Mrs. Marks' father, who had inherited the trusted position from his own father and which had apparently been passed down for generations.

The culture in which Mrs. Marks' was raised also included a somewhat "closed" community.   Associating outside the "Gypsy" culture was discouraged, and that included education.  Children in Mrs. Marks' culture either attended school until about the third or fourth grade or they did not go at all.  **As her only schooling, Mrs. Marks spent exactly one week in the third grade and, to this day, she cannot write nor can she read cursive.  Her childhood years were spent cleaning and cooking, and spending time with aunts, uncles and cousins**

---

[6]  Sourcebook, United States Sentencing Commission, Table 25B

**who shared the same culture.   Marriages were often arranged by parents, as they were**
**when Rose married.**

At the age of 17, Rose Marks married Herky Johnson, who was in his mid-twenties, had already been married, and had children from that marriage.   The marriage was arranged by the parents and since Johnson and his family were from Central Florida, Rose, by tradition, moved to Central Florida to join her new husband and his family.[7]   However, after three months of verbal abuse, Rose left Herky and returned to her parents' home in Baltimore.   Ricky was born from this very short marriage.

Rose cared for Ricky, returned to the chores she had before at  her parents' home, and she began to do fortune telling.  In about 1973, when Ricky was about two years old, Rose entered into another marriage arranged with by her parents with Nicholas Marks.  Marks' family also lived in the Baltimore area and, this time,  Rose remained near  to her parents.  She  did fortune telling, as did her mother-in-law, and Nicholas was a "peacemaker" among the Gypsies,  a role passed down to him from his father.  He also did roofing, bought and sold cars and, occasionally, collected scrap metal.  Rosie was born during the first years of the marriage and Michael came three years later.  As time passed, Rose Marks spent time working in New York City while Nicholas remained in the Washington/Virginia area.

Mrs. Marks' father died in 1993 and her mother in 1998.  Both died of cancer.  In 1998/1999, Mrs. Marks and her family lost their Virginia home to eminent domain and after receiving about $400,000 in compensation, they moved to South Florida and bought a home at 1319 Seminole Drive in Fort Lauderdale.

---

[7]  Gypsy marriages are celebrated within the community; however, they are not legally recorded with the local authorities.

Between the years in which Mrs. Marks' parents died, her daughter Rosie gave birth to Frisco in 1996. Frisco was born with epilepsy and he remained seriously ill throughout his short life. For years, Frisco was treated at Miami Children's Hospital and when the hospital ran out of ideas, the family turned to New York hospitals, Mount Sinai and Presbyterian, until, at the age of 7, Frisco died. The deaths of Mrs. Marks' parents and the battle to save Frisco caused Mrs. Marks great depression, and she began an addiction to both Valium and alcohol, as well as compulsive gambling. By January 2005, Nicholas had been diagnosed with brain cancer, and the battle to save his life ended on June 30, 2006. Shortly thereafter, Mrs. Marks discovered Nicholas had provided financial support to his brother, Sam, from whatever Mrs. Marks had earned as a psychic. Problems began at the hospital, when Sam Marks, a convicted felon, attempted to disconnect his brother from life support as he threatened Mrs. Marks with personal harm if she did not return to full-time work and provide him with support.[8] There was an arrest and restraining orders against Sam, and Rose was able to resist him until 2009. However, by then, she was battling deep depression, drug and alcohol abuse, and her gambling caused her to borrow against the equity in the Seminole Drive home and not allow her to meet other financial obligations, some related to this offense. After 2009, Mrs. Marks provided a lot of cash to her brother-in-law.

On August 16, 2011, Mrs. Marks was arrested. Her assets were frozen, including the home on Seminole Drive, although, by that time, not much equity remained. (She eventually got the home back, but the mortgage was over a year in arrears and she had to sell it to avoid foreclosure). Mrs. Marks was released on bond and was, for a time, on home confinement. She

---

[8] Mrs. Marks had only been working part-time since about 1992 and, thereafter, much of the work she had was conducted over the telephone.

lived with her brother, John, at 1350 Hollywood Boulevard, Hollywood  and then an apartment at 2615 NE 49th Street in Hollywood until she was remanded following the jury's verdict on September 26, 2013.

**Mrs. Marks is a 62 Year Old First Time Offender With Physical and Mental Health Problems:**   Because the guidelines fail to consider the length of time a defendant refrains from the commission of her first crime, Mrs. Marks   may receive some consideration in sentencing, pursuant to *United States v. Ward,* 814 F. Supp. 23 (E. D. Va. 1993, which recognized that a departure was warranted because the guidelines failed to consider that Ward had not committed his first offense until he was 49 years old.  Mrs. Marks  also believes that, post-*Booker,* this argument is most compelling when considered with the following argument that age makes recidivism less likely.

