```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     CASE NO. 11-80072-CR-MARRA
3
     UNITED STATES OF AMERICA,
4                                    West Palm Beach, Florida
                    Plaintiff(s),
5                                    March 3, 2014
               vs.
6
     ROSE MARKS,
7
                    Defendant(s).
8    ------------------------------------------------------------

9                         SENTENCING HEARING
                  BEFORE THE HONORABLE KENNETH A. MARRA
10                    UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF(S):   Roger Stefin, Esquire
                             Laurence M. Bardfeld, Esquire
13                           United States Attorney's Office
                             500 East Broward Boulevard
14                           Seventh Floor
                             Fort Lauderdale, Florida 33301
15

16
     FOR THE DEFENDANT(S):   Paul Schwartz, Esquire
17                           Kopelowitz Ostrow
                             700 South Federal Highway
18                           Suite 200
                             Boca Raton, Florida 33432
19

20                           Alvin Entin, Esquire
                             Entin & Della Fera, PA
21                           110 Southeast Sixth Street
                             Suite 1970
22                           Fort Lauderdale, Florida 33301

23
     REPORTED BY:            Tammy Nestor, RPR
24                           Nestor Court Reporting, Inc.
                             tammynestor@yahoo.com
25
```

```
 1                        I-N-D-E-X

 2
     WITNESS                   DIRECT   CROSS   REDIRECT   RECROSS
 3
 4   MICHAEL WOLF

 5      BY MR. ENTIN            54

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings began at 3:01 p.m.:

3              THE COURT:  Good afternoon.  Please be seated.  We are

4    here in the case of United States of America versus Rose Marks,

5    case No. 11-80072-CR-Marra.  May I have counsel state their

6    appearances, please.

7              MR. STEFIN:  Good afternoon, Your Honor.  Roger Stefin

8    and Larry Bardfeld on behalf of the United States.

9              THE COURT:  Good afternoon.

10             MR. SCHWARTZ:  Good afternoon, Your Honor.  Fred

11   Schwartz and Alvin Entin on behalf of Rose Marks.

12             THE COURT:  Good afternoon.

13             All right.  We are here for sentencing.  Have both

14   sides reviewed the presentence investigation report?

15             MR. STEFIN:  Yes, Your Honor.

16             MR. SCHWARTZ:  Yes, Your Honor.

17             THE COURT:  Has the defendant reviewed it with

18   counsel?

19             MR. SCHWARTZ:  Yes, Your Honor.

20             THE COURT:  We have a number of objections to discuss.

21   Are we ready to proceed on those?

22             MR. SCHWARTZ:  I am, Your Honor.

23             THE COURT:  Okay.

24             MR. STEFIN:  Judge, are we going to do this one at a

25   time, one objection at a time, or all the objections and then

```
 1    all the responses?

 2              THE COURT:  We will do them one at a time.

 3              MR. SCHWARTZ:  Your Honor, the government has asked

 4    for a number of enhancements over and above the base offense

 5    level.  One enhancement is an enhancement predicated upon the

 6    amount of money.

 7              THE COURT:  Let's do that one last.

 8              MR. SCHWARTZ:  Okay.  They have asked for an

 9    enhancement on vulnerable victims.  First I would like to point

10    out, and I will be doing this for many of the enhancements that

11    the government requests, that of the victims that they are

12    asking for enhancements on, many of them, or a number them are

13    victims of either Cynthia Millers or Nancy Marks and not Rose

14    Marks.  In addition, one of them Rose shared with Nancy.

15              But if you look at Nancy Marks's presentence

16    investigative report which Your Honor has reviewed since you

17    have sentenced her, for the same victims, for the same conduct

18    or even more serious conduct with Andrea Walker because Andrea

19    Walker's husband was dying when she was a client of Nancy's and

20    had already died when she was Rose's victim -- Rose's client,

21    there is no enhancement for vulnerable victims.

22              And 3553(a)(6), I believe, talks about disparity of

23    codefendants in similar situations.  I don't quite understand

24    why there should be a disparity between Andrea Walker for one

25    when Rose gets vulnerable victims for her and Nancy doesn't.  I
```

```
1    think we need to -- that Rose should be treated in the same

2    manner.  And it's not like we have different probation offices

3    writing different reports.  The same probation officer wrote

4    the same report.

5           THE COURT:  Let me hear from the government because I

6    tend to agree with you.

7           MR. SCHWARTZ:  Then I will shut up, Judge.

8           MR. STEFIN:  Your Honor, I don't think it's fair to

9    compare apples to oranges when certain defendants plead guilty

10   and the government enters into a bargain with them.  Part of

11   that bargain is not to make arguments that it might otherwise

12   have made and would have made if the case had gone to trial.

13   That's one of the benefits the defendants that pled guilty

14   received.

15          THE COURT:  Probation always ignores the plea

16   agreements plea agreements and makes their own recommendation

17   on enhancements.

18          MR. STEFIN:  I'm sorry, say that again.

19          THE COURT:  Probation never follows the plea

20   agreements.  They make their own independent recommendations on

21   enhancements and reductions from the guidelines.  How often do

22   we have cases where there is an agreement not to seek a

23   leadership role and probation recommends a leadership role or

24   there's a recommendation to have a sophisticated means and

25   probation will recommend sophisticated means.  They do their
```

```
 1   own independent evaluation all the time and ignore the plea

 2   agreements all the time.

 3            MR. STEFIN:  We are going with the probation officer's

 4   recommendations, I will sit down because I think they are

 5   recommending in this instance the vulnerable victim

 6   enhancement.

 7            THE COURT:  I understand, but he's saying in Nancy

 8   Marks's case they didn't make that recommendation.  Why didn't

 9   they make it in Nancy's case and they made it here.  They

10   didn't look at the plea agreement and say the plea agreement

11   doesn't have it, so therefore, we are not going to consider it.

12   They never look at the plea agreement and decide whether they

13   are going to accept the plea agreement.  They always point out

14   that the Court's not bound by the plea agreement.  So we are

15   going to tell you what we really think.

16            MR. STEFIN:  Judge, I think prior to this case going

17   to trial, there were a lot of facts that the probation office

18   wasn't privy to that changed things considerably.

19            THE COURT:  That may be a good reason.

20            MR. STEFIN:  You know, then again, we didn't ask for

21   more than ten victims with respect to one, but there were

22   clearly more than ten victims.

23            THE COURT:  Why are these people vulnerable other than

24   they had sad personal lives?

25            MR. STEFIN:  Well, sad personal lives, I think these
```

1    people in several instances that I can cite, people were either

2    emotionally distraught, extremely emotionally distraught,

3    Ms. Walker being a perfect example, and being a victim of this

4    defendant.  I think she's a classic example of a vulnerable

5    victim.  She finds out her husband has pancreatic cancer.

6    She's beside herself with grief.  According to the testimony,

7    she's up all night crying, wanders into the shop, and has made

8    basically these representations that through these defendants'

9    works, and they work with the angels, the archangels and so

10   forth.  They can help preserve her husband's life for a few

11   years, and it goes on and on and on.  This woman is a classic

12   vulnerable victim.

13           We have two victims who testified about being suicidal

14   at the time they went in to see defendants or codefendants of

15   this defendant.  Jennifer Hill said she was at a very low point

16   in her life and she was suicidal.  And Mr. Montassir testified

17   to that as well.

18           There was a woman, not this defendant, but one of the

19   coconspirators that women Etsuko Argueta who maybe initially

20   going through life's traumas and turmoils and believed in

21   Cynthia Miller, by then she's being treated for brain cancers,

22   is being told, you know, as part of the money she has to give

23   is to help restore her to health, to preserve her health.  That

24   lady is clearly a vulnerable victim just for her medical

25   reasons alone.

1          Then there was another victim we didn't present at

2     trial because it didn't directly pertain to this defendant.

3     That was Shahan Karadayi, S-H-A-H-A-N K-A-R-A-D-A-Y-I.  And

4     with defendant's counsel permission, I want to proffer a couple

5     things about him.  This is a man from Turkey who was visiting,

6     actually studying in the United States.  He was suffering from

7     mental illness.  He was hearing voices in his head.

8          And he happened to go into the psychic shop and became

9     a victim of Cynthia Miller.  She did a reading and told him

10    that, you know, the angels were communicating with him and they

11    needed for him to produce gold coins which could be buried and

12    then prayed on.  And they told him that this was necessary

13    because, again, these were the voices of the archangels or the

14    angels.

15         THE COURT:  Did they know that he had some mental

16    illness?

17         MR. STEFIN:  When he went in there and had his

18    reading, he told them -- he told her about the voices, yes, he

19    had voices in his head that were talking to him.  This is a man

20    who was clearly mentally ill, Your Honor.  And after he

21    gathered together -- he came from a wealthy family in Turkey

22    and he purchased gold coins on several occasions totaling up to

23    $400,000 in gold coins.  He turned them over to Cynthia Miller.

24    In fact, about a hundred thousand dollars worth of those coins

25    was ultimately recovered in a safety deposit box that belonged

1  to her husband Michael Marks.

2          But at any rate, this man was clearly mentally ill.

3  After losing the money, he went into a mental health facility

4  and was treated for mental illness and was put on medications.

5          Judge, just to say these people were at low points in

6  their life and that's not vulnerable, I strongly disagree with

7  that assessment.

8          I think the whole nature of this crime is people were

9  vulnerable.  There are some people more vulnerable than others

10 and these are the examples I would give to you to support a

11 vulnerable victim enhancement.

12         THE COURT:  Wasn't it that it just turned out that

13 some of these people were more vulnerable than others?  They

14 didn't go out go out looking for vulnerable people.  Vulnerable

15 people just happened to pass through.  And the ones that were

16 more susceptible to being deceived, they are the ones who got

17 hooked.  The other less vulnerable are the ones who kept going

18 on about their business and moved on.

19         MR. STEFIN:  Judge, they don't have to go out looking

20 for victims.  They have their office set up, and people who are

21 vulnerable come to them.

22         THE COURT:  You are saying that are everybody who

23 looks for psychic whatever guidance is vulnerable?

24         MR. STEFIN:  No, Judge, but I think as part of this

25 scam, and this is not just isolated to this defendant or the

```
 1    codefendants in this case, but this is a well-known scam that

 2    takes place throughout the United States by groups of people

 3    that have both Romany background, but also non-Romanies as

 4    well.

 5          The fortunetelling scam basically, yes, people can go

 6    in and get a reading or pay for a horoscope or whatever else

 7    that is, and there's no argument that these people are

 8    vulnerable.  They are paying their money for a particular

 9    service.