Mrs. Marks   also  believes this Court may consider that as a first-time offender at age 62, and already facing some physical and mental health issues, she presents a lower risk of recidivism than most offenders.  In *United States v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D. N.Y. 2005), the district judge found that "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants" and in *United States v. Nellum,* 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(unpub.), the court cited lower recidivism rates for older defendants and granted a downward departure.  Age and infirmity may be considered under section 3553(a), especially if they diminish the risk of re-offending, *United States v. Lata,* 415 F. 3d 107, 113 (1st Cir.  2005). In this case, Mrs. Marks asks that this be considered as a sentencing factor under 18 USC § 3553 in fashioning *a reasonable and not greater than necessary sentence.*

**The "Silver Tsunami" And Sentencing - Age and Health as Mitigating Factors,** by Evan A. Jenness and published in the September/October 2013 Champion, discusses the issue of elderly and infirmed inmates.  What is "old" when it comes to sentencing a defendant to prison is not the equivalent of "old" in the outside world.  The medium age of a federal defendant at sentencing is 34.[9]

The National Institute of Corrections defines prisoners 50 and older as "elderly" and "aging",[10] and 15 states specifically define an "older" inmate as 50 or older.[11] Only 10.8 % of all federal defendants are over 50.[12]  Rose Marks is 62 years old and facing 262 to 327 months.

Mrs. Marks has a history of heart palpitations and has seen a cardiologist for the past 25 years.   She has also been diagnosed with diverticulitis,  and she almost recently died of an intestinal infection.  Additionally, she has had pain in her right knee and has received cortisone injections.  Medical records indicate that medical procedures/treatments have been recommended but Mrs. Marks has lacked the financial resources to pursue them.

Mrs. Marks had  seen  Dr. Neri Franzon of Fort Lauderdale since she moved to South Florida and although the doctor would not provide a summary of her treatment, the doctor did provide her medical chart and lab reports dating back until 2002. Mrs. Marks was last seen on August 20, 2013 and was prescribed Valium.

---

[9] Sourcebook, Table 6

[10]Dr. Joann B. Morton, An Administrative Review of the Older Inmate, USDOJ, National Institute of Corrections, 4 (1992)

[11] Old Behind Bars, at 17

[12] Sourcebook, Table 6

Mrs. Marks was seen by her primary doctor for flu-like symptoms in January 2009. She was prescribed antibiotics, but when the symptoms continued and she began experiencing shortness of breath, she went to the Emergency Room of Broward General on February 9, 2009. She was seen by Dr. Glenn Singer of Broward Pulmonary and Sleep Specialists on March 5, 2009. She was diagnosed with bronchitis, tobacco abuse (her father had died of lung cancer) and obesity (she had gained 50 pounds since her husband died).

Mrs. Marks was seen by Dr. Joel Stein at the Institute of Non-Surgical Orthopedics on September 12, 2013, complaining of knee pain. X-rays were negative but she could not afford an MRI. The pain scale that day was recorded as 8/10.

Mrs. Marks was an inpatient at Holy Cross Hospital from May 9, 2013 to May 13, 2013. The final diagnosis included diverticulitis, abdominal pain, nausea and vomiting, diarrhea and hematochezia, hypokalemia and mild anemia. A colonoscopy was considered a month after discharge, but Mrs. Marks lacked financial resources to follow up.

Pursuant to the most recent amendment (739) to § 5H1.4, a defendant's physical condition, individually or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a reasonable but not greater than necessary sentence.

In an August 21, 2006 memorandum to all district court judges, the Administrative Office of the U.S. Courts indicated that the Bureau of Prisons will consider the presentence investigation report, the statement of reasons and judicial placement recommendations in assigning a CARE level to an inmate. There are four levels in the BOP CARE level system, which classifies inmates according to their healthcare needs. At 62 years of age and Mrs. Marks' physical and mental

health history, we believe she is already precluded from Level 1.  Level 2 is reserved for inmates who are stable out-patients, who can handle their own daily living activities, and their need for acute medical services is less than three months in duration, occur no more than every two years, and can be resolved without hospitalization.  Level 3 is reserved for inmates who are fragile out-patients and Level 4 is for inmates with acute medical conditions.  At Mrs. Marks' current age and health, **and the sentence the government is seeking, Mrs. Marks  will eventually  find herself  at higher CARE levels in the years to come. During those years, her advancing age and increasing health conditions will certainly tax the resources and finances of the Bureau of Prisons,  place an  added risk to the inmate, and may exacerbate present conditions. Even when the sentencing guidelines were mandatory, downward departures under § 5H1.4 were permissible. Again, Mrs. Marks asks that her age and health be considered as sentencing factors under 18 USC § 3553 in fashioning** *a reasonable and not greater than necessary sentence*.