10          But where the defendants profit greatly is when they

11    find a vulnerable victim that, for lack of a better word, falls

12    in the trap where the person is suffering from an extreme

13    emotional situation and is made to believe that based on

14    spiritual and religious reasons, it's important for them to go

15    along with this plan, to have money to pray upon and pray on

16    and so forth.  Yes, they do find.  And they make their money

17    off the vulnerable victims.  Obviously --

18          THE COURT:  Was the woman who graduated from the naval

19    academy, got an MBA from Columbia, was she vulnerable?

20          MR. STEFIN:  From an emotional standpoint, she was.

21    But there is no indication --

22          THE COURT:  Only the people who fall for it are

23    vulnerable; all the other people are not vulnerable?

24          MR. STEFIN:  I'm not going to make that argument and

25    I'm not making that argument here.
```

1              THE COURT:  It just so happened a couple of the people

2    might have fallen into the category of vulnerable, so

3    therefore, she gets enhanced because a couple of the victims

4    turned out to be vulnerable people, emotionally vulnerable?

5              MR. STEFIN:  Judge, I disagree with they turned out to

6    be that.  These people were drawn in because they were that and

7    the defendants knew that at the time.

8              You know, 1B1.3 talks about --

9              THE COURT:  The gentleman from I forget where, the

10   engineer from in Europe somewhere, what was his name?

11             MR. STEFIN:  Sondergaard?

12             THE COURT:  Was he vulnerable?

13             MR. STEFIN:  Judge, how many vulnerable victims do we

14   want to demonstrate?

15             THE COURT:  I'm just trying to -- I'm just trying to

16   understand.  If a victim of a fraud turns out to be a

17   vulnerable person, then the enhancement applies as opposed to

18   directing the scam towards vulnerable people generally?

19             MR. STEFIN:  If they take advantage of somebody.

20             THE COURT:  Which is it?  How does it work?

21             MR. STEFIN:  It depends on the circumstances of each

22   individual person.  If the person is -- at the time they walk

23   in, if they are under extreme emotional distress or suffering

24   from a mental or emotional disorder at the time they come in,

25   then they are a vulnerable victim if they take advantage of

1    that.  That's what they did in the instances I have set forth.

2         THE COURT:  They would have taken advantage of anyone

3    that would have given them the money.  Were they just, you

4    know, again, seeking out -- let's look for vulnerable people we

5    can take advantage of?  They were going to take advantage of

6    anybody that walked in the door if they could.

7         MR. STEFIN:  That's true.  And to the extent that they

8    succeed with vulnerable people, this enhancement should apply.

9    Just because there are times that one could argue that, for

10   example, the engineer was not under extreme emotional distress

11   like Ms. Walker was or Ms. Hill was or Ms. Argueta who had

12   brain tumors or Mr. Karadayi who was suffering from a mental

13   illness which was known to the defendant at the time he walked

14   in.

15        THE COURT:  It wasn't known to this defendant.

16        MR. STEFIN:  No, no, I've said that.  The offense only

17   succeeds -- and I'm not saying that there aren't people -- you

18   know, people who willingly pay their money for a product and

19   later turn out to have some kind of mental or emotional problem

20   unknown to the defendants, that's not the case here, that's not

21   the situation here.

22        When Ms. Walker found out after her husband died, you

23   know, this whole strange story about how she learned that her

24   husband now had entered into some agreement with another women

25   to donate sperm and she might become pregnant with her

```
 1    husband's child, she was under extreme emotional distress and
 2    disorder.
 3              And it doesn't say according to the vulnerable victim
 4    guideline that somebody has to have a mental illness.  It says
 5    someone who is unusually vulnerable due to age, physical or
 6    mental condition, or who is otherwise particularly susceptible
 7    to the criminal conduct.
 8              And again, given the examples that I gave, these
 9    people that I have described were under a mental condition that
10    made them particularly susceptible to the criminal conduct.
11    And this enhancement really should apply.
12              THE COURT:  All right.  Thank you.
13              Do you want to respond, Mr. Schwartz?
14              MR. SCHWARTZ:  If it's not necessary to, I won't.
15              MR. STEFIN:  Judge, can I make one last comment
16    before --
17              THE COURT:  Yes.
18              MR. STEFIN:  When Ms. Montassir first started with the
19    defendant, we would argue that she was vulnerable then.  But
20    even if the Court was not persuaded that her life situation was
21    so extreme that made her vulnerable, if the Court recalls --
22              THE COURT:  She was in a bad marriage.
23              MR. STEFIN:  Right, but --
24              THE COURT:  Everybody who walks in the door is
25    vulnerable according to you because they've got some issue that
```

```
 1    they are dealing with.  Who doesn't have some emotional issue

 2    that you could say they took advantage of other than I guess

 3    the two that you kind of concede they weren't vulnerable, the

 4    engineer and the MBA from Columbia?

 5              MR. STEFIN:  Well, I can't describe their -- none of

 6    these people were psychiatrically examined, so I can't tell you

 7    what their mental condition was.  I can tell you, Judge, and

 8    based on the testimony, regardless how you feel Ms. Montassir

 9    was -- and it doesn't have to do with the fact that everybody

10    is under some type of stress or everybody has problems in their

11    lives.  It all has to do with how people are able to handle

12    that stress or the problems in their lives.

13              Some people have tragedies throughout their lives and

14    are able to withstand them.  And other people have what we

15    consider to be a minor tragedy or minor issue and they

16    completely fall apart.

17              I want to remind the Court that this fraud which went

18    on for 20 years against Ms. Montassir, in the midst of it,

19    within, I think, five years before it came to an end, her son

20    was tragically killed.  The one person who was most important

21    to her in her entire life, and this is from the testimony of

22    the case, she completely fell apart.  She basically gave up on

23    life.  She just fell into the direction of the defendant.  The

24    defendant basically took over.

25              THE COURT:  Wasn't she already under her control
```

```
 1    before the child died --

 2              MR. STEFIN:  But I'm saying --

 3              THE COURT:  -- according to the evidence?

 4              MR. STEFIN:  Even if the Court wants to say that's not

 5    true, although I don't know why the Court would say that, after

 6    her son died, she had an emotional condition that made her

 7    completely, totally vulnerable.  At that point she went along

 8    with a plan to change her will.  I mean, that whole story we

 9    will probably get into with one of the other enhancements.  She

10    just was waiting to die and to be with her son.  And that by

11    itself distinguishes this defendant from codefendants.  You

12    know, nobody gave that type of testimony besides her.

13              So I very strongly -- you know, as far as all the

14    enhancements that we are talking about, at the very least, I

15    think this is the strongest one.

16              THE COURT:  All right.  Thank you.

17              MR. SCHWARTZ:  Judge Spellman once told me, if you

18    think you won, sit down and be quiet.  I don't always follow

19    what he said.  Let me just add two quick things.

20              One, Mr. Stefin said none of these defendants had

21    psychiatric examinations.  After her son died, none of these --

22    victims rather.  After her son died in a divorce proceeding,

23    and we heard testimony about it, I believe, during trial,

24    Ms. Montassir had a psychiatric examination and was given a

25    clean bill of health.  And Andrea Walker didn't come to Rose
```

```
 1    until after her husband had passed away.  But just noting those
 2    two points, I'm going to be quiet on the issue of vulnerable
 3    victims.
 4            May I go to the next one, Judge?
 5            THE COURT:  Yes.
 6            MR. SCHWARTZ:  More than minimal planning or what we
 7    call sophisticated scheme.  The government --
 8            THE COURT:  Let me hear from the government.
 9            MR. SCHWARTZ:  I'm sorry, you want to hear from
10    Mr. Stefin?
11            THE COURT:  Let me hear from Mr. Stefin.
12            MR. STEFIN:  Judge, for this enhancement to apply,
13    it's not necessary that every aspect of the crime be
14    sophisticated.
15            THE COURT:  What aspect of lying to people is
16    sophisticated?
17            MR. STEFIN:  The lying part is not very sophisticated.
18            THE COURT:  All right.  So --
19            MR. STEFIN:  But the money side of this, which is part
20    of the fraud, some cases have recognized that the money -- the
21    flow of the money, in consideration of that, is part and parcel
22    of the crime.
23            THE COURT:  You mean the fact that they spent it?
24            MR. STEFIN:  The method and manner in which they
25    obtained the money, in which they obtained other valuables from
```

```
 1   victims, the fact --
 2          THE COURT:  Convincing somebody to go and get $135,000
 3   of gold coins and bring it to me and they spent it or used it,
 4   that's sophisticated?  Because they go tell someone to go to
 5   Neiman Marcus and get me a gift card for whatever at Neiman
 6   Marcus and bring it to me, that's sophisticated and they used
 7   the gift cards, that's sophisticated?
 8          MR. STEFIN:  They are using multiple layers of
 9   individual -- for example -- well, there is a level of
10   sophistication to that.  The defendant is able to conceal money
11   that's coming in by directing a person to send them checks and
12   then they fill out the checks to pay for the cars and pay for
13   their mortgage.  They direct moneys to go to third party family
14   member.
15          I do believe that the fact that they have victims send
16   them gold or jewelry or other valuables including gift cards to
17   conceal their use of these proceeds, the fact that they
18   instruct, and this defendant in particular instructed
19   Ms. Montassir to send money to the third party that she claimed
20   was helping her, I believe, in the work, and I might be
21   misquoting the evidence on that, but this was to Victoria Ely,
22   who is her sister, also using the name Victoria Somers,
23   hundreds of thousands of dollars, money which disappears and is
24   not accounted for, the fact that the defendant has multiple
25   bank accounts, the fact that she's using this false name for
```