**Mrs. Marks' History of Drug and Alcohol Abuse and Compulsive Gambling:** Mrs. Marks first began experiencing depression and related emotional problems while she and family members were seeking treatment for her grandson, Frisco, shortly after he was born in 1996.  This was only three years after her father died and two years before she lost her mother to cancer.  Mrs. Marks made several trips to the emergency rooms at Holy Cross and Cleveland Clinic complaining of severe depression, insomnia and heart palpitations.   Dr. Franzone began prescribing Valium and very quickly, Mrs. Marks sought additional pills from other doctors and

even friends and family.  She was soon taking about 15 to 30 mgs of Valium daily, especially following her mother's death.

By 2005, Mrs. Marks' husband of 35 years was diagnosed with brain cancer.  By the time he died in June 2006, Mrs. Marks was consuming about 30 mgs of Valium daily.  Further, as an outlet for her severe depression, she began to spend time at the casino.  Her addictive personality quickly led her to both compulsive gambling and alcohol abuse, which began when the casino offered her free cocktails.

According to the Government, there were years in which Mrs. Marks spent 150 to 240 days at the casino.  Admittedly, those were only the days in which she used her gambling card, and the Government's numbers are under-reported. (Mrs. Marks played the slot machines, but her gambling caused her to pawn her belongings, borrow from the equity in her home, and borrow from friends and associates.)  Mrs. Marks was offered wine, beer, Bloody Marys and other vodka drinks and she would routinely consume 6 or 8 drinks during an 8 to 10 hour day at the casino.  By the time Sam Marks began to threaten her and she was forced to return to work, she had begun to also drink at home, alone, at night, and she frequently drank herself to sleep.

Dr. Michael P. Brannon  interviewed Mrs. Marks at the Federal Detention Center for the purpose of completing a Forensic Psychological Evaluation.  His report, dated January 3, 2014, reported Mrs. Marks' history of depression, as well as the abuse of alcohol, Valium, and compulsive gambling.

> "The examinee acknowledged the abuse of alcohol and Valium.
> She reported that she first used alcohol when she was 16 years of
> age and Valium when she was 40 years of age.  At the time of her

arrest she reported that she was abusing alcohol and Valium on a daily basis. She reported that she experienced several 'blackouts' due to her abuse of drugs and alcohol. She reported that most of her drug and alcohol abuse has occurred when she was alone. She identified her daughter as her primary source of emotional support. She reported that her use of drugs and alcohol resulted in numerous problems in her life. She reported that she has never received drug or alcohol rehabilitation treatment.

Mrs. Marks was arrested in the instant offense on August 16, 2011; however, she continued to abuse both alcohol and Valium. Following her remand following the jury's verdict on September 26, 2013, she spent three days in detox at the Palm Beach County Jail. Mrs. Marks has no history of past treatment for substance abuse. At sentencing, Counsel will seek this Court's recommendation that Mrs. Marks be considered a candidate for the Bureau of Prisons RDAP program, pursuant to 18 USC § 3621(e). This appears consistent with Dr. Brannon's conclusion.

"The examinee reported numerous symptoms of depression and anxiety. In addition, she reported addictions to Valium, alcohol, and gambling. Psychological testing, an interview with the examinee's daughter, and trial transcripts corroborated the examinee's self-reported symptoms. The examinee would be an appropriate candidate for duel diagnosis treatment including psychological and psychiatric interventions for her emotional

distress.  In addition, she would require participation in substance rehabilitation and gambling rehabilitation groups.  In the absence of appropriate treatment services the examinee's psychological problems and addictions are likely to worsen in the foreseeable future."

**Mrs. Marks' Family Ties and BOP Visiting Unique to her Situation:** The PSR suggests a guideline range which may be considered a Life sentence for Mrs. Marks.  However, this Court is well aware that the sentencing guidelines have been *advisory* since 2005,  and  the sentencing factors of 18 USC § 3553 must be considered in fashioning *a reasonable and not greater than necessary sentence.*  With that said, should a sentence be imposed which approaches what  the PSR suggests, Mrs. Marks will, most likely,  face BOP conditions seldom seen by  female defendants convicted of a  fraud offense in the Southern District of Florida.