```
 1    many, many years which basically I believe the bases of that
 2    was the way it was demonstrated with one of the testifying
 3    witnesses who never even knew who she was dealing with and when
 4    she filed a lawsuit against Joyce Michaels and got a judgment,
 5    there was nobody to collect that money from.
 6           And I think that is part of the level of sophisticated
 7    means that could be supported.  The defendant signing documents
 8    such as a promissory note under a false name, never telling the
 9    victim Ms. Walker that her true name was Rose Marks and not
10    Joyce Michael.
11           And how did that end up?  You know, when Ms. Walker
12    inquired with a lawyer whether she could sue to get her money
13    back, she was told by the lawyer that they couldn't find any
14    property in the name of Joyce Michael, that the house that she
15    thought belonged to the defendant was in the name of some lady
16    named Rose Marks.  I think all of these things demonstrate
17    sophisticated means and would support that enhancement.
18           Again, individually any of these things individually,
19    you know, the Court may not think it's very sophisticated for
20    the defendant to have her housekeeper go to the bank, that the
21    defendant would write checks to the housekeeper for cash and
22    have the housekeeper go to the bank and withdraw hundreds of
23    thousands of dollars from the bank in cash, but that certainly
24    concealed the ultimate destination of this money which was
25    utilized by this defendant.
```

1          I think it's sophisticated the fact that she utilized

2    investigators, at least one or more, to attempt to locate

3    Ms. Montassir, if the Court recalls that.  Utilizing

4    Ms. Von Bulen, the Court recalls, perpetuate this hoax on

5    Ms. Montassir, make her believe that she was communicating with

6    famous clients of the defendant.  And this went on, I believe,

7    for several years, this letter writing relationship that

8    Ms. Montassir believed she had with Mr. Powell and then later

9    email correspondence with Mr. Pitt.

10         I believe all that indicates a level of

11   sophistication.  And then again, repeating what I said earlier

12   about this bizarre soul transferring story that she had the

13   victim -- and this is not the only victim, Ms. Montassir, who

14   was told this story about being able to transfer your soul to

15   the body of another.  But the victim was made to believe that

16   when she died or her soul would go into the body of this woman

17   that the defendant had chosen --

18         THE COURT:  That's sophisticated?

19         MR. STEFIN:  Well, I think it's part of an

20   elaborate -- it's not just a simple --

21         THE COURT:  It's ridiculous.  It's absurd.  How is it

22   sophisticated?  It's a completely ridiculous story that some

23   people actually believed or were convinced to believe was

24   possible or true.  But I mean the bigger the lie and the more

25   ridiculous the lie, that makes it sophisticated?  I mean,

```
1    because it's so outlandish, it's sophisticated?  That no one in

2    their right mind would believe it, so it makes it

3    sophisticated?  I don't see that having anything to do with

4    sophistication.  I believed your argument about the money and

5    the bank accounts might show some sophistication, but the fact

6    that they can come up with the most ridiculous lie that anyone

7    can conceive of, that makes it a sophisticated offense?

8         MR. STEFIN:  It makes it a more elaborate offense than

9    someone telling you need to give me money, we will pray upon

10   it, and we will give the money back.  This was something that

11   went on for 20-some odd years with one victim and then I think

12   it was 30 years with another victim.

13        The elaborate nature of this scheme, I don't think

14   this falls in the category of being another run-of-the-mill

15   fraud case.  I think there were so many aspects of this -- and

16   again, the money transfers and the money tracing, the ability

17   of the defendant to basically by having money go directly to

18   third parties for payment of her personal expenses and then

19   when she's questioned about -- when she -- and then the

20   defendant has the wherewithal to go to a tax accountant and

21   file tax returns in which she furnishes information about some

22   of her bank accounts but not others of her bank accounts, I

23   mean, again, I think this supports a sophisticated means

24   enhancement, Judge.

25        THE COURT:  Thank you.
```

```
 1        MR. SCHWARTZ:  The next issue I would raise, Judge, is

 2   the issue of the four-point enhancement for role.  The

 3   government says that --

 4        THE COURT:  Are you saying she shouldn't have any

 5   enhancement at all or just saying it shouldn't be four levels?

 6        MR. SCHWARTZ:  Well, I would say she shouldn't have

 7   any enhancement at all and I'll tell the Court why.  You know,

 8   if the Court decides to enhance less than four, I would

 9   certainly be less happy than if the Court didn't enhance at

10   all, but it will be better than four points.

11        The reason I don't think she should have an

12   enhancement, and I have resisted my urge to talk about the

13   Romany culture generally to try to explain what Rose did and

14   why she did it.  I'm not going to do that.  But I don't think

15   there's any question from the books we have read, the

16   information on the Romany culture, that it's a patriarchal

17   culture, without insulting some of the Romany gentlemen in the

18   courtroom, the women work, the men play golf.

19        I wish the Jewish culture was like that, but it's not.

20   At the end of the day, the men are the ones who make the

21   decisions, who control where shops are set up, how shops are

22   set up, which members of the family work in a particular shop,

23   and things of that sort.

24        And that was the case with Rose and her husband

25   Nicholas until Nicholas died in 2006.  After that, the oldest
```

1  son of the family should have, if anybody was in control,

2  should have become the person in control.  For a number of

3  reasons, that didn't happen here.  Ricky Marks, his wife Nancy

4  Marks, and their daughter Vivian Marks had their own business

5  that they ran on their own.  The connection was they used the

6  location that Rose owned and paid her for it.  That doesn't

7  make her a leader.  And they sent her one client when Nancy

8  stopped or the client stopped being happy with Nancy.

9          Cynthia Miller and Rose's son Michael had their own

10  shop, their location, in Fort Lauderdale.  At one point

11  Cynthia, I guess because Rose had no money and was broke and

12  was losing all her money, sent Gary Cheta to Rose.  I think

13  Gary is here with us today.

14          And Rose didn't tell or couldn't tell Cynthia or Nancy

15  what to do or how to run their clients.  Vivian worked with

16  Nancy.  If anybody was a leader, perhaps to the extent Ricky

17  was a leader of that family.

18          But, you know, the fact that the government labeled

19  her the matriarch, the fact that she was the oldest person in

20  this conspiracy, the fact that she had credit because she had a

21  house that had equity and no one else had credit doesn't make

22  her a leader as defined by the guidelines.

23          And I'm not going to reiterate everything I said in my

24  objections as to what the guidelines say is a leader and how to

25  determine that someone is a leader, but one telling thing that

```
 1    I didn't say in my objections, Mr. Stack, who is a very good
 2    detective, had a number of informants close to Rose's family.
 3    He had an informant who was her brother-in-law Sam.  He had
 4    another informant who hasn't been identified -- I won't
 5    identify her on the record -- who also assisted him.  He had
 6    hundreds and hundreds of hours of conversations with these
 7    informants that he recorded.  And part of what the paralegals
 8    that the Court was nice enough to allow us to use did was
 9    listen to those conversations to see if there was anything
10    exculpatory on them and also to report back what it was that
11    they heard in these conversations.
12            And I'm sure Mr. Stack or the government listened to
13    these conversations.  At no point have we been given or pointed
14    out to or did we find any conversation that said Rose was the
15    leader of this group.  They talked about Ricky and what Ricky
16    did.  They talked about Michael and some of the things he did.
17    They talked a little bit about Rose, and I hope she will
18    forgive me when I say this, but the main comment I remember
19    that they said about Rose and her sister Victoria was they were
20    so fat because they don't get out on the street and hustle
21    clients.
22            No one said that Rose was in charge or Rose was the
23    leader of this group; otherwise, we would have seen that in
24    this proceeding on the question of leadership role from the
25    government who has all those hours of tapes.
```

1          In addition, the government, I guess, should have been

2     aware since Sammy was a government informant and since they

3     analyzed all of Rose's finances, that Rose, after her husband

4     died, was virtually in retirement.  She had to stop working.

5     She didn't go to New York.  She didn't really work down here in

6     Fort Lauderdale.  Her father-in-law, Nicholas Marks's father,

7     and her brother-in-law Sammy and another brother-in-law came to

8     her and said, you have to go back to work, you have to make

9     money.

10         And she gave hundreds of thousands, Rose estimates

11    over a million, but at least hundreds of thousands of dollars

12    in cash to Sammy Marks and to her father-in-law.

13         I can't prove the cash because it was cash, but I can

14    prove that she was required to give her 1977 white Rolls-Royce

15    to her father-in-law.  And the government knew that too and

16    knew it at the time that he had possession of that car even

17    though it was still in her name titled to her because they went

18    out on the day they arrested her here and seized that car in

19    Los Angeles, California.  So they knew she was required to give

20    that to her father-in-law.

21         All these things corroborate the fact that in this

22    patriarchal society, Rose was not a leader, was not a manager.

23    She certainly didn't organize or design this scheme.  This is

24    something that has been handed down in her culture for a

25    millennium or thereabouts with various variances as times

1    change.

2          So she didn't organize or set up the fraudulent

3    scheme.  She participated in it, certainly.  She didn't control

4    any of the people.  The one person that the government points

5    to as a person who was criminally liable which is required

6    under the statute -- under the guidelines, that Rose controlled

7    was Deborah Von Bulen.

8          You saw Ms. Von~Bulen here in court.  You heard her

9    testimony in court.  And I provided you in my objections

10   excerpts of that testimony where Ms. Von~Bulen said that she

11   believed that she was helping Ms. Deveraux or Ms. Montassir

12   with story ideas when she was corresponding either on behalf of

13   Brad Pitt allegedly or Colin Powell allegedly and she didn't

14   think that anything criminal was happening, which makes sense

15   since she was also a client of Rose's.  And if she thought Rose

16   was doing something criminal, she would have stopped being a

17   client.

18         But she was doing these things as a secretary.  Rose,

19   as I think Your Honor is aware by now, has trouble reading.

20   She can read a bit.  She can't read cursive at all.  And she

21   has trouble writing an articulate sentence.  Her spelling is

22   all wrong.  Her grammar is all wrong.  Her only education was

23   three weeks or two weeks in the third grade, not kindergarten,

24   first, or second, and nothing after third grade.  So she

25   couldn't put these letters into proper English.  At least that

 1   would sound reasonable to Ms. Deveraux.  She asked her friend

 2   and client Ms. Von~Bulen to do it and she did at one point.

 3   She said, I can't find Jude, would you help me find her.  And

 4   Ms. Von~Bulen did.  Neither of those based on the only evidence

 5   we have regarding Ms. Von Bulen's state of mind which is her

 6   testimony establish that Ms. Von Bulen was a criminally liable

 7   person.

 8           So for the purpose of managerial role, she wouldn't

 9   qualify as someone Rose managed.  For those reasons, Judge, I

10   suggest that there's no evidence here that Rose was a manager.

11           Just to point out some of the things the government

12   says, they say she managed the criminal enterprise because she

13   was the one who could get credit for the cars.  You heard from

14   Mr. Gordon, I believe it was, who testified that she got credit

15   for the cars because he had her house -- his boss had her house

16   on a mortgage.  There was a lot of equity in the house.  And

17   they knew if the car disappeared, they could go against Rose's

18   home.  So she was basically a third party guarantor for her

19   son's daughter-in-laws or daughter and granddaughter.

20           That doesn't make her a manager of a criminal scheme.

21   That makes her what my father would say is a fool for

22   guaranteeing someone else's loan.

23           I suggest to the Court, and maybe I'm missing

24   something Your Honor wants to ask me about, but there is no

25   evidence that she was a manager.  She was a participant in a

```
 1    scheme.  She had one really good client for her who made her a

 2    lot of money over a 17-year period, but she wasn't a manager.