Pursuant to BOP p.s. 5100.08, both the length of sentence proposed here and a finding that Mrs. Marks was an organizer/leader in this conspiracy will very well preclude her from the minimum security camp at Coleman, located just north of Orlando.  According to the BOP, low and medium security facilities for women are few, there are five and only Tallahassee is located within the BOP's Southeast Region.[13]  Outside this region are FCI Danbury, located in Southwest Connecticut, FCI Waseca, located in Southern Minnesota, FCI Tucson,[14] located in Southern Arizona, and FCI Dublin, located in Northern California.

---

[13]  FCI Tallahassee is an RDAP facility.

[14]  FCI Tucson is a women's medium security facility.

Mrs. Marks  is aware that visiting hours are generous and always encouraged by officials of the Bureau of Prisons.   "The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and develop closer relationships between the inmate and family members or others in the community (see BOP  p.s. 5267.07).   Further, according to BOP  p.s. 5267.08B, last revised on July 15, 2009, inmates at the FCI's (low and medium security) receive visits from 8 AM until 3PM, Friday through Sunday and federal holidays, they are normally entitled to up to six visitors at a time, and inmates normally receive 35 visit points a month.  (One visit point equals a visit of an hour or fraction thereof.)  With that said, many of Mrs. Marks' family members are co-defendants in this case and now convicted felons. It will be difficult for them to visit her, no matter where she is designated, especially while they remain under supervised release.  Most likely, Mrs. Marks will receive few visits and this will, undoubtedly, contribute to her history of severe depression.   Mrs. Marks asks this Court to consider these factors when fashioning *a reasonable but not greater than necessary sentence.*

**Latest Sentencing Statistics:** The United States Sentencing Commission's "Sourcebook," of the 2,122  cases sentenced in the Southern District of Florida last year, 38.4 %, up from 35.7 %, received sentences below the *advisory* guideline range, 10.2 % because of substantial assistance motions, and 20 %, almost twice the number of  government sponsored motions, because of the sentencing factors of 18 USC § 3553.  Nationally, the nature and circumstances of the offense and/or history and characteristics of the defendant were cited as reasons for a downward variance in 9,719 cases.  Indeed, district courts continue to exercise discretion, even specifically citing a defendant's age, health, family ties and responsibilities,  post-*Booker*, and impose sentences below the *advisory* guideline range.

**Conclusion:**   Rose Marks  is well aware that in fashioning a "reasonable" but not greater than necessary sentence in her case, this Court must consider the nature and circumstances of the offense, 18 USC § 3553(a)(1).  To that end, Mrs. Marks  respects the findings of the jury in her case, but she maintains her innocence. **With that said, we believe the guideline applications suggested in the PSR are wrong, excessive, and have the result of producing both a "draconian" and "unreasonable" sentence in this case.   Mrs.  Marks  has also asked this Court to consider all of her arguments and the sentencing factors  of 18 USC § 3553 in fashioning a reasonable but greater than necessary sentence.**

Subsequent to *Booker,* this Court must also consider the history and characteristics of the defendant, 18 USC § 3553(a)(1).  To that end, Mrs. Marks  asks this Court to consider she is now 62 years old and has both physical and mental/emotional health problems.  She has never been arrested  before, she has never been incarcerated before, and she has never been separated from her family before.  Mrs. Marks has provided extensive information to be considered under 18 USC § 3553 in fashioning *a reasonable but not greater than necessary sentence in her case.*  She also  asks that this Court recommend to the Bureau of Prisons that she be designated to a facility as close to her family as possible and that she be considered a candidate for its Residential Anti-Drug Abuse Program under 18 USC § 3621(e)

Mrs. Marks   and Counsel thank this Court for considering our Objections to the Presentence Investigation Report and Request for Alternative Sentence, and the many letters written to this Court on behalf of Mrs. Marks.  Counsel will have further remarks at the time of sentencing.

Dated: January 23, 2014.

Respectfully submitted,

By:    /s/ Fred A. Schwartz
           Fred A. Schwartz, Esq.
           Fla. Bar No. 360538
           *Attorney for Defendant ROSE MARKS*
           Kopelowitz Ostrow, et al.
           700 South Federal Highway, Suite 200
           Boca Raton, Florida  33432
           schwartz@kolawyers.com
           Telephone:  (561) 910-3070
           Facsimile:  (561) 910-3080

           ALVIN E. ENTIN
           Florida Bar No. 127027
           ENTIN & DELLA FERA, P.A.
           110 SE 6TH Street, Suite 1970
           Fort Lauderdale, FL 33301
           Telephone: (954) 761-7201
           Facsimile:  (954) 764-2443

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 23, 2014, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

           /s/ Fred A. Schwartz
           Fred A. Schwartz, Esq.