 3              THE COURT:  Didn't she direct people to make payments

 4    to varies accounts?

 5              MR. SCHWARTZ:  She told clients to make payments to

 6    her sister's account on one occasion.  She told clients to make

 7    payments to her either as Joyce Michael or in her name Rose

 8    Marks.

 9              THE COURT:  Didn't she tell coconspirators to tell the

10    clients where to send the money?

11              MR. SCHWARTZ:  I saw no evidence of that during trial,

12    Judge.  If you did, then I may have missed it.  But there's no

13    evidence of her telling Cynthia or Nancy how to deal with their

14    clients.

15              THE COURT:  Weren't some of the clients of the

16    coconspirators having the money made payable to Rose?

17              MR. SCHWARTZ:  Absolutely.  And the reason for that,

18    Judge, is not because Rose said, tell Sally Smith to make the

19    check out to me.  It was because Ricky Marks, and he's here and

20    again I'm insulting him, but Ricky Marks isn't very good at

21    making payments for things.  And Ricky would not make payments

22    for one of his Ferraris or two of his Ferraris or his Mercedes

23    or something like that and Rose would have to make those

24    payments.  And Rose would call her son or daughter-in-law and

25    say, you owe me $70,000 on the Ferrari.  Nancy would then
```

 1   either pay her directly and money would go into her account

 2   from Nancy or Nancy would tell one of her clients to pay her

 3   the money, make the check out to a wire transfer to Rose Marks.

 4        But I know of no evidence in the case where Rose is

 5   recorded or there's any testimony from Nancy or Cynthia or

 6   Vivian or any of them that Rose told me to tell Sally Smith to

 7   wire transfer the money to Rose.

 8        THE COURT:  But there's no evidence that the reason

 9   the money was paid to Rose is because Ricky didn't pay his car

10   bill either.

11        MR. SCHWARTZ:  There isn't.  There isn't.  But that

12   factually -- we know that factually from the testimony of

13   Gordon that many times Ricky wouldn't pay and we would get the

14   money from Rose.  And we know that Rose, from the evidence in

15   the trial, that Rose was paying the rent in New York because

16   the lease was in her name and she was paying the utilities and

17   paying the maid up there.  And we know money came to her.

18        So in the absence of any proof either way, I don't

19   think we can make the assumption that Rose as the leader of the

20   conspiracy was directing the money come directly to her from a

21   particular client.

22        I do think that she probably, knowing how she

23   sometimes yells at me, yelled at her children, you owe me

24   money, get me the money, but that had nothing to do with

25   directing the criminal scheme.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. SCHWARTZ:  Thank you, Your Honor.

 3              THE COURT:  Mr. Stefin.

 4              MR. STEFIN:  Judge, I think the evidence that was

 5    actually presented at trial indicated something slightly

 6    different.  This was a family business, that the business was

 7    headed by this defendant with respect to the family members

 8    that were part of this conspiracy.  The office space which was

 9    used for many, many years in New York was leased by this

10    defendant under her fictitious name.  She's the one who paid

11    the rent for many, many years, and the other defendants,

12    codefendants, were utilizing that space on a number of

13    occasions as testified to by a number of victims.

14              Codefendants, as the Court has already noticed and

15    noted, codefendants would instruct victims on numerous

16    occasions to make payments either to Rose Marks or in some

17    instances to a fictitious name Vivian White or other names,

18    money of which ended up in the bank accounts, one or more bank

19    accounts of this defendant.

20              Family member, the codefendants in this case, there

21    was testimony on a number of occasions that victims testified

22    that the psychic, the codefendant of this defendant, would

23    identify the defendant Joyce Michael in most instances as a

24    more senior high-level psychic who would step in on the

25    difficult cases.
```

 1              In particular, the testimony of Etsuko Argueta, the

 2     lady from Japan, she testified that Cynthia Miller told her,

 3     because she was instructed to make payments to Rose Marks, she

 4     asked who Rose Marks was, and Codefendant Miller told her that

 5     Rose Marks was her mother.  Not true.  It's her mother-in-law,

 6     she said, but that Rose Marks helps with the work because she

 7     handles -- helps out in the difficult cases and she needed help

 8     because this project was too much for her to handle by herself.

 9              Victim by the name of Gary Cheta testified.  Again,

10     this case was first handled by Cynthia Miller, but then he was

11     switched over to the defendant who then took over his case.

12     This was based on a representation that Rose Marks, at that

13     time known to him as Joseph Michael, was known to him as the

14     creme de la creme of psychics.  That was his testimony.

15              Again, the same things with Andrea Walker.  She was

16     first being handled by Codefendant Nancy Marks, but Nancy then

17     switched her over to Rose when Nancy claimed that things were

18     too complicated and that Joyce Michael handled the difficult

19     cases.

20              We also had the testimony of Paul Hughes who testified

21     that he dealt with Nancy Marks but he met the defendant on one

22     occasion and he was told by Nancy Marks the following, and I

23     quote this from the trial:

24              Question, had Nancy made any representations about

25     what Rose does or what type of clients that she has?

1        Answer, yes, she told me that she handled the more

2   serious cases and that she had more vast knowledge and that she

3   also instructed them with their cases kind of like -- she said

4   that she basically ran the operation.

5        And this is the transcript Volume 5, August 30, 2013

6   on page 81.

7        We also have the testimony regarding Ms. Von Bulen who

8   defense counsel disputes that she was a knowing co-conspirator.

9   But Ms. Von Bulen who testified under a grant of immunity

10  talked about this bizarre letter-writing scenario where she

11  claimed that she was being instructed by the defendant as to

12  exactly what to say in these letters and this correspondence,

13  which again, as I said earlier, went on for many, many months.

14       She claimed that she would receive these

15  correspondences from the victim, contact the defendant, would

16  read it over to -- would read this to her, and then the

17  defendant would dictate to her in sum and substance what the

18  response should be.

19       And, you know, what's interesting is defense counsel

20  portrays the defendant as basically an illiterate woman,

21  uneducated, certainly incapable of managing other people's

22  affairs or her own affairs even.  It's kind of interesting that

23  this defendant who is so illiterate and maybe does have trouble

24  as far as the internet and emails and so forth, but she was

25  engaging in a very intelligent -- as the Court remembers the

```
 1    emails and even the letter with Colin Powell -- an intelligent

 2    correspondence and communications with a writer, with an

 3    author.  And as bizarre as it was, the author believed that she

 4    was actually dealing with clients of the defendant when it was,

 5    in fact, the defendant herself.  And some of the letters, some

 6    of the emails, I remember a lot of the conversation was just

 7    very day-to-day trivial types of information discussing again

 8    with Mr. Pitt, Brad Pitt, for example, some of the

 9    correspondence had to do with the fact that he had appeared on

10    a particular TV show and he being the defendant was saying how

11    nervous he was when he was there and so forth, just very

12    ordinary conversations.

13         And the defendant again was directing Ms. Von Bulen,

14    who the Court can draw its own conclusions as to whether she's

15    a co-conspirator, I don't think Ms. Von Bulen understood the

16    entirety of this scheme.  But I think she knew enough that she

17    was writing these fictional letters to somebody.  And I

18    don't -- you know, again, the jury -- strike what the jury

19    said.  The jury found this defendant guilty and I think there's

20    a logical conclusion that Ms. Von Bulen had to know there was

21    something strange and bizarre about what she was being asked to

22    do, especially the investigative work on behalf of this

23    defendant, getting into the victim's bank account, drawing maps

24    of the victim's location, going on the internet and getting

25    personal information about the victim which she sent in a
```

1    letter to the defendant.  I think Ms.  Von Bulen was more than

2    just a innocent dupe of the defendant.

3              We also know that in addition to her directing

4    Ms. Von Bulen, the defendant had as part of her scheme, she

5    again, the third time I'm mentioning this, the changing the

6    will scenario where she convinced the victim that this woman

7    that she had chosen to take over her soul, a lady by the name

8    Cynthia Miller was going to be the recipient of her soul.  She

9    arranged, the defendant arranged to have Cynthia Miller appear

10   on several occasions.  The testimony at trial was that she met

11   her at the beach on one occasion and the victim met Cynthia

12   Miller -- the defendant brought Cynthia Miller over to her

13   apartment on another occasion and that Cynthia Miller just was

14   mute and didn't say anything and acted like a zombie and the

15   defendant explained that that's because her soul had been taken

16   from her or something along those lines.

17             Cynthia Miller, codefendant who has plead guilty,

18   didn't just show up there by coincidence.  The logic is she was

19   part of the scheme and she was directed by the defendant to

20   play her part in this portion of the scheme.

21             We also know that Don Ely and his wife Rose Marks pled

22   guilty.  Donny would accompany this defendant years back to

23   coin shops where some of the gold coins that came from victims

24   was cashed and Donny Ely would cash out gold coins on the same

25   date that this defendant would cash out gold coins.  And this

1    happened on a number of occasions.  And again, it only stands

2    to reason that Donny Ely wasn't there by coincidence but that

3    he was there by direction of this defendant to assist in

4    cashing out gold coins.

5         So I think the evidence demonstrates clearly that this

6    defendant, if not the organizer of this scheme, she was at

7    least the manager and supervisor of this offense which involved

8    five or more participants and I think it would be appropriate

9    to impose a three- or four-level increase?

10        THE COURT:  Thank you.

11        MR. SCHWARTZ:  Your Honor, before we get to the

12   question of the monetary amount, there was one thing that we

13   didn't raise.  And I guess the same way that Rose, the

14   government suggests, was brought in by her daughter or

15   daughter-in-laws because she was so good at what she did, I

16   brought Mr. Entin, my friend and former partner in, because

17   he's so good at what he did.

18        In reviewing the PSI this morning together, he pointed

19   out something to me that I missed when I made my written

20   objections, and that is that we also have an enhancement for

21   ten or more victims, that the probation department has

22   recommended to the Court in the presentence investigation

23   report.

24        Now, Rose was convicted of a conspiracy, but every

25   other defendant in the case -- I'm sorry, most of the other

1    defendants in the case pleaded guilty to a conspiracy.  And I

2    may be wrong.  Mr. Santucci would know better than I.  I

3    haven't read all of their PSIs or PSRs, but I have read most of

4    them and I think maybe one of them, Nancy, if I'm not mistaken,

5    has an enhancement for ten or more victims.  And we know that

6    Nancy personally had ten or more clients that we heard about

7    during testimony at the trial.

8        We heard about Rose only having five clients during

9    the trial that came forward, Silvia Roma, Gary Cheta, Jude

10   Deveraux, Deanna Wolf, and Andrea Walker.  So I would ask you,

11   Your Honor, at this late date to allow me to supplement my

12   objections by the one question by Mr. Entin this morning and

13   say if we are going to treat the defendants equally, why is

14   Rose the only one who had ten or more victims unless there's

15   one other that I'm missing.

16       THE COURT:  You are not disputing factually that for

17   purposes of the conspiracy there were more than ten victims in

18   the case?

19       MR. SCHWARTZ:  I believe there were more than ten

20   victims in this conspiracy.  I don't question that, Judge.  I

21   am talking about disparity under 3553 -- 56(a), I think (a)(6).

22   I just raise that point to the Court for the first time.  And

23   then I would get to the monetary amount if Your Honor wishes me

24   to do that at this point.

25       THE COURT:  I think that's all that's left.

1          MR. SCHWARTZ:  Okay.  I made a motion.  Your Honor

2     granted my motion that we get a forensic accountant to

3     determine what the records show Rose got as part of this

4     conspiracy and --

5          MR. STEFIN:  You withdrew the motion, Mr. Schwartz?

6          MR. SCHWARTZ:  I did.  I promise to get there,

7     Mr. Stefin.  You know I'm slow.

8          I had a conversation with Mr. Stefin and we agreed

9     based on his agents having already done the forensic accounting

10     of the records that the records showed approximately

11     $17.8 million going to Rose from all of the various sources

12     that we are talking about.

13          We also agreed -- so we agreed, rather than burden the

14     already overburdened CJA fund with additional expenses for

15     forensic accountants to do what had already been done, that we

16     would agree to stipulate that that was the amount that the

17     records would show with the proviso that Mr. Stefin could argue

18     that from the testimony or other sources it was more and I

19     could argue that it was less.

20          So here I am arguing that it was less than

21     $17.8 million or at least $17.8 million that Your Honor should

22     rely on from the records.

23          Ms. Deveraux testified during trial that she gave Rose

24     $20 million.  However, when asked on cross-examination how do

25     you know that, she said the detectives told her.  And that's a

```
 1    reasonable error.  They saw a lot of money coming from a lot of
 2    people and for some reason they estimated it was 20 million
 3    from Rose -- from -- I keep saying Deveraux.  I would ask Your
 4    Honor, if I say Deveraux, to take it as Montassir.  I
 5    apologize.
 6          The records show Ms. Montassir gave Ms. Marks a little
 7    more than $12 million.  But as I point out in my objections,
 8    Judge, Ms. Marks did pay taxes on some of the money she got
 9    from Ms. Montassir and she did do some, even though there is
10    allegations and the jury found that she committed fraud, she
11    also did some real work as Ms. Montassir's assistant.
12          And I cite to Your Honor a number of those things that
13    she did.  I tried to get some records from New York
14    Presbyterian Hospital recently regarding the sperm and egg
15    donation and in vitro fertilization to disprove something else
16    that Ms. Montassir said and they don't have records now.  But
17    Ms. Montassir conceded that Rose arranged for the in vitro
18    fertilization.  She helped her pick the egg donor.  She helped
19    her pick the sperm donors through pictures.  She also assisted
20    when the in vitro -- or was present with her when the in vitro
21    was done.  She assisted with the baby.  There was pictures with
22    Rose and the baby on park benches shortly after she was born.
23          We know, although Ms. Montassir said Rose stole the
24    money, that she helped her sell at least an apartment and two
25    or three houses.  And I cite to you on my objections or my
```

```
 1   supplements to the objections that Rose helped Ms. Montassir.
 2   After the baby died, she helped her have everything in the
 3   house boxed up.  She helped ship those things that Jude wanted
 4   to Florida for Jude and arranged to help sell those other
 5   things.
 6         She arranged with the funeral home to take the boy's
 7   body from the estate where Jude had lived and never wanted to
 8   see again and move it -- do an actual burial, bought a funeral
 9   plot, et cetera.  She did significant work for Jude.  She also
10   did some work for other people in giving them real advice, real
11   counseling.  Again, some of it was part of a fraud, but some of
12   it helped these people or her clients in what they were trying
13   to accomplish or achieve.
14         Mr. Cheta, who is here in the courtroom, I guess, to
15   observe, testified that -- I think he said he called Rose mom
16   on occasion and Rose's advice was very helpful in dealing with
17   the situation of the breakup with his girlfriend.
18         So I suggest to the Court that she should get some
19   credit, a few million dollars maybe, over 34 years on the
20   moneys that she received.
21         Deanna Wolf came to her because she had a husband who
22   was an alcoholic or boyfriend who was an alcoholic who had
23   commitment problems, et cetera.  And over the years that,
24   relationship got better and things worked out.  And she, I
25   believe, credited Rose with helping her with some of that.  She
```

```
1    stayed with her for 34 years.

2            So if we are going to take in -- if we are going to

3    speculate on amounts, I believe we can also speculate that

4    there was at least some significant value to the work Rose did.

5            Then we get to the question of the will.  Allegedly

6    Rose was telling Jude that the spirits are going to be

7    transferred to other people's bodies and you have to make a

8    will to Cynthia Miller so that when you die, Cynthia will get

9    the money.  And the government has even provided some

10   tabulation on how much money Jude got from some royalties

11   subsequent thereto.

12           The problems with that is there never was an executed

13   will  Jude went on the internet, I believe he testified, and

14   got some forms of wills and made out some wills.  Some of them

15   said Cynthia Miller.  Some of them said Alexandra Jude Cynthia

16   Miller or something of that sort.  One of them that I quoted

17   from Jude's -- Ms. Montassir's deposition said Cynthia

18   Reynolds.  But there was no -- there was no will signed.  There

19   was no -- there was no money transferred.  Ms. Montassir didn't

20   die.

21           I suggest to the Court that it's very, very remote to

22   say the amount of money that Ms. Deveraux eventually made from

23   her books should be charged to Rose's amount of loss or

24   prospective loss or attempted loss.

25           So I would ask Your Honor to do what you did, I
```

1   believe, with Rosey Marks and not look to what the victim said

2   in a statement she believed she had paid to Rosey Marks but

3   rather rely on the financial records that are there and can be

4   corroborated, can be checked, and find that the amount of loss

5   was $17.8 million.

6           That's a heck of a lot of money.  But a 20-point

7   enhancement is a very large enhancement.  And the difference

8   between a 22-point enhancement and a 20-point enhancement is

9   again a significant amount of money -- significant amount of

10  months.  So I would ask Your Honor to stay with what the

11  government can actually prove.  Thank you.

12          THE COURT:  Thank you.

13          MR. STEFIN:  Judge, my citation from the trial which I

14  researched before today was that on September 11, 2013 on page

15  154, Ms. Montassir, upon being questioned by defense counsel,

16  testified at trial that she thought the amount of money that

17  she paid the defendant over the years was between 17 and 20

18  million dollars.  That was her testimony.

19          And then the testimony in evidence at trial was that

20  one of the tapes that we played in a recorded telephone

21  conversation with the defendant, Ms. Montassir asserted that

22  the defendant owed her between 17 and 20 million dollars.  And

23  the defendant didn't deny that assertion, although she

24  expressed on other occasions she didn't recall exactly how much

25  the amount of money was.  It could have been 10 million.  It

1    could have been 20 million.  That's what the defendant said in

2    his conversations.  But she didn't deny the assertion that it

3    was between 17 and 20 million dollars.

4         I also cited in my response, Your Honor, and I repeat

5    that in a sidebar conference during the trial, defense counsel

6    stated that the defendant was being paid about a million

7    dollars a year.  He conceded that as part and parcel of another

8    argument that he was making.  And we also cited in our brief

9    the fact that the defendant herself according to a published

10   newspaper interview with the Sun Sentinel claimed that she had

11   been hired by the victim for a million dollars a year.

12        So the assertion by Ms. Montassir at trial that it was

13   between 17 and 20 million dollars is pretty consistent with the

14   idea that the defendant got at least $17 million a year for 17

15   years.

16        And the Court's already aware of the fact that while

17   the victim's -- Ms. Montassir's relationship with the defendant

18   began in 1991, her documentation only began around 1997.  She

19   said she had discarded those earlier records.

20        So just based on that alone, Your Honor, I think it's

21   a reasonable -- and again, the Court can make a reasonable

22   estimate of losses.  That's what the guideline states and the

23   case law.  It's not a science in this instance because although

24   we have 17.8 documented, we know that there was a lot more

25   money that was given to the defendant.  And the Court can

 1   reasonably find that it was at least $2.2 million bringing it

 2   up beyond $20 million.

 3          On top of all of that, the government then submitted

 4   the affidavit of Ms. Montassir talking about the amounts of

 5   money that she received for residuals for books that she had

 6   written, and that becomes relevant due to the fact that as part

 7   of the scheme, the defendant induced Ms. Montassir to change

 8   her will to name Cynthia Miller as the beneficiary of the will.

 9          And defense counsel claims that there was never an

10   executed will.  My recollection, and I would need to see the

11   record, but my recollection Ms. Montassir recalled signing that

12   will.  She just didn't have a copy of it.  She also didn't have

13   copies of the Colin Powell letters.  She testified about them,

14   but as we found out in cross-examination, defense counsel ended

15   producing one of those letters.  Ms. Montassir didn't have all

16   her records.  It doesn't mean they didn't exist.

17          Even if -- well, we do know from the unsigned copy and

18   we also know that Ms. Montassir had a copy of the birth

19   certificate of Cynthia Miller which she said she was given, I

20   believe, by the defendant in order to complete the correct

21   paperwork.

22          So the intended loss is something that the Court can

23   consider as well as the absolute actual losses.  And had

24   Ms. Montassir, and again, you know, we are getting into how

25   long she would have lived, but in Ms. Montassir's mind, back in

1    the beginning of 2008, she was keeping her door unlooked to the

2    hotel room because she was told by the defendant, if you recall

3    this testimony, she was told by the defendant she was going to

4    be dying very soon and make sure you keep the door unlocked so

5    we can get in and take care of your personal affairs.

6          Ms. Montassir was at the end of her mental and

7    emotional rope and all she wanted to do was die.  And she was

8    really in bad mental condition at that time, and I believe the

9    agent testified about that.

10         And I am not going to say that part of the plot was to

11   push this lady over the edge so that the will could go into

12   fruition, but this was one of the most evil, pernicious parts

13   of this trial, that they would take advantage of a lady who was

14   basically at the end of her rope and get her to change her will

15   to name the daughter-in-law of the defendant.  This victim had

16   other family elsewhere in this world, but they were going to

17   take it all, Judge.

18         And the estimated earnings as provided in the

19   affidavit Ms. Montassir submitted, and the Court can consider

20   this because affidavits are permitted in a sentencing, she

21   estimated -- well, not even estimated.  She had records,

22   according to her affidavit, in which she totaled up about

23   2.5 million, $2,557,650 just between 2009 and 2013.  And she

24   estimated for 2008 which she did not have records for was about

25   1.2 million.

1          So all and all, Your Honor, whether you take into

2     consideration the additional three and a half million dollars

3     or not, I think there's ample evidence by which this Court can

4     make a reasonable estimate that the amount of loss in this case

5     and intended loss exceeded $20 million.

6          THE COURT:  All right.  Thank you.

7          MR. SCHWARTZ:  I would just add one thing if we are

8     talking about the wills, Judge.  I did quote, and my client

9     asked me to mention to you, that from one book, there are a

10    number of other books that I quoted in my supplement where

11    Ms. Montassir uses this scenario about transferring spirits

12    from one person to another person as a story plot in her book.

13    And I asked her.  She denied it on cross.  But I did ask her

14    wasn't the whole will scenario something that you were using

15    for a story plot.  She said no, she didn't do that in her book.

16    And I cited to you and I copied as an attachment pages in her

17    book where that plot existed.

18          THE COURT:  Thank you.

19          Let me make a few rulings now regarding these

20    objections.

21          First, let's talk about the amount of loss.  I am

22    going to find that the amount of loss is the amount of

23    17.8 million, whatever the documented amount is.  I am not

24    going to rely on the testimony of Ms. Montassir as to what she

25    believed or thinks she may have provided over the years.

```
 1   Frankly, I did not find Ms. Montassir to be a very reliable
 2   witness.  And I am not going to rely on her testimony in terms
 3   of establishing the amount of loss beyond the amount that's
 4   been documented.
 5           So I believe that reduces the guidelines by two
 6   levels.  Right?
 7           THE PROBATION OFFICER:  Your Honor, the enhancement
 8   for the loss is now 20.
 9           THE COURT:  Which reduces it --
10           THE PROBATION OFFICER:  From 22.
11           THE COURT:  -- from 22.  Okay.
12           As far as the role enhancement, I'm going to find that
13   the defendant was a manager or supervisor of the coconspirators
14   in this conspiracy, involved more than five participants, and
15   therefore, she should be enhanced by three levels based upon
16   her role.
17           I think the evidence establishes that she was
18   directing the other codefendants how to funnel some of the
19   money.  And the other evidence as to other coconspirators, I
20   think was it Von Bulen, she was a participant, her testimony
21   that she didn't know -- she believed this was part of an
22   exercise in trying to develop fictional material for
23   Ms. Montassir's books, so I find that to be less than credible
24   and I believe she knew what she was doing was improper and
25   could certainly be considered a participant.
```

```
 1              But I don't believe she organized the scheme.  The way
 2    it's operated is more of a family tradition and the others all
 3    fell in line with this operation.  But I think Ms. Rose Marks
 4    managed and supervised the other participants, so a three-level
 5    increase for that rather than four.
 6              I do not believe that the conspiracy in the conduct
 7    here involves sophisticated means as meant by the guidelines.
 8    The fact that she funneled money to different accounts I don't
 9    think made this particularly sophisticated.  And the fact that
10    the representations were so outlandish that -- again, I don't
11    think the fact that you make an outlandish representation that
12    most people wouldn't or couldn't possibly believe to be true
13    makes it sophisticated.  It makes it more incomprehensible as
14    to how anyone would fall for it, but I don't believe, I don't
15    think it makes it sophisticated.  So I'm going to sustain the
16    objection to the sophisticated means.
17              Now, as far the vulnerable victims enhancement, it
18    seems to me that in order for that enhancement to apply, the
19    mental condition, and that's what the government is relying
20    upon, the mental condition of these victims has to be the basis
21    upon which the victim held this victim to the scheme.  It has
22    to be as a result of the mental condition that the defendant
23    took advantage of in order to convince the victim to fall prey
24    to the scheme.
25              And I'm certainly not a psychologist and I can't try
```

```
 1   and figure out why any rational human being would have believed

 2   any of the representations that were being made by Ms. Marks

 3   and the other codefendants, but it seems to me every one of the

 4   victims, because there were a couple victims that even the

 5   government conceded these people weren't vulnerable, there may

 6   have been a few people who had emotional or psychological

 7   issues that were pressing them at the time, but there has to be

 8   something more.

 9          There had to be something more in this case than the

10   depression or the crisis, the life crisis that one of these

11   victims was going through at the time to cause them to fall for

12   these outlandish representations.  There's something else going

13   on, something else going on within these people that would

14   cause them to fall prey to this.  And I don't believe it was

15   because Ms. Walker's husband was ill.  For that reason, that's

16   what did it.  If it wasn't for her husband being ill, she would

17   never have fallen for it, or the other ones with the same

18   situation where there were some emotional crisis that they were

19   going through at the time and but for that emotional crisis,

20   they would have never fallen victim, these people for whatever

21   reason wanted to believe these crazy stories that were being

22   told to them.  They were looking for something in their life

23   that they wanted to latch on to.  And even if they weren't

24   going through that particular crisis in my judgment, if they

25   had walked in to that shop on, I think it was 59th Street, they
```

1    would have fallen for it regardless.  It wasn't because of this

2    mental or emotional turmoil that was going on in their lives

3    that caused them to all of a sudden fall victim to this.

4    There's something else in their mental makeup, their

5    psychological makeup that caused them to just want to believe

6    in this.

7              So I don't think the enhancement is applicable.  I

8    don't believe these were vulnerable victims.  These people had

9    something else missing in their life, some other problem that

10   caused them to believe in these somewhat absurd stories that

11   were being told.  So I'm going to sustain the objection to

12   vulnerable victim enhancement as well.

13             So where does that leave us?

14             MR. SCHWARTZ:  Your Honor, I did raise ore tenus the

15   objection to ten or more victims.

16             THE COURT:  I am overruling that objection.

17             Does that take us to 32?

18             THE PROBATION OFFICER:  The total offense level is 32

19   with a criminal history category of 1.  The guideline

20   imprisonment range is 121 to 151 months.

21             THE COURT:  Thank you.

22             MR. SCHWARTZ:  Your Honor, Mr. Entin was going to talk

23   about the possible downward departure rationale, if Your Honor

24   wants to --

25             THE COURT:  The variance?

1          MR. SCHWARTZ:  The variance, yes, sir.

2          MR. ENTIN:  3553.

3          THE COURT:  Did you want to be heard first or did you

4    want to wait until after Mr. Entin spoke on what sentence I

5    should impose?

6          MR. STEFIN:  I can make a recommendation now.

7          THE COURT:  However you want to do it.  Do you want to

8    do it before or after Mr. Entin argues?

9          MR. STEFIN:  I'll go first.  Part of my dilemma is the

10   fact that I disagree with the Court's assessment on the

11   vulnerable victim, but you know, that's how it goes.

12         THE COURT:  I understand.

13         MR. STEFIN:  First of all, it goes without saying that

14   we are going to be asking for the high end of the guidelines.

15   I think the sentence even in the high end is lower than what

16   the government would have hopefully received in this particular

17   case.  Whether or not these victims were vulnerable in the

18   classic sense of the word or the way the Court understands it,

19   I think this offense, and again, not just the victims in this

20   case, but this whole scheme, basically captures people who for

21   whatever mental or emotional susceptibilities they have

22   captures them, whether you say they seek them out or they

23   separate them out from the ordinary clients who come in for

24   something like a reading that they pay for and leave, but these

25   people are the ones that -- in this case there were a number of

```
 1   instances where these people are going through mental and

 2   emotional trauma, suffering from a mental disorder.  And again,

 3   somebody who is hearing voices is mentally ill, if he's not

 4   vulnerable, then there's nobody that's vulnerable.

 5          THE COURT:  I didn't hear about that one until today.

 6   And he wasn't even, as I understand it, wasn't this defendant's

 7   client.

 8          MR. STEFIN:  He's not this defendant's client, but

 9   these were the type of people that we argue --

10          THE COURT:  All right.  But I'm not basing my ruling

11   on a victim who I never heard anything about until today and

12   who is not this defendant's victim.  So you can tell me about

13   him, but I am not going to make a ruling and enhance her

14   sentence on someone else's victim that I had no knowledge about

15   until half an hour ago.

16          MR. STEFIN:  Fair enough, Judge.  Judge, nevertheless,

17   the way this scheme would work, when they would extract large

18   sums of money from particular individuals as opposed to the

19   one-time customer, they would befriend these individuals, they

20   would make them believe that they were this person's best

21   friend, sometimes their only friend.  Part of the technique was

22   to isolate them.  You heard a number of times how they would

23   tell people, don't discuss this with anyone else because they

24   knew if this person discussed it with friends and family, they

25   would say what are you, out of your mind, sending money to a
```

```
 1    psychic.  They knew that, so they would isolate these people
 2    and the people were susceptible to being isolated.
 3          And they also -- this crime is also particularly cruel
 4    because the defendant and codefendants would do this all under
 5    the guise of religion, under the guise of spiritually.  They
 6    would pray with the victims.  They would tell them that they
 7    had special connections with the higher authorities.
 8          And when it comes to religion, people are very
 9    susceptible and very sensitive because everybody has their own
10    belief systems and they believe in a higher being.  And to be
11    told that a serious problem, a curse that's been placed on your
12    family for centuries and is cause of your problems today can be
13    fixed and we can fix it and, you know, the archangels are
14    giving us direction of how to do that, I just think that's
15    particularly cruel.
16          You know, isolating these people, being their best
17    friend, and basically all it is is just a fraud and a scam from
18    one end of the spectrum to the other.  And as I said earlier,
19    Your Honor, this is not a crime that is isolated to this
20    defendant or to this defendant's family.  This has been
21    recognized, although the average person is not aware of it,
22    there's a national association, law enforcement association,
23    that investigates and is devoted to basically these types of
24    crimes.  And they exist throughout the country.  And this has
25    been going on for many, many years in this country and
```

```
 1    throughout the world.

 2          And this case in particular has generated a fair

 3    amount of publicity.  There's been national reporting.  Some of

 4    the publicity has been generated by the defendant herself.  And

 5    I would suggest that people that are involved in this type of

 6    offense have been watching this case pretty carefully.

 7          There were several other cases that have come about in

 8    the United States recently that received publicity.  One was up

 9    in New York.  The lady went to trial.  She was convicted after

10    a short trial of defrauding two or three victims.  The story is

11    very similar to this story and I think it was like 100, 150

12    thousand dollars.  She was convicted and got a sentence in New

13    York of a 5- to 15-year sentence.

14          But I do believe that the penalty imposed in this case

15    should serve as a warning and deterrence to others, people that

16    are watching this case.  The defendant may ask for leniency.  I

17    expect she will.  And one mitigating circumstance could be the

18    argument that she's an older woman now.  She's in her 60s.

19    This is her first conviction.  But this defendant has been

20    involved in this activity for many, many years.  And the fact

21    that she has never been caught up until now or held accountable

22    for what she's been doing to these people for all these years,

23    I don't believe should be a mitigating factor, Your Honor.

24          I would ask for the high end of the guidelines which I

25    believe is 151.  Thank you.
```

```
 1            THE COURT:  Thank you.

 2            MR. ENTIN:  Judge, I have one witness before I go into

 3    my argument if that would be all right with the Court.

 4            THE COURT:  Well, let me talk to the reporter.

 5            MR. ENTIN:  Judge, you got a copy of Dr. Brannon's

 6    report.  I know that we filed it.  It was referred to in the

 7    sentencing memorandum as well indicating that Ms. Marks has a

 8    problem both with alcohol and pills as well as a gambling

 9    addiction.

10            And I have a witness that I just want to call briefly

11    with regard to the gambling addiction issue just so the Court

12    can gauge the fact that this is a real addiction, something

13    capable of being treated, and that there's redemption with

14    appropriate treatment for the addiction.

15            With the permission of the Court, may I call my

16    witness?

17            THE COURT:  If you like.

18            MR. ENTIN:  Mr. Wolf.

19            THE COURT:  Is he going to testify?

20            THE COURTROOM DEPUTY:  Please raise your right hand.

21                         MICHAEL WOLF

22    Having been first duly sworn on oath, was examined and

23    testified as follows:

24            THE COURTROOM DEPUTY:  Please take a seat state your

25    full name.
```

```
 1                        DIRECT EXAMINATION
 2   BY MR. ENTIN:
 3   Q    State your full name and present business address.
 4   A    Michael H. Wolf, 200 Southeast Sixth Street, Suite 603,
 5   Fort Lauderdale.
 6   Q    How are you employed, Michael?
 7   A    I'm an attorney.
 8   Q    How long have you been employed as an attorney?
 9   A    What year is this, about 37 years.
10   Q    Did you run into a problem in your practice in your career
11   approximately 10 to 12 years ago?
12   A    It was in the late '90s.
13   Q    And what was the problem that you ran into?
14   A    I got involved in some fraudulent activity.
15   Q    What was the causation for the fraudulent activity?
16   A    Gambling, gambling problem.
17   Q    Was it a serious addiction?
18   A    To me it was, yes.
19   Q    Does the Florida Bar have a program that addresses lawyers
20   that have addiction difficulties both with drugs or alcohol or
21   other matters?
22   A    They do.
23   Q    What is the name of that program?
24   A    Florida Lawyers' Assistance.
25   Q    Do they recognize and did they recognize at that time
```

1    gambling as an addiction?

2    A    Yes.

3    Q    And were you accepted into the program at that time?

4    A    I was.

5    Q    And as a result of being accepted in that program, were

6    you amenable to treatment to deal with the underlying causes of

7    the gambling addiction?

8    A    Yes.

9    Q    As a result of that, were you able to maintain your

10   license?

11   A    Yes.

12   Q    As a result of that, have you been able to deal with your

13   gambling problem?

14   A    Yes.

15   Q    Is it something that you have to work on every day?

16   A    It's a constant battle, sure.

17   Q    But it's a real problem?

18   A    Absolutely.

19            MR. ENTIN:  I have nothing further.

20            THE COURT:  All right.  Thank you.

21            Any cross?

22            MR. STEFIN:  (Shaking head.)

23            A JUROR:  Thank you, sir.

24            MR. ENTIN:  Judge, Mr. Stefin is correct, we are going

25   to be asking the Court for leniency under the 3553 factors.

1   And I think the most important thing to talk about right off

2   the bat is that the purpose of federal sentencing, and I think

3   it's been the purpose of federal sentencing always in the

4   guidelines and before the guidelines, was to insure honesty,

5   insure uniformity, and proportionality in federal sentencing.

6   And that's why the 3553 factors have become important.

7          The Court has told us in Gall and other cases that the

8   guidelines are not even presumptively correct.  So looking at

9   this particular case, based on the psychological reports that

10  the government has really not challenged and they have been

11  argued in every pleading that we filed --

12          MR. STEFIN:  Judge, can I just say I don't even

13  know -- were there psychological reports that were filed?

14  Because I don't recall seeing any.

15          MR. ENTIN:  I have a copy right here, Roger, of our

16  first response to the objections to presentence investigation

17  report and request for alternative sentence which was provided

18  to the government and which quoted in numerous places the

19  reports of Dr. Brannon.  I will be glad to show you a copy of

20  Dr. Brannon's report that we have here.  I am advised by

21  Mr. Schwartz that that was filed.

22          It's clear from these reports -- if Your Honor wishes

23  to read the report, we have got a copy of it here -- that --

24  and this is no excuse for an offense, Your Honor.  I want the

25  Court to understand that I'm not trying to excuse the offense.

1    But as a result of the loss of her grandchild as well as the

2    loss of her husband, what was a social drinking problem

3    exacerbated into alcoholism and pill usage and also manifested

4    itself in the gambling addiction problems that you heard so

5    much about during the trial.

6           Other than those factors, Your Honor, the fact that

7    she had the gambling, the drinking, and the pill problem, she

8    does present as a 63-year-old individual with no prior criminal

9    record at all, none.

10          And with all the task forces and federal groups that

11   are getting together to discuss this, she doesn't have a

12   traffic ticket on her criminal history.  She's had no

13   involvement with the law.

14          Now, the cases that we have read with regard to that

15   indicate that a person initially convicted for the first time

16   in their 60s has a much lower rate of recidivism than maybe a

17   younger person.

18          In addition, if it's a person who has reached a

19   certain age and also has had problems that have led to the

20   nature of the conduct, that those things can also be dealt with

21   over time and they are a factor to be considered by the Court.

22          More importantly, Judge, and I think in this case

23   something that we have to look at, other than the fact that

24   Rose Marks went to trial and Rose Marks' amount of money that

25   she took basically from one victim was significantly larger

```
 1    than any of the other people in the case, what is there to
 2    distinguish her or her conduct from that of Nancy Marks or
 3    Cynthia Miller or any of the other people that Your Honor has
 4    convicted and has sentenced?
 5          Nancy Marks received a sentence of about 45 months
 6    from Your Honor.  She got three points for accepting
 7    responsibility that my client is not entitled to.  And my
 8    client took more money, but their conduct was essentially the
 9    same.  I don't know that the dollars alone are something which
10    should be the determiner in this particular case as to whether
11    or not a sentence some 20 levels higher would be appropriate
12    vis-a-vis those factors.
13          THE COURT:  You forgot that she was an organizer or
14    supervisor of others.
15          MR. ENTIN:  Okay.  So that's another factor to take
16    into consideration as well as having not gone to trial.
17          But if you take the 45 months that you gave Nancy
18    Marks, add in three points for the responsibility that Rose
19    didn't accept, add in the three points that you gave her for
20    leadership and add an additional kicker for the additional
21    money, that's a long way from 151 months.
22          And when we look at the case law under 3553, it says
23    it should be a sentence no longer than is necessary to do three
24    things:  One, to punish the defendant; two, to deter the
25    defendant; and three, to deter other people.
```

1        I don't think a sentence three times as high as the

2   sentence that you gave Nancy Marks is necessary to punish Rose.

3   The conduct was essentially the same.

4        I don't think a sentence three times as high as Nancy

5   Marks is going to deter Rose Marks any more than a sentence

6   more similar to Nancy's and I don't know that a sentence three

7   times Nancy Marks' would deter somebody else who might be a

8   leader.

9        Your Honor, I really think in a case like this an

10  appropriate sentence would probably be something in the 70- to

11  90-month range.  It's more time than you gave Nancy Marks.  It

12  recognizes the fact that you have assigned a leadership role.

13  It recognizes the extra money.  But it also, Your Honor, takes

14  into account her age, her lack of prior criminal activity, the

15  unlikelihood of recidivism, and also takes into effect that we

16  shouldn't be penalized extraordinarily for having gone to trial

17  but should penalize that which congress indicated was the

18  appropriate penalty, which is not getting the three points for

19  acceptance of responsibility.

20       This is a serious matter.  Nobody has indicated it's

21  not a serious matter.  But in reviewing the proportionality of

22  the sentences is what -- Your Honor has to come to a conclusion

23  that what she did was three times as bad as what anybody else

24  did in this case.  And I don't think Your Honor can come to

25  that conclusion.  And therefore, a lower sentence is

```
 1    appropriately warranted.

 2           THE COURT:  Thank you.

 3           MR. SCHWARTZ:  And may I add one thing to Alvin?  At

 4    the bottom of the guidelines, it's 121 months, which is 10

 5    years and 1 month.  At the top it's 12 years and 7 months.  At

 6    her age and with her problems, we really wanted to try to get

 7    her into a prison camp as opposed to a more secure facility.

 8    And ten years seems to be the cutoff that the Bureau of Prisons

 9    utilizes for determining if somebody goes to a camp or goes to

10    a more secure facility.

11           I point that out to the Court in fashioning its

12    sentence while I again agree with Alvin that perhaps her

13    sentence should be twice that of Nancy Marks.  The other thing

14    I would mention is, based on Dr. Brannon's findings, we would

15    ask that Your Honor make a determination that she's eligible

16    for the residential drug and alcohol program.

17           THE COURT:  Anything else?

18           Ms. Marks, did you wish to say anything before I

19    pronounce sentence?

20           THE DEFENDANT:  Yes, Your Honor.

21           MR. ENTIN:  Can she sit and read it, Judge?  Is that

22    all right with you?

23           THE COURT:  Yes, that's fine.

24           THE DEFENDANT:  I have to read, Your Honor, from what

25    I wrote, please, so I don't forget what I need to tell you,
```

1   please.

2          THE COURT:  That's fine.  Take your time.  You can

3   sit.

4          THE DEFENDANT:  Thank you, Your Honor, for giving me a

5   chance to apologize to my family and my friends.  I am very

6   sorry to have lived to see the day come where I had to look at

7   my granddaughter's scared and sad eyes in jail for 90 days.

8   That in itself was a punishment to me.

9          I would like to apologize to my friends Jude, Deanna,

10  Gary, Silvia, and Andrea.  At the time I didn't realize what I

11  was doing wrong.  Now I see that I caused a lot of hurt and

12  disappointment and I lost life-long friendships because of it.

13  We grew old together and shared very intimate details of our

14  lives with one another.  Those once-in-a-lifetime friendships I

15  have lost forever and I will regret that for the rest of my

16  life.

17         I lost everything, Your Honor.  I lost control over

18  everything.  I allowed my addictions to take over.  I could not

19  accept the loss of my father, my mother, my seven-year-old

20  grandson, and my husband all at the same time.

21         I would also like to apologize to Your Honor and to

22  the government for any extra work or expense I may have caused.

23         I plead with Your Honor to allow me to spend time with

24  my grandchildren and my children.  If you can find it in your

25  heart, Your Honor, have mercy on me.  I beg you.

```
 1              THE COURT:  Thank you, ma'am.

 2         The Court has -- do we have a restitution amount or

 3    are we going to have to schedule a hearing on that?

 4              MR. STEFIN:  Judge, I think it would be based on

 5    17.8 million, but we would need a list of the victims' names

 6    because some of them were not mentioned at trial.

 7              MR. ENTIN:  Judge, you can set a date.  I think we can

 8    agree on an amount with Mr. Stefin and Mr. Bardfeld.

 9              THE COURT:  Let's pick a date.

10              MR. ENTIN:  And, of course, we would waive the

11    defendant's presence.  She's here to waive it as well for any

12    such hearing.  I think we are going to be able to work it out.

13              THE COURT:  Ms. Marks, if we have a hearing to

14    determine restitution, are you agreeing that you need not be

15    present and we can proceed without you being physically

16    present?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  All right.  Thank you.

19         The Court has considered the statements of all the

20    parties, the presentence report which contains the advisory

21    guidelines, as well as the statutory factors set forth in 18

22    U.S.C. section 3553, subsection A, subsections 1 through 7.

23         The Court will impose a sentence within and at the low

24    end of the advisory guideline range which the Court finds will

25    adequately reflect the seriousness of the offense and provide
```

1   just and reasonable punishment.

2          It is the finding the Court that the defendant is not

3   able to pay a fine as well as restitution.

4          Pursuant to the sentencing reform act of 1984, it is

5   the judgment of the Court that the defendant, Rose Marks, is

6   hereby committed to the custody of the Bureau of Prisons to be

7   imprisoned for a term of 121 months as to Counts 1, 2, 4

8   through 11, 22 -- as to all counts.

9          What's the max?

10          THE PROBATION OFFICER:  Your Honor, Counts 1, 2, 4,

11   and 5 through 11 have statutory maxes of 20 years.

12          THE COURT:  Of 20 years?

13          THE PROBATION OFFICER:  Of 20 years, so they can be

14   121 months.  And then Counts 12 and 13 have statutory maxes of

15   10 years or 120 months.  And 14 and 15 are both 0 to 3 years or

16   36 months.

17          THE COURT:  Okay.  All right.  Let me restate that.

18          The defendant is committed to the Bureau of Prisons

19   for a period of 121 months.  This term consists of 121 months

20   as to Counts 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11; 120 months as

21   to Counts 12 and 13; and 36 months as to Counts 14 and 15, all

22   terms to run concurrently.

23          It is further ordered the defendant shall pay

24   restitution in an amount to be determined at a final hearing to

25   be scheduled for May 16, 2014 at 9:30 a.m.

1          Upon release from imprisonment, defendant shall be

2     placed on supervised release for a term of three years.  The

3     term consists of three years as to Counts 1, 2, and 4 through

4     13 and one year as to Counts 14 and 15, again all terms to run

5     concurrently.

6          Within 72 hours of her release from the custody of the

7     Bureau of Prisons, the defendant shall report in person to the

8     probation office in the district where she's released.  While

9     on supervised release, the defendant shall not commit any

10    crimes, she shall be prohibited from possessing a firearm or

11    other dangerous devices, and she shall not possess a controlled

12    substance.

13         She shall cooperate in the collection of DNA, shall

14    comply with the standard conditions of supervised release that

15    have been adopted by this Court as well as the following

16    special conditions:  Substance abuse treatment, financial

17    disclosure requirement, related concern restriction and

18    permissible search as noted in part G of the presentence

19    report.

20         Defendant shall also immediately pay to the United

21    States a special assessment of $100 as to each of the counts of

22    conviction for a total of $1,400 in special assessments.

23         The total sentence is 121 months imprisonment, 3 years

24    supervised release, and $1,400 special assessment and

25    restitution to be determined.

 1            The Court also orders forfeiture of the defendant's

 2    right, title, and interest in certain property consistent with

 3    the verdict of forfeiture.  And the Court requests that the

 4    United States submit a proposed order of forfeiture within

 5    three days of this proceeding.

 6            Now that sentence has been imposed, does the defendant

 7    or her counsel object to the Court's findings of fact or the

 8    manner in which sentence was pronounced?

 9            MR. SCHWARTZ:  Your Honor, I don't object to the

10    sentence.  I have no legal objection to the sentence.  And I

11    was never quite sure what they meant by the manner, but I would

12    attest that your manner was an excellent one, Judge.

13            Can I ask a couple of more matters?

14            THE COURT:  Let me find out if the government wants to

15    state any objections for the record.

16            MR. STEFIN:  Judge, we would preserve objections to

17    our adverse guideline rulings as far as vulnerable victim,

18    sophisticated means, and loss amount.

19            MR. SCHWARTZ:  Your Honor, we would ask Your Honor to

20    recommend the federal prison camp at Alderson in West Virginia

21    for the defendant.

22            THE COURT:  What's the name of the --

23            MR. SCHWARTZ:  I believe that's the federal prison

24    camp at Alderson, A-L-D-E-R-S-O-N I believe, but I will provide

25    your courtroom deputy with the exact spelling.

 1           Second, I would ask Your Honor to consider

 2  recommending the residential drug and alcohol treatment

 3  program, the RDAP program.

 4           THE COURT:  I will make both of those recommendations.

 5           MR. SCHWARTZ:  Third, I have a notice of appeal which

 6  we are going to file, but Your Honor's already found the

 7  defendant earlier in the proceedings to be indigent for costs.

 8  I would ask Your Honor if you can waive the filing fee for the

 9  notice of appeal because she just doesn't have the money.

10           THE COURT:  I don't know if I can or not.  I assume

11  she can do it in-forma-pauperis, I guess, if she's indigent.

12           MR. SCHWARTZ:  I will do that.  It talks about the

13  judge finding the defendant was indigent, so I can rely on --

14           THE COURT:  If she's already been found indigent, I

15  will continue to find her indigent for appellate purposes.

16           MR. SCHWARTZ:  Thank you.  And I would note for the

17  record that Mr. Entin has read some of the transcript for this

18  proceeding and who is on the criminal CJA panel has volunteered

19  if Your Honor or the magistrate wishes to stay on and do the

20  appeal as a CJA counsel.

21           THE COURT:  All right.  Well, we will deal with that.

22  I'm not sure how to deal with that right now, so I'm not going

23  to make any appointments at this time.

24           MR. ENTIN:  Judge, we would also request that the

25  defendant be allowed to self-surrender.

```
 1              THE COURT:  She's already in custody.

 2              MR. ENTIN:  Pardon?

 3              THE COURT:  She's already in custody.  How would she

 4    self-surrender?  You want me to release her so she can

 5    self-surrender?

 6              MR. ENTIN:  Yes.  Mr. Bardfeld and Mr. Stefin have

 7    been attempting to help me for a couple months to get some

 8    medical treatment for the defendant that she's been unable to

 9    get.  There's been an MRI ordered of her leg which is swelled

10    up about three times its normal size.  We have called everybody

11    appropriate at FDC.  Nobody has been able to move it.  I would

12    ask even the Court to set a bond for a period of anywhere

13    between 15 and 30 days so we can resolve the medical

14    circumstances prior to her going in.

15              THE COURT:  I don't understand the prior to her going

16    in.  Are you saying that there's an agreement with the

17    government --

18              MR. ENTIN:  No, there's no agreement.

19              THE COURT:  -- that she can be released so that she

20    could have medical treatment?

21              MR. SCHWARTZ:  No.

22              MR. ENTIN:  No, the government has never agreed.  They

23    have been trying to help me get the medical treatment, but the

24    FDC has not been responsive.

25              THE COURT:  So you are also asking me to release her
```

```
 1    from custody?

 2              MR. ENTIN:  That's right.

 3              THE COURT:  Which I have already remanded her.  That's

 4    a whole different issue than self-surrendering.  In order to

 5    self-surrender, you have to be out of custody.

 6              MR. ENTIN:  I'm asking Your Honor to release her.

 7              THE COURT:  I'm not releasing her until you file a

 8    motion and you can lay out everything for me, and then I'll

 9    take it under consideration after I have heard from the

10    government.  But I am not releasing her today under any

11    circumstances and I'm not likely to release her under any

12    circumstances.  So file your motion and we will go from there.

13              Is there anything else?

14         MR. SCHWARTZ:  No, Your Honor.

15              THE COURT:  All right.  Ms. Marks, you have the right

16    to appeal both the jury's verdict, the conviction, and the

17    sentence.  If you wish to file an appeal, you must file your

18    notice of appeal within 14 days from the date judgment is

19    entered in this case.  And if you are unable to pay for the

20    cost of an appeal, you make seek leave to file the appeal

21    in-forma-pauperis, which I have already granted you the right

22    to do.  Good luck, ma'am.  Thank you.

23              MR. SCHWARTZ:  Thank you, Your Honor.  I know you have

24    no control over the marshals, but we would ask that she be sent

25    back to the Federal Detention Center at the marshals' earliest
```

```
 1   convenience.

 2           THE COURT:  Is that what's going to happen?

 3           THE MARSHAL:  Yes.

 4           THE COURT:  Thank you.

 5           MR. SCHWARTZ:  Thank you.

 6           (Thereupon, the hearing concluded at 3:53 p.m.)

 7                          - - -

 8                   C E R T I F I C A T E

 9

10           I hereby certify that the foregoing is an

11   accurate transcription of the proceedings in the

12   above-entitled matter.

13

14

15   6/4/14                s/ Tammy Nestor
                            Tammy Nestor, RPR
16                          Nestor Court Reporting, Inc.
                            tammynestor@yahoo.com
17

18

19

20

21

22

23

24

25
